# EXHIBIT
# B



**NEW YORK**
STATE OF
OPPORTUNITY.

**Department of**
**Financial Services**

**KATHY HOCHUL**
Governor

**ADRIENNE A. HARRIS**
Superintendent

STATE OF NEW YORK

Supreme Court, County Of New York

Wesco Insurance Company

    Plaintiff(s)    655437/2024

against

CUMIS Insurance Society, Inc.

    Defendant(s)

RE :CUMIS Insurance Society, Inc.

Attorney for Plaintiff(s) and Defendant(s) please take notice as follows:

Attorney for Plaintiff(s) is hereby advised of acknowledgement of service upon this Department Summons & Complaint Electronic Filing in the above entitled action on October 28, 2024 at Albany, New York. The $40.00 fee is also acknowledged.

Original to Attorney for Plaintiff(s):

    Gunnercooke US LLP
    Max W. Gershweir, Esq.
    475 Park Avenue South - 23rd Floor
    New York, New York 10016

Pursuant to the requirement of section 1212 of the Insurance Law, Defendant(s) is hereby notified of service as effected above. A copy of the paper is enclosed.

Duplicate to Defendant:

    Faye A. Patzner, Secretary
    CUMIS Insurance Society, Inc.
    5910 Mineral Point Road P.O. Box 1084
    Madison, Wisconsin 53705

**Rawle Lewis**
**Director of Producer Licensing**

Dated Albany, New York, October 31, 2024
755244    alic0tgw

1 of 1

1

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 3 of 834

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| WESCO INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>CUMIS INSURANCE SOCIETY, INC.,<br><br>Defendant. | Index. No. 655437/2024<br><br>**NOTICE OF APPEARANCE** |

**PLEASE TAKE NOTICE** that Deborah H. Renner of Dentons US LLP hereby appears as

counsel of record for Defendant CUMIS Insurance Society, Inc. in this action.

My contact information is as follows:

Deborah H. Renner, Esq.
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 398.5793
deborah.renner@dentons.com

I respectfully request that the Clerk update the docket as indicated above.

Dated: New York, New York
     December 5, 2024

                 Respectfully submitted,

                 **DENTONS  US LLP**

                 */s/ Deborah H. Renner*
                 1221 Avenue of the Americas
                 New York, NY  10020
                 Telephone: (212) 398.5793
                 Facsimile:(212) 768.6800
                 deborah.renner@dentons.com

                 *Counsel for Defendant*
                 *CUMIS Insurance Society, Inc.*

2

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 4 of 834

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

WESCO INSURANCE COMPANY,

Plaintiff,

v.

CUMIS INSURANCE SOCIETY, INC.,

Defendant.

Index. No. 655437/2024

**ANSWER**

---

Defendant CUMIS Insurance Society, Inc. ("CUMIS"), for its Answer to the Complaint of Plaintiff Wesco Insurance Company ("Wesco"), states as follows:

1.      Wesco is a foreign corporation authorized to issue certain policies of insurance in the State of New York.

**RESPONSE:** CUMIS denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 1 of the Complaint.

2.      CUMIS is a foreign corporation authorized to issue certain policies of insurance in the State of New York.

**RESPONSE:** CUMIS admits the allegations contained in Paragraph 2 of the Complaint.

3.      At all times relevant herein, UHAB Housing Development Fund Corporation ("UHAB") owned the premises located at 2285 2nd Avenue, New York, New York (the "Premises").

**RESPONSE:** CUMIS denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 3 of the Complaint.

1

3

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 5 of 834

4.    At all times relevant herein, UHAB leased the Premises to Lower East Side People's Federal Credit Union (the "Credit Union").

**RESPONSE:** CUMIS denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 4 of the Complaint.

5.    Timothy Miller ("Miller") sued UHAB and the Credit Union in an action captioned *Timothy Miller v. UHAB Housing Development Fund Corporation, et al*., in the Supreme Court of the State of New York, Kings County, under Index No. 528913/2021 (the "Underlying Action").

**RESPONSE:** The Underlying Action speaks for itself and is the best evidence of its contents. CUMIS denies the allegations in Paragraph 5 of the Complaint to the extent they are inconsistent therewith.

6.    In the Underlying Action, Miller seeks damages for injuries he allegedly sustained on February 22, 2021, when he slipped and fell on a portion of the public sidewalk abutting the Premises, due to UHAB and the Credit Union's negligent failure to properly maintain the sidewalk.

**RESPONSE**: The filings in the Underlying Action speak for themselves and are the best evidence of Mr. Miller's allegations.  CUMIS denies the allegations of paragraph 6 of the Complaint to the extent they are inconsistent therewith.

7.    CUMIS issued to the Credit Union, as lessee of the Premises, an insurance policy numbered 004577, effective October 4, 2020, to October 4, 2021, providing commercial general liability coverage subject to the policy's terms and conditions (the "CUMIS Policy").

**RESPONSE:** CUMIS admits it issued Policy No. 004577 to Lower East Side Peoples Federal Credit Union as the named insured for the policy period of October 4, 2020, to October 4, 2021 (the "CUMIS Policy").  The CUMIS Policy speaks for itself and is the best evidence of its

2

4

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 6 of 834

terms. CUMIS denies the remaining allegations in Paragraph 7 of the Complaint to the extent they are inconsistent therewith.

8. The CUMIS Policy includes an endorsement identifying UHAB as an additional insured "with respect to `bodily injury' . . . arising out of the ownership, maintenance or use of" the Premises.

**RESPONSE:** The CUMIS Policy speaks for itself, and is the best evidence of its terms. CUMIS denies the remaining allegations of Paragraph 8 of the Complaint to the extent they are inconsistent therewith.

9. Wesco issued an insurance policy to UHAB, as the Premises owner, bearing policy number WP131595109-03, which was in effect on February 22, 2021, providing commercial general liability coverage subject to the policy's terms and conditions ("the Wesco Policy").

**RESPONSE:** CUMIS denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 9 of the Complaint.

10. Wesco, through its agents, has demanded that CUMIS defend and indemnify UHAB in the Underlying Action as an additional insured under the CUMIS Policy.

**RESPONSE:** CUMIS denies the allegations in Paragraph 10 of the Complaint.

11. CUMIS has failed to agree to defend or indemnify UHAB in the Underlying Action.

**RESPONSE:** CUMIS admits that it has no obligation to defend or indemnify UHAB in the Underlying Action under the CUMIS Policy and that it has not done so. CUMIS denies the remaining allegations of Paragraph 11 of the Complaint.

12. Wesco has defended UHAB to date in the Underlying Action due to CUMIS's failure to do so.

INDEX NO. 655437/2024
 RECEIVED NYSCEF: 12/18/2024

**RESPONSE:** CUMIS denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 12 of the Complaint.

### As and for a First Cause of Action

13.     Wesco repeats all previous allegations made herein.

**RESPONSE:** CUMIS repeats and realleges all previous responses as if fully set forth herein.

14.     UHAB and/or Wesco have complied with all conditions precedent to coverage for UHAB under the CUMIS Policy.

**RESPONSE:** Paragraph 14 alleges a legal conclusion to which no response is required. CUMIS otherwise denies the allegations contained in Paragraph 14 of the Complaint.

15.     The Underlying Action complaint's allegations raise the possibility that UHAB's liability, if any, will arise out of the ownership, maintenance or use of the Leased Premises.

**RESPONSE:** CUMIS denies the allegations in Paragraph 15 of the Complaint.

16.     Wesco is thus entitled to a judgment declaring that CUMIS has a duty to defend UHAB in the Underlying Action as an additional insured under the CUMIS Policy.

**RESPONSE:** CUMIS denies the allegations in Paragraph 16 of the Complaint.

### As and for a Second Cause of Action

17.     Wesco repeats all previous allegations made herein.

**RESPONSE:** CUMIS repeats and realleges all previous responses as if fully set forth herein.

18.     Any liability UHAB may incur in the Underlying Action will necessarily arise out of the ownership, maintenance or use of the Leased Premises.

**RESPONSE:** CUMIS denies the allegations in Paragraph 18 of the Complaint.

4

19.     Wesco is thus entitled to a judgment declaring that CUMIS has a duty to indemnify UHAB in the Underlying Action as an additional insured under the CUMIS Policy.

**RESPONSE:** CUMIS denies the allegations in Paragraph 19 of the Complaint.

### As and for a Third Cause of Action

20.     Wesco repeats all previous allegations made herein.

**RESPONSE:** CUMIS repeats and realleges all previous responses as if fully set forth herein.

21.     The coverage provided to UHAB under the Wesco Policy is excess to the coverage provided it under the CUMIS Policy as respects the Underlying Action based on the policies' respective "other insurance" clauses.

**RESPONSE:** CUMIS denies the allegations in Paragraph 21 of the Complaint.

22.     Wesco is therefore entitled to a declaratory judgment to that effect and to recover from CUMIS, as CUMIS's implied indemnitee through their relative mutual obligations to UHAB, all amounts it has incurred and will incur defending and, if necessary, indemnifying UHAB in the Underlying Action.

**RESPONSE:** CUMIS denies the allegations in Paragraph 22 of the Complaint.

### AFFIRMATIVE/ADDITIONAL DEFENSES

CUMIS hereby sets forth its separate and distinct affirmative and additional defenses to Plaintiff's Complaint. By listing any matter as an affirmative defense, CUMIS does not assume the burden of proving any matter upon which Plaintiff bears the burden of proof under applicable law. Moreover, by setting forth certain affirmative defenses below, CUMIS does not waive its right to assert additional defenses. CUMIS's investigation is ongoing and it reserves the right to

5

7

assert additional defenses that may become known to it during the course of discovery or otherwise.

## FIRST DEFENSE

The Complaint fails to state a cause of action upon which relief may be granted.

## SECOND DEFENSE

The Complaint does not assert an actual, present controversy concerning the duty to indemnify, and therefore declaratory relief is unavailable.

## THIRD DEFENSE

The Complaint requests the Court to issue an improper advisory opinion.

## FOURTH DEFENSE

Any obligation CUMIS owes to Plaintiff or its insured is defined, limited, and controlled by the express terms of the CUMIS Policy, including, but not limited to, the coverages, limits, exclusions, endorsements, conditions, definitions, and all other terms set forth in the CUMIS Policy, which are incorporated as though fully set forth herein.

## FIFTH DEFENSE

UHAB is not an additional insured under the CUMIS Policy for purposes of the Underlying Action because Timothy Miller's injuries at issue in the Underlying Action are not alleged to have arisen "out of the ownership, maintenance or use of that part of the premises" leased from UHAB to Lower East Side People's Federal Credit Union (the "Credit Union"), because such lease did not include the sidewalk on which Mr. Miller was injured. All terms of the subject lease between UHAB and the Credit Union are incorporated as though fully set forth herein.

## SIXTH DEFENSE

6

8

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 10 of 834

Upon information and belief, Plaintiff has failed to satisfy conditions precedent to this action, including failing to provide proper notice to CUMIS.

**WHEREFORE**, CUMIS demands judgment dismissing the Complaint together with the costs and disbursements of this action, and such other and further relief as this court deems just, proper, and equitable.

Dated: December 18, 2024
New York, New York

/s/ Deborah H. Renner
Deborah H. Renner
Dentons US LLP
1221 Avenue of the Americas
New York, NY  10020
(312) 876-8220
deborah.renner@dentons.com

*Counsel for Defendant CUMIS Insurance Society, Inc.*

7

9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------x
                                 :

WESCO INSURANCE COMPANY,       :    Index No.: 655437/2024

                    Plaintiff,    :    **NOTICE OF**

                               :    **MOTION**

          -against-       :

                               :

CUMIS INSURANCE SOCIETY, INC.,    :

                    Defendant.   :

----------------------------------------------------------------x

PLEASE TAKE NOTICE that upon the attached Affirmation of Max W. Gershweir dated March 6, 2025, the exhibits attached thereto, the Affirmation of Nicole Fisher dated March 6, 2025, the Memorandum of Law dated March 6, 2025, and upon all prior papers and proceedings had herein, plaintiff Wesco Insurance Company will move this Court in the Motion Submission Part, Room 130, of the Courthouse located at 60 Centre Street, New York, New York, on the 28th day of March, 2025, at 9:30 a.m. or as soon thereafter as counsel can be heard, for summary judgment pursuant to CPLR 3212 against defendant CUMIS Insurance Society, Inc.:

    a.    declaring that CUMIS has a duty to defend UHAB Housing Development Fund in an action captioned *Timothy Miller v. UHAB Housing Development Fund Corporation, et al.*, in the Supreme Court of the State of New York, Kings County, Index No. 528913/2021 ("the Underlying Action"), as an additional insured under an insurance policy issued by CUMIS bearing policy number 004577 ("the CUMIS Policy");

    b.    declaring that CUMIS has a duty to indemnify UHAB in the Underlying Action as an additional insured under the CUMIS Policy;

10

c.    declaring that UHAB's coverage under the CUMIS Policy is primary to its coverage under the policy Wesco issued to it with respect to the Underlying Action;

d.    declaring that CUMIS must reimburse Wesco for all reasonable costs Wesco has incurred defending and, if necessary, indemnifying UHAB in the Underlying Action, plus interest;

e.    setting this matter down for a hearing on the amount Wesco is entitled to recover on its claim against CUMIS for defense and indemnification costs; and for such other and further relief as may be just and proper.

Pursuant to CPLR 2214(b), answering affidavits, if any, must be served upon the undersigned at least seven days before the return date of the motion.

Dated:    New York, New York
          March 6, 2025

                              GUNNERCOOKE US LLP

                              By: _____
                                   Max W. Gershweir
                               Attorneys for Plaintiff
                              475 Park Avenue South – 23rd Floor
                              New York, New York 10016
                              646.440.8375

To:    All parties via NYSCEF

2

11

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 13 of 834

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x
                                                      :
WESCO INSURANCE COMPANY,                              :        Index No.: 655437/2024
                                                      :
                              Plaintiff,              :        **AFFIRMATION**
                                                      :
        -against-                                     :
                                                      :
CUMIS INSURANCE SOCIETY, INC.,                        :
                                                      :
                              Defendant.              :
                                                      :
-----------------------------------------------------------------x

I, Max W. Gershweir, an attorney duly licensed to practice law before the Courts of the State of New York, affirm under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding at law:

1.      I am a member of Gunnercooke US LLP, attorneys for plaintiff Wesco Insurance Company. I affirm under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding at law.

2.      I submit this affirmation in support of Wesco's motion for summary judgment pursuant to CPLR 3212 against defendant CUMIS Insurance Society, Inc.:

    a.      declaring that CUMIS has a duty to defend UHAB Housing Development Fund in an action captioned *Timothy Miller v. UHAB Housing Development Fund Corporation, et al.*, in the Supreme Court of the State of New York, Kings County, Index No. 528913/2021 ("the Underlying Action"), as an additional insured under an insurance policy issued by CUMIS bearing policy number 004577 ("the CUMIS Policy");

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 14 of 834

     b.    declaring that CUMIS has a duty to indemnify UHAB in the Underlying Action as an additional insured under the CUMIS Policy;

     c.    declaring that UHAB's coverage under the CUMIS Policy is primary to its coverage under the policy Wesco issued to it with respect to the Underlying Action;

     d.    declaring that CUMIS must reimburse Wesco for all reasonable costs Wesco has incurred defending and, if necessary, indemnifying UHAB in the Underlying Action, plus interest;

     e.    setting this matter down for a hearing on the amount Wesco is entitled to recover on its claim against CUMIS for defense and indemnification costs; and for such other and further relief as may be just and proper.

**Summary of action**

3.    This action involves a dispute over whether UHAB, a building owner insured under a commercial general liability insurance policy issued by Wesco ("the Wesco Policy"), is entitled to defense and indemnification in the Underlying Action as an additional insured under the CUMIS Policy, a commercial general liability insurance policy CUMIS issued to Lower East Side People's Federal Credit Union, UHAB's tenant.

4.    In the Underlying Action, the plaintiff, Timothy Miller, seeks damages against UHAB and Credit Union for injuries he allegedly sustained when he tripped and fell due to a defective condition on a public sidewalk abutting the premises UHAB leased to Credit Union.

2

13

**Grounds for relief**

5.      The CUMIS Policy includes an endorsement covering UHAB as an additional insured "with respect to 'bodily injury' . . . arising out of the ownership, maintenance or use of" the leased premises.

6.      Since, under well-settled New York law construing this industry-standard endorsement, a property owner's liability for injury sustained on a public sidewalk abutting the premises leased to the named insured is deemed to arise out of the ownership, maintenance or use of those premises, no matter which party is liable for the alleged condition, CUMIS is required to defend and indemnify UHAB in the Underlying Action.

7.      Moreover, since UHAB's coverage under the CUMIS Policy is primary to its coverage under the Wesco Policy based on the policies' respective "other insurance" provisions, CUMIS must reimburse Wesco in full for the reasonable amounts it spends defending and, if necessary, indemnifying UHAB in the Underlying Action.

**Exhibits**

8.      The following exhibits are attached to this affirmation:

Exhibit A:     CUMIS Policy (copy exchanged by Credit Union as an exhibit to its Supplemental Response to Notice for Discovery and Inspection dated June 20, 2023, in the Underlying Action)

Exhibit B:     Wesco Policy

Exhibit C:     Lease (copy efiled by Credit Union as an exhibit to its summary judgment motion in the Underlying Action)

Exhibit D:     Underlying Action Summons and Complaint

Exhibit E:     Miller Bill of Particulars

3

14

Exhibit F:    Miller deposition transcript

Exhibit G:    Photographs

Exhibit H:    Donkor deposition transcript

Exhibit I:    Barry-Fell deposition transcript

Exhibit J:    August 8, 2024 letter

**Conclusion**

9.    For the reasons stated more fully in the accompanying memorandum of law, the motion should be granted.

WHEREFORE, Wesco respectfully requests that this Court grant its motion in its entirety and grant such further relief as the Court deems just and proper.

Dated:    New York, New York
          March 6, 2025

_____
Max W. Gershweir

4

15

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 17 of 834

## WORD COUNT CERTIFICATION

Your affirmant certifies the word count of this Affirmation in Support contains 719 words and complies with the word count limit of Rule 202.8-b of the Uniform Civil Rules for the Supreme Court and the County Court. This word count was calculated by the word-processing system used to prepare this document.

Dated:     New York, New York
           March 6, 2025

_____
            Max W. Gershweir

16

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 18 of 834

# EXHIBIT A

**CUNA MUTUAL** GROUP

CUMIS Insurance Society, Inc.

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

031-2349-2
004577-70

| Effective Date: |
|---|
| 10/04/2020 |

## PROPERTY AND BUSINESS LIABILITY POLICY DECLARATIONS

Policy Number:
004577

Named Insured and Mailing Address:
Lower East Side Peoples Federal Credit Union
37 Avenue B
New York NY 10009 7441

Representative:
Gagne,Marc A

Policy Period: From: 10/04/2020 To: 10/04/2021 at 12:01 AM., Standard Time at your mailing address shown above until terminated.

### REASON FOR THIS DECLARATION:
Endorsement

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

| | Annual Premium |
|---|---|
| PROPERTY/EXPENSE/INCOME COVERAGES | |
| LIABILITY COVERAGES | |
| REAL ESTATE LENDING COVERAGES | |
| TERRORISM RISK INSURANCE ACT COVERAGE | |
| NY State Fire Insurance Fee- Property/Expense/Income | |

### FORM(S) AND ENDORSEMENT(S) MADE A PART OF THIS POLICY:*
### Refer To Forms Schedule

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations.

CUPOP 01 01 04 14                CUMIS Insurance Society, Inc.                LT 07/02/2021

18



**CUNA MUTUAL GROUP**

*CUMIS Insurance Society, Inc.*

Home Office:          Administrative Office:
2000 Heritage Way   5910 Mineral Point Rd
Waverly, IA 50677     Madison, WI 53705

031-2349-2
004577-70

| Effective Date: |
| --- |
| 10/04/2020 |

## PART I
## PROPERTY/EXPENSE/INCOME COVERAGES
## DECLARATIONS

Policy Number:
004577

Representative:
Gagne,Marc A

### DESCRIPTION OF PREMISES:

| Prems. No. | Bldg. No. | Location |
| --- | --- | --- |
| 1 | 1 | 37 Avenue B New York NY 10009 7441 |

**COVERAGES PROVIDED:** Insurance at the described premises applies only for coverages for which a limit of insurance is shown or for which an entry is made.

| Coverage | Limit of Insurance | Deductible | Causes of Loss Form | Inflation Guard (1) | Coinsurance |
| --- | --- | --- | --- | --- | --- |
| Business Personal Property | $364,995 | $1,000 | Special | 4% | 100% |
| Rental Income | $20,000 | | | | 100% |
| Extra Expense | $20,000 | | Special | | |
| Data Processing Equipment | $250,000 | $500 | | | 100% |
| Data Processing Extra Expense | $5,000 | | | | |

\* If the Windstorm or Hail Deductible or the Named Storm Deductible is less than the All Perils Deductible, the All Perils Deductible applies.

**MORTGAGE HOLDERS:**
**Refer To Mortgagee/Loss Payee Schedule.**

**FORM(S) AND ENDORSEMENT(S) APPLICABLE TO THIS COVERAGE PART:**
**Refer To Forms Schedule**

(1) Automatic Increase In Limit of Insurance

PART I – PROPERTY/EXPENSE/INCOME COVERAGES
CUPOP 01 01 04 14                    CUMIS Insurance Society, Inc.                    LT 07/02/2021    19



**CUMIS Insurance Society, Inc.**

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

031-2349-2
004577-70

| Effective Date: |
| --- |
| 10/04/2020 |

## PART I
## PROPERTY/EXPENSE/INCOME COVERAGES
## DECLARATIONS

Policy Number:
004577

Representative:
Gagne,Marc A

### DESCRIPTION OF PREMISES:

| Prems. No. | Bldg. No. | Location |
| --- | --- | --- |
| 2 | 1 | 134 Avenue C<br>New York NY 10009 5361 |

**COVERAGES PROVIDED:** Insurance at the described premises applies only for coverages for which a limit of insurance is shown or for which an entry is made.

| Coverage | Limit of Insurance | Deductible | Causes of Loss Form | Inflation Guard (1) | Coinsurance |
| --- | --- | --- | --- | --- | --- |
| Business Personal Property | $60,833 | $1,000 | Special | 4% | 100% |
| Data Processing Equipment | $15,000 | $500 | | | 100% |
| Data Processing Extra Expense | $5,000 | | | | |

\* If the Windstorm or Hail Deductible or the Named Storm Deductible is less than the All Perils Deductible, the All Perils Deductible applies.

**MORTGAGE HOLDERS:**
**Refer To Mortgagee/Loss Payee Schedule.**

**FORM(S) AND ENDORSEMENT(S) APPLICABLE TO THIS COVERAGE PART:**
**Refer To Forms Schedule**

(1) Automatic Increase In Limit of Insurance

PART I – PROPERTY/EXPENSE/INCOME COVERAGES
CUPOP 01 01 04 14                          CUMIS Insurance Society, Inc.                          LT 07/02/2021    20


### CUNA MUTUAL GROUP

*CUMIS Insurance Society, Inc.*

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

031-2349-2
004577-70

| Effective Date: |
| --- |
| 10/04/2020 |

## PART I
## PROPERTY/EXPENSE/INCOME COVERAGES
## DECLARATIONS

Policy Number:
004577

Representative:
Gagne,Marc A

---

### DESCRIPTION OF PREMISES:

| Prems. No. | Bldg. No. | Location |
| --- | --- | --- |
| 10 | 1 | 237 E 104th St<br>New York NY 10029 5404 |

---

**COVERAGES PROVIDED:** Insurance at the described premises applies only for coverages for which a limit of insurance is shown or for which an entry is made.

| Coverage | Limit of Insurance | Deductible | Causes of Loss Form | Inflation Guard (1) | Coinsurance |
| --- | --- | --- | --- | --- | --- |
| Business Personal Property | $60,833 | $500 | Special | 4% | 100% |
| Data Processing Equipment | $40,000 | $500 | | | 100% |

* If the Windstorm or Hail Deductible or the Named Storm Deductible is less than the All Perils Deductible, the All Perils Deductible applies.

---

**MORTGAGE HOLDERS:**
**Refer To Mortgagee/Loss Payee Schedule.**

---

**FORM(S) AND ENDORSEMENT(S) APPLICABLE TO THIS COVERAGE PART:**
**Refer To Forms Schedule**

---

(1) Automatic Increase In Limit of Insurance

PART I – PROPERTY/EXPENSE/INCOME COVERAGES
CUPOP 01 01 04 14             CUMIS Insurance Society, Inc.             LT 07/02/2021     21

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 23 of 834

 **CUNA MUTUAL** GROUP

*CUMIS Insurance Society, Inc.*

Home Office:                Administrative Office:
2000 Heritage Way       5910 Mineral Point Rd
Waverly, IA 50677         Madison, WI 53705

031-2349-2
004577-70

| Effective Date: |
| --- |
| 10/04/2020 |

## PART I
## PROPERTY/EXPENSE/INCOME COVERAGES
## DECLARATIONS

Policy Number:                                          Representative:
004577                                                       Gagne,Marc A

---

### DESCRIPTION OF PREMISES:

| Prems. No. | Bldg. No. | Location |
| --- | --- | --- |
| 11 | 1 | 2-4 St Pauls Ave |
| | | Staten Island NY 10301 3212 |

**COVERAGES PROVIDED:** Insurance at the described premises applies only for coverages for which a limit of insurance is shown or for which an entry is made.

| Coverage | Limit of Insurance | Deductible | Causes of Loss Form | Inflation Guard (1) | Coinsurance |
| --- | --- | --- | --- | --- | --- |
| Business Personal Property | $60,833 | $500 | Special | 4% | 100% |
|   * Business Personal Property - Named Storm Deductible | | 5% | | | |
| Data Processing Equipment | $40,000 | $500 | | | 100% |

\* If the Windstorm or Hail Deductible or the Named Storm Deductible is less than the All Perils Deductible, the All Perils Deductible applies.

---

**MORTGAGE HOLDERS:**
**Refer To Mortgagee/Loss Payee Schedule.**

**FORM(S) AND ENDORSEMENT(S) APPLICABLE TO THIS COVERAGE PART:**
**Refer To Forms Schedule**

(1) Automatic Increase In Limit of Insurance



## CUMIS Insurance Society, Inc.

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

031-2349-2
004577-70

| Effective Date: |
| --- |
| 10/04/2020 |

## PART I
## PROPERTY/EXPENSE/INCOME COVERAGES
## DECLARATIONS

Policy Number:
004577

Representative:
Gagne,Marc A

### DESCRIPTION OF PREMISES:

| Prems. No. | Bldg. No. | Location |
| --- | --- | --- |
| 12 | 1 | 2283-85 2nd Ave New York NY 10035 4820 |

**COVERAGES PROVIDED:** Insurance at the described premises applies only for coverages for which a limit of insurance is shown or for which an entry is made.

| Coverage | Limit of Insurance | Deductible | Causes of Loss Form | Inflation Guard (1) | Coinsurance |
| --- | --- | --- | --- | --- | --- |
| Business Personal Property | $173,680 | $500 | Special | 4% | 100% |

\* If the Windstorm or Hail Deductible or the Named Storm Deductible is less than the All Perils Deductible, the All Perils Deductible applies.

**MORTGAGE HOLDERS:**
**Refer To Mortgagee/Loss Payee Schedule.**

**FORM(S) AND ENDORSEMENT(S) APPLICABLE TO THIS COVERAGE PART:**
**Refer To Forms Schedule**

(1) Automatic Increase In Limit of Insurance

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 25 of 834



**CUNA MUTUAL GROUP**

CUMIS Insurance Society, Inc.

Home Office:                    Administrative Office:
2000 Heritage Way              5910 Mineral Point Rd
Waverly, IA 50677              Madison, WI 53705

031-2349-2
004577-70

| Effective Date: |
| --- |
| 10/04/2020 |

## PART II
## PROPERTY COVERAGES
## DECLARATIONS

Policy Number:                           Representative:
004577                                   Gagne,Marc A

For PERILS COVERED see applicable form attached.

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE |
| --- | --- | --- |
| Automated Teller Machine 100% Coinsurance | Replacement | $500 |
| Scheduled Articles See Scheduled Articles Schedule | $10,000 | $500 |
| Valuable Information | $250,000 | |

**FORM(S) AND ENDORSEMENT(S) APPLICABLE TO THIS COVERAGE PART:**
**Refer To Forms Schedule**

PART II – PROPERTY COVERAGES
CUPOP 01 01 04 14                    CUMIS Insurance Society, Inc.                    LT 07/02/2021

24

004577

**CUNA MUTUAL GROUP**

*CUMIS Insurance Society, Inc.*

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

| Effective Date: |
| --- |
| 10/04/2020 |

## PART IIA
## SCHEDULED ARTICLES COVERAGE
## SCHEDULE

Policy Number:
004577

Representative:
Gagne,Marc A

| **DESCRIPTION** | **LIMIT** |
| --- | --- |
| | $10,000 |

1998 International T-444E - VIN 8594
Garaged at 330 Tomkins Ave, Staten Island, NY 10304

**FORM(S) AND ENDORSEMENT(S) APPLICABLE TO THIS COVERAGE PART:**
**Refer To Forms Schedule**

PART IIA – SCHEDULED ARTICLES COVERAGE
CUPOP 01 01 04 14                    CUMIS Insurance Society, Inc.                    LT 07/02/2021

25

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 27 of 834



**CUNA MUTUAL GROUP**

CUMIS Insurance Society, Inc.

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

031-2349-2
004577-70

| Effective Date: |
|---|
| 10/04/2020 |

## PART III
## LIABILITY COVERAGE
## DECLARATIONS

Policy Number:
004577

Representative:
Gagne,Marc A

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| **Business Liability** | |
| Each Occurrence | $1,000,000 |
| Aggregate | $3,000,000 |
| **Medical Payments** | |
| Each Person | $5,000 |
| **Employers Liability** | |
| **Excess Liability** | |
| Each Occurrence | |
| Aggregate | |

| STATE | PREMS. NO. | CLASSIFICATION DESCRIPTION |
|---|---|---|
| New York | 1 | Premises - open to public |
| New York | 1 | Premises - occupied by employees |
| New York | 2 | Premises - open to public |
| New York | 2 | Premises - occupied by employees |
| New York | 2 | Storage Only |
| New York | 10 | Premises - open to public |
| New York | 11 | Premises - open to public |
| New York | 11 | Premises - occupied by employees |
| New York | 12 | Construction Operations - Contractor (Not Railroads) - Excluding Operations On Board Ships |

**FORM(S) AND ENDORSEMENT(S) APPLICABLE TO THIS COVERAGE PART:**
**Refer To Forms Schedule**

PART III – LIABILITY COVERAGE
CUPOP 01 01 04 14                    CUMIS Insurance Society, Inc.                    LT 07/02/2021

26



CUMIS Insurance Society, Inc.

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

031-2349-2
004577-70

| Effective Date: |
|---|
| 10/04/2020 |

## PART V
## REAL ESTATE LENDING COVERAGES
## DECLARATIONS

Policy Number:
004577

Representative:
Gagne,Marc A

| COVERAGE | LIMIT OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| Real Estate Mortgage Operations – Residential Per Mortgage | $750,000 | $10,000 |
| Real Estate Mortgage Operations – Commercial Per Mortgage | $750,000 | $10,000 |

**FORM(S) AND ENDORSEMENT(S) APPLICABLE TO THIS COVERAGE PART:**
Refer To Forms Schedule

PART V - REAL ESTATE LENDING COVERAGE
CUPOP 01 01 04 14                    CUMIS Insurance Society, Inc.                    LT 07/02/2021

27



## CUNA MUTUAL GROUP

CUMIS Insurance Society, Inc.

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

031-2349-2
004577-70

| Effective Date: |
| --- |
| 10/04/2020 |

## LOCATIONS SCHEDULE

Policy Number:
004577

Representative:
Gagne,Marc A

Lower East Side Peoples Federal Credit Union
37 Avenue B
New York NY 10009 7441

| PREMS NO. | BLDG NO. | STREET CITY ST ZIP |
| --- | --- | --- |
| 1 | 1 | 37 Avenue B<br>New York NY 10009 7441 |
| 2 | 1 | 134 Avenue C<br>New York NY 10009 5361 |
| 10 | 1 | 237 E 104th St<br>New York NY 10029 5404 |
| 11 | 1 | 2-4 St Pauls Ave<br>Staten Island NY 10301 3212 |
| 12 | 1 | 2283-85 2nd Ave<br>New York NY 10035 4820 |

Locations Schedule
CUPOP 01 01 04 14

CUMIS Insurance Society, Inc.

LT 07/02/2021

28

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:36 PM
INDEX NO. 655437/2024

NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 03/06/2025

PARTICIPATING CLAUSE
PROPERTY AND BUSINESS LIABILITY POLICY

This policy is issued by a stock company having special regulations lawfully applicable to its organization, policies or contracts of insurance of which the following shall apply to and form a part of this policy.

By virtue of this policy, the policyholder shall participate in the return of unused premiums (dividends) to the extent and on the condition determined fixed and declared by the Board of Directors in accordance with the law.

**In Witness Whereof**, this Company has executed and attested these presents; but this policy shall not be valid unless countersigned by the duly authorized Agent of this Company at the agency hereinbefore mentioned.

Assistant Secretary                              President

CUPOP 01 00 08 09                    CUMIS Insurance Society, Inc.                    Page 1 of 1
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

29

## COMMON POLICY PROVISIONS
## PROPERTY AND BUSINESS LIABILITY POLICY

## CONTENTS

**General Policy Conditions**...................................................................................................................4
Audit And Inspection
Bankruptcy Or Liquidation Proceeding
Cancellation
Concealment, Misrepresentation Or Fraud
Conformity With Statute
Control Of Property
Coverage Territory
Insurance Under Two Or More Coverages
Liberalization
Modification Of Policy Terms
No Benefit To Bailee
Nonrenewal
Other Insurance - Property And Lending Coverages
Policy Period
Premium Audit
Premiums
Separation Of Insureds
Titles Of Paragraphs
Transfer Of Your Rights And Duties Under This Policy

**Loss Conditions**...................................................................................................................................9
Abandonment
Appraisal
Arbitration Of A Property, Expense/Income Or Lending Loss
Legal Action Against Us
Loss Payment
Recovered Property
Rights To Recover From Others
The Injured Person's Duties In The Event Of A Medical Payments Loss
Your Duties In The Event Of A Liability Occurrence, Offense, Claim, Suit Or Lawsuit
Your Duties In The Event Of A Property, Lending Or Expense/Income Coverage Loss Or Damage

**Definitions** .........................................................................................................................................14
Accidental Breakdown
Accountholder
Actual Cash Value
Advertisement
Advertising Injury
Annual Aggregate Limit

CUPOP 02 00 01 18                    CUMIS Insurance Society, Inc.                    Page 1 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

30

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## CONTENTS

**Definitions** - continued
Auto
Automated Teller Machine
Automatic Sprinkler System
Bodily Injury
Bonus Payments
Borrower
Building Collapse
Business Income
By-Product Material
Communication Supply Service
Conversion
Data Processing Equipment
Data Processing Services
Dependent Business Premises
Discovered
Electronic Data
Environment
Extra Expense
Flood
Foreclosed Property
Fungus
Hazardous Properties
Hostile Fire
Impaired Property
Impairment
Insured Contract
Lack Or Insufficiency Of Insurance
Lawsuit
Leased Auto
Lending
Loading Or Unloading
Loan Servicing
Loss To Your Data Processing Operations
Loss To Your Mortgageholder's Interest
Mobile Equipment
Money
Mudflow
Non-Negotiable Securities
Nuclear Facility
Nuclear Material

CUPOP 02 00 01 18             CUMIS Insurance Society, Inc.             Page 2 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

31

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 33 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## CONTENTS

**Definitions** - continued
Nuclear Reactor
Object
Occurrence
Outstanding Loan Balance
Period Of Restoration
Personal Injury
Personal Teller Machine
Pollutants
Pollution Or Contamination
Power Supply Service
Prepaid Rent
Products-Completed Operations Hazard
Professional Service
Profit On A Sub-Lease
Property Damage
Real Estate
Real Property
Rental Income
Repossessed
Securities
Sewage Treatment Service
Soft Costs
Source Material
Special Nuclear Material
Spent Fuel
Suit
Tenant's Lease Interest
Tenant's Interest In Undamaged Improvements And Betterments
Valuable Information
Valid Insurance
Waste
Watercraft
Water Supply Service
Your Product
Your Work

CUPOP 02 00 01 18                 CUMIS Insurance Society, Inc.                 Page 3 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

32

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

All the Coverages in this Policy are subject to the following Provisions. They apply unless superseded by a more specific Provision in an individual Coverage's wording. Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy the words "you" and "your" refer to the Named Insured shown on the Declarations. The words "we," "us" and "our" refers to CUMIS Insurance Society, Inc.

Other words and phrases that appear in quotation marks have special meaning and are defined in the Policy.

## GENERAL POLICY CONDITIONS

**Audit And Inspection**

1. We may examine and audit your books and records as they relate to this Policy at any time during the Policy Period and up to three years afterward.

2. We have the right but are not obligated to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

3. Any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

4. Paragraphs 2. and 3. above apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**Bankruptcy Or Liquidation Proceeding**

Your or your estate's bankruptcy, liquidation or insolvency will not relieve us of any of our obligations under this Policy.

CUPOP 02 00 01 18                CUMIS Insurance Society, Inc.                Page 4 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

33

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 35 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**GENERAL POLICY CONDITIONS**

**Cancellation**

1. You may cancel this Policy by mailing or delivering written notice of cancellation to us.

2. If we cancel this Policy, cancellation is effective:

   a. 10 days after we mail or deliver notice of cancellation for nonpayment of premium; or

   b. 30 days after we mail or deliver notice of cancellation for any other reason.

3. When we cancel this Policy, we will mail or deliver to you, and to your agent, written notice of cancellation stating the effective date and the reason for cancellation. We will mail or deliver this notice to the last mailing address known to us. If this notice is mailed, proof of mailing will be sufficient proof of notice.

4. If this Policy is canceled by us or you, we will send you any premium refund due. If we cancel, the refund will be pro rata. If you cancel, the refund may be less than pro rata. The less than pro rata premium refund will equal 90% of the pro rata unearned premium.

**Concealment, Misrepresentation Or Fraud**

1. This entire Policy is void if whether before or after a loss you have willfully concealed or misrepresented any material fact or circumstances concerning this insurance.

2. An inadvertent error by you to disclose all hazards to us shall not invalidate coverage that is otherwise afforded under this Policy.

**Conformity With Statute**

Terms of this Policy which are in conflict with the statutes of the state where this Policy is issued are amended to conform to such statutes.

**Control Of Property**

1. Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

2. The breach of any condition of this Policy at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

CUPOP 02 00 01 18                CUMIS Insurance Society, Inc.                Page 5 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

34

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 36 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**GENERAL POLICY CONDITIONS**

### Coverage Territory

1. Coverage under this Policy applies in all parts of the world unless otherwise stated in the Coverage.

2. With respect to Liability Coverages, when claim or "suit" is brought outside the United States of America (including its territories and possessions), Puerto Rico and Canada, the following applies:

   We have the right, but not the duty, to investigate and settle such claims and to defend such "suits." In any case we elect not to investigate, settle or defend, you will investigate and defend as reasonably necessary. We have the right, but not the duty, to supervise your investigation and defense. Subject to our prior authorization, you will make settlement as we deem proper. We will reimburse you for the reasonable cost of such investigation and defense. We will reimburse you for the amount of the settlement we have authorized.

### Insurance Under Two Or More Coverages

If two or more of this Policy's Coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

### Liberalization

If we adopt any revision within 75 days prior to or during the Policy Period that would broaden the coverage under this Policy, without additional premium, the broadened coverage will immediately apply to this Policy.

### Modification Of Policy Terms

This Policy contains all the agreements between you and us concerning the insurance afforded. This Policy's terms can be amended or waived only by endorsement issued by us and made a part of this Policy.

### No Benefit To Bailee

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

### Nonrenewal

If we do not renew this Policy, we will mail or deliver to you, and to your agent, written notice of nonrenewal stating the effective date and the reason for nonrenewal. We will mail or deliver this notice to the last mailing address known to us at least 60 days prior to the end of the Policy Period. If this notice is mailed, proof of mailing will be sufficient proof of notice.

CUPOP 02 00 01 18    CUMIS Insurance Society, Inc.    Page 6 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

35

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 37 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**GENERAL POLICY CONDITIONS**

**Other Insurance - Property And Lending Coverages**

1. You may have other insurance subject to the same plan, terms, conditions and provisions as this insurance. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit Of Insurance bears to the Limits Of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in paragraph 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit Of Insurance.

**Policy Period**

We will pay for loss, damage or an "occurrence" that happens during the Policy Period shown on the Declarations.

**Premium Audit**

1. Premium shown in a Coverage as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the Policy Period is greater than the earned premium, we will return the excess to the first Named Insured.

2. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**Premiums**

1. You are responsible for payment of all premiums and will be the payee for any return premiums we pay.

2. All premiums for this Policy will be computed according to our rules, rates, rating plans, premiums and minimum premiums applicable to the Coverages provided.

3. The premiums are based on conditions existing at the beginning of the Policy Period or the last anniversary date of this Policy. We may, because of undeclared exposures or change in conditions, require an additional premium according to our rates, rules and forms in effect at the time of the change.

CUPOP 02 00 01 18        CUMIS Insurance Society, Inc.        Page 7 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

36

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 38 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**GENERAL POLICY CONDITIONS**

**Separation Of Insureds**

Except with respect to the Limits Of Insurance, this insurance applies:

1.  As if each Named Insured were the only Named Insured; and

2.  Separately to each insured against whom claim is made or "suit" is brought.

**Titles Of Paragraphs**

The titles of the various paragraphs of this Policy and endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provisions to which they relate.

**Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this Policy may not be transferred without our written consent.

CUPOP 02 00 01 18        CUMIS Insurance Society, Inc.        Page 8 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

37

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**LOSS CONDITIONS**

**Abandonment**

There can be no abandonment of any property to us.

**Appraisal**

1. If we and you disagree on the value of the property or the amount of loss, either may make written request for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   a. Pay its chosen appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

2. If there is an appraisal, it is not a confirmation of coverage. We still retain our right to assert any defenses or deny the claim.

**Arbitration Of A Property, Expense/Income Or Lending Loss**

1. If you and we disagree on whether there is any coverage under the Property, Expense/Income, or Lending Coverages, or the amount of coverage, the controversy will be settled by arbitration upon written demand of either party. Written notice must be made within 60 days after we receive proof of loss or damage. The procedure is as follows:

   a. The arbitration will be conducted in accordance with the rules of the American Arbitration Association, unless other means of conducting the arbitration are agreed to between the parties.

   b. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.

2. All parties agree to consider themselves bound by any award made by the arbitrators.

**Legal Action Against Us**

1. Property, Lending or Expense/Income Coverages:

   No person or organization may bring a legal action against us under these Coverages unless:

   a. There has been full compliance with all of the terms of the Coverage and these provisions; and

   b. The action is brought within three years after the date that the loss occurred.

CUPOP 02 00 01 18                    CUMIS Insurance Society, Inc.                    Page 9 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

38

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 40 of 834

**Legal Action Against Us** - continued

If in conflict with state statutes that allow you a certain time period for filing "suit," this provision is amended to conform to such statutes.

2.  Liability Coverages:

No person or organization has a right under these Coverages:

a.  To join us as a party or otherwise bring us into a "suit" asking for damages from you.

b.  To sue us on one of these Coverages unless all of the terms of the Coverage and these provisions have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial in a civil proceeding or arbitration or other alternative dispute resolution proceeding; but we will not be liable for damages that are not payable under the terms of one of these Coverages or that are in excess of the applicable Limit Of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**Loss Payment**

We will adjust all losses with you. We will pay you unless some other person is named in the Policy to receive payment. Payment for loss will be made within 30 days after we reach agreement with you, entry of a final judgment, or the filing of an appraisal award with us.

**Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit Of Insurance.

**Rights To Recover From Others**

If you have rights to recover all or part of any payment we have made under this Policy, those rights are transferred to us. You must do everything necessary to secure these rights. You must do nothing after a loss to impair those rights. At our request you will bring "suit" or transfer those rights to us and help us enforce them. But you may waive your rights against another party in writing prior to a loss.

CUPOP 02 00 01 18                CUMIS Insurance Society, Inc.                Page 10 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

39

## COMMON POLICY PROVISIONS
## PROPERTY AND BUSINESS LIABILITY POLICY
### LOSS CONDITIONS

**The Injured Person's Duties In The Event Of A Medical Payments Loss**

At our request, the injured person must see that the following are done:

1. Give us written proof of claim, under oath if we request, as soon as practicable.

2. Give us written authorization to allow us to obtain copies of medical reports and records.

3. Submit to examination, at our expense, by physicians of our choice as often as we reasonably require.

4. Permit us to question the injured person at such times as may be reasonably required, about any matter relating to the accident and "bodily injury." If requested, the answers must be by a signed or recorded statement.

5. Cooperate with us in the investigation or settlement of the claim.

**Your Duties In The Event Of A Liability Occurrence, Offense, Claim, Suit Or Lawsuit**

1. You must see to it that we are notified as soon as practicable of an "occurrence," offense, negligent act, error or omission which may result in a claim. To the extent possible, notice should include:

   a. How, when and where the "occurrence" or offense took place;

   b. The names and addresses of any injured persons and witnesses; and

   c. The nature and location of any injury or damage arising out of the "occurrence" or offense.

2. If a claim is made or "suit" or "lawsuit" is brought against any insured, you must immediately record the specifics of the claim, "suit" or "lawsuit" and the date received and notify us as soon as practicable.

   You must see to it that we receive written notice of the claim, "suit" or "lawsuit" as soon as practicable.

3. You and any other involved insured must:

   a. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim, "suit" or "lawsuit";

   b. Authorize us to obtain records and other information;

   c. Cooperate with us in the investigation or settlement of the claim, or defense against the "suit" or "lawsuit"; and

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 42 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**LOSS CONDITIONS**

**Your Duties In The Event Of A Liability Occurrence, Offense, Claim, Suit Or Lawsuit** - continued

d.  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

4.  No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

5.  The duty to defend does not begin until we are given notice of a "suit" or "lawsuit" and all other Conditions and duties arising under the Policy have been complied with.

**Your Duties In The Event Of A Property, Lending Or Expense/Income Coverage Loss Or Damage**

You must see that the following are done in the event of loss or damage to Covered Property:

1.  Notify the police if a law may have been broken.

2.  Give us prompt notice of the loss or damage. Include a description of the property involved. But, failure to furnish such notice or proof of loss as soon as reasonably possible will not invalidate or reduce a claim unless our rights are jeopardized.

3.  As soon as possible, give us a description of how, when and where the loss or damage occurred.

4.  Take all reasonable steps to protect the Covered Property from further damage. This will not increase the Limit Of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause Of Loss. If feasible, set the damaged property aside and in the best possible order for examination. Also, keep a record of your expenses, for consideration in the settlement of the claim.

5.  At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

6.  As often as may be reasonably required, permit us to inspect the property and records proving the loss or damage and examine your books and records.

    Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies of your books and records.

7.  If requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

CUPOP 02 00 01 18                    CUMIS Insurance Society, Inc.                    Page 12 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

41

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 43 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**LOSS CONDITIONS**

**Your Duties In The Event Of A Property, Lending Or Expense/Income Coverage Loss Or Damage** - continued

8.  Send us a signed, sworn statement of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9.  Cooperate with us in the investigation or settlement of the claim.

10. Promptly send us any legal papers or notices received concerning the loss.

11. Make no statement that will assume any obligation or admit any liability, for any loss for which we may be liable, without our consent.

12. In case of loss to "valuable information," make every reasonable effort to collect amounts owed to you.

CUPOP 02 00 01 18                    CUMIS Insurance Society, Inc.                    Page 13 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

42

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 44 of 834

**Accountholder**

"Accountholder" means any entity or natural person that has:

1. A deposit account with you; or

2. A loan account with you.

**Accidental Breakdown**

1. "Accidental breakdown" means a sudden and "accidental breakdown" of the "object" or a part of the "object." At the time the breakdown occurs, it must manifest itself by physical damage to the "object" that necessitates repair or replacement.

2. None of the following are "accidental breakdown":

   a. Depletion, deterioration, corrosion or erosion;

   b. Wear and tear;

   c. Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

   d. Breakdown of any structure or foundation supporting the "object" or any of its parts;

   e. The functioning of any safety or protective device;

   f. Lightning;

   g. Flood, unless an "accidental breakdown" results from a flood;

   h. Fire;

   i. "Accidental breakdown" caused directly or indirectly by any earth movement, earthquake, landslide, or earth sinking, rising or shifting, or volcanic eruption;

   j. Seizure or destruction of property by order of governmental authority;

   k. Nuclear reaction or radiation, or radioactive contamination, however caused;

   l. War, including undeclared or civil war;

   m. Warlike action by a military force, including action in hindering or defending against an actual or expected attack by a government, sovereign or other authority using military personnel or other agents; or

CUPOP 02 00 01 18
CUMIS Insurance Society, Inc.
Page 14 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

43

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 45 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Accidental Breakdown** - continued

    n.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**Actual Cash Value**

"Actual cash value" means the amount which it would cost to repair or replace the damaged property with one of like kind or quality, less allowance for physical deterioration and depreciation.

**Advertisement**

1.  "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

2.  For the purposes of this definition:

    a.  Notices that are published include material placed on the Internet or on similar electronic means of communication; and

    b.  Regarding websites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an "advertisement."

**Advertising Injury**

"Advertising injury" means injury other than "bodily injury," "property damage" or "personal injury" arising out of one or more of the following offenses:

1.  Oral, electronic or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

2.  Oral, electronic or written publication, in any manner, of material that violates a person's right of privacy;

3.  The use of another's advertising idea in your "advertisement"; or

4.  Infringing upon another's copyright, trade dress, symbol, service mark, collective mark, title, slogan or trademark.

**Annual Aggregate Limit**

"Annual aggregate limit" means the total amount that will be paid during one annual Policy Period, for all losses "discovered."

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 46 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Auto**

1. "Auto" means:

   a. A land motor vehicle, trailer, or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

2. However, "auto" does not include "mobile equipment."

**Automated Teller Machine**

1. "Automated teller machine" means:

   a. An electronic mechanical device which requires the use of an access card, personal identification number (PIN) or other electronic identification method to disburse "money" or accept deposits;

   b. An electronic mechanical device used for the entry of loan application information by a person applying for a loan; and

   c. A kiosk or similar structure used to house or protect the device, including fixtures, lights and signs, fences, machinery, and equipment constituting a permanent part of, or pertaining to the service of the device, kiosk or similar structure.

2. "Automated teller machine" does not include cash dispensing or cash recycling electronic devices whose operation requires the direct involvement of an employee or volunteer of a financial institution for each transaction.

3. "Automated teller machine" includes a "personal teller machine."

**Automatic Sprinkler System**

"Automatic sprinkler system" means:

1. Any automatic fire protective or extinguishing system, including connected:

   a. Sprinklers and discharge nozzles;

   b. Ducts, pipes, valves and fittings;

   c. Tanks, their component parts and supports; and

   d. Pumps and private fire protection mains.

CUPOP 02 00 01 18                    CUMIS Insurance Society, Inc.                    Page 16 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

45

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 47 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Automatic Sprinkler System** - continued

> 2. When supplied from an automatic fire protective system:
>
>   a. Non-automatic fire protective systems; and
>
>   b. Hydrants, standpipes and outlets.

**Bodily Injury**

"Bodily injury" means physical harm, sickness, or disease that is sustained by a person during the Policy Period, including death resulting from any of these. "Bodily injury" includes emotional or mental injury only if the emotional or mental injury is the direct result of physical harm, sickness or disease.

**Bonus Payments**

"Bonus payments" mean a pro rata share of the cash bonus you were required to pay at the time you entered into a lease of a location shown on the Declarations. The pro rata share will be determined by allocating the cash payment to the entire term of the lease. Only that portion of the cash bonus attributable to the unexpired term of the lease at the time of a loss will be considered a "bonus payment."

**Borrower**

"Borrower" means any individual or organization to whom or which you extend, agree to extend or refuse to extend, a loan, lease or extension of credit, or any individual or organization guaranteeing such a loan, lease or extension of credit.

**Building Collapse**

"Building Collapse" means:

1. An abrupt falling down or caving in of a building or any portion of a building with the result that the building or portion of the building cannot be occupied for its intended purposes; or

2. A building or any portion of a building that has not abruptly fallen down or caved in, but is in imminent danger of abruptly falling down or caving in, or has suffered a substantial impairment of structural integrity.

A building that is standing or any portion of a building that is standing is not considered to be in a state of "building collapse" even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion unless the building is in imminent danger of abruptly falling down or caving in or has suffered a substantial impairment of structural integrity.

CUPOP 02 00 01 18            CUMIS Insurance Society, Inc.                    Page 17 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

46

INDEX NO. 655437/2024
Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 48 of 834 RECEIVED NYSCEF: 03/06/2025

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Business Income**

"Business income" means the:

1. Net income (net profit or loss before income taxes) excluding interest of any kind and investment income that would have been earned or incurred;

2. "Rental income"; and

3. Continuing normal operating expenses, including payroll.

**By-Product Material**

"By-product material" has the meaning given it in the Atomic Energy Act of 1954 or in any amendatory law thereof.

**Communication Supply Service**

"Communication supply service" means property supplying communication service, including telephone, internet service provider (ISP), radio, microwave or television services, to a premises described on the Declarations, such as:

1. Overhead and underground communication transmission lines and distribution lines, including fiber optic transmission lines and coaxial cables;

2. Microwave radio relays except satellites; and

3. Telephone company central office switching equipment.

**Conversion**

"Conversion" means transfer of legal ownership of insured property by the "borrower" via sale, trade or disposal without your consent.

**Data Processing Equipment**

"Data processing equipment" means an electronic programmable computer that can store, retrieve and process data by means of various software programs, including a monitor, printer, other peripheral data processing hardware that provides communication, including input and output functions, or auxiliary functions such as data transmission.

**Data Processing Services**

"Data processing services" means the transformation of information on "data processing equipment" from the source format into a desired form and the subsequent processing of such information.

 CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 49 of 834

## COMMON POLICY PROVISIONS
## PROPERTY AND BUSINESS LIABILITY POLICY
## DEFINITIONS

**Dependent Business Premises**

"Dependent business premises" means premises operated by others on whom you depend to deliver materials, "data processing services" or other services to you. "Dependent business premises" does not mean "communication supply service," "power supply service," "sewage treatment service" or "water supply service."

**Discovered**

"Discovered" means the time at which you first know, or have reason to suspect a covered loss.

**Electronic Data**

"Electronic data" means any information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media that are used with electronically controlled equipment.

**Environment**

"Environment" means any person, any man-made object or feature, animals, crops or vegetation, land, bodies of water, underground water or water table supplies, air and other feature of the earth or its atmosphere, whether or not altered, developed or cultivated and whether or not owned, controlled, or occupied by the Insured; including, but not limited to any of the above.

**Extra Expense**

"Extra expense" means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property. This expense could include rental of temporary equipment or facilities and the cost of additional labor. "Extra expense" does not include the cost to repair or replace any property, or any loss to "valuable information."

**Flood**

"Flood" means a general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or two or more properties (one of which is your property) from:

1. Overflow of inland or tidal waters;

2. Unusual and rapid accumulation or runoff of surface waters from any source;

3. Mudslide or "mudflow"; or

4. Collapse or subsidence of land along the shore of a lake or similar body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels that result in a "flood" as defined in 1. above.

CUPOP 02 00 01 18                    CUMIS Insurance Society, Inc.                    Page 19 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

48

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 50 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Foreclosed Property**

"Foreclosed property" is property that you have:

1. Filed a complaint for foreclosure;

2. Perfected your right in possession;

3. Received a foreclosure judgment; or

4. Acquired through foreclosure, repossession or deed in lieu of foreclosure,

because the property was security for a loan in default that you owned or serviced.

**Fungus**

"Fungus" means any microorganism or by-product of a microorganism, including, but not limited to mold, mildew, fungi, mycotoxins and spores.

**Hazardous Properties**

"Hazardous properties" include radioactive, toxic or explosive properties.

**Hostile Fire**

"Hostile fire" means a fire that becomes uncontrollable or breaks out from where it was intended to be.

**Impaired Property**

"Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

1. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

2. You have failed to fulfill the terms of a contract or agreement,

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**Impairment**

"Impairment" means that as a result of the accidental physical loss, the value of the property is less than the "outstanding loan balance."

CUPOP 02 00 01 18                    CUMIS Insurance Society, Inc.                    Page 20 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

49

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 51 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Insured Contract**

"Insured contract" means:

1. A contract for a lease of premises;

2. A sidetrack agreement;

3. Any easement or license agreement;

4. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

5. An elevator maintenance agreement; or

6. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph 6. does not include that part of any contract or agreement that indemnifies an architect, engineer or surveyor for injury or damage arising out of:

   a. Preparing, approving, or failing to prepare or approve, maps, drawings, opinions, reports, surveys, field orders, change orders, designs or specifications; or

   b. Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage.

**Lack Or Insufficiency Of Insurance**

"Lack or insufficiency of insurance" means non-existence, inadequacy, invalidity or uncollectibility of insurance you customarily require. This includes failure of the Policy to name you as mortgagee.

**Lawsuit**

"Lawsuit" means a civil court action in which damages or other relief to which this insurance applies are alleged.

**Leased Auto**

"Leased auto" means any "auto" you lease to a lessee under a lease agreement or arrangement.

CUPOP 02 00 01 18              CUMIS Insurance Society, Inc.                    Page 21 of 34
        Includes copyrighted material of Insurance Services Office, Inc. with its permission.

                                                                                      50

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 52 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**
**DEFINITIONS**

**Lending**

"Lending" means:

1. An agreement, refusal, grant or extension of any loan, lease or extension of credit in your favor, regardless of whether the transaction is completed;

2. The restructure, termination, transfer, collection, repossession or foreclosure of any loan, lease or extension of credit originated by you;

3. "Loan servicing"; or

4. The actual or alleged violation of:

   a. The Automatic Stay of the Bankruptcy Code;

   b. The Fair Debt Collection Practices Act (15 U.S.C. Sec. 1692 et seq.) or any similar state statute; or

   c. Any federal or state unfair or deceptive practices act, statute, regulation or other law relating to an agreement, refusal, grant or extension of any loan, lease or extension of credit.

**Loading Or Unloading**

"Loading or unloading" means the handling of property:

1. After it is moved from the place where it is accepted for movement into or onto an aircraft, "watercraft" or "auto";

2. While it is in or on an aircraft, "watercraft" or "auto"; or

3. While it is being moved from an aircraft, "watercraft" or "auto" to the place where it is finally delivered,

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, "watercraft" or "auto."

**Loan Servicing**

"Loan servicing" means:

1. The servicing of a loan, lease or extension of credit (not including financing for investment banking, or leveraged or management buyouts);

2. Record keeping;

CUPOP 02 00 01 18              CUMIS Insurance Society, Inc.              Page 22 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

51

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 53 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Loan Servicing** - continued

3. Billing;

4. Disbursements of principal and interest for a loan; or

5. Credit reporting or statements of a "borrower's" creditworthiness.

**Loss To Your Data Processing Operations**

"Loss to your data processing operations" means direct damage, by a Covered Cause Of Loss under this Policy, to:

1. Property covered under "data processing equipment"; or

2. The building that houses your data processing operations, that prevents you from using the "data processing equipment."

**Loss To Your Mortgageholder's Interest**

"Loss to your mortgageholder's interest" means that:

1. The mortgagor has defaulted in payments, you have foreclosed on the mortgaged property, and applied proceeds to the mortgage balance; and

2. The value of the mortgaged property is less than the principal plus accrued interest and attorney's fees of a valid mortgage or deed of trust including accrued interest.

**Mobile Equipment**

1. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      1) Power cranes, shovels, loaders, diggers or drills; or

      2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

CUPOP 02 00 01 18                CUMIS Insurance Society, Inc.                Page 23 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

52

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 54 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Mobile Equipment** - continued

e. Vehicles not described in subparagraph 1.a., 1.b., 1.c. or 1.d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment;

2) Cherry pickers and similar devices used to raise or lower workers; or

f. Vehicles not described in subparagraph 1.a., 1.b., 1.c. or 1.d. above maintained primarily for purposes other than the transportation of persons or cargo.

2. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

a. Equipment designed primarily for:

1) Snow removal;

2) Road maintenance, but not construction or resurfacing; or

3) Street cleaning;

b. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

3. However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos."

**Money**

"Money" means currency, coins, bank notes and Federal Reserve notes, checks, drafts and share drafts.

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 55 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Mudflow**

"Mudflow" means a river of liquid and flowing mud on the surfaces of normally dry land areas, as when earth is carried by a current of water. Other earth movements, such as landslide, slope failure or a saturated soil mass moving by liquidity down a slope, are not mudflows.

**Non-Negotiable Securities**

"Non-negotiable securities" means "securities" that cannot be negotiated or converted to cash by unauthorized persons without resort to forgery.

**Nuclear Facility**

"Nuclear facility" means:

1. Any "nuclear reactor";

2. Any equipment or device designed or used for:

    a. Separating the isotopes of uranium or plutonium;

    b. Processing or utilizing "spent fuel"; or

    c. Handling, processing or packaging "waste";

3. Any equipment or device used for processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

4. Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste,"

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**Nuclear Material**

"Nuclear material" means "source material," "special nuclear material" or "by-product material."

**Nuclear Reactor**

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

CUPOP 02 00 01 18                 CUMIS Insurance Society, Inc.                 Page 25 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

54

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 56 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

### Object

"Object" means any permanently installed building machinery and equipment except:

1.  A steam heating boiler or vessel and a condensate return tank associated with the boiler or vessel;

2.  An electrical, reciprocating or rotating apparatus within or forming a part of the steam heating boiler or vessel;

3.  "Data processing equipment" unless used only to control or operate an "object";

4.  An "automated teller machine";

5.  "Electronic data";

6.  Drainage, waste or sewer piping, underground piping, including a lawn sprinkler system;

7.  Piping, valves or fittings forming a part of a sprinkler or fire suppression sprinkler system; or

8.  Piping or a vessel buried or encased in the earth, concrete or other material, whether above or below ground, or in an enclosure which does not allow access for inspection or repair.

### Occurrence

"Occurrence" means an event or series of causally related events that contribute concurrently or consecutively to loss or damage.

### Outstanding Loan Balance

1.  "Outstanding loan balance" means the balance due you on the date of loss less:

    a.  Payments which are more than 180 days past due on the date of loss;

    b.  Unearned interest, finance or carrying charges; and

    c.  Penalties or other charges which may have been added to the balance after the inception date of the loan.

2.  If two or more items of property secure the same loan, the "outstanding loan balance" is the proportionate part of the unpaid balance that the damaged property represents.

### Period Of Restoration

"Period of restoration" means the period of time beginning with the date of damage and ending when the property should be repaired, rebuilt or replaced with reasonable speed and similar quality. The expiration date of this Policy will not cut short the "period of restoration."

CUPOP 02 00 01 18                    CUMIS Insurance Society, Inc.                    Page 26 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

55

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## DEFINITIONS

### Personal Injury

"Personal injury" means injury, other than "bodily injury," "property damage" or "advertising injury" arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Malicious prosecution;

3. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that the person occupies, committed by or on behalf of you, its owner, landlord or lessor;

4. Oral, electronic or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

5. Oral, electronic or written publication, in any manner, of material that violates a person's right of privacy; or

6. Discrimination, except for any discrimination related to "lending."

### Personal Teller Machine

"Personal teller machine" means an electronic and mechanical device used by an "accountholder" to remotely communicate and interact with an employee or volunteer of a financial institution through video and audio links, whereby the employee or volunteer manipulates the devise to distribute "money" or accept deposits.

### Pollutants

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and "waste."

### Pollution Or Contamination

"Pollution or contamination" means any unclean, unsafe, damaging, injurious or unhealthful conditions arising out of the presence of "pollutants," whether permanent or transient in any "environment."

### Power Supply Service

"Power supply service" means property supplying electricity, steam or gas to a premises described on the Declarations, such as:

1. Utility generating plants;

2. Switching stations and substations;

CUPOP 02 00 01 18                    CUMIS Insurance Society, Inc.                    Page 27 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

56

INDEX NO. 655437/2024
Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 58 of 834
RECEIVED NYSCEF: 03/06/2025

**Power Supply Service** - continued

3. Transformers and overhead or underground transmission lines, including distribution lines; and

4. Pipes and pumping stations.

**Prepaid Rent**

"Prepaid rent" means a pro rata share of the rent you were required to advance at the time you entered into a lease of a location shown on the Declarations. The pro rata share will be determined by allocating the amount of the rent advanced to the entire term of the lease. Only that portion of the advance rent attributable to the unexpired term of the lease at the time of loss will be considered "prepaid rent."

**Products-Completed Operations Hazard**

1. "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work," except:

   a. Products that are still in your physical possession; or

   b. Work that has not yet been completed or abandoned.

2. "Your work" will be deemed completed at the earliest of the following times:

   a. When all of the work called for in your contract has been completed;

   b. When all of the work to be done at the site has been completed if your contract calls for work at more than one site; or

   c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

3. This hazard does not include "bodily injury" or "property damage" arising out of:

   a. The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

   b. The existence of tools, uninstalled equipment or abandoned or unused materials; or

   c. Products or operations for which the classification in this insurance or in our manual or rules includes products or completed operations.

CUPOP 02 00 01 18                     CUMIS Insurance Society, Inc.                     Page 28 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## DEFINITIONS

**Professional Service**

"Professional service" includes but is not limited to:

1. Accounting, auditing or tax services for a fee;

2. Advising, inspecting, reporting, selling, brokering, or recommending in the insured's capacity as a travel agent, insurance company, insurance consultant, insurance broker, insurance agent, financial planner or representative thereof, for fee or commission;

3. Advising, recommending, selling or brokering stocks, bonds, mutual funds or other investment instruments for a fee or commission;

4. Architect, engineer, inspection, appraisal, or investigation services for a fee;

5. Day care or child care service for a fee;

6. Health care service for a fee;

7. Legal services for a fee;

8. "Data processing services" for a fee; or

9. Selecting, obtaining or maintaining insurance, suretyship, or bonds.

**Profit On A Sub-Lease**

"Profit on a sub-lease" means a pro rata share of the net profit you would receive on a sub-lease of a location shown on the Declarations. The pro rata share will be determined by allocating the total amount of net profit to the entire term of the lease or sub-lease, whichever is shorter. Only that portion of the profit attributable to the unexpired term will be considered "profit on a sub-lease."

**Property Damage**

"Property damage" means:

1. Physical injury to tangible property, including all resulting loss of use of that property; or

2. Loss of use of tangible property that is not physically injured.

**Real Estate**

"Real estate" means:

1. Land and anything a part of or attached to the land such as a building; or

CUPOP 02 00 01 18                    CUMIS Insurance Society, Inc.                    Page 29 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

58

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 60 of 834

**Real Estate - continued**

2.  Mobile trailer homes only if intended for use as a permanent, private residence and situated on a foundation or blocks, with wheels removed so as to be rendered immobile at the time of loss.

**Real Property**

"Real property" means buildings or structures that are attached to or erected on land. "Real property" includes a mobile trailer home intended for use as a permanent, private residence and situated on a foundation or blocks with wheels removed so as to be rendered immobile at time of loss.

**Rental Income**

1.  "Rental income" means the sum of:

    a.  The total gross income you expect to receive from your tenant of the described premises as furnished and equipped by you; and

    b.  The amount of continuing charges you incur which otherwise were the legal obligation of and would be paid by your tenant.

2.  In determining the amount of loss we will consider the rental experience before the date of damage and the probable experience thereafter had no loss occurred.

**Repossessed**

"Repossessed" means that you or someone on your behalf has physical care, custody and control of the property used as collateral on a loan.

**Securities**

"Securities" means original mortgages, documents of title, evidences of debt, security agreements, money orders, certificates of deposit, stock or bond certificates, instruction to or statement of uncertificated security of a Federal Reserve Bank, and certificated security.

**Sewage Treatment Service**

"Sewage treatment service" means property used to transport sewage, waste water and waste from a premises described on the Declarations, such as:

1.  Pumping stations including holding treatment disposal facilities; and

2.  Sewer mains, sewage and waste pipes.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 61 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Soft Costs**

"Soft costs" means expenses you incur that are over and above the expenses which you would have incurred if there had been no direct physical loss or damage to Covered Property during construction. "Soft costs" include: extra construction expenses incurred in order to continue the construction and meet deadlines under construction contracts; interest on construction loans from the date of loss to the date construction is completed; "real estate" taxes or construction assessments that are attributable to the period from the date of loss to the date construction is completed; architect, engineering and consultant fees; legal and accounting fees; insurance premiums; advertising and promotional expenses; and costs and commissions attributable to the renegotiation of leases.

**Source Material**

"Source material" has the meaning given it in the Atomic Energy Act of 1954 or in any amendatory law thereof.

**Special Nuclear Material**

"Special nuclear material" has the meaning given it in the Atomic Energy Act of 1954 or any amendatory law thereof.

**Spent Fuel**

"Spent fuel" means any fuel element or fuel component, solid or liquid, that has been used or exposed to radiation in a "nuclear reactor."

**Suit**

1.  "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged.

2.  "Suit" includes:

    a.  An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    b.  Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**Tenant's Lease Interest**

"Tenant's lease interest" means the difference between the appraised rental value and the rent you would have been required to pay for the unexpired term of the lease following cancellation; or the difference between the rent you would have been required to pay for the unexpired term of the lease and the rent you are required to pay under a new lease covering the same term, whichever is less.

CUPOP 02 00 01 18                CUMIS Insurance Society, Inc.                Page 31 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

60

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 62 of 834

## COMMON POLICY PROVISIONS
## PROPERTY AND BUSINESS LIABILITY POLICY
## DEFINITIONS

**Tenant's Interest In Undamaged Improvements And Betterments**

"Tenant's interest in undamaged improvements and betterments" means the appraised value, on the date of cancellation of the lease, of fixtures, alterations, installations or additions you made to the interior of leased premises which have not been damaged and which cannot be removed.

**Valuable Information**

"Valuable information" means:

1.  Mortgage or loan documents;

2.  Accounts receivable records;

3.  Converted data, programs, or instructions used in your data processing operations, including the materials on which the data is recorded;

4.  Inscribed, microfilmed, printed or written documents, papers, ledgers, or journals;

5.  Manuscripts or records, including abstracts, books, deeds, drawings, films and maps; or

6.  Data or a virtual document stored on an optical disk or other storage media.

**Valid Insurance**

"Valid insurance" means a valid policy, or other evidence of insurance.

**Waste**

1.  "Waste" means any waste material:

    a.  Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

    b.  Resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

2.  "Waste" includes materials to be disposed of, recycled, reconditioned or reclaimed.

**Watercraft**

"Watercraft" means watercraft of any type, and their trailers, motors, parts and watercraft equipment, including electronic equipment permanently installed.

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 63 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

### Water Supply Service

"Water supply service" means property supplying water to a premises described on the Declarations, such as:

1. Pumping stations; and

2. Water mains.

### Your Product

"Your product":

1. Means:

   a. Any goods or products, other than "real property," manufactured, sold, handled, distributed or disposed of by:

      1) You;

      2) Others trading under your name; or

      3) A person or organization whose business or assets you have acquired; and

   b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

2. Includes:

   a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of any of the items included in paragraph 1. above; and

   b. The providing of or failure to provide warnings or instructions.

3. Does not include vending machines or other property rented to or located for the use of others but not sold.

### Your Work

"Your work":

1. Means:

   a. Work or operations performed by you or on your behalf; and

   b. Materials, parts or equipment furnished in connection with such work or operations.

CUPOP 02 00 01 18 CUMIS Insurance Society, Inc. Page 33 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

62

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 64 of 834

**COMMON POLICY PROVISIONS**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Your Work** - continued

2.  Includes:

    a.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of any of the items included in paragraph 1. above; and

    b.  The providing of or failure to provide warnings or instructions.

CUPOP 02 00 01 18                CUMIS Insurance Society, Inc.                Page 34 of 34
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

63

## NEW YORK ENDORSEMENT
## PROPERTY AND BUSINESS LIABILITY POLICY

This endorsement is subject to the Declarations and Common Policy Provisions, except as modified in this endorsement.

**Actual Cash Value**

The Actual Cash Value Definition in the Common Policy Provisions is replaced with the following:

1. "Actual cash value" means the lesser of the amounts that it would cost to:

    a. Repair the property to its condition immediately prior to the loss; or

    b. Replace it with an item substantially identical to the item damaged.

2. Such amount will include all monies paid or payable as sales taxes on the item repaired or replaced.

**Anti-Arson Application**

The Anti-Arson Application Condition is added to the:

Building Coverage - Special
Business Personal Property Coverage - Special
Builder's Risk Completed Value Coverage
Data Processing Operations Coverage
Automated Teller Machine Coverage

as follows:

1. When the property is subject to the Anti-Arson Application in accordance with New York Department of Financial Services Regulation No. 96, the following provisions are added:

    If you fail to return the completed, signed and affirmed anti-arson application to us:

    a. Or our agent within 45 days of the effective date of a new Policy, we will cancel the entire Policy by giving 20 days written notice to you and to the mortgageholder shown on the Declarations.

    b. Prior to the end of the Policy Period, we will cancel the Policy by giving you written notice to you and the mortgageholder shown on the Declarations at least 15 days before the effective date of cancellation.

CUPOP 02 NY 01 18                    CUMIS Insurance Society, Inc.                    Page 1 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

64

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 66 of 834

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Anti-Arson Application** - continued

2. The cancellation provisions set forth in subparts 1.a. and 1.b. above supersede any contrary provision in this Policy including this endorsement.

3. If the notice in subpart 1.a. or 1.b. above is mailed, proof of mailing will be sufficient proof of notice. Delivery of notice will be the same as mailing.

**Appraisal**

The Appraisal Loss Condition in the Common Policy Provisions is replaced with the following:

1. If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   a. Pay its chosen appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

2. If there is an appraisal, we will still retain our right to deny the claim.

**Arson Or Theft Reward**

The Arson Or Theft Reward Extension Of Coverage in the Builder's Risk Completed Value Coverage is deleted.

**Arson Reward**

The Arson Reward Extension Of Coverage in the Building Coverage - Special is deleted.

**Audit And Inspection**

The Audit And Inspection General Policy Condition in the Common Policy Provisions is replaced with the following:

1. We may examine and audit your books and records as they relate to this Policy at any time during the Policy Period and up to three years afterward. An audit to determine the final premium due or to be refunded will be completed within 180 days after the expiration date of this Policy.

2. We have the right but are not obligated to:

   a. Make inspections and surveys at any time;

CUPOP 02 NY 01 18                    CUMIS Insurance Society, Inc.                    Page 2 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

65

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 67 of 834

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Audit And Inspection** - continued

    b.  Give you reports on the conditions we find; and

    c.  Recommend changes.

3.  Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

    a.  Are safe or healthful; or

    b.  Comply with laws, regulations, codes or standards.

4.  Paragraphs 2. and 3. above apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**Cancellation**

The Cancellation General Policy Condition in the Common Policy Provisions is replaced with the following:

1.  You may cancel this Policy by mailing or delivering written notice of cancellation to us.

2.  If we cancel this Policy:

    a.  During the first 60 days this Policy is initially in effect, except for the bases for cancellation set forth in subpart 2.b. below, cancellation is effective 20 days after we provide the notice described in paragraph 3. below.

    b.  After this Policy has been in effect for 60 days unless cancelled pursuant to subpart 1.a. above, or on or after the effective date if this Policy is a renewal, cancellation is effective 15 days after we provide the notice described in paragraph 3. below for any of the following reasons:

        1)  Nonpayment of premium provided, however, that a notice of cancellation on this ground will inform you of the amount due;

        2)  Conviction of a crime arising out of acts increasing the hazard insured against;

        3)  Discovery of fraud or material misrepresentation in the obtaining of this Policy or in the presentation of a claim under this Policy;

        4)  After issuance of this Policy or after the last renewal date, discovery of an act or omission, or a violation of any Policy condition, that substantially and materially increases the hazard insured against, and that occurred subsequent to inception of the current Policy Period;

CUPOP 02 NY 01 18      CUMIS Insurance Society, Inc.      Page 3 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

66

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Cancellation** - continued

5) Material physical change in the property insured, occurring after issuance or last renewal Policy Period of this Policy, which results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the Policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or the last annual renewal Policy Period of this Policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time this Policy was issued or last renewed;

6) A determination by the superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interests of our policyholders, our creditors or the public;

7) A determination by the superintendent that the continuation of this Policy would violate, or would place us in violation of, any provision of New York Insurance law, Chapter 28; or

8) Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk or danger that you will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds, provided, however, that:

   a) A notice of cancellation on this ground will inform you in plain language that you must act within 10 days if review by the department of the ground for cancellation is desired pursuant to subpart 2.b.9)c) below;

   b) Notice of cancellation on this ground will be provided simultaneously by us to the department; and

   c) Upon written request by you made to the department within 10 days from your receipt of notice of cancellation on this ground, the department will undertake a review of the ground for cancellation to determine whether or not we have satisfied the criteria for cancellation specified in this subpart 2.b.9); if after such review the department finds no sufficient cause for cancellation on this ground, the notice of cancellation on this ground will be deemed null and void.

3. If we cancel this Policy, we will mail or deliver to you, and to your agent, written notice of cancellation stating the effective date, and the reason for cancellation. We will mail or deliver this notice to the last mailing address known to us. If this notice is mailed, proof of mailing will be sufficient proof of notice.

4. If this Policy is canceled by us or you, we will send you any premium refund due. If we cancel, the refund will be pro rata. If you cancel, the refund may be less than pro rata.

CUPOP 02 NY 01 18    CUMIS Insurance Society, Inc.    Page 4 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

67

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 69 of 834

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Concealment, Misrepresentation Or Fraud**

The Concealment, Misrepresentation Or Fraud General Policy Condition in the Common Policy Provisions is replaced with the following Fraud General Policy Condition:

We do not provide coverage for any insured who has made fraudulent statements or engaged in fraudulent conduct in connection with any loss or damage for which coverage is sought under this Policy.

**Conditional Renewal**

The Conditional Renewal Condition is added to the Common Policy Provisions as follows:

1. If we elect to renew this Policy, but with a change of limits, change in type of coverage, reduction of coverage, increased deductible, additional exclusion or upon increased premiums in excess of 10% (exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit), we will mail or deliver to you, and to your agent, written notice of conditional renewal at least 60, but not more than 120, days prior to the end of the Policy Period

   a. If this notice is mailed or delivered less than 60 days prior to the end of the Policy Period, but prior to the end of the Policy Period, coverage will remain in effect with the same terms and conditions as the expired Policy and at the lower of the current rates or prior Policy Period's rates until 60 days after the notice is mailed or delivered, unless during the extended coverage period you replace the coverage or elect to cancel in which event such cancellation will be on a pro rata premium basis.

   b. If you elect to renew on the basis of the conditional renewal notice, then such terms, conditions and rates will govern the Policy upon expiration of such 60 day extended coverage period. However, if notice was mailed or delivered at least 30 days prior to the end of the Policy Period, and you elect to renew, the terms, conditions and rates set forth in the conditional renewal notice will apply as of the renewal date.

   c. If the notice is mailed or delivered on or after the end of the Policy Period, coverage provided by this Policy will remain in effect on the same terms and conditions of the expiring Policy for another required Policy Period, and at the lower of the current rates or the prior Policy Period's rates, unless during the additional required Policy Period you replace the coverage or elect to cancel in which event such cancellation will be on a pro rata premium basis.

2. Notice will include the specific reasons for conditional renewal, including the amount of any premium increase and a description of any other changes. Notice will also advise of the availability of loss information in accordance with New York law.

CUPOP 02 NY 01 18                CUMIS Insurance Society, Inc.                Page 5 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

68

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Conditional Renewal** - continued

3.  If we elect to simply notify you that this Policy will not be renewed upon the same terms, conditions or rates; an alternative renewal notice will be mailed or delivered on a timely basis to you, and to your agent. The alternative renewal notice will advise that a second notice will be mailed or delivered at a later date indicating our intention as specified in paragraph 1. above and that coverage will continue on the same terms, conditions and rates as the expiring Policy, until the later of the expiration date or 60 days after the second notice is mailed or delivered, unless during the extended coverage period, you replace the coverage or elect to cancel in which event such cancellation will be on a pro rata premium basis.

4.  If this notice is mailed, proof of mailing will be sufficient proof of notice.

5.  For any extended coverage period provided, the Annual Aggregate Limit, as shown on the Declarations, will be increased in proportion that the extended coverage period bears to the Policy Period.

6.  The last sentence of paragraph 3.of the Limits Of Insurance Additional Condition in the Business Liability Coverage does not apply when the Policy Period is extended because we sent you an incomplete or late conditional notice.

**Coverage Territory**

The Coverage Territory General Policy Condition in the Common Policy Provisions is replaced with the following:

1.  Coverage under this Policy applies in all parts of the world unless otherwise stated in the Coverage.

2.  With respect to Liability Coverages, when claim or "suit" is brought outside the United States of America (including its territories and possessions), Puerto Rico and Canada, and we are prevented by law or otherwise, from defending you, the following applies:

    We have the right, but not the duty, to investigate and settle such claims and to defend such "suits." In any case we elect not to investigate, settle or defend, you will investigate and defend as reasonably necessary. We have the right, but not the duty, to supervise your investigation and defense. Subject to our prior authorization, you will make settlement as we deem proper. We will reimburse you for any expenses you incurred under the defense and supplementary payments provision. We will also reimburse you for the amount of the settlement we have authorized.

CUPOP 02 NY 01 18          CUMIS Insurance Society, Inc.          Page 6 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

69

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 71 of 834

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Exclusions**

The Exclusions in the Business Income Coverage is replaced with the following:

In addition to the Exclusions that apply to Business Personal Property Coverage - Special or Building Coverage - Special for the described premises, the following Exclusions apply:

1. Any "extra expense" caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration."

2. The cost to repair or replace any property.

3. Any loss caused by loss to "valuable information."

4. Any other consequential loss.

**Exclusions**

The Exclusions in the Extra Expense Coverage is replaced with the following:

In addition to the Exclusions that apply to the Business Personal Property Coverage - Special or Building Coverage - Special for the described premises, the following Exclusions apply.

Coverage does not apply to:

1. Loss of income;

2. Any "extra expense" caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration";

3. The cost to repair or replace any property;

4. Any loss caused by loss to "valuable information"; or

5. Any other consequential loss.

**Exclusions**

The Exclusions in Loss Of Rental Income Coverage is replaced with the following:

The Exclusions found in your Business Personal Property Coverage - Special and Building Coverage apply to this Coverage.

CUPOP 02 NY 01 18                    CUMIS Insurance Society, Inc.                    Page 7 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

70

## NEW YORK ENDORSEMENT
## PROPERTY AND BUSINESS LIABILITY POLICY

**Fungus**

The Fungus Definition in the Common Policy Provisions is replaced with the following:

"Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**Fungus**

The Fungus Concurrent Policy Exclusion in the Builder's Risk Completed Value Coverage is deleted.

**Fungus, Wet Rot, Dry Rot And Bacteria**

The Fungus, Wet Rot, Dry Rot And Bacteria Concurrent Policy Exclusion in the:

Building Coverage - Special
Business Personal Property Coverage - Special
Data Processing Operations Coverage
Real Estate Mortgage Operations Coverage

is deleted.

**Fungus, Wet Rot And Dry Rot**

The Fungus, Wet Rot And Dry Rot Other Policy Exclusion is added to:

Builder's Risk Completed Value Coverage
Building Coverage - Special
Business Personal Property Coverage - Special
Data Processing Operations Coverage
Real Estate Mortgage Operations Coverage

as follows:

We will not pay for loss or damage caused by or resulting from "fungus," wet rot or dry rot. However, this Exclusion does not apply when "fungus," wet rot or dry rot results from a Covered Cause of Loss.

**Fungus, Wet Rot, Dry Rot And Bacteria Clean Up And Removal**

The Fungus, Wet Rot, Dry Rot And Bacteria Clean Up And Removal Additional Coverage in the:

Builder's Risk Completed Value Coverage
Building Coverage - Special
Business Personal Property Coverage - Special

CUPOP 02 NY 01 18              CUMIS Insurance Society, Inc.              Page 8 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

71

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 73 of 834

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Fungus, Wet Rot, Dry Rot And Bacteria Clean Up And Removal** – continued

is replaced with the following:

1. We will pay the costs you incur to clean up, remove, restore or replace Covered Property because of direct physical loss or damage caused by the presence of "fungus," wet or dry rot or bacteria at a building described on the Declarations.

2. This Additional Coverage does not apply to any cost incurred to test for or detect the presence of "fungus," wet or dry rot or bacteria, unless this cost is incurred after completion of clean up, removal, restoration or replacement of Covered Property to confirm that "fungus," wet or dry rot or bacteria is no longer present.

3. This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

4. The Additional Coverage applies only under the Policy in effect at the time "fungus," wet or dry rot or bacteria is first "discovered" at a building described on the Declarations. The renewal of this Policy will not increase the total amount of coverage.

**Legal Action Against Us**

The Legal Action Against Us Loss Condition in the Common Policy Provisions is replaced with the following:

1. Property, Lending or Expense/Income Coverages:

   No person or organization may bring a legal action against us under these Coverages unless:

   a. There has been full compliance with all of the terms of the Coverage and these provisions; and

   b. The action is brought within three years after the date that the loss occurred.

   If in conflict with state statutes that allow you a certain time period for filing "suit," this provision is amended to conform to such statutes.

2. Liability Coverages:

   a. No person or organization has a right under these Coverages:

      1) To join us as a party or otherwise bring us into a "suit" asking for damages from you.

      2) To sue us on one of these Coverages unless all of the terms of the Coverage and these provisions have been fully complied with.

CUPOP 02 NY 01 18                CUMIS Insurance Society, Inc.                Page 9 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

72

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 74 of 834

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Legal Action Against Us** - continued

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of one of these Coverages or that are in excess of the applicable Limit Of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

b.  With respect to "bodily injury" and personal injury claims, if we deny coverage or do not admit liability because an insured or the injured person, someone acting for the injured person or other claimant fails to give us written notice as soon as practicable, then the injured person, someone acting for the injured person or other claimant may bring an action against us, provided the sole question is whether the denial of coverage or nonadmission of liability is based on the failure to provide timely notice.

However, the injured person, someone acting for the injured person or other claimant may not bring an action if within 60 days after we deny coverage or do not admit liability, we or an insured:

1)  Brings an action to declare the rights of the parties under the Policy; and

2)  Names the injured person, someone acting for the injured person or other claimant as a party to the action.

**Loading Or Unloading**

The Loading Or Unloading Definition in the Common Policy Provisions is deleted.

**Nonrenewal**

The Nonrenewal General Policy Condition in the Common Policy Provisions is replaced with the following:

1.  If we do not renew this Policy, we will mail or deliver to you, and to your agent, written notice of nonrenewal stating the effective date and the reason for nonrenewal. Notice will also advise of the availability of loss information in accordance with New York law. We will mail or deliver this notice to the last mailing address known to us at least 60, but not more than 120, days prior to the end of the Policy Period.

2.  If this notice is mailed or delivered less than 60 days prior to the end of the Policy Period, but prior to the end of the Policy Period, coverage will remain in effect with the same terms and conditions as the expired Policy and at the lower of the current rates or prior Policy Period's rates until 60 days after the notice is mailed or delivered, unless during the extended coverage period, you replace the coverage or elect to cancel in which event such cancellation will be on a pro rata premium basis.

CUPOP 02 NY 01 18                    CUMIS Insurance Society, Inc.                    Page 10 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

73

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Nonrenewal** - continued

3. If the notice is mailed or delivered on or after the end of the Policy Period, coverage provided by this Policy will remain in effect on the same terms and conditions of the expiring Policy for another required Policy Period and at the lower of the current rates or the prior Policy Period's rates, unless during the additional required Policy Period, you replace the coverage or elect to cancel, in which event such cancellation will be on a pro rata premium basis.

4. If we elect to simply notify you that this Policy will not be renewed, an alternative renewal notice will be mailed or delivered on a timely basis to you and your agent. The alternative renewal notice will advise that a second notice will be mailed or delivered at a later date indicating our intention as specified in paragraph 1. above and that coverage will continue on the same terms, conditions and rates as the expiring Policy, until the later of the expiration date or 60 days after the second notice is mailed or delivered, unless during the extended coverage period, you replace the coverage or elect to cancel in which event such cancellation will be on a pro rata premium basis.

5. If this notice is mailed, proof of mailing will be sufficient proof of notice.

6. For any extended coverage period as provided in paragraph 2. above, the Annual Aggregate Limit as shown on the Declarations, will be increased in proportion that the extended coverage period bears to the Policy Period.

7. The last sentence of paragraph 3.of the Limits Of Insurance Additional Condition in the Business Liability Coverage does not apply when the Policy Period is extended because we sent you a late nonrenewal notice.

**Personal Injury**

The Personal Injury Definition is added to the Business Liability Coverage as follows:

"Personal injury" means injury, including consequential "bodily injury," other than "property damage" or "advertising injury" arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Malicious prosecution;

3. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that the person occupies, committed by or on behalf of you, its owner, landlord or lessor;

4. Oral, electronic or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

5. Oral, electronic or written publication, in any manner, of material that violates a person's right of privacy; or

CUPOP 02 NY 01 18 CUMIS Insurance Society, Inc. Page 11 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

74

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:36 PM INDEX NO. 655437/2024
NYSCEF DOC. NO. 7 Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 76 of 834 RECEIVED NYSCEF: 03/06/2025

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Personal Injury** - continued

6. Discrimination, except for any discrimination related to "lending."

**Pollutants**

The Pollutants Definition in the Pollution Clean Up And Removal Increased Limits Endorsement is replaced with the following:

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and "waste."

**Premium Audit**

The Premium Audit General Policy Condition in the Common Policy Provisions is replaced with the following:

1. Premium shown in a Coverage as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. An audit to determine the final premium due or to be refunded will be completed within 180 days after the expiration date of this Policy. But the audit may be waived if the total annual premium attributable to the auditable exposure base is not reasonably expected to exceed $1500. If the sum of the advance and audit premiums paid for the Policy Period is greater than the earned premium, we will return the excess to the first Named Insured.

2. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**Robbery Reward**

The Robbery Reward Extension Of Coverage in the Automated Teller Machine Coverage is deleted.

**The Injured Person's Duties In The Event Of A Medical Payments Loss**

The Injured Person's Duties In The Event Of A Medical Payments Loss, Loss Condition in the Common Policy Provisions is replaced with the following:

At our request, the injured person must see that the following are done:

1. Give us written proof of claim, under oath if we request, as soon as reasonably possible.

2. Give us written authorization to allow us to obtain copies of medical reports and records.

3. Submit to examination, at our expense, by physicians of our choice as often as we reasonably require.

CUPOP 02 NY 01 18                     CUMIS Insurance Society, Inc.                     Page 12 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

75

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**The Injured Person's Duties In The Event Of A Medical Payments Loss** - continued

4. Permit us to question the injured person at such times as may be reasonably required, about any matter relating to the accident and "bodily injury." If requested, the answers must be by a signed or recorded statement.

5. Cooperate with us in the investigation or settlement of the claim.

**Your Duties In The Event Of A Liability Occurrence, Offense, Claim, Suit Or Lawsuit**

The Your Duties In The Event Of A Liability Occurrence, Claim, Suit Or Lawsuit Loss Condition in the Common Policy Provisions is replaced with the following:

1. You must see to it that we are notified as soon as reasonably possible of an "occurrence," offense, negligent act, error or omission which may result in a claim. To the extent possible, notice should include:

   a. How, when and where the "occurrence" or offense took place;

   b. The names and addresses of any injured persons and witnesses; and

   c. The nature and location of any injury or damage arising out of the "occurrence" or offense.

2. Notice given by or on behalf of you, or written notice by or on behalf of the injured person or any other claimant, to any agent of ours in New York, that adequately identifies you, will be the same as notice to us.

3. If a claim is made or "suit" or "lawsuit" is brought against any insured, you must as soon as reasonably possible record the specifics of the claim, "suit" or "lawsuit" and the date received and notify us as soon as reasonably possible.

   You must see to it that we receive written notice of the claim, "suit" or "lawsuit" as soon as reasonably possible.

4. You and any other involved insured must:

   a. As soon as reasonably possible send us copies of any demands, notices, summonses or legal papers received in connection with the claim, "suit" or "lawsuit";

   b. Authorize us to obtain records and other information;

   c. Cooperate with us in the investigation or settlement of the claim, or defense against the "suit" or "lawsuit"; and

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

d.  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**Your Duties In The Event Of A Liability Occurrence, Offense, Claim, Suit Or Lawsuit** - continued

5.  No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

6.  The duty to defend does not begin until we are given notice of a "suit" or "lawsuit" and all other Conditions and duties arising under the Policy have been complied with.

7.  Failure to give notice to us, as required under this Loss Condition, will not invalidate any claim made by you, the injured person or any other claimant, unless the failure to provide such timely notice has prejudiced us. However, no claim made by you or any other claimant will be invalidated if it will be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

**Your Duties In The Event Of A Property, Lending Or Expense/Income Coverage Loss Or Damage**

The Your Duties In The Event Of A Property, Lending Or Expense/Income Coverage Loss Or Damage Loss Condition in the Common Policy Provisions is replaced with the following:

You must see that the following are done in the event of loss or damage to Covered Property:

1.  Notify the police if a law may have been broken.

2.  Give us notice as soon as practicable of the loss or damage. Include a description of the property involved. But, failure to furnish such notice or proof of loss as soon as practicable will not invalidate or reduce a claim unless our rights are jeopardized.

3.  Notice given by or on behalf of you, or written notice by or on behalf of any claimant, to any agent of ours in New York, that adequately identifies you, will be the same as notice to us.

4.  As soon as possible, give us a description of how, when and where the loss or damage occurred.

5.  Take all reasonable steps to protect the Covered Property from further damage. This will not increase the Limit Of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause Of Loss. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses, for consideration in the settlement of the claim.

6.  At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

7.  As often as may be reasonably required, permit us to inspect the property and records proving the loss or damage and examine your books and records.

CUPOP 02 NY 01 18    CUMIS Insurance Society, Inc.    Page 14 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

77

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:36 PM
INDEX NO. 655437/2024
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 03/06/2025

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 79 of 834

NEW YORK ENDORSEMENT
PROPERTY AND BUSINESS LIABILITY POLICY

Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies of your books and records.

**Your Duties In The Event Of A Property, Lending Or Expense/Income Coverage Loss Or Damage** - continued

8.  If requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

9.  Send us a signed, sworn statement of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

10. Cooperate with us in the investigation or settlement of the claim.

11. As soon as reasonably possible send us any legal papers or notices received concerning the loss.

12. Make no statement that will assume any obligation or admit any liability, for any loss for which we may be liable, without our consent.

13. In case of loss to "valuable information," make every reasonable effort to collect amounts owed to you.

14. Failure to give notice to us, as required under this Loss Condition, will not invalidate any claim made by you or any other claimant, unless the failure to provide such timely notice has prejudiced us. However, no claim made by you or any other claimant will be invalidated if it will be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

**Your Duties In Event Of A Loss**

The Your Duties In Event Of A Loss, Loss Condition in the Foreclosed Building Coverage is replaced with the following:

You must see that the following are done in the event of loss or damage to Covered Property:

1.  Notify the police if a law may have been broken.

2.  Give us notice as soon as practicable of the loss or damage. Include a description of the property involved. But, failure to furnish such notice or proof of loss as soon as reasonably possible will not invalidate or reduce a claim unless our rights are jeopardized.

3.  Notice given by or on behalf of you, or written notice by or on behalf of any claimant, to any agent of ours in New York, that adequately identifies you, will be the same as notice to us.

CUPOP 02 NY 01 18                     CUMIS Insurance Society, Inc.                     Page 15 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 80 of 834

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

4.  As soon as possible, give us a description of how, when and where the loss or damage occurred.

**Your Duties In Event Of A Loss** - continued

5.  Take all reasonable steps to protect the Covered Property from further damage. This will not increase the Limit Of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause Of Loss. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses, for consideration in the settlement of the claim.

6.  At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

7.  As often as may be reasonably required, permit us to inspect the property and records proving the loss or damage and examine your books and records. Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies of your books and records.

8.  If requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

9.  Send us a signed, sworn statement of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

10. Cooperate with us in the investigation or settlement of the claim.

11. As soon as reasonably possible send us any legal papers or notices received concerning the loss.

12. Make no statement that will assume any obligation or admit any liability, for any loss that for which we may be liable, without our consent.

13. Failure to give notice to us, as required under this Condition, will not invalidate any claim made by you or any other claimant, unless the failure to provide such timely notice has prejudiced us. However, no claim made by you or any other claimant will be invalidated if it will be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

CUPOP 02 NY 01 18        CUMIS Insurance Society, Inc.        Page 16 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

79

**NEW YORK ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Virus Or Bacteria**

The Virus Or Bacteria Concurrent Policy Exclusion is added to:

Builder's Risk Completed Value Coverage
Building Coverage - Special
Business Personal Property Coverage - Special
Data Processing Operations Coverage
Real Estate Mortgage Operations Coverage

as follows:

1. Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

2. However, this Exclusion does not apply to loss or damage caused by or resulting from "fungus," wet rot or dry rot. Such loss or damage is addressed in the Fungus, Wet Rot Or Dry Rot Other Policy Exclusion in this endorsement.

The terms of this Exclusion, or the inapplicability of this Exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Policy.

CUPOP 02 NY 01 18                CUMIS Insurance Society, Inc.                Page 17 of 17
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

80

# NEW YORK
## STANDARD FIRE POLICY ENDORSEMENT
## PROPERTY AND BUSINESS LIABILITY POLICY

Notwithstanding anything to the contrary contained herein, it is understood and agreed that, as respects property insured hereunder which is subject to the Standard Fire Policy law the coverage provided by this policy against the perils of fire and lightning shall be subject to the provisions of the Standard Fire Policy as set forth in the following. However, to the extent that coverage provided otherwise under this policy is broader than that under the said Standard Fire Policy such broader coverage shall apply.

All other terms, conditions and limits of this policy remain unchanged.

### Standard Fire Policy

In Consideration of the Provisions and Stipulations herein or added hereto and of the Premium specified in the Declarations (or in endorsement attached hereto), this Company for the term specified in the Declarations from inception date shown in the Declarations (at noon, Standard Time) to expiration date shown in the Declarations (at noon, Standard Time) at location of property involved, does insure the insured named in the Declarations and legal representatives, to the lesser amount of either: 1) THE ACTUAL CASH VALUE OF THE PROPERTY AT THE TIME OF LOSS; OR 2) THE AMOUNT WHICH IT WOULD COST TO REPAIR OR REPLACE THE PROPERTY WITH MATERIAL OF LIKE KIND AND QUALITY WITHIN A REASONABLE TIME AFTER SUCH LOSS, WITHOUT ALLOWANCE FOR ANY INCREASED COST OF REPAIR OR RECONSTRUCTION BY REASON OF ANY ORDINANCE OR LAW REGULATING CONSTRUCTION OR REPAIR, AND WITHOUT COMPENSATION FOR LOSS RESULTING FROM INTERRUPTION OF BUSINESS OR MANUFACTURE, OR 3) TO AN AMOUNT NOT EXCEEDING THE LIMIT OF INSURANCE SPECIFIED IN THE DECLARATIONS, BUT IN ANY EVENT FOR NO MORE THAN THE INTEREST OF THE INSURED, AGAINST ALL DIRECT LOSS BY FIRE, LIGHTNING AND BY REMOVAL FROM PREMISES ENDANGERED BY THE PERILS INSURED AGAINST IN THIS POLICY, EXCEPT AS HEREINAFTER PROVIDED, to the property described hereinafter while located or contained as described in this policy, or pro rata for five days at each proper place to which any of the property shall necessarily be removed for preservation from the perils insured against in this policy, but not elsewhere.

Assignment of this policy shall not be valid except with the written consent of this Company.

This policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of this policy, together with such other provisions, stipulations and agreements as may be added hereto, as provided in this policy.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 83 of 834

**Concealment, fraud.** This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

**Uninsurable and excepted property.** This policy shall not cover accounts, bills, currency, deeds, evidences of debt, money or securities; nor, unless specifically named hereon in writing, bullion or manuscripts.

**Perils not included.** This Company shall not be liable for loss by fire or other perils insured against in this policy caused, directly or indirectly, by: (a) enemy attack by armed forces, including action taken by military, naval or air forces in resisting an actual or an immediately impending enemy attack; (b) invasion; (c) insurrection; (d) rebellion; (e) revolution; (f) civil war; (g) usurped power; (h) order of any civil authority except acts of destruction at the time of and for the purpose of preventing the spread of fire, provided that such fire did not originate from any of the perils excluded by this policy; (i) neglect of the insured to use all reasonable means to save and preserve the property at and after a loss, or when the property is endangered by fire in neighboring premises; (j) nor shall this Company be liable for loss by theft.

**Other insurance.** Other insurance may be prohibited or the amount of insurance may be limited by endorsement attached hereto.

**Conditions suspending or restricting insurance. Unless otherwise provided in writing added hereto this Company shall not be liable for loss occurring** (a) while the hazard is increased by any means within the control or knowledge of the insured; or (b) while a described building, whether intended for occupancy by owner or tenant, is vacant or unoccupied beyond a period of sixty consecutive days; or (c) as a result of explosion or riot, unless fire ensue, and in that event for loss by fire only.

**Other perils or subjects.** Any other peril to be insured against or subject of insurance to be covered in this policy shall be by endorsement in writing hereon or added hereto.

**Added provisions.** The extent of the application of insurance under this policy and of the contribution to be made by this Company in case of loss, and any other provision or agreement not inconsistent with the provisions of this policy, may be provided for in writing added hereto, but no provision may be waived except such as by the terms of this policy is subject to change.

**Waiver provisions.** No permission affecting this insurance shall exist, or waiver of any provision be valid, unless granted herein or expressed in writing added hereto. No provision, stipulation or forfeiture shall be held to be waived by any requirement or proceeding on the part of this Company relating to appraisal or to any examination provided for herein.

**Cancellation of policy.** This policy shall be cancelled at any time at the request of the insured, in which case this Company shall, upon demand and surrender of this policy, refund the excess of paid premium above the customary short rates for the expired time. This policy may be cancelled at any time by this Company by giving to the insured a five days' written notice of cancellation with or without tender of the excess of paid premium above the pro rata premium for the expired time, which excess, if not tendered, shall be refunded on demand. Notice of cancellation shall state that said excess premium (if not tendered) will be refunded on demand.

**Mortgagee interests and obligations.** If loss hereunder is made payable, in whole or in part, to a designated mortgagee not named herein as the insured, such interest in this policy may be cancelled by giving to such mortgagee a ten days' written notice of cancellation.

If the insured fails to render proof of loss such mortgagee, upon notice, shall render proof of loss in the form herein specified within sixty (60) days thereafter and shall be subject to the provisions hereof relating to appraisal and time of payment and of bringing suit. If this Company shall claim that no liability existed as to the mortgagor or owner, it shall, to the extent of payment of loss to the mortgagee, be subrogated to all the mortgagee's rights of recovery, but without impairing mortgagee's right to sue; or it may pay off the mortgage debt and require an assignment thereof and of the mortgage. Other provisions relating to the interests and obligations of such mortgagee may be added hereto by agreement in writing.

**Pro rata liability.** This Company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved, whether collectible or not.

**Requirements in case loss occurs.** The insured shall give immediate written notice to this Company of any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed; **and within sixty days after the loss, unless such time is extended in writing by this Company, the insured shall render to this Company a proof of loss,** signed and sworn to by the insured, stating the knowledge and belief of the insured as to the following: the time and origin of the loss, the interest of the insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto, all encumbrances thereon, all other contracts of insurance, whether valid or not, covering any of said property, any changes in the title, use, occupation, location, possession or exposures of said property since the issuing of this policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss and whether or not it then stood on leased ground, and shall furnish a copy of all the descriptions and schedules in all policies and, if required, verified plans and specifications of any building, fixtures or machinery destroyed or damaged. The insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examinations under oath by any person named by this Company, and subscribe the same; and, as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this Company or its representative, and shall permit extracts and copies thereof to be made.

**Appraisal.** In case the insured and this Company shall fail to agree as to the actual cash value or the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty days of such demand. The appraisers shall first select a competent and disinterested umpire; and failing for fifteen days to agree upon such umpire, then, on request of the insured or this Company, such umpire shall be selected by a judge of a court of record in the state in which the property covered is located. The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two when filed with this Company shall determine the amount of actual cash value and loss. Each appraiser shall be paid by the party selecting him and the expenses of appraisal and umpire shall be paid by the parties equally.

**Company's options.** It shall be optional with this Company to take all, or any part, of the property at the agreed or appraised value, and also to repair, rebuild or replace the property destroyed or damaged with other of like kind and quality within a reasonable time, on giving notice of its intention so to do within thirty days after the receipt of the proof of loss herein required.

**Abandonment.** There can be no abandonment to this Company of any property.

**When loss payable.** The amount of loss for which this Company may be liable shall be payable sixty days after proof of loss, as herein provided, is received by this Company and ascertainment of the loss is made either by agreement between the insured and this Company expressed in writing or by the filing with this Company of an award as herein provided.

**Suit.** No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within twenty four months next after inception of the loss.

**Subrogation.** This Company may require from the insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by this Company.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 84 of 834

# NAMED STORM DEDUCTIBLE / CALENDAR YEAR ENDORSEMENT
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions and provisions of the Coverages listed below apply to this endorsement. This endorsement modifies the:

Builder's Risk Completed Value Coverage
Building Coverage - Special
Business Personal Property Coverage - Special

## ADDITIONAL CONDITIONS

**Named Storm Deductible**

A Named Storm is a weather-related event involving wind that has been identified and assigned a formal name by the National Hurricane Center or the Central Pacific Hurricane Center (hereafter referred to as NHC and CPHC). Under terms of this endorsement, a Named Storm begins at the time a Watch or Warning is issued by the NHC or CPHC for the area in which the affected premises are located, and ends 72 hours after the termination of the last Watch or Warning issued for that area by the NHC or the CPHC.

1.  The Named Storm Deductible, as shown as a percentage on the Declarations, will apply to any Named Storm loss or damage to Covered Property. This Deductible will apply if a Named Storm contributed in any way to the covered loss or damage. No other deductible applies to a Named Storm "occurrence," except for the provisions in the Calendar Year Named Storm Deductible Additional Condition of this endorsement.

2.  Calculation of the Deductible:

    a.  Specific Insurance

        In determining the amount, if any, that we will pay for loss or damage, we will deduct an amount equal to the Named Storm Deductible percentage shown on the Declarations multiplied by the Limit Of Insurance shown on the Declarations.

    b.  Blanket Insurance

        In determining the amount, if any, that we will pay for loss or damage, we will deduct an amount equal to the Named Storm Deductible percentage shown on the Declarations multiplied by the applicable reported values shown on the Blanket Coverage - Report Schedule for the property that sustained damage.

    c.  Newly Acquired or Constructed Building

CUPOP 10 24 01 16                  CUMIS Insurance Society, Inc.                  Page 1 of 3
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

83

INDEX NO. 655437/2024
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 03/06/2025

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 85 of 834

## NAMED STORM DEDUCTIBLE / CALENDAR YEAR ENDORSEMENT
## PROPERTY AND BUSINESS LIABILITY POLICY

## ADDITIONAL CONDITIONS

**Named Storm Deductible** - continued

In determining the amount, if any, that we will pay for loss or damage, we will deduct an amount equal to the highest Named Storm Deductible percentage shown on the Declarations for any location with building coverage multiplied by an amount equal to the total value of the building that sustained damage.

d.  Newly Acquired Personal Property

In determining the amount, if any, that we will pay for loss or damage, we will deduct an amount equal to the highest Named Storm Deductible percentage shown on the Declarations for any location with Business Personal Property Coverage - Special multiplied by an amount equal to the total value of the business personal property at the location that sustained damage.

**Calendar Year Named Storm Deductible**

1.  The Named Storm Deductible, as shown as a percentage on the Declarations, can be exhausted only once at each premises described on the Declarations during each calendar year and applies to loss to Covered Property caused by one or more Named Storm "occurrence" during each calendar year.

2.  Application of Calendar Year Named Storm Deductible:

    a.  In the event of the first Named Storm loss to Covered Property caused by a single "occurrence" during a calendar year, we will pay only that part of the total of all loss payable that exceeds the Named Storm Deductible percentage shown on the Declarations during a calendar year.

    b.  In the event of a Named Storm loss caused by the second and each subsequent Named Storm "occurrence" during the same calendar year, we will pay only that part of the total of all loss payable that exceeds the greater of:

        1)  The remaining percentage of the Named Storm Deductible shown on the Declarations; or

        2)  The deductible that applies to fire that is in effect at the time of the loss.

        The remaining percentage of the Calendar Year Named Storm Deductible is determined by subtracting all previous Named Storm losses during the calendar year from the Named Storm Deductible shown on the Declarations.

    c.  If:

        1)  Covered Property is insured under more than one policy issued by us; and

        2)  Different Named Storm Deductibles apply to the same property under such policies,

CUPOP 10 24 01 16                    CUMIS Insurance Society, Inc.                    Page 2 of 3
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

84

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 86 of 834

**NAMED STORM DEDUCTIBLE / CALENDAR YEAR ENDORSEMENT**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## ADDITIONAL CONDITIONS

**Calendar Year Named Storm Deductible** - continued

then the Named Storm Deductible applicable under all such policies, used to determine the total of all loss payable will be the highest amount stated in any one of the policies.

d. When a renewal policy is issued by us, or we issue a policy that replaces a policy issued by us and the renewal or replacement policy takes effect on a date other than January 1st of the calendar year, the following provisions apply:

1) If the renewal or replacement policy provides a lower Named Storm Deductible than the prior policy, and you have incurred a loss from a Named Storm "occurrence" under the prior policy in the same calendar year, the lower Named Storm Deductible will not take effect until January 1st of the following calendar year.

2) If the renewal or replacement policy provides a lower Named Storm Deductible than the prior policy, and you have not incurred a loss from a Named Storm "occurrence" in the same calendar year, the lower Named Storm Deductible will take effect on the effective date of the renewal or replacement policy.

3) If the renewal or replacement policy provides a higher Named Storm Deductible than the prior policy, the higher Named Storm Deductible:

a) Will take effect on the effective date of the renewal or replacement policy; and

b) Will be used to calculate the remaining percentage of the Named Storm Deductible described in paragraph 2. b. above.

e. We require that you promptly report any Named Storm loss that is below the Named Storm Deductible percentage shown on the Declarations so that we may consider the amount of such loss when adjusting claims for subsequent Named Storm losses that occur during the calendar year.

Nothing in this endorsement implies or affords coverage for any loss or damage that is excluded under terms of the Water Exclusion or any other Exclusion in this Policy. If this Policy is endorsed to cover flood or if you have a flood insurance policy, a separate Flood Deductible applies to loss or damage attributable to Flood, in accordance with the terms of that endorsement or policy.

CUPOP 10 24 01 16    CUMIS Insurance Society, Inc.    Page 3 of 3
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

85

## BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this Coverage.

Words and phrases that appear in quotation marks have special meaning and are defined in the Policy.

## COVERED PROPERTY

**Business Personal Property**

This Policy covers business personal property you own or lease for which you are legally liable. The property must be located in the building described on the Declarations with a Limit Of Insurance shown or in the open (or in a vehicle) within 2000 feet of the described premises or within 2000 feet of the building the business personal property is located in, whichever distance is greater. Covered Property consists of the following:

1. Furniture and fixtures;

2. Machinery and equipment;

3. Signs and light fixtures;

4. Supplies;

5. All other personal property owned by you and used in your business;

6. Your interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations installations or additions:

   a. Made a part of the building or structure occupied but not owned by you; and

   b. Acquired or made at your expense but cannot legally be removed.

7. Building glass, including all lettering, ornamentation, security alarm tape and bullet resistant glass under your care, custody, or control for which you are legally liable; and

8. Your interest as a condominium unit owner in fixtures, improvements, and alterations making up part of the building and owned by the insured as a condominium unit owner.

CUPOP 21 00 01 18                    CUMIS Insurance Society, Inc.                    Page 1 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

86

## BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL PROPERTY AND BUSINESS LIABILITY POLICY

## PROPERTY NOT COVERED

The following property is not covered under Business Personal Property Coverage - Special:

1. Growing crops, lawns, trees, shrubs and plants (other than lawns, trees, shrubs and plants which are part of a vegetated roof), except as provided in the Flexible $1,000,000 Blanket Extensions Of Coverage;

2. Water;

3. Aircraft, "autos" (except for detached trailers you do not own to the extent they are covered under the Flexible Extensions Of Coverage), "watercraft," all-terrain vehicles, snowmobiles and agricultural or construction equipment;

4. "Money" or "securities";

5. Property that is covered under another coverage of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

6. The cost to research, replace or restore "valuable information" including that which exists on electronic or magnetic media, except as provided in the Extensions Of Coverage; or

7. Property of others in any storage container that is intended to be accessed by others, including, but not limited to: safe deposit boxes, single key boxes, and lobby boxes.

## ADDITIONAL COVERAGES

Payments under the Additional Coverages are subject to the applicable Limit Of Insurance shown on the Declarations, unless otherwise specified.

**Accidental Breakdown Of Objects**

1. We will pay for direct physical loss or damage to Covered Property caused by an "accidental breakdown" to an "object." The "object" must be:

   a. Owned by you or in your care, custody or control; and

   b. At the premises described on the Declarations.

2. We will not pay for "accidental breakdown" to any "object" while being tested.

3. Whenever we determine that an "object" is exposed to a dangerous condition, we may immediately suspend the insurance against loss from "accidental breakdown" by delivering or mailing to you a written notice that coverage has been suspended.

4. The Concurrent Policy Exclusions and Other Policy Exclusions do not apply to this Additional Coverage.

CUPOP 21 00 01 18                    CUMIS Insurance Society, Inc.                    Page 2 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 89 of 834

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL
PROPERTY AND BUSINESS LIABILITY POLICY**

**ADDITIONAL COVERAGES**

**Burglary Damage To A Building You Do Not Own**

We will pay amounts you are contractually obligated to pay for direct physical loss or damage caused by a burglary or attempted burglary to a building you occupy, but do not own.

**Condominium Assessments**

1. We will pay your share of an assessment charged to all unit-owners by the Condominium Association when the assessment is:

   a. Made during the Policy Period;

   b. Attributed to a condominium described on the Declarations;

   c. The result of a direct physical loss or damage caused by a Covered Cause Of Loss to property in which each unit-owner has a common undivided interest.

2. This Additional Coverage applies only as excess insurance over any deductible, self-insurance or any other insurance purchased by or for the Condominium Association.

3. This Additional Coverage does not apply:

   a. If at the time of loss, the Condominium Association is either intentionally or unintentionally self-insured for all loss and damage by the peril causing the loss; or

   b. To newly acquired property.

**Debris Removal**

1. We will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause Of Loss that occurs during the Policy Period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

   a. The date of direct physical loss or damage; or

   b. The end of the Policy Period.

2. The most we will pay under this Additional Coverage is 25% of:

   a. The amount we pay for the direct physical loss of or damage to Covered Property; plus

   b. The Deductible in this Policy applicable to that loss or damage.

   But this limitation does not apply to any additional debris removal limit provided in paragraph 3. below.

CUPOP 21 00 01 18 CUMIS Insurance Society, Inc. Page 3 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

88

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 90 of 834

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL
PROPERTY AND BUSINESS LIABILITY POLICY**

**ADDITIONAL COVERAGES**

**Debris Removal** - continued

3. If:

a. The sum of direct physical loss or damage and debris removal expenses exceeds the Limit Of Insurance applicable to the Covered Property that has sustained loss or damage; or

b. The actual debris removal expense exceeds the amount payable under the 25% limitation in paragraph 2. above,

however, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $10,000 at each described premises.

4. We will pay up to an additional $100,000 for debris removal not subject to the Limit Of Insurance for each described premises due to any one "occurrence" of physical loss or damage under this Additional Coverage, if one of both of the following circumstances apply:

a. The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit Of Insurance on the Covered Property that has sustained loss or damage.

b. The actual debris removal expense exceeds 25% of the sum of the Deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if subparagraph 4.a. or 4.b. above applies, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit Of Insurance on the Covered Property that has sustained loss or damage, plus $100,000.

5. This Additional Coverage does not apply to costs to:

a. Remove debris of property owned by or leased to a landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this Policy;

b. Remove any property that is Property Not Covered;

c. Remove deposits of mud or earth from the grounds of the described premises;

d. Extract "pollutants" from land or water; or

e. Remove, restore or replace polluted land or water.

CUPOP 21 00 01 18                CUMIS Insurance Society, Inc.                Page 4 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

89

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 91 of 834

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL PROPERTY AND BUSINESS LIABILITY POLICY**

**ADDITIONAL COVERAGES**

**Elevator Collision**

We will pay for direct loss or damage to Covered Property caused by an elevator collision.

**Fungus, Wet Rot, Dry Rot And Bacteria Clean Up And Removal**

1. We will pay the costs you incur to clean up, remove, restore or replace Covered Property because of direct physical loss or damage caused by the presence of "fungus," wet or dry rot or bacteria at a premises described on the Declarations.

2. This Additional Coverage does not apply to any cost incurred to test for or detect the presence of "fungus," wet or dry rot or bacteria unless this cost is incurred after completion of clean up, removal, restoration or replacement of Covered Property to confirm that "fungus," wet or dry rot or bacteria is no longer present.

3. The most we will pay under this Additional Coverage is $25,000 for Covered Property at a premises described on the Declarations.

4. This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

5. The Additional Coverage applies only under the Policy in effect at the time "fungus," wet or dry rot or bacteria is first "discovered" at a premises described on the Declarations. The renewal of this Policy will not increase the total amount of coverage.

**Interruption Of Services**

We will pay for loss of or damage to Covered Property caused by an interruption of service to the building located at the premises described on the Declarations. This interruption must result from a direct physical loss or damage by a Covered Cause Of Loss to "communication supply service," power supply service," "sewage treatment service" or "water supply service."

**Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause Of Loss, we will pay for direct physical loss of or damage to that property while it is being moved or while temporarily stored at another location.

CUPOP 21 00 01 18    CUMIS Insurance Society, Inc.    Page 5 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

90

## BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL PROPERTY AND BUSINESS LIABILITY POLICY

### FLEXIBLE $1,000,000 BLANKET EXTENSIONS OF COVERAGE

The $1,000,000 limit applicable to the Flexible Blanket Extensions Of Coverage is in addition to the Business Personal Property Coverage - Special Limits Of Insurance shown on the Declarations. At the time of loss, you may elect to apportion this Flexible $1,000,000 Blanket Limit Of Insurance to any one or any combination of the Extensions Of Coverage: Business Personal Property At Your Employee's Home, Business Personal Property Off Premises, In Transit-Worldwide, Detached Trailers You Do Not Own, Fine Arts And Antiques, Fire Extinguisher Recharge, Key Replacement/Lock Repair, Leasehold Interests, Personal Effects Of Employees - Business Travel, Personal Effects Of Employees - On Premises, Personal Property Of Others, Public Safety Service Charge, Trees, Shrubs, Lawn And Plants and Unexpired Warranties, Maintenance Contracts Or Service Contracts. However, the most we will pay under the Flexible Blanket Extensions Of Coverage is $1,000,000 for all loss arising out of any one "occurrence."

### Business Personal Property At Your Employee's Home

Coverage is extended to apply to your Covered Property while located at your director's, volunteer's or employee's (including leased employee's) home.

This Extension Of Coverage does not apply to property owned by your director, volunteer or employee.

### Business Personal Property Off Premises, In Transit - Worldwide

Coverage is extended to apply to your Covered Property while in transit or temporarily at a location you do not own, lease or operate anywhere in the world. This extension includes your Covered Property while located at a fair, exhibition or trade show.

### Detached Trailers You Do Not Own

Coverage is extended to costs you are contractually obligated to pay as the result of the direct physical loss or damage to detached trailers you do not own, provided the trailer is:

1. Not attached to any motor vehicle; and

2. In your care, custody and control or at the premises described on the Declarations.

### Fine Arts And Antiques

Coverage is extended to apply to fine arts and antiques you own, or for which you are legally liable to others, at a premises described on the Declarations, or while in transit to or from a premises described on the Declarations.

The value of fine arts and antiques will be determined by the market value at the time of the loss.

CUPOP 21 00 01 18                 CUMIS Insurance Society, Inc.                 Page 6 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

91

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL
PROPERTY AND BUSINESS LIABILITY POLICY**

**FLEXIBLE $1,000,000 BLANKET EXTENSIONS OF COVERAGE**

### Fire Extinguisher Recharge

Coverage is extended to costs you incur to recharge a portable fire extinguisher at a premises described on the Declarations, when it has been used to combat a fire at a premises described on the Declarations.

No Deductible applies to this Extension Of Coverage.

### Key Replacement/Lock Repair

Coverage is extended to costs you incur to replace stolen keys that secure a premises described on the Declarations. This Extension Of Coverage includes costs you incur to replace or re-key the locks resulting from the theft.

### Leasehold Interests

Coverage is extended to loss you incur as the direct result of the cancellation by the lessor of a written lease of a premise described on the Declarations that results from direct physical loss or damage to that premise caused by a Covered Cause Of Loss. The coverage provided under this extension applies only to: "bonus payment"; "prepaid rent"; "profit on a sub-lease"; a "tenant's lease interest"; or the value of your lease at the date of cancellation of a "tenant's interest in undamaged improvements or betterments."

### Personal Effects Of Employees - Business Travel

Coverage is extended to loss of personal effects (except "money," "securities" or "autos") owned by your directors, volunteers or employees (including leased employees) and taken along on business travel. This Extension Of Coverage will only apply when your directors, volunteers or employees (including, leased employees) are traveling on business for you away from the described premises. We will not pay for losses covered by other insurance, but we will cover losses that are not paid due to a restriction or deductible on the other insurance policy.

No Deductible applies to this Extension Of Coverage.

### Personal Effects Of Employees - On Premises

Coverage is extended to loss of personal effects (except "money," "securities" or "autos") owned by your directors, volunteers or employees (including leased employees). These personal effects must be at a premises described on the Declarations. We will not pay for losses covered by other insurance but we will cover losses that are not paid due to a restriction or deductible on the other insurance policy.

No Deductible applies to this Extension Of Coverage.

CUPOP 21 00 01 18                    CUMIS Insurance Society, Inc.                    Page 7 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

92

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 94 of 834

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL PROPERTY AND BUSINESS LIABILITY POLICY**

**FLEXIBLE $1,000,000 BLANKET EXTENSIONS OF COVERAGE**

**Personal Property Of Others**

Coverage is extended to loss of personal property of others in your care, custody or control that you do not lease.

We will not pay for personal property that was inadvertently "repossessed" at the same time a vehicle was "repossessed."

**Public Safety Service Charge**

When a public safety service agency is called to save or protect Covered Property from direct physical loss or damage by a Covered Cause Of Loss, coverage is extended to the resulting service charge:

1. Assumed by contract or agreement made prior to the loss; or

2. Required by local ordinance.

No Deductible applies to this Extension Of Coverage.

**Trees, Shrubs, Lawn And Plants**

1. Coverage is extended to pay for reasonable expenses incurred by you for your trees, shrubs, lawn and plants at a premises described on the Declarations for direct physical loss or damage, only if caused by:

   a. Fire and lightning;

   b. Explosion;

   c. Riot, civil commotion;

   d. Aircraft;

   e. Vandalism;

   f. Vehicles; or

   g. Theft,

   including expense incurred for removing debris.

CUPOP 21 00 01 18     CUMIS Insurance Society, Inc.     Page 8 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

93

## BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL PROPERTY AND BUSINESS LIABILITY POLICY

### FLEXIBLE $1,000,000 BLANKET EXTENSIONS OF COVERAGE

**Trees, Shrubs, Lawn And Plants** - continued

2.  We will also pay for reasonable expenses incurred by you in removing a fallen tree from a premises described on the Declarations if:

    a.  The tree damaged the building you own or are responsible under your lease to insure; and

    b.  The falling of the tree was caused by windstorm.

**Unexpired Warranties, Maintenance Contracts Or Service Contracts**

We will reimburse you on a pro-rata basis for the amount you paid to purchase non-refundable extended warranties, maintenance contracts or service contracts which are no longer valid due to direct physical loss of or damage to Covered Property that you repair or replace. The amount we pay will be based on the pro-rata allocation of the original cost of the warranty, maintenance contract or service contract for the time remaining under the contract on the date of loss.

### EXTENSIONS OF COVERAGE

The limits applicable to the Extensions Of Coverage in this section are in addition to the Limits Of Insurance shown on the Declarations.

The Coinsurance Condition does not apply to the Extensions Of Coverage.

**Arson, Theft Or Vandalism Reward**

Coverage is extended to provide a reward for information that leads to a conviction in connection with a fire, theft or vandalism loss covered under this Policy. You must obtain prior written approval from us concerning the terms and amount of the reward.

The most we will pay under this Extension Of Coverage for loss is $50,000 for any one "occurrence."

**Business Personal Property At Newly Acquired Locations**

Coverage is extended to apply to property at any newly acquired location other than the premises described on the Declarations.

Insurance under this Extension Of Coverage for each newly acquired or constructed property will end when any of the following first occurs:

1.  This Policy expires;

2.  180 days after you acquire or begin to construct the property; or

3.  You report the value of the business personal property at the newly acquired location to us.

CUPOP 21 00 01 18                    CUMIS Insurance Society, Inc.                    Page 9 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

94

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 96 of 834

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL
PROPERTY AND BUSINESS LIABILITY POLICY**

**EXTENSIONS OF COVERAGE**

**Business Personal Property At Newly Acquired Locations** - continued

We will charge you additional premium for values reported from the acquisition date through the end of the Policy Period.

This Extension Of Coverage applies separately to each location you acquire. The most we will pay under this Extension Of Coverage is $2,000,000 for loss or damage caused by any one "occurrence."

**Extra Expense**

1. We will pay for the actual and necessary "extra expenses" you incur to avoid or minimize the suspension of business and to continue your business activities. Coverage applies when you sustain a direct physical loss or damage to property at the premises described on the Declarations, caused by or resulting from any Covered Cause Of Loss.

2. We will also pay the actual and necessary "extra expense" caused by the interruption of service to the described premises. The interruption must result from direct physical loss or damage by a Covered Cause Of Loss to a: "communication supply service," "water supply service," "power supply service" or "sewage treatment service" which provide service for a fee or charge to the premises described on the Declarations. Only the "extra expense" you incur after the service has been interrupted for 12 hours will be covered.

3. This Extension Of Coverage applies separately to each premises described on the Declarations to which this insurance applies. The most we will pay under this Extension Of Coverage is $10,000 in any one "occurrence."

**Newly Acquired Business Personal Property At A Covered Location**

1. Coverage is extended to your newly acquired business personal property at a premises described on the Declarations.

2. Insurance under this Extension Of Coverage for Newly Acquired Business Personal Property At A Covered Location will end at the time any of the following first occurs:

   a. This Policy expires;

   b. 180 days after you acquire the property; or

   c. The date you report the value of the newly acquired property to us.

3. We will charge you additional premium based on the values reported from the date the property is acquired through the end of the Policy Period.

4. This Extension Of Coverage applies separately to each insured location you acquire. The most we will pay under this Extension Of Coverage is $250,000 for loss or damage caused by any one "occurrence."

CUPOP 21 00 01 18                     CUMIS Insurance Society, Inc.                     Page 10 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

95

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 97 of 834

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## EXTENSIONS OF COVERAGE

### Valuable Information Cost Of Research

Coverage is extended to apply to your costs to research, replace or restore "valuable information," including that which exists on electronic or magnetic media, for which duplicates do not exist.

We will not pay for loss caused by error in machine programming or instruction to machine.

This Extension Of Coverage applies separately to each described premises to which this insurance applies. The most we will pay under this Extension Of Coverage is $25,000 for loss or damage in any one "occurrence."

## COVERED CAUSES OF LOSS

This Coverage insures against direct physical loss to the Covered Property unless the loss is excluded or limited in this Policy.

## CONCURRENT POLICY EXCLUSIONS

We will not pay for loss or damage caused directly or indirectly by any of the following. All loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

### Building Ordinance

The enforcement of or compliance with any ordinance or law:

1. Regulating the construction, use or repair of any property; or

2. Requiring the tearing down of any property, including the cost of removing its debris.

This Exclusion applies whether the loss results from:

1. An ordinance or law that is enforced or complied with even if the property has not been damaged; or

2. The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

### Consequential Losses

Delay, loss of use or loss of market.

CUPOP 21 00 01 18                 CUMIS Insurance Society, Inc.                 Page 11 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

96

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**CONCURRENT POLICY EXCLUSIONS**

**Earth Movement**

1. Any earth movement (other than sinkhole collapse), such as an earthquake (including tremors and aftershocks), landslide, mine subsidence (meaning subsidence of a man-made mine whether or not mining activities have ceased) or earth sinking, rising or shifting. But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

2. Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

   Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   a. Airborne volcanic blast or airborne shock waves;

   b. Ash, dust or particulate matter; or

   c. Lava flow.

   All volcanic eruptions that occur within any 168 hour period will constitute a single "occurrence."

   Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to the described property.

   This Exclusion applies regardless of whether any of the above in paragraph 1. and 2. is caused by an act of nature or is otherwise caused.

**Fungus, Wet Rot, Dry Rot And Bacteria**

The presence or existence of "fungus," wet or dry rot or bacteria. This Exclusion does not apply to the extent:

1. The presence or existence of the "fungus," wet or dry rot or bacteria is attributable to explosion, fire, water resulting from fire suppression efforts, leaking from fire protection equipment, lightning, or;

2. Coverage is afforded under the Fungus, Wet Rot, Dry Rot And Bacteria Clean Up And Removal Additional Coverage.

**Governmental Action**

Seizure or destruction of property by order of governmental authority. But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage.

CUPOP 21 00 01 18      CUMIS Insurance Society, Inc.      Page 12 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

97

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL PROPERTY AND BUSINESS LIABILITY POLICY**

**CONCURRENT POLICY EXCLUSIONS**

**Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused. But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**Steam Apparatus Explosion**

1. Explosion of steam boilers, steam pipes, steam engines or steam turbines owned, leased, or operated by you. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

2. Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**War And Military Action**

1. War, including undeclared or civil war;

2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**Water**

1. "Flood," surface water, waves (including tidal waves and tsunami), tides, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

2. Mudslide or "mudflow"; or

3. Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

   a. You do your best to maintain heat in the building or structure; or

   b. You drain the equipment and shut off the water supply if the heat is not maintained.

CUPOP 21 00 01 18                    CUMIS Insurance Society, Inc.                    Page 13 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

98

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL PROPERTY AND BUSINESS LIABILITY POLICY**

## CONCURRENT POLICY EXCLUSIONS

**Water** - continued

But if water, as described in paragraphs 1. through 3. above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

This Exclusion applies regardless of whether any of the above, in paragraphs 1. through 3., is caused by an act of nature or is otherwise caused.

## OTHER POLICY EXCLUSIONS

We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause Of Loss results, we will pay for only the resulting loss or damage from the Covered Cause Of Loss.

**Disappearance**

Property that is missing, but there is no physical evidence to show what happened to it; or a shortage disclosed on taking inventory.

**Electrical Apparatus**

Artificially generated electrical current, including electrical arcing, that disturbs electrical devices, appliances or wires. But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

**Maintenance Types Of Loss**

1. Wear and tear;

2. Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

3. Smog;

4. Settling, cracking, shrinking or expansion, except for building glass;

5. Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals; or

6. Except as provided in the Elevator Collision Additional Coverage and the Accidental Breakdown Of Objects Additional Coverage, mechanical breakdown, including rupture or bursting caused by centrifugal force.

CUPOP 21 00 01 18                      CUMIS Insurance Society, Inc.                      Page 14 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

99

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 101 of 834

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL
PROPERTY AND BUSINESS LIABILITY POLICY**

**OTHER POLICY EXCLUSIONS**

**Negligent Work**

1.  Acts or decisions, including, the failure to act or decide, of any person, group, organization or governmental body;

2.  Faulty, inadequate or defective:

    a.  Planning, zoning, development, surveying, siting;

    b.  Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

    c.  Materials used in repair, construction, renovation or remodeling; or

    d.  Maintenance,

    of part or all of any property on or off the described premises.

**Pollution**

The "pollution or contamination" of any "environment" by "pollutants" or seepage of "pollutants" that are introduced at any time, anywhere, in any way or arising out of the actual, alleged or threatened discharge, dispersal, release or escape of "pollutants."

The cleaning up, testing, monitoring, containing, treating, detoxifying, and neutralizing of "pollutants" even if caused by a governmental direction or request.

This Exclusion does not apply to:

1.  Direct physical loss of or damage to Covered Property caused by:

    a.  Fire;

    b.  Lightning;

    c.  Smoke;

    d.  An accident involving an aircraft or vehicle;

    e.  Windstorm or hail;

    f.  An explosion;

    g.  A falling object entering the roof or outside wall of a building;

    h.  A leak from fire extinguishing equipment;

CUPOP 21 00 01 18                    CUMIS Insurance Society, Inc.                    Page 15 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

100

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 102 of 834

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**OTHER POLICY EXCLUSIONS**

**Pollution** - continued

    i.   A collapse caused by weight of snow;

    j.   Ice or sleet;

    k.   Riot or civil commotion;

    l.   An accidental discharge or leak of water or steam as the direct result of a crack or break in a plumbing, heating or air conditioning system or appliance (other than a sump pump) located on premises described on the Declarations;

    m.   Volcanic activity; or

    n.   Sinkhole collapse meaning the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite.

2.   Debris Removal; and

3.   Fungus, Wet Rot, Dry Rot And Bacteria Clean Up And Removal Additional Coverage.

**Theft, Dishonesty Or Fraud**

1.   Theft, dishonest or criminal act by you, any of your directors, any of your partners, officers, managers, volunteers, employees (including temporary employees and leased employees), trustees, authorized representatives or anyone to whom the property is entrusted for any purpose:

    a.   Acting alone or in collusion with others; or

    b.   Whether or not occurring during the hours of employment.

    This Exclusion does not apply to acts of destruction by your volunteers, employees (including temporary employees and leased employees) or authorized representatives.

2.   Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

3.   Theft of building materials and supplies that are not attached to a building.

CUPOP 21 00 01 18           CUMIS Insurance Society, Inc.           Page 16 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

101

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 103 of 834

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**CONDITIONS**

In addition to the Conditions in the Common Policy Provisions, the following Conditions also apply to this Coverage.

**Coinsurance**

If a Coinsurance Percentage is shown on the Declarations, the following Condition applies:

We will not pay the full amount of any loss if the replacement cost of Covered Property at the time of loss multiplied by the Coinsurance Percentage shown on the Declarations is greater than the Limit Of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the replacement cost of Covered Property at the time of loss by the Coinsurance Percentage;

(2) Divide the Limit Of Insurance of the property by the figure determined in step (1);

(3) Multiply the total amount of loss, before the application of any Deductible, by the figure determined in step (2); and

(4) Subtract the Deductible from the figure determined in step (3).

We will pay the amount determined in step (4) or the Limit Of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

This Coinsurance Condition does not apply to a covered loss of $100,000 or less.

**Deductible**

We will not pay for loss or damage in any one "occurrence" until the amount of loss or damage exceeds the Deductible shown on the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit Of Insurance, after any deduction required by the Coinsurance Condition.

When the "occurrence" involves loss to more than one item of Covered Property and more than one Limit Of Insurance applies, the Deductible will reduce the total amount of loss payable if loss to at least one item is less than the sum of the Limit Of Insurance applicable to that item plus the Deductible.

In the event a loss is covered under both Building Coverage - Special and Business Personal Property Coverage - Special, the Deductible will not be applied more than once.

CUPOP 21 00 01 18
CUMIS Insurance Society, Inc.
Page 17 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

102

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 104 of 834

## BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL
## PROPERTY AND BUSINESS LIABILITY POLICY

### CONDITIONS

**Inflation Guard**

The Limit Of Insurance for Business Personal Property Coverage - Special will automatically increase by the annual percentage shown on the Declarations.

The amount of increase will be:

(1) The Limit Of Insurance that applied on the most recent of the Policy inception date, the Policy anniversary date, or any other policy change amending the Limit Of Insurance, times

(2) The percentage of annual increase shown on the Declarations, expressed as a decimal (example 4% is .04), times

(3) The number of days since the beginning of the current Policy year or the effective date of the most recent Policy change amending the Limit Of Insurance, divided by 365.

**Limit Of Insurance**

The most we will pay for loss or damage in any one "occurrence" is the applicable Limit Of Insurance shown on the Declarations.

**Valuation Of Covered Property**

1. We will determine the value of Covered Property at replacement cost (without deduction for depreciation) for purposes of the Coinsurance Condition. The value of glass includes the cost of glass replaced with safety glazing material if required by law.

   However, the value of Covered Property for purposes of a loss determination is the lesser of the:

   a. Replacement cost (without deduction for depreciation); or

   b. Repair cost (without deduction for depreciation).

   The value of Covered Property for purposes of a loss determination of your improvements and betterments is nothing if others pay for repairs or replacement.

2. If you do not repair or replace the Covered Property, we will pay you on an "actual cash value" basis.

3. We will not pay on a replacement cost basis for any loss or damage:

   a. Until the lost or damaged property is actually repaired or replaced; and

   b. Unless the repair or replacement is made and you commence the repair or replacement within 24 months from the date of loss or damage.

CUPOP 21 00 01 18 

CUMIS Insurance Society, Inc. 

Page 18 of 19

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 105 of 834

**BUSINESS PERSONAL PROPERTY COVERAGE - SPECIAL**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## CONDITIONS

**Valuation Of Covered Property** - continued

We will pay you the difference between the "actual cash value" previously paid up to the cost to replace or repair, subject to Limit Of Insurance.

CUPOP 21 00 01 18                    CUMIS Insurance Society, Inc.                    Page 19 of 19
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

104

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 106 of 834

## VALUABLE INFORMATION COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

### CONTENTS

**Property Covered** ...............................................................................................................2

**Property Not Covered** .......................................................................................................2

**Amount Of Loss** .................................................................................................................2

**Additional Coverage**..........................................................................................................3
Equipment And Supplies

**Covered Causes Of Loss** .....................................................................................................3

**Concurrent Policy Exclusions**...........................................................................................3
Consequential Losses
Governmental Action
Nuclear Hazard
War And Military Action

**Other Policy Exclusions**.....................................................................................................4
Audit Expense
Bookkeeping Error
Dishonesty Or Fraud
Maintenance Types Of Loss
Mysterious Disappearance
Programming Errors
Work Upon Covered Property

**Conditions** .........................................................................................................................5
Determination Of Receivables And Loans
Limit Of Insurance
Newly Acquired Organizations
Recoveries

**Definitions** .........................................................................................................................6
Money
Securities
Valuable Information

CUPOP 22 00 08 09                    CUMIS Insurance Society, Inc.                    Page 1 of 7
copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

105

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 107 of 834

## VALUABLE INFORMATION COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage.  Read the entire Policy carefully to determine rights, duties and what is and is not covered.  The Common Policy Provisions apply to this Coverage.

Words and phrases that appear in quotation marks have special meaning and are defined in the Policy.

## PROPERTY COVERED

This Policy covers "valuable information" wherever located, that is owned by you, or "valuable information" of others in your care, custody or control.

## PROPERTY NOT COVERED

The following property is not covered under Valuable Information Coverage:

1. "Money."

2. Money orders, certificates of deposit, stock or bond certificates, instruction to or statement of uncertificated security of a Federal Reserve Bank and certificated security.

3. Evidences of debt issued in connection with credit or charge cards, which are not of your own issue.

4. Property of others in a safe deposit box.

## AMOUNT OF LOSS

1. The amount of loss due to a Covered Cause Of Loss to Covered Property is:

   a. Reasonable expenses that you incur to re-establish your "valuable information"; and

   b. Collection expenses in excess of your normal collection expenses that are made necessary by the loss; and

   c. All amounts represented by the damaged "valuable information" due from your accountholders or customers that you are unable to collect.  This amount will be reduced for bad debts that you are normally unable to collect; and

   d. Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts.

2. The following will be deducted from the total amount of accounts receivable and loans however that amount is established:

   a. The amount of the accounts for which there is no loss; and

CUMIS Insurance Society, Inc.
copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 108 of 834

**VALUABLE INFORMATION COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## AMOUNT OF LOSS

   b.   The amount of the accounts that you are able to re-establish, or collect; and

   c.   An amount to allow for bad debts that you are normally unable to collect; and

   d.   All unearned interest and service charges.

## ADDITIONAL COVERAGE

Payments under the Additional Coverage will not increase the applicable Limit Of Insurance shown in the Declarations.

**Equipment And Supplies**

   This Policy covers up to $1,000 of office equipment and supplies that are owned by you or owned by others and in your care, custody or control by loss due to a Covered Cause Of Loss.  Office equipment and supplies does not mean "valuable information," "money," and "securities."  We will not pay for the Deductible part of any loss otherwise covered by any insurance.

## COVERED CAUSES OF LOSS

This Coverage insures against risks of direct accidental physical loss to Covered Property subject to all Exclusions in the Policy.

## CONCURRENT POLICY EXCLUSIONS

We will not pay for loss or damage caused directly or indirectly by any of the following.  All loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**Consequential Losses**

   Delay, loss of use or loss of market.

**Governmental Action**

   Seizure or destruction of property by order of governmental authority.  But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage.

**Nuclear Hazard**

   Nuclear reaction or radiation, or radioactive contamination, however caused.  But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

CUPOP 22 00 08 09                 CUMIS Insurance Society, Inc.                          Page 3 of 7
copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

107

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 109 of 834

VALUABLE INFORMATION COVERAGE
PROPERTY AND BUSINESS LIABILITY POLICY

## CONCURRENT POLICY EXCLUSIONS

**War And Military Action**

1. War, including undeclared or civil war; or

2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

## OTHER POLICY EXCLUSIONS

We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause Of Loss results, we will pay for only the resulting loss or damage from the Covered Cause Of Loss.

**Audit Expense**

Any expense for auditing to prove the existence of a loss.

**Bookkeeping Error**

Bookkeeping, accounting or billing errors or omissions.

**Dishonesty Or Fraud**

1. Theft, dishonest, or criminal act by any director, volunteer, employee (including leased employees), trustee, authorized representative or anyone to whom the property is entrusted for any purpose:

   a. Acting alone or in collusion with others; or

   b. Whether or not occurring during the hours of employment.

   This Exclusion does not apply to acts of destruction by your directors, volunteers, employees (including leased employees), trustees or authorized representatives.

2. Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

3. Forgery or alteration.

CUPOP 22 00 08 09
CUMIS Insurance Society, Inc.
copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Page 4 of 7

108

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 110 of 834

VALUABLE INFORMATION COVERAGE
PROPERTY AND BUSINESS LIABILITY POLICY

## OTHER POLICY EXCLUSIONS

**Maintenance Types Of Loss**

1. Wear and tear; or

2. Deterioration or any quality in property that causes it to damage or destroy itself.

**Mysterious Disappearance**

Property that is missing, but there is no physical evidence to show what happened to it; or A shortage disclosed on taking inventory; or Property misplaced or mislaid.

**Programming Errors**

Errors or omissions in programming or instructions to machines.

**Work Upon Covered Property**

Processing or actual work upon Covered Property, but we will pay for direct loss caused by resulting fire or explosion.

## CONDITIONS

In addition to the Conditions in the Common Policy Provisions, the following Conditions also apply to this Coverage.

**Determination Of Receivables And Loans**

1. If you cannot accurately establish the amount of accounts receivable and loans outstanding as of the time of the loss, the following method will be used:

   a. Determine the total of the average monthly amounts of accounts receivable and loans for the 12 months immediately preceding the month in which the loss occurs; and

   b. Adjust that total for any normal fluctuations in the amount of accounts receivable and loans for the month in which the loss occurred or for any demonstrated variance from the average for that month.

**Limit Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

CUPOP 22 00 08 09 CUMIS Insurance Society, Inc. Page 5 of 7
copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

109

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 111 of 834

VALUABLE INFORMATION COVERAGE
PROPERTY AND BUSINESS LIABILITY POLICY

## CONDITIONS

**Newly Acquired Organizations**

The words "you" and "your" also include any organization (other than a partnership or joint venture) that you acquire or form and over which you maintain ownership or sole interest if there is no other similar insurance available to that organization.

This Coverage Extension ends:

a.   90 days after you acquire or form the organization; or

b.   At the end of the Policy Period shown in the Declarations,

whichever is earlier.

When you merge with another entity, and you are the surviving entity, the 90 day limitation in a. above does not apply.

This Coverage Extension does not apply to losses that occurred before the date you acquired the organization or before the date of merger.

**Recoveries**

You will pay us the amount of all recoveries you receive for a loss paid by us.  But any recoveries in excess of the amount we have paid belong to you.

If either you or we recover any property after loss settlement, that party must give the other prompt notice.  At your option, the property will be returned to you. If so, your loss will be readjusted based on the amount you received for the property recovered, with allowance for recovery expenses incurred.

## DEFINITIONS

**Money**

"Money" means currency, coins, banknotes and Federal Reserve notes, checks, drafts and share drafts.

**Securities**

"Securities" means original mortgages, documents of title, evidences of debt, security agreements, "money" orders, certificates of deposit, stock or bond certificates, instruction to or statement of uncertificated security of a Federal Reserve Bank, and certificated security.

CUPOP 22 00 08 09                CUMIS Insurance Society, Inc.                Page 6 of 7
copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

110

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 112 of 834

VALUABLE INFORMATION COVERAGE
PROPERTY AND BUSINESS LIABILITY POLICY

## DEFINITIONS

**Valuable Information**

"Valuable information" means:

a. Mortgage or loan documents; or

b. Accounts receivable records; or

c. Converted data, programs, or instructions used in your data processing operations, including the materials on which the data is recorded; or

d. Inscribed, microfilmed, printed or written documents, papers, ledgers or journals; or

e. Manuscripts or records, including abstracts, books, deeds, drawings, films, maps; or

f. Data or a virtual document stored on an optical disk or other storage media.

CUPOP 22 00 08 09              CUMIS Insurance Society, Inc.                     Page 7 of 7
copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

111

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 113 of 834

## DATA PROCESSING OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this Coverage.

Words and phrases that appear in quotation marks have special meaning and are defined in the Policy.

## COVERED PROPERTY

**Data Processing Equipment**

This Policy covers the following equipment located within the premises described on the Declarations or in the open (or in a vehicle) within 2000 feet of the described premises or within 2000 feet of the building, whichever distance is greater. This equipment may be either property you own or property belonging to others, which is in your care and for which you are or may be liable.

1. "Data processing equipment";

2. The air conditioning system that is used solely to service your "data processing equipment";

3. The electrical system that is used solely to service your data processing operations, provided such damage occurs within the building that houses your data processing operation or within 2000 feet of such building;

4. Mobile communication equipment including cellular telephone; laptop computers; paging devices; handheld personal digital assistants; handheld global positioning systems; and any other handheld communication devices;

5. Telephone and facsimile equipment;

6. Checking or share draft processing equipment;

7. Copy machines; and

8. Fire and burglary alarm systems.

CUPOP 23 00 01 16      CUMIS Insurance Society, Inc.      Page 1 of 11
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

112

## DATA PROCESSING OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

## PROPERTY NOT COVERAGE

The following property is not covered under Data Processing Operations Coverage:

1. "Valuable information";

2. "Money" and "securities";

3. Your property that you rent or lease to someone else;

4. "Automated teller machines"; or

5. Televisions, DVRs and VCRs.

## OPTIONAL COVERAGE

**Data Processing Extra Expense**

If Data Processing Extra Expense Optional Coverage at the premises described on the Declarations and for which a Data Processing Extra Expense Limit Of Insurance is shown on the Declarations, this Policy covers the actual and necessary "extra expense" you incur to avoid or minimize the suspension of business and to continue your business activities after a "loss to your data processing operations."

We will also pay for the actual and necessary "extra expense" caused by the interruption of service to the premises described on the Declarations and for which a Data Processing Extra Expense Limit Of Insurance is shown on the Declarations. The interruption must result from direct physical loss or damage by a Covered Cause Of Loss to "dependent business premises," "communication supply service," "water supply service," "power supply service," or "sewage treatment service" which provide service for a fee or charge to the premises described on the Declarations. Only the "extra expense" you incur after the service has been interrupted for 12 hours will be covered.

## ADDITIONAL COVERAGES

Payments under the Additional Coverages are subject to the applicable Limit Of Insurance shown on the Declarations, unless otherwise specified.

**Civil Authority**

We will pay for the actual and necessary "extra expense" you incur because a civil authority prevents access to the premises which house your data processing operations because of damage to the adjacent premises by a Covered Cause Of Loss.

The Civil Authority Additional Coverage applies only to Data Processing Extra Expense.

CUPOP 23 00 01 16
CUMIS Insurance Society, Inc.
Page 2 of 11
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

113

## DATA PROCESSING OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

## ADDITIONAL COVERAGE

### Debris Removal Of Damaged Property

1. We will pay your expense to remove debris resulting from the direct physical loss of or damage to Covered Property caused by a Covered Cause Of Loss that occurs during the Policy Period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

   a. The date of direct physical loss or damage; or

   b. The end of the Policy Period.

2. The most we will pay under this Additional Coverage is 25% of:

   a. The amount we pay for the direct physical loss of or damage to Covered Property; plus

   b. The Deductible in this Policy applicable to that loss or damage.

3. This Additional Coverage does not apply to costs to:

   a. Extract "pollutants" from land or water; or

   b. Remove, restore or replace polluted land or water.

The Debris Removal Of Damaged Property Additional Coverage applies only to Data Processing Equipment Covered Property.

### Electrical Or Mechanical Breakdown

We will pay for loss or damage to Covered Property due to an electrical or mechanical breakdown resulting from:

1. Lightning; or

2. Power surge of artificially generated current originating outside of the Covered Property.

The Electrical Or Mechanical Breakdown Additional Coverage applies to Data Processing Equipment Covered Property and Data Processing Extra Expense.

### Fire Protection Devices

We will pay for your expenses incurred to recharge or refill any fire protection devices that are designed specifically to protect Covered Property due to a Covered Cause Of Loss.

The Fire Protection Devices Additional Coverage applies only to Data Processing Equipment Covered Property.

CUPOP 23 00 01 16    CUMIS Insurance Society, Inc.    Page 3 of 11
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

114

**DATA PROCESSING OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## ADDITIONAL COVERAGE

**Loss Of Ingress And Egress**

We will pay for the actual and necessary "extra expense" you incur that results from loss of ingress or egress to a premises described on the Declarations that is caused by direct physical loss or damage to adjacent property from a Covered Cause Of Loss. Without regard to any other term or condition of the Policy, for the purpose of this Additional Coverage, Covered Cause Of Loss does not include earthquake or the action of any civil authority. The most we will pay for this Additional Coverage is $75,000 or the Limit Of Insurance shown on the Declarations for Data Processing Extra Expense Coverage, whichever is less.

**Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause Of Loss, we will pay for direct physical loss of or damage to that property while it is being moved or while temporarily stored at another location.

The Preservation Of Property Additional Coverage applies to Data Processing Equipment Covered Property and Data Processing Extra Expense.

**Unexpired Warranties, Maintenance Contracts Or Service Contracts**

We will reimburse you on a pro rata basis for the amount you paid to purchase non-refundable extended warranties, maintenance contracts or service contracts which are no longer valid due to direct physical loss of or damage to Covered Property that you repair or replace. The amount we pay will be based on the pro rata allocation of the original cost of the warranty, maintenance contract or service contract for the time remaining under the contract on the date of loss.

## EXTENSIONS OF COVERAGE

The limits applicable to the Extensions Of Coverage are in addition to the Limits Of Insurance shown on the Declarations.

The Coinsurance Condition does not apply to the Extensions Of Coverage.

**Arson, Theft Or Vandalism Reward**

Coverage is extended to provide a reward for information that leads to a conviction in connection with a fire, theft or vandalism loss covered under this Policy. You must obtain prior written approval from us concerning the terms and amount of the reward.

The most we will pay under this Extension Of Coverage is $50,000 for any one "occurrence."

CUPOP 23 00 01 16                    CUMIS Insurance Society, Inc.                    Page 4 of 11
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

115

**DATA PROCESSING OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**EXTENSIONS OF COVERAGE**

### Data Processing Equipment At Your Employee's Home

Coverage is extended to apply to your "data processing equipment" while located at your director's, volunteer's or employee's (including leased employee's) home.

This Extension Of Coverage applies separately to your "data processing equipment" while located at each director's, volunteer's, or employee's home. This Extension Of Coverage does not apply to property owned by your director, volunteer or employee. The most we will pay under this Extension Of Coverage is $100,000 for loss or damage in any one "occurrence."

### Data Processing Equipment Off Premises, In Transit - Worldwide

Coverage is extended to apply to your Covered Property while in transit or temporarily at a location you do not own, lease or operate anywhere in the world. This extension includes your Covered Property while located at a fair, exhibition or trade show.

This Extension Of Coverage does not apply to property while located at the home of your director, volunteer or employee (including leased employees). The most we will pay under this Extension Of Coverage is $100,000 for loss or damage in any one "occurrence."

The Data Processing Equipment Off Premises, In Transit - Worldwide Extension Of Coverage applies only to "data processing equipment."

### Newly Acquired Data Processing Equipment At A Covered Location

Coverage is extended to your newly acquired "data processing equipment" at a premises described on the Declarations.

Insurance under this Extension Of Coverage will end when any of the following first occurs:

1.  This Policy expires;

2.  180 days after you acquire the property; or

3.  The date you report the value of the newly acquired equipment to us.

We will charge you an additional premium based on the values reported from the date the equipment was acquired through the end of the Policy Period.

This Extension Of Coverage applies separately to each location. The most we will pay under this Extension Of Coverage is $250,000 for loss or damage caused by any one "occurrence."

CUPOP 23 00 01 16    CUMIS Insurance Society, Inc.    Page 5 of 11
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

116

## DATA PROCESSING OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

## EXTENSIONS OF COVERAGE

**Property At Newly Acquired Locations**

Coverage is extended to apply to newly acquired Covered Property at newly acquired locations other than the premises described on the Declarations.

Insurance under this Extension Of Coverage for newly acquired or constructed property will end when any of the following first occurs:

1. This Policy expires;

2. 180 days expire after you acquire the "data processing equipment"; or

3. The date you report the values to us.

We will charge you additional premium for values reported from the acquisition date through the end of the Policy Period.

This Extension Of Coverage applies separately to each location you acquire. The most we will pay under this Extension Of Coverage is $2,000,000 for loss or damage sustained as a result of any one "occurrence."

The Property At Newly Acquired Locations Extension Of Coverage applies to Data Processing Equipment Covered Property and Data Processing Extra Expense Coverage.

## COVERED CAUSES OF LOSS

This Coverage insures against direct physical loss to the Covered Property unless the loss is excluded or limited in this Policy.

## CONCURRENT POLICY EXCLUSIONS

We will not pay for loss or damage caused directly or indirectly by any of the following. All loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**Building Ordinance**

The enforcement of or compliance with any ordinance or law:

1. Regulating the construction, use or repair of any property; or

2. Requiring the tearing down of any property, including the cost of removing its debris.

CUPOP 23 00 01 16    CUMIS Insurance Society, Inc.    Page 6 of 11
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

117

**DATA PROCESSING OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**CONCURRENT POLICY EXCLUSIONS**

**Building Ordinance** - continued

This Exclusion applies whether the loss results from:

1. An ordinance or law that is enforced or complied with even if the property has not been damaged; or

2. The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

**Consequential Losses**

Delay, loss of use or loss of market.

**Fungus, Wet Rot, Dry Rot And Bacteria**

The presence or existence of "fungus," wet or dry rot or bacteria. This Exclusion does not apply to the extent the presence or existence of the "fungus," wet or dry rot or bacteria is attributable to: explosion, fire, water resulting from fire suppression efforts or leaking from fire protection equipment, or lightning.

**Governmental Action**

Seizure or destruction of property by order of governmental authority. But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage.

**Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused. But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**War And Military Action**

1. War, including undeclared or civil war;

2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

CUPOP 23 00 01 16    CUMIS Insurance Society, Inc.    Page 7 of 11
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

118

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 120 of 834

**DATA PROCESSING OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**OTHER POLICY EXCLUSIONS**

We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause Of Loss results, we will pay for only the resulting loss or damage from the Covered Cause Of Loss.

**Disappearance**

Property that is missing, but there is no physical evidence to show what happened to it or a shortage disclosed on taking inventory.

**Electrical Disturbance**

Short circuit, electrical arcing or other electrical disturbances except as provided in the Electrical Or Mechanical Breakdown Additional Coverage.

**Maintenance Types Of Loss**

1. Wear and tear;

2. Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

3. Smog;

4. Settling, cracking, shrinking or expansion;

5. Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals; or

6. Except as provided in the Electrical Or Mechanical Breakdown Additional Coverage, mechanical breakdown, including rupture or bursting caused by centrifugal force.

**Pollution**

1. The "pollution or contamination" of any "environment" by "pollutants" or seepage of "pollutants" that are introduced at any time, anywhere, in any way arising out of the actual, alleged or threatened discharge, dispersal, release or escape of "pollutants."

2. The cleaning up, testing, monitoring, containing, treating, detoxifying, and neutralizing of "pollutants" even if caused by a governmental direction or request.

This Exclusion does not apply to:

a. Direct physical loss of or damage to Covered Property caused by:

1) Fire;

CUPOP 23 00 01 16                    CUMIS Insurance Society, Inc.                    Page 8 of 11
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**DATA PROCESSING OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**OTHER POLICY EXCLUSIONS**

**Pollution** - continued

    2)  Lightning;

    3)  Smoke;

    4)  An accident involving an aircraft or vehicle;

    5)  Windstorm or hail;

    6)  An explosion;

    7)  A falling object entering the roof or outside wall of a building;

    8)  A leak from fire extinguishing equipment;

    9)  A collapse caused by weight of snow;

    10) Ice or sleet;

    11) Riot or civil commotion;

    12) An accidental discharge or leak of water or steam as the direct result of a crack or break in a plumbing, heating or air conditioning system or appliance (other than a sump pump) located on premises described on the Declarations;

    13) Volcanic activity; or

    14) Sinkhole collapse meaning the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite.

  b.  Debris Removal Of Damaged Property Additional Coverage.

**Programming Errors**

    Errors or omissions in programming or instruction to machines.

**Theft, Dishonesty Or Fraud**

  1.  Theft, dishonest or criminal act by you, any of your directors, any of your partners, officers, managers, volunteers, employees (including temporary employees and leased employees), trustees, authorized representatives or anyone to whom the property is entrusted for any purpose:

    a.  Acting alone or in collusion with others; or

    b.  Whether or not occurring during the hours of employment.

CUPOP 23 00 01 16           CUMIS Insurance Society, Inc.           Page 9 of 11
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

120

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 122 of 834

**DATA PROCESSING OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## OTHER POLICY EXCLUSIONS

**Theft, Dishonesty Or Fraud** - continued

This Exclusion does not apply to acts of destruction by your volunteers, employees (including temporary employees and leased employees) or authorized representatives.

2. Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**Work Upon Covered Property**

Processing or actual work upon Covered Property, but we will pay for direct loss caused by resulting fire or explosion.

## CONDITIONS

In addition to the Conditions in the Common Policy Provisions, the following Conditions also apply to this Coverage.

**Coinsurance**

If a Coinsurance Percentage is shown on the Declarations, the following Condition applies:

We will not pay the full amount of any loss if the replacement cost of Covered Property at the time of loss multiplied by the Coinsurance Percentage shown on the Declarations is greater than the Limit Of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the replacement cost of Covered Property at the time of loss by the Coinsurance Percentage;

(2) Divide the Limit Of Insurance of the property by the figure determined in step (1);

(3) Multiply the total amount of loss, before the application of any Deductible, by the figure determined in step (2); and

(4) Subtract the Deductible from the figure determined in step (3).

We will pay the amount determined in step (4) or the Limit Of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

The Coinsurance Condition applies only to Data Processing Equipment Covered Property.

This Coinsurance Condition does not apply to a covered loss of $100,000 or less.

CUPOP 23 00 01 16                    CUMIS Insurance Society, Inc.                    Page 10 of 11
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

121

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 123 of 834

## DATA PROCESSING OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

### CONDITIONS

### Deductible

We will not pay for loss or damage in any one "occurrence" until the amount of loss or damage exceeds the Deductible shown on the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit Of Insurance, after any deduction required by the Coinsurance Condition.

When the "occurrence" involves loss to more than one item of Covered Property and more than one Limit Of Insurance applies, the Deductible will reduce the total amount of loss payable if loss to at least one item is less than the sum of the Limit Of Insurance applicable to that item plus the Deductible.

The Deductible Condition applies only to Data Processing Equipment Covered Property.

### Limit Of Insurance

The most we will pay for loss or damage in any one "occurrence" is the applicable Limit Of Insurance shown on the Declarations.

The Limit Of Insurance Condition applies to Data Processing Equipment Covered Property and Data Processing Extra Expense Coverage.

### Valuation Of Covered Property

We will determine the value of Covered Property at replacement cost (without deduction for depreciation) for purposes of the Coinsurance Condition.

However, the value of Covered Property for purposes of a loss determination is the lesser of the:

1. Replacement cost (without deduction for depreciation). If identical replacement of the Covered Property is not possible, the valuation of Covered Property will be the cost to replace the property with similar property intended to perform the same function;

2. Repair cost (without deduction for depreciation) of the Covered Property; or

3. The "actual cash value" of Covered Property on the date of loss, if you do not repair or replace the Covered Property.

If the Covered Property is not replaced or repaired, the value of Covered Property for purposes of a loss determination will be based on the "actual cash value" on the date of loss.

The Valuation Of Covered Property Condition applies only to Data Processing Equipment Covered Property.

 CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 124 of 834

# AUTOMATED TELLER MACHINE COVERAGE
# PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this Coverage.

Words and phrases that appear in quotation marks have special meaning and are defined in the Policy.

## PROPERTY COVERED

This Policy covers "automated teller machines" owned by you or leased to you for which you are liable.

## PROPERTY NOT COVERED

The following property is not covered under Automated Teller Machine Coverage:

a.  "Money," and "securities";

b.  Walks, parking lots and other paved surfaces; except as provided within the Extensions Of Coverage;

c.  Land and water;

d.  Trees, shrubs, plants and lawns;

e.  Retaining walls that are not attached to the kiosk; or

f.  "Valuable information."

Payments under the Additional Coverages are subject to the applicable Limit Of Insurance shown on the Declarations.

## ADDITIONAL COVERAGES

**Debris Removal Of Damaged Property**

1.  We will pay your expense to remove debris resulting from the direct physical loss of or damage to Covered Property caused by a Covered Cause Of Loss that occurs during the Policy Period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

    a.  The date of direct physical loss or damage; or

    b.  The end of the Policy Period.

CUPOP 24 00 01 18                    CUMIS Insurance Society, Inc.                    Page 1 of 7
Contains copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

123

**AUTOMATED TELLER MACHINE COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## ADDITIONAL COVERAGES

**Debris Removal Of Damaged Property** – continued

2. The most we will pay under this Additional Coverage is 25% of:

   a. The amount we pay for the direct physical loss of or damage to Covered Property; plus

   b. The Deductible in this Policy applicable to that loss or damage.

3. This Additional Coverage does not apply to costs to:

   a. Extract "pollutants" from land or water; or

   b. Remove, restore or replace polluted land or water.

**Electrical Or Mechanical Breakdown**

We will pay for loss or damage to Covered Property due to an electrical or mechanical breakdown resulting from:

a. Lightning; or

b. Power surge of artificially generated current originating outside of the Covered Property.

## EXTENSIONS OF COVERAGE

The limits applicable to the Extensions Of Coverage are in addition to the Limits Of Insurance shown on the Declarations.

**Robbery Reward**

Coverage is extended to provide a reward for information that leads to the conviction of a person causing:

a. "Bodily injury" during a robbery or attempted robbery within 100 feet of an "automated teller machine" owned by you or leased to you; or

b. Damage to an "automated teller machine" owned by you or leased to you.

You need prior written approval from us concerning the terms and amount of the reward.

The most we will pay under this Extension Of Coverage for loss is $5,000 in any one "occurrence."

No deductible applies to this Extension Of Coverage.

CUPOP 24 00 01 18                    CUMIS Insurance Society, Inc.                    Page 2 of 7
Contains copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

124

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 126 of 834

**AUTOMATED TELLER MACHINE COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## EXTENSIONS OF COVERAGE

**Walks, Parking Lot And Other Paved Surfaces**

We will pay for loss or damage to walks, parking lot and other paved surfaces caused by damage or theft of an "Automated Teller Machine".

The most we will pay under this Extension Of Coverage for loss is $10,000 in any one "occurrence."

## COVERED CAUSES OF LOSS

This Coverage insures against direct physical loss to the Covered Property unless the loss is excluded or limited in this Policy.

CUPOP 24 00 01 18    CUMIS Insurance Society, Inc.    Page 3 of 7
Contains copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

125

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 127 of 834

**AUTOMATED TELLER MACHINE COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**CONCURRENT POLICY EXCLUSIONS**

We will not pay for loss or damage caused directly or indirectly by any of the following. All loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

### Building Ordinance

The enforcement of or compliance with any ordinance or law:

a.  Regulating the construction, use or repair of any property; or

b.  Requiring the tearing down of any property, including the cost of removing its debris.

### Consequential Losses

Delay, loss of use or loss of market.

### Governmental Action

Seizure or destruction of property by order of governmental authority. But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this coverage.

### Nuclear Hazard

Nuclear reaction or radiation, or radioactive contamination, however caused. But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

### Power Failure

The failure of power or other utility service supplied to the Covered Property, however caused, if the failure occurs away from the Covered Property. But if loss or damage by a Covered Cause Of Loss results, we will pay for that resulting loss or damage.

### War And Military Action

1.  War, including undeclared or civil war;

2.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

CUPOP 24 00 01 18                CUMIS Insurance Society, Inc.                Page 4 of 7
Contains copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

126

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 128 of 834

## AUTOMATED TELLER MACHINE COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

## OTHER POLICY EXCLUSIONS

We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause Of Loss results, we will pay for only the resulting loss or damage from the Covered Cause Of Loss.

### Electrical Disturbance

Short circuit, electrical arcing or other electrical disturbances except as provided in the Electrical Or Mechanical Breakdown Additional Coverage.

### Maintenance Types Of Loss

1. Wear and tear;

2. Rust, corrosion, "fungus," decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

3. Smog;

4. Settling, cracking, shrinking or expansion;

5. Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals; or

6. Except as provided in the Electrical Or Mechanical Breakdown Additional Coverage, mechanical breakdown, including rupture or bursting caused by centrifugal force.

### Pollution

1. The "pollution or contamination" of any "environment" by "pollutants" or seepage of "pollutants" that are introduced at anytime, anywhere, in any way arising out of the actual, alleged or threatened discharge, dispersal, release or escape of "pollutants."

2. The cleaning up, testing, monitoring, containing, treating, detoxifying, and neutralizing of "pollutants" even if caused by a governmental direction or request.

   This exclusion does not apply to:

   a. Coverage provided for "pollution or contamination" from smoke or fumes from a "hostile fire"; or

   b. Coverage provided for Debris Removal Of Damaged Property that includes removal of "pollutants." But, Debris Removal Of Damaged Property is subject to a limit of 25% of the direct physical damage loss to the covered property and is not provided for the removal of "pollutants" from land or water.

CUPOP 24 00 01 18                CUMIS Insurance Society, Inc.                Page 5 of 7
Contains copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

127

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 129 of 834

## AUTOMATED TELLER MACHINE COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

## OTHER POLICY EXCLUSIONS

**Theft, Dishonesty Or Fraud**

1.  Theft, dishonest, or criminal act by any director, volunteer, employee (including leased employees), trustee, authorized representative or anyone to whom the property is entrusted for any purpose:

    a.  Acting alone or in collusion with others; or

    b.  Whether or not occurring during the hours of employment.

    This exclusion does not apply to acts of destruction by your directors, volunteers, employees (including leased employees), trustees or authorized representatives.

2.  Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**Work Upon Covered Property**

Processing or actual work upon Covered Property, but we will pay for direct loss caused by resulting fire or explosion.

## CONDITIONS

In addition to the Conditions in the Common Policy Provisions, the following Conditions also apply to this coverage.

**Coinsurance**

If a Coinsurance Percentage is shown on the Declarations, the following Condition applies:

If your last report to us of replacement cost values is less than the full replacement cost value of all your "automated teller machines" on the reporting date, we will pay only a proportion of the loss. The proportion of the loss payable, prior to the application of the deductible, will not be greater than the proportion determined by:

a.  The replacement cost values you reported for all "automated teller machines," divided by;

b.  The replacement cost values of all "automated teller machines" on the reporting date.

For the remainder of any loss, you will either have to rely on other insurance or absorb the loss yourself.

CUPOP 24 00 01 18
CUMIS Insurance Society, Inc.
Page 6 of 7
Contains copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 130 of 834

## AUTOMATED TELLER MACHINE COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

## CONDITIONS

**Deductible**

We will not pay for loss or damage in any one "occurrence" until the amount of loss or damage exceeds the Deductible shown on the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit Of Insurance, after any deduction required by the Coinsurance Condition.

When the "occurrence" involves loss to more than one item of Covered Property and more than one Limit Of Insurance applies, the Deductible will reduce the total amount of loss payable if loss to at least one item is less than the sum of the Limit Of Insurance applicable to that item plus the Deductible.

**Limit Of Insurance**

The most we will pay for loss or damage in any one "occurrence" for any one "automated teller machine" is the applicable Limit Of Insurance shown on the Declarations.

**Reporting Of Newly Acquired Automated Teller Machine**

You must report the replacement cost values of any newly acquired "automated teller machines" before the next policy annual anniversary date. You may not correct inaccurate reports after a loss.

**Valuation Of Covered Property**

We will determine the value of Covered Property at replacement cost (without deduction for depreciation) for purposes of the Coinsurance Condition.

However, the value of Covered Property for purposes of a loss determination is the lesser of the:

a. Replacement cost (without deduction for depreciation); or

b. Repair cost (without deduction for depreciation) of the Covered Property.

CUPOP 24 00 01 18                    CUMIS Insurance Society, Inc.                    Page 7 of 7
Contains copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

129

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 131 of 834

## SCHEDULED ARTICLES COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties, and what is and is not covered. The Common Policy Provisions apply to this coverage.

Words and phrases that appear in quotation marks have special meaning and are defined in the Policy.

## COVERED PROPERTY

This Policy covers articles described in the Schedule, which you own or are in your care, custody, and control.

## COVERED CAUSES OF LOSS

This coverage insures against risks of direct physical loss to Covered Property subject to the following exclusions.

## CONCURRENT POLICY EXCLUSIONS

We will not pay for loss or damage caused directly or indirectly by any of the following. All loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**Governmental Action**

Seizure or destruction of property by order of governmental authority. But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this coverage.

**Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused. But if loss or damage by fire results, we will pay for that resulting loss or damage.

**War And Military Action**

1. War, including undeclared or civil war;

2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 132 of 834

SCHEDULED ARTICLES COVERAGE
PROPERTY AND BUSINESS LIABILITY POLICY

## CONCURRENT POLICY EXCLUSIONS

**Consequential Losses**

Delay, loss of use or loss of market.

## OTHER POLICY EXCLUSIONS

We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause Of Loss results, we will pay for only the resulting loss or damage from the Covered Cause Of Loss.

**Disappearance**

Property that is missing, but there is no physical evidence to show what happened to it. A shortage disclosed on taking inventory.

**Electrical Apparatus**

Artificially generated electric current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if loss or damage by fire results, we will pay for that resulting loss or damage.

**Maintenance Types Of Loss**

1. Wear and tear, gradual deterioration;

2. Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

3. Marring, chipping, scratching or breakage unless caused by:

    a. Fire, lightning, explosion, cyclone, tornado, thieves; or

    b. Overturning, derailment or collision of a conveyance on which the property is being transported;

4. Smog;

5. Release, discharge or dispersal of "pollutants" except smoke or fumes from a "hostile fire";

CUPOP 25 00 08 09

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 2 of 4

131

**Maintenance Types Of Loss** - continued

6. Settling, cracking, shrinking or expansion;

7. Insects, birds, rodents or other animals;

8. Mechanical breakdown, including rupture or bursting caused by centrifugal force; or

9. Smoke, vapor or gas from agricultural smudging or industrial operations.

"Pollutants" means any noise, solid, semisolid, liquid, gaseous or thermal irritant or contaminant, including any vapor, soot, fume, acid, alkali, chemical, biological and/or other etiologic agent or material, electromagnetic or ionizing radiation and energy, genetically engineered material, teratogenic, carcinogenic and mutagenic material, waste and any other irritant or contaminant. Waste includes any material to be disposed of, recycled, reconditioned or reclaimed.

"Hostile fire" means a fire which becomes uncontrollable or breaks out from where it is intended to be.

**Negligent Work**

Loss due to or resulting from any repairing, restoration or retouching process.

**Theft, Dishonesty Or Fraud**

1. Dishonest, criminal act or theft by any employee, director, trustee, authorized representative or anyone to whom the property is entrusted for any purpose:

   a. Acting alone or in collusion with others; or

   b. Whether or not occurring during the hours of employment.

   This exclusion does not apply to common carriers or to acts of destruction by your employees.

2. Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**Weather Conditions**

Property in the open damaged by rain, hail, sleet, snow or freezing.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 134 of 834

**SCHEDULED ARTICLES COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## CONDITIONS

In addition to the Conditions in the Common Policy Provisions, the following Conditions also apply to this coverage.

### Deductible

We will be liable only when a covered loss exceeds the Deductible shown on the Declarations in any one "occurrence" and then only for the amount of the excess.

### Coinsurance Clause

We will only pay for losses in the proportion that the Limit Of Insurance bears to the value of the property at the time of loss as computed under the Valuation Section.

### Valuation Of Covered Property

We will determine the value of Covered Property at "actual cash value" except:

Pairs or Sets. If there is a loss of an article which is part of a pair or set, we will pay you the full amount of the pair or set, as set forth in the Schedule, if you surrender the remaining article or articles of the pair or set to us.

### Reinstatement

The Limit Of Insurance will not be reduced by the payment of any claim, except for total loss of a schedule item, in which event we will refund unearned premium on that item.

### Limit Of Insurance

The most we will pay for loss or damage for any one article is the applicable Limit Of Insurance shown in the Schedule.

## DEFINITIONS

### Actual Cash Value

"Actual cash value" means the amount which it would cost to repair or replace the damaged property with one of like kind or quality, less allowance for physical deterioration and depreciation.

### Occurrence

"Occurrence" for the purpose of this coverage means an event or series of causally related events that contribute concurrently or consecutively to loss or damage.

CUPOP 25 00 08 09                    CUMIS Insurance Society, Inc.                    Page 4 of 4
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

133

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 135 of 834

## EXTRA EXPENSE COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this Coverage.

Words and phrases that appear in quotation marks have special meaning and are defined in the Policy.

## COVERAGE

**Extra Expense**

1. We will pay the actual and necessary "extra expense" you incur to avoid or minimize the suspension of business and to continue your business activities. Coverage applies when you sustain a direct physical loss or damage to property at the premises described on the Declarations and for which an Extra Expense Coverage Limit Of Insurance is shown on the Declarations, caused by or resulting from any Covered Cause Of Loss.

2. We will also pay the actual and necessary "extra expense" caused by the interruption of service to the premises described on the Declarations and for which an Extra Expense Coverage Limit Of Insurance is shown on the Declarations. The interruption must result from direct physical loss or damage by a Covered Cause Of Loss to: "dependent business premises," "communication supply service," "water supply service," "power supply service" or "sewage treatment service" which provide service for a fee or charge to the premises described on the Declarations and for which an Extra Expense Coverage Limit Of Insurance is shown on the Declarations. Only the "extra expense" you incur after the service has been interrupted for 12 hours will be covered.

## ADDITIONAL COVERAGES

Payments under the Additional Coverages are subject to the applicable Limit Of Insurance shown on the Declarations.

**Alterations And New Buildings**

We will pay for the actual and necessary "extra expense" you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause Of Loss to:

1. New buildings or structures, whether complete or under construction;

2. Alterations or additions to existing buildings or structures; and

3. Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

CUPOP 41 00 04 14 CUMIS Insurance Society, Inc. Page 1 of 4
Includes copyrighted material of Insurance Services, Inc., with its permission.

134

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 136 of 834

**EXTRA EXPENSE COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## ADDITIONAL COVERAGES

**Alterations And New Buildings** - continued

   a.   Used in the construction, alterations or additions; or

   b.   Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of your business activities, the "period of restoration" will begin on the date your business activities would have begun if the direct physical loss or damage had not occurred.

**Civil Authority**

We will pay for the actual and necessary "extra expense" you incur caused by action of civil authority that prohibits access to the described premises due to direct physical loss or damage to property, other than at the described premises, caused by or resulting from any Covered Cause Of Loss.

**Fairs, Exhibitions And Trade Shows**

We will pay for the actual and necessary "extra expense" you incur during the "period of restoration" due to direct physical loss or damage to covered:

1.   Personal property; or

2.   Fine arts,

while in transit to a fair, exhibition, or trade show caused by a Covered Cause Of Loss.

**Loss Of Ingress And Egress**

We will pay for the actual and necessary "extra expense" you incur that results from loss of ingress or egress to a premises described on the Declarations that is caused by direct physical loss or damage to adjacent property from a Covered Cause Of Loss. Without regard to any other term or condition of this Policy, for the purposes of this Additional Coverage, Covered Cause Of Loss does not include earthquake or the action of any civil authority. The most we will pay for this Additional Coverage is $75,000 or the limit shown on the Declarations for Extra Expense Coverage, whichever is less.

## EXTENSION OF COVERAGE

The limits applicable to the Extension Of Coverage are in addition to the Limits Of Insurance shown on the Declarations.

**Newly Acquired Locations**

You may extend the insurance provided by this Coverage to newly acquired property at newly acquired locations.

CUPOP 41 00 04 14                    CUMIS Insurance Society, Inc.                    Page 2 of 4
Includes copyrighted material of Insurance Services, Inc., with its permission.

135

**EXTRA EXPENSE COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## EXTENSION OF COVERAGE

**Newly Acquired Locations** - continued

Insurance under this Extension Of Coverage for each newly acquired location will end when any of the following first occurs:

1.  This Policy expires;

2.  180 days expire after you acquire the property; or

3.  You notify us of how you want this Coverage to apply to that location.

We will charge you additional premium from the date you acquire the property.

This Extension Of Coverage applies separately to each location. The most we will pay under this Extension Of Coverage is $1,000,000 for loss in any one "occurrence."

## COVERED CAUSES OF LOSS

For the purpose of this Coverage, Covered Causes Of Loss will mean the coverages, as defined and limited, applicable under this Policy to either the Business Personal Property Coverage - Special or the Building Coverage - Special at the described premises.

## EXCLUSIONS

In addition to the Exclusions that apply to the Business Personal Property Coverage - Special or Building Coverage - Special for the described premises, the following Exclusions apply.

Coverage does not apply to:

1.  Loss of income;

2.  Any "extra expense" caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration";

3.  The cost to repair or replace any property;

4.  Any loss caused by loss to "valuable information"; or

5.  Any other consequential loss.

The Fungus Concurrent Policy Exclusions found in the Business Personal Property Coverage - Special and Building Coverage - Special do not apply to the actual and necessary "extra expense" you incur during the 45 day period after you first discover the "fungus."

CUPOP 41 00 04 14                    CUMIS Insurance Society, Inc.                    Page 3 of 4
Includes copyrighted material of Insurance Services, Inc., with its permission.

136

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 138 of 834

**EXTRA EXPENSE COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**CONDITIONS**

In addition to the Conditions in the Common Policy Provisions, the following Conditions also apply to this Coverage.

**Limit Of Insurance**

The most we will pay for loss in any one "occurrence" is the applicable Limit Of Insurance shown on the Declarations.

**Loss Determination**

The amount of "extra expense" will be determined based on:

1. All expenses that exceed the normal operating expenses that would have been incurred by your business activities during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

    a. The salvage value that remains of any property bought for temporary use during the "period of restoration," once your business activities are resumed; and

    b. Any "extra expense" that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

2. All necessary expenses that reduce the "extra expense" loss that otherwise would have been incurred.

**Resumption Of Operations**

We will reduce the amount of "extra expense" loss to the extent you can return your business activities to normal and discontinue such "extra expense."

CUPOP 41 00 04 14                    CUMIS Insurance Society, Inc.                    Page 4 of 4
Includes copyrighted material of Insurance Services, Inc., with its permission.

137

## LOSS OF RENTAL INCOME COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this Coverage.

Words and phrases that appear in quotation marks have special meaning and are defined in the Policy.

### COVERAGE

We will pay the loss of "rental income" caused by a Covered Cause Of Loss, during the term of this Policy, at the premises described on the Declarations.

We will be liable under this Coverage for:

a.  The actual loss of "rental income" sustained by you resulting directly from necessary untenantability.

b.  Such expenses incurred for the purpose of reducing loss under this Coverage (except expense incurred to extinguish a fire), but these expenses must not exceed the amount of the covered loss, and these expenses will not be subject to the Coinsurance Clause.

c.  Your "rental income" loss due to damage to adjacent property caused by a Covered Cause Of Loss, when access to your property is prohibited by civil authority.

### EXTENSION OF COVERAGE

The limits applicable to the Extension Of Coverage are in addition to the Limits Of Insurance shown on the Declarations.

**Newly Acquired Rental Property**

You may extend the insurance that applies to your loss of "rental income" to newly acquired rental property.

Insurance under this Extension Of Coverage for newly acquired rental property will end at the time any of the following first occurs:

a.  This Policy expires; or

b.  180 days after you acquire the property; or

CUPOP 42 00 08 09        CUMIS Insurance Society, Inc.        Page 1 of 3
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

138

INDEX NO. 655437/2024
Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 140 of 834
RECEIVED NYSCEF: 03/06/2025

**New Acquired Rental Property** - continued

    c.   You report the value of the newly acquired rental property to us.

We will charge you additional premium based on the date the property was acquired.

This Extension Of Coverage applies separately to each insured location you acquire. The most we will pay under this Extension Of Coverage is $1,000,000 for loss or damage caused by any one "occurrence."

## COVERED CAUSES OF LOSS

Covered Causes Of Loss means the coverages, as defined and limited, applicable under this Policy to the Business Personal Property Coverage - Special and Building Coverage at the described premises.

## EXCLUSIONS

The Exclusions found in your Business Personal Property Coverage – Special and Building Coverage apply to this Coverage.

The "fungus" exclusion found in the Business Personal Property Coverage – Special and Building Coverage does not apply to the loss of "rental income" you incur during the 45 day period after you first discover the direct physical loss or damage caused by "fungus."

## CONDITIONS

In addition to the Conditions in the Common Policy Provisions, the following conditions also apply to this Coverage.

**Coinsurance Clause**

We will only pay for "rental income" losses in the proportion that the Limit Of Insurance under this Coverage bears to the amount of "rental income" that would have been earned (had no loss occurred) during the 12 months immediately following the date of damage to the premises described on the Declarations.

CUPOP 42 00 08 09                  CUMIS Insurance Society, Inc.                Page 2 of 3
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

139

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 141 of 834

LOSS OF RENTAL INCOME COVERAGE
PROPERTY AND BUSINESS LIABILITY POLICY

## CONDITIONS

### Limit Of Insurance

We will not be liable for any amount in excess of the actual loss sustained by you, and in no event to exceed the lesser of the following:

a.  The reduction in "rental income," less charges and expenses which do not necessarily continue during the period of untenantability, for only such length of time as would be required to rebuild, repair, or replace as quickly as possible the part of the described premises that has been damaged, beginning with the date of such damage but not limited by the date of expiration of this Coverage;

b.  The amount of insurance produced by the application of the Coinsurance Clause;

c.  The Limit Of Insurance for loss of "rental income" specified on the Declarations for the described premises.

## DEFINITIONS

### Fungus

"Fungus" means any microorganism or by-product of a microorganism, including, but not limited to mold, mildew, fungi, myotoxins and spores.

### Occurrence

"Occurrence" for purpose of this coverage means an event or series of causally related events that contribute concurrently or consecutively to loss or damage.

### Rental Income

"Rental income" is the sum of:

a.  The total gross income you would have received from your tenant of the described premises as furnished and equipped by you; and

b.  The amount of continuing charges you incur which otherwise were the legal obligation of and would be paid by your tenant.

In determining the amount of loss we will consider the rental experience before the date of damage and the probable experience thereafter had no loss occurred.

CUPOP 42 00 08 09                CUMIS Insurance Society, Inc.                Page 3 of 3
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

140

# REAL ESTATE MORTGAGE OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

## CONTENTS

**Coverage A. Mortgageholder's Interest** ............................................................................... 2
   Mortgageholder's Interest Covered Property
   Mortgageholder's Interest Property Not Covered
   Mortgageholder's Interest Additional Coverage
   Mortgageholder's Interest Covered Causes Of Loss
   Mortgageholder's Interest Conditions

**Coverage B. Foreclosed Property And Property Owned Or Held In Trust** ...................................... 7
   Foreclosed Property And Property Owned Or Held In Trust Covered Property
   Foreclosed Property And Property Owned Or Held In Trust Property Not Covered
   Foreclosed Property And Property Owned Or Held In Trust Additional Coverages
   Foreclosed Property And Property Owned Or Held In Trust Covered Causes Of Loss
   Foreclosed Property And Property Owned Or Held In Trust Conditions

**Coverage C. Mortgageholder's Liability** ......................................................................15
   Mortgageholder's Liability Additional Coverages
   Mortgageholder's Liability Extension Of Coverage
   Mortgageholder's Liability Covered Causes Of Loss
   Mortgageholder's Liability Conditions

**Coverage D. Real Estate Tax Liability** ........................................................................ 20
   Real Estate Tax Liability Additional Coverage
   Real Estate Tax Liability Extension Of Coverage
   Real Estate Tax Liability Conditions

**Coverage E. Mortgageholder's Interest In Mortgage Guarantee Insurance** ................................. 24
   Mortgageholder's Interest In Mortgage Guarantee Insurance Additional Coverage
   Mortgageholder's Interest In Mortgage Guarantee Insurance Conditions

**Condition** .................................................................................................. 28

**Additional Condition** ....................................................................................... 28

**Concurrent Policy Exclusions** ............................................................................... 30

**Other Policy Exclusions** .................................................................................... 32

**Definitions** ................................................................................................ 34

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 1 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

141

## REAL ESTATE MORTGAGE OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this Coverage.

Words and phrases that appear in quotation marks have special meaning and are defined in the Policy.

## COVERAGE A. MORTGAGEHOLDER'S INTEREST

We will pay in accordance with the Limits Of Insurance for "loss to your mortgageholder's interest" arising out of a Covered Cause Of Loss to Covered Property and resulting from:

1.  An error or accidental omission by you or your representative in following your customary procedures in requiring, procuring and maintaining insurance payable to you as mortgageholder; or

2.  A "lack or insufficiency of insurance" payable to you as mortgageholder.

## MORTGAGEHOLDER'S INTEREST
## COVERED PROPERTY

Covered Property means:

1.  "Real property"; and

2.  Personal property secured on the mortgage in connection with that "real property."

It includes such property sold under an agreement in which you retain title, such as a conditional sales agreement.

## MORTGAGEHOLDER'S INTEREST
## PROPERTY NOT COVERED

The following property is not covered under Mortgageholder's Interest:

1.  "Foreclosed property" on which a foreclosure judgment or deed has been recorded on public records on or before the date the damage occurred;

2.  Accounts, bills, currency, deeds, food stamps or other evidences of debt, "money," notes or "securities";

3.  Bridges, roadways, walks, patios, parking lots or other paved surfaces;

4.  Land (including land on which property is located), water, growing crops or lawns (other than lawns that are part of a vegetated roof);

5.  Retaining walls that are not attached to the covered building;

CUPOP 53 00 01 16      CUMIS Insurance Society, Inc.      Page 2 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

142

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 144 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## MORTGAGEHOLDER'S INTEREST
## PROPERTY NOT COVERED

6. Trees, shrubs and plants (other than trees, shrubs and plants that are part of a vegetated roof); or

7. Electronic data in any form.

## MORTGAGEHOLDER'S INTEREST
## ADDITIONAL COVERAGE

Payments under the Additional Coverage will not increase the applicable Limit Of Insurance shown on the Declarations.

**Mortgages Serviced For Others**

We will cover loss arising from mortgages owned by others and serviced by you as if you owned the mortgage interest in them. All such mortgages must be serviced under a written contract. We will make loss payment payable jointly to you and the mortgage owner.

## MORTGAGEHOLDER'S INTEREST
## COVERED CAUSES OF LOSS

The Covered Causes Of Loss are those causes of loss (including flood as required by the Flood Disaster Protection Act of 1973) including any amendment of or addition to such law against which you customarily require mortgagors to provide property insurance policies that protect your interest in mortgaged property, subject to all the Exclusions of this Coverage.

## MORTGAGEHOLDER'S INTEREST
## CONDITIONS

In addition to the Conditions in the Common Policy Provisions the following Conditions apply to Mortgageholder's Interest.

**Date Of Loss**

The date of loss for Mortgageholder's Interest is the date damage occurs.

**Deductible**

We will be liable only when a covered loss exceeds the Deductible shown on the Declarations and only for the amount of the excess. If only one deductible is shown on the Declarations for Real Estate Mortgage Operations Coverage, that deductible applies separately to each loss per mortgage ("residential mortgage" or "commercial mortgage").

CUPOP 53 00 01 16               CUMIS Insurance Society, Inc.               Page 3 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

143

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**MORTGAGEHOLDER'S INTEREST**
**CONDITIONS**

**Deductible** - continued

If two separate deductibles are shown on the Declarations for Real Estate Mortgage Operations Coverage, the deductible for:

1. "Residential mortgages" applies separately to each loss per "residential mortgage"; and

2. "Commercial mortgages" applies separately to each loss per "commercial mortgage."

**Duties In The Event Of Loss**

In the event of loss you must follow the steps listed in the Common Policy Provisions, Your Duties In The Event Of A Property, Lending, Or Expense/Income Coverage Loss Or Damage Loss Condition.

**Limit Of Insurance**

Under Mortgageholder's Interest, the most we will pay is the lesser of:

1. The amount of your mortgage balance including accrued interest, after you have taken all reasonable steps to reduce it;

2. The amount of the actual direct loss to the property damaged or destroyed that would be payable as determined in accordance with the conditions and limits of the insurance policies your customary procedures require, less the amount of any other insurance recovery payable to you on the Covered Property; or

3. The Limit Of Insurance shown on the Declarations. If only one Limit Of Insurance is shown on the Declarations for Real Estate Mortgage Operations Coverage, that limit applies per mortgage loss ("residential mortgage" or "commercial mortgage").

   If two separate Limits Of Insurance are shown on the Declarations for Real Estate Mortgage Operations Coverage, the:

   a. "Residential mortgages" Limit Of Insurance applies per "residential mortgage" loss; and

   b. "Commercial mortgages" Limit Of Insurance applies per "commercial mortgage" loss.

The Per Mortgage Limit Of Insurance shown on the Declarations is not increased if more than one of the Coverages (Mortgageholder's Interest, Foreclosed Property And Property Owned Or Held In Trust, Mortgageholder's Liability, Real Estate Tax Liability and Mortgageholder's Interest In Mortgage Guarantee Insurance) apply to one loss.

CUPOP 53 00 01 16
CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Page 4 of 36

144

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 146 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**MORTGAGEHOLDER'S INTEREST**
**CONDITIONS**

**Newly Acquired Organizations**

The words "you" and "your" also include any organization (other than a partnership or joint venture) that you acquire or form and over which you maintain ownership or sole interest if there is no other similar insurance available to that organization.

This Coverage Extension ends:

1.  90 days after you acquire or form the organization; or

2.  At the end of the Policy Period shown on the Declarations,

whichever is earlier.

When you merge with another entity, and you are the surviving entity, the 90 day limitation in paragraph 1. above does not apply.

This Coverage Extension does not apply to losses that occurred before the date you acquired the organization or before the date of merger.

**Policy Period**

The Policy Period Condition in the Common Policy Provisions is replaced with the following:

Under Mortgageholder's Interest, coverage applies only when the date of loss occurs during the Policy Period shown on the Declarations. The date of the error or accidental omission does not have to be within the Policy Period.

No coverage is provided for a date of loss before the effective date or after the termination date of the Policy.

**Transfer Of Mortgage**

We and all other insurance companies covering a loss, if in agreement, may pay you an amount equal to the outstanding balance on the mortgage, even if that amount is greater than the amount of loss. If so, we and the other insurance companies may demand and receive a full assignment of the mortgage, including all securities held as collateral for the debt, as interests may appear.

**Your Duties In Administration Of Real Estate Operations**

As a condition of coverage you must establish and enforce the following procedures:

1.  You require written confirmation of insurance at the closing where mortgage funds are disbursed. The insurance provided must insure those causes of loss your customary procedures require to protect your interest in mortgaged property;

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 5 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 147 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**MORTGAGEHOLDER'S INTEREST**
**CONDITIONS**

**Your Duties In Administration Of Real Estate Operations** - continued

2.  You will impress upon your mortgagor the requirement that property insurance must be kept in force listing you as mortgageholder;

3.  You will review all insurance cancellation notices to determine if the cancellation results in a "lack or insufficiency of insurance"; and

4.  You will obtain property insurance to protect your interest in mortgaged property, within 90 days of when you or your representative first become aware of an error or omission or "lack or insufficiency of insurance." Your representative includes an organization performing real estate loan administration or tracking services.

    Coverage provided under Mortgageholder's Interest terminates the earliest of the following dates:

    a.  The 91st day after you or your representative were aware of the error or omission or "lack or insufficiency of insurance"; or

    b.  The date insurance coverage is obtained for the mortgaged property.

As a condition of coverage you must:

1.  Make every reasonable effort to collect the loan secured by the mortgage, including, if applicable pursuit of collection in bankruptcy. Unless required by law, you must not release the mortgagor from the obligation if the foreclosure does not by statute release the obligation; and

2.  Foreclose on the mortgaged property and apply the proceeds of sale to the mortgage balance. However, we do reserve the right to waive the foreclosure requirement.

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 6 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

146

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 148 of 834

## REAL ESTATE MORTGAGE OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

## COVERAGE B. FORECLOSED PROPERTY AND PROPERTY OWNED OR HELD IN TRUST

We will pay for direct physical loss or damage to Covered Property caused by or resulting from any Covered Cause Of Loss. Coverage applies only if the loss is not otherwise insured due to error or accidental omission, by you or your representative, in the operation of your customary procedure in procuring and maintaining insurance payable to you as owner or trustee of the Covered Property.

## FORECLOSED PROPERTY AND PROPERTY OWNED OR HELD IN TRUST COVERED PROPERTY

Covered Property means "real property" located within the United States of America, its territories and possessions except Puerto Rico, and personal property located within the building:

1. You own;

2. In which you have a fiduciary interest as trustee or otherwise; or

3. Which is "foreclosed property" on or before the date the damage occurred.

## FORECLOSED PROPERTY AND PROPERTY OWNED OR HELD IN TRUST PROPERTY NOT COVERED

The following property is not covered under Foreclosed Property And Property Owned Or Held In Trust:

1. Accounts, bills, currency, deeds, food stamps or other evidences of debt, "money," notes or "securities";

2. Bridges, roadways, walks, patios, parking lots or other paved surfaces;

3. Land (including land on which property is located), water, growing crops or lawns (other than lawns that are part of a vegetated roof);

4. Retaining walls that are not attached to the covered building;

5. Trees, shrubs and plants (other than trees, shrubs and plants that are part of a vegetated roof); or

6   Electronic data in any form.

CUPOP 53 00 01 16        CUMIS Insurance Society, Inc.        Page 7 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

147

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**FORECLOSED PROPERTY AND**
**PROPERTY OWNED OR HELD IN TRUST**
**ADDITIONAL COVERAGES**

Payments under the Additional Coverages will not increase the applicable Limit Of Insurance shown on the Declarations, unless otherwise specified.

**Debris Removal Of Damaged Property**

1. We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause Of Loss that occurs during the Policy Period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

   a. The date of direct physical loss or damage; or

   b. The end of the Policy Period.

2. The most we will pay under this Additional Coverage is 25% of:

   a. The amount we pay for the direct physical loss of or damage to Covered Property; plus

   b. The Deductible in this Policy applicable to that loss or damage.

3. This Additional Coverage does not apply to costs to:

   a. Extract "pollutants" from land or water;

   b. Remove, restore or replace polluted land or water; or

   c. Extract "fungus," wet or dry rot or bacteria from Covered Property.

**Fungus, Wet Rot, Dry Rot And Bacteria Clean Up And Removal**

1. We will pay for loss or damage by "fungus," wet or dry rot or bacteria:

   a. When the "fungus," wet or dry rot or bacteria is the result of "fungus specified cause of loss" that occur during the Policy Period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after the "occurrence" for "fungus specified cause of loss" other than fire or lightning.

   b. Only for the following:

      1) Direct physical loss or damage to Covered Property caused by "fungus," wet or dry rot or bacteria, including the cost of removal of the "fungus," wet or dry rot or bacteria;

      2) The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus," wet or dry rot or bacteria; and

CUPOP 53 00 01 16             CUMIS Insurance Society, Inc.             Page 8 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

148

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**FORECLOSED PROPERTY AND**
**PROPERTY OWNED OR HELD IN TRUST**
**ADDITIONAL COVERAGES**

**Fungus, Wet Rot, Dry Rot And Bacteria Clean Up And Removal** - continued

3) The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus," wet or dry rot or bacteria is present.

2. The following replaces the Limit Of Insurance Condition for Foreclosed Property And Property Owned Or Held in Trust but only with respect to loss covered under this Additional Coverage:

   a. The most we will pay for losses (except fire and lightning), under this Additional Coverage, during one annual Policy Period is the "annual aggregate limit" of $10,000, regardless of the number of claims.

   b. This limit is the most we will pay for the total of all loss or damage (except fire and lightning) arising out of all "occurrences" of "fungus specified cause of loss" that take place in a 12 month period (starting with the beginning of the present annual Policy Period).

   c. With respect to a particular "occurrence" of loss that results in "fungus," wet or dry rot or bacteria we will not pay more than a total of $10,000 even if the "fungus," wet or dry rot or bacteria continues to be present or active, or recurs, in a later Policy Period.

3. The coverage provided under this Additional Coverage does not increase the applicable Limit Of Insurance on any Covered Property. If a particular "occurrence" results in loss or damage by "fungus," wet or dry rot or bacteria other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit Of Insurance on the affected Covered Property.

   If there is covered loss or damage to Covered Property, not caused by "fungus," wet or dry rot or bacteria loss payment will not be limited by the terms of this Additional Coverage, except to the extent that "fungus," wet or dry rot or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Additional Coverage.

**FORECLOSED PROPERTY AND**
**PROPERTY OWNED OR HELD IN TRUST**
**COVERED CAUSES OF LOSS**

The Covered Causes Of Loss are:

1. Fire.

2. Lightning.

CUPOP 53 00 01 16    CUMIS Insurance Society, Inc.    Page 9 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

149

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 151 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**FORECLOSED PROPERTY AND**
**PROPERTY OWNED OR HELD IN TRUST**
**COVERED CAUSES OF LOSS**

3. Explosion, including the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass. This Cause Of Loss does not include loss or damage by:

   a. Electric arcing;

   b. Breakage of water pipes;

   c. Breakage or operation of pressure relief devices; or

   d. Explosion of steam boiler or steam pipes, if owned or leased by you or operated under your control.

4. Windstorm or hail, but not including:

   a. Frost or cold weather; or

   b. Ice (other than hail), snow or sleet, whether driven by wind or not.

   We will not pay for loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters.

5. Smoke causing sudden and accidental loss or damage. This Cause Of Loss does not include smoke from agricultural smudging or industrial operations.

6. Aircraft or vehicles, meaning only physical contact of an aircraft, a spacecraft, a self-propelled missile, a vehicle or an object thrown up by a vehicle with the property or with the building or structure containing the property. This Cause Of Loss includes loss or damage by objects falling from aircraft.

7. Riot or civil commotion.

8. Vandalism, meaning willful and malicious damage to, or destruction of, the described property.

   We will not pay for loss or damage:

   a. To glass (other than glass building blocks) that is part of a building, structure, or an outside sign; but we will pay for loss or damage to other property caused by or resulting from breakage of glass by vandals; or

   b. Caused by or resulting from theft, except for building damage caused by the breaking in or exiting of burglars.

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 10 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

150

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 152 of 834

## REAL ESTATE MORTGAGE OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

### FORECLOSED PROPERTY AND
### PROPERTY OWNED OR HELD IN TRUST
### COVERED CAUSES OF LOSS

9. Sinkhole collapse, meaning loss or damage caused by the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or similar rock formations. This Cause Of Loss does not include the cost of filling sinkholes.

10. Volcanic action, meaning direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

    a. Airborne volcanic blast or airborne shock waves;

    b. Ash, dust or particulate matter; or

    c. Lava flow.

    All volcanic eruptions that occur within any 168 hour period will constitute a single "occurrence."

    This Cause Of Loss does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the property.

11. Weight of ice and snow which causes damage to a building.

    This does not include loss to an awning, fence, patio, pavement, swimming pool, foundation, retaining wall, bulkhead, pier, wharf or dock.

12. Freezing of a plumbing, heating or air conditioning system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing is a Covered Cause Of Loss provided that, in the case of a vacant building, you have maintained heat in the building or shut off the water supply and drained the system and appliances of water.

### FORECLOSED PROPERTY AND
### PROPERTY OWNED OR HELD IN TRUST
### CONDITIONS

In addition to the Conditions in the Common Policy Provisions, the following Conditions apply to Foreclosed Property And Property Owned Or Held In Trust.

**Date Of Loss**

The date of loss for Foreclosed Property And Property Owned Or Held In Trust is the date the damage occurs.

CUPOP 53 00 01 16                CUMIS Insurance Society, Inc.                Page 11 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

151

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 153 of 834

**Deductible**

We will be liable only when a covered loss exceeds the Deductible shown on the Declarations and only for the amount of the excess. If only one deductible is shown on the Declarations for Real Estate Mortgage Operations Coverage, that deductible applies separately to each loss per mortgage ("residential mortgage" or "commercial mortgage").

If two separate deductibles are shown on the Declarations for Real Estate Mortgage Operations Coverage, the deductible for:

1. "Residential mortgages" applies separately to each loss per "residential mortgage"; and

2. "Commercial mortgages" applies separately to each loss per "commercial mortgage."

**Duties In The Event Of Loss**

In the event of loss you must follow the steps listed in the Common Policy Provisions, Your Duties In The Event Of A Property, Lending, Or Expense/Income Coverage Loss Or Damage Loss Condition.

**Limit Of Insurance**

Under Foreclosed Property And Property Owned Or Held In Trust, the most we will pay is the lesser of:

1. The cost to repair the damaged property with like kind and quality less deduction of depreciation;

2. The "actual cash value" of Covered Property at the time of loss or damage; or

3. The Limit Of Insurance shown on the Declarations. If only one Limit Of Insurance is shown on the Declarations for Real Estate Mortgage Operations Coverage, that limit applies per mortgage loss ("residential mortgage" or "commercial mortgage").

   If two separate Limits Of Insurance are shown on the Declarations for Real Estate Mortgage Operations Coverage, the:

   a. "Residential mortgages" Limit Of Insurance applies per "residential mortgage" loss; and

   b. "Commercial mortgages" Limit Of Insurance applies per "commercial mortgage" loss.

The Per Mortgage Limit Of Insurance shown on the Declarations is not increased if more than one of the Coverages (Mortgageholder's Interest, Foreclosed Property And Property Owned Or Held In Trust, Mortgageholder's Liability, Real Estate Tax Liability and Mortgageholder's Interest In Mortgage Guarantee Insurance) apply to one loss.

CUPOP 53 00 01 16
CUMIS Insurance Society, Inc.
Page 12 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

152

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 154 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**FORECLOSED PROPERTY AND**
**PROPERTY OWNED OR HELD IN TRUST**
**CONDITIONS**

**Newly Acquired Organizations**

The words "you" and "your" also include any organization (other than a partnership or joint venture) that you acquire or form and over which you maintain ownership or sole interest if there is no other similar insurance available to that organization.

This Coverage Extension ends:

1. 90 days after you acquire or form the organization; or

2. At the end of the Policy Period shown on the Declarations,

whichever is earlier.

When you merge with another entity, and you are the surviving entity, the 90 day limitation in paragraph 1. above does not apply.

This Coverage Extension does not apply to losses that occurred before the date you acquired the organization or before the date of merger.

**Policy Period**

The Policy Period Condition in the Common Policy Provisions is replaced with the following:

Under Foreclosed Property And Property Owned Or Held In Trust, coverage applies only when the date of loss occurs during the Policy Period shown on the Declarations. The date of the error or accidental omission does not have to be within the Policy Period.

No coverage is provided for a date of loss before the effective date or after the termination date of coverage.

**Time Period**

Coverage on each item of Covered Property applies only during the period of time that:

1. Begins on the day you acquire the property, your fiduciary interest in it begins or a foreclosure judgment or deed is recorded on public records; and

2. Ends the earlier of:

   a. The day other insurance on the property is obtained; or

   b. 90 days after the date when you first become aware that an error or accidental omission has occurred.

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 13 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

153

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 155 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**FORECLOSED PROPERTY AND**
**PROPERTY OWNED OR HELD IN TRUST**
**CONDITIONS**

**Your Duties In Administration Of Real Estate Operations**

As a condition of coverage you must establish and enforce a procedure to procure and maintain insurance against the Covered Causes Of Loss in amounts, and under conditions, you customarily require to protect your interest as owner, fiduciary or trustee of the Covered Property.

CUPOP 53 00 01 16                     CUMIS Insurance Society, Inc.                     Page 14 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

154

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 156 of 834

## REAL ESTATE MORTGAGE OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY
## COVERAGE C. MORTGAGEHOLDER'S LIABILITY

We will pay those sums that you become legally obligated to pay as damages due to an error or accidental omission in the operation of your customary procedures in processing and maintaining insurance against the Covered Causes Of Loss for the benefit of the mortgagor in amounts, and under conditions, customarily accepted by the mortgagor.

**Flood Disaster Protection Act**

We will pay those sums you become legally obligated to pay as damages due to an error or accidental omission in your compliance with the Flood Disaster Protection Act of 1973 including any amendment of or addition to such law in:

1.  Determining that Covered Property should have flood insurance; and

2.  Requiring the mortgagor to obtain flood insurance.

We have the right and duty, using attorneys of our choice, to defend any "suit," seeking those damages or such loss. However, we have no duty to defend you against a claim or "suit" seeking damages to which this insurance does not apply. But:

1.  The amount we will pay for damages is limited as described in Limit Of Insurance;

2.  We will not pay for fines or penalties;

3.  We may investigate and settle any claim or "suit" at our discretion; and

4.  Our right and duty to defend end when we have used up the Limit Of Insurance in the payment of judgments or settlements.

The damages payable under this Coverage must arise out of your capacity as a mortgageholder, mortgage fiduciary or mortgage servicing agency.

## MORTGAGEHOLDER'S LIABILITY
## ADDITIONAL COVERAGES

Payments under the Additional Coverages will not increase the applicable Limit Of Insurance shown on the Declarations.

**Additional Insureds**

Under Mortgageholder's Liability, the words "you" and "your" are extended to include your partners, officers, trustees, directors and employees but only with respect to their duties as such.

The existence of one or more Additional Insureds does not increase the Limit Of Insurance.

CUPOP 53 00 01 16                CUMIS Insurance Society, Inc.                Page 15 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

155

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**MORTGAGEHOLDER'S LIABILITY**
**ADDITIONAL COVERAGES**

### Mortgages Serviced For Others

We will cover loss arising from mortgages owned by others and serviced by you as if you owned the mortgage interest in them. All such mortgages must be serviced under a written contract. We will make loss payment payable jointly to you and the mortgage owner.

**MORTGAGEHOLDER'S LIABILITY**
**EXTENSION OF COVERAGE**

### Supplementary Payments

1.  In addition to the Limit Of Insurance, we will pay, with respect to any claim or "suit" we defend:

    a.  All expenses we incur;

    b.  The cost of bonds to release attachments, but only for bond amounts within our Limit Of Insurance. We do not have to furnish these bonds;

    c.  All reasonable expenses incurred by you at our request, including actual loss of earnings up to $500 a day because of time off from work;

    d.  All costs taxed against you in the "suit";

    e.  Prejudgment interest awarded against you on that part of the judgment we pay. If we make an offer to pay the Limit Of Insurance, we will not pay any prejudgment interest based on that period of time after the offer;

    f.  All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the Limit Of Insurance; and

    g.  The cost of any required appeal bond for any judgment that we appeal, but only for the bond amount for that part of the judgment that is for damages to which this insurance applies and which are within the Limit Of Insurance. We will pay, or reimburse you for, the cost of a higher appeal bond amount if we are required to do so under the law that applies. We will not be the principal under any appeal bond, and we do not have to furnish any appeal bond.

2.  These payments will not reduce the Limit Of Insurance

CUPOP 53 00 01 16                 CUMIS Insurance Society, Inc.                 Page 16 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

156

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 158 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## MORTGAGEHOLDER'S LIABILITY
## COVERED CAUSES OF LOSS

The Covered Causes Of Loss are those risks and causes of loss against which the mortgagor customarily obtains insurance policies. They do not include causes of loss excluded under Policy Exclusions.

## MORTGAGEHOLDER'S LIABILITY
## CONDITIONS

In addition to the Conditions in the Common Policy Provisions, the following Conditions apply to Mortgageholder's Liability.

### Date Of Loss

The date of loss of Mortgageholder's Liability is the date of the "occurrence" or the date the damage occurs.

### Deductible

We will be liable only when a covered loss exceeds the Deductible shown on the Declarations and only for the amount of the excess. If only one deductible is shown on the Declarations for Real Estate Mortgage Operations Coverage, that deductible applies separately to each loss per mortgage ("residential mortgage" or "commercial mortgage").

If two separate deductibles are shown on the Declarations for Real Estate Mortgage Operations Coverage, the deductible for:

1. "Residential mortgages" applies separately to each loss per "residential mortgage"; and

2. "Commercial mortgages" applies separately to each loss per "commercial mortgage."

### Duties In The Event Of Loss

In the event of loss you must follow the steps listed in the Common Policy Provisions, Your Duties In The Event Of A Liability Occurrence, Claim, Suit Or Lawsuit Loss Condition.

### Limit Of Insurance

Under Mortgageholder's Liability, the most we will pay is the lesser of:

1. The amount that would be payable to the mortgagor if there had been no error or accidental omission in maintaining insurance for the benefit of the mortgagor as agreed; or

CUPOP 53 00 01 16                CUMIS Insurance Society, Inc.                Page 17 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

157

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 159 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**MORTGAGEHOLDER'S LIABILITY**
**CONDITIONS**

**Limit Of Insurance** - continued

2.  The Limit Of Insurance shown on the Declarations. If only one Limit Of Insurance is shown on the Declarations for Real Estate Mortgage Operations Coverage, that limit applies per mortgage loss ("residential mortgage" or "commercial mortgage").

    If two separate Limits Of Insurance are shown on the Declarations for Real Estate Mortgage Operations Coverage, the:

    a.  "Residential mortgages" Limit Of Insurance applies per "residential mortgage" loss; and

    b.  "Commercial mortgages" Limit Of Insurance applies per "commercial mortgage" loss.

The Per Mortgage Limit Of Insurance shown on the Declarations is not increased if more than one of the Coverages (Mortgageholder's Interest, Foreclosed Property And Property Owned Or Held In Trust, Mortgageholder's Liability, Real Estate Tax Liability and Mortgageholder's Interest In Mortgage Guarantee Insurance) apply to one loss.

**Newly Acquired Organizations**

The words "you" and "your" also include any organization (other than a partnership or joint venture) that you acquire or form and over which you maintain ownership or sole interest if there is no other similar insurance available to that organization.

This Coverage Extension ends:

1.  90 days after you acquire or form the organization; or

2.  At the end of the Policy Period shown on the Declarations,

whichever is earlier.

When you merge with another entity, and you are the surviving entity, the 90 day limitation in paragraph 1. above does not apply.

This Coverage Extension does not apply to losses that occurred before the date you acquired the organization or before the date of merger.

CUPOP 53 00 01 16
CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Page 18 of 36

158

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**MORTGAGEHOLDER'S LIABILITY**
**CONDITIONS**

### Policy Period

The Policy Period Condition in the Common Policy Provisions is replaced with the following:

Under Mortgageholder's Liability, coverage applies to claims or "suits" arising from an event that occurs during the Policy Period shown on the Declarations. The date of the error or accidental omission does not have to be within the Policy Period.

No coverage is provided for a date of loss before the effective date or after the termination date of coverage.

### Separation Of Insureds

The insurance under Mortgageholder's Liability applies separately to you and each additional insured, except with respect to the Limit Of Insurance.

### Your Duties In Administration Of Real Estate Operations

As a condition of coverage you must establish and enforce procedures to maintain insurance against the Covered Causes Of Loss in amounts and under conditions, customarily accepted by the mortgagor, as agreed.

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 19 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

159

## REAL ESTATE MORTGAGE OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY
## COVERAGE D. REAL ESTATE TAX LIABILITY

We will pay for damages for which you are legally liable due to error or accidental omission in paying real estate taxes, as agreed, on behalf of the mortgagor. Damages include penalties and interest but does not include the original tax amount due.

However we have no duty to defend you against a claim or "suit" seeking damages to which this insurance does not apply.

## REAL ESTATE TAX LIABILITY
## ADDITIONAL COVERAGE

Payments under the Additional Coverage will not increase the applicable Limit Of Insurance shown on the Declarations.

**Additional Insureds**

Under Real Estate Tax Liability, the words "you" and "your" are extended to include your partners, officers, trustees, directors and employees but only with respect to their duties as such.

The existence of one or more additional insureds does not increase the Limit Of Insurance.

## REAL ESTATE TAX LIABILITY
## EXTENSION OF COVERAGE

**Supplementary Payments**

1. In addition to the Limit Of Insurance, we will pay, with respect to any claim or "suit" we defend:

   a. All expenses we incur;

   b. The cost of bonds to release attachments, but only for bond amounts within our Limit Of Insurance. We do not have to furnish these bonds;

   c. All reasonable expenses incurred by you at our request, including actual loss of earnings up to $500 a day because of time off work;

   d. All costs taxed against you in the "suit";

   e. Prejudgment interest awarded against you on that part of the judgment we pay. If we make an offer to pay the Limit Of Insurance, we will not pay any prejudgment interest based on that period of time after the offer;

   f. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the Limit Of Insurance; and

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 20 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

160

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 162 of 834

## REAL ESTATE MORTGAGE OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

## REAL ESTATE TAX LIABILITY
## EXTENSION OF COVERAGE

**Supplementary Payments** - continued

    g.  The cost of any required appeal bond for any judgment that we appeal, but only for the bond amount for that part of the judgment that is for damages to which this insurance applies and which are within the Limit Of Insurance. We will pay, or reimburse you for, the cost of a higher appeal bond amount if we are required to do so under the law that applies. We will not be the principal under any appeal bond, and we do not have to furnish any appeal bond.

2.  These payments will not reduce the Limit Of Insurance

## REAL ESTATE TAX LIABILITY
## CONDITIONS

In addition to the Conditions in the Common Policy Provisions, the following Conditions apply to Real Estate Tax Liability.

**Date Of Loss**

The date of loss for Real Estate Tax Liability is the date damage occurs.

**Deductible**

We will be liable only when a covered loss exceeds the Deductible shown on the Declarations and only for the amount of the excess. If only one deductible is shown on the Declarations for Real Estate Mortgage Operations Coverage, that deductible applies separately to each loss per mortgage ("residential mortgage" or "commercial mortgage").

If two separate deductibles are shown on the Declarations for Real Estate Mortgage Operations Coverage, the deductible for:

1.  "Residential mortgages" applies separately to each loss per "residential mortgage"; and

2.  "Commercial mortgages" applies separately to each loss per "commercial mortgage."

**Duties In The Event Of Loss**

In the event of loss you must follow the steps listed in the Common Policy Provisions, Your Duties In The Event Of A Liability Occurrence, Claim, Suit Or Lawsuit Loss Condition.

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 21 of 36
                    Includes copyrighted material of Insurance Services Office, Inc., with its permission.

161

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**REAL ESTATE TAX LIABILITY**
**CONDITIONS**

## Limit Of Insurance

Under Real Estate Tax Liability, the most we will pay for damages due to error or accidental omission in connection with any single mortgage is the lesser of:

1. The actual accrued damage you are legally liable for, not including the original amount of taxes due; or

2. The Limit Of Insurance shown on the Declarations. If only one Limit Of Insurance is shown on the Declarations for Real Estate Mortgage Operations Coverage, that limit applies per mortgage loss ("residential mortgage" or "commercial mortgage").

   If two separate Limits Of Insurance are shown on the Declarations for Real Estate Mortgage Operations Coverage, the:

   a. "Residential mortgages" Limit Of Insurance applies per "residential mortgage" loss; and

   b. "Commercial mortgages" Limit Of Insurance applies per "commercial mortgage" loss.

The Per Mortgage Limit Of Insurance shown on the Declarations is not increased if more than one of the Coverages (Mortgageholder's Interest, Foreclosed Property And Property Owned Or Held In Trust, Mortgageholder's Liability, Real Estate Tax Liability and Mortgageholder's Interest In Mortgage Guarantee Insurance) apply to one loss.

## Newly Acquired Organizations

The words "you" and "your" also include any organization (other than a partnership or joint venture) that you acquire or form and over which you maintain ownership or sole interest if there is no other similar insurance available to that organization.

This Coverage Extension ends:

1. 90 days after you acquire or form the organization; or

2. At the end of the Policy Period shown on the Declarations,

whichever is earlier.

When you merge with another entity, and you are the surviving entity, the 90 day limitation in paragraph 1. above does not apply.

This Coverage Extension does not apply to losses that occurred before the date you acquired the organization or before the date of merger.

CUPOP 53 00 01 16       CUMIS Insurance Society, Inc.       Page 22 of 36

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

162

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 164 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**REAL ESTATE TAX LIABILITY**
**CONDITIONS**

**Policy Period**

The Policy Period Condition in the Common Policy Provisions is replaced with the following:

Under Real Estate Tax Liability, coverage applies to claims or "suits" arising from an event that occurs during the Policy Period shown on the Declarations. The date of the error or accidental omission does not have to be within the Policy Period.

No coverage is provided for a date of loss before the effective date or after the termination date of coverage.

**Separation Of Insureds**

The insurance under Real Estate Tax Liability applies separately to you and each additional insured, except with respect to the Limit Of Insurance.

**Your Duties In Administrations Of Real Estate Operations**

You must establish and enforce procedures to promptly pay real estate taxes, if agreed to, on behalf of the mortgagor.

CUPOP 53 00 01 16                CUMIS Insurance Society, Inc.                Page 23 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

163

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## COVERAGE E. MORTGAGEHOLDER'S INTEREST IN MORTGAGE GUARANTEE INSURANCE

We will pay for loss due to error or accidental omission, by you or your representative, in the operation of your customary procedure to comply with the requirements of:

1. Veterans Administration (V.A.);

2. Federal Housing Administration (F.H.A.);

3. Small Business Administration (S.B.A.);

4. Any other governmental or quasi-governmental mortgage guarantee agency;

5. Any private mortgage guarantee insurance company,

in procuring and maintaining mortgage guarantee insurance payable to you as mortgageholder and notification to mortgage insurance guarantors that mortgage payments are delinquent.

### MORTGAGEHOLDER'S INTEREST IN MORTGAGE GUARANTEE INSURANCE ADDITIONAL COVERAGE

Payments under the Additional Coverage will not increase the applicable Limit Of Insurance shown on the Declarations.

**Mortgages Serviced For Others**

We will cover loss arising from mortgages owned by others and serviced by you as if you owned the mortgage interest in them. All such mortgages must be serviced under a written contract. We will make loss payment payable jointly to you and the mortgage owner.

### MORTGAGEHOLDER'S INTEREST IN MORTGAGE GUARANTEE INSURANCE CONDITIONS

In addition to the Conditions in the Common Policy Provisions, the following Conditions apply to Mortgageholder's Interest In Mortgage Guarantee Insurance.

**Date Of Loss**

The date of loss for Mortgageholder's Interest In Mortgage Guarantee Insurance is the date the mortgage goes in default.

CUPOP 53 00 01 16      CUMIS Insurance Society, Inc.      Page 24 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

164

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**MORTGAGEHOLDER'S INTEREST IN**
**MORTGAGE GUARANTEE INSURANCE**
**CONDITIONS**

**Deductible**

We will be liable only when a covered loss exceeds the Deductible shown on the Declarations and only for the amount of the excess. If only one deductible is shown on the Declarations for Real Estate Mortgage Operations Coverage, that deductible applies separately to each loss per mortgage ("residential mortgage" or "commercial mortgage").

If two separate deductibles are shown on the Declarations for Real Estate Mortgage Operations Coverage, the deductible for:

1. "Residential mortgages" applies separately to each loss per "residential mortgage"; and

2. "Commercial mortgages" applies separately to each loss per "commercial mortgage."

**Duties In The Event Of Loss**

In the event of loss you must follow the steps listed in the Common Policy Provisions, Your Duties In The Event Of A Property, Lending Or Expense/Income Coverage Loss Or Damage Loss Condition.

**Limit Of Insurance**

Under Mortgageholder's Interest In Mortgage Guarantee Insurance, the most we will pay is the lesser of:

1. The amount that would be payable to you by the mortgage guarantee company if no error or accidental omission had occurred;

2. The amount of your mortgage balance including accrued interest, after you have taken all reasonable steps to reduce it; or

3. The Limit Of Insurance shown on the Declarations. If only one Limit Of Insurance is shown on the Declarations for Real Estate Mortgage Operations Coverage, that limit applies per mortgage loss ("residential mortgage" or "commercial mortgage").

   If two separate Limits Of Insurance are shown on the Declarations for Real Estate Mortgage Operations Coverage, the:

   a. "Residential mortgages" Limit Of Insurance applies per "residential mortgage" loss; and

   b. "Commercial mortgages" Limit Of Insurance applies per "commercial mortgage" loss.

The Per Mortgage Limit Of Insurance shown on the Declarations is not increased if more than one of the Coverages (Mortgageholder's Interest, Foreclosed Property And Property Owned Or Held In Trust, Mortgageholder's Liability, Real Estate Tax Liability and Mortgageholder's Interest In Mortgage Guarantee Insurance) apply to one loss.

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 25 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

165

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 167 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**MORTGAGEHOLDER'S INTEREST IN**
**MORTGAGE GUARANTEE INSURANCE**
**CONDITIONS**

**Newly Acquired Organizations**

The words "you" and "your" also include any organization (other than a partnership or joint venture) that you acquire or form and over which you maintain ownership or sole interest if there is no other similar insurance available to that organization.

This Coverage Extension ends:

1.  90 days after you acquire or form the organization; or

2.  At the end of the Policy Period shown on the Declarations,

whichever is earlier.

When you merge with another entity, and you are the surviving entity, the 90 day limitation in paragraph 1. above does not apply.

This Coverage Extension does not apply to losses that occurred before the date you acquired the organization or before the date of merger.

**Policy Period**

The Policy Period Condition in the Common Policy Provisions is replaced with the following:

Under Mortgageholder's Interest In Mortgage Guarantee Insurance, coverage applies only when the date of loss occurs during the Policy Period shown on the Declarations. The date of error or accidental omission does not have to be within the Policy Period.

**Transfer Of Mortgage**

We and all other insurance companies covering a loss, if in agreement, may pay you an amount equal to the outstanding balance on the mortgage, even if that amount is greater than the amount of loss. If so, we and the other insurance companies may demand and receive a full assignment of the mortgage, including all securities held as collateral for the debt, as interest may appear.

**Your Duties In Administration Of Real Estate Operations**

As a condition of coverage, you must:

1.  Establish and enforce procedures to procure and maintain mortgage guarantee insurance payable to you as mortgageholder against losses covered by mortgage guarantee insurance;

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 26 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

166

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 168 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**MORTGAGEHOLDER'S INTEREST IN**
**MORTGAGE GUARANTEE INSURANCE**
**CONDITIONS**

**Your Duties In Administration Of Real Estate Operations** - continued

2. Make every reasonable effort to collect the loan secured by the mortgage, including, if applicable, pursuit of collection in bankruptcy. Unless required by law, you must not release the mortgagor from the obligation if the foreclosure does not by statute release the obligation; and

3. Foreclose on the mortgaged property and apply the proceeds of sale to the mortgage balance. However, we do reserve the right to waive the foreclosure requirement.

CUPOP 53 00 01 16
CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Page 27 of 36

167

## REAL ESTATE MORTGAGE OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

## CONDITION

This Condition is applicable to the following Coverages: Mortgageholder's Interest, Foreclosed Property And Property Owned Or Held In Trust, Mortgageholder's Liability, Real Estate Tax Liability and Mortgageholder's Interest In Mortgage Guarantee Insurance.

### Rights To Recover From Others

The Rights To Recover From Others Condition in the Common Policy Provisions is replaced with the following:

If you have rights to recover all or part of any payment we have made under this Policy, those rights are transferred to us. You must do everything necessary to secure these rights. You must do nothing after a loss to impair those rights. At our request you will bring "suit" or transfer those rights to us and help us enforce them. But you may waive your rights against another party in writing prior to a loss. We will not attempt to recover any loss from your employee whose error or accidental omission caused the loss.

## ADDITIONAL CONDITION

This Additional Condition is applicable to the following Coverages: Mortgageholder's Interest, Foreclosed Property And Property Owned Or Held In Trust and Mortgageholder's Interest In Mortgage Guarantee Insurance.

### Federal Mortgage Agency Loss Payee

1. We will make any payment in satisfaction of loss covered under this Coverage involving property in which a "federal mortgage agency" has an interest by a check made payable jointly to you and the "federal mortgage agency," as joint loss payees, provided that you request in writing that we do so, or that the "federal mortgage agency" sends us written notice of its interest in the property, before we issue our check. In the event of a loss affecting the interest of the Government National Mortgage Association, the Government National Mortgage Association, it successors and assigns shall be named on the loss payable draft as their interest may appear.

2. If you request that this Coverage be canceled or be reduced, then we will endeavor to give written notice of such request within 10 days thereafter to any "federal mortgage agency" that you have previously identified to us in writing. However, our failure to do so will not impair or delay the effectiveness of any such cancellation or reduction, and we will not be held liable to the "federal mortgage agency," to you or to any other party for failure to provide such notice.

3. Should we cancel, reduce, nonrenew or restrictively modify this Coverage, we will endeavor to give written notice of such action 30 days in advance of the effective date of such action, if practicable in the circumstances, to any "federal mortgage agency" that you have previously identified to us in writing. However, our failure to do so will not impair or delay the effectiveness of any such cancellation, reduction, nonrenewal or restrictive modification, and we will not be held liable to the "federal mortgage agency," to you or to any other party for failure to provide such notice.

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 28 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

168

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 170 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**ADDITIONAL CONDITION**

**Federal Mortgage Agency Loss Payee** - continued

4.  Should you fail to assert a claim under this Coverage for a covered loss, then a "federal mortgage agency" having an interest in property which is the subject of your loss may file claim under this Coverage, on your behalf, provided that:

    a.  The "federal mortgage agency" submits proof of its interest in the property that is the subject of your loss;

    b.  The "federal mortgage agency" submits proof at least 30 days prior to its first sending any notice or claim to us, it informed you in writing of its intention to file and pursue such claim if you failed to do so;

    c.  If the notice required in subparagraph 4.b. above is sent to you prior to the expiration of the time for making a claim under this Coverage but the 30 day notice period expires after the time for making a claim under this Coverage, then the "federal mortgage agency" will have 10 days from the expiration of said 30 day period in which to make such claim;

    d.  All other conditions to coverage that would apply were the claim made by you must be satisfied;

    e.  All other notices, proofs of loss and other things that this Coverage would require to be done by you are done by the "federal mortgage agency" within the time periods provided by this Coverage;

    f.  All limits of liability, deductibles and other restrictions upon and terms of coverage shown on the applicable Declarations will apply to the claim made by the "federal mortgage agency" as if the claim were made by you;

    g.  The "federal mortgage agency" will be deemed your agent for all purposes in connection with such claim and loss, you will no longer have any right to separately make claim for such loss, and the "federal mortgage agency" will be deemed empowered to negotiate, settle, and release such claim, and to release all of our liability under this Coverage with respect to such claim and loss on its own behalf and on your behalf; and

    h.  Any loss payment will be made by check made payable jointly to the "federal mortgage agency" and to you, and will be delivered to the "federal mortgage agency."

Notwithstanding the foregoing, no "federal mortgage agency" is an insured under this Coverage or will have any other rights beyond those set forth above, and this Coverage is for your sole and exclusive use and benefit.

CUPOP 53 00 01 16          CUMIS Insurance Society, Inc.          Page 29 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

169

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 171 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**CONCURRENT POLICY EXCLUSIONS**

Concurrent Policy Exclusions are applicable to the following Coverages: Mortgageholder's Interest, Foreclosed Property And Property Owned Or Held In Trust, Mortgageholder's Liability, Real Estate Tax Liability and Mortgageholder's Interest In Mortgage Guarantee Insurance.

We will not pay for loss or damage caused directly or indirectly by any of the following. All loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**Building Ordinance**

The enforcement of or compliance with any ordinance or law:

1.  Regulating the construction, use or repair of any property; or

2.  Requiring the tearing down of any property, including the cost of removing its debris.

This Exclusion applies whether the loss results from:

1.  An ordinance or law that is enforced or complied with even if the property has not been damaged; or

2.  The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

**Earth Movement**

1.  Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

2.  Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

    Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

    a.  Airborne volcanic blast or airborne shock waves;

    b.  Ash, dust or particulate matter; or

    c.  Lava flow.

    All volcanic eruptions that occur within any 168 hour period will constitute a single "occurrence."

CUPOP 53 00 01 16                CUMIS Insurance Society, Inc.                Page 30 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

170

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 172 of 834

**Earth Movement** - continued

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

**Fungus, Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus," wet or dry rot or bacteria. This Exclusion does not apply to:

1.  "Fungus," wet or dry rot or bacteria that results from fire or lightning; or

2.  The Fungus, Wet Rot, Dry Rot And Bacteria Clean Up And Removal Additional Coverage with respect to loss or damage by a Cause Of Loss other than fire or lightning.

**Governmental Action**

Seizure or destruction of property by order of governmental authority. But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage.

**Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused. But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire. But if loss or damage by fire results, we will pay for that resulting loss or damage.

**Power Failure**

The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises. But if failure of power or other utility service results in a Covered Cause Of Loss, we will pay for the loss or damage caused by that Covered Cause Of Loss.

**War And Military Action**

1.  War, including undeclared or civil war;

2.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 31 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

171

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 173 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## OTHER POLICY EXCLUSIONS

Other Policy Exclusions are applicable to the following Coverages: Mortgageholder's Interest, Foreclosed Property And Property Owned Or Held In Trust, Mortgageholder's Liability, Real Estate Tax Liability and Mortgageholder's Interest In Mortgage Guarantee Insurance.

We will not pay for loss or damage caused by or resulting from:

### Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or "watercraft." Use includes operation and "loading or unloading."

### Dishonesty

Dishonesty by your employee or representative.

### Electrical Apparatus

Artificially generated electrical current, including electrical arcing, that disturbs electrical devices, appliances or wires. But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

### Insolvency

Uncollectibility due to insolvency of an insurer.

### Intentional Acts

Any loss resulting from intentional failure of you or your representative to procure or maintain insurance.

### Knowledge Of Error

Any event, "occurrence," or damage, or loss that occurs more than 90 days after you know that an error or accidental omission or "lack or insufficiency of insurance" has occurred.

### Pollution

1. The "pollution or contamination" of any "environment" by "pollutants" or seepage of "pollutants" that are introduced at any time, anywhere, in any way or arising out of the actual, alleged or threatened discharge, dispersal, release or escape of "pollutants."

2. The cleaning up, testing, monitoring, containing, treating, detoxifying, and neutralizing of "pollutants" even if caused by a governmental direction or request.

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 32 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

172

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 174 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**OTHER POLICY EXCLUSIONS**

**Pollution** - continued

This Exclusion does not apply to:

1. Coverage provided for "pollution or contamination" from smoke or fumes from a "hostile fire"; or

2. Coverage provided for Debris Removal Of Damaged Property Additional Coverage that includes removal of "pollutants." But, Debris Removal Of Damaged Property Additional Coverage is subject to a limit of 25% of the direct physical damage loss to the covered property and is not provided for the removal of "pollutants" from land or water.

**Pollution, Bodily Injury Or Property Damage**

1. "Bodily injury" or "property damage" arising out of:

   a. The "pollution or contamination" of any "environment" by "pollutants" or seepage of "pollutants" that are introduced at any time, anywhere, in any way; or

   b. The actual, alleged or threatened discharge, dispersal, release or escape of "pollutants."

2. Any costs, or other loss or damage arising out of such "pollution or contamination" or seepage, including, but not limited to, cleaning up, remedying, testing, monitoring, containing, treating, detoxifying, and neutralizing such contamination, seepage, or "pollutants," even if caused by a governmental direction or request.

3. Payment for the investigation or defense of any loss, injury or damage, or any cost, fine, penalty, expense, claim or "suit" related to any of the above.

This Exclusion does not apply to "bodily injury" or "property damage" caused by heat, smoke or fumes from a "hostile fire."

**Supplemental Insurance**

Failure to obtain or maintain title, life, health or accident insurance policies.

CUPOP 53 00 01 16                CUMIS Insurance Society, Inc.                Page 33 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

173

## REAL ESTATE MORTGAGE OPERATIONS COVERAGE
## PROPERTY AND BUSINESS LIABILITY POLICY

## DEFINITIONS

Definitions are applicable to the following Coverages: Mortgageholder's Interest, Foreclosed Property And Property Owned Or Held In Trust, Mortgageholder's Liability, Real Estate Tax Liability and Mortgageholder's Interest In Mortgage Guarantee Insurance.

### Commercial Mortgage(s)

"Commerical mortgage(s)" means a mortgage listed on the NCUA Call Report Form 5300 as a member business loan real estate secured or a mortgage on property where business operations are intended to take place.

### Federal Mortgage Agency

"Federal mortgage agency" means the following and its successors and assigns:

1. Federal National Mortgage Association (Fannie Mae),

2. Federal Home Loan Mortgage Company (Freddie Mac),

3. Government National Mortgage Association (Ginnie Mae),

4. FHL Bank of Atlanta,

5. FHL Bank of Boston,

6. FHL Bank of Chicago,

7. FHL Bank of Cincinnati,

8. FHL Bank of Dallas,

9. FHL Bank of Des Moines,

10. FHL Bank of Indianapolis,

11. FHL Bank of New York,

12. FHL Bank of Pittsburgh,

13. FHL Bank of San Francisco,

14. FHL Bank of Seattle,

15. FHL Bank of Topeka,

16. Federal Agricultural Mortgage Corporation (Farmer Mac), or

CUPOP 53 00 01 16                    CUMIS Insurance Society, Inc.                    Page 34 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

174

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## DEFINITIONS

**Federal Mortgage Agency** - continued

17. Charlie Mac, LLC.

### Fungus Specified Cause Of Loss

"Fungus specified cause of loss" means the following:

1. The direct force of wind or hail that damages the building causing an opening in a roof or wall, and rain, snow or sleet enters through this opening.

2. Freezing of a plumbing, heating or air conditioning system or of an appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. However if the structure is vacant, unoccupied or being constructed, we will not pay for loss unless reasonable care has been used to maintain heat in the building, or shut off the water supply and drain the system and appliances of water.

3. Aircraft or vehicles that damages the building causing an opening in a roof or wall, and rain, snow or sleet enters through this opening.

4. Theft or vandalism that damages the building causing an opening in a roof or wall, and rain, snow or sleet enters through this opening.

5. Riot or civil commotion that damages the building causing an opening in a roof or wall, and rain, snow or sleet enters through this opening.

6. Explosion (other than the breakage of a water or steam pipe) that damages the building causing an opening in a roof or wall, and rain, snow or sleet enters through this opening.

7. Sudden sinkhole sinking or collapsing of land into underground empty spaces created by the action of water on limestone or dolomite, that damages the building causing an opening in a roof or wall, and rain, snow or sleet enters through this opening.

### Occurrence

"Occurrence" means:

1. An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "bodily injury" or "property damage."

   All damages that arise from continuous or repeated exposure to substantially the same general conditions are considered to arise from one "occurrence."

CUPOP 53 00 01 16    CUMIS Insurance Society, Inc.    Page 35 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

175

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 177 of 834

**REAL ESTATE MORTGAGE OPERATIONS COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**DEFINITIONS**

**Occurrence** - continued

   2. An offense that results in "personal injury."

   All damages that arise from exposure to the same act, publication or general conditions are considered to arise from one "occurrence."

   3. An offense that results in "advertising injury."

   All damages that arise from exposure to the same publication, misappropriation, infringement, harmful material or act are considered to arise from one "occurrence" regardless of:

   a. The frequency of repetition;

   b. The number, kind or type of media used; or

   c. The number of claimants.

   "Occurrence" means for all other coverages an event or series of causally related events that contribute concurrently or consecutively to loss or damage.

**Residential Mortgage(s)**

"Residential mortgage(s)" means a mortgage listed on the NCUA Call Report Form 5300 as a residential real estate loan or a mortgage on a 1 to 4 family property which is the residence of the mortgagor (borrower).

CUPOP 53 00 01 16                CUMIS Insurance Society, Inc.                Page 36 of 36
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

176

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## CONTENTS

**Coverage A Bodily Injury And Property Damage Liability** ....................................................................3
Insuring Agreement

**Coverage A Exclusions**..........................................................................................................................5
Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability
Aircraft, Auto Or Watercraft
Alcohol
Compensation Plans
Contracts
Damage To Property In Your Control
Damage To Your Product Or Work
Employment Liability
Employment Related Practices
Intentional Injury
Mobile Equipment
Nuclear Energy
Pollution
Product Recall
Professional Services
Recording And Distribution Of Material Or Information In Violation Of Law
War

**Coverage B Personal Injury And Advertising Injury Liability**............................................................ 14
Insuring Agreement

**Coverage B Exclusions** ....................................................................................................................... 14
Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability
Advertising Injury
Employment Related Practices
Media Type Businesses
Personal Injury And Advertising Injury
Pollution
Pollution - Related
Recording And Distribution Of Material Or Information In Violation Of Law

**Coverage C Medical Payments** ........................................................................................................... 18
Insuring Agreement

**Coverage C Exclusions** ....................................................................................................................... 19

CUPOP 61 00 04 14 NY                CUMIS Insurance Society, Inc.                Page 1 of 28
              Includes copyrighted material of Insurance Services Office, Inc., with its permission.

177

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 179 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## CONTENTS

**Coverage D Supplementary Payments**................................................................................**20**
Insuring Agreement

**Who Is An Insured** ................................................................................................ **21**

**Additional Conditions** ........................................................................................**23**
Limit Of Insurance
Other Insurance
Transfer Of Duties When The Limit Of Insurance Is Used Up
Unintentional Failure To Disclose All Hazards

**Definitions** ............................................................................................................**27**
Executive Officer
Member
Occurrence
Property Damage

CUPOP 61 00 04 14 NY          CUMIS Insurance Society, Inc.          Page 2 of 28
          Includes copyrighted material of Insurance Services Office, Inc., with its permission.

178

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 180 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this Coverage.

The words "this insurance" mean the business liability insurance provided under this Coverage.

The word "insured" means any person or organization qualifying as such under Who Is An Insured.

Throughout this Policy the words "you" and "your" refer to the Named Insured shown on the Declarations. The words "we," "us," and "our" refer to CUMIS Insurance Society, Inc.

Other words and phrases that appear in quotation marks have special meaning and are defined in the Policy.

## COVERAGE A
## BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**Insuring Agreement**

1.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty, using attorneys of our own choice, to defend the insured against any "suit" seeking those damages even if any of the allegations of the "suit" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

    a.  The amount we will pay for damages is limited as described in the Limit Of Insurance Additional Condition;

    b.  Our right and duty to defend ends when we have used up the applicable Limit Of Insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided under Coverage D.

2.  This insurance applies to "bodily injury" and "property damage" only if:

    a.  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the Coverage Territory;

    b.  The "bodily injury" or "property damage" occurs during the Policy Period; and

CUPOP 61 00 04 14 NY            CUMIS Insurance Society, Inc.            Page 3 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

179

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 181 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**Insuring Agreement** - continued

    c.  Prior to the Policy Period, no insured listed under paragraph 1. of Who Is An Insured and no employee authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized employee knew, prior to the Policy Period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the Policy Period will be deemed to have been known prior to the Policy Period.

3.  "Bodily injury" or "property damage" which occurs during the Policy Period and was not, prior to the Policy Period, known to have occurred by any insured listed under paragraph 1. of Who Is An Insured or any employee authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the Policy Period.

4.  "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Who Is An Insured or any employee authorized by you to give or receive notice of an "occurrence" or claim:

    a.  Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

    b.  Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

    c.  Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

5.  Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

6.  "Property damage" that is loss of use of tangible property that is not physically injured will be deemed to occur at the time of the "occurrence" that caused the loss of use.

CUPOP 61 00 04 14 NY          CUMIS Insurance Society, Inc.          Page 4 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

180

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**COVERAGE A EXCLUSIONS**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability**

Damages arising out of:

1. Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

2. The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This Exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in paragraph 1. and 2. above.

However, unless paragraph 1. above applies, this Exclusion does not apply to damages because of "bodily injury."

As used in this Exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**Aircraft, Auto Or Watercraft**

1. "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or "watercraft" owned or operated by or rented or loaned to any insured. Use includes operation and loading or unloading. This Exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or "watercraft" that is owned or operated by or rented or loaned to any insured.

2. This Exclusion does not apply to:

   a. "Watercraft" you do not own that is less than 75 feet long;

   b. A "watercraft" while ashore on premises you own or rent;

   c. Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

   d. "Bodily injury" or "property damage" arising out of the operation of:

CUPOP 61 00 04 14 NY    CUMIS Insurance Society, Inc.    Page 5 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

181

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 183 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**
**COVERAGE A EXCLUSIONS**

**Aircraft, Auto Or Watercraft** - continued

1) Machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

2) Any cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; or

3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment;

e. Aircraft chartered with a pilot and crew; or

f. Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or "watercraft."

**Alcohol**

1. "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

a. Causing or contributing to the intoxication of any person;

b. The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

c. Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This Exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

a. The supervision, hiring, employment, training or monitoring of others by that insured; or

b. Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage" involved that which is described in subparagraph 1.a., 1.b. or 1.c. above.

2. However, this Exclusion applies only if you are in the business of manufacturing, distributing, selling, servicing or furnishing alcoholic beverages. For the purposes of this Exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

CUPOP 61 00 04 14 NY                    CUMIS Insurance Society, Inc.                    Page 6 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

182

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 184 of 834

### Compensation Plans

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### Contracts

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This Exclusion does not apply to liability for damages:

1. That the insured would have in the absence of the contract or agreement; or

2. Assumed in an oral or written contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the "insured contract." Solely for the purposes of liability assumed in an "insured contract," reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage," provided:

   a. Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

   b. Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### Damage To Property In Your Control

1. "Property damage" to:

   a. Property you own, rent, or occupy, including any costs or expenses incurred by you, or any person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason;

   b. Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

   c. Property loaned to you;

   d. Personal property in your care, custody or control;

   e. That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

CUPOP 61 00 04 14 NY                    CUMIS Insurance Society, Inc.                    Page 7 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

183

**Damage To Property In Your Control** - continued

f.  That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Subparagraphs 1.c., 1.d., 1.e. and 1.f. of this Exclusion do not apply to liability assumed under a sidetrack agreement.

2.  This Exclusion does not apply to "property damage" to premises rented to you.

**Damage To Your Product Or Work**

1.  "Property damage" to "your product" arising out of it or any part of it.

2.  "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

3.  This Exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**Employment Liability**

1.  "Bodily injury" to:

    a.  An employee of the insured arising out of and in the course of employment by the insured; or

    b.  The spouse, child, parent, brother or sister of that employee or any other person as a consequence of subparagraph 1.a. above.

2.  This Exclusion applies:

    a.  Whether the insured may be liable as an employer or in any other capacity; and

    b.  To any obligation to share damages with or repay someone else who must pay damages because of the injury.

3.  This Exclusion does not apply to liability assumed by the insured under an "insured contract."

**Employment Related Practices**

1.  "Bodily injury" to:

    a.  A person arising out of any:

        1)  Refusal to hire or promote that person;

CUPOP 61 00 04 14 NY                    CUMIS Insurance Society, Inc.                    Page 8 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

184

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 186 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**
**COVERAGE A EXCLUSIONS**

**Employment Related Practices** - continued

2) Termination of that person's employment; or

3) Employment related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person.

b. The spouse, child, parent, brother or sister of that person or any other person as a consequence of "bodily injury" to that person at whom any of the employment related practices described in subparagraph 1.a. above is directed.

2. This Exclusion applies:

a. Whether the insured may be liable as an employer or in any other capacity; and

b. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

3. This Exclusion does not apply to liability assumed by the insured under an "insured contract."

**Intentional Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This Exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

**Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

1. The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

2. The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**Nuclear Energy**

1. "Bodily injury" or "property damage," including all forms of radioactive contamination of property:

a. With respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

CUPOP 61 00 04 14 NY                CUMIS Insurance Society, Inc.                Page 9 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

185

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 187 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**COVERAGE A EXCLUSIONS**

**Nuclear Energy** - continued

b.  Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

1)  Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any amendatory law thereof; or

2)  The insured is, or had this insurance not been issued, would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2.  Under any medical payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

3.  "Bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material," if:

a.  The "nuclear material":

1)  Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

2)  Has been discharged or dispersed there from;

b.  The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

c.  The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions, or Canada, then this Exclusion applies only to radioactive contamination to such "nuclear facility" and any property at such "nuclear facility."

**Pollution**

1.  "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a.  At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph 1.a. does not apply to "bodily injury":

1)  If sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

CUPOP 61 00 04 14 NY                    CUMIS Insurance Society, Inc.                    Page 10 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

186

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**COVERAGE A EXCLUSIONS**

**Pollution** - continued

  2) Or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your Policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

  3) Or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

b. At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of "waste";

c. Which are or were at any time transported, handled, stored, treated, disposed of, or processed as "waste" by or for any:

  1) Insured; or

  2) Person or organization for whom you may be legally responsible;

d. At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph 1.d. does not apply to "bodily injury" or "property damage":

  1) Arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

  2) Sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

  3) Arising out of heat, smoke or fumes from a "hostile fire";

CUPOP 61 00 04 14 NY                    CUMIS Insurance Society, Inc.                    Page 11 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

187

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**
**COVERAGE A EXCLUSIONS**

**Pollution** - continued

 e. At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

2. Any loss, cost or expense arising out of any:

 a. Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

 b. Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants."

However, this paragraph 2. does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**Product Recall**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

1. "Your product";

2. "Your work"; or

3. "Impaired property,"

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**Professional Services**

"Bodily injury" and "property damage" due to your rendering or failure to render any "professional service."

CUPOP 61 00 04 14 NY     CUMIS Insurance Society, Inc.     Page 12 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

188

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 190 of 834

**Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

1. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

2. The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

3. Any federal, state or local statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003 and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**War**

"Bodily injury" or "property damage" due to:

1. War, including undeclared or civil war;

2. Warlike action by a military force, including action in hindering of defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

CUPOP 61 00 04 14 NY          CUMIS Insurance Society, Inc.          Page 13 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

189

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 191 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**COVERAGE B**
**PERSONAL INJURY AND ADVERTISING INJURY LIABILITY**

**Insuring Agreement**

1. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty, using attorneys of our own choice, to defend the insured against any "suit" seeking those damages even if any of the allegations of the "suit" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" and "advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

   a. The amount we will pay for damages is limited as described in Limit Of Insurance; and

   b. Our right and duty to defend end when we have used up the applicable Limit Of Insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Coverage D.

2. This insurance applies to "personal injury" or "advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the Coverage Territory during the Policy Period.

**COVERAGE B EXCLUSIONS**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability**

"Personal injury" or "advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This Exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

CUPOP 61 00 04 14 NY                CUMIS Insurance Society, Inc.                Page 14 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

190

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 192 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**COVERAGE B EXCLUSIONS**

**Advertising Injury**

"Advertising injury" arising out of:

1. Breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

2. The failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement"; or

3. The wrong description of the price of goods, products or services stated in your "advertisement."

**Employment Related Practices**

1. "Personal injury" or "advertising injury" to:

   a. A person arising out of any:

      1) Refusal to hire or promote that person;

      2) Termination of that person's employment; or

      3) Employment related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person.

   b. The spouse, child, parent, brother or sister of that person or any other person as a consequence of "personal injury" to that person at whom any of the employment related practices described in subparagraph 1.a. above is directed.

2. This Exclusion applies:

   a. Whether the insured may be liable as an employer or in any other capacity; and

   b. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**Media Type Businesses**

1. "Personal injury" or "advertising injury" committed by an insured whose business is:

   a. Advertising, broadcasting, publishing, telecasting;

   b. Designing or determining content of websites for others; or

   c. An Internet search, access, content or service provider.

CUPOP 61 00 04 14 NY                    CUMIS Insurance Society, Inc.                    Page 15 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

191

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 193 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**COVERAGE B EXCLUSIONS**

**Media Type Businesses** - continued

2. However, this Exclusion does not apply to "personal injury" caused by any of these offenses: false arrest, detention or imprisonment; malicious prosecution; or the wrongful eviction from, wrongful entry into, or invasion of the rights of private occupancy of a room, dwelling or premises that the person occupies, committed by or on behalf of you, its owner, landlord or lessor.

3. For purposes of this Exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**Personal Injury And Advertising Injury**

"Personal injury" or "advertising injury":

1. Arising out of oral, electronic or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity;

2. Arising out of oral, electronic or written publication, in any manner, of material whose first publication took place before the beginning of the Policy Period;

3. Arising out of a criminal act committed by or at the direction of the insured;

4. Caused by or at the direction of the insured with knowledge that the act would violate the rights of another and would inflict "personal injury" or "advertising injury";

5. For which the insured has assumed liability in a contract or agreement. This paragraph 5. does not apply to liability for damages that the insured would have in the absence of the contract or agreement or assumed in a written contract or agreement that is an "insured contract," provided the "personal injury' or "advertising injury" to which this insurance applies, is caused by an offense first committed after the execution of such contract or agreement;

6. Caused by or at the direction of the insured with knowledge that the act would violate the rights of another and would inflict "personal injury" or advertising injury";

7. Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers;

8. Due to rendering or failure to render any "professional service"; or

9. Arising out of any electronic social networking services, blogs or other forums the insured hosts, owns, or over which the insured exercises control.

CUPOP 61 00 04 14 NY              CUMIS Insurance Society, Inc.                Page 16 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

192

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 194 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**COVERAGE B EXCLUSIONS**

**Pollution**

"Personal injury" or "advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**Pollution - Related**

Any loss, cost or expense arising out of any:

1. Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clear up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

2. Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants."

**Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal injury" or "advertising injury" arising directly or indirectly out of any act or omission that violates or is alleged to violate:

1. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

2. The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

3. Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003 that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

CUPOP 61 00 04 14 NY                    CUMIS Insurance Society, Inc.                    Page 17 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

193

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 195 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**COVERAGE C**
**MEDICAL PAYMENTS**

**Insuring Agreement**

1. We will pay medical expenses as described below for "bodily injury" caused by an accident:

   a. On premises you own or rent;

   b. On ways next to premises you own or rent; or

   c. Because of your operations,

   provided that:

   a. The accident takes place in the Coverage Territory and during the Policy Period;

   b. The expenses are incurred and reported to us within two years of the date of the accident; and

   c. The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

2. We will make these payments regardless of fault. These payments will not exceed the applicable Limit Of Insurance. We will pay reasonable expenses for:

   a. First aid administered at the time of an accident;

   b. Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

   c. Necessary ambulance, hospital, professional nursing and funeral services.

3. Sublimit of $5,000

   a. We will pay medical expenses as described below for emotional or mental injury that are not a direct result of physical harm, sickness or disease caused by an accident:

      1) On premises you own or rent;

      2) On ways next to premises you own or rent; or

      3) Because of your operations,

      provided that:

      1) The accident takes place in the Coverage Territory and during the Policy Period;

CUPOP 61 00 04 14 NY                CUMIS Insurance Society, Inc.                Page 18 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

194

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## COVERAGE C
## MEDICAL PAYMENTS

**Insuring Agreement** - continued

> 2) The expenses are incurred and reported to us within two years of the date of the accident; and
>
> 3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. We will pay reasonable expenses for emotional or mental injury. Payments will be over and above any other collectable benefits available to the injured party.

c. This sublimit is included within, and not in addition to, the applicable Limit Of Insurance for Coverage C Medical Payments.

## COVERAGE C EXCLUSIONS

We will not pay expenses for "bodily injury":

1. To any insured, except a volunteer worker;

2. To a person hired to do work for or on behalf of any insured or a tenant of any insured;

3. To a person injured on that part of premises you own or rent that the person normally occupies;

4. To a person, whether or not an employee of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law;

5. Included within the "products-completed operations hazard"; or

6. Excluded under Coverage A.

CUPOP 61 00 04 14 NY        CUMIS Insurance Society, Inc.        Page 19 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

195

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 197 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**
**COVERAGE D**
**SUPPLEMENTARY PAYMENTS**

**Insuring Agreement**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend under Coverages A or B:

   a. All expenses we incur;

   b. The cost of bail bonds or bonds required to release attachments or appeal judgments, but only for bond amounts within the applicable Limit Of Insurance. We do not have to furnish these bonds;

   c. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $500 a day because of time off from work;

   d. All costs taxed against the insured in the "suit." However, these payments do not include attorney fees or attorney expenses taxed against the insured;

   e. Pre-judgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit Of Insurance, we will not pay any pre-judgment interest based on that period of time after the offer; and

   f. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit Of Insurance.

2. These payments will not reduce the Limit Of Insurance.

CUPOP 61 00 04 14 NY          CUMIS Insurance Society, Inc.          Page 20 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

196

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 198 of 834

**Who Is An Insured**

1. If the Named Insured shown on the Declarations is:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your "members," your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your "members" are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your "executive officers" or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your employees, other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company) but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business and your volunteer workers only with respect to their liability for your activities or activities they perform on your behalf.

   b. However, none of these employees or volunteer workers are insureds for:

      1) "Bodily injury," "personal injury" or "advertising injury":

         a) To you, to your partners or "members" (if you are a partnership or joint venture), to your "members" (if you are a limited liability company), to a co-employee while in the course of his or her employment or performing duties related to the conduct of your business or to your other volunteer workers while performing duties related to the conduct of your business;

         b) To the spouse, child, parent, brother or sister of that co-employee or volunteer worker as a consequence of subpart 2.b.1)a) above; or

         c) Arising out of his or her providing or failing to provide professional health care services.

      2) "Property damage" to property:

CUPOP 61 00 04 14 NY                   CUMIS Insurance Society, Inc.                   Page 21 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

197

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 199 of 834

**Who Is An Insured** - continued

    a) Owned or occupied by; or

    b) In the care, custody or control of, or over which physical control is being exercised for any purpose by,

you, any of your employees, volunteer workers, any partner or "member" (if you are a partnership or joint venture), or any "member" (if you are a limited liability company).

This limitation does not apply to "property damage" to premises while rented to you or temporarily occupied by you with permission of the owner.

3. Any person (other than your employee), or any organization while acting as your "real estate" manager.

4. A person who is one of your Board of Directors or on one of your committees, while acting within the scope of their duties as such on your behalf.

5. Any organization you newly acquire or form and over which you maintain ownership or majority interest, will be deemed to be a Named Insured if there is no other similar insurance available to that organization. However:

    a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the Policy Period, whichever is earlier;

    b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

    c. Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company, except to the extent provided under any organization you newly acquire or form, that is not shown as a Named Insured on the Declarations.

CUPOP 61 00 04 14 NY          CUMIS Insurance Society, Inc.          Page 22 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

198

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 200 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**ADDITIONAL CONDITIONS**

**Limit Of Insurance**

1. The Limits Of Insurance shown on the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits."

2. The Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A;

   b. Damages under Coverage B; and

   c. Medical expenses under Coverage C,

   because of all "bodily injury," "property damage," "personal injury" and "advertising injury" arising out of any one "occurrence."

3. The Aggregate Limit is the most we will pay for the sum of:

   a. Damages under Coverage A;

   b. Damages under Coverage B; and

   c. Medical expenses under Coverage C,

   because of all "bodily injury," "property damage," "personal injury" and "advertising injury" arising during the Policy Period. The Aggregate Limit applies separately to each consecutive Policy Period and to any remaining period of less than 12 months, starting with the beginning of the Policy Period shown on the Declarations, unless the Policy Period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for the purposes of determining the Limit Of Insurance.

4. The Medical Payments Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person in any one "occurrence."

CUPOP 61 00 04 14 NY                    CUMIS Insurance Society, Inc.                    Page 23 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

199

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 201 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**ADDITIONAL CONDITIONS**

**Other Insurance**

1. If other valid and collectible insurance is available to the insured for a loss we cover under Coverage A, B or C, our obligations are limited as follows:

   a. Primary Insurance - This insurance is primary except when subparagraph 1.b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in paragraph 4. below.

   b. Excess Insurance - This insurance is excess over any of the other insurance, whether primary, excess, contingent or any other basis:

      1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

      2) That is insurance that applies to "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

      3) If the loss arises out of the maintenance or use of aircraft, "auto" or "watercraft" to the extent not subject to Coverage A Exclusions.

      Any other primary insurance available to you covering liability for damages arising out of the premises or operation, or the products and competed operations, for which you have been added as an additional insured.

2. When this insurance is excess, we will have no duty under Coverage A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to your rights against all those other insurers.

3. When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

   a. The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

   b. The total of all deductible and self-insured amounts under all that other insurance.

4. If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

5. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 202 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## ADDITIONAL CONDITIONS

**Other Insurance** - continued

6. We will share the remaining loss, if any, with any other insurance that is not described in this Additional Condition and was not bought specifically to apply in excess of the Limits Of Insurance shown on the Declarations.

7. This insurance is primary and will not seek contribution from any other insurance available to an additional insured under your Policy provided that:

   a. The additional insured is a Named Insured under such other insurance; and

   b. You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

   This supersedes any provision to the contrary.

**Transfer Of Duties When The Limit Of Insurance Is Used Up**

1. If we conclude that, based on "occurrences," offenses, claims or "suits" which may have been reported to us and to which this insurance may apply, the:

   a. Each Occurrence Limit; or

   b. Aggregate Limit

   is likely to be used up in the payment of judgments or settlements, we will notify you, in writing, to that effect.

2. When a Limit Of Insurance described in paragraph 1. above has actually been used up in the payment of judgments or settlements:

   a. We will notify you, in writing, as soon as practicable, that:

      1) Such Limit Of Insurance has actually been used up; and

      2) Our duty to defend "suits" seeking damages subject to that Limit Of Insurance has also ended.

   b. We will initiate, and cooperate in, the transfer of control, to you, of all claims and "suits" seeking damages which are subject to that Limit Of Insurance and which are reported to us before that Limit Of Insurance is used up. You must cooperate in the transfer of control of said claims and "suits."

CUPOP 61 00 04 14 NY                CUMIS Insurance Society, Inc.                Page 25 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

201

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 203 of 834

**Transfer Of Duties When The Limit Of Insurance Is Used Up** - continued

> We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided you are cooperating in completing such transfer.

> We will take no action whatsoever with respect to any claim or "suit" seeking damages that would have been subject to that Limit Of Insurance, had it not been used up, if the claim or "suit" is reported to us after that Limit Of Insurance has been used up.

c.  The insured involved in a "suit" seeking damages subject to Limit Of Insurance, must arrange for the defense of such "suit" within such time period as agreed to between you and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

3.  You will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with subpart 2.b. above. Your duty to reimburse us will begin on:

a.  The date on which the applicable Limit Of Insurance is used up, if we sent notice in accordance with paragraph 1. above; or

b.  The date on which we sent notice in accordance with subpart 2.a. above if we did not send notice in accordance with paragraph 1. above.

4.  The exhaustion of any Limit Of Insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

**Unintentional Failure To Disclose All Hazards**

Your unintentional failure to disclose all hazards or prior "occurrences" existing as of the inception date of this Policy shall not prejudice the Coverage afforded by this Policy.

CUPOP 61 00 04 14 NY                    CUMIS Insurance Society, Inc.                    Page 26 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

202

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 204 of 834

**BUSINESS LIABILITY COVERAGE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

## DEFINITIONS

If any of the Definitions in this insurance are contrary to Definitions contained in the Common Policy Provisions, then the Definitions contained in this insurance apply.

### Executive Officer

"Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

### Member

1. "Member" means one of the persons or entities constituting a partnership, joint venture or limited liability company.

2. For purposes of this insurance, "member" does not mean a person who is a member of a natural person credit union.

### Occurrence

"Occurrence" means:

1. An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "bodily injury" or "property damage."

   All damages that arise from continuous or repeated exposure to substantially the same general conditions are considered to arise from one "occurrence."

2. An offense that results in "personal injury."

   All damages that arise from exposure to the same act, publication or general conditions are considered to arise from one "occurrence."

3. An offense that results in "advertising injury."

   All damages that arise from exposure to the same publication, misappropriation, infringement, harmful material or act are considered to arise from one "occurrence" regardless of:

   a. The frequency of repetition;

   b. The number, kind or type of media used; or

   c. The number of claimants.

CUPOP 61 00 04 14 NY                    CUMIS Insurance Society, Inc.                    Page 27 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

203

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 205 of 834

**Property Damage**

1. "Property damage" means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the "occurrence" that caused it.

2. For the purposes of this insurance, "electronic data" is not tangible property.

CUPOP 61 00 04 14 NY     CUMIS Insurance Society, Inc.     Page 28 of 28
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

204

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 206 of 834



**CUNA MUTUAL** GROUP

CUMIS Insurance Society, Inc.

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

004577

## DESIGNATED PREMISES EXCLUSION ENDORSEMENT
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement. This endorsement modifies the Business Liability Coverage.

## COVERAGE A AND COVERAGE B
## EXCLUSION

The Designated Premises Exclusion is added to Coverage A Bodily Injury And Property Damage Liability and Coverage B Personal Injury And Advertising Injury Liability as follows:

This insurance does not apply to:

**Designated Premises**

"Bodily injury," "property damage," "personal injury," or "advertising injury" arising out of:

1. The ownership, maintenance or use of the premises shown in the Schedule below or any property located on these premises;

2. Operations on these premises or elsewhere which are necessary or incidental to the ownership, maintenance or use of those premises; or

3. Goods or products manufactured at or distributed from those premises.

**SCHEDULE**

Description and Location of Premises: "The ownership, maintenance or use of any premises that are or should be listed on Lower East Side Peoples Federal Credit Union's books as Real Estate Owned (REO), including but not limited to all foreclosed premises."

CUPOP 61 10 03 10

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/21
Page 1 of 1

205

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 207 of 834

## CERTIFIED ACTS OF TERRORISM EXCLUSION
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions and provisions of the Coverages listed below apply to this endorsement. This endorsement modifies coverage provided under the following:

Business Liability Coverage
Employer's Liability Endorsement
Excess Liability Coverage

## ADDITIONAL EXCLUSION

### Certified Act Of Terrorism

This insurance does not apply to:

1.  "Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism."

2.  The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under the applicable Coverage.

## ADDITIONAL DEFINITIONS

### Any Injury Or Damage

"Any injury or damage" means any injury or damage covered under the Coverage to which this endorsement is applicable, and includes but is not limited to "bodily injury," "property damage," "personal injury" and "advertising injury" as defined in the applicable Coverage.

### Certified Act Of Terrorism

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

a.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

b.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

CUPOP 61 15 01 15

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 1 of 1
206

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 208 of 834

## UNMANNED AIRCRAFT EXCLUSION ENDORSEMENT
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement. This endorsement modifies the Business Liability Coverage.

## COVERAGE A EXCLUSION

### Aircraft, Auto Or Watercraft

The Aircraft, Auto Or Watercraft Exclusion in Coverage A Bodily Injury And Property Damage Liability is replaced with the following:

1. "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft including "unmanned aircraft," "auto" or "watercraft" owned or operated by or rented or loaned to any insured. Use includes operation and loading or unloading. This Exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft including "unmanned aircraft," "auto" or "watercraft" that is owned or operated by or rented or loaned to any insured.

2. This Exclusion does not apply to:

   a. A "watercraft" you do not own that is less than 75 feet long;

   b. A "watercraft" while ashore on premises you own or rent;

   c. Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

   d. "Bodily injury" or "property damage" arising out of the operation of:

      1) Machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

      2) Any cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; or

      3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment;

CUPOP 61 26 01 16 NY                 CUMIS Insurance Society, Inc.                 Page 1 of 2
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

207

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 209 of 834

## UNMANNED AIRCRAFT EXCLUSION ENDORSEMENT
## PROPERTY AND BUSINESS LIABILITY POLICY

### COVERAGE A EXCLUSION

e.  Aircraft chartered with a pilot and crew; or

f.  Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or "watercraft."

### ADDITIONAL COVERAGE B EXCLUSION

**Unmanned Aircraft**

The Unmanned Aircraft Exclusion is added to Coverage B Personal Injury And Advertising Injury Liability as follows:

"Personal injury" or "advertising injury" arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft." Use includes operation and "loading or unloading."

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the offense which caused the "personal injury" or "advertising injury" involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft."

This exclusion does not apply to:

1.  The use of another's advertising idea in your "advertisement"; or

2.  Infringing upon another's copyright, trade dress or slogan in your "advertisement."

### DEFINITION

**Unmanned Aircraft**

"Unmanned aircraft" means an aircraft that is not:

1.  Designed;

2.  Manufactured; or

3.  Modified after manufacture,

to be controlled directly by a person from within or on the aircraft.

CUPOP 61 26 01 16 NY          CUMIS Insurance Society, Inc.          Page 2 of 2
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

208



**CUMIS** Insurance Society, Inc.

| Home Office: | Administrative Office: |
|---|---|
| 2000 Heritage Way | 5910 Mineral Point Rd |
| Waverly, IA 50677 | Madison, WI 53705 |

004577

## LOSS PAYABLE CLAUSE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement.

Effective: 10/04/2020, 12:01 a.m. until cancelled.

### LOSS PAYEE

Neighborhood Housing Services of New York City, Inc.
121 W 27th St Frnt 4
New York NY 10001 6207

### TYPE OF PROPERTY

Building Coverage - Special

### LOCATION OF PROPERTY

37 Avenue B
New York NY 10009 7441

Loss under this Policy to property described above will be payable as interest may appear to you and the loss payee shown on the Declarations, or above.

The insurance, solely as to the interest of the loss payee, will not be invalidated by any act or neglect by you other than fraudulent acts or omissions.

We reserve the right to cancel this Policy at any time as provided by its terms and will give the loss payee the same notice that is given to you. Cancellation of the Policy will also terminate this agreement.

If we pay the loss payee for loss under this Policy, we will be entitled, to the extent of such payment, to any rights of recovery which the loss payee may have.

Separate payments may be made to each party at interest provided we protect the equities of all parties.

CUPOP 20 01 08 09

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/2021
Page 1 of 1    209

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 211 of 834

## ADDITIONAL INSURED ENDORSEMENT
## BUSINESS AGREEMENTS
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement. This endorsement modifies the Business Liability Coverage.

## WHO IS AN INSURED

**Who Is An Insured**

The following is added to the Who Is An Insured provision in the Business Liability Coverage:

City of New York and The NYC Department of Youth and Community Development  but only with respect to its liability resulting directly from its activities performed under a contract or an agreement with you relating to the conduct of your business.

However;

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

## ADDITIONAL CONDITION

**Limit Of Insurance**

With respect to the insurance afforded to the additional insured, the following is added to the Limit Of Insurance Additional Condition in the Business Liability Coverage:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits Of Insurance shown on the Declarations,

whichever is less.

This endorsement shall not increase the applicable Limits Of Insurance shown on the Declarations.

CUPOP 61 22 04 14

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/21
Page 1 of 1

210

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:36 PM

NYSCEF DOC. NO. 7

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 212 of 834

INDEX NO. 655437/2024

RECEIVED NYSCEF: 03/06/2025

004577

# ADDITIONAL INSURED ENDORSEMENT
## PREMISES YOU LEASE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement. This endorsement modifies the Business Liability Coverage.

---

Designation of Premises (Part You Lease):
2283-85 2nd Ave
New York NY 10035 4820

Name of Person or Organization (Additional Insured):
UHAB Housing Development Fund Corp.
120 Wall St Fl 20
New York NY 10005 4029

## WHO IS AN INSURED

**Who Is An Insured**

The following is added to the Who Is An Insured provision in the Business Liability Coverage:

The person or organization shown on this endorsement is also an insured, but only with respect to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the ownership, maintenance or use of that part of the premises designated on this endorsement, leased to you, and subject to the following Additional Exclusions:

The insurance does not apply:

1. To any "occurrence" which takes place after you cease to be a tenant in said premises; or

2. To structural alterations, new construction or demolition operations performed by or on behalf of the person or organization designated above.

However;

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

---

CUPOP 61 02 04 14

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/21
Page 1 of 2

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 213 of 834

**ADDITIONAL INSURED ENDORSEMENT**
**PREMISES YOU LEASE**
**PROPERTY AND BUSINESS LIABILITY POLICY**
**ADDITIONAL CONDITION**

**Limit Of Insurance**

With respect to the insurance afforded to the additional insured, the following is added to the Limit Of Insurance Additional Condition in the Business Liability Coverage:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits Of Insurance shown on the Declarations,

whichever is less.

This endorsement shall not increase the applicable Limits Of Insurance shown on the Declarations.

CUPOP 61 02 04 14        CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/21
Page 2 of 2

212



CUMIS Insurance Society, Inc.

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

004577

## LOSS PAYABLE CLAUSE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement.

Effective: 10/04/2020, 12:01 a.m. until cancelled.

### LOSS PAYEE

USBank Equipment Finance
PO Box 790448
Saint Louis MO 63179 0448

### TYPE OF PROPERTY

Sharp MX4141 Copier
Lease/Agreement #008139

### LOCATION OF PROPERTY

37 Avenue B
New York NY 10009 7441

Loss under this Policy to property described above will be payable as interest may appear to you and the loss payee shown on the Declarations, or above.

The insurance, solely as to the interest of the loss payee, will not be invalidated by any act or neglect by you other than fraudulent acts or omissions.

We reserve the right to cancel this Policy at any time as provided by its terms and will give the loss payee the same notice that is given to you. Cancellation of the Policy will also terminate this agreement.

If we pay the loss payee for loss under this Policy, we will be entitled, to the extent of such payment, to any rights of recovery which the loss payee may have.

Separate payments may be made to each party at interest provided we protect the equities of all parties.

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

CUPOP 20 01 08 09

LT 07/02/2021
Page 1 of 1    213

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:36 PM
NYSCEF DOC. NO. 7

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 215 of 834

INDEX NO. 655437/2024
RECEIVED NYSCEF: 03/06/2025

004577

# ADDITIONAL INSURED ENDORSEMENT
## PREMISES YOU LEASE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement. This endorsement modifies the Business Liability Coverage.

---

Designation of Premises (Part You Lease):
37 Avenue B
New York NY 10009 7441

---

Name of Person or Organization (Additional Insured):
37 Avenue B HDFC



c/o LESPMHA
228 E 3rd St
New York NY 10009 7584

---

## WHO IS AN INSURED

**Who Is An Insured**

The following is added to the Who Is An Insured provision in the Business Liability Coverage:

The person or organization shown on this endorsement is also an insured, but only with respect to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the ownership, maintenance or use of that part of the premises designated on this endorsement, leased to you, and subject to the following Additional Exclusions:

The insurance does not apply:

1. To any "occurrence" which takes place after you cease to be a tenant in said premises; or

2. To structural alterations, new construction or demolition operations performed by or on behalf of the person or organization designated above.

However;

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

CUPOP 61 02 04 14

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/21
Page 1 of 3

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 216 of 834

**ADDITIONAL INSURED ENDORSEMENT**
**PREMISES YOU LEASE**
**PROPERTY AND BUSINESS LIABILITY POLICY**

**ADDITIONAL CONDITION**

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

LT 07/02/21
CUPOP 61 02 04 14                    CUMIS Insurance Society, Inc.                    Page 2 of 3
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

215

**ADDITIONAL INSURED ENDORSEMENT**
**PREMISES YOU LEASE**
**PROPERTY AND BUSINESS LIABILITY POLICY**
**ADDITIONAL CONDITION**

**Limit Of Insurance**

With respect to the insurance afforded to the additional insured, the following is added to the Limit Of Insurance Additional Condition in the Business Liability Coverage:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1.  Required by the contract or agreement; or

2.  Available under the applicable Limits Of Insurance shown on the Declarations,

whichever is less.

This endorsement shall not increase the applicable Limits Of Insurance shown on the Declarations.

LT 07/02/21

CUPOP 61 02 04 14    CUMIS Insurance Society, Inc.    Page 3 of 3
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

216



**CUNA MUTUAL** GROUP

004577

CUMIS Insurance Society, Inc.

Home Office:            Administrative Office:
2000 Heritage Way       5910 Mineral Point Rd
Waverly, IA 50677       Madison, WI 53705

## LOSS PAYABLE CLAUSE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement.

Effective: 10/04/2020, 12:01 a.m. until cancelled.

### LOSS PAYEE

City of New York HPD, AIMA
100 Gold St
New York NY 10038 1605

### TYPE OF PROPERTY

Building Coverage - Special

### LOCATION OF PROPERTY

37 Avenue B
New York NY 10009 7441

Loss under this Policy to property described above will be payable as interest may appear to you and the loss payee shown on the Declarations, or above.

The insurance, solely as to the interest of the loss payee, will not be invalidated by any act or neglect by you other than fraudulent acts or omissions.

We reserve the right to cancel this Policy at any time as provided by its terms and will give the loss payee the same notice that is given to you. Cancellation of the Policy will also terminate this agreement.

If we pay the loss payee for loss under this Policy, we will be entitled, to the extent of such payment, to any rights of recovery which the loss payee may have.

Separate payments may be made to each party at interest provided we protect the equities of all parties.

CUPOP 20 01 08 09

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/2021
Page 1 of 1    217

 **CUNA MUTUAL** GROUP

004577

*CUMIS Insurance Society, Inc.*

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

## LOSS PAYABLE CLAUSE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement.

Effective: 10/04/2020, 12:01 a.m. until cancelled.

### LOSS PAYEE

Minolta Business Systems
15325 SE 30th Pl Ste 100
Bellevue WA 98007 6597

### TYPE OF PROPERTY

Minolta D1351 Photocopier #31714386
Account #3124580001

### LOCATION OF PROPERTY

37 Avenue B
New York NY 10009 7441

Loss under this Policy to property described above will be payable as interest may appear to you and the loss payee shown on the Declarations, or above.

The insurance, solely as to the interest of the loss payee, will not be invalidated by any act or neglect by you other than fraudulent acts or omissions.

We reserve the right to cancel this Policy at any time as provided by its terms and will give the loss payee the same notice that is given to you. Cancellation of the Policy will also terminate this agreement.

If we pay the loss payee for loss under this Policy, we will be entitled, to the extent of such payment, to any rights of recovery which the loss payee may have.

Separate payments may be made to each party at interest provided we protect the equities of all parties.

CUPOP 20 01 08 09

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/2021
Page 1 of 1    218

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 220 of 834



**CUNA MUTUAL** GROUP

*CUMIS Insurance Society, Inc.*

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

004577

## LOSS PAYABLE CLAUSE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement.

Effective: 10/04/2020, 12:01 a.m. until cancelled.

### LOSS PAYEE

Wells Fargo Financial Leasing, Inc., its successors and assigns
PO Box 979284
Miami FL 33197 9284

### TYPE OF PROPERTY

Sharp Copier Model MX5001N
Agreement # 001-0105827-001

### LOCATION OF PROPERTY

37 Avenue B
New York NY 10009 7441

Loss under this Policy to property described above will be payable as interest may appear to you and the loss payee shown on the Declarations, or above.

The insurance, solely as to the interest of the loss payee, will not be invalidated by any act or neglect by you other than fraudulent acts or omissions.

We reserve the right to cancel this Policy at any time as provided by its terms and will give the loss payee the same notice that is given to you. Cancellation of the Policy will also terminate this agreement.

If we pay the loss payee for loss under this Policy, we will be entitled, to the extent of such payment, to any rights of recovery which the loss payee may have.

Separate payments may be made to each party at interest provided we protect the equities of all parties.

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

CUPOP 20 01 08 09

LT 07/02/2021
Page 1 of 1   219

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:36 PM
INDEX NO. 655437/2024
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 03/06/2025

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 221 of 834

004577

# ADDITIONAL INSURED ENDORSEMENT
# BUSINESS AGREEMENTS
# PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement. This endorsement modifies the Business Liability Coverage.

## WHO IS AN INSURED

**Who Is An Insured**

The following is added to the Who Is An Insured provision in the Business Liability Coverage:

The Mayor's Fund and the City, together with their officials and employees   but only with respect to its liability resulting directly from its activities performed under a contract or an agreement with you relating to the conduct of your business.

However;

1.  The insurance afforded to such additional insured only applies to the extent permitted by law; and

2.  If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

## ADDITIONAL CONDITION

**Limit Of Insurance**

With respect to the insurance afforded to the additional insured, the following is added to the Limit Of Insurance Additional Condition in the Business Liability Coverage:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1.  Required by the contract or agreement; or

2.  Available under the applicable Limits Of Insurance shown on the Declarations,

whichever is less.

This endorsement shall not increase the applicable Limits Of Insurance shown on the Declarations.

LT 07/02/21

CUPOP 61 22 04 14                    CUMIS Insurance Society, Inc.                    Page 1 of 1
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

220

**CUNA MUTUAL** GROUP

CUMIS Insurance Society, Inc.

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

004577

## LOSS PAYABLE CLAUSE
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement.

Effective: 10/04/2020, 12:01 a.m. until cancelled.

### LOSS PAYEE

Pitney Bowes Global Financial Services
27 Waterview Dr
Shelton CT 06484 4301

### TYPE OF PROPERTY

Postage Meter
Account/Lease: 0011248333

### LOCATION OF PROPERTY

37 Avenue B
New York NY 10009 7441

Loss under this Policy to property described above will be payable as interest may appear to you and the loss payee shown on the Declarations, or above.

The insurance, solely as to the interest of the loss payee, will not be invalidated by any act or neglect by you other than fraudulent acts or omissions.

We reserve the right to cancel this Policy at any time as provided by its terms and will give the loss payee the same notice that is given to you. Cancellation of the Policy will also terminate this agreement.

If we pay the loss payee for loss under this Policy, we will be entitled, to the extent of such payment, to any rights of recovery which the loss payee may have.

Separate payments may be made to each party at interest provided we protect the equities of all parties.

CUPOP 20 01 08 09

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/2021
Page 1 of 1    221

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:36 PM
INDEX NO. 655437/2024
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 03/06/2025

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 223 of 834

004577

## ADDITIONAL INSURED ENDORSEMENT
## BODILY INJURY AND PROPERTY DAMAGE LIABILITY
## PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement. This endorsement modifies the Business Liability Coverage.

## WHO IS AN INSURED

**Who Is An Insured**

The following is added to the Who Is An Insured provision in the Business Liability Coverage:

Grow Brooklyn  is also an insured, but only with respect to its liability for "bodily injury" or "property damage" resulting solely from the negligence of Lower East Side Peoples Federal Credit Union.

However;

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

## ADDITIONAL CONDITION

**Limit Of Insurance**

With respect to the insurance afforded to the additional insured, the following is added to the Limit Of Insurance Additional Condition in the Business Liability Coverage:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits Of Insurance shown on the Declarations,

whichever is less.

This endorsement shall not increase the applicable Limits Of Insurance shown on the Declarations.

CUPOP 61 21 04 14
CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/2021
Page 1 of 1



## CUNA MUTUAL GROUP

CUMIS Insurance Society, Inc.

Home Office:
2000 Heritage Way
Waverly, IA 50677

Administrative Office:
5910 Mineral Point Rd
Madison, WI 53705

004577

### LOSS PAYABLE CLAUSE
### PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement.

Effective: 10/04/2020, 12:01 a.m. until cancelled.

**LOSS PAYEE**

Conseco Finance Vendor Service Corp.
15325 SE 30th Pl Ste 100
Bellevue WA 98007 6597

**TYPE OF PROPERTY**

Copier #40795975-1

**LOCATION OF PROPERTY**

37 Avenue B
New York NY 10009 7441

Loss under this Policy to property described above will be payable as interest may appear to you and the loss payee shown on the Declarations, or above.

The insurance, solely as to the interest of the loss payee, will not be invalidated by any act or neglect by you other than fraudulent acts or omissions.

We reserve the right to cancel this Policy at any time as provided by its terms and will give the loss payee the same notice that is given to you. Cancellation of the Policy will also terminate this agreement.

If we pay the loss payee for loss under this Policy, we will be entitled, to the extent of such payment, to any rights of recovery which the loss payee may have.

Separate payments may be made to each party at interest provided we protect the equities of all parties.

CUPOP 20 01 08 09

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/2021
Page 1 of 1   223

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:36 PM
INDEX NO. 655437/2024
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 03/06/2025

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 225 of 834

004577

### ADDITIONAL INSURED ENDORSEMENT
### BUSINESS AGREEMENTS
### PROPERTY AND BUSINESS LIABILITY POLICY

Various provisions in this Policy restrict Coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered. The Common Policy Provisions apply to this endorsement. This endorsement modifies the Business Liability Coverage.

## WHO IS AN INSURED

**Who Is An Insured**

The following is added to the Who Is An Insured provision in the Business Liability Coverage:

Mayor's Fund to Advance New York City, the City, and their respective officials and employees  but only with respect to its liability resulting directly from its activities performed under a contract or an agreement with you relating to the conduct of your business.

However;

1.  The insurance afforded to such additional insured only applies to the extent permitted by law; and

2.  If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

## ADDITIONAL CONDITION

**Limit Of Insurance**

With respect to the insurance afforded to the additional insured, the following is added to the Limit Of Insurance Additional Condition in the Business Liability Coverage:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1.  Required by the contract or agreement; or

2.  Available under the applicable Limits Of Insurance shown on the Declarations,

whichever is less.

This endorsement shall not increase the applicable Limits Of Insurance shown on the Declarations.

CUPOP 61 22 04 14

CUMIS Insurance Society, Inc.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

LT 07/02/21
Page 1 of 1

224

# FORMS SCHEDULE

**POLICY NUMBER:**    004577

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

REFER TO DECLARATIONS FOR APPLICABLE PREMISES AND COVERAGES

| Form and Edition | Description |
|---|---|
| CUPOP 01 00 08 09 | PARTICIPATING CLAUSE |
| CUPOP 02 00 01 18 | COMMON POLICY PROVISIONS |
| CUPOP 21 00 01 18 | BUSINESS PERSONAL PROPERTY SPECIAL |
| CUPOP 22 00 08 09 | VALUABLE INFORMATION COVERAGE |
| CUPOP 23 00 01 16 | DATA PROCESSING OPERATIONS COVERAGE |
| CUPOP 25 00 08 09 | SCHEDULED ARTICLES COVERAGE |
| CUPOP 24 00 01 18 | AUTOMATED TELLER MACHINE |
| CUPOP 10 10 03 10 NY | STANDARD FIRE POLICY STATE |
| CUPOP 41 00 04 14 | EXTRA EXPENSE COVERAGE |
| CUPOP 42 00 08 09 | LOSS OF RENTAL INCOME |
| CUPOP 53 00 01 16 | REAL ESTATE MORTGAGE OPERATIONS COVERAGE |
| CUPOP 61 00 04 14 NY | BUSINESS LIABILITY COVERAGE |
| CUPOP 02 NY 01 18 | CREDIT UNION PACKAGE OF PROTECTION ENDORSEMENT |
| CUPOP 61 15 01 15 | TRIA LIABILITY EXCLUSION |
| TRIPRA 01 15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM TRIPRA |
| CUPOP 61 10 03 10 | LIABILITY EXCLUSION ENDORSEMENT |
| CUPOP 10 24 01 16 | NAMED STORM DEDUCTIBLE / CALENDAR YEAR ENDORSEMENT |
| CUPOP 61 26 01 16 NY | UNMANNED AIRCRAFT EXCLUSION ENDORSEMENT |

225

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 227 of 834

| CUPOP 20 01 08 09 | ADDITIONAL INSURED ENDORSEMENT (LOSS PAYABLE CLAUSE) |
|---|---|
| CUPOP 20 01 08 09 | ADDITIONAL INSURED ENDORSEMENT (LOSS PAYABLE CLAUSE) |
| CUPOP 20 01 08 09 | ADDITIONAL INSURED ENDORSEMENT (LOSS PAYABLE CLAUSE) |
| CUPOP 20 01 08 09 | ADDITIONAL INSURED ENDORSEMENT (LOSS PAYABLE CLAUSE) |
| CUPOP 61 22 04 14 | ADDITIONAL INSURED ENDORSEMENT (BUSINESS AGREEMENTS) |
| CUPOP 61 02 04 14 | ADDITIONAL INSURED ENDORSEMENT (PREMISES YOU LEASE) |
| CUPOP 20 01 08 09 | ADDITIONAL INSURED ENDORSEMENT (LOSS PAYABLE CLAUSE) |
| CUPOP 20 01 08 09 | ADDITIONAL INSURED ENDORSEMENT (LOSS PAYABLE CLAUSE) |
| CUPOP 61 22 04 14 | ADDITIONAL INSURED ENDORSEMENT (BUSINESS AGREEMENTS) |
| CUPOP 61 21 04 14 | ADDITIONAL INSURED ENDORSEMENT (BODILY INJURY AND PROPERTY DAMAGE) |
| CUPOP 61 02 04 14 | ADDITIONAL INSURED ENDORSEMENT (PREMISES YOU LEASE) |
| CUPOP 61 22 04 14 | ADDITIONAL INSURED ENDORSEMENT (BUSINESS AGREEMENTS) |
| CUPOP 20 01 08 09 | ADDITIONAL INSURED ENDORSEMENT (LOSS PAYABLE CLAUSE) |

# CAP ON LOSSES FROM
# CERTIFIED ACTS OF TERRORISM ENDORSEMENT

This endorsement is subject to the Declarations, Coverages, Definitions, Exclusions, and Conditions contained in the Policy, except as modified in this endorsement.

## ADDITIONAL EXCLUSION

**Cap On Certified Terrorism Losses**

1.  If aggregate insured losses attributable to "certified acts of terrorism" under the Terrorism Risk Insurance Act exceed $100 billion in any one calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

2.  The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy.

## ADDITIONAL DEFINITION

**Certified Act Of Terrorism**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

a.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

b.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

TRIPRA 01 15      CUMIS Insurance Society, Inc.      Page 1 of 1
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

227

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 229 of 834

# EXHIBIT B

# COMMERCIAL POLICY



877-528-7878

## 800 SUPERIOR AVENUE EAST, 21ST FLOOR

## CLEVELAND, OH 44114

## Wesco Insurance Company

INSURANCE IS PROVIDED BY
THE COMPANY DESIGNATED ON THE
DECLARATIONS PAGE
(A Stock Insurance Company)

THIS POLICY CONSISTS OF:
- -- DECLARATIONS
- -- COMMON POLICY CONDITIONS
- -- ONE OR MORE COVERAGE PARTS, and
- -- APPLICABLE FORMS AND ENDORSEMENTS

IL-PJ-WIC 0414

229

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 231 of 834

This page intentionally left blank

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:36 PM INDEX NO. 655437/2024
NYSCEF DOC. NO. 8 RECEIVED NYSCEF: 03/06/2025

## Read Your Policy Carefully

This policy is a legal contract between you and us. The information on this page is not the insurance contract and only the actual policy provisions will control. The policy sets forth in detail the rights and obligations of both you and us. **It is therefore important that you read your policy carefully.**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of the policy.

This policy is signed by the President and Secretary of the insurance company and, if required by State law, this policy shall not be valid unless countersigned on the Declaration page by its authorized representative.

President     Secretary

ILSIGDEC 1015

231

INDEX NO. 655437/2024
RECEIVED NYSCEF: 03/06/2025

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 233 of 834

This page intentionally left blank



Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

## COMMERCIAL COMMON POLICY DECLARATIONS SUMMARY PAGE

| | |
|---|---|
| **Policy Number** WPP1595109 03 | **Policy Period**   From: 12/31/2020   To: 12/31/2021<br>12:01 A.M. Standard Time at the Name Insured's Address |

**Transaction**
Renewal

| **Named Insured and Address**<br>UHAB HDFC<br>C/O BRENT SHARMAN<br>120 WALL STREET, 20TH FLOOR<br>NEW YORK NY 10005 | **Producer:** 147712<br>Arthur J. Gallagher Risk Management Services, Inc.<br>250 Park Avenue, 3rd Floor<br>New York NY 10177<br>Telephone: (212) 994-7100 |
|---|---|

| **Business Description**<br>BUILDING OWNER | **Type of Business**<br>Organization Including a<br>Corporation | **Auditable** ☐<br><br>**Audit Period** | **Non-Auditable** ☒<br><br>Non-Auditable |
|---|---|---|---|

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy. This policy consists of the following coverage parts for which a premium is indicated. This premium may be subject to adjustment.

| COVERAGE PART DESCRIPTION | PREMIUM |
|---|---|
| Commercial Fire | ▮ |
| General Liability | ▮ |
| NY Fire Fee | ▮ |

| | |
|---|---|
| **Policy Premium** | ▮ |
| **Deposit Premium (if applicable)** | |
| **Taxes and Surcharges** | N/A in NY |
| **Total Deposit Premium** | ▮ |
| (Includes Taxes, Surcharges, and applicable Terrorism Premium) | |



**FORMS AND ENDORSEMENTS***

See Forms and Endorsements Schedule

*Entry optional if above in common policy declarations schedule

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

2-01010

ILDEC-NY 0414

Page 1 of 14

233

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 235 of 834

This page intentionally left blank

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

## COMMERCIAL COMMON POLICY DECLARATIONS SUMMARY PAGE

THESE DECLARATIONS TOGETHER WITH THE COVERAGE DECLARATIONS, COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

_____12/17/2020_____
**Date**

_____
**Signature of Authorized Representative**

ILDEC-NY 0414

This page intentionally left blank

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

**Policy Number:**
WPP1595109 03
**Named Insured:**
UHAB HDFC

# COMMERCIAL COMMON POLICY DECLARATIONS
# LOCATION SUMMARY

**Premises # 1**
2283 SECOND AVENUE
NEW YORK NY 10035

**Premises # 2**
206 WEST 123RD ST
NEW YORK NY 10027

**Premises # 3**
2285 SECOND AVENUE
NEW YORK NY 10035

**Premises # 4**
272 EAST 7TH STREET
NEW YORK NY 10009

Issued Date: 12/17/2020

ILLOCSUM 0414

Page 3 of 137

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 239 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 240 of 834

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

**Policy Number:**
WPP1595109 03
**Named Insured:**
UHAB HDFC

# COMMERCIAL COMMON POLICY DECLARATIONS
## SUB-LOCATION ADDRESS SCHEDULE

**Premises # 1 Building # 1**
2283 SECOND AVENUE NEW YORK NY 10035
APARTMENTS WITH MERCANTILE

**Premises # 2 Building # 1**
206 WEST 123RD ST NEW YORK NY 10027
APARTMENTS WITHOUT MERCANTILE

**Premises # 3 Building # 1**
2285 SECOND AVENUE NEW YORK NY 10035
APARTMENTS WITH MERCANTILE

**Premises # 4 Building # 1**
272 EAST 7TH STREET NEW YORK NY 10009
APARTMENTS WITHOUT MERCANTILE

Issued Date: 12/17/2020

ILSUBLASCH 0414

INDEX NO. 655437/2024

NYSCEF DOC. NO. 8 Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 241 of 834

RECEIVED NYSCEF: 03/06/2025

This page intentionally left blank

240

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

# COMMERCIAL GENERAL LIABILITY COVERAGE DECLARATIONS

| **Policy Number** WPP1595109 03 | **Policy Period** | **From:** 12/31/2020  **To:** 12/31/2021 |
|---|---|---|
| | | 12:01 A.M. Standard Time at the Name Insured's Address |

**Transaction**
Renewal

| **Named Insured and Address** | **Producer:** 147712 |
|---|---|
| UHAB HDFC | Arthur J. Gallagher Risk Management Services, Inc. |
| C/O BRENT SHARMAN | 250 Park Avenue, 3rd Floor |
| 120 WALL STREET, 20TH FLOOR | New York NY 10177 |
| NEW YORK NY 10005 | **Telephone:** (212) 994-7100 |

| **Business Description** | **Type of Business** | **Audit Period** |
|---|---|---|
| BUILDING OWNER | Organization Including a Corporation | Non-Auditable |

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**LIMITS OF INSURANCE**

| | |
|---|---|
| General Aggregate Limit (Other than Products-Completed Operations) | $2,000,000 |
| Products - Completed Operations Aggregate Limit | $2,000,000 |
| Each Occurrence Limit | $1,000,000 |
| Personal and Advertising Injury Limit | $1,000,000 |
| Medical Expense Limit, any one person | $5,000 |
| Damage to Premises Rented to You Limit, any one premises | $100,000 |

**AMENDED LIMITS OF LIABILITY**

   Refer to attached schedule, if any.

**LOCATIONS OF ALL PREMISES YOU OWN, RENT OR OCCUPY**

   Refer to attached schedule.

**CLASSIFICATIONS**

   Refer to attached schedule, if any.

**TOTAL PREMIUM FOR THIS COVERAGE PART**     ▮▮▮▮▮

**FORMS AND ENDORSEMENTS***

See Forms and Endorsements Schedule

*Entry optional if shown in common policy declarations.*

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY DECLARATIONS, COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

| 12/17/2020 | _(signature)_ |
|---|---|
| **Date** | **Signature of Authorized Representative** |

GLDEC 0414

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 243 of 834

This page intentionally left blank

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

**Policy Number:**
WPP1595109 03
**Named Insured:**
UHAB HDFC

# COMMERCIAL GENERAL LIABILITY COVERAGE DECLARATIONS
## EXTENSION OF DECLARATIONS

## LOCATION OF PREMISES

Location of All Premises You Own, Rent or Occupy:

| 1 | 2 | 3 |
|---|---|---|
| 2283 SECOND AVENUE NEW YORK NY 10035 | 206 WEST 123RD ST NEW YORK NY 10027 | 2285 SECOND AVENUE NEW YORK NY 10035 |

4
272 EAST 7TH STREET
NEW YORK NY 10009

## PREMIUM

| Location | Classification | Code No. | Exposure | Basis | Rate Premises Ops | Rate Prod/Comp Ops. | Advanced Premium Premises Ops. | Advanced Premium Prod/Comp Ops. |
|---|---|---|---|---|---|---|---|---|
| 1 | | 60022 | 3 | U | ■ | ■ | ■ | ■ |
| | Apartment, Tenement, Boarding or Rooming Houses in Greater New York - Without elevator | | | | | | | |
| 1 | | 61217 | 700 | a | ■ | ■ | ■ | ■ |
| | Buildings or Premises - bank or office - mercantile or manufacturing - maintained by the insured (Lessor's risk only) (For-Profit) | | | | | | | |
| 2 | | 60022 | 6 | U | ■ | ■ | ■ | ■ |
| | Apartment, Tenement, Boarding or Rooming Houses in Greater New York - Without elevator | | | | | | | |
| 3 | | 60022 | 3 | U | ■ | ■ | ■ | ■ |
| | Apartment, Tenement, Boarding or Rooming Houses in Greater New York - Without elevator | | | | | | | |
| 3 | | 61217 | 600 | a | ■ | ■ | ■ | ■ |
| | Buildings or Premises - bank or office - mercantile or manufacturing - maintained by the insured (Lessor's risk only) (For-Profit) | | | | | | | |
| 4 | | 60022 | 19 | U | ■ | ■ | ■ | ■ |
| | Apartment, Tenement, Boarding or Rooming Houses in Greater New York - Without elevator | | | | | | | |
| | 25 Employees Hired Auto and Non-Owned Auto Liability | | | | | | ■ | |
| All | Terrorism | | | | | | ■ | ■ |

**Extension of Declarations – Total Advance Annual Premium** ■

Issued Date: 12/17/2020

GLDEC 0414

This page intentionally left blank

244

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

# COMMERCIAL PROPERTY COVERAGE DECLARATIONS

| **Policy Number** WPP1595109 03 | **Policy Period** | **From:** 12/31/2020 **To:** 12/31/2021 |
|---|---|---|
| | | 12:01 A.M. Standard Time at the Name Insured's Address |

**Transaction**
Renewal

| **Named Insured and Address** | **Producer:** 147712 |
|---|---|
| UHAB HDFC | Arthur J. Gallagher Risk Management Services, Inc. |
| C/O BRENT SHARMAN | 250 Park Avenue, 3rd Floor |
| 120 WALL STREET, 20TH FLOOR | New York NY 10177 |
| NEW YORK NY 10005 | **Telephone:** (212) 994-7100 |

| **Business Description** | **Type of Business** | **Audit Period** |
|---|---|---|
| BUILDING OWNER | Organization Including a Corporation | Non-Auditable |

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**DESCRIPTION OF PREMISES**
  Refer to attached schedule.

**COVERAGES PROVIDED**
  Refer to attached schedule, if any.

**OPTIONAL COVERAGES**
  Refer to attached schedule, if any.

**MORTGAGEES AND ADDITIONAL INTERESTS**
  Refer to attached schedule, if any.

**TOTAL PREMIUM FOR THIS COVERAGE PART**     $10,008.00

| **FORMS AND ENDORSEMENTS*** |
|---|
| See forms and Endorsements Schedule |

**\*Entry optional if shown in common policy declarations.**

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY DECLARATIONS, COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

| 12/17/2020 | |
|---|---|
| **Date** | **Signature of Authorized Representative** |

CPDEC 0414

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 247 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 248 of 834

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

**Policy Number:**
WPP1595109 03
**Named Insured:**
UHAB HDFC

# COMMERCIAL PROPERTY
## DESCRIPTION OF PREMISES

| Loc. No. | Bldg. No. | Occupancy | Construction | Class | Prot. | Terr. | EQ Class. | EQ Terr. |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | Apartments with Mercantile Occupancies – Up to 10 Units | Joisted Masonry (Code 2) | 0321 | 1 | 310 | | |
| 2 | 1 | Apartments without Mercantile Occupancies – Up to 10 Units | Joisted Masonry (Code 2) | 0311 | 1 | 310 | | |
| 3 | 1 | Apartments with Mercantile Occupancies – Up to 10 Units | Joisted Masonry (Code 2) | 0321 | 1 | 310 | | |
| 4 | 1 | Apartments without Mercantile Occupancies – 11 to 30 Units | Joisted Masonry (Code 2) | 0312 | 1 | 310 | | |

Issued Date: 12/17/2020

CPDECB 0414

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 249 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 250 of 834

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

**Policy Number:**
WPP1595109 03
**Named Insured:**
UHAB HDFC

## COMMERCIAL PROPERTY
## DESCRIPTION OF COVERAGES PROVIDED

| Loc. No. | Bldg. No. | Coverage | Limit of Insurance | Blanket Coverage | Covered Causes of Loss | Coinsurance* | Deductible |
|---|---|---|---|---|---|---|---|
| 1 | 1 | Building | ■ | | Special | 100% | $2,500 |
| 1 | 1 | Personal Property Of The Insured | ■ | | Special | 80% | $2,500 |
| 1 | 1 | Business Income including Rental Value with Extra Expense | ■ | | Special | 80% | |
| 2 | 1 | Building | ■ | | Special | 100% | $2,500 |
| 2 | 1 | Personal Property Of The Insured | ■ | | Special | 80% | $2,500 |
| 2 | 1 | Business Income including Rental Value with Extra Expense | ■ | | Special | 80% | |
| 3 | 1 | Building | ■ | | Special | 100% | $2,500 |
| 3 | 1 | Personal Property Of The Insured | ■ | | Special | 80% | $2,500 |
| 3 | 1 | Business Income including Rental Value with Extra Expense | ■ | | Special | 80% | |
| 4 | 1 | Building | ■ | | Special | 100% | $2,500 |
| 4 | 1 | Personal Property Of The Insured | ■ | | Special | 80% | $2,500 |
| 4 | 1 | Business Income including Rental Value with Extra Expense | ■ | | Special | 80% | |

*IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENT

Issued Date: 12/17/2020

CPDECC 0414

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 251 of 834

This page intentionally left blank

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

**Policy Number:**
WPP1595109 03
**Named Insured:**
UHAB HDFC

# COMMERCIAL PROPERTY
## DESCRIPTION OF OPTIONAL COVERAGES PROVIDED

| Loc. No. | Bldg. No. | Coverage | Effective Date | Expiration Date | Agreed Value | Valuation* Bldg. | Valuation* Pers. Prop. | Valuation* Incl "Stock" | Inflation Guard Bldg. | Inflation Guard Pers. Prop. | Indemnity Monthly Limit | Indemnity Extended Period | Indemnity Maximum Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | Building | 12/31/2020 | 12/31/2021 | X | RC | | | | | | | |
| 1 | 1 | Personal Property Of The Insured | | | | | RC | | | | | | |
| 1 | 1 | Business Income including Rental Value with Extra Expense | | | | | | | | | | | |
| 2 | 1 | Building | 12/31/2020 | 12/31/2021 | X | RC | | | | | | | |
| 2 | 1 | Personal Property Of The Insured | | | | | RC | | | | | | |
| 2 | 1 | Business Income including Rental Value with Extra Expense | | | | | | | | | | | |
| 3 | 1 | Building | 12/31/2020 | 12/31/2021 | X | RC | | | | | | | |
| 3 | 1 | Personal Property Of The Insured | | | | | RC | | | | | | |
| 3 | 1 | Business Income including Rental Value with Extra Expense | | | | | | | | | | | |
| 4 | 1 | Building | 12/31/2020 | 12/31/2021 | X | RC | | | | | | | |
| 4 | 1 | Personal Property Of The Insured | | | | | RC | | | | | | |
| 4 | 1 | Business Income including Rental Value with Extra Expense | | | | | | | | | | | |

* RC - Replacement Cost
FRC - Functional Replacement Cost
ACV - Actual Cash Value

Issued Date: 12/17/2020

CPDECD 0414

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 253 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 254 of 834

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

**Policy Number:**
WPP1595109 03
**Named Insured:**
UHAB HDFC

# COMMERCIAL PROPERTY
# SUPPLEMENTAL DECLARATIONS

## LOCATION SCHEDULE PREMIUM CHARGES:

| Loc No. | Bldg No. | Coverage | Covered Causes of Loss | Premium |
|---|---|---|---|---|
| 1 | 1 | Building | Special Including Theft | ▮ |
| 1 | 1 | Personal Property Of The Insured | Special Including Theft | ▮ |
| 1 | 1 | Business Income including Rental Value with Extra Expense | Special Including Theft | ▮ |
| 1 | | Equipment Breakdown | | ▮ |
| | | | **Location 1 Total** | ▮ |
| 2 | 1 | Building | Special Including Theft | ▮ |
| 2 | 1 | Personal Property Of The Insured | Special Including Theft | ▮ |
| 2 | 1 | Business Income including Rental Value with Extra Expense | Special Including Theft | ▮ |
| 2 | | Equipment Breakdown | | ▮ |
| | | | **Location 2 Total** | ▮ |
| 3 | 1 | Building | Special Including Theft | ▮ |
| 3 | 1 | Personal Property Of The Insured | Special Including Theft | ▮ |
| 3 | 1 | Business Income including Rental Value with Extra Expense | Special Including Theft | ▮ |
| 3 | | Equipment Breakdown | | ▮ |
| | | | **Location 3 Total** | ▮ |
| 4 | 1 | Building | Special Including Theft | ▮ |
| 4 | 1 | Personal Property Of The Insured | Special Including Theft | ▮ |
| 4 | 1 | Business Income including Rental Value with Extra Expense | Special Including Theft | ▮ |
| 4 | | Equipment Breakdown | | ▮ |
| | | | **Location 4 Total** | ▮ |

Total for All Locations: ▮

## OTHER PROPERTY COVERAGE PREMIUM CHARGES:

| Coverage | Premium |
|---|---|
| Identity Recovery | ▮ |
| Terrorism | ▮ |

**Total Other Property:** ▮

**Total Property Premium Charges:** ▮
(Excludes Taxes and Surcharges)

Issued Date: 12/17/2020

CPDECF 0414

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 255 of 834

This page intentionally left blank

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

**Policy Number:**
WPP1595109 03
**Named Insured:**
UHAB HDFC

# COMMERCIAL COMMON POLICY DECLARATIONS
# POLICY INTEREST SCHEDULE

LOSS PAYABLE PROVISIONS
CP12181012
THE CITY OF NY AND NYC DEPARTMENT OF HOUSING
PRESERVATION & DEVELOPMENT
100 GOLD STREET
NEW YORK, NY 10038
Units (Loc - Bldg): 1-1, 2-1, 3-1

LOSS PAYABLE PROVISIONS
CP12181012
US DEPARTMENT OF HOUSING & URBAN
DEVELOPMENT OF PHILADELPHIA HOMEOWNERSHIP
1090 PENN SQUARE EAST
ATTN: PETER SPINA
PHILADELPHIA, PA 19107
Units (Loc - Bldg): 1-1, 2-1, 3-1

LOSS PAYABLE PROVISIONS
CP12181012
SECRETARY OF HOUSING & URBAN DEVELOPMENT
OF WASHINGTON DC, ISAOA, ATIMA
451 7TH STREET SW
WASHINGTON , DC 20410-8000
Units (Loc - Bldg): 1-1, 2-1, 3-1

LOSS PAYABLE PROVISIONS
CP12181012
THE CITY OF NEW YORK ITS OFFICIALS AND
EMPLOYEES
100 GOLD STREET
NEW YORK, NY 10038
Units (Loc - Bldg): 4-1

ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR
RECEIVER
CG20180413
THE CITY OF NY AND NYC DEPARTMENT OF HOUSING
PRESERVATION & DEVELOPMENT, 100 GOLD STREET,
NEW YORK, NY 10038
  Location #: 1

ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR
RECEIVER
CG20180413
THE CITY OF NY AND NYC DEPARTMENT OF HOUSING
PRESERVATION & DEVELOPMENT, 100 GOLD STREET,
NEW YORK, NY 10038
  Location #: 2

ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR
RECEIVER
CG20180413
THE CITY OF NY AND NYC DEPARTMENT OF HOUSING
PRESERVATION & DEVELOPMENT, 100 GOLD STREET,
NEW YORK, NY 10038
  Location #: 3

ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR
RECEIVER
CG20180413
US DEPARTMENT OF HOUSING & URBAN
DEVELOPMENT OF PHILADELPHIA HOMEOWNERSHIP,
ATTN: PETER SPINA,  1090 PENN SQUARE EAST,
PHILADELPHIA, PA 19107
  Location #: 1

ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR
RECEIVER
CG20180413
US DEPARTMENT OF HOUSING & URBAN
DEVELOPMENT OF PHILADELPHIA HOMEOWNERSHIP,
ATTN: PETER SPINA,  1090 PENN SQUARE EAST,
PHILADELPHIA, PA 19107
  Location #: 2

ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR
RECEIVER
CG20180413
US DEPARTMENT OF HOUSING & URBAN
DEVELOPMENT OF PHILADELPHIA HOMEOWNERSHIP,
ATTN: PETER SPINA,  1090 PENN SQUARE EAST,
PHILADELPHIA, PA 19107
  Location #: 3

ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR
RECEIVER
CG20180413
SECRETARY OF HOUSING & URBAN DEVELOPMENT
OF WASHINGTON DC, ISAOA, ATIMA, 451 7TH STREET
SW, WASHINGTON, DC 20410-8000
  Location #: 1

ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR
RECEIVER
CG20180413
SECRETARY OF HOUSING & URBAN DEVELOPMENT
OF WASHINGTON DC, ISAOA, ATIMA, 451 7TH STREET
SW, WASHINGTON, DC 20410-8000
  Location #: 2

Issued Date: 12/17/2020

ILPISCH 0414

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 257 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 258 of 834

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

**Policy Number:**
WPP1595109 03
**Named Insured:**
UHAB HDFC

## COMMERCIAL COMMON POLICY DECLARATIONS
## POLICY INTEREST SCHEDULE

ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR
RECEIVER
CG20180413
SECRETARY OF HOUSING & URBAN DEVELOPMENT
OF WASHINGTON DC, ISAOA, ATIMA, 451 7TH STREET
SW, WASHINGTON, DC 20410-8000
  Location #: 3

ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR
RECEIVER
CG20180413
THE CITY OF NEW YORK ITS OFFICIALS AND
EMPLOYESS 100 GOLD STREET NEW YORK NY 10038
  Location #: 4

Issued Date: 12/17/2020

ILPISCH 0414

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 259 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 260 of 834



Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

**Policy Number:**
WPP1595109 03
**Named Insured:**
UHAB HDFC

# COMMERCIAL COMMON POLICY DECLARATIONS
## FORMS AND ENDORSEMENTS SCHEDULE

| Coverage | Form Number | Edition Date | Title |
|---|---|---|---|
| CF | 311220NY | 07/10 | EQUIPMENT BREAKDOWN COVERAGE NEW YORK |
| CG | 330729NY | 10/13 | COMMERCIAL GENERAL LIABILITY COVERAGE EXPANSION ENDORSEMENT – NEW YORK (NON-CONTRACTORS) |
| CF | APP-ANTIAR-NY | 08/14 | STATE OF NEW YORK ANTI-ARSON APPLICATION |
| CG | CG0001 | 04/13 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG | CG0104 | 12/04 | NEW YORK CHANGES – PREMIUM AUDIT |
| CG | CG0163 | 07/11 | NEW YORK CHANGES – COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG | CG2018 | 04/13 | ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR RECEIVER |
| CG | CG2107 | 05/14 | EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY |
| CG | CG2109 | 06/15 | EXCLUSION - UNMANNED AIRCRAFT |
| CG | CG2116 | 04/13 | EXCLUSION – DESIGNATED PROFESSIONAL SERVICES |
| CG | CG2132 | 05/09 | COMMUNICABLE DISEASE EXCLUSION |
| CG | CG2136 | 03/05 | EXCLUSION - NEW ENTITIES |
| CG | CG2139 | 10/93 | CONTRACTUAL LIABILITY LIMITATION (FOR USE WITH CGL AND PRODUCTS POLICIES) |
| CG | CG2144 | 07/98 | LIMITATION OF COVERAGE TO DESIGNATED PREMISES OR PROJECT |
| CG | CG2147 | 12/07 | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG | CG2149 | 09/99 | TOTAL POLLUTION EXCLUSION ENDORSEMENT |
| CG | CG2151 | 04/13 | AMENDMENT OF LIQUOR LIABILITY EXCLUSION - EXCEPTION FOR SCHEDULED PREMISES OR ACTIVITIES |
| CG | CG2160 | 09/98 | EXCLUSION - YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS |
| CG | CG2170 | 01/15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| CG | CG2621 | 10/91 | NEW YORK CHANGES - TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS USED UP |
| CG | CG3345 | 12/05 | NEW YORK CHANGES – NON-BINDING ARBITRATION |
| CF | CP0010 | 10/12 | BUILDING AND PERSONAL PROPERTY COVERAGE |
| CF | CP0030 | 10/12 | BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM |
| CF | CP0090 | 07/88 | COMMERCIAL PROPERTY CONDITIONS |
| CF | CP0133 | 05/18 | NEW YORK CHANGES |
| CF | CP0164 | 09/17 | NEW YORK CHANGES - FUNGUS, WET ROT AND DRY ROT |
| CF | CP0178 | 08/08 | NEW YORK – EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA |
| CF | CP1030 | 09/17 | CAUSE OF LOSS - SPECIAL FORM |
| CF | CP1218 | 10/12 | LOSS PAYABLE PROVISIONS |
| CG | GL990027 | 10/17 | HIRED AND NON-OWNED AUTO LIABILITY |

Issued Date: 12/17/2020

ILFORMSCH 0414

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 261 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 262 of 834

Wesco Insurance Company
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

**Policy Number:**
WPP1595109 03
**Named Insured:**
UHAB HDFC

# COMMERCIAL COMMON POLICY DECLARATIONS
## FORMS AND ENDORSEMENTS SCHEDULE

| Coverage | Form Number | Edition Date | Title |
|---|---|---|---|
| IL | IL0017 | 11/98 | COMMON POLICY CONDITIONS |
| IL | IL0023 | 07/02 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT |
| IL | IL0183 | 08/08 | NEW YORK CHANGES – FRAUD |
| IL | IL0268 | 01/14 | NEW YORK CHANGES - CANCELLATION AND NONRENEWAL |
| IL | IL0935 | 07/02 | EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES |
| IL | IL0952 | 01/15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| IL | IL0985 | 01/15 | DISCLOSURE PURSUANT TO TERRORISM RISK |
| IL | IL1201 | 11/85 | POLICY CHANGES |
| IL | IL990034 | 09/14 | IDENTITY RECOVERY COVERAGE |
| IL | IL990040NY | 09/14 | IDENTITY RECOVERY COVERAGE NEW YORK AMENDATORY |
| IL | IL990044 | 01/17 | ASBESTOS EXCLUSION |
| CG | TGL990001 | 11/14 | CONSTRUCTION EXCLUSION |

Issued Date: 12/17/2020

ILFORMSCH 0414

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 263 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 264 of 834

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

263

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 265 of 834

This page intentionally left blank

AGENCY CUSTOMER ID: _____



# INSURANCE SUPPLEMENT - STANDARD FIRE POLICY ONLY

| AGENCY | CARRIER | NAIC CODE |
|---|---|---|
| Arthur J. Gallagher Risk Management Services, Inc. | Wesco Insurance Company | 25011 |

| POLICY NUMBER | APPLICANT / NAMED INSURED |
|---|---|
| WPP1595109 03 | UHAB HDFC |

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

In this state, a terrorism exclusion makes an exception for (and thereby provides coverage for) fire losses resulting from an act of terrorism. Therefore, if you reject this offer of terrorism coverage, that rejection does not apply to fire losses resulting from an act of terrorism. Coverage for such fire losses will be provided in your policy. The additional premium just for such fire coverage is stated below. If you reject the offer described above for terrorism coverage, this premium is due.

### Acceptance or Rejection of Terrorism Insurance Coverage

[X] I hereby elect to purchase terrorism coverage for a prospective premium of $ ▮▮▮▮▮▮▮▮▮▮▮▮ .

[ ] I hereby decline to purchase terrorism coverage for certified acts of terrorism. I understand that an **exclusion** of certain terrorism losses will be made part of the policy.

If you decline this offer, the premium for terrorism (fire only) coverage is $ ▮▮▮▮▮▮▮▮▮▮ .

| _____ | _____ | _____ |
|---|---|---|
| Policyholder / Applicant's Signature | Print Name | Date |
| _____ | _____ | _____ |
| Policyholder / Applicant's Signature | Print Name | Date |
| _____ | _____ | _____ |
| Policyholder / Applicant's Signature | Print Name | Date |

Effective Date

**Includes copyrighted material of the National Association of Insurance Commissioners, with its permission.**

ACORD 62 US (2015/01)
© 2003-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

265

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 267 of 834

This page intentionally left blank



## KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS

In the event you need to contact someone about this insurance for any reason, please contact your agent. If no agent was involved in the sale of this insurance, or if you have additional questions, you may contact AmTrust North America at the address and/or telephone number below.

---

**AMTRUST POLICYHOLDER SERVICE OFFICE**
AmTrust North America
800 Superior Ave • 21st Floor • Cleveland, OH, 44114
Telephone: 877.528.7878 • Fax: 800.487.9654

Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent or insurance company please have your policy number available.

---

## AmTrust Claims Service

AmTrust's claims staff has an average of 20+ years of experience and provides effective management of claims. Some of the benefits for our customers include a toll-free 24/7 centralized call center staffed by special claims operators; adjusters specialized by claim types, field adjusters to provide direct assistance at loss locations and a highly qualified panel of defense attorneys.

### Information Required for All Claims Reported

- Name of the insured and policy number
- Date, time and place of accident
- Description of accident or incident
- Name, phone and/or email of person making the report

Refer to our Website for additional information on reporting a claim
Website: https://amtrustgroup.com/small-business-insurance/claims/claim-center/report-claim

---

**Workers' Compensation (All States)**
First Report of Claim:
Phone: 866.272.9267
Fax: 775.908.3724 or 877.669.9140
Email: amtrustclaims@qrm-inc.com
Claims Status: 888.239.3909

**Other than Workers' Compensation (All States)**
First Report of Claim:
Phone: 866.272.9267
Fax: 877.207.3961
Email: anaclaimsreporting@amtrustgroup.com
Claims Status: 888.239.3909

Agents: Send ACORD Notice of Loss to www.anaclaimsreporting@amtrustgroup.com

---

**Employment Practices Liability, Cyber Liability and Data Breach Response Claims for Small Business (All States)**
Paul Poppish, VP Claims
Amtrust North America
233 N. Michigan Avenue, Suite 1200
Chicago, IL 60601

Phone: 312.803.4630
888.239.3909 ext 394630
Fax: 312.781.0423
Paul.Poppish@amtrustgroup.com

---

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 269 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 270 of 834

COMMERCIAL PROPERTY
31-1220NY 07 10

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EQUIPMENT BREAKDOWN COVERAGE NEW YORK

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CAUSES OF LOSS-- BASIC FORM
CAUSES OF LOSS-- BROAD FORM
CAUSES OF LOSS-- SPECIAL FORM

A.  The following is added as an Additional Coverage to the Causes of Loss— Basic Form, Broad Form or Special Form.

**Additional Coverage-- Equipment Breakdown**
The term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below.

1.  We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

    **a.**  mechanical breakdown, including rupture or bursting caused by centrifugal force;
    **b.**  artificially generated electrical, magnetic or electromagnetic energy, including electric arcing, that damages, disturbs, disrupts or otherwise interferes with any electrical or electronic wire, device, appliance, system or network.
    **c.**  explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;
    **d.**  loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or
    **e.**  loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

2.  Unless otherwise shown in a Schedule, the following coverages also apply to the direct result of an "accident." These coverages do not provide additional amounts of insurance.

    **a.  Expediting Expenses**
    With respect to your damaged Covered Property, we will pay the reasonable extra cost to:
    **(1)**  make temporary repairs; and
    **(2)**  expedite permanent repairs or permanent replacement.
    The most we will pay for loss or expense under this coverage is $100,000 unless otherwise shown in a Schedule.
    **b.  Hazardous Substances**
    We will pay for the additional cost to repair or replace Covered Property because of contamination by a "hazardous substance." This includes the additional expenses to clean up or dispose of such property. This does not include contamination of "perishable goods" by refrigerant, including but not limited to ammonia, which is addressed in 2.c.(1)(b) below. As used in this coverage,

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 271 of 834

additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $100,000 unless otherwise shown in a Schedule.

**c.    Spoilage**

**(1)**    We will pay:

**(a)**    for physical damage to "perishable goods" due to spoilage;

**(b)**    for physical damage to "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia;

**(c)**    any necessary expenses you incur to reduce the amount of loss under this coverage to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

**(2)**    If you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident," less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with the Valuation condition.

The most we will pay for loss, damage or expense under this coverage is $100,000 unless otherwise shown in a Schedule.

**d.    Data Restoration**

We will pay for your reasonable and necessary cost to research, replace and restore lost "data."

The most we will pay for loss or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $100,000 unless otherwise shown in a Schedule.

**e.    Service Interruption**

**(1)**    Any insurance provided for Business Income, Extra Expense or Spoilage is extended to apply to your loss, damage or expense caused by the interruption of utility services. The interruption must result from an "accident" to equipment, including overhead transmission lines, that is owned by a utility, landlord, a landlord's utility or other supplier who provides you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, internet access, telecommunications services, wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that it is not Covered Property.

**(2)**    We will not pay for any loss of Business Income you sustain that results from the interruption of utility services during the first 24 hours following the "accident." However, if a deductible is shown in a Schedule as provided for in paragraph B.1. below, or if the "period of restoration" begins more than 24 hours after the time of the direct physical damage for Business Income, then that deductible or time period will apply instead of the 24 hours provided for in this paragraph.

**(3)**    The most we will pay in any "one accident" for loss, damage or expense under this coverage is the applicable limit for Business Income, Extra Expense or Spoilage, except that if a limit is shown in a Schedule for Service Interruption, that limit will apply to Business Income and Extra Expense loss under this coverage.

**f.    Business Income and Extra Expense**

Any insurance provided under this coverage part for Business Income or Extra Expense is extended to the coverage provided by this endorsement. However, if a deductible is shown in a Schedule, then as respects Equipment Breakdown coverage, the "period of restoration" will begin immediately after the "accident," and the deductible shown in the Schedule will apply.

The most we will pay for loss or expense under this coverage is the applicable limit for Business Income and Extra Expense, unless otherwise shown in a Schedule.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 272 of 834

3. **EXCLUSIONS**

All exclusions in the Causes of Loss form apply except as modified below and to the extent that coverage is specifically provided by this Additional Coverage Equipment Breakdown.

a.    The following exclusions are modified:

(1)    If the Causes of Loss -- Basic Form or Causes of Loss – Broad Form applies, the following is added to Exclusion B.2.: Depletion, deterioration, corrosion, erosion, wear and tear, or other gradually developing conditions. However, if an "accident" results, we will pay for the resulting loss, damage or expense caused by that "accident."

(2)    The following is added to Exclusion B.1.g.:
However, if electrical "covered equipment" requires drying out because of Water as described in g.(1) through g.(3) above, we will pay for the direct expenses of such drying out subject to the applicable Limit of Insurance and deductible for Building or Business Personal Property, whichever applies.

(3)    If the Causes of Loss—Special Form applies, as respects this endorsement only, the last paragraph of Exclusion B.2.d. is deleted and replaced with the following:
But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in an "accident," we will pay for the loss, damage or expense caused by that "accident."

b.    The following exclusions are added:

(1)    We will not pay for loss, damage or expense caused by or resulting from:

(a)    a hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment; or

(b)    any of the following:

(i)    defect, programming error, programming limitation, computer virus, malicious code, loss of "data," loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind; or

(ii)    misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.

However, if an "accident" results, we will pay for the resulting loss, damage or expense caused by that "accident."

(2)    With respect to Service Interruption coverage, we will also not pay for an "accident" caused by or resulting from: fire; lightning; windstorm or hail; explosion (except as specifically provided in A.1.c. above); smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing; collapse; flood or earth movement.

(3)    With respect to Business Income, Extra Expense and Service Interruption coverages, we will also not pay for any increase in loss resulting from an agreement between you and your customer or supplier.

(4)    We will not pay for any loss or damage to animals.

4. **DEFINITIONS**

The following definitions are added:

a.    "Boilers and vessels" means:

(1)    Any boiler, including attached steam, condensate and feedwater piping; and

(2)    Any fired or unfired pressure vessel subject to vacuum or internal pressure other than the static pressure of its contents.

This term does not appear elsewhere in this endorsement, but may appear in a Schedule.

**b.** "Covered equipment"

 **(1)** "Covered equipment" means, unless otherwise specified in a Schedule, Covered Property:

   **(a)** that generates, transmits or utilizes energy, including electronic communications and data processing equipment; or

   **(b)** which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

 **(2)** None of the following is "covered equipment":

   **(a)** structure, foundation, cabinet, compartment or air supported structure or building;

   **(b)** insulating or refractory material;

   **(c)** sewer piping, buried vessels or piping, or piping forming a part of a sprinkler or fire suppression system;

   **(d)** water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

   **(e)** "vehicle"or any equipment mounted on a "vehicle";

   **(f)** satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

   **(g)** dragline, excavation or construction equipment; or

   **(h)** equipment manufactured by you for sale.

**c.** "Data" means information or instructions stored in digital code capable of being processed by machinery.

**d.** "Hazardous substance" means any substance that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

**e.** "Media" means material on which "data" is recorded, such as magnetic tapes, hard disks, optical disks or floppy disks.

**f.** "One accident" means: If an initial "accident" causes other "accidents," all will be considered "one accident." All "accidents" that are the result of the same event will be considered "one accident."

**g.** "Perishable goods" means personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

**h.** "Production machinery" means any machine or apparatus that processes or produces a product intended for eventual sale. However, "production machinery" does not mean any fired or unfired pressure vessel other than a cylinder containing a movable plunger or piston.

This term does not appear elsewhere in this endorsement, but may appear in a Schedule.

**i.** "Vehicle" means, as respects this endorsement only, any machine or apparatus that is used for transportation or moves under its own power. "Vehicle" includes, but is not limited to, car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester. However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power source will not be considered a "vehicle."

**B.** The Building and Personal Property Coverage Form is modified as follows.
The definitions stated above also apply to section B. of this endorsement.

 **1. DEDUCTIBLE**

 The deductible in the Declarations applies unless a separate Equipment Breakdown deductible is shown in a Schedule. If a separate Equipment Breakdown deductible is shown, the following applies.

 Only as regards Equipment Breakdown Coverage, provision D. DEDUCTIBLE is deleted and replaced with the following:

---

**31-1220NY 07 10**  Includes Copyrighted Material of Insurance Services, Inc.  **Page 4 of 6**
Used with permission

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 274 of 834

a. **Deductibles for Each Coverage**

(1) Unless the Schedule indicates that your deductible is combined for all coverages, multiple deductibles may apply to any "one accident."

(2) We will not pay for loss, damage or expense under any coverage until the amount of the covered loss, damage or expense exceeds the deductible amount indicated for that coverage in the Schedule.
We will then pay the amount of loss, damage or expense in excess of the applicable deductible amount, subject to the applicable limit.

(3) If deductibles vary by type of "covered equipment" and more than one type of "covered equipment" is involved in any "one accident," only the highest deductible for each coverage will apply.

b. **Direct and Indirect Coverages**

(1) Direct Coverages Deductibles and Indirect Coverages Deductibles may be indicated in the Schedule.

(2) Unless more specifically indicated in the Schedule:

(a) Indirect Coverages Deductibles apply to Business Income and Extra Expense loss; and

(b) Direct Coverages Deductibles apply to all remaining loss, damage or expense covered by this endorsement.

c. **Application of Deductibles**

(1) Dollar Deductibles
We will not pay for loss, damage or expense resulting from any "one accident" until the amount of loss, damage or expense exceeds the applicable Deductible shown in the Schedule. We will then pay the amount of loss, damage or expense in excess of the applicable Deductible or Deductibles, up to the applicable Limit of Insurance.

(2) Time Deductible
If a time deductible is shown in the Schedule, we will not be liable for any loss occurring during the specified number of hours or days immediately following the "accident." If a time deductible is expressed in days, each day shall mean twenty-four consecutive hours.

(3) Multiple of Average Daily Value (ADV)
If a deductible is expressed as a number times ADV, that amount will be calculated as follows:
The ADV (Average Daily Value) will be the Business Income (as defined in any Business Income coverage that is part of this policy) that would have been earned during the period of interruption of business had no "accident" occurred, divided by the number of working days in that period. No reduction shall be made for the Business Income not being earned, or in the number of working days, because of the "accident" or any other scheduled or unscheduled shutdowns during the period of interruption. The ADV applies to the Business Income value of the entire location, whether or not the loss affects the entire location. If more than one location is included in the valuation of the loss, the ADV will be the combined value of all affected locations. For purposes of this calculation, the period of interruption may not extend beyond the "period of restoration."
The number indicated in the Schedule will be multiplied by the ADV as determined above. The result shall be used as the applicable deductible.

(4) Percentage of Loss Deductibles
If a deductible is expressed as a percentage of loss, we will not be liable for the indicated percentage of the gross amount of loss, damage or expense (prior to any applicable deductible or coinsurance) insured under the applicable coverage. If the dollar amount of such percentage is less than the indicated minimum deductible, the minimum deductible will be the applicable deductible.

**31-1220NY 07 10**     Includes Copyrighted Material of Insurance Services, Inc.     **Page 5 of 6**
Used with permission

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 275 of 834

2. **CONDITIONS**

The following conditions are in addition to the Conditions in the Building and Personal Property Coverage Form, the Commercial Property Conditions and the Common Policy Conditions.

a. **Suspension**
Whenever "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an "accident" to that "covered equipment." This can be done by mailing or delivering a written notice of suspension to:
**(1)** your last known address; or
**(2)** the address where the "covered equipment" is located.
Once suspended in this way, your insurance can be reinstated only by an endorsement for that "covered equipment." If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment" for the period of suspension. But the suspension will be effective even if we have not yet made or offered a refund.

b. **Jurisdictional Inspections**
If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

c. **Environmental, Safety and Efficiency Improvements**
If "covered equipment" requires replacement due to an "accident," we will pay your additional cost to replace with equipment that is better for the environment, safer or more efficient than the equipment being replaced.  However, we will not pay more than 125% of what the cost would have been to replace with like kind and quality. This condition does not increase any of the applicable limits. This condition does not apply to any property to which Actual Cash Value applies.

d. **Coinsurance**
If a coinsurance percentage is shown in a Schedule for specified coverages, the following condition applies. We will not pay for the full amount of your loss if the applicable limit is less than the product of the specified coinsurance percentage times the value of the property subject to the coverage at the time of the loss. Instead, we will determine what percentage this calculated product is compared to the applicable limit and apply that percentage to the gross amount of loss. We will then subtract the applicable deductible. The resulting amount, or the applicable limit, is the most we will pay. We will not pay for the remainder of the loss. Coinsurance applies separately to each insured location.

The most we will pay for loss, damage or expense under this endorsement arising from any "one accident" is the applicable Limit of Insurance in the Declarations unless otherwise shown in a Schedule. Coverage provided under this endorsement does not provide an additional amount of insurance.

**POLICY NUMBER:** WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**33-0729NY 10 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

# COMMERCIAL GENERAL LIABILITY COVERAGE EXPANSION ENDORSEMENT – NEW YORK (NON-CONTRACTORS)

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART – CG 00 01**

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**Additional Premium  $** 200.00

**SECTION I – COVERAGES**
**COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**2.  Exclusions**

**g.  Aircraft, Auto Or Watercraft**

Paragraph **(2)** is replaced by the following:

**(2)** A watercraft you do not own that is:

**(a)** Less than 51 feet long; and

**(b)** Not being used to carry persons or property for a charge.

This provision applies to any person, who with your consent, either uses or is responsible for the use of a watercraft. This insurance is excess over any other valid and collectible insurance available to the insured whether primary, excess, or contingent.

**j.  Damage To Property**

Paragraph **(2)** is not applicable.

**(2)** This paragraph is deleted.

Paragraph **(4)** replaced with the following:

**(4)** Personal property in the care, custody or control of the insured which exceeds $50,000 regardless of the number of:

**(a)** Insureds

**(b)** Claims made; or

**(c)** Persons or organizations making claims

The most we will pay under this coverage is $50,000. Our duty to pay and defend ends under this coverage when the coverage limit has been exhausted.

**n.  Recall Of Products, Work Or Impaired Property**

Replace with the following:

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**33-0729NY 10 13**     Includes copyrighted material of Insurance Services Office, Inc.,     **Page 1 of 6**
Used with permission

275

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 277 of 834

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it, but this exclusion does not apply to "product recall expenses" that you incur for the "covered recall" of "your product".

This insurance does not apply to "Product Recall Expense" arising out of or resulting from:

**a.** Any product withdrawal initiated due to:

**(1)** The failure of "your products" to accomplish their intended purpose, including any breach of warranty of fitness, whether written or implied.  This exclusion does not apply if such failure has caused or is reasonably expected to cause "bodily injury" or physical damage to tangible property.

**(2)** Copyright, patent, trade secret or trademark infringements;

**(3)** Transformation of a chemical nature, deterioration or decomposition of "your product", except if it is caused by:

**(a)** An error in manufacturing, design, processing or transportation of "your product"; or

**(b)** "Product tampering"

**(4)** Expiration of the designated shelf life of "your product".

**b.** A "product withdrawal", initiated because of a "defect" in "your product" known to exist by the Named Insured or the Named Insured's "executive officers", prior to the inception date of this Coverage Form or prior to the time "your product" leaves your control or possession.

**c.** Recall of any specific products for which "bodily injury" or "property damage" is excluded under **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** by endorsement.

**d.** Recall of "your products" which have been banned from the market by an authorized government entity prior to the policy period.

**e.** The defense of a claim or "suit" against you for "product withdrawal expenses".

**f.** **COVERAGE A** does not apply to "product recall expense" arising out of any withdrawal or recall that occurred before you acquired or formed the organization.

We will not pay more than $100,000 annually for "product recall expense" incurred from all "Covered Recall" events covered during this policy term.

Replace the following paragraph:

Exclusion **c.** through **n.** do not apply to damage by "specific perils" to premises while rented to you or temporarily occupied by you with permission of the owner.  A separate limit of insurance applies to this coverage as described in Section **III –** Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**2. Exclusions**

Paragraph **e. Contractual Liability** is amended as follows:

**e.   Contractual Liability**

This paragraph is deleted.

**Page 2 of 6**          Includes copyrighted material of Insurance Services Office, Inc.,          **33-0729NY 10 13**
Used with permission

276

## COVERAGE C – MEDICAL PAYMENTS

Paragraph **1.a. (3)(b)** under **SECTION I – COVERAGE C – MEDICAL PAYMENTS** is replaced with the following:

(b) The expenses are incurred and reported to us within two years of the date of the accident; However, expenses reported to us after two years of the date of the accident will not be denied solely because of the late submission unless such late submission operates to prejudice our rights; and

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

Paragraph **1.b.** and **1.d.** under **SECTION I - SUPPLEMENTARY PAYMENTS – COVERAGE A AND B** is replaced with the following:

**b.** Up to $2,500 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $300 a day because of time off from work.

## SECTION II – WHO IS AN INSURED

Paragraph **3.a.** is amended as follows:

**a.** Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

However, provision **a.** above does not apply if the newly formed or acquired organization is excluded by either a provision of the Coverage Form or by endorsement.

The following is added under **SECTION II – WHO IS AN INSURED:**:

**4.** Organization over which you maintain ownership of more than 50% will be a Named Insured if there is no other similar insurance available to that organization; however

**a.** **COVERAGE A.** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**b.** **COVERAGE B.** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

If such organizations are not shown in the **DECLARATIONS,** you must report them to us within 180 days of inception date of the policy, unless it can be shown not to be reasonably possible to give such notice. In such instances, notice will be given as soon as reasonably possible thereafter.

**5.** Any person or organization with whom you agreed, because of written contract or written agreement to provide insurance, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendors business, subject to the following additional exclusions:

The insurance afforded the vendor does not apply to:

**a.** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

**b.** Any express warranty unauthorized by you;

**c.** Any physical or chemical change in the product made intentionally by the vendor;

**d.** Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing or the substitution of parts under instruction from the manufacturer, and then repackaged in the original container;

**e.** Any failure to make such inspection, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business in connection with the sale of the product;

**33-0729NY 10 13**          Includes copyrighted material of Insurance Services Office, Inc.,          **Page 3 of 6**
Used with permission

**f.** Demonstration, installation, servicing or repair operations, except such operations performed at the vendors premises in connection with the sale of the product;

**g.** Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any thing or substance by or for the vendor.

This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into accompanying or containing such products.

**6.** Any person or organization to whom you are obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to liability arising out of the maintenance or use of that part of any premises leased to you, including common or public areas about such premises if so required in the contract. However, no such person or organization is an insured with respect to:

**a.** Any "occurrence" that takes place after you cease to occupy those premises; or

**b.** Structural alterations, new construction or demolition operations performed by or on behalf of such insured.

**7.** Any person or organization granting a license to make, or distribute "your products" including "your products" which use the name or logo of grantor and to whom you are obligated by virtue of the written contract to provide insurance such as afforded by this policy, but only with respect to liability arising out of "your products".

## SECTION III – LIMITS OF INSURANCE

The following is added to Paragraph **2.** of **SECTION III – LIMITS OF INSURANCE**:

**d.** The General Aggregate Limit applies separately to each of your "locations".
For the purpose of this provision only, "Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

Paragraph **6**. is replaced with the following:

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is replaced by a "Specific Perils" Limit which is the greater of:

**a.** $300,000; or

**b.** The amount shown in the **DECLARATIONS** for **Damage To Premises Rented To You Limit.**

The "Specific Perils" limit is the most we will pay under **COVERAGE A** for damages because of "property damage" to any one premises, while rented to you or temporarily occupied by you with permission of the owner.

However, provisions **a.** and **b.** above do not apply if any reference in the **DECLARATIONS** for **Damage to Premises Rented to You** is deleted from this policy either by the provisions of the Coverage Form or by endorsement.

The following is added under **SECTION III** – **LIMITS OF INSURANCE**:

**7. Product Recall Expense**

$100,000 is the most we will pay for all "product recall expenses" arising out of the same defect or deficiency.

**8. Professional Services**

Subject to provisions in **SECTION I – COVERAGES - COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY – 2. Exclusions r.** and **COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY – 2. Exclusions q.** the most we will pay for Professional Services is $50,000 each annual period.

**Page 4 of 6**          Includes copyrighted material of Insurance Services Office, Inc.,          **33-0729NY 10 13**
Used with permission

278

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

Replace paragraph **2.a**. with the following:

**a.** You must see to it we are notified as soon as practicable of an "occurrence" or an offense, which may result in a claim. Knowledge of an "occurrence" or an offense by your "employees" shall not, in itself, constitute knowledge to you unless any one of your partners, "executive officers", directors or insurance managers shall have actually received notice. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" took place;

**(2)** The names and addresses of any injured persons and witnesses; and,

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

The following is added to paragraph **2**. under **SECTION IV** – **COMMERCIAL GENERAL LIABILITY CONDITIONS**:

**f.** Your rights afforded under this policy shall not be prejudiced if you fail to give us notice of an "occurrence", offense, claim or "suit", solely due to your reasonable and documented belief that the "bodily injury" or "property damage" is not covered under this policy.

**g.** You must see to it that the following are done in the event of an actual or anticipated "covered recall" that may result in "product recall expense":

**(1)** Give us prompt notice of any discovery or notification that "your product" must be withdrawn or recalled. Include a description of "your product" and the reason for withdrawal or recall.

**(2)** Cease any further release, shipment, consignment or any other method or distribution of like or similar products until it has been determined that all such products are free from defects that could be a cause of loss under this insurance.

**4. Other Insurance**

The following is added to **Other Insurance** and supersedes any provision to the contrary with respects to the Commercial General Liability Coverage Part and Products/Completed Operations Liability Coverage Part.

**d.** This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:

**(i)** The additional insured is a Named Insured under such other insurance; and

**(ii)** You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured. 2013 REVISION

**6. Representations**

Replace with the following:

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

Any knowledge of an error or omission in the description of, or failure to completely describe any premises or operations intended to be covered by the Coverage Form will not invalidate or affect coverage for these premises or operations. You must report such error or omission to us as soon as practicable after its discovery. However, this provision does not affect our right to collect additional premium or exercise our right to cancellation or non-renewal.

**33-0729NY 10 13**          Includes copyrighted material of Insurance Services Office, Inc.,          **Page 5 of 6**
Used with permission

279

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 281 of 834

8. **Transfer Of Rights Of Recovery Against Others To Us**

Replace with the following:

If the insured has rights to recover all or part of any payment we have made under this Coverage Form, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. However, if the insured has waived those rights to recover through a written contract or if "your work" was commenced under a letter of intent or work order, subject to a subsequent reduction to writing with customers whose customary contracts require a waiver, we waive any right to recovery we may have under this Coverage Form.

## SECTION V – DEFINITIONS

Paragraph **3.** of **SECTION V – DEFINITIONS** is replaced with the following:

3. "Bodily Injury" means injury, sickness or disease sustained by a person. This includes mental anguish, mental injury, shock, fright or death resulting from "bodily injury", sickness or disease**.**

The following definitions are added:

23. "Covered recall," means:

   a. A product recall made necessary because you determine that the product recall is necessary; or

   b. An authorized government entity has ordered you to conduct a product recall.

24. "Product recall expense" means necessary and reasonable expenses for:

   a. Costs of notification;

   b. Costs of stationery, envelopes, production of announcements and postage or facsimiles;

   c. Costs of overtime paid to your regular non-salaried employees and costs incurred by your employees, including costs of transportation and accommodations;

   d. Costs of computer time;

   e. Costs of hiring independent contractors and other temporary employees;

   f. Costs of transportation, shipping or packaging

   g. Costs of warehouse or storage space; or

   h. Costs of proper disposal of "your products", or products that contain "your products", that can not be reused, not exceeding your purchase price or your cost to produce the products;

25. "Specific Peril" means fire; lightning; explosion or leakage from fire sprinkler extinguishing equipment.

26. "Professional services" means:

   a. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

   b. Supervisory or inspection activities performed as part of any related architectural or engineering activities.

All other policy wording not specifically changed, modified, or replaced by this endorsement wording remains in effect.

**Page 6 of 6**             Includes copyrighted material of Insurance Services Office, Inc.,             **33-0729NY 10 13**
Used with permission

280

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 282 of 834

**State of New York**

**Anti-Arson Application**

**(NYFA-1) Part 1**

Policy #: _____

Agent: _____

**WARNING:  This application must be completed and returned by the applicant or insured pursuant to Section 168-j of the New York Insurance Law and Insurance Department Regulation 96.**

Name of Applicant or Insured _____

Location of Property _____

Amount of Insurance   $ _____   Applicant is ☐ Owner-Occupant  ☐ Absentee Owner  ☐ Tenant  ☐ Other

Occupancy (s) _____

_____

**VALUATION**:   This information helps to explain the amount of insurance selected at the time of application, but does not determine the value at the time of loss.

Purchase Information:   Date _____   Price $ _____   Cost of Subsequent Improvement $ _____

Estimated Replacement Cost   $ _____   Estimated Fair Market Value (exclusive of land) $ _____

For rental properties, indicate the annual rental income   $ _____

Check the valuation method used to establish the amount of insurance:   ☐ Replacement Cost   ☐ Replacement Cost Less Physical Depreciation

☐ Fair Market Value (exclusive of land)

☐ Other _____

Who determined the value? _____   Attach a copy of any appraisal.

**UNDERWRITING INFORMATION:**   If the answer to any of the following questions is "yes", complete the corresponding numbered section in PART II.

| | | Yes | No |
|---|---|---|---|
| 1. | Is the applicant other than an individual or sole proprietorship? | ☐ | ☐ |
| 2. | Are any mortgage payments (building or contents) overdue by 3 months or more? | ☐ | ☐ |
| 3. | Are there any real estate tax liens or other liens against the property or real estate taxes overdue for one year or more? | ☐ | ☐ |
| 4. | Are there any outstanding recorded violations of fire safety, health, building, or construction codes at this location? | ☐ | ☐ |
| 5. | Has anyone with a financial interest in this property been convicted for arson, fraud, or other crimes related to loss on property during the last 5 years? | ☐ | ☐ |
| 6. | Is the mortgage other than a federal or state chartered lending institution? | ☐ | ☐ |
| 7. | Except where federal or state chartered lending institutions are the applicants please furnish the following information: Have there been fire losses during the past 5 years exceeding $1,000 in damage to this property or to any property in which the applicant has an equity interest as an owner or mortgagee? | ☐ | ☐ |
| 8. | (a) If the property is commercial, is more than 10% of the rental space vacant, unoccupied or seasonal? | ☐ | ☐ |
| | (b) If the property is residential, are 5% or more of the apartments vacant, unoccupied or seasonal? | ☐ | ☐ |
| | (c) Is the water, sewage, electricity or heat out of service? | ☐ | ☐ |
| 9. | Other Policies: | | |
| | (a) Is there any other insurance in force or applied for on this property? | ☐ | ☐ |
| | (b) Has any coverage or policy on this property been declined, cancelled or non-renewed in the last 3 years? | ☐ | ☐ |
| 10 | Has this property been under the ownership of the applicant for less than 3 years? | ☐ | ☐ |

**ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPAMY OR OTHER PERSON FILES ASTATEMENT OR CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.**

**THE PROPOSED INSURED AFFIRMS THAT THE FOREGOING INFORMATION IS TRUE AND AGREES THAT THESE APPLICATIONS SHALL CONSTITUTE A PART OF ANY POLICY ISSUED WHETHER ATTACHED OR NOT AND THAT ANY WILLFUL CONCEALMENT OR MISREPRESENTATION OF A MATERIAL FACT OR CIRCUMSTANCE SHALL BE GROUNDS TO RESCIND THE INSURANCE POLICY.**

| SIGNATURE OF PROPOSED INSURED | TITLE | DATE |
|---|---|---|
| _____ | _____ | _____ |

**INSUREDS SHALL NOTIFY THE INSURER IN WRITING OF ANY CHANGE IN THE INFORMATION CONTAINED HEREIN, UPON RENEWAL OR ANNUALLY WHICHEVER IS SOONER. FAILURE TO COMPLY MAY RESULT IN RESCISSION OF YOUR POLICY.**

APP-ANTIAR-NY 0814

Case 1:25-cv-02172-PAE Document 1-8 Filed 03/17/25 Page 283 of 834

**State of New York Anti-Arson Application
(NYFA-1) PART 2**

**OWNERSHIP INFORMATION:**

1. List the names and addresses of:     Shareholders of a corporation     Partners, including limited partners     Trustees and beneficiaries

   Note:     List only those possessing an ownership interest of 25% or more, except for close corporation beneficiaries where all owners should be listed.

| Name | Address | Position | Interest % |
|------|---------|----------|-----------|
| | | | |
| | | | |

2. Mortgage Payments

   Mortgagee _____ Date Due _____ Amount Due _____

   List any other encumbrances: _____

3. Unpaid Taxes or Unpaid Liens:   Type _____ Date Due _____ Amount Due _____

4. Code Violations:     Date _____ Describe _____

5. Convictions: Date _____ Describe _____

   Name of Person _____

6. Name(s) of Unchartered Mortgagee(s) _____

7. Losses:  Location _____ Date _____ Amount _____ Description _____

8. Vacancy and/or Unoccupancy:

   Indicate seasonal period (if any) when building is unused: _____

   For apartment buildings indicate:     Total Units _____     Unoccupied units _____

   For other buildings indicate:   Vacancy _____     % Unoccupancy _____

   For all buildings indicate the following:

   Reason for vacancy/unoccupancy: _____

   Anticipated date of occupancy: _____

   If the building is vacant or unoccupied, indicate how it is protected from unauthorized entry: _____

   Is there a governmental order to vacate or destroy the building or has the building been classified as inhabitable or structurally unsafe?     YES ☐   NO ☐

   If water, sewage, electricity or heat is out of service, explain circumstances: _____

   Is there unrepaired damage or have items been stripped from the building?  If Yes, Describe: _____     ☐   ☐

   Is the building for sale?  If Yes, date put up for sale: _____     ☐   ☐

9. Other Policies:  Indicate status: (In force, applied for, declined, cancelled or nonrenewed)

| Status | Date | Amount of Insurance | Carrier | Policy # |
|--------|------|---------------------|---------|----------|
| | | | | |
| | | | | |

10 List all real estate transactions during the last 3 years involving this property

| Date | Selling Price | Name of Seller | Amount of Mortgage | Mortgagee |
|------|---------------|----------------|--------------------|-----------|
| | | | | |
| | | | | |

**ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES A STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.**

**THE PROPOSED INSURED AFFIRMS THAT THE FOREGOING INFORMATION IS TRUE AND AGREES THAT THESE APPLICATIONS SHALL CONSTITUTE A PART OF ANY POLICY ISSUED WHETHER ATTACHED OR NOT AND THAT ANY WILLFUL CONCEALMENT OR MISREPRESENTATION OF A MATERIAL FACT OR CIRCUMSTANCE SHALL BE GROUNDS TO RESCIND THE INSURANCE POLICY.**

**SIGNATURE OF PROPOSED INSURED** _____     **TITLE** _____     **DATE** _____

APP-ANTIAR-NY 0814

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 284 of 834

**COMMERCIAL GENERAL LIABILITY**
**CG 00 01 04 13**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

### COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 285 of 834

## 2. Exclusions

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1), (2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

     © Insurance Services Office, Inc., 2012

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

© Insurance Services Office, Inc., 2012 **CG 00 01 04 13**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 288 of 834

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3), (4), (5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 289 of 834

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 290 of 834

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C – MEDICAL PAYMENTS

### 1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

### 2. Exclusions

We will not pay expenses for "bodily injury":

a. **Any Insured**

To any insured, except "volunteer workers".

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

d. **Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. **Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

f. **Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

g. **Coverage A Exclusions**

Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

© Insurance Services Office, Inc., 2012

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 292 of 834

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      (1) "Bodily injury" or "personal and advertising injury":

         (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

         (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

         (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1)(a) or (b) above; or

         (d) Arising out of his or her providing or failing to provide professional health care services.

      (2) "Property damage" to property:

         (a) Owned, occupied or used by;

         (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

         you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A;** and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 295 of 834

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 296 of 834

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

### 7. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

### 8. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

### 9. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

### SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 297 of 834

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 298 of 834

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 299 of 834

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      (2) The providing of or failure to provide warnings or instructions.

   c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

   a. Means:

      (1) Work or operations performed by you or on your behalf; and

      (2) Materials, parts or equipment furnished in connection with such work or operations.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

      (2) The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 300 of 834

**COMMERCIAL GENERAL LIABILITY**
**CG 01 04 12 04**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – PREMIUM AUDIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **b.** of the **Premium Audit** Condition **Section IV** is replaced by the following:

**PREMIUM AUDIT**

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and re-trospective premiums is the date shown as the due date on the bill. An audit to deter-mine the final premium due or to be re-funded will be completed within 180 days after the expiration date of the policy. But the audit may be waived if the total annual premium attributable to the auditable ex-posure base is not reasonably expected to exceed $1500. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

**B.** Except as provided in Paragraph **A.** above, the **Examination Of Your Books And Records** Common Policy Condition continues to apply.

**CG 01 04 12 04** © ISO Properties, Inc., 2003 **Page 1 of 1**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 301 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 302 of 834

COMMERCIAL GENERAL LIABILITY
CG 01 63 07 11

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES –
# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Paragraph **1. Insuring Agreement** of Section **I – Coverage A Bodily Injury And Property Damage Liability** is replaced by the following:

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

CG 01 63 07 11
© Insurance Services Office, Inc., 2010
**Page 1 of 3** 301 □

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**B.** Paragraph **1.a.** of Section **I – Coverage B Personal And Advertising Injury Liability** is replaced by the following:

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III –** Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** and **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**C.** The following is added as Paragraph **e.** to the **Duties In The Event Of Occurrence, Offense, Claim Or Suit** Condition (Paragraph **2.** of **Section IV – Commercial General Liability Conditions**):

**e.** Notice given by or on behalf of the insured, or written notice by or on behalf of the injured person or any other claimant, to any agent of ours in New York State, with particulars sufficient to identify the insured, shall be considered to be notice to us.

**D.** Paragraph **3.** of **Section IV – Commercial General Liability Conditions** is replaced by the following:

**3. Legal Action Against Us**

**a.** Except as provided in Paragraph **b.,** no person or organization has a right under this Coverage Part:

**(1)** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**(2)** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**b.** With respect to "bodily injury" and "personal and advertising injury" claims, if we deny coverage or do not admit liability because an insured or the injured person, someone acting for the injured person or other claimant fails to give us written notice as soon as practicable, then the injured person, someone acting for the injured person or other claimant may bring an action against us, provided the sole question is whether the denial of coverage or nonadmission of liability is based on the failure to provide timely notice.

However, the injured person, someone acting for the injured person or other claimant may not bring an action if within 60 days after we deny coverage or do not admit liability, we or an insured:

**(1)** Brings an action to declare the rights of the parties under the policy; and

**(2)** Names the injured person, someone acting for the injured person or other claimant as a party to the action.

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 304 of 834

**E.** The following provision is added and supersedes any provision to the contrary:

Failure to give notice to us as required under this Coverage Part shall not invalidate any claim made by the insured, injured person or any other claimant, unless the failure to provide such timely notice has prejudiced us. However, no claim made by the insured, injured person or other claimant will be invalidated if it shall be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

**F.** The definition of "loading or unloading" in the **Definitions** Section does not apply. □

This page intentionally left blank

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**CG 20 18 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED –

# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person(s) Or Organization(s): | Designation Of Premises |
|---|---|
| THE CITY OF NY AND NYC DEPARTMENT OF HOUSING PRESERVATION & DEVELOPMENT, 100 GOLD STREET, NEW YORK, NY 10038 | 2283 SECOND AVENUE, NEW YORK, NY 10035 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II  Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership,maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additionalinsured only applies to the extent permitted bylaw; and

**2.**  If coverage provided to the additional insured is required by a contract or agreement, the insuranceafforded to such additional insured will not be broader than that  which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations,new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to

**Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract Or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.**    Required by the contract or agreement; or

**2.**    Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**CG 20 18 04 13**              © Insurance Services Office, Inc., 2012              **Page 1 of 1**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 307 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 308 of 834

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**CG 20 18 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED –

# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s): | Designation Of Premises |
|---|---|
| THE CITY OF NY AND NYC DEPARTMENT OF HOUSING PRESERVATION & DEVELOPMENT, 100 GOLD STREET, NEW YORK, NY 10038 | 206 WEST 123RD ST, NEW YORK, NY 10027 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II  Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that  which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to

**Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract Or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.**    Required by the contract or agreement; or

**2.**    Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**CG 20 18 04 13**                    © Insurance Services Office, Inc., 2012                    **Page 1 of 1**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 309 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 310 of 834

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**CG 20 18 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED –
# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s): | Designation Of Premises |
|---|---|
| THE CITY OF NY AND NYC DEPARTMENT OF HOUSING PRESERVATION & DEVELOPMENT, 100 GOLD STREET, NEW YORK, NY 10038 | 2285 SECOND AVENUE, NEW YORK, NY 10035 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II  Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.**  If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that  which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract Or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.**    Required by the contract or agreement; or

**2.**    Available under the applicable Limits of Insurance shown in the Declarations; whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**CG 20 18 04 13**                      © Insurance Services Office, Inc., 2012                      **Page 1 of 1**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 311 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 312 of 834

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**CG 20 18 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED –

# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person(s) Or Organization(s): | Designation Of Premises |
|---|---|
| US DEPARTMENT OF HOUSING & URBAN DEVELOPMENT OF PHILADELPHIA HOMEOWNERSHIP, ATTN: PETER SPINA,  1090 PENN SQUARE EAST, PHILADELPHIA, PA 19107 | 2283 SECOND AVENUE, NEW YORK, NY 10035 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II  Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership,maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additionalinsured only applies to the extent permitted bylaw; and

**2.**  If coverage provided to the additional insured is required by a contract or agreement, the insuranceafforded to such additional insured will not be broader than that  which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations,new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to

**Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract Or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.**   Required by the contract or agreement; or

**2.**   Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**CG 20 18 04 13**                © Insurance Services Office, Inc., 2012                **Page 1 of 1**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 313 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 314 of 834

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**CG 20 18 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED –

# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s): | Designation Of Premises |
|---|---|
| US DEPARTMENT OF HOUSING & URBAN DEVELOPMENT OF PHILADELPHIA HOMEOWNERSHIP, ATTN: PETER SPINA,  1090 PENN SQUARE EAST, PHILADELPHIA, PA 19107 | 206 WEST 123RD ST, NEW YORK, NY 10027 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II  Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership,maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additionalinsured only applies to the extent permitted bylaw; and

**2.**  If coverage provided to the additional insured is required by a contract or agreement, the insuranceafforded to such additional insured will not be broader than that  which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations,new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract Or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.**    Required by the contract or agreement; or

**2.**    Available under the applicable Limits of Insurance shown in the Declarations; whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**CG 20 18 04 13**          © Insurance Services Office, Inc., 2012          **Page 1 of 1**

313

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 315 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 316 of 834
POLICY NUMBER: WPP1595109 03 **COMMERCIAL GENERAL LIABILITY**
**CG 20 18 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED –
# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s): | Designation Of Premises |
|---|---|
| US DEPARTMENT OF HOUSING & URBAN DEVELOPMENT OF PHILADELPHIA HOMEOWNERSHIP, ATTN: PETER SPINA,  1090 PENN SQUARE EAST, PHILADELPHIA, PA 19107 | 2285 SECOND AVENUE, NEW YORK, NY 10035 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II  Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.**  If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that  which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract Or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.**    Required by the contract or agreement; or

**2.**    Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**CG 20 18 04 13** © Insurance Services Office, Inc., 2012 **Page 1 of 1**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 317 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 318 of 834

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**CG 20 18 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED –
# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s): | Designation Of Premises |
|---|---|
| SECRETARY OF HOUSING & URBAN DEVELOPMENT OF WASHINGTON DC, ISAOA, ATIMA, 451 7TH STREET SW, WASHINGTON, DC 20410-8000 | 2283 SECOND AVENUE, NEW YORK, NY 10035 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II  Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership,maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additionalinsured only applies to the extent permitted bylaw; and

**2.**  If coverage provided to the additional insured is required by a contract or agreement, the insuranceafforded to such additional insured will not be broader than that  which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations,new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to

**Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract Or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.**    Required by the contract or agreement; or

**2.**    Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**CG 20 18 04 13**                    © Insurance Services Office, Inc., 2012                    **Page 1 of 1**

317

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 319 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 320 of 834

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**CG 20 18 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED –
# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s): | Designation Of Premises |
|---|---|
| SECRETARY OF HOUSING & URBAN DEVELOPMENT OF WASHINGTON DC, ISAOA, ATIMA, 451 7TH STREET SW, WASHINGTON, DC 20410-8000 | 206 WEST 123RD ST, NEW YORK, NY 10027 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to
**Section III – Limits Of Insurance:**
If coverage provided to the additional insured is required by a contract Or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;
whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**CG 20 18 04 13**            © Insurance Services Office, Inc., 2012            **Page 1 of 1**

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 322 of 834

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**CG 20 18 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED –

# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person(s) Or Organization(s): | Designation Of Premises |
|---|---|
| SECRETARY OF HOUSING & URBAN DEVELOPMENT OF WASHINGTON DC, ISAOA, ATIMA, 451 7TH STREET SW, WASHINGTON, DC 20410-8000 | 2285 SECOND AVENUE, NEW YORK, NY 10035 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II  Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership,maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additionalinsured only applies to the extent permitted bylaw; and

**2.**  If coverage provided to the additional insured is required by a contract or agreement, the insuranceafforded to such additional insured will not be broader than that  which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations,new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to

**Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract Or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.**    Required by the contract or agreement; or

**2.**    Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**CG 20 18 04 13**          © Insurance Services Office, Inc., 2012          **Page 1 of 1**

321

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 323 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 324 of 834

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY
CG 20 18 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED –

# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person(s) Or Organization(s): | Designation Of Premises |
|---|---|
| THE CITY OF NEW YORK ITS OFFICIALS AND EMPLOYESS 100 GOLD STREET NEW YORK NY 10038 | 272 EAST 7TH STREET NEW YORK NY 10009 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II  Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership,maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additionalinsured only applies to the extent permitted bylaw; and

**2.**  If coverage provided to the additional insured is required by a contract or agreement, the insuranceafforded to such additional insured will not be broader than that  which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations,new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to

**Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract Or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.**    Required by the contract or agreement; or

**2.**    Available under the applicable Limits of Insurance shown in the Declarations; whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

323

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 326 of 834

**COMMERCIAL GENERAL LIABILITY**
**CG 21 07 05 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – LIMITED BODILY INJURY EXCEPTION NOT INCLUDED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

CG 21 07 05 14                    © Insurance Services Office, Inc., 2013                    **Page 1 of 1**

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 327 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 328 of 834

**COMMERCIAL GENERAL LIABILITY**
**CG 21 09 06 15**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – UNMANNED AIRCRAFT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.g. Aircraft, Auto Or Watercraft** under **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**g. Aircraft, Auto Or Watercraft**

**(1) Unmanned Aircraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and "loading or unloading".

This Paragraph **g.(1)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft".

**(2) Aircraft (Other Than Unmanned Aircraft), Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft (other than "unmanned aircraft"), "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This Paragraph **g.(2)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft (other than "unmanned aircraft"), "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This Paragraph **g.(2)** does not apply to:

**(a)** A watercraft while ashore on premises you own or rent;

**(b)** A watercraft you do not own that is:

**(i)** Less than 26 feet long; and

**(ii)** Not being used to carry persons or property for a charge;

**(c)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(d)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**CG 21 09 06 15**          © Insurance Services Office, Inc., 2014          **Page 1 of 2**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 329 of 834

**(e)** "Bodily injury" or "property damage" arising out of:

**(i)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(ii)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Unmanned Aircraft**

"Personal and advertising injury" arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the offense which caused the "personal and advertising injury" involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft".

This exclusion does not apply to:

**a.** The use of another's advertising idea in your "advertisement"; or

**b.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**C.** The following definition is added to the **Definitions** section:

"Unmanned aircraft" means an aircraft that is not:

**1.** Designed;

**2.** Manufactured; or

**3.** Modified after manufacture;

to be controlled directly by a person from within or on the aircraft.

© Insurance Services Office, Inc., 2014

**CG 21 09 06 15**

328

POLICY NUMBER:WPP1595109 03

**COMMERCIAL GENERAL LIABILITY
CG 21 16 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – DESIGNATED PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Description Of Professional Services |
| --- |
| 1.    ANY PROFESSIONAL SERVICES BEING PROVIDED BY OR ON BEHALF OF THE INSURED |
| 2. |
| 3. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

With respect to any professional services shown in the Schedule, the following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" due to the rendering of or failure to render any professional service.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

**CG 21 16 04 13**                © Insurance Services Office, Inc., 2012                **Page 1 of 1**

329

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 331 of 834

This page intentionally left blank

**COMMERCIAL GENERAL LIABILITY**
**CG 21 32 05 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Communicable Disease**

"Bodily injury" or "property damage" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**b.** Testing for a communicable disease;

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Communicable Disease**

"Personal and advertising injury" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**b.** Testing for a communicable disease;

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 333 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 334 of 834

**COMMERCIAL GENERAL LIABILITY**
**CG 21 36 03 05**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – NEW ENTITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **3.** of **Section II – Who Is An Insured** does
not apply.

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 336 of 834

**COMMERCIAL GENERAL LIABILITY**
**CG 21 39 10 93**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTRACTUAL LIABILITY LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the DEFINI-TIONS Section is replaced by the following:

"Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement.

**CG 21 39 10 93**     Copyright, Insurance Services Office, Inc., 1992     **Page 1 of 1**     335

This page intentionally left blank

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**CG 21 44 07 98**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES OR PROJECT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| **Premises:** |
|---|
| See Locations Listed on the General Liability Declarations |
| **Project:** |
| Not Applicable |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance applies only to "bodily injury", "property damage", "personal  and advertising injury" and medical expenses arising out of:

**1.** The ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises; or

**2.** The project shown in the Schedule.

**CG 21 44 07 98**       Copyright, Insurance Services Office, Inc.,  1997       **Page 1 of 1**337 □

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 339 of 834

This page intentionally left blank

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**CG 21 47 12 07**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.**, **Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2.**, **Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

CG 21 47 12 07

© ISO Properties, Inc., 2006

**Page 1 of 1**

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 341 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 342 of 834

**COMMERCIAL GENERAL LIABILITY**
**CG 21 49 09 99**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of,  "pollutants".

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 343 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 344 of 834

POLICY NUMBER: WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**CG 21 51 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF LIQUOR LIABILITY EXCLUSION – EXCEPTION FOR SCHEDULED PREMISES OR ACTIVITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Description Of Premises Or Activities:**<br>NO SCHEDULED ACTIVITIES |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following replaces Exclusion **c.** under Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person, including causing or contributing to the intoxication of any person because alcoholic beverages were permitted to be brought on your premises, for consumption on your premises;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1), (2)** or **(3)** above.

This exclusion applies only if you:

**(1)** Manufacture, sell or distribute alcoholic beverages;

**(2)** Serve or furnish alcoholic beverages for a charge whether or not such activity:

  **(a)** Requires a license;

  **(b)** Is for the purpose of financial gain or livelihood;

**(3)** Serve or furnish alcoholic beverages without a charge, if a license is required for such activity; or

**(4)** Permit any person to bring any alcoholic beverages on your premises, for consumption on your premises.

However, this exclusion does not apply to "bodily injury" or "property damage" arising out of:

  **(i)** The selling, serving or furnishing of alcoholic beverages at the specified activity described in the Schedule; or

  **(ii)** Permitting any person to bring any alcoholic beverages on the premises described in the Schedule, for consumption on the premises described in the Schedule.

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 345 of 834

This page intentionally left blank

**COMMERCIAL GENERAL LIABILITY**
**CG 21 60 09 98**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" (or "personal and advertising injury" if defined as such in your policy) arising directly or indirectly out of:

**a.** Any actual or alleged failure, malfunction or inadequacy of:

  **(1)** Any of the following, whether belonging to any insured or to others:

   **(a)** Computer hardware, including microprocessors;

   **(b)** Computer application software;

   **(c)** Computer operating systems and related software;

   **(d)** Computer networks;

   **(e)** Microprocessors (computer chips) not part of any computer system; or

   **(f)** Any other computerized or electronic equipment or components; or

  **(2)** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **2.a.(1)** of this endorsement

due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 and beyond.

**b.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **2.a.** of this endorsement.

**CG 21 60 09 98**          Copyright, Insurance Services Office, Inc.,  1998          **Page 1 of 1** 345 □

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 347 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 348 of 834

**COMMERCIAL GENERAL LIABILITY**
**CG 21 70 01 15**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART
    UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

**CG 21 70 01 15**          © Insurance Services Office, Inc., 2015          **Page 1 of 1** 347

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 350 of 834

COMMERCIAL GENERAL LIABILITY
CG 26 21 10 91

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS USED UP

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following Condition is added to COMMERCIAL GENERAL LIABILITY CONDITIONS (Section IV):

**Transfer of Duties When a Limit of Insurance Is Used Up.**

**a.** If we conclude that, based on "occurrences," offenses, claims or "suits" which have been reported to us and to which this insurance may apply, the:

**(1)** General Aggregate Limit (other than the Products/Completed Operations Aggregate Limit);

**(2)** Products/Completed Operations Aggregate Limit;

**(3)** Personal and Advertising Injury Limit;

**(4)** Each Occurrence Limit; or

**(5)** Fire Damage Limit

is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

**b.** When a limit of insurance described in paragraph **a.** above has actually been used up in the payment of judgments or settlements:

**(1)** We will notify the first Named Insured, in writing, as soon as practicable, that:

**(a)** Such a limit has actually been used up; and

**(b)** Our duty to defend "suits" seeking damages subject to that limit has also ended.

**(2)** We will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all claims and "suits" seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said claims and "suits".

We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

We will take no action whatsoever with respect to any claim or "suit" seeking damages that would have been subject to that limit, had it not been used up, if the claim or "suit" is reported to us after that limit of insurance has been used up.

**(3)** The first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

**c.** The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with paragraph **b.(2)** above.

The duty of the first Named Insured to reimburse us will begin on:

**(1)** The date on which the applicable limit of insurance is used up, if we sent notice in accordance with paragraph **a.** above; or

**(2)** The date on which we sent notice in accordance with paragraph **b.(1)** above, if we did not send notice in accordance with paragraph a. above.

**d.** The exhaustion of any limit of insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

**CG 26 21 10 91**         Copyright, Insurance Services Office, Inc.,  1991         **Page 1 of 1**349

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 351 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 352 of 834

**COMMERCIAL GENERAL LIABILITY**
**CG 33 45 12 05**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES – NON-BINDING ARBITRATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

If we and the insured do not agree whether coverage is provided under this Coverage Part for a claim made against the insured, then either party may make a written demand for arbitration.

When this demand is made, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction. Each party will:

**1.** Pay the expenses it incurs; and

**2.** Bear the expenses of the third arbitrator equally.

Unless both parties agree otherwise, arbitration will take place in the county or parish in which the address shown in the Declarations is located. Local rules of law as to procedure and evidence will apply. Any decision agreed to by the arbitrators may be appealed to a court of competent jurisdictions.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 353 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 354 of 834

COMMERCIAL PROPERTY
CP 00 10 10 12

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H.** Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.,** and limited in **A.2.** Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery; and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire-extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

**c. Personal Property Of Others** that is:

**(1)** In your care, custody or control; and

**(2)** Located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater.

353

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 355 of 834

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

2. **Property Not Covered**

Covered Property does not include:

**a.** Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

   **(1)** The lowest basement floor; or

   **(2)** The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof);

**i.** Personal property while airborne or waterborne;

**j.** Bulkheads, pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of a building;

**m.** Underground pipes, flues or drains;

**n.** Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph, **n.,** does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system;

**o.** The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

**p.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

   **(1)** Are licensed for use on public roads; or

   **(2)** Are operated principally away from the described premises.

   This paragraph does not apply to:

     **(a)** Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 356 of 834

(b) Vehicles or self-propelled machines, other than autos, you hold for sale;

(c) Rowboats or canoes out of water at the described premises; or

(d) Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers; or

q. The following property while outside of buildings:

(1) Grain, hay, straw or other crops;

(2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes Of Loss form as shown in the Declarations.

**4. Additional Coverages**

**a. Debris Removal**

(1) Subject to Paragraphs **(2)**, **(3)** and **(4)**, we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) Debris Removal does not apply to costs to:

(a) Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

(b) Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

(c) Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

(d) Remove property of others of a type that would not be Covered Property under this Coverage Form;

(e) Remove deposits of mud or earth from the grounds of the described premises;

(f) Extract "pollutants" from land or water; or

(g) Remove, restore or replace polluted land or water.

(3) Subject to the exceptions in Paragraph **(4),** the following provisions apply:

(a) The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

(b) Subject to **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

(4) We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 357 of 834

Therefore, if **(4)(a)** and/or **(4)(b)** applies, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

**(5) Examples**

The following examples assume that there is no Coinsurance penalty.

**Example 1**

| | |
|---|---:|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 50,000 |
| Amount of Loss Payable: | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense: | $ 10,000 |
| Debris Removal Expense Payable: | $ 10,000 |

($10,000 is 20% of $50,000.)

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3).**

**Example 2**

| | |
|---|---:|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 80,000 |
| Amount of Loss Payable: | $ 79,500 |
| | ($80,000 – $500) |
| Debris Removal Expense: | $ 40,000 |
| Debris Removal Expense Payable | |
| Basic Amount: | $ 10,500 |
| Additional Amount: | $ 25,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000, capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4),** because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph **(4).** Thus, the total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for service at each premises described in the Declarations, unless a higher limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

     © Insurance Services Office, Inc., 2011     CP 00 10 10 12

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 358 of 834

**d. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e.(3)** through **e.(9)** of this Additional Coverage.

**(3)** The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(b)** Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced at the same or another premises; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 359 of 834

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment and Valuation Conditions and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in **e.(6)** of this Additional Coverage, is not subject to such limitation.

**f. Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data. This Additional Coverage does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

**(a)** If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(b)** If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

---

     © Insurance Services Office, Inc., 2011     CP 00 10 10 12     358

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 360 of 834

**(4)** The most we will pay under this Additional Coverage, Electronic Data, is $2,500 (unless a higher limit is shown in the Declarations) for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Building, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Your Business Personal Property**

**(a)** If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

**(i)** Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions; or

**(ii)** Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(b)** This Extension does not apply to:

**(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

**(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** If the Causes Of Loss – Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(3)** If the Causes Of Loss – Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist) and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and, therefore, coverage of such costs is not additional insurance.

**d. Property Off-premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.

**(2)** This Extension does not apply to property:

**(a)** In or on a vehicle; or

**(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

© Insurance Services Office, Inc., 2011
360

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

**f. Non-owned Detached Trailers**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

(a) The trailer is used in your business;

(b) The trailer is in your care, custody or control at the premises described in the Declarations; and

(c) You have a contractual responsibility to pay for loss or damage to the trailer.

(2) We will not pay for any loss or damage that occurs:

(a) While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

(b) During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

(3) The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

(4) This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

**g. Business Personal Property Temporarily In Portable Storage Units**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 100 feet of the building or structure described in the Declarations or within 100 feet of the premises described in the Declarations, whichever distance is greater.

(2) If the applicable Covered Causes of Loss form or endorsement contains a limitation or exclusion concerning loss or damage from sand, dust, sleet, snow, ice or rain to property in a structure, such limitation or exclusion also applies to property in a portable storage unit.

(3) Coverage under this Extension:

(a) Will end 90 days after the business personal property has been placed in the storage unit;

(b) Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the business personal property has been stored there for 90 or fewer days as of the time of loss or damage.

(4) Under this Extension, the most we will pay for the total of all loss or damage to business personal property is $10,000 (unless a higher limit is indicated in the Declarations for such Extension) regardless of the number of storage units. Such limit is part of, not in addition to, the applicable Limit of Insurance on Your Business Personal Property. Therefore, payment under this Extension will not increase the applicable Limit of Insurance on Your Business Personal Property.

(5) This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form or policy, and does not apply to loss or damage to the storage unit itself.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 363 of 834

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage:

1. Fire Department Service Charge;

2. Pollutant Clean-up And Removal;

3. Increased Cost Of Construction; and

4. Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**Example 1**

(This example assumes there is no Coinsurance penalty.)

| | | |
|---|---|---|
| Deductible: | $ | 250 |
| Limit of Insurance – Building 1: | $ | 60,000 |
| Limit of Insurance – Building 2: | $ | 80,000 |
| Loss to Building 1: | $ | 60,100 |
| Loss to Building 2: | $ | 90,000 |

The amount of loss to Building 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building 1:

$ 60,100
– 250
$ 59,850 Loss Payable – Building 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building 2. Loss payable for Building 2 is the Limit of Insurance of $80,000.

Total amount of loss payable:

$59,850 + $80,000 = $139,850

**Example 2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example 1.

| | | |
|---|---|---|
| Loss to Building 1: | $ | 70,000 |
| (Exceeds Limit of Insurance plus Deductible) | | |
| Loss to Building 2: | $ | 90,000 |
| (Exceeds Limit of Insurance plus Deductible) | | |
| Loss Payable – Building 1: | $ | 60,000 |
| (Limit of Insurance) | | |
| Loss Payable – Building 2: | $ | 80,000 |
| (Limit of Insurance) | | |
| Total amount of loss payable: | $ | 140,000 |

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

1. **Abandonment**

There can be no abandonment of any property to us.

2. **Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

3. **Duties In The Event Of Loss Or Damage**

a. You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.

© Insurance Services Office, Inc., 2011

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 364 of 834

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 365 of 834

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a. Description Of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d.** and **e.** below.

**b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

© Insurance Services Office, Inc., 2011    364

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value, even when attached to the building:

**(1)** Awnings or floor coverings;

**(2)** Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

**(3)** Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**d.** Glass at the cost of replacement with safety-glazing material if required by law.

**e.** Tenants' Improvements and Betterments at:

**(1)** Actual cash value of the lost or damaged property if you make repairs promptly.

**(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies:

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in Step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step **(2)**; and

**(4)** Subtract the deductible from the figure determined in Step **(3)**.

We will pay the amount determined in Step **(4)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example 1 (Underinsurance)**

| When: | | |
|---|---|---|
| The value of the property is: | $ 250,000 |
| The Coinsurance percentage for it is: | 80% |
| The Limit of Insurance for it is: | $ 100,000 |
| The Deductible is: | $ 250 |
| The amount of loss is: | $ 40,000 |

Step **(1)**: $250,000 x 80% = $200,000

(the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2)**: $100,000 ÷ $200,000 = .50

Step **(3)**: $40,000 x .50 = $20,000

Step **(4)**: $20,000 – $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example 2 (Adequate Insurance)**

| When: | | |
|---|---|---|
| The value of the property is: | $ 250,000 |
| The Coinsurance percentage for it is: | 80% |
| The Limit of Insurance for it is: | $ 200,000 |
| The Deductible is: | $ 250 |
| The amount of loss is: | $ 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate, and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 367 of 834

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example 3**

When:     The value of the property is:

| | |
|---|---:|
| Building at Location 1: | $ 75,000 |
| Building at Location 2: | $ 100,000 |
| Personal Property at Location 2: | $ 75,000 |
| | $ 250,000 |

The Coinsurance percentage for it is:     90%

The Limit of Insurance for Buildings and Personal Property at Locations 1 and 2 is:     $ 180,000

The Deductible is:     $ 1,000

The amount of loss is:

| | |
|---|---:|
| Building at Location 2: | $ 30,000 |
| Personal Property at Location 2: | $ 20,000 |
| | $ 50,000 |

Step **(1):** $250,000 x 90% = $225,000

(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step **(2):** $180,000 ÷ $225,000 = .80

Step **(3):** $50,000 x .80 = $40,000

Step **(4):** $40,000 − $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

**a.** The term mortgageholder includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item:

**1. Agreed Value**

**a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 368 of 834

**b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

**c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

**(1)** On or after the effective date of this Optional Coverage; and

**(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

**a.** The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

**b.** The amount of increase will be:

**(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

**(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

**(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example**

| If: | | |
|---|---|---|
| The applicable Limit of Insurance is: | | $ 100,000 |
| The annual percentage increase is: | | 8% |
| The number of days since the beginning of the policy year (or last policy change) is: | | 146 |
| The amount of increase is: $100,000 x .08 x 146 ÷ 365 = | | $ 3,200 |

**3. Replacement Cost**

**a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

**b.** This Optional Coverage does not apply to:

**(1)** Personal property of others;

**(2)** Contents of a residence;

**(3)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

**(4)** "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

**c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

**(1)** Until the lost or damaged property is actually repaired or replaced; and

**(2)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also apply:

**(3)** If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

**(4)** We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1), (2)** or **(3),** subject to **f.** below:

**(1)** The Limit of Insurance applicable to the lost or damaged property;

**(2)** The cost to replace the lost or damaged property with other property:

**(a)** Of comparable material and quality; and

**(b)** Used for the same purpose; or

**(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 369 of 834

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**4. Extension Of Replacement Cost To Personal Property Of Others**

**a.** If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

**b.** With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**3.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 370 of 834

COMMERCIAL PROPERTY
CP 00 30 10 12

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Coverage

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit Of Insurance is shown in the Declarations:

**(1)** Business Income Including "Rental Value".

**(2)** Business Income Other Than "Rental Value".

**(3)** "Rental Value".

If option **(1)** above is selected, the term Business Income will include "Rental Value". If option **(3)** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises means:

**(a)** The portion of the building which you rent, lease or occupy;

**(b)** The area within 100 feet of the building or within 100 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

**(c)** Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

### 2. Extra Expense

**a.** Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies at that premises.

**b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

**(1)** Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 371 of 834

**(2)** Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

**3. Covered Causes Of Loss, Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**4. Additional Limitation – Interruption Of Computer Operations**

**a.** Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**b.** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**c.** Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**d.** This Additional Limitation does not apply when loss or damage to electronic data involves only electronic data which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

**5. Additional Coverages**

**a. Civil Authority**

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Four consecutive weeks after the date of that action; or

**(2)** When your Civil Authority Coverage for Business Income ends;

whichever is later.

   © Insurance Services Office, Inc., 2011   **CP 00 30 10 12**

**b. Alterations And New Buildings**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

   **(a)** Used in the construction, alterations or additions; or

   **(b)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income Coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**c. Extended Business Income**

**(1) Business Income Other Than "Rental Value"**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

   **(a)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

   **(b)** Ends on the earlier of:

      **(i)** The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

      **(ii)** 60 consecutive days after the date determined in **(1)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(2) "Rental Value"**

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

   **(a)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

   **(b)** Ends on the earlier of:

      **(i)** The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

      **(ii)** 60 consecutive days after the date determined in **(2)(a)** above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**d. Interruption Of Computer Operations**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Additional Limitation – Interruption Of Computer Operations.

CP 00 30 10 12                © Insurance Services Office, Inc., 2011                **Page 3 of 9**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 373 of 834

**(2)** Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss. However, we will not provide coverage under this Additional Coverage when the Additional Limitation – Interruption Of Computer Operations does not apply based on Paragraph **A.4.d.** therein.

**(3)** With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

**(a)** If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(b)** If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Interruption Of Computer Operations.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage, Interruption Of Computer Operations, is $2,500 (unless a higher limit is shown in the Declarations) for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

**(5)** This Additional Coverage, Interruption Of Computer Operations, does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in **(4)** above has not been exhausted.

**6. Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

**a.** You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

**b.** The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location, unless a higher limit is shown in the Declarations.

**c.** Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

**(1)** This policy expires;

© Insurance Services Office, Inc., 2011

CP 00 30 10 12

**(2)** 30 days expire after you acquire or begin to construct the property; or

**(3)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

The Additional Condition, Coinsurance, does not apply to this Extension.

**B. Limits Of Insurance**

The most we will pay for loss in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

Payments under the following coverages will not increase the applicable Limit of Insurance:

**1.** Alterations And New Buildings;

**2.** Civil Authority;

**3.** Extra Expense; or

**4.** Extended Business Income.

The amounts of insurance stated in the Interruption Of Computer Operations Additional Coverage and the Newly Acquired Locations Coverage Extension apply in accordance with the terms of those coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage.

**C. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Loss**

**a.** You must see that the following are done in the event of loss:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the direct physical loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(6)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(7)** Cooperate with us in the investigation or settlement of the claim.

**(8)** If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3. Loss Determination**

  **a.** The amount of Business Income loss will be determined based on:

    **(1)** The Net Income of the business before the direct physical loss or damage occurred;

    **(2)** The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

    **(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

    **(4)** Other relevant sources of information, including:

      **(a)** Your financial records and accounting procedures;

      **(b)** Bills, invoices and other vouchers; and

      **(c)** Deeds, liens or contracts.

  **b.** The amount of Extra Expense will be determined based on:

    **(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

      **(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

      **(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

    **(2)** Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

**c. Resumption Of Operations**

  We will reduce the amount of your:

    **(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

    **(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

  **d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**4. Loss Payment**

  We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

  **a.** We have reached agreement with you on the amount of loss; or

  **b.** An appraisal award has been made.

**D. Additional Condition**

**COINSURANCE**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

**1.** The Coinsurance percentage shown for Business Income in the Declarations; times

**2.** The sum of:

  **a.** The Net Income (Net Profit or Loss before income taxes), and

  **b.** Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

© Insurance Services Office, Inc., 2011

CP 00 30 10 12

Instead, we will determine the most we will pay using the following steps:

Step **(1):** Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

Step **(2):** Divide the Limit of Insurance for the described premises by the figure determined in Step **(1);** and

Step **(3):** Multiply the total amount of loss by the figure determined in Step **(2).**

We will pay the amount determined in Step **(3)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

**(1)** Prepaid freight – outgoing;

**(2)** Returns and allowances;

**(3)** Discounts;

**(4)** Bad debts;

**(5)** Collection expenses;

**(6)** Cost of raw stock and factory supplies consumed (including transportation charges);

**(7)** Cost of merchandise sold (including transportation charges);

**(8)** Cost of other supplies consumed (including transportation charges);

**(9)** Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

**(10)** Power, heat and refrigeration expenses that do not continue under contract (if Form **CP 15 11** is attached);

**(11)** All payroll expenses or the amount of payroll expense excluded (if Form **CP 15 10** is attached); and

**(12)** Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion – not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example 1 (Underinsurance)**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $ 400,000

The Coinsurance percentage is: 50%

The Limit of Insurance is: $ 150,000

The amount of loss is: $ 80,000

Step **(1):** $400,000 x 50% = $200,000

(the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2):** $150,000 ÷ $200,000 = .75

Step **(3):** $80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example 2 (Adequate Insurance)**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $ 400,000

The Coinsurance percentage is: 50%

The Limit of Insurance is: $ 200,000

The amount of loss is: $ 80,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to Extra Expense Coverage.

**E. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

**1. Maximum Period Of Indemnity**

**a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

**CP 00 30 10 12** © Insurance Services Office, Inc., 2011 **Page 7 of 9** 375

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 377 of 834

**b.** The most we will pay for the total of Business Income loss and Extra Expense is the lesser of:

**(1)** The amount of loss sustained and expenses incurred during the 120 days immediately following the beginning of the "period of restoration"; or

**(2)** The Limit Of Insurance shown in the Declarations.

**2. Monthly Limit Of Indemnity**

**a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

**b.** The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

**(1)** The Limit of Insurance, multiplied by

**(2)** The fraction shown in the Declarations for this Optional Coverage.

**Example**

| When: | | |
|---|---|---|
| The Limit of Insurance is: | $ | 120,000 |
| The fraction shown in the Declarations for this Optional Coverage is: | | 1/4 |
| The most we will pay for loss in each period of 30 consecutive days is: | $ | 30,000 |
| ($120,000 x 1/4 = $30,000) | | |
| If, in this example, the actual amount of loss is: | | |
| Days 1–30: | $ | 40,000 |
| Days 31–60: | $ | 20,000 |
| Days 61–90: | $ | 30,000 |
| | $ | 90,000 |
| We will pay: | | |
| Days 1–30: | $ | 30,000 |
| Days 31–60: | $ | 20,000 |
| Days 61–90: | $ | 30,000 |
| | $ | 80,000 |

The remaining $10,000 is not covered.

**3. Business Income Agreed Value**

**a.** To activate this Optional Coverage:

**(1)** A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

**(a)** During the 12 months prior to the date of the Work Sheet; and

**(b)** Estimated for the 12 months immediately following the inception of this Optional Coverage.

**(2)** The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

**(a)** The Coinsurance percentage shown in the Declarations; multiplied by

**(b)** The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

**b.** The Additional Condition, Coinsurance, is suspended until:

**(1)** 12 months after the effective date of this Optional Coverage; or

**(2)** The expiration date of this policy;

whichever occurs first.

**c.** We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

**(1)** Within 12 months of the effective date of this Optional Coverage; or

**(2)** When you request a change in your Business Income Limit of Insurance.

**d.** If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

**(1)** The Business Income Limit of Insurance; divided by

**(2)** The Agreed Value.

**Example**

| When: | | |
|---|---|---|
| The Limit of Insurance is: | $ 100,000 | |
| The Agreed Value is: | $ 200,000 | |
| The amount of loss is: | $ 80,000 | |

Step **(1):** $100,000 ÷ $200,000 = .50

Step **(2):** .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

**4. Extended Period Of Indemnity**

Under Paragraph **A.5.c., Extended Business Income,** the number 60 in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 378 of 834

## F. Definitions

1. "Finished stock" means stock you have manufactured.

   "Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

   "Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

2. "Operations" means:

   a. Your business activities occurring at the described premises; and

   b. The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

3. "Period of restoration" means the period of time that:

   a. Begins:

      (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

      (2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

      caused by or resulting from any Covered Cause of Loss at the described premises; and

   b. Ends on the earlier of:

      (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      (2) The date when business is resumed at a new permanent location.

   "Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

      (1) Regulates the construction, use or repair, or requires the tearing down, of any property; or

      (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

   The expiration date of this policy will not cut short the "period of restoration".

4. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

5. "Rental Value" means Business Income that consists of:

   a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

   b. Continuing normal operating expenses incurred in connection with that premises, including:

      (1) Payroll; and

      (2) The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

6. "Suspension" means:

   a. The slowdown or cessation of your business activities; or

   b. That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 379 of 834

This page intentionally left blank

**Policy Number:** WPP1595109 03

**COMMERCIAL PROPERTY**
**CP 00 90 07 88**

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and
2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:
   a. During the policy period shown in the Declarations; and
   b. Within the coverage territory.

2. The coverage territory is:
   a. The United States of America (including its territories and possessions);
   b. Puerto Rico; and
   c. Canada.

**CP 00 90 07 88**        © ISO Properties, Inc.,  2001        **Page 1 of 2** 379

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 381 of 834

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance;

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you; or

   c. Your tenant.

This will not restrict your insurance.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 382 of 834

**COMMERCIAL PROPERTY**
**CP 01 33 05 18**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** If this policy covers the interest of the owner of any of the following types of buildings or structures:

    **1.** Residential, except owner-occupied single-family or owner-occupied two-family buildings or structures;

    **2.** Commercial; or

    **3.** Industrial;

the following provision is added:

    Before payment to you for loss or damage to the above buildings or structures caused by or resulting from fire, we will:

        **(1)** Deduct from your payment the claim of any tax district that issues a certificate of lien in accordance with the Insurance Law; and

        **(2)** Pay directly to the tax district the amount of the claim.

    When we pay that claim, we will have no obligation to pay the amount of that claim to you. Our payment of that claim within 30 days of our receipt of the certificate of lien will be a conclusive presumption that the claim was valid and properly paid.

**B.** The following is added with respect to any Condition of this Coverage Part which requires you to notify us of loss or to notify us of an accident, claim or "suit":

    **1.** Notice given by or on your behalf; or

    **2.** Written notice by or on behalf of any claimant;

to any of our agents in New York State, which adequately identifies you, will be the same as notice to us.

**C. Legal Action Against Us**

    **1.** The **Legal Action Against Us** Loss Condition in the Legal Liability Coverage Form is replaced by the following:

    No person or organization has a right under this Coverage Form:

        **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from you; or

        **b.** To sue us on this Coverage Form unless all of its terms have been fully complied with.

    A person or organization may sue us to recover on an agreed settlement or on a final judgment against you; but we will not be liable for damages that are not payable under the terms of this Coverage Form or that are in excess of the Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, you and the claimant or the claimant's legal representative.

    **2.** Paragraph **b.** of Additional Condition **H.5. Legal Action Against Us** in the Mortgageholders Errors And Omissions Coverage Form is replaced by the following:

        **b.** No person or organization has a right under Coverages **C** and **D:**

        **(1)** To join us as a party or otherwise bring us into a "suit" asking for damages from you; or

        **(2)** To sue us on this Coverage Form unless all of its terms have been fully complied with.

**CP 01 33 05 18**          © Insurance Services Office, Inc., 2017          **Page 1 of 4**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 383 of 834

A person or organization may sue us to recover on an agreed settlement or on a final judgment against you; but we will not be liable for damages that are not payable under the terms of this Coverage Form or that are in excess of the Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, you and the claimant or the claimant's legal representative.

**D.** The **Examination Of Your Books And Records** Common Policy Condition is replaced by the following:

**Examination Of Your Books And Records**

**1.** Except as provided in **2.** below, we may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**2.** We will conduct an audit to determine the final premium due or to be refunded, for coverage for which an advance or deposit premium was paid based on estimated exposure. But the audit may be waived if:

**a.** The total annual premium attributable to the auditable exposure base is not reasonably expected to exceed $1,500; or

**b.** The policy requires notification to the insurer with the specific identification of any additional exposure units (e.g., buildings) for which coverage is requested.

If the audit is not waived, it must be completed within 180 days after:

**a.** The expiration date of the policy; or

**b.** The anniversary date, if this is a continuous policy or a policy written for a term longer than one year.

**E.** The following sentence is deleted from Paragraph **A.** in the Legal Liability Coverage Form:

We will have the right and duty to defend any "suit" seeking those damages.

The following sentence is added to Paragraph **A.** in the Legal Liability Coverage Form:

We will have the right and duty to defend any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent.

**F.** The following sentence is deleted from Paragraph **A.3.** in the Mortgageholders Errors And Omissions Coverage Form:

We will have the right and duty to defend any "suit" seeking those damages.

The following is added to Paragraph **A.3.** in the Mortgageholders Errors And Omissions Coverage Form:

We will have the right and duty to defend any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent.

**G.** The following Condition is added to Paragraph **D.** of the Legal Liability Coverage Form and Paragraph **F.4.** of the Mortgageholders Errors And Omissions Coverage Form:

**Transfer Of Duties When A Limit Of Insurance Is Used Up**

**1.** If we conclude that, based on claims or "suits" which have been reported to us and to which this insurance may apply, a Limit of Insurance is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

**2.** When the Limit of Insurance has actually been used up in the payment of judgments or settlements:

**a.** We will notify the first Named Insured, in writing, as soon as practicable, that:

**(1)** Such a limit has actually been used up; and

**(2)** Our duty to defend "suits" seeking damages subject to that limit has also ended.

**b.** We will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all claims and "suits" seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said claims and "suits".

We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

We will take no action whatsoever with respect to any claim or "suit" seeking damages that would have been subject to that limit, had it not been used up, if the claim or "suit" is reported to us after that limit of insurance has been used up.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 384 of 834

c. The first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

3. The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with Paragraph **2.b.** above.

The duty of the first Named Insured to reimburse us will begin on:

a. The date on which the applicable limit of insurance is used up, if we sent notice in accordance with Paragraph **1.** above; or

b. The date on which we sent notice in accordance with Paragraph **2.a.** above, if we did not send notice in accordance with Paragraph **1.** above.

4. The exhaustion of any limit of insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

**H.** Except as provided in **I.** below, the **Appraisal** Condition is replaced by the following:

**Appraisal**

1. If we and you disagree on the value of the property, the extent of the loss or damage or the amount of the loss or damage, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand.

2. If we or you fail to proceed with the appraisal of the covered loss after a written demand is made by either party, then either party may apply to a court having jurisdiction for an order directing the party that failed to proceed with the appraisal to comply with the demand for the appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such order.

3. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property, the extent of the loss or damage and the amount of the loss or damage. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

4. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**I.** The **Appraisal** Condition in:

1. Business Income (And Extra Expense) Coverage Form **CP 00 30;** and

2. Business Income (Without Extra Expense) Coverage Form **CP 00 32;**

is replaced by the following:

**Appraisal**

1. If we and you disagree on the amount of Net Income and operating expense, the extent of the loss or damage or the amount of the loss or damage, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand.

2. If we or you fail to proceed with the appraisal of the covered loss after a written demand is made by either party, then either party may apply to a court having jurisdiction for an order directing the party that failed to proceed with the appraisal to comply with the demand for the appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such order.

3. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense, the extent of the loss or damage and the amount of the loss or damage. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 385 of 834

**4.** Each party will:

   **a.** Pay its chosen appraiser; and

   **b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**J.** The following provision is added to the Commercial Property Coverage Part:

**Estimation Of Claims**

Upon request, we will furnish you or your representative with a written estimate of damages to real property specifying all deductions, provided such an estimate has been prepared by us or has been prepared on our behalf for our own purposes. This estimate will be provided within 30 days after your request or its preparation, whichever is later.

**K.** The following provision is added to the Legal Liability Coverage Form and supersedes any provision to the contrary:

Failure to give prompt notice to us, as required under this Coverage Form, shall not invalidate any claim made by you or any other claimant, unless the failure to provide such timely notice has prejudiced us. However, no claim made by you or any other claimant will be invalidated if it shall be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 386 of 834

**COMMERCIAL PROPERTY**
**CP 01 64 09 17**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES – FUNGUS, WET ROT AND DRY ROT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** In the Causes Of Loss – Basic Form, Causes Of Loss – Broad Form, Causes Of Loss – Special Form, and Mortgageholders Errors And Omissions Coverage Form, the exclusion titled **"Fungus", Wet Rot, Dry Rot And Bacteria** and the **Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria** are deleted. Under these forms, the following exclusion is added:

We will not pay for loss or damage caused by or resulting from "fungus", wet rot or dry rot. However, this exclusion does not apply when "fungus", wet rot or dry rot results from a Covered Cause of Loss.

**B.** In the Building And Personal Property Coverage Form and the Condominium Association Coverage Form, under the Additional Coverage – Increased Cost Of Construction, Paragraph **A.4.e.(5)** is replaced by the following:

(5) Under this Additional Coverage, we will not pay for:

(a) The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants"; or

(b) Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

**C.** Paragraph **B.6.** of Ordinance Or Law Coverage Endorsement **CP 04 05** is replaced by the following:

6. We will not pay under this endorsement for:

a. Enforcement of or compliance with any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants"; or

b. The costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

**D.** Paragraph **B.6.** of Ordinance Or Law Coverage For Tenant's Interest In Improvements And Betterments (Tenant's Policy) Endorsement **CP 04 26** is replaced by the following:

6. We will not pay under this endorsement for:

a. Enforcement of or compliance with any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants"; or

b. The costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

385

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 387 of 834

**E.** Paragraph **E.3.** of Functional Building Valuation Endorsement **CP 04 38** is replaced by the following:

   **3.** We will not pay under this endorsement for:

      **a.** Enforcement of or compliance with any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants"; or

      **b.** The costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 388 of 834

**COMMERCIAL PROPERTY**
**CP 01 78 08 08**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NEW YORK – EXCLUSION OF LOSS
# DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part.

**C.** The terms of the exclusion in Paragraph **B.,** or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part.

CP 01 78 08 08
© Insurance Services Office, Inc., 2008
**Page 1 of 1**387 ☐

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 389 of 834

This page intentionally left blank

**COMMERCIAL PROPERTY
CP 10 30 09 17**

# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.** Definitions.

## A. Covered Causes Of Loss

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

## B. Exclusions

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

### a. Ordinance Or Law

The enforcement of or compliance with any ordinance or law:

**(1)** Regulating the construction, use or repair of any property; or

**(2)** Requiring the tearing down of any property, including the cost of removing its debris.

This exclusion, Ordinance Or Law, applies whether the loss results from:

**(a)** An ordinance or law that is enforced even if the property has not been damaged; or

**(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

### b. Earth Movement

**(1)** Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

**(2)** Landslide, including any earth sinking, rising or shifting related to such event;

**(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

**(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**(5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

**(a)** Airborne volcanic blast or airborne shock waves;

**(b)** Ash, dust or particulate matter; or

**(c)** Lava flow.

With respect to coverage for Volcanic Action as set forth in **(5)(a), (5)(b)** and **(5)(c),** all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5),** is caused by an act of nature or is otherwise caused.

**CP 10 30 09 17** © Insurance Services Office, Inc., 2016 **Page 1 of 10**389

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 391 of 834

### c. Governmental Action

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

### d. Nuclear Hazard

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

### e. Utility Services

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

### f. War And Military Action

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

### g. Water

**(1)** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings; or

**(5)** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1), (3)** or **(4),** or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5),** is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 392 of 834

But if any of the above, in Paragraphs **(1)** through **(5),** results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

**h.  "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)**  When "fungus", wet or dry rot or bacteria result from fire or lightning; or

**(2)**  To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.**  We will not pay for loss or damage caused by or resulting from any of the following:

**a.**  Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)**  Electrical or electronic wire, device, appliance, system or network; or

**(2)**  Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)**  Electrical current, including arcing;

**(b)**  Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)**  Pulse of electromagnetic energy; or

**(d)**  Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.**  Delay, loss of use or loss of market.

**c.**  Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.(1)**  Wear and tear;

**(2)**  Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)**  Smog;

**(4)**  Settling, cracking, shrinking or expansion;

**(5)**  Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)**  Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)**  The following causes of loss to personal property:

**(a)**  Dampness or dryness of atmosphere;

**(b)**  Changes in or extremes of temperature; or

**(c)**  Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.**  Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.**  Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 393 of 834

g. Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

h. Dishonest or criminal act (including theft) by you, any of your partners, members, officers, managers, employees (including temporary employees and leased workers), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion:

(1) Applies whether or not an act occurs during your normal hours of operation;

(2) Does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

i. Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

j. Rain, snow, ice or sleet to personal property in the open.

k. Collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;

(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, k., does not apply:

(a) To the extent that coverage is provided under the Additional Coverage, Collapse; or

(b) To collapse caused by one or more of the following:

(i) The "specified causes of loss";

(ii) Breakage of building glass;

(iii) Weight of rain that collects on a roof; or

(iv) Weight of people or personal property.

l. Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, l., does not apply to damage to glass caused by chemicals applied to the glass.

m. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 394 of 834

of part or all of any property on or off the described premises.

### 4. Special Exclusions

The following provisions apply only to the specified Coverage Forms:

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.,** Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.** Ordinance Or Law;

**(b)** Paragraph **B.1.c.** Governmental Action;

**(c)** Paragraph **B.1.d.** Nuclear Hazard;

**(d)** Paragraph **B.1.e.** Utility Services; and

**(e)** Paragraph **B.1.f.** War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**5. Additional Exclusion**

The following provisions apply only to the specified property:

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated:

1. We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

   a. Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

   b. Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

   c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

   d. Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

      However, this limitation does not apply to:

      (1) Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

      (2) Business Income Coverage or Extra Expense Coverage.

   e. Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

   f. Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

   g. Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

      (1) Dampness or dryness of atmosphere or of soil supporting the vegetation;

      (2) Changes in or extremes of temperature;

      (3) Disease;

      (4) Frost or hail; or

      (5) Rain, snow, ice or sleet.

2. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

   a. Animals, and then only if they are killed or their destruction is made necessary.

   b. Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

      (1) Glass; or

      (2) Containers of property held for sale.

   c. Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

      However, this limitation does not apply:

      (1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 396 of 834

**(2)** To Business Income Coverage or to Extra Expense Coverage.

**3.** The special limit shown for each category, **a.** through **d.,** is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are (unless a higher limit is shown in the Declarations):

  **a.** $2,500 for furs, fur garments and garments trimmed with fur.

  **b.** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

  **c.** $2,500 for patterns, dies, molds and forms.

  **d.** $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.3.,** does not apply to Business Income Coverage or to Extra Expense Coverage.

**4.** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

  **a.** Results in discharge of any substance from an automatic fire protection system; or

  **b.** Is directly caused by freezing.

However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. Additional Coverage – Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

**1.** For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**2.** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

  **a.** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

  **b.** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

  **c.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

  **d.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

    **(1)** A cause of loss listed in **2.a.** or **2.b.;**

    **(2)** One or more of the "specified causes of loss";

    **(3)** Breakage of building glass;

    **(4)** Weight of people or personal property; or

    **(5)** Weight of rain that collects on a roof.

**3.** This **Additional Coverage – Collapse** does **not** apply to:

  **a.** A building or any part of a building that is in danger of falling down or caving in;

  **b.** A part of a building that is standing, even if it has separated from another part of the building; or

  **c.** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**4.** With respect to the following property:

  **a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

b. Awnings, gutters and downspouts;

c. Yard fixtures;

d. Outdoor swimming pools;

e. Fences;

f. Piers, wharves and docks;

g. Beach or diving platforms or appurtenances;

h. Retaining walls; and

i. Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.,** we will pay for loss or damage to that property only if:

(1) Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

(2) The property is Covered Property under this Coverage Form.

5. If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

a. The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.;**

b. The personal property which collapses is inside a building; and

c. The property which collapses is not of a kind listed in **4.,** regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

6. This Additional Coverage, Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

7. This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

8. The term Covered Cause of Loss includes the Additional Coverage, Collapse, as described and limited in **D.1.** through **D.7.**

E. **Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

1. The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria are the result of one or more of the following causes that occur during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence:

a. A "specified cause of loss" other than fire or lightning; or

b. Flood, if the Flood Coverage Endorsement applies to the affected premises.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

c. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continue to be present or active, or recur, in a later policy period.

© Insurance Services Office, Inc., 2016
CP 10 30 09 17

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 398 of 834

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria cause an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss form or under the Additional Coverage, Collapse.

6. The following, **6.a.** or **6.b.,** applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form:

   a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

   b. If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**F. Additional Coverage Extensions**

1. **Property In Transit**

   This Extension applies only to your personal property to which this form applies.

   a. You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

   b. Loss or damage must be caused by or result from one of the following causes of loss:

      (1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

      (2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

      (3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

   c. The most we will pay for loss or damage under this Extension is $5,000.

   This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

2. **Water Damage, Other Liquids, Powder Or Molten Material Damage**

   If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

### 3. Glass

**a.** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

**b.** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

This Coverage Extension **F.3.** does not increase the Limit of Insurance.

### G. Definitions

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

**a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

**(1)** The cost of filling sinkholes; or

**(2)** Sinking or collapse of land into man-made underground cavities.

**b.** Falling objects does not include loss or damage to:

**(1)** Personal property in the open; or

**(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means:

**(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and

**(2)** Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe caused by wear and tear, when the pipe is located off the described premises and is connected to or is part of a potable water supply system or sanitary sewer system operated by a public or private utility service provider pursuant to authority granted by the state or governmental subdivision where the described premises are located.

But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage under this policy in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss," such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the surface of the ground.

© Insurance Services Office, Inc., 2016

CP 10 30 09 17

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 400 of 834

POLICY NUMBER: WPP1595109 03

**COMMERCIAL PROPERTY**
**CP 12 18 10 12**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

BUILDERS' RISK COVERAGE FORM
BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

**SCHEDULE**

| Location Number: 1 | Building Number: 1 | Applicable Clause (Enter C.1., C.2., C.3. or C.4.):   C.1 |
|---|---|---|
| **Description Of Property:** BUILDING | | |
| **Loss Payee Name:** THE CITY OF NY AND NYC DEPARTMENT OF HOUSING PRESERVATION & DEVELOPN | | |
| **Loss Payee Address:** 100 GOLD STREET NEW YORK, NY 10038 | | |

| Location Number: 2 | Building Number: 1 | Applicable Clause (Enter C.1., C.2., C.3. or C.4.):   C.1 |
|---|---|---|
| **Description Of Property:** BUILDING | | |
| **Loss Payee Name:** THE CITY OF NY AND NYC DEPARTMENT OF HOUSING PRESERVATION & DEVELC | | |
| **Loss Payee Address:** 100 GOLD STREET NEW YORK, NY 10038 | | |

| Location Number: 3 | Building Number: 1 | Applicable Clause (Enter C.1., C.2., C.3. or C.4.):   C.1 |
|---|---|---|
| **Description Of Property:** BUILDING | | |
| **Loss Payee Name:** THE CITY OF NY AND NYC DEPARTMENT OF HOUSING PRESERVATION & DEVELOPM | | |
| **Loss Payee Address:** 100 GOLD STREET NEW YORK, NY 10038 | | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**CP 12 18 10 12**      © Insurance Services Office, Inc., 2011      **Page 1 of 3**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 401 of 834

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99,** the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

**C.** The following is added to the **Loss Payment** Loss Condition, as indicated in the Declarations or in the Schedule:

**1. Loss Payable Clause**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear

**2. Lender's Loss Payable Clause**

**a.** The Loss Payee shown in the Schedule or in the Declarations is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

**(1)** Warehouse receipts;

**(2)** A contract for deed;

**(3)** Bills of lading;

**(4)** Financing statements; or

**(5)** Mortgages, deeds of trust, or security agreements.

**b.** For Covered Property in which both you and a Loss Payee have an insurable interest:

**(1)** We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.

**(2)** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

**(3)** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

**(a)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(b)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(c)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

**(4)** If we pay the Loss Payee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(a)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(b)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**c.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**d.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 402 of 834

3. **Contract Of Sale Clause**

   **a.** The Loss Payee shown in the Schedule or in the Declarations is a person or organization you have entered into a contract with for the sale of Covered Property.

   **b.** For Covered Property in which both you and the Loss Payee have an insurable interest, we will:

   **(1)** Adjust losses with you; and

   **(2)** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

   **c.** The following is added to the **Other Insurance** Condition:

   For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

4. **Building Owner Loss Payable Clause**

   **a.** The Loss Payee shown in the Schedule or in the Declarations is the owner of the described building in which you are a tenant.

   **b.** We will adjust losses to the described building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

   **c.** We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

This page intentionally left blank

POLICY NUMBER: WPP1595109 03

**COMMERCIAL PROPERTY**
**CP 12 18 10 12**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

BUILDERS' RISK COVERAGE FORM
BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

## SCHEDULE

| **Location Number:** 1 | **Building Number:** 1 | **Applicable Clause** (Enter C.1., C.2., C.3. or C.4.): C.1 |
|---|---|---|
| **Description Of Property:** BUILDING | | |
| **Loss Payee Name:** US DEPARTMENT OF HOUSING & URBAN DEVELOPMENT OF PHILADELPHIA HOMEO | | |
| **Loss Payee Address:** 1090 PENN SQUARE EAST     ATTN: PETER SPINA     PHILADELPHIA, PA 19107 | | |
| **Location Number:** 2 | **Building Number:** 1 | **Applicable Clause** (Enter C.1., C.2., C.3. or C.4.): C.1 |
| **Description Of Property:** BUILDING | | |
| **Loss Payee Name:** US DEPARTMENT OF HOUSING & URBAN DEVELOPMENT OF PHILADELPHIA HOMI | | |
| **Loss Payee Address:** 1090 PENN SQUARE EAST     ATTN: PETER SPINA     PHILADELPHIA, PA 19107 | | |
| **Location Number:** 3 | **Building Number:** 1 | **Applicable Clause** (Enter C.1., C.2., C.3. or C.4.): C.1 |
| **Description Of Property:** BUILDING | | |
| **Loss Payee Name:** US DEPARTMENT OF HOUSING & URBAN DEVELOPMENT OF PHILADELPHIA HOMEOV | | |
| **Loss Payee Address:** 1090 PENN SQUARE EAST     ATTN: PETER SPINA     PHILADELPHIA, PA 19107 | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | |

**CP 12 18 10 12**                              © Insurance Services Office, Inc., 2011                              **Page 1 of 3**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 405 of 834

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99,** the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

**C.** The following is added to the **Loss Payment** Loss Condition, as indicated in the Declarations or in the Schedule:

**1. Loss Payable Clause**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear

**2. Lender's Loss Payable Clause**

**a.** The Loss Payee shown in the Schedule or in the Declarations is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

**(1)** Warehouse receipts;

**(2)** A contract for deed;

**(3)** Bills of lading;

**(4)** Financing statements; or

**(5)** Mortgages, deeds of trust, or security agreements.

**b.** For Covered Property in which both you and a Loss Payee have an insurable interest:

**(1)** We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.

**(2)** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

**(3)** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

**(a)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(b)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(c)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

**(4)** If we pay the Loss Payee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(a)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(b)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**c.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**d.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

3. **Contract Of Sale Clause**

   a. The Loss Payee shown in the Schedule or in the Declarations is a person or organization you have entered into a contract with for the sale of Covered Property.

   b. For Covered Property in which both you and the Loss Payee have an insurable interest, we will:

      (1) Adjust losses with you; and

      (2) Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

   c. The following is added to the **Other Insurance** Condition:

      For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

4. **Building Owner Loss Payable Clause**

   a. The Loss Payee shown in the Schedule or in the Declarations is the owner of the described building in which you are a tenant.

   b. We will adjust losses to the described building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

   c. We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

CP 12 18 10 12    © Insurance Services Office, Inc., 2011    **Page 3 of 3** 405

This page intentionally left blank

POLICY NUMBER: WPP1595109 03

**COMMERCIAL PROPERTY**
**CP 12 18 10 12**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

BUILDERS' RISK COVERAGE FORM
BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

**SCHEDULE**

| **Location Number:** 1 | **Building Number:** 1 | **Applicable Clause** C.1 **(Enter C.1., C.2., C.3. or C.4.):** |
|---|---|---|
| **Description Of Property:** BUILDING | | |
| **Loss Payee Name:** SECRETARY OF HOUSING & URBAN DEVELOPMENT OF WASHINGTON DC, ISAOA, A | | |
| **Loss Payee Address:** 451 7TH STREET SW  WASHINGTON , DC 20410-8000 | | |

| **Location Number:** 2 | **Building Number:** 1 | **Applicable Clause** C.1 **(Enter C.1., C.2., C.3. or C.4.):** |
|---|---|---|
| **Description Of Property:** BUILDING | | |
| **Loss Payee Name:** SECRETARY OF HOUSING & URBAN DEVELOPMENT OF WASHINGTON DC, ISAOA, | | |
| **Loss Payee Address:** 451 7TH STREET SW  WASHINGTON , DC 20410-8000 | | |

| **Location Number:** 3 | **Building Number:** 1 | **Applicable Clause** C.1 **(Enter C.1., C.2., C.3. or C.4.):** |
|---|---|---|
| **Description Of Property:** BUILDING | | |
| **Loss Payee Name:** SECRETARY OF HOUSING & URBAN DEVELOPMENT OF WASHINGTON DC, ISAOA, AT | | |
| **Loss Payee Address:** 451 7TH STREET SW  WASHINGTON , DC 20410-8000 | | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**CP 12 18 10 12** © Insurance Services Office, Inc., 2011 **Page 1 of 3** 407

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 409 of 834

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99,** the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

**C.** The following is added to the **Loss Payment** Loss Condition, as indicated in the Declarations or in the Schedule:

**1. Loss Payable Clause**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear

**2. Lender's Loss Payable Clause**

**a.** The Loss Payee shown in the Schedule or in the Declarations is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

**(1)** Warehouse receipts;

**(2)** A contract for deed;

**(3)** Bills of lading;

**(4)** Financing statements; or

**(5)** Mortgages, deeds of trust, or security agreements.

**b.** For Covered Property in which both you and a Loss Payee have an insurable interest:

**(1)** We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.

**(2)** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

**(3)** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

**(a)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(b)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(c)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

**(4)** If we pay the Loss Payee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(a)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(b)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**c.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**d.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

© Insurance Services Office, Inc., 2011

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 410 of 834

3. **Contract Of Sale Clause**

   a. The Loss Payee shown in the Schedule or in the Declarations is a person or organization you have entered into a contract with for the sale of Covered Property.

   b. For Covered Property in which both you and the Loss Payee have an insurable interest, we will:

      (1) Adjust losses with you; and

      (2) Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

   c. The following is added to the **Other Insurance** Condition:

      For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

4. **Building Owner Loss Payable Clause**

   a. The Loss Payee shown in the Schedule or in the Declarations is the owner of the described building in which you are a tenant.

   b. We will adjust losses to the described building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

   c. We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 411 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 412 of 834

POLICY NUMBER: WPP1595109 03

**COMMERCIAL PROPERTY**
**CP 12 18 10 12**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

> BUILDERS' RISK COVERAGE FORM
> BUILDING AND PERSONAL PROPERTY COVERAGE FORM
> CONDOMINIUM ASSOCIATION COVERAGE FORM
> CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
> STANDARD PROPERTY POLICY

**SCHEDULE**

| Location Number: 4 | Building Number: 1 | Applicable Clause (Enter C.1., C.2., C.3. or C.4.):  C.1 |
|---|---|---|
| **Description Of Property:** BUILDING | | |
| **Loss Payee Name:** THE CITY OF NEW YORK ITS OFFICIALS AND EMPLOYEES | | |
| **Loss Payee Address:** 100 GOLD STREET NEW YORK, NY 10038 | | |

| Location Number: | Building Number: | Applicable Clause (Enter C.1., C.2., C.3. or C.4.): |
|---|---|---|
| **Description Of Property:** | | |
| **Loss Payee Name:** | | |
| **Loss Payee Address:** | | |

| Location Number: | Building Number: | Applicable Clause (Enter C.1., C.2., C.3. or C.4.): |
|---|---|---|
| **Description Of Property:** | | |
| **Loss Payee Name:** | | |
| **Loss Payee Address:** | | |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

**CP 12 18 10 12**       © Insurance Services Office, Inc., 2011       **Page 1 of 3**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 413 of 834

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99,** the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

**C.** The following is added to the **Loss Payment** Loss Condition, as indicated in the Declarations or in the Schedule:

**1. Loss Payable Clause**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear

**2. Lender's Loss Payable Clause**

**a.** The Loss Payee shown in the Schedule or in the Declarations is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

**(1)** Warehouse receipts;

**(2)** A contract for deed;

**(3)** Bills of lading;

**(4)** Financing statements; or

**(5)** Mortgages, deeds of trust, or security agreements.

**b.** For Covered Property in which both you and a Loss Payee have an insurable interest:

**(1)** We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.

**(2)** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

**(3)** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

**(a)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(b)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(c)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

**(4)** If we pay the Loss Payee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(a)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(b)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**c.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**d.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**CP 12 18 10 12** © Insurance Services Office, Inc., 2011 **Page 2 of 3** 412

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 414 of 834

3. **Contract Of Sale Clause**

  a. The Loss Payee shown in the Schedule or in the Declarations is a person or organization you have entered into a contract with for the sale of Covered Property.

  b. For Covered Property in which both you and the Loss Payee have an insurable interest, we will:

     (1) Adjust losses with you; and

     (2) Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

  c. The following is added to the **Other Insurance** Condition:

     For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

4. **Building Owner Loss Payable Clause**

  a. The Loss Payee shown in the Schedule or in the Declarations is the owner of the described building in which you are a tenant.

  b. We will adjust losses to the described building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

  c. We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 415 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 416 of 834

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# HIRED AUTO AND NON-OWNED AUTO LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

Insurance is provided only with respect to those coverages for which a specific premium charge is shown:

| Coverage | Additional Premium |
|---|---|
| Hired Auto Liability and Non-Owned Auto Liability | $ **80** |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A. HIRED AUTO LIABILITY**

The insurance provided under **Section I** - **Coverage A** – **Bodily Injury And Property Damage Liability** applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your "employees" in the course of your business.

**B. NON-OWNED AUTO LIABILITY**

The insurance provided under **Section I** - **Coverage A** – **Bodily Injury And Property Damage Liability** applies to "bodily injury" or "property damage" arising out of the use of a "non-owned auto" by any person other than you in the course of your business.

**C.** With respect to the insurance provided by this endorsement:

1. Subparagraphs **b., c., e., g., h., j., k., l., m.**, and **n.** of Paragraph **2.**, **Exclusions** of **Section I** - **Coverage A** – **Bodily Injury And Property Damage Liability** do not apply.

2. The following exclusions are added to Paragraph **2.**, **Exclusions** of **Section I** - **Coverage A** – **Bodily Injury And Property Damage Liability**:

   a. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

      (1) That the insured would have in the absence of the contract or agreement; or

      (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

   b. "Bodily injury" to:

      (1) An "employee" of the insured arising out of and in the course of:

         (a) Employment by the insured; or

         (b) Performing duties related to the conduct of the insured's business; or

      (2) The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph **(1)** above.

      This exclusion applies:

      (1) Whether the insured may be liable as an employer or in any other capacity; and

      (2) To any obligation to share damages with or repay someone else who must pay the damages because of the injury.

      This exclusion does not apply to:

      (1) Liability assumed by the insured under an "insured contract"; or

      (2) "Bodily injury" to domestic "employees" not entitled to workers compensation benefits.

GL990027  1017                                                      Page 1 of 2

**c.** "Property damage" to:

**(1)** Property owned or being transported by, or rented or loaned to the insured; or

**(2)** Property in the care, custody or control of the insured.

**D.** For the purposes of this endorsement only, **Section II – Who Is An Insured** is replaced by the following:

Each of the following is an insured under this Insurance to the extent set forth below:

**1.** You.

**2.** Any other person using a "hired auto" with your permission.

**3.** With respect to a "non-owned auto", any partner or "executive officer" of yours, but only while such "non-owned auto" is being used in your business.

**4.** Any other person or organization, but only with respect to their liability because of acts or omissions of an insured under paragraphs **1.**, **2.** or **3.** above.

None of the following is an insured:

**1.** Any person engaged in the business of his or her employer with respect to "bodily injury" to any co-employee of such person injured in the course of employment;

**2.** Any partner or "executive officer" with respect to any "auto" owned by such partner or officer or a member of his or her household;

**3.** Any person while employed in or otherwise engaged in performing duties related to the conduct of an "auto business", other than an "auto business" you operate;

**4.** The owner or lessee (of whom you are a sublessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of any such owner or lessee;

**5.** Any person or organization with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

**E.** For the purposes of this endorsement only, the definition of "insured contract" in **Section V** - **Definitions** is amended by the addition of the following:

**9.** "Insured contract' means:

**g.** That part of any contract or agreement entered into, as part of your business pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

**F.** For the purposes of this endorsement only, the following definitions are added to the **Section V** - **Definitions**:

**1.** "Auto business" means the business or occupation of selling, repairing, servicing, storing or parking "autos".

**2.** "Hired auto" means any "auto" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employees", your partners or your "executive officers", or members of their households,

**3.** "Non-owned auto" means any "auto" you do not own, lease, hire, rent or borrow which is used in connection with your business. This includes "autos" owned by your "employees", your partners or your "executive officers", or members of their households, but only while used in your business or your personal affairs.

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98          Copyright, Insurance Services Office, Inc., 1998          **Page 1 of 1**417 ☐

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 419 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 420 of 834

IL 00 23 07 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF TRANSPORTATION

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

IL 00 23 07 02                    © ISO Properties, Inc.,  2001                    **Page 1 of 2** 419 □

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 421 of 834

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2001
IL 00 23 07 02 420 □

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 422 of 834

IL 01 83 08 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – FRAUD

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART – FARM PROPERTY – OTHER FARM PROVISIONS FORM – ADDITIONAL COVERAGES, CONDITIONS, DEFINITIONS
FARM COVERAGE PART – LIVESTOCK COVERAGE FORM
FARM COVERAGE PART – MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM

The **CONCEALMENT, MISREPRESENTATION OR FRAUD** Condition is replaced by the following:

**FRAUD**

We do not provide coverage for any insured ("insured") who has made fraudulent statements or engaged in fraudulent conduct in connection with any loss ("loss") or damage for which coverage is sought under this policy.

However, with respect to insurance provided under the COMMERCIAL AUTOMOBILE COVERAGE PART, we will provide coverage to such "insured" for damages sustained by any person who has not made fraudulent statements or engaged in fraudulent conduct if such damages are otherwise covered under the policy.

IL 01 83 08 08                © Insurance Services Office, Inc., 2008                **Page 1 of 1**

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 423 of 834

This page intentionally left blank

IL 02 68 01 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraphs **1., 2., 3.** and **5.** of the **Cancellation** Common Policy Condition are replaced by the following:

**1.** The first Named Insured shown in the Declarations may cancel this entire policy by mailing or delivering to us advance written notice of cancellation.

**2. Cancellation Of Policies In Effect**

**a. 60 Days Or Less**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 30 days before the effective date of cancellation if we cancel for any reason not included in Paragraph **A.2.b.** below.

**(2)** 15 days before the effective date of cancellation if we cancel for any of the reasons included in Paragraph **A.2.b.** below.

**b. For More Than 60 Days**

If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy we issued, we may cancel only for any of the reasons listed below, provided we mail the first Named Insured written notice at least 15 days before the effective date of cancellation:

**(1)** Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

**(2)** Conviction of a crime arising out of acts increasing the hazard insured against;

**(3)** Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim;

**(4)** After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;

**(5)** Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, which results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

**(6)** Required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

IL 02 68 01 14 © Insurance Services Office, Inc., 2013 **Page 1 of 5**

**(7)** A determination by the Superintendent that the continuation of the policy would violate, or would place us in violation of, any provision of the Insurance Code; or

**(8)** Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If we cancel for this reason, you may make a written request to the Department of Financial Services, within 10 days of receipt of this notice, to review our cancellation decision. Also, we will simultaneously send a copy of this cancellation notice to the Department of Financial Services.

**3.** We will mail or deliver our notice, including the reason for cancellation, to the first Named Insured at the address shown in the policy and to the authorized agent or broker.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**7.** If one of the reasons for cancellation in Paragraph **A.2.b.** or **D.2.b.(2)** exists, we may cancel this entire policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this policy.

**C.** The following conditions are added:

**1. Nonrenewal**

If we decide not to renew this policy we will send notice as provided in Paragraph **C.3.** below.

**2. Conditional Renewal**

If we conditionally renew this policy subject to:

**a.** A change of limits;

**b.** A change in type of coverage;

**c.** A reduction of coverage;

**d.** An increased deductible;

**e.** An addition of exclusion; or

**f.** Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in Paragraph **C.3.** below.

**3. Notices Of Nonrenewal And Conditional Renewal**

**a.** If we decide not to renew this policy or to conditionally renew this policy as provided in Paragraphs **C.1.** and **C.2.** above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least 60 but not more than 120 days before:

**(1)** The expiration date; or

**(2)** The anniversary date if this is a continuous policy.

**b.** Notice will be mailed or delivered to the first Named Insured at the address shown in the policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

**c.** Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

**d.** If we violate any of the provisions of Paragraph **C.3.a., b.** or **c.** above by sending the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice:

**(1)** And if notice is provided prior to the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first Named Insured, during this 60-day period, has replaced the coverage or elects to cancel;

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 426 of 834

**(2)** And if the notice is provided on or after the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy for another policy period, at the lower of the current rates or the prior period's rates, unless the first Named Insured, during this additional policy period, has replaced the coverage or elects to cancel.

**e.** If you elect to renew on the basis of a late conditional renewal notice, the terms, conditions and rates set forth in such notice shall apply:

**(1)** Upon expiration of the 60-day period, unless Subparagraph **(2)** below applies; or

**(2)** Notwithstanding the provisions in Paragraphs **d.(1)** and **d.(2),** as of the renewal date of the policy if the conditional renewal notice was sent at least 30 days prior to the expiration or anniversary date of the policy.

**f.** We will not send you notice of nonrenewal or conditional renewal if you, your authorized agent or broker or another insurer of yours mails or delivers notice that the policy has been replaced or is no longer desired.

**D.** The following provisions apply when the Commercial Property Coverage Part, the Farm Coverage Part or the Capital Assets Program (Output Policy) Coverage Part is made a part of this policy:

**1.** Items **D.2.** and **D.3.** apply if this policy meets the following conditions:

**a.** The policy is issued or issued for delivery in New York State covering property located in this state; and

**b.** The policy insures:

**(1)** For loss of or damage to structures, other than hotels or motels, used predominantly for residential purposes and consisting of no more than four dwelling units; or

**(2)** For loss of or damage to personal property other than farm personal property or business property; or

**(3)** Against damages arising from liability for loss of, damage to or injury to persons or property, except liability arising from business or farming; and

**c.** The portion of the annual premium attributable to the property and contingencies described in **1.b.** exceeds the portion applicable to other property and contingencies.

**2.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2. Procedure And Reasons For Cancellation**

**a.** We may cancel this entire policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 15 days before the effective date of cancellation if we cancel for nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**b.** But if this policy:

**(1)** Has been in effect for more than 60 days; or

**(2)** Is a renewal of a policy we issued;

we may cancel this policy only for one or more of the following reasons:

**(1)** Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

**(2)** Conviction of a crime arising out of acts increasing the risk of loss;

**(3)** Discovery of fraud or material misrepresentation in obtaining the policy or in making a claim;

**(4)** Discovery of willful or reckless acts or omissions increasing the risk of loss;

**(5)** Physical changes in the covered property that make that property uninsurable in accordance with our objective and uniformly applied underwriting standards in effect when we:

**(a)** Issued the policy; or

**(b)** Last voluntarily renewed the policy;

---

IL 02 68 01 14 © Insurance Services Office, Inc., 2013 **Page 3 of 5** 425

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 427 of 834

**(6)** The Superintendent of Financial Services' determination that continuing the policy would violate Chapter 28 of the Insurance Law; or

**(7)** Required pursuant to a determination by the Superintendent of Financial Services that the continuation of our present premium volume would be hazardous to the interests of our policyholders, our creditors or the public.

3. The following are added:

**a. Conditional Continuation**

Instead of cancelling this policy, we may continue it on the condition that:

**(1)** The policy limits be changed; or

**(2)** Any coverage not required by law be eliminated.

If this policy is conditionally continued, we will mail or deliver to the first Named Insured written notice at least 20 days before the effective date of the change or elimination. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**b. Nonrenewal**

If, as allowed by the laws of New York State, we:

**(1)** Do not renew this policy; or

**(2)** Condition policy renewal upon:

**(a)** Change of limits; or

**(b)** Elimination of coverage;

we will mail or deliver written notice of nonrenewal or conditional renewal:

**(a)** At least 45 days; but

**(b)** Not more than 60 days;

before the expiration date of the policy. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**E.** The following is added to the Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions, the Commercial Property Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

When the property is subject to the Anti-arson Application in accordance with New York Department of Financial Services' Insurance Regulation No. 96, the following provisions are added:

If you fail to return the completed, signed and affirmed anti-arson application to us:

**1.** Or our broker or agent within 45 days of the effective date of a new policy, we will cancel the entire policy by giving 20 days' written notice to you and to the mortgageholder shown in the Declarations.

**2.** Before the expiration date of any policy, we will cancel the policy by giving written notice to you and to the mortgageholder shown in the Declarations at least 15 days before the effective date of cancellation.

The cancellation provisions set forth in **E.1.** and **E.2.** above supersede any contrary provisions in this policy including this endorsement.

If the notice in **E.1.** or **E.2.** above is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**F.** The following applies to the Commercial Property Coverage Part, the Farm Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

Paragraphs **f.** and **g.** of the **Mortgageholders** Condition are replaced by the following:

**f. Cancellation**

**(1)** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(a)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(b)** 30 days before the effective date of cancellation if we cancel for any other reason.

© Insurance Services Office, Inc., 2013
IL 02 68 01 14

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 428 of 834

**(2)** If you cancel this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, cancellation will become effective on the later of:

    **(a)** The effective date of cancellation of the insured's coverage; or

    **(b)** 10 days after we give notice to the mortgageholder.

**g. Nonrenewal**

**(1)** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**(2)** If you elect not to renew this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, nonrenewal will become effective on the later of:

    **(a)** The expiration date of the policy; or

    **(b)** 10 days after we give notice to the mortgageholder.

**G.** The following provisions apply when the following are made a part of this policy:

Commercial General Liability Coverage Part

Employment-Related Practices Liability Coverage Part

Farm Liability Coverage Form

Liquor Liability Coverage Part

Products/Completed Operations Liability Coverage Part

**1.** The aggregate limits of this policy as shown in the Declarations will be increased in proportion to any policy extension provided in accordance with Paragraph **C.3.d.** above.

**2.** The last sentence of Limits Of Insurance does not apply when the policy period is extended because we sent the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice.

---

**IL 02 68 01 14**    © Insurance Services Office, Inc., 2013    **Page 5 of 5**427

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 429 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 430 of 834

IL 09 35 07 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> CRIME AND FIDELITY COVERAGE PART
> STANDARD PROPERTY POLICY

**A.** We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

**1.** The failure, malfunction or inadequacy of:

**a.** Any of the following, whether belonging to any insured or to others:

**(1)** Computer hardware, including microprocessors;

**(2)** Computer application software;

**(3)** Computer operating systems and related software;

**(4)** Computer networks;

**(5)** Microprocessors (computer chips) not part of any computer system; or

**(6)** Any other computerized or electronic equipment or components; or

**b.** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **A.1.a.** of this endorsement;

due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

**2.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **A.1.** of this endorsement.

**B.** If an excluded Cause of Loss as described in Paragraph **A.** of this endorsement results:

**1.** In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

**2.** Under the Commercial Property Coverage Part:

**a.** In a "Specified Cause of Loss", or in elevator collision resulting from mechanical breakdown, under the Causes of Loss – Special Form; or

**b.** In a Covered Cause of Loss under the Causes Of Loss – Basic Form or the Causes Of Loss – Broad Form;

we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

**C.** We will not pay for repair, replacement or modification of any items in Paragraphs **A.1.a.** and **A.1.b.** of this endorsement to correct any deficiencies or change any features.

© ISO Properties, Inc.,  2001

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 431 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 432 of 834

IL 09 52 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

IL 09 52 01 15                    © Insurance Services Office, Inc., 2015                    **Page 1 of 1**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 433 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 434 of 834

POLICY NUMBER: WPP1595109 03

**IL 09 85 01 15**

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| |
|---|
| **SCHEDULE – PART I** |
| **Terrorism Premium (Certified Acts)**    **$** 1,322.00 |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):** |
| Commercial Property Coverage Part<br>Commercial General Liability Coverage Part |
| **Additional information, if any, concerning the terrorism premium:** |
| **SCHEDULE – PART II** |
| **Federal share of terrorism losses**                80**% Year: 20** 20<br>(Refer to Paragraph **B.** in this endorsement.) |
| **Federal share of terrorism losses**                80**% Year: 20** 21<br>(Refer to Paragraph **B.** in this endorsement.) |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**IL 09 85 01 15**                © Insurance Services Office, Inc., 2015                **Page 1 of 2**433

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 435 of 834

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015     **IL 09 85 01 15** 434

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number : 0

| POLICY NUMBER<br>WPP1595109 03 | POLICY CHANGES EFFECTIVE<br>12/31/2020 | COMPANY<br>Wesco Insurance Company |
|---|---|---|
| NAMED INSURED<br>UHAB HDFC | | AUTHORIZED REPRESENTATIVE<br>Chris Foy |

COVERAGE PARTS AFFECTED
General Liability
Commercial Property

THE DEDUCTIBLE APPLICABLE TO PERSONAL PROPERTY OF THE INSURED REFLECTED ON CPDECC 0414, COMMERCIAL PROPERTY DESCRIPTION OF COVERAGES PROVIDED, IS AMENDED TO $1,000 APPLICABLE TO ALL LOCATIONS ON THE POLICY.

THE FOLLOWING FORMS ARE MADE A PART OF THIS POLICY:
CP990099NY0619 – PROPERTY EXPANDED COVERAGE ENDORSEMENT SILVER (WITH BUSINESS INCOME AND EXTRA EXPENSE) NEW YORK
CP04050917 – ORDINANCE OR LAW COVERAGE
CP910030312 – EARTHQUAKE ENDORSEMENT
CP910080312 – SUPERIOR FLOOD ENDORSEMENT
CR00211115 – COMMERCIAL CRIME COVERAGE FORMS (LOSS SUSTAINED FORMS)
SCHEDULE A – ORDINANCE OR LAW COVERAGE CHANGES
SCHEDULE B – EARTHQUAKE COVERAGE CHANGES
SCHEDULE C – FLOOD COVERAGE CHANGES

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF NEW YORK INSURANCE LAW AND REGULATIONS.**

2-01010

Authorized Representative Signature

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 437 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 438 of 834

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# IDENTITY RECOVERY COVERAGE
## IDENTITY THEFT CASE MANAGEMENT SERVICE AND EXPENSE REIMBURSEMENT

The following is added as an Additional Coverage.  If this is being endorsed onto a multi-section form, it is added to the Property section:

**IDENTITY RECOVERY COVERAGE**

We will provide the Case Management Service and Expense Reimbursement Coverage indicated below if all of the following requirements are met:

1. There has been an "identity theft" involving the personal identity of an "identity recovery insured" under this policy; and

2. Such "identity theft" is first discovered by the "identity recovery insured" during the policy period for which this Identity Recovery coverage is applicable; and

3. Such "identity theft" is reported to us within 60 days after it is first discovered by the "identity recovery insured."

If all three of the requirements listed above have been met, then we will provide the following to the "identity recovery insured":

1. **Case Management Service**
   Services of an "identity recovery case manager" as needed to respond to the "identity theft"; and

2. **Expense Reimbursement**
   Reimbursement of necessary and reasonable "identity recovery expenses" incurred as a direct result of the "identity theft."

This coverage is additional insurance.

**EXCLUSIONS**

The following additional exclusions apply to this coverage:

We do not cover loss or expense arising from any of the following.

1. The theft of a professional or business identity.

2. Any fraudulent, dishonest or criminal act by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any authorized representative of an "identity recovery insured", whether acting alone or in collusion with others. However, this exclusion shall not apply to the interests of an "identity recovery insured" who has no knowledge of or involvement in such fraud, dishonesty or criminal act.

3. An "identity theft" that is not reported in writing to the police.

**LIMITS**

Case Management Service is available as needed for any one "identity theft" for up to 12 consecutive months from the inception of the service. Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement coverage.

Expense Reimbursement coverage is subject to a limit of $15,000 annual aggregate per "identity recovery insured." Regardless of the number of claims, this limit is the most we will pay for the total of all loss or expense arising out of all "identity thefts" to any one "identity recovery insured" which are first discovered by the "identity recovery insured" during a 12-month period starting with the beginning of the present annual policy period. If an "identity theft" is first discovered in one policy period and continues into other policy periods, all loss and expense arising from such "identity theft" will be subject to the aggregate limit applicable to the policy period when the "identity theft" was first discovered.

**IL990034 0914**                                                                **Page 1 of 4**

Legal costs as provided under item d. of the definition of "identity recovery expenses" are part of, and not in addition to, the Expense Reimbursement coverage limit.

Item e. (Lost Wages) and item f. (Child and Elder Care Expenses) of the definition of "identity recovery expenses" are jointly subject to a sublimit of $5,000. This sublimit is part of, and not in addition to, the Expense Reimbursement coverage limit. Coverage is limited to wages lost and expenses incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

Item g. (Mental Health Counseling) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement coverage limit. Coverage is limited to counseling that takes place within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

Item h. (Miscellaneous Unnamed Costs) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expenses Reimbursement coverage limit. Coverage is limited to costs incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

## DEDUCTIBLE

Case Management Service is not subject to a deductible.

Expense Reimbursement coverage is subject to a deductible of $100. Any one "identity recovery insured" shall be responsible for only one deductible under this Identity Recovery Coverage during any one policy period.

## CONDITIONS

The following additional conditions apply to this coverage:

**A. Help Line**

For assistance, the "identity recovery insured" should call the **Identity Recovery Help Line** at **1-877-645-7434**.

The **Identity Recovery Help Line** can provide the "identity recovery insured" with:

1. Information and advice for how to respond to a possible "identity theft"; and

2. Instructions for how to submit a service request for Case Management Service and/or a claim form for Expense Reimbursement Coverage.

In some cases, we may provide Case Management services at our expense to an "identity recovery insured" prior to a determination that a covered "identity theft" has occurred. Our provision of such services is not an admission of liability under the policy. We reserve the right to deny further coverage or service if, after investigation, we determine that a covered "identity theft" has not occurred.

As respects Expense Reimbursement Coverage, the "identity recovery insured" must send to us, within 60 days after our request, receipts, bills or other records that support his or her claim for "identity recovery expenses."

**B. Services**

The following conditions apply as respects any services provided by us or our designees to any "identity recovery insured" under this endorsement:

1. Our ability to provide helpful services in the event of an "identity theft" depends on the cooperation, permission and assistance of the "identity recovery insured."

2. All services may not be available or applicable to all individuals. For example, "identity recovery insureds" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions.

3. We do not warrant or guarantee that our services will end or eliminate all problems associated with an "identity theft" or prevent future "identity thefts."

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 440 of 834

## DEFINITIONS

With respect to the provisions of this endorsement only, the following definitions are added:

1. **"Identity Recovery Case Manager"** means one or more individuals assigned by us to assist an "identity recovery insured" with communications we deem necessary for re-establishing the integrity of the personal identity of the "identity recovery insured." This includes, with the permission and cooperation of the "identity recovery insured," written and telephone communications with law enforcement authorities, governmental agencies, credit agencies and individual creditors and businesses.

2. **"Identity Recovery Expenses"** means the following when they are reasonable and necessary expenses that are incurred as a direct result of an "identity theft":

   a. Costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an "identity theft."

   b. Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage solely as a result of your efforts to report an "identity theft" or amend or rectify records as to your true name or identity as a result of an "identity theft."

   c. Costs for credit reports from established credit bureaus.

   d. Fees and expenses for an attorney approved by us for the following:

      (1) The defense of any civil suit brought against an "identity recovery insured."

      (2) The removal of any civil judgment wrongfully entered against an "identity recovery insured."

      (3) Legal assistance for an "identity recovery insured" at an audit or hearing by a governmental agency.

      (4) Legal assistance in challenging the accuracy of the "identity recovery insured's" consumer credit report.

      (5) The defense of any criminal charges brought against an "identity recovery insured" arising from the actions of a third party using the personal identity of the "identity recovery insured."

   e. Actual lost wages of the "identity recovery insured" for time reasonably and necessarily taken away from work and away from the work premises. Time away from work includes partial or whole work days. Actual lost wages may include payment for vacation days, discretionary days, floating holidays and paid personal days. Actual lost wages does not include sick days or any loss arising from time taken away from self employment. Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours.

   f. Actual costs for supervision of children or elderly or infirm relatives or dependants of the "identity recovery insured" during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured."

   g. Actual costs for counseling from a licensed mental health professional. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured."

   h. Any other reasonable costs necessarily incurred by an "identity recovery insured" as a direct result of the "identity theft."

      (1) Such costs include:

         (A) Costs by the "identity recovery insured" to recover control over his or her personal identity.

         (B) Deductibles or service fees from financial institutions.

      (2) Such costs do not include:

         (A) Costs to avoid, prevent or detect "identity theft" or other loss.

         (B) Money lost or stolen.

         (C) Costs that are restricted or excluded elsewhere in this endorsement or policy.

3. **"Identity Recovery Insured"** means the following:

   a. When the business  insured under this policy is a sole proprietorship, the "identity recovery insured" is the individual person who is the sole proprietor of the insured business and their spouse or domestic partner.

   b. When the entity insured under this policy is a partnership, the "identity recovery insureds" are the current partners.

**IL990034 0914**

**Page 3 of 4**

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 441 of 834

c.  When the entity insured under this policy is a corporation or other organization, the "identity recovery insureds" are all individuals having an ownership position of 20% or more of the insured entity. However, if and only if there is no one who has such an ownership position, then the "identity recovery insured" shall be:

(1)  The chief executive of the insured entity; or

(2)  As respects a religious institution, the senior ministerial employee.

An "identity recovery insured" must always be an individual person. The entity insured under this policy is not an "identity recovery insured."

4.  **"Identity Theft"** means the fraudulent use of the social security number or other method of identifying an "identity recovery insured." This includes fraudulently using the personal identity of an "identity recovery insured" to establish credit accounts, secure loans, enter into contracts or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

All other provisions of this policy apply.

IL990034 0914                                                                      **Page 4 of 4**

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 442 of 834

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# IDENTITY RECOVERY COVERAGE
# NEW YORK AMENDATORY ENDORSEMENT
## IDENTITY THEFT CASE MANAGEMENT SERVICE AND EXPENSE REIMBURSEMENT

This endorsement modifies insurance provided under the following:

> IDENTITY RECOVERY COVERAGE

The Section titled **Limits**, is deleted and replaced with the following:

> Case Management Service is available as needed for any one "identity theft" for up to 12 consecutive months from the inception of the service. Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement coverage.
>
> Expense Reimbursement coverage is subject to a limit of $15,000 annual aggregate per "identity recovery insured." Regardless of the number of claims, this limit is the most we will pay for the total of all loss or expense arising out of all "identity thefts" to any one "identity recovery insured" which are first discovered by the "identity recovery insured" during a 12-month period starting with the beginning of the present annual policy period. If an "identity theft" is first discovered in one policy period and continues into other policy periods, all loss and expense arising from such "identity theft" will be subject to the aggregate limit applicable to the policy period when the "identity theft" was first discovered.
>
> Legal costs as provided under item d. of the definition of "identity recovery expenses" are part of, and not in addition to, the Expense Reimbursement coverage limit.
>
> Item e. (Lost Wages) and item f. (Child and Elder Care Expenses) of the definition of "identity recovery expenses" are jointly subject to a sublimit of $5,000. This sublimit is part of, and not in addition to, the Expense Reimbursement coverage limit. Coverage is limited to wages lost and expenses incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."
>
> Item g. (Miscellaneous Unnamed Costs) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expenses Reimbursement coverage limit. Coverage is limited to costs incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

Section **Definitions** 2.g. should be deleted and replaced with the following:

g.   Any other reasonable costs necessarily incurred by an "identity recovery insured" as a direct result of the "identity theft."

   (1)  Such costs include:

   (A)  Costs by the "identity recovery insured" to recover control over his or her personal identity.

   (B)  Deductibles or service fees from financial institutions.

   (2)  Such costs do not include:

   (A)  Costs to avoid, prevent or detect "identity theft" or other loss.

   (B)  Money lost or stolen.

   (C)  Costs that are restricted or excluded elsewhere in this endorsement or policy.

**Definitions** 2.h. should be deleted in its entirety.

**IL990040NY 0914**                                                                                           **Page 1 of 1**

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 443 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 444 of 834

**POLICY NUMBER:** WPP1595109 03

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - ASBESTOS

The Exclusion Section of the Liability Coverage provided under this policy is amended to add the following:

**Asbestos**

A. This insurance does not apply to any loss of, "bodily injury," "property damage," or "personal and advertising injury"" arising out of the actual, alleged or suspected:

1. Ingestion, inhalation, absorption, presence or exposure or threat of exposure to asbestos in any form, or goods, products containing any form of asbestos;

2. Use of any form of asbestos in constructing or manufacturing any good, product or structure;

3. Removal of any form of asbestos from any good, product or structure; or

4. The manufacture, intellectual development, sale, transportation, storage, or disposal of asbestos or goods or products containing any form of asbestos.

B. We will not pay:

1. Loss, cost or expense, including but not limited to defense costs, claim expenses, bonds or fees arising out of any request, demand, or order that any insured or others identify, abate, test for, sample, monitor, clean up, remove, cover, contain, treat, detoxify, decontaminate, neutralize, or mitigate; or in any way respond to or assess the effects of asbestos; or repair, replace or improve any property as a result of such effects; or

2. Loss, cost or expense arising out of any claim or "suit" by or on behalf of a government authority for damages because of identification of, abatement of, testing for, sampling, monitoring, cleaning up, removing, covering, containing, treating, detoxifying, decontaminating, neutralizing, or mitigating; or in any way responding to or assessing the effects of asbestos; or repairing, replacing or improving any property as a result of such effects.

C. This exclusion applies whether or not:

1. Such loss, cost or expense was caused by the instigation of, or with the direct or indirect involvement of any Named Insured, the Named Insured's employees, Additional Insureds or other persons on the Named Insured's premises or worksite at any time.

2. Such loss, cost or expense was caused by or arising out of the failure at any time of any Named Insured, the Named Insured's employees, Additional Insureds, or other persons on any Named Insured's premises or worksite to supervise or keep the premise or worksite in a safe condition.

**IL990044 0117** **Page 1 of 1**

443

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 445 of 834

This page intentionally left blank

POLICY NUMBER:  WPP1595109 03

**COMMERCIAL GENERAL LIABILITY**
**TGL990001 11 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CONSTRUCTION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This insurance does not apply to "bodily injury" or "property damage" or "personal and advertising injury" arising out of any of the following:

1. change, alteration, or modification of the size of any building or structure;
2. movement of any building or structure;
3. construction or erection of any new building or structure;
4. demolition of any building or structure; or
5. construction, demolition, movement of any load bearing wall or any modification to the structure of any loading bearing wall.

This exclusion applies to any work performed as part of or in connection with any of the foregoing.

This exclusion applies regardless of whether the described operations are ongoing, completed or in any other stage when the loss occurs.

This exclusion applies regardless of whether such operations are conducted by any insured or on behalf of any insured or whether the operations are conducted for any insured or for any other person or entity.

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 447 of 834

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROPERTY EXPANDED COVERAGE ENDORSEMENT
## SILVER
### (WITH BUSINESS INCOME AND EXTRA EXPENSE)
### NEW YORK

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CAUSES OF LOSS – SPECIAL FORM
BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
COMMERCIAL CRIME COVERAGE FORM (LOSS SUSTAINED FORM)

**I.  SCHEDULE OF ADDITIONAL AND ENHANCED COVERAGES AND LIMITS**

The following is a summary of increased Limits Of Insurance and/or additional coverages provided by this endorsement, subject to the provisions of your policy.

| Physical Damage Coverages | Limit Of Insurance | Page # |
|---|---|---|
| Accounts Receivable | $50,000 | 4 |
| Brands And Labels | $10,000 | 6 |
| Business Personal Property – Expanded Premises | Within 1,000 Feet | 3 |
| Business Personal Property – Peak Season | 25% | 4 |
| Claims Settlement Assistance | $5,000 | 5 |
| Debris Removal | $25,000 | 3 |
| Electronic Data | $50,000 | 3 |
| Electronic Data Processing Equipment | $50,000/See Form | 6 |
| Fine Arts | $10,000 | 7 |
| Fire Department Service Charge | $25,000 | 3 |
| Fungus, Wet Rot, Dry Rot And Bacteria | $25,000 | 11 |
| Newly Acquired Or Constructed Property – Building | $1,000,000 | |
| Newly Acquired Or Constructed Property – Business Personal Property | $500,000 | 3 |
| Newly Acquired Or Constructed Property – Period Of Coverage | 90 Days | |
| Ordinance Or Law-Undamaged Portion of the Building | Building Limit | 8 |
| Ordinance Or Law-Demolition Cost And Increased Cost Of Construction | $50,000 (Combined) | |
| Outdoor Property | $25,000/$1,000 | 4 |
| Outdoor Signs | $15,000 | 7 |
| Personal Effects And Property Of Others | $25,000 | 4 |
| Pollutant Clean-up And Removal | $25,000 | 3 |
| Property Off-premises | $50,000 | 4 |
| Recharge Or Refill Of Fire Protection System | $5,000 | 5 |
| Sewer, Drain, Or Sump Discharge | $10,000 | 12 |
| Spoilage | 1,000 Feet, $25,000 | 6 |
| Transit | $50,000 | 11 |
| Utility Services – Direct Damage | $50,000 | 12 |
| Valuable Papers And Records | $25,000 | 4 |

CP990099NY 0619

Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

Page 1 of 20

447

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 449 of 834

| Crime Coverages | Limit Of Insurance | Page # |
|---|---|---|
| Employee Theft | $25,000 | 13 |
| Forgery Or Alteration | $25,000 | 13 |
| Money And Securities | $10,000/$10,000 | 13 |
| **Business Income Coverages** | **Limit Of Insurance** | **Page #** |
| Civil Authority | 12 Weeks | 14 |
| Dependent Properties | $100,000 | 15 |
| Extended Business Income | 180 Days | 14 |
| Interruption Of Computer Operations | $5,000 | 14 |
| Newly Acquired Location | $125,000 | 14 |
| Pollutant Clean-up And Removal | $25,000 | 17 |
| Sewer, Drain, Or Sump Discharge | $25,000 | 18 |
| Spoilage | $25,000 | 17 |
| Utility Services – Time Element | $10,000 | 15 |
| Web Site Service Provider | $25,000 | 18 |

## II.  CONDITIONS

### A.  Applicability Of Coverage

The coverage provided under this endorsement is only available in connection with those coverage forms that form part of your policy.  If two or more coverages apply to the same loss or damage, the broader coverage, and only the broader coverage, will apply.

### B.  Limit Of Insurance

1.  When coverage is provided by this form and another coverage form is attached to this policy, the greater Limit Of Insurance will apply unless indicated otherwise in this form. In no instance will multiple limits apply to coverages which may be duplicated within this policy.

2.  Limit Of Insurance identified herein are not excess of, nor in addition to, Limit Of Insurance provided by the coverage or Cause of Loss forms applicable to this endorsement, unless otherwise stated.

3.  Coverage is considered to be on an occurrence basis, unless otherwise stated in this form.

### C.  Deductible

The deductible listed in the Property Declarations will apply unless specific deductible provisions are set forth under any coverage enhancement.

### D.  Adjusters' Fees

Coverages provided herein are not applicable to fees you may incur by retaining a public adjuster or appraiser.

### E.  Applicability Of Exclusions

Specific exclusionary endorsements attached to the policy supersede coverage provisions contained in this coverage endorsement.

CP990099NY 0619
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Page 2 of 20

448

### F. Terms Of Your Policy

Except as specifically provided under this endorsement, all other terms, conditions, and limitations of your policy remain unchanged.

### G. Requirement For Covered Cause Of Loss

Except where a specific Covered Cause of Loss is identified in this coverage enhancement, coverage for the losses described herein are applicable only for Covered Causes of Loss as designated in the Causes Of Loss Form attached to the policy.

### H. Other Insurance

If there is other insurance under a separate policy covering the same loss or damage as provided for in this coverage enhancement, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, regardless of whether you are able to collect. However, we will not pay more than the applicable Limit Of Insurance.

**III.** THE **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, CP 00 10,** IS AMENDED AS FOLLOWS:

### A. Your Business Personal Property, Section A.1.b., is amended as follows:

The first paragraph is deleted and replaced with the following:

**Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the **YOUR BUSINESS PERSONAL PROPERTY – SEPARATION OF COVERAGE FORM, CP 19 10**.

### B. Additional Coverages, Section A.4., is amended as follows:

#### 1. Debris Removal

The Limit Of Insurance for **Debris Removal** is increased to $25,000.

#### 2. Fire Department Service Charge

The Limit Of Insurance for **Fire Department Service Charge** is increased to $25,000.

#### 3. Pollutant Clean-up And Removal

The Limit Of Insurance for **Pollutant Clean-up and Removal** is increased to $25,000.

#### 4. Electronic Data

The Limit Of Insurance for Electronic Data is increased to $50,000.

### C. Coverage Extensions, Section A.5., is amended as follows:

#### 1. Newly Acquired Or Constructed Property is amended as follows:

##### a. Buildings

The last paragraph under **Buildings** is deleted and replaced with the following:

The most we will pay for loss or damage under this Extension is $1,000,000 at each building.

CP990099NY 0619

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 3 of 20

449

    **b.** **Your Business Personal Property**

The last paragraph in Section **(a)** under **Your Business Personal Property** is deleted and replaced with the following:

The most we will pay for loss or damage under this Extension is $500,000 at each building.

    **c.** **Period Of Coverage**

Paragraph **(b)** under **Period Of Coverage** is deleted and replaced with the following:

**(b)** 90 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**2.** **Personal Effects And Property Of Others**

The Limit Of Insurance for this Extension is increased to $25,000.

**3.** **Valuable Papers And Records (Other Than Electronic Data)**

Paragraph **(4)** is deleted and replaced with the following:

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $25,000. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist), and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit Of Insurance on Your Business Personal Property and therefore coverage of such costs is not additional insurance.

**4.** **Property Off-premises**

Paragraph **(3)** under **Property Off-premises** is deleted and replaced with the following:

**(3)** The most we will pay for loss or damage under this Extension is $50,000.

**5.** **Outdoor Property**

    **a.** Coverage is extended to apply to the following additional causes of loss:

**(6)** Vandalism and malicious mischief; or

**(7)** Theft.

    **b.** The most we will pay for loss or damage under this Extension is $25,000. The most we will pay for any one tree, shrub, or plant is $1,000.

**D.** The following **Coverage Extensions** are added to **Section A.5.**:

    **h.** **Business Personal Property – Peak Season**

The Limit Of Insurance for Business Personal Property will be increased by 25% at the time of loss, if the loss occurs at a time considered to be a peak period in sales or production, to provide for seasonal variation of total stock value, but this Coverage Extension shall only apply if the Limit Of Insurance for Business Personal Property for the location or building suffering the loss or damage is insured for a minimum of 100% of your average monthly values for the 12 months prior to the loss. If you have not been in business for the 12 months prior to the loss, then the Business Personal Property limit must be a minimum of 100% of average monthly values for the number of months that you have been in business.

If Business Personal Property is covered on a blanket basis, all Business Personal Property covered under the blanket limit must be equal to or greater than 100% of the average monthly values at all locations included within the blanket, for the 12 months prior to the loss (or the number of months that you have been in business if you have not been in business for 12 months prior to the loss.)

This peak season increase in limit shall not be included in the calculations under the Coinsurance condition.

CP990099NY 0619     Includes copyrighted material of Insurance Services Office, Inc., with its permission.     Page 4 of 20

450

**i. Accounts Receivable**

**(1)** The insurance that applies to Business Personal Property is extended to apply to accounts receivable. We will pay:

   **(a)** All amounts due from your customers that you are unable to collect;

   **(b)** Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

   **(c)** Collection expenses in excess of your normal collection expenses that are made necessary; and

   **(d)** Other reasonable expenses that you incur to reestablish your records of accounts receivable;

   as a result of direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable.

**(2)** The most we will pay under this Coverage Extension for loss or damage at the described premises is $50,000.

**(3)** Paragraph **B. Exclusions** in the Causes of Loss Form does not apply to this Coverage Extension except for:

   **(a)** Paragraph **B.1.c.,** Governmental Action;

   **(b)** Paragraph **B.1.d.,** Nuclear Hazard;

   **(c)** Paragraph **B.1.f.,** War And Military Action;

   **(d)** Paragraph **B.2.h.;**

   **(e)** Paragraph **B.2.i.;**

   **(f)** Paragraph **B.3.;** and

   **(g)** Paragraph **B.6.** is added and shown below:

   **B.6.** We will not pay for:

   **a.** Loss or damage caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or other property.

   **b.** Loss or damage caused by or resulting from bookkeeping, accounting or billing errors or omissions.

   **c.** Any loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

**j. Claims Settlement Assistance**

We will pay for your cost to prepare documents as we may specifically request of you during the settlement of a claim. Such documents might include inventories of damaged and undamaged property with their values, photographs, or photocopying.

We will not pay for:

**(a)** A higher cost of labor or lost time, than is adequate to pay to perform the preparation work; or

**(b)** The services of attorneys, appraisers, or insurance agents, adjusters, or brokers.

The most we will pay under this Coverage Extension is $5,000.

No deductible shall apply to this coverage.

**k. Recharge Or Refill Of Fire Protection System**

We will pay your expenses to recharge or refill automatic fire protection systems when such systems are discharged as the result of any of the Covered Causes of Loss.

CP990099NY 0619

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 5 of 20

451

We will not pay recharging or refilling expenses if the discharge occurred while the system was being tested.

The most we will pay under this Coverage Extension is $5,000.

No deductible shall apply to this coverage.

**l. Brands And Labels**

If branded or labeled merchandise that is Covered Property is damaged by a Covered Cause of Loss, we may take all or any part of the property at an agreed or appraised value. If so, you may:

**(1)** Stamp "salvage" on the merchandise or its containers, if the stamp will not physically damage the merchandise; or

**(2)** Remove the brands or labels, if doing so will not physically damage the merchandise. You must re-label the merchandise or its containers to comply with the law.

We will pay reasonable costs you incur to perform these activities, however, we will only pay the lesser of the applicable limit of insurance for the damaged property or the total of the cost of stamping or re-labeled and the value of the property.

The most we will pay under this Coverage Extension is $10,000.

No deductible shall apply to this coverage.

**m. Spoilage**

**(1)** We will pay for direct physical loss or damage to your perishable Business Personal Property while at or within 1,000 feet of the described premises caused by spoilage due to changes in temperature or humidity resulting from:

**(a)** Complete or partial interruption of electrical power to the described premises due to conditions beyond your control; or

**(b)** Mechanical breakdown or failure of heating, cooling or humidity control equipment or apparatus at the described premises.

**(2)** We will not pay for loss or damage caused by or resulting from:

**(a)** The disconnection of any heating, cooling or humidity control equipment or apparatus from the source of power;

**(b)** The deactivation of electrical power caused by the manipulation of any switch or other device used to control the flow of electrical power or current; or

**(c)** The inability of an electric utility company or other power source to provide sufficient power due to:

**(i)** Lack of fuel; or

**(ii)** Governmental order;

**(d)** The inability of a power source at the described premises to provide sufficient power due to lack of generating capacity to meet demand; or

**(e)** Breaking of any glass that is a permanent part of any refrigerating, cooling or humidity control unit.

The most we will pay under this Coverage Extension is $25,000.

**n. Electronic Data Processing Equipment**

**(1) Coverage**

**(a)** Covered Property is either your property or the property of others in your care and used by you

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 454 of 834

in your business or profession at the premises listed in the Declarations, including:

**(i)** "Hardware"

**(ii)** "Data"

**(iii)** "Media"

**(b)** Property Not Covered:

**(i)** Accounts, records, documents and other valuable papers, except as they may be converted to "data" and stored on "media", and then only in that converted form.

**(ii)** Property of yours that you have rented, leased or loaned to someone else.

**(iii)** Electronic alarm systems.

**(c)** Coverage Extensions

**(i)** We will pay for loss or damage to backup "data" stored at an offsite premises.

**(ii)** We will pay up to $10,000 for loss or damage to your covered property while temporarily located away from your premises or while in transit within the territory covered by this policy.

**(iii)** We will pay for loss or damage to your covered property while in transit to, and while at a temporary storage location, to avoid imminent loss, provided we are notified in writing within 365 days of such move.

The most we will pay under this Coverage Extension is $50,000.

### o. Fine Arts

**(1) Coverage**
We will pay up to $10,000 to cover direct physical loss or damage to property defined as "Fine Arts" caused by a Covered Cause of Loss.

We will cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded by the Causes of Loss Form.

We will not pay for loss caused by repairs or restoration upon the covered property. We will not pay for any reduction in the value of damaged property after the damage has been repaired.

**(2) Valuation**
In the event of loss or damage, we will pay the actual cash value of the item, subject to the limitation of any one occurrence.  The actual cash value will be the price the insured paid for the item or the value as determined by an appraisal of the item not more than 360 days prior to the date of loss or damage.

In no event will the actual cash value exceed the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practical.

### p. Outdoor Signs

We will pay for direct physical loss or damage to all outdoor signs, whether or not the sign is attached to a building, at the described premises:

**(1)** Owned by you; or

**(2)** Owned by others but in your care, custody or control, subject to the terms and conditions of the Causes Of Loss Form and of the Building And Personal Property Coverage Form, as attached to this policy and as amended below.

For this coverage only, the **Causes Of Loss Form** is amended as follows:

CP990099NY 0619

Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

Page 7 of 20

453

    **a.** Paragraph **B., Exclusions** in the **Causes Of Loss Form** does not apply to this Coverage, except for:

      **(1)** Paragraph **B.1.c., Governmental Action**;

      **(2)** Paragraph **B.1.d., Nuclear Hazard**;

      **(3)** Paragraph **B.1.f., War And Military Action**;

      **(4)** Paragraph **B.2.a.;**

      **(5)** Paragraph **B.2.b.;**

      **(6)** Paragraph **B.2.h.;**

      **(7)** Paragraph **B.2.i.;**

      **(8)** Paragraph **B.2.m.;** and

      **(9)** Paragraph **B.3.**

    **b.** We will not pay for loss or damage caused by or resulting from:

      **(1)** Building decay;

      **(2)** Insect or vermin damage; or

      **(3)** Use of defective materials

      except as covered under the **Additional Coverage – Collapse**;

    **c.** We will not pay for loss or damage caused by or resulting from:

      **(1)** Hidden or latent defect other than described in **b.** above;

      **(2)** Rust;

      **(3)** Corrosion;

      **(4)** Wear and tear;

      **(5)** Mechanical breakdown;

      **(6)** Breakage during transportation; or

      **(7)** Breakage during installation, repairing, or dismantling.

    The most we will pay under this Coverage Extension is $15,000 per sign.

  **q.** **Ordinance Or Law**

    **(1) Application Of Coverage(s)**

    The coverage(s) provided by this Section applies with respect to an ordinance or law that regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises, subject to the following:

    **(a)** The requirements of the ordinance or law are in force at the time of loss; or the ordinance or law is promulgated or revised after the loss but prior to commencement of reconstruction or repair and provided that such ordinance or law requires compliance as a condition precedent to obtaining a building permit or certificate of occupancy.

    **(b)** Coverage under this Section applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered under this endorsement.

    **(c)** Coverage under this Section applies only if:

      **(i)** The building sustains direct physical damage that is covered under this policy and as a result of such damage, you are required to comply with the ordinance or law; or

      **(ii)** The building sustains both direct physical damage that is covered under this policy and direct physical damage that is not covered under this policy, and as a result of the building damage in its entirety, you are required to comply with the ordinance or law.

CP990099NY 0619

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 8 of 20

454

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 456 of 834

However, there is no coverage under this Section if the building sustains direct physical damage that is not covered under this policy, and such damage is the subject of the ordinance or law, even if the building has also sustained covered direct physical damage

**(d)** If coverage applies under this Section based on the terms of Paragraph **(1)(c)(ii)**, we will not pay the full amount of loss otherwise payable under the terms of **Coverages A**, **B**, and/or **C** of this Section. Instead, we will pay a proportion of such loss, meaning the proportion that the covered direct physical damage bears to the total direct physical damage.

(Paragraph (**5**) of this Section provides an example of this procedure.)

However, if the covered direct physical damage, alone, would have resulted in a requirement to comply with the ordinance or law, then we will pay the full amount of loss otherwise payable under the terms of **Coverages A**, **B** and/or **C** of this Section.

**(e)** We will not pay under this Section for:

**(i)** Enforcement of or compliance with any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(ii)** The costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(f)** We will not pay under this Section for any loss in value or any cost incurred due to an ordinance or law that you were required to comply with before the time of the current loss, even in the absence of building damage, if you failed to comply.

**(2) Coverage**

**(a) Coverage A – Coverage For Loss To The Undamaged Portion Of The Building**

With respect to the building that has sustained covered direct physical damage, we will pay under **Coverage A** for the loss in value of the undamaged portion of the building as a consequence of a requirement to comply with an ordinance or law that requires demolition of undamaged parts of the same building.

**Coverage A** is included within the Limit Of Insurance applicable to such building as shown in the Schedule or addressed elsewhere in this policy. **Coverage A** does not increase the Limit Of Insurance.

**(b) Coverage B – Demolition Cost Coverage**

With respect to the building that has sustained covered direct physical damage, we will pay the cost to demolish and clear the site of undamaged parts of the same building as a consequence of a requirement to comply with an ordinance or law that requires demolition of such undamaged property.

The Coinsurance Additional Condition does not apply to Demolition Cost Coverage.

**(c) Coverage C – Increased Cost Of Construction Coverage**

Paragraph **A.4.e.** is deleted and replaced with the following:

With respect to the building that has sustained covered direct physical damage, we will pay the increased cost to:

**(i)** Repair or reconstruct damaged portions of that building; and/or

**(ii)** Reconstruct or remodel undamaged portions of that building, whether or not demolition is required;

when the increased cost is a consequence of a requirement to comply with the minimum standards of the ordinance or law.

CP990099NY 0619
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.
Page 9 of 20

455

However:

**(a)** This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

**(b)** We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

The Coinsurance Additional Condition does not apply to Increased Cost of Construction Coverage.

**(3) Loss Payment**

**(a)** All following loss payment provisions, **(3)(b)** through **(3)(c)**, are subject to the apportionment procedures set forth in Paragraph **(1)(e)** of this Section.

**(b)** When there is a loss in value of an undamaged portion of a building to which **Coverage A** applies, the loss payment for that building, including damaged and undamaged portions, will be determined as follows:

**(i)** If the Replacement Cost Coverage Option applies and such building is being repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

**(a)** The amount you would actually spend to repair, rebuild or reconstruct such building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

**(b)** The Limit Of Insurance applicable to such building as shown in the Declarations or addressed elsewhere in this policy. (If this policy is endorsed to cover Earthquake and/or Flood as a Covered Cause of Loss, the Limit Of Insurance applicable to the building in the event of damage by such Covered Cause of Loss may be lower than the Limit Of Insurance that otherwise would apply.)

**(ii)** If the Replacement Cost Coverage Option applies and such building is not repaired or replaced, or if the Replacement Cost Coverage Option does not apply, we will not pay more than the lesser of:

**(a)** The actual cash value of such building at the time of loss; or

**(b)** The Limit Of Insurance applicable to such building as shown in the Declarations or addressed elsewhere in this policy. (If this policy is endorsed to cover Earthquake and/or Flood as a Covered Cause of Loss, the Limit Of Insurance applicable to the building in the event of damage by such Covered Cause of Loss may be lower than the Limit Of Insurance that otherwise would apply.)

**(c)** The most we will pay for the total of all covered losses for Demolition Cost and Increased Cost Of Construction, is the Combined Limit Of Insurance shown for **Coverages B** and **C** in the Schedule. Subject to this Combined Limit Of Insurance, the following loss payment provisions apply:

**(i)** For Demolition Cost, we will not pay more than the amount you actually spend to demolish and clear the site of the described premises.

**(ii)** With respect to the Increased Cost Of Construction:

**(a)** We will not pay for the increased cost of construction:

**(i)** Until the building is actually repaired or replaced, at the same or another premises; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the same premises.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

CP990099NY 0619

Page 10 of 20

(c) If the ordinance or law requires relocation to another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the new premises.

(4) Regardless of the number of buildings or locations, the terms of this Section apply per occurrence.

(5) Example of proportionate loss payment for Ordinance Or Law Coverage Losses (procedure as set forth in Paragraph **(1)(e)**).

Assume:

- Wind is a Covered Cause of Loss; Flood is an excluded Cause of Loss

- The building has a value of $200,000

- Total direct physical damage to building: $100,000

- The ordinance or law in this jurisdiction is enforced when building damage equals or exceeds 50% of the building's value

- Portion of direct physical damage that is covered (caused by wind): $30,000

- Portion of direct physical damage that is not covered (caused by flood): $70,000

- Loss under Ordinance Or Law **Coverage C** of this endorsement: $60,000

**Step 1:** Determine the proportion that the covered direct physical damage bears to the total direct physical damage.

$30,000 ÷ $100,000 = .30

**Step 2:** Apply that proportion to the Ordinance or Law loss.

$60,000 x .30 = $18,000

In this example, the most we will pay under this endorsement for the **Coverage C** loss is $18,000, subject to the applicable Limit Of Insurance and any other applicable provisions.

**Note**: The same procedure applies to losses under **Coverages A** and **B** of this Coverage Extension.

**IV.** THE **CAUSES OF LOSS – SPECIAL FORM, CP 10 30,** IS AMENDED AS FOLLOWS:

**A.** The Limit Of Insurance for **Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, Section E.,** is increased to $25,000.

**B. Additional Coverage Extensions, Section F.,** is amended as follows:

**1. Property In Transit, Section a.,** is deleted and replaced with the following:

**a.** You may extend the insurance provided by this Coverage Part to apply to your personal property in transit while:

(1) In or on a motor vehicle you own, lease, or operate; or

(2) Shipped at your own risk;

Between points in the coverage territory.

**2. Property In Transit, Section c.,** is deleted and replaced with the following:

**c.** The most we will pay for loss or damage under this Coverage Extension is $50,000.

CP990099NY 0619

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 11 of 20

457

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 459 of 834

**C.** The following are added to **Additional Coverage Extensions, Section F.**:

### 4. Utility Services – Direct Damage

We will pay for loss or damage to Covered Property, caused by the interruption of incoming utility service to the described premises. The interruption must result from direct physical loss or damage by a Covered Cause of Loss to the property described as follows under Utility Services:

**Utility Services**

**a.** Water supply services means the following types of property supplying water to the described premises:

**(1)** Pumping stations; and

**(2)** Water mains.

**b.** Wastewater removal property, meaning a utility system for removing wastewater and sewage from the described premises, other than a system designed primarily for draining storm water. The utility property includes sewer mains, pumping stations and similar equipment for moving the effluent to a holding, treatment or disposal facility, and includes such facilities.

Coverage under this endorsement does not apply to interruption in service caused by or resulting from a discharge of water or sewage due to heavy rainfall or flooding.

**c.** Communication supply services means property supplying communication services, including telephone, radio, microwave or television services to the described premises, such as:

**(1)** Communication transmission lines including optic fiber transmission lines;

**(2)** Coaxial cables; and

**(3)** Microwave radio relays except satellites.

Communication supply services does not include overhead transmission and distribution lines.

**d.** Power supply services means the following types of property supplying electricity, steam, or gas to the described premises:

**(1)** Utility generating plants;

**(2)** Switching stations;

**(3)** Substations;

**(4)** Transformers; and

**(5)** Transmission lines.

Power supply services does not include overhead transmission and distribution lines.

The most we will pay for loss or damage under this Coverage Extension is $50,000.

### 5. Sewer, Drain, Or Sump Discharge (Not Flood-Related)

We will pay for direct physical loss or damage to Covered Property, caused by or resulting from water or waterborne material that backs up, overflows, or is otherwise discharged from a sewer, drain or sump located on premises described in the declarations, provided such discharge is not caused by flood or flood-related conditions. Flood-related conditions include: surface water, waves (including tidal wave and tsunami), tides, tidal water, and overflow of any body of water, including storm surge. For the purpose of this endorsement, the term "drain" includes a roof drain and related fixtures.

CP990099NY 0619          Includes copyrighted material of Insurance Services Office, Inc.,
                                    with its permission.                          Page 12 of 20

458

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 460 of 834

We will not pay for direct damage if the discharge results from an insured's failure to perform routine maintenance or repair necessary to keep a sewer or drain or a sump, sump pump or related equipment, free from obstruction and in proper working condition.

We will not pay the cost of repairing or replacing a sewer, drain, sump, sump pump or any related parts or equipment.

To the extent that the Water Exclusion under the Cause of Loss Form might conflict with coverage provided here, the Water Exclusion does not apply to this coverage.

The most we will pay under this Coverage Extension for direct physical loss or damage in any policy year is $10,000.

**V.** THE **COMMERCIAL CRIME COVERAGE FORM (LOSS SUSTAINED FORM), CR 00 21,** IS AMENDED AS FOLLOWS:

**A. Insuring Agreements**

The first Paragraph of Section **A., Insuring Agreements**, is deleted in its entirety and replaced by the following:

Coverage is provided under the following Insuring Agreements for which a Limit Of Insurance is shown in the Schedule of Coverages and applies to loss that you sustain resulting directly from an "occurrence" taking place during the Policy Period shown in the policy, except as provided in Condition **E.1.k.** or **E.1.l.,** which is "discovered" by you during the Policy Period shown in the policy or during the period of time provided in the Extended Period To Discover Loss Condition **E.1.g.**:

Paragraph **A. 5**. **Outside the Premises** is amended by adding the following:

    **c.** In regards to **a.** and **b.** we will pay only for the amount of loss that you can not recover**:**

        **(i)** Under your contract with the "messenger" or armored motor vehicle; and

        **(ii)** From any insurance or indemnity carried by, or for the benefit of customers of, the "messenger" or armored motor vehicle company.

**B. Limit Of Insurance**

Section **B.** is deleted in its entirety and replaced with the following:

    **B. Limit Of Insurance**

    The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit Of Insurance shown in the Schedule of Coverages.

    If any loss is covered under more than one Insuring Agreement or Coverage, the most we will pay for such loss shall not exceed the largest Limit Of Insurance available under any one of those Insuring Agreements or Coverages.

**C. Deductible**

Section **C., Deductible**, is deleted and replaced with the following:

    **C. Deductible**

    We will not pay for loss resulting directly from an "occurrence" unless the amount of loss exceeds the greater of $500 or the deductible amount shown in the Schedule of Coverages under Crime coverage. if it is a higher deductible. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit Of Insurance.

CP990099NY 0619

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 13 of 20

459

**VI. THE BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM, CP 00 30,** IS AMENDED AS FOLLOWS:

**A. Additional Coverages**, **Section A.5.**, is amended as follows:

**1. Civil Authority**

The last two paragraphs of **Additional Coverages – Civil Authority** are deleted and replaced with the following:

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to twelve consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Twelve consecutive weeks after the date of that action; or

**(2)** When your Civil Authority Coverage for Business Income ends;

whichever is later.

**2. Extended Business Income – Other Than "Rental Value"**

Section **(1)(b)(ii)** of **Additional Coverages – Extended Business Income** is deleted and replaced with the following:

**(ii)** 180 consecutive days after the date determined in **(1)(a)** above.

**3. Extended Business Income – "Rental Value"**

Section **(2)(b)(ii)** of **Additional Coverages – Extended Business Income** is deleted and replaced with the following:

**(ii)** 180 consecutive days after the date determined in **(2)(a)** above.

**4. Interruption Of Computer Operations**

Paragraph **(4)** of **Additional Coverages – Interruption Of Computer Operations** is deleted and replaced with the following:

**(4)** The most we will pay under this Additional Coverage is $5,000 for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved.

If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption that begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

**5. Newly Acquired Locations**

**(1) Section b.** of **Coverage Extension – Newly Acquired Locations** is deleted and replaced with the following:

**b.** The most we will pay under this coverage, for the sum of Business Income loss and Extra Expense incurred, is $125,000 at each location.

CP990099NY 0619

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 14 of 20

460

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 462 of 834

**(2)** Section **c.** of **Coverage Extension – Newly Acquired Locations** is deleted and replaced with the following:

**c.** Insurance under this coverage for each newly acquired location will end when any of the following first occurs:

**(1)** This policy expires;

**(2)** 180 days expire after you acquire or begin to construct the property; or

**(3)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

**B.** The following coverages are added to **Additional Coverages, Section A.5.:**

**e.** **Dependent Properties**

**(1)** We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to "dependent property" caused by or resulting from a Covered Cause of Loss. However, this Additional Coverage does not apply when the only loss to "dependent property" is loss or damage to electronic data, including destruction or corruption of electronic data. If the "dependent property" sustains loss or damage to electronic data and other property, coverage under this endorsement will not continue once the other property is repaired, rebuilt or replaced. The term electronic data has the meaning set forth in the Coverage Form to which this endorsement applies.

**(2)** A Business Income loss arising out of loss or damage at the premises of a "dependent property" which is located outside of the Coverage Territory is not covered under this Additional Coverage.

**(3)** The provisions of the Business Income Coverage Form respecting direct physical loss or damage at dependent property premises will apply separately to each separate dependent property premises, except that, with respect to Limits, two or more dependent properties sustaining loss in the same occurrence shall be considered as one dependent property.

**(4)** Under Resumption of Operations, Section **C.3.c.**, the following is added:

We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available:

**(a)** Source of materials; or

**(b)** Outlet for your products.

**(5)** The most we will pay for your Business Income and Extra Expense loss under this Additional Coverage from any one or more dependent property premises as described in **5.a. (1), (2), (3),** and **(4)** above, is the lesser of the Business Income Coverage limit or $100,000.

**f.** **Utility Services – Time Element**

**(1) Coverage**

Coverage for Business Income and/or Extra Expense, as provided and limited in the applicable Coverage Form, is extended to apply to a "suspension" of "operations" at the described premises caused by an interruption of an incoming utility service to that premises. The interruption must result from direct physical loss or damage by a Covered Cause of Loss to the property described in Paragraph **5.** below. .

CP990099NY 0619

Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

Page 15 of 20

461

**(2) Waiting Period**

Coverage begins after the same number of hours applicable to Business Income Coverage under the Business Income Coverage Form or as amended**,** from the time of direct physical loss or damage by a covered cause of loss to the premises of the provider of the utility service.

**(3) Duration Of Coverage**

**(a)** Begins:

**(i)** Following expiration of the waiting period, if any, for Business Income; or

**(ii)** At the time of interruption of utility service to the described premises, for Extra Expense and

**(b)** Ends when:

**(i)** "Operations" are fully resumed by any legal means; or

**(ii)** "Operations" could be fully resumed with reasonable speed following restoration of utility service to the described premises;

whichever occurs first.

The expiration date of this policy will not cut short the duration of coverage under this endorsement.

The "period of restoration" definition in the Business Income Coverage Form, or in any endorsement amending the Coverage Form, does not apply to the coverage provided under this Additional Coverage.

**(4) Exception**

Coverage under this endorsement does not apply to Business Income loss or Extra Expense related to interruption in utility service that causes loss or damage to electronic data, including destruction or corruption of electronic data. The term electronic data has the meaning set forth in the Coverage Form to which this endorsement applies.

**(5) Utility Services**

**(a)** Water supply services, meaning the following types of property supplying water to the described premises:

**(i)** Pumping stations; and

**(ii)** Water mains.

**(b)** Wastewater removal property, meaning a utility system for removing wastewater and sewage from the described premises, other than a system designed primarily for draining storm water. The utility property includes sewer mains, pumping stations and similar equipment for moving the effluent to a holding, treatment or disposal facility, and includes such facilities.

Coverage under this endorsement does not apply to interruption in service caused by or resulting from a discharge of water or sewage due to heavy rainfall or flooding.

**(c)** Communication supply services, meaning property supplying communication services, including telephone, radio, microwave or television services, to the described premises, such as:

**(i)** Communication transmission lines, including optic fiber transmission lines;

**(ii)** Coaxial cables; and

**(iii)** Microwave radio relays except satellites.

Communication supply services does not include overhead transmission  and distribution lines.

CP990099NY 0619          Includes copyrighted material of Insurance Services Office, Inc., with its permission.          Page 16 of 20

462

**(d)** Power supply services**,** meaning the following types of property supplying electricity, steam or gas to the described premises:

**(i)** Utility generating plants;

**(ii)** Switching stations;

**(iii)** Substations;

**(iv)** Transformers; and

**(v)** Transmission lines.

Power supply services does not include overhead transmission and distribution lines.

**(6)** The Coinsurance Additional Condition does not apply to this coverage.

**(7)** The most we will pay under this Additional Coverage, arising from any one or more off-premises utility services as described in **(5)(a), (5)(b),** and **(5)(c)** above is the lesser of the Business Income limit or $10,000

**g. Pollutant Clean-up And Removal**

**(1)** If we pay your expense to extract "pollutants" from land or water at the described premises because the discharge, dispersal, seepage, migration, release or escape of the "pollutants" was caused by or resulted from a Covered Cause of Loss that occurs during the policy period, we will pay the amount of actual and necessary loss of Business Income you sustain during the increased period of "suspension" of "operations" caused by or resulting from the extraction and removal of these "pollutants".

**(2)** The most we will pay under this Additional Coverage is the lesser of the Business Income limit or $25,000.

**h. Spoilage**

**(1)** We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to "perishable stock" held within refrigeration equipment at a scheduled premise, caused by or resulting from:

**(a)** A Covered Cause of Loss damaging the refrigeration equipment or damaging the on-site equipment controlling or monitoring the refrigeration equipment;

**(b)** Breakdown of the refrigeration equipment or of the on-site controlling or monitoring equipment; or

**(c)** Contamination of the "perishable stock" by a refrigerant.

**(2**) We will not pay for loss or damage caused by or resulting from:

**(a)** The disconnection of any refrigerating, cooling or humidity control system from the source of power;

**(b)** The deactivation of electrical power caused by the manipulation of any switch or other device used to control the flow of electrical power or current;

**(c)** The inability of an Electrical Utility Company or other power source to provide sufficient power due to:

**(i)** Lack of fuel; or

**(ii)** Governmental order;

**(d)** The inability of a power source at the described premises to provide sufficient power due to lack of generating capacity to meet demand; or

Includes copyrighted material of Insurance Services Office, Inc.,

CP990099NY 0619 with its permission. Page 17 of 20

463

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 465 of 834

**(e)** Breaking of any glass that is a permanent part of any refrigerating, cooling or humidity control unit.

**(3)** The most we will pay under this Additional Coverage is the lesser of the Business Income limit or $25,000.

**i.  Web Site Service Provider**

**(1)** We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to an independent contractor web site service provider, caused by or resulting from a Covered Cause of Loss. The web site service must maintain a web site on your behalf, which is used to produce business for you. However, coverage under this Extension does not apply when the only loss to the web site service provider is loss or damage to electronic data, including destruction or corruption of electronic data. If the web site service provider sustains loss or damage to electronic data and other property, coverage under this endorsement will not continue once the other property is repaired, rebuilt or replaced. The term electronic data has the meaning set forth in the Coverage Form to which this endorsement applies.

**(2)** Under the **Loss Determination** Loss Condition, the following is added to the **Resumption Of Operations** Provision:

We will reduce the amount of your Business Income loss to the extent you can resume "operations", in whole or in part, by using a back-up copy of the web site design code.

**(3)** The most we will pay under this Additional Coverage is the lesser of the Business Income limit or $25,000.

**j.  Sewer, Drain Or Sump Discharge (Not Flood-Related)**

**(1)** We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to Covered Property caused by or resulting from water or waterborne material that backs up, overflows, or is otherwise discharged from a sewer, drain or sump located on premises described in the declarations, provided such discharge is not caused by flood or flood-related conditions. Flood-related conditions include: surface water, waves (including tidal wave and tsunami), tides, tidal water, and overflow of any body of water, including storm surge. For the purpose of this endorsement, the term "drain" includes a roof drain and related fixtures.

**(2)** We will not pay for the actual loss of Business Income if the discharge results from an insured's failure to perform routine maintenance or repair necessary to keep a sewer or drain or a sump, sump pump or related equipment, free from obstruction and in proper working condition.

We will not pay the cost of repairing or replacing a sewer, drain, sump, sump pump or any related parts or equipment.

To the extent that the Water Exclusion under the Cause of Loss Form might conflict with coverage provided here, the Water Exclusion does not apply to this coverage.

**(3)** The most we will pay under this Additional Coverage in any policy year is the lesser of the Business Income limit or $25,000**.**

## VII. DEFINITIONS

The following definitions are intended for this form only and supersede any of those which are elsewhere stated or defined outside of this endorsement.

**A.** "Data" means information stored electronically and includes facts, instructions, concepts and programs converted to a form useable in electronic data processing operations.

Includes copyrighted material of Insurance Services Office, Inc.,
CP990099NY 0619                    with its permission.                    Page 18 of 20

464

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 466 of 834

**B.** "Dependent property" means property operated by others whom you depend on to:

1. Deliver materials or services to you, or to others for your account (Contributing Locations). But any property which delivers any of the following services is not a Contributing Location with respect to such services:

   a. Water supply services;

   b. Power supply services;

   c. Wastewater removal services; or

   d. Communication supply services, including services relating to Internet access or access to any electronic network;

2. Accept your products or services (Recipient Locations);

3. Manufacture products for delivery to your customers under contract of sale (Manufacturing Locations); or

4. Attract customers to your business (Leader Locations).

**C.** "Fine Arts" means paintings, etchings, pictures, tapestries, rare or art glass, art glass windows, valuable rugs, statuary, sculptures, "antique" furniture, "antique" jewelry, bric-a-brac. porcelains, and similar property of rarity, historical value or artistic merit.

"Antique" means an object having value because its:

1. craftsmanship is in the style or fashion of former times; and

2. age is 100 years old or older.

**D.** "Hardware" means a network of electronic machine components (microprocessors) capable of accepting instructions and information, processing the information according to the instructions, and producing desired results.

1. "Hardware" includes but is not limited to:

   a. mainframe and mid-range computers and network servers;

   b. personal computers and workstations;

   c. laptops, palmtops, notebook PCs, other portable computer devices and accessories including, but not limited to, multimedia projectors; and

   d. peripheral data processing equipment, including but not limited to, printers, keyboards, monitors, and modems.

2. "Hardware" does not include:

   a. "software";

   b. "telecommunications equipment";

   c. "reproduction equipment";

   d. "protection and control systems"; and

   e. "off-site server" and "on-site server".

**E.** "Media" means processing, recording, or storage media used with "hardware". This includes but is not limited to films, tapes, cards, discs, drums, cartridges, or cells.

**F.** "Period of restoration", with respect to "dependent property", means the period of time that:

1. Begins 72 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the premises of the "dependent property"; and

2. Ends on the date when the property at the premises of the "dependent property" should be repaired, rebuilt or replaced with reasonable speed and similar quality.

"Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

a. Regulates the construction, use or repair, or requires the tearing down, of any property; or

CP990099NY 0619
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Page 19 of 20

465

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 467 of 834

   **b.** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**G.** "Period of restoration", with respect to Web Site Service Provider Coverage, means the period of time that:

   **1.** Begins at the time of direct physical loss or damage at the property premises of the Web Site Services Provider, caused by or resulting from any Covered Cause of Loss shown for Business Income Coverage at the described premises; and

   **2.** Ends on the earlier of:

      **a.** The date when the property at the Web Site Services Provider should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      **b.** The date when business of the Web Site Service Provider's property is resumed at a new permanent location; or

      **c.** The end of 60 continuous days.

"Period of restoration" does not include any increased period required to repair or reconstruct the property to comply with the minimum standards of any ordinance or law, in force at the time of loss that regulates the construction or repair, or requires the tearing down of any property.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

**H.** "Period of restoration" with respect to coverages other than "dependent property" and Web Site Service Provider means the period of time that:

   **1.** Begins:

      **a.** 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

      **b.** Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

      caused by or resulting from any Covered Cause of Loss at the described premises; and

   **2.** Ends on the earlier of:

      **a.** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      **b.** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

   **1.** Regulates the construction, use or repair, or requires the tearing down, of any property; or

   **2.** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**I.** "Perishable stock" "Perishable stock" means personal property:

   **1.** Maintained under controlled conditions for its preservation; and

   **2.** Susceptible to loss or damage if the controlled conditions change.

**J.** "Suspension" means:

   **1.** The slowdown or cessation of your business activities; or

   **2.** That a part or all of the described premises is rendered un-tenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

POLICY NUMBER: WPP1595109 03

**COMMERCIAL PROPERTY**
**CP 04 05 09 17**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ORDINANCE OR LAW COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
STANDARD PROPERTY POLICY

**SCHEDULE**

| Building Number/ Premises Number | Coverage A | Coverage B Limit Of Insurance | Coverage C Limit Of Insurance | Coverages B And C Combined Limit Of Insurance |
|---|---|---|---|---|
| 1 **/** 1-4 | ☒ | $ See Schedule A | $ See Schedule A | $                          * |
| / | ☐ | $ | $ | $                          * |
| / | ☐ | $ | $ | $                          * |
| **Post-Loss Ordinance Or Law Option:   Yes** ☒ **No** ☐ | | | | |
| *Do **not** enter a Combined Limit of Insurance if individual Limits of Insurance are selected for Coverages **B** and **C,** or if one of these Coverages is not applicable. | | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | |

**A.** Each Coverage – Coverage **A,** Coverage **B** and Coverage **C** – is provided under this endorsement only if that Coverage(s) is chosen by entry in the above Schedule and then only with respect to the building identified for that Coverage(s) in the Schedule.

**B. Application Of Coverage(s)**

The Coverage(s) provided by this endorsement applies with respect to an ordinance or law that regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises, subject to the following:

**1.** The requirements of the ordinance or law are in force at the time of loss. But if the Post-Loss Ordinance Or Law Option is indicated in the Schedule as being applicable, then Paragraph **B.2.** applies instead of this Paragraph **B.1.**

**2.** The requirements of the ordinance or law are in force at the time of loss; or the ordinance or law is promulgated or revised after the loss but prior to commencement of reconstruction or repair and provided that such ordinance or law requires compliance as a condition precedent to obtaining a building permit or certificate of occupancy.

**3.** Coverage under this endorsement applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered under this endorsement.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 469 of 834

4. Coverage under this endorsement applies only if:

   **a.** The building sustains only direct physical damage that is covered under this policy and as a result of such damage, you are required to comply with the ordinance or law; or

   **b.** The building sustains both direct physical damage that is covered under this policy and direct physical damage that is not covered under this policy, and as a result of the building damage in its entirety, you are required to comply with the ordinance or law.

   However, there is no coverage under this endorsement if the building sustains direct physical damage that is not covered under this policy, and such damage is the subject of the ordinance or law, even if the building has also sustained covered direct physical damage.

5. If coverage applies under this endorsement based on the terms of Paragraph **B.4.b.,** we will not pay the full amount of loss otherwise payable under the terms of Coverages **A, B,** and/or **C** of this endorsement. Instead, we will pay a proportion of such loss, meaning the proportion that the covered direct physical damage bears to the total direct physical damage.

   (Paragraph **F.** of this endorsement provides an example of this procedure.)

   However, if the covered direct physical damage, alone, would have resulted in a requirement to comply with the ordinance or law, then we will pay the full amount of loss otherwise payable under the terms of Coverages **A, B** and/or **C** of this endorsement.

6. We will not pay under this endorsement for:

   **a.** Enforcement of or compliance with any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

   **b.** The costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

7. We will not pay under this endorsement for any loss in value or any cost incurred due to an ordinance or law that you were required to comply with before the time of the current loss, even in the absence of building damage, if you failed to comply.

## C. Coverage

1. **Coverage A – Coverage For Loss To The Undamaged Portion Of The Building**

   With respect to the building that has sustained covered direct physical damage, we will pay under Coverage **A** for the loss in value of the undamaged portion of the building as a consequence of a requirement to comply with an ordinance or law that requires demolition of undamaged parts of the same building.

   Coverage **A** is included within the Limit Of Insurance applicable to such building as shown in the Declarations or addressed elsewhere in this policy. Coverage **A** does not increase the Limit of Insurance.

2. **Coverage B – Demolition Cost Coverage**

   With respect to the building that has sustained covered direct physical damage, we will pay the cost to demolish and clear the site of undamaged parts of the same building as a consequence of a requirement to comply with an ordinance or law that requires demolition of such undamaged property.

   The Coinsurance Additional Condition does not apply to Demolition Cost Coverage.

3. **Coverage C – Increased Cost Of Construction Coverage**

   **a.** With respect to the building that has sustained covered direct physical damage, we will pay the increased cost to:

      **(1)** Repair or reconstruct damaged portions of that building; and/or

      **(2)** Reconstruct or remodel undamaged portions of that building, whether or not demolition is required;

      when the increased cost is a consequence of a requirement to comply with the minimum standards of the ordinance or law.

      However:

      **(1)** This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

© Insurance Services Office, Inc., 2016

468

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 470 of 834

**(2)** We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

The Coinsurance Additional Condition does not apply to Increased Cost of Construction Coverage.

**b.** When a building is damaged or destroyed and Coverage **C** applies to that building in accordance with Paragraph **C.3.a.** above, coverage for the increased cost of construction also applies to repair or reconstruction of the following, subject to the same conditions stated in Paragraph **C.3.a.:**

**(1)** The cost of excavations, grading, backfilling and filling;

**(2)** Foundation of the building;

**(3)** Pilings; and

**(4)** Underground pipes, flues and drains.

The items listed in **b.(1)** through **b.(4)** above are deleted from Property Not Covered, but only with respect to the coverage described in this provision, **3.b.**

**D. Loss Payment**

**1.** All following loss payment provisions, **D.2.** through **D.5.,** are subject to the apportionment procedures set forth in Paragraph **B.5.** of this endorsement.

**2.** When there is a loss in value of an undamaged portion of a building to which Coverage **A** applies, the loss payment for that building, including damaged and undamaged portions, will be determined as follows:

**a.** If the Replacement Cost Coverage Option applies and such building is being repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

**(1)** The amount you would actually spend to repair, rebuild or reconstruct such building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

**(2)** The Limit Of Insurance applicable to such building as shown in the Declarations or addressed elsewhere in this policy. (If this policy is endorsed to cover Earthquake and/or Flood as a Covered Cause of Loss, the Limit of Insurance applicable to the building in the event of damage by such Covered Cause of Loss may be lower than the Limit of Insurance that otherwise would apply.)

**b.** If the Replacement Cost Coverage Option applies and such building is **not** repaired or replaced, or if the Replacement Cost Coverage Option does **not** apply, we will not pay more than the lesser of:

**(1)** The actual cash value of such building at the time of loss; or

**(2)** The Limit Of Insurance applicable to such building as shown in the Declarations or addressed elsewhere in this policy. (If this policy is endorsed to cover Earthquake and/or Flood as a Covered Cause of Loss, the Limit of Insurance applicable to the building in the event of damage by such Covered Cause of Loss may be lower than the Limit of Insurance that otherwise would apply.)

**3.** Unless Paragraph **D.5.** applies, loss payment under Coverage **B** – Demolition Cost Coverage will be determined as follows:

We will not pay more than the lesser of the following:

**a.** The amount you actually spend to demolish and clear the site of the described premises; or

**b.** The applicable Limit Of Insurance shown for Coverage **B** in the Schedule.

**CP 04 05 09 17**  © Insurance Services Office, Inc., 2016  **Page 3 of 5**

469

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 471 of 834

4. Unless Paragraph **D.5.** applies, loss payment under Coverage **C** – Increased Cost Of Construction Coverage will be determined as follows:

a. We will not pay under Coverage **C**:

(1) Until the building is actually repaired or replaced, at the same or another premises; and

(2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

b. If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay under Coverage **C** is the lesser of:

(1) The increased cost of construction at the same premises; or

(2) The applicable Limit Of Insurance shown for Coverage **C** in the Schedule.

c. If the ordinance or law requires relocation to another premises, the most we will pay under Coverage **C** is the lesser of:

(1) The increased cost of construction at the new premises; or

(2) The applicable Limit Of Insurance shown for Coverage **C** in the Schedule.

5. If a Combined Limit Of Insurance is shown for Coverages **B** and **C** in the Schedule, Paragraphs **D.3.** and **D.4.** do not apply with respect to the building that is subject to the Combined Limit, and the following loss payment provisions apply instead:

The most we will pay, for the total of all covered losses for Demolition Cost and Increased Cost of Construction, is the Combined Limit Of Insurance shown for Coverages **B** and **C** in the Schedule. Subject to this Combined Limit of Insurance, the following loss payment provisions apply:

a. For Demolition Cost, we will not pay more than the amount you actually spend to demolish and clear the site of the described premises.

b. With respect to the Increased Cost of Construction:

(1) We will not pay for the increased cost of construction:

(a) Until the building is actually repaired or replaced, at the same or another premises; and

(b) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

(2) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the same premises.

(3) If the ordinance or law requires relocation to another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the new premises.

E. The terms of this endorsement apply separately to each building to which this endorsement applies.

F. Example of proportionate loss payment for Ordinance Or Law Coverage Losses (procedure as set forth in Paragraph **B.5.**).

Assume:

- Wind is a Covered Cause of Loss; Flood is an excluded Cause of Loss
- The building has a value of $200,000
- Total direct physical damage to building: $100,000
- The ordinance or law in this jurisdiction is enforced when building damage equals or exceeds 50% of the building's value
- Portion of direct physical damage that is covered (caused by wind): $30,000
- Portion of direct physical damage that is not covered (caused by flood): $70,000
- Loss under Ordinance Or Law Coverage **C** of this endorsement: $60,000

**Step 1:** Determine the proportion that the covered direct physical damage bears to the total direct physical damage.

$30,000 ÷ $100,000 = .30

**Step 2:** Apply that proportion to the Ordinance or Law loss.

$60,000 x .30 = $18,000

In this example, the most we will pay under this endorsement for the Coverage **C** loss is $18,000, subject to the applicable Limit of Insurance and any other applicable provisions.

**Note:** The same procedure applies to losses under Coverages **A** and **B** of this endorsement.

© Insurance Services Office, Inc., 2016

CP 04 05 09 17   470

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 472 of 834

**G.** The following definition is added:

"Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 473 of 834

This page intentionally left blank

POLICY NUMBER: WPP1595109 03
EFFECTIVE DATE: 12/31/2020

COMMERCIAL PROPERTY
CP9 10 03 03 12

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EARTHQUAKE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

### SCHEDULE*

Total Aggregate Earthquake Limit      $  See Schedule B

Premises Limits, Deductible and Waiting Period:

| Prem. No./ Bldg. No. | Aggregate Limit | Per Occurrence Limit | Per Occurrence Physical Damage Deductible | Per Occurrence Business Income Waiting Period |
|---|---|---|---|---|
| 1-4/1 / / | See Schedule B | See Schedule B | 25,000 | 72 Hours |

Where only a Premises Number is shown, the Aggregate and Per Occurrence Limits and the Deductible apply to the entire premises, regardless of the number of buildings at that premises.

Where both a Premises Number and Building Number(s) are shown, the Aggregate and Per Occurrence Limits and the Deductible apply separately to each identified building.

* Information required to complete the Schedule, if not shown on this endorsement, will be shown in the Declarations.

**I.** Section **B. Exclusions**, Item **b. Earth Movement**, of **CAUSES OF LOSS - SPECIAL FORM CP 10 30** is deleted and replaced with the following, but only as respects those premises and buildings described in the schedule above:

**b. Earth Movement**

**(1)** Landslide, including any earth sinking, rising or shifting related to such event;

**(2)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

**(3)** Earth sinking, rising or shifting (other than sinkhole collapse and earthquake, including any earth sinking, rising or shifting related to such event), including soil conditions that cause settling, cracking or other disarrangement of foundations or other parts of realty.  Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in **b.(1)** through **(3)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

All earthquakes and aftershocks that occur within any 168 hour period during the term of this endorsement will constitute a single occurrence.

**(4)** Volcanic eruption, explosion or effusion.  But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

**CP9 10 03 03 12**                                                                           **Page 1 of 3**
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

473

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 475 of 834

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

**(a)** Airborne volcanic blast or airborne shock waves;

**(b)** Ash, dust or particulate matter; or

**(c)** Lava flow.

All volcanic eruptions that occur within any 168 hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

**II.** The following is hereby added to section **C. Limitations of the CAUSES OF LOSS — SPECIAL FORM**:

The most we will pay for loss or damage caused by or resulting from earthquake, including any earth sinking, rising or shifting related to such event, during any 12 month period, or fraction thereof beginning with the effective date shown in the declarations and ending with the next occurring policy anniversary or expiration date (whichever comes first), regardless of the number of occurrences and buildings involved, is the Total Aggregate Earthquake Limit shown in the Schedule of the Earthquake Endorsement. Subject to the Total Aggregate Earthquake Limit, the most we will pay for such loss or damage to a premises or building during any 12 month period, or fraction thereof beginning with the effective date shown in the declarations and ending with the next occurring policy anniversary or expiration date (whichever comes first), regardless of the number of occurrences, is the Aggregate Limit shown in the Schedule corresponding to that premises or building. Subject to the applicable aggregate limits, the most we will pay for such loss or damage to a premises or building in any one occurrence is the Per Occurrence Limit shown in the Schedule corresponding to that premises or building. In no event will we pay more than any applicable limit shown in the Schedule for any such loss or damage, as set forth above, even if a cause or event other than earthquake directly or indirectly contributes concurrently or in any sequence with earthquake to the loss or damage, whether or not such other cause or event is a Covered Cause of Loss. However, if earthquake results in fire or explosion, then:

**a.** the most we will pay for the loss or damage caused by that fire or explosion will be the applicable Limit of Insurance shown in the Declarations; and

**b.** the most we will pay for the loss or damage caused by or resulting from earthquake and any contributing cause or event other than fire or explosion will be the applicable Per Occurrence Limit shown in the Schedule, subject to the applicable aggregate limits shown in the Schedule.

But in no event will we pay more for the combined loss or damage described in **a.** and **b.** above than the applicable Per Occurrence Limit shown in the Schedule, subject to the applicable aggregate limits shown in the Schedule, or the applicable Limit of Insurance shown in the Declarations, whichever is greater.

**III.** The following is added to Section **D. Deductible** of the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**:

With respect to loss or damage caused by or resulting from earthquake, including any earth sinking, rising or shifting related to such event, the Deductible shown in the Schedule of the Earthquake Endorsement replaces the Deductible shown in the Declarations, even if a cause or event other than earthquake directly or indirectly contributes concurrently or in any sequence with earthquake to the loss or damage, whether or not such other cause or event is a Covered Cause of Loss. However, if earthquake results in fire or explosion, then:

**a.** the Deductible shown in the Declarations will apply to the loss or damage caused by that fire or explosion; and

**b.** the Deductible shown in the Schedule of the Earthquake Endorsement will apply to the loss or damage caused by or resulting from earthquake and any contributing cause or event other than fire or explosion.

If an endorsement to the policy applies a higher deductible than the Deductible shown in the Schedule of the Earthquake Endorsement to loss or damage to which the Deductible shown in the Schedule of the

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 476 of 834

Earthquake Endorsement would otherwise be applicable, then the higher deductible will apply to the extent applicable.

The Deductible shown in the Schedule of the Earthquake Endorsement, to the extent applicable, will apply separately for each occurrence and premises or building to which it corresponds on the Schedule and does not apply to Business Income, "Rental Value" loss or Extra Expense.

If the adjusted amount of such loss or damage is less than or equal to the Deductible, we will not pay for that loss or damage.  If the adjusted amount exceeds the Deductible, we will then subtract the amount of the Deductible from the adjusted amount, and will pay the resulting amount or the Limit of Insurance, whichever is less.

**IV.** With respect to loss or damage caused by or resulting from earthquake, including any earth sinking, rising or shifting related to such event, even if a cause or event other than earthquake directly or indirectly contributes concurrently or in any sequence with earthquake to the loss or damage, whether or not such other cause or event is a Covered Cause of Loss, the definition of "period of restoration" in Section **F. Definitions** of the **BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM** is deleted and replaced with the following:

**3.** "Period of restoration" means the period of time that:

   **a.** Begins:

   **(1)** after the applicable Waiting Period shown in the Schedule of the Earthquake Endorsement has elapsed for Business Income or "Rental Value" coverage; or

   **(2)** Immediately after the time of direct physical loss or damage at the building for Extra Expense coverage; and

   **b.** Ends on the earlier of:

   **(1)** The date when the property at the building should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

   **(2)** The date when business is resumed at a new permanent location.

   The Waiting Period:

   **(1)** will apply separately at each building for each occurrence, as set forth in the Schedule of the Earthquake Endorsement;

   **(2)** begins immediately after the time of direct physical loss or damage at the building.

   "Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

   **(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

   **(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

**CP9 10 03 03 12**
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
**Page 3 of 3**

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 477 of 834

This page intentionally left blank

POLICY NUMBER: WPP1595109 03
EFFECTIVE DATE: 12/31/2020

**COMMERCIAL PROPERTY**
CP9 10 08 03 12

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# SUPERIOR FLOOD ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

### SCHEDULE*

Total Aggregate Flood Limit        $  See Schedule C

Premises Limits, Deductible and Waiting Period:

| Prem. No./ Bldg. No. | Aggregate Limit | Per Occurrence Limit | Per Occurrence Physical Damage Deductible | Per Occurrence Business Income Waiting Period |
|---|---|---|---|---|
| 1-4/1 / / | See Schedule C | See Schedule C | $25,000 | 72 Hours |

Where only a Premises Number is shown, the Aggregate and Per Occurrence Limits and the Deductible apply to the entire premises, regardless of the number of buildings at that premises.

Where both a Premises Number and Building Number(s) are shown, the Aggregate and Per Occurrence Limits and the Deductible apply separately to each identified building.

* Information required to complete the Schedule, if not shown on this endorsement, will be shown in the Declarations.

---

**I.**   The **CAUSES OF LOSS — SPECIAL FORM** is changed as follows, but only as respects those premises and buildings described in the Schedule above:

The term Covered Cause of Loss includes the Additional Coverage — Flood as described and limited below.

**A.**   We will pay for direct physical loss of or damage to Covered Property caused by or resulting from:

**1.**   Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

**2.**   Mudslide or Mudflow;

**3.**   Water that backs up or overflows from a sewer, drain or sump;

**4.**   Water under the ground surface pressing on, or flowing or seeping through:

**a.**   Foundations, walls, floors or paved surfaces;

**b.**   Basements, whether paved or not;

**c.**   Doors, windows or other openings.

**B.**   **Exclusions B.1.g. Water** does not apply to the extent that coverage is provided under this endorsement.

**CP9 10 08 03 12**                                                                      **Page 1 of 3**
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 479 of 834

**C.** If endorsement **CP9 04 02** or **CP9 04 03** is a part of the policy, the **WATER BACK UP OF SEWERS AND DRAINS** section of that endorsement is hereby deleted.

**II.** The following is added to Section **C. Limitations** of the **CAUSES OF LOSS — SPECIAL FORM**:

The most we will pay for loss or damage covered under the Additional Coverage — Flood, including both Property Damage and Business Interruption, during any 12 month period, or fraction thereof beginning with the effective date shown in the declarations and ending with the next occurring policy anniversary or expiration date (whichever comes first), regardless of the number of occurrences and premises or buildings involved, is the Total Aggregate Flood Limit shown in the Schedule of the Flood Endorsement.  Subject to the Total Aggregate Flood Limit, the most we will pay for such loss or damage to a premises or building during any 12 month period, or fraction thereof beginning with the effective date shown in the declarations and ending with the next occurring policy anniversary or expiration date (whichever comes first), regardless of the number of occurrences, is the Aggregate Limit shown in the Schedule corresponding to that premises or building.  Subject to the applicable aggregate limits, the most we will pay for such loss or damage to a premises or building in any one occurrence is the Per Occurrence Limit shown in the Schedule corresponding to that premises or building.  In no event will we pay more than any applicable limit shown in the Schedule for any such loss or damage, as set forth above, even if a cause or event other than flood, as described in the Additional Coverage — Flood, directly or indirectly contributes concurrently or in any sequence with flood to the loss or damage, whether or not such other cause or event is a Covered Cause of Loss.  However, if flood, as described in that coverage, results in fire, explosion or sprinkler leakage, then:

**a.** the most we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage will be the applicable Limit of Insurance shown in the Declarations; and

**b.** the most we will pay for the loss or damage caused by or resulting from flood and any contributing cause or event other than fire, explosion or sprinkler leakage will be the Per Occurrence Limit shown in the Schedule, subject to the applicable aggregate limits shown in the Schedule.

But in no event will we pay more for the combined loss or damage described in **a.** and **b.** above than the applicable Per Occurrence Limit shown in the Schedule, subject to the applicable aggregate limits shown in the Schedule, or the applicable Limit of Insurance shown in the Declarations, whichever is greater.

**III.** The following is added to Section **D. Deductible** of the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**:

With respect to coverage under the Additional Coverage — Flood, the Deductible shown in the Schedule of the Flood Endorsement replaces the Deductible shown in the Declarations, even if a cause or event other than flood, as described in the Additional Coverage — Flood, directly or indirectly contributes concurrently or in any sequence with flood to the loss or damage, whether or not such other cause or event is a Covered Cause of Loss.  However, if flood results in fire, explosion or sprinkler leakage, then:

**a.** the Deductible shown in the Declarations will apply to the loss or damage caused by that fire, explosion or sprinkler leakage; and

**b.** the Deductible shown in the Schedule of the Flood Endorsement will apply to the loss or damage caused by or resulting from flood and any contributing cause or event other than fire, explosion or sprinkler leakage.

If an endorsement to the policy applies a higher deductible than the Deductible shown in the Schedule of the Flood Endorsement to loss or damage to which the Deductible shown in the Schedule of the Flood Endorsement would otherwise be applicable, then the higher deductible will apply to the extent applicable.

The Deductible shown in the Schedule of the Flood Endorsement, to the extent applicable, will apply separately for each occurrence and for each premises or building to which it corresponds on the Schedule, unless otherwise stated and does not apply to Business Income, "Rental Value" loss or Extra Expense.

If the adjusted amount of loss or damage covered under Additional Coverage — Flood is less than or equal to the Deductible, we will not pay for that loss or damage.  If the adjusted amount exceeds the Deductible, we

**CP9 10 08 03 12**                                                                                   **Page 2 of 3**

will then subtract the amount of the Deductible from the adjusted amount, and will pay the resulting amount or the Limit of Insurance, whichever is less.

If you have "primary insurance" that insures against any loss or damage covered under Additional Coverage — Flood, and the amount of loss payable under that "primary insurance":

**a.** exceeds the Deductible shown in the Schedule above, the Deductible shall not apply to any adjusted amount of loss or damage covered under Additional Coverage — Flood;

**b.** is less than the Deductible shown in the Schedule above, the Deductible shall apply only to the extent it exceeds the amount of loss payable under your "primary insurance".

**IV.** With respect to coverage under the Additional Coverage — Flood only, the definition of "period of restoration" in Section **F. Definitions** of the **BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM** is deleted and replaced with the following:

**3.** "Period of restoration" means the period of time that:

**a.** Begins:

**(1)** after the applicable Waiting Period shown in the Schedule of the Flood Endorsement has elapsed for Business Income or "Rental Value" coverage; or

**(2)** Immediately after the time of direct physical loss or damage at the building for Extra Expense coverage; and

**b.** Ends on the earlier of:

**(1)** The date when the property at the building should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(2)** The date when business is resumed at a new permanent location.

The Waiting Period:

**(1)** will apply separately at each building for each occurrence, as set forth in the Schedule of the Flood Endorsement;

**(2)** begins immediately after the time of direct physical loss or damage at the building; or

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**V.** The following is added to Section **H. Definitions** of the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**:

**4.** "Primary insurance" means:

**a.** insurance covering all or any part of the Deductible stated in the Schedule of the Flood Endorsement, including insurance provided under the National Flood Insurance Program; and

**b.** any other valid and collectible insurance covering any amount excess of the Deductible stated in the Schedule of the Flood Endorsement, but not any insurance provided by this policy.

**CP9 10 08 03 12**                                                                                    **Page 3 of 3**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

479

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 481 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 482 of 834

CRIME AND FIDELITY
CR 00 21 11 15

# COMMERCIAL CRIME COVERAGE FORM
## (LOSS SUSTAINED FORM)

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is or is not covered.

Throughout this Policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

**A. Insuring Agreements**

Coverage is provided under the following Insuring Agreements for which a Limit Of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place during the Policy Period shown in the Declarations, except as provided in Condition **E.1.k.** or **E.1.l.,** which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition **E.1.g.:**

**1. Employee Theft**

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

For the purposes of this Insuring Agreement, "theft" shall also include forgery.

**2. Forgery Or Alteration**

**a.** We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

**(1)** Made or drawn by or drawn upon you; or

**(2)** Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced.

**b.** If you are sued for refusing to pay any instrument covered in Paragraph **2.a.,** on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay for such legal expenses is in addition to the Limit of Insurance applicable to this Insuring Agreement.

**3. Inside The Premises – Theft Of Money And Securities**

We will pay for:

**a.** Loss of "money" and "securities" inside the "premises" or "financial institution premises":

**(1)** Resulting directly from "theft" committed by a person present inside such "premises" or "financial institution premises"; or

**(2)** Resulting directly from disappearance or destruction.

**b.** Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

**c.** Loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of, or unlawful entry into, those containers.

**4. Inside The Premises – Robbery Or Safe Burglary Of Other Property**

We will pay for:

**a.** Loss of or damage to "other property":

**(1)** Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

**(2)** Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

481

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 483 of 834

**b.** Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

**c.** Loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

**5. Outside The Premises**

We will pay for:

**a.** Loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

**b.** Loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

**6. Computer And Funds Transfer Fraud**

**a.** We will pay for:

**(1)** Loss resulting directly from a fraudulent:

**(a)** Entry of "electronic data" or "computer program" into; or

**(b)** Change of "electronic data" or "computer program" within;

any "computer system" owned, leased or operated by you, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs **6.a.(1)(a)** and **6.a.(1)(b):**

**(i)** "Money", "securities" or "other property" to be transferred, paid or delivered; or

**(ii)** Your account at a "financial institution" to be debited or deleted.

**(2)** Loss resulting directly from a "fraudulent instruction" directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that account.

**b.** As used in Paragraph **6.a.(1),** fraudulent entry or fraudulent change of "electronic data" or "computer program" shall include such entry or change made by an "employee" acting, in good faith, upon a "fraudulent instruction" received from a computer software contractor who has a written agreement with you to design, implement or service "computer programs" for a "computer system" covered under this Insuring Agreement.

**7. Money Orders And Counterfeit Money**

We will pay for loss resulting directly from your having, in good faith, accepted in exchange for merchandise, "money" or services:

**a.** Money orders issued by any post office, express company or "financial institution" that are not paid upon presentation; or

**b.** "Counterfeit money" that is acquired during the regular course of business.

**B. Limit Of Insurance**

The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit Of Insurance shown in the Declarations.

If any loss is covered under more than one Insuring Agreement or coverage, the most we will pay for such loss shall not exceed the largest Limit of Insurance available under any one of those Insuring Agreements or coverages.

**C. Deductible**

We will not pay for loss resulting directly from an "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

**D. Exclusions**

**1.** This insurance does not cover:

**a. Acts Committed By You, Your Partners Or Your Members**

Loss resulting from "theft" or any other dishonest act committed by:

**(1)** You; or

**(2)** Any of your partners or "members";

whether acting alone or in collusion with other persons.

482

**b. Acts Committed By Your Employees Learned Of By You Prior To The Policy Period**

Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this insurance and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of such "theft" or dishonest act prior to the Policy Period shown in the Declarations.

**c. Acts Committed By Your Employees, Managers, Directors, Trustees Or Representatives**

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

**(1)** Whether acting alone or in collusion with other persons; or

**(2)** While performing services for you or otherwise;

except when covered under Insuring Agreement **A.1.**

**d. Confidential Or Personal Information**

Loss resulting from:

**(1)** The disclosure or use of another person's or organization's confidential or personal information; or

**(2)** The disclosure of your confidential or personal information. However, this Paragraph **1.d.(2)** does not apply to loss otherwise covered under this insurance that results directly from the use of your confidential or personal information.

For the purposes of this exclusion, confidential or personal information includes, but is not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

**e. Data Security Breach**

Fees, costs, fines, penalties and other expenses incurred by you which are related to the access to or disclosure of another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

**f. Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

**g. Indirect Loss**

Loss that is an indirect result of an "occurrence" covered by this insurance including, but not limited to, loss resulting from:

**(1)** Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property";

**(2)** Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance; or

**(3)** Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

**h. Legal Fees, Costs And Expenses**

Fees, costs and expenses incurred by you which are related to any legal action, except when covered under Insuring Agreement **A.2.**

**i. Nuclear Hazard**

Loss or damage resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**j. Pollution**

Loss or damage caused by or resulting from pollution. Pollution means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**k. Virtual Currency**

Loss involving virtual currency of any kind, by whatever name known, whether actual or fictitious including, but not limited to, digital currency, crypto currency or any other type of electronic currency.

**l. War And Military Action**

Loss or damage resulting from:

**(1)** War, including undeclared or civil war;

CR 00 21 11 15 © Insurance Services Office, Inc., 2015 **Page 3 of 15** 483

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 485 of 834

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**2.** Insuring Agreement **A.1.** does not cover:

**a. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**b. Trading**

Loss resulting from trading, whether in your name or in a genuine or fictitious account.

**c. Warehouse Receipts**

Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

**3.** Insuring Agreements **A.3., A.4.** and **A.5.** do not cover:

**a. Accounting Or Arithmetical Errors Or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

**b. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**c. Fire**

Loss or damage resulting from fire, however caused, except:

**(1)** Loss of or damage to "money" and "securities"; and

**(2)** Loss from damage to a safe or vault.

**d. Money Operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

**e. Motor Vehicles Or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers or semitrailers or equipment and accessories attached to them.

**f. Transfer Or Surrender Of Property**

**(1)** Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "financial institution premises":

**(a)** On the basis of unauthorized instructions; or

**(b)** As a result of a threat including, but not limited to:

**(i)** A threat to do bodily harm to any person;

**(ii)** A threat to do damage to any property;

**(iii)** A threat to introduce a denial of service attack into any "computer system";

**(iv)** A threat to introduce a virus or other malicious instruction into any "computer system" which is designed to damage, destroy or corrupt "electronic data" or "computer programs" stored within the "computer system";

**(v)** A threat to contaminate, pollute or render substandard your products or goods; or

**(vi)** A threat to disseminate, divulge or utilize:

**i.** Your confidential information;

**ii.** Confidential or personal information of another person or organization; or

**iii.** Weaknesses in the source code within any "computer system".

© Insurance Services Office, Inc., 2015    CR 00 21 11 15    484

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 486 of 834

**(2)** However, this exclusion does not apply under Insuring Agreement **A.5.** to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

**(a)** Had no knowledge of any threat at the time the conveyance began; or

**(b)** Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**g. Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

**h. Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone else acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

**4.** Insuring Agreement **A.6.** does not cover:

**a. Authorized Access**

Loss resulting from a fraudulent:

**(1)** Entry of "electronic data" or "computer program" into; or

**(2)** Change of "electronic data" or "computer program" within;

any "computer system" owned, leased or operated by you by a person or organization with authorized access to that "computer system", except when covered under Insuring Agreement **A.6.b.**

**b. Credit Card Transactions**

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

**c. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**d. Fraudulent Instructions**

Loss resulting from an "employee" or "financial institution" acting upon any instruction to:

**(1)** Transfer, pay or deliver "money", "securities" or "other property"; or

**(2)** Debit or delete your account;

which instruction proves to be fraudulent, except when covered under Insuring Agreement **A.6.a.(2)** or **A.6.b.**

**e. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

**E. Conditions**

The following conditions apply in addition to the Common Policy Conditions:

**1. Conditions Applicable To All Insuring Agreements**

**a. Additional Premises Or Employees**

If, while this insurance is in force, you establish any additional "premises" or hire additional "employees", other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such "premises" and "employees" shall automatically be covered under this insurance. Notice to us of an increase in the number of "premises" or "employees" is not required, and no additional premium will be charged for the remainder of the Policy Period shown in the Declarations.

**b. Concealment, Misrepresentation Or Fraud**

This insurance is void in any case of fraud by you as it relates to this insurance at any time. It is also void if you or any other Insured, at any time, intentionally conceals or misrepresents a material fact concerning:

**(1)** This insurance;

**(2)** The property covered under this insurance;

**(3)** Your interest in the property covered under this insurance; or

**(4)** A claim under this insurance.

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 487 of 834

**c. Consolidation – Merger Or Acquisition**

If you consolidate or merge with, or purchase or acquire the assets or liabilities of, another entity:

**(1)** You must give us written notice as soon as possible and obtain our written consent to extend the coverage provided by this insurance to such consolidated or merged entity or such purchased or acquired assets or liabilities. We may condition our consent by requiring payment of an additional premium; but

**(2)** For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this insurance shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all "occurrences" causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

**d. Cooperation**

You must cooperate with us in all matters pertaining to this insurance as stated in its terms and conditions.

**e. Duties In The Event Of Loss**

After you "discover" a loss or a situation that may result in loss of or damage to "money", "securities" or "other property", you must:

**(1)** Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreement **A.1.** or **A.2.**) involves a violation of law, you must also notify the local law enforcement authorities;

**(2)** Give us a detailed, sworn proof of loss within 120 days;

**(3)** Cooperate with us in the investigation and settlement of any claim;

**(4)** Produce for our examination all pertinent records;

**(5)** Submit to examination under oath at our request and give us a signed statement of your answers; and

**(6)** Secure all of your rights of recovery against any person or organization responsible for the loss and do nothing to impair those rights.

**f. Employee Benefit Plans**

The "employee benefit plans" shown in the Declarations (hereinafter referred to as Plan) are included as Insureds under Insuring Agreement **A.1.,** subject to the following:

**(1)** If any Plan is insured jointly with any other entity under this insurance, you or the Plan Administrator is responsible for selecting a Limit of Insurance for Insuring Agreement **A.1.** that is sufficient to provide a Limit of Insurance for each Plan that is at least equal to that required under ERISA as if each Plan were separately insured.

**(2)** With respect to loss sustained or "discovered" by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

**(3)** If the first Named Insured is an entity other than a Plan, any payment we make for loss sustained by any Plan will be made to the Plan sustaining the loss.

**(4)** If two or more Plans are insured under this insurance, any payment we make for loss:

**(a)** Sustained by two or more Plans; or

**(b)** Of commingled "money", "securities" or "other property" of two or more Plans;

resulting directly from an "occurrence", will be made to each Plan sustaining loss in the proportion that the Limit of Insurance required under ERISA for each Plan bears to the total of those limits.

**(5)** The Deductible Amount applicable to Insuring Agreement **A.1.** does not apply to loss sustained by any Plan.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 488 of 834

**g. Extended Period To Discover Loss**

We will pay for loss that you sustained prior to the effective date of cancellation of this insurance, which is "discovered" by you:

**(1)** No later than one year from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(2)** No later than one year from the date of that cancellation with regard to any "employee benefit plan".

**h. Joint Insured**

**(1)** If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this insurance. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

**(2)** If any Insured, or partner, "member", "manager", officer, director or trustee of that Insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every Insured.

**(3)** An "employee" of any Insured is considered to be an "employee" of every Insured.

**(4)** If this insurance or any of its coverages are cancelled as to any Insured, loss sustained by that Insured is covered only if it is "discovered" by you:

**(a)** No later than one year from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by that Insured, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(b)** No later than one year from the date of that cancellation with regard to any "employee benefit plan".

**(5)** We will not pay more for loss sustained by more than one Insured than the amount we would pay if all such loss had been sustained by one Insured.

**(6)** Payment by us to the first Named Insured for loss sustained by any Insured, or payment by us to any "employee benefit plan" for loss sustained by that Plan, shall fully release us on account of such loss.

**i. Legal Action Against Us**

You may not bring any legal action against us involving loss:

**(1)** Unless you have complied with all the terms of this insurance;

**(2)** Until 90 days after you have filed proof of loss with us; and

**(3)** Unless brought within two years from the date you "discovered" the loss.

If any limitation in this condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**j. Liberalization**

If we adopt any revision that would broaden the coverage under this insurance without additional premium within 45 days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this insurance.

**k. Loss Sustained During Prior Insurance Issued By Us Or Any Affiliate**

**(1) Loss Sustained Partly During This Insurance And Partly During Prior Insurance**

If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place:

**(a)** Partly during the Policy Period shown in the Declarations; and

**(b)** Partly during the policy period(s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest;

and this insurance became effective at the time of cancellation of the prior insurance, we will first settle the amount of loss that you sustained during this Policy Period. We will then settle the remaining amount of loss that you sustained during the policy period(s) of the prior insurance.

CR 00 21 11 15      © Insurance Services Office, Inc., 2015      **Page 7 of 15** 487

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 489 of 834

**(2) Loss Sustained Entirely During Prior Insurance**

If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place entirely during the policy period(s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest, we will pay for the loss, provided:

(a) This insurance became effective at the time of cancellation of the prior insurance; and

(b) The loss would have been covered under this insurance had it been in effect at the time of the "occurrence".

We will first settle the amount of loss that you sustained during the most recent prior insurance. We will then settle any remaining amount of loss that you sustained during the policy period(s) of any other prior insurance.

**(3)** In settling loss under Paragraphs **k.(1)** and **k.(2):**

(a) The most we will pay for the entire loss is the highest single Limit of Insurance applicable during the period of loss, whether such limit was written under this insurance or was written under the prior insurance issued by us.

(b) We will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under this insurance. If no loss was sustained under this insurance, we will apply the Deductible Amount shown in the Declarations to the amount of loss sustained under the most recent prior insurance.

If the Deductible Amount is larger than the amount of loss sustained under this insurance, or the most recent prior insurance, we will apply the remaining Deductible Amount to the remaining amount of loss sustained during the prior insurance.

We will not apply any other Deductible Amount that may have been applicable to the loss.

**(4)** The following examples demonstrate how we will settle losses subject to this condition:

**Example Number 1**

The Insured sustained a covered loss of $10,000 resulting directly from an "occurrence" taking place during the terms of Policy **A** and Policy **B.**

**Policy A**

The current policy. Written at a Limit of Insurance of $50,000 and a Deductible Amount of $5,000.

**Policy B**

Issued prior to Policy **A.** Written at a Limit of Insurance of $50,000 and a Deductible Amount of $5,000.

**Settlement Of Loss**

The amount of loss sustained under Policy **A** is $2,500 and under Policy **B,** $7,500.

The highest single Limit of Insurance applicable to this entire loss is $50,000 written under Policy **A.** The Policy **A** Deductible Amount of $5,000 applies. The loss is settled as follows:

(a) The amount of loss sustained under Policy **A** ($2,500) is settled first. The amount we will pay is nil ($0.00) because the amount of loss is less than the Deductible Amount (i.e., $2,500 loss - $5,000 deductible = $0.00).

(b) The remaining amount of loss sustained under Policy **B** ($7,500) is settled next. The amount recoverable is $5,000 after the remaining Deductible Amount from Policy **A** of $2,500 is applied to the loss (i.e., $7,500 loss - $2,500 deductible = $5,000).

The most we will pay for this loss is $5,000.

**Example Number 2**

The Insured sustained a covered loss of $250,000 resulting directly from an "occurrence" taking place during the terms of Policy **A** and Policy **B.**

**Policy A**

The current policy. Written at a Limit of Insurance of $125,000 and a Deductible Amount of $10,000.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 490 of 834

### Policy B

Issued prior to Policy **A**. Written at a Limit of Insurance of $150,000 and a Deductible Amount of $25,000.

#### Settlement Of Loss

The amount of loss sustained under Policy **A** is $175,000 and under Policy **B,** $75,000.

The highest single Limit of Insurance applicable to this entire loss is $150,000 written under Policy **B.** The Policy **A** Deductible Amount of $10,000 applies. The loss is settled as follows:

**(a)** The amount of loss sustained under Policy **A** ($175,000) is settled first. The amount we will pay is the Policy **A** Limit of $125,000 because $175,000 loss - $10,000 deductible = $165,000, which is greater than the $125,000 policy limit.

**(b)** The remaining amount of loss sustained under Policy **B** ($75,000) is settled next. The amount we will pay is $25,000 (i.e., $150,000 Policy **B** limit - $125,000 paid under Policy **A** = $25,000).

The most we will pay for this loss is $150,000.

### Example Number 3

The Insured sustained a covered loss of $2,000,000 resulting directly from an "occurrence" taking place during the terms of Policies **A, B, C** and **D.**

#### Policy A

The current policy. Written at a Limit of Insurance of $1,000,000 and a Deductible Amount of $100,000.

#### Policy B

Issued prior to Policy **A.** Written at a Limit of Insurance of $750,000 and a Deductible Amount of $75,000.

#### Policy C

Issued prior to Policy **B.** Written at a Limit of Insurance of $500,000 and a Deductible Amount of $50,000.

#### Policy D

Issued prior to Policy **C.** Written at a Limit of Insurance of $500,000 and a Deductible Amount of $50,000.

### Settlement Of Loss

The amount of loss sustained under Policy **A** is $350,000; under Policy **B,** $250,000; under Policy **C,** $600,000; and under Policy **D,** $800,000.

The highest single Limit of Insurance applicable to this entire loss is $1,000,000 written under Policy **A.** The Policy **A** Deductible Amount of $100,000 applies. The loss is settled as follows:

**(a)** The amount of loss sustained under Policy **A** ($350,000) is settled first. The amount we will pay is $250,000 (i.e., $350,000 loss - $100,000 deductible = $250,000).

**(b)** The amount of loss sustained under Policy **B** ($250,000) is settled next. The amount we will pay is $250,000 (no deductible is applied).

**(c)** The amount of loss sustained under Policy **C** ($600,000) is settled next. The amount we will pay is $500,000, the policy limit (no deductible is applied).

**(d)** We will not make any further payment under Policy **D,** as the maximum amount payable under the highest single Limit of Insurance applying to the loss of $1,000,000 under Policy **A** has been satisfied.

The most we will pay for this loss is $1,000,000.

**I. Loss Sustained During Prior Insurance Not Issued By Us Or Any Affiliate**

**(1)** If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place during the policy period of any prior cancelled insurance that was issued to you or a predecessor in interest by another company, and the period of time to discover loss under that insurance had expired, we will pay for the loss under this insurance, provided:

**(a)** This insurance became effective at the time of cancellation of the prior insurance; and

**(b)** The loss would have been covered under this insurance had it been in effect at the time of the "occurrence".

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 491 of 834

**(2)** In settling loss subject to this condition:

**(a)** The most we will pay for the entire loss is the lesser of the Limits of Insurance applicable during the period of loss, whether such limit was written under this insurance or was written under the prior cancelled insurance.

**(b)** We will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under the prior cancelled insurance.

**(3)** The insurance provided under this condition is subject to the following:

**(a)** If loss covered under this condition is also partially covered under Condition **E.1.k.,** the amount recoverable under this condition is part of, not in addition to, the amount recoverable under Condition **E.1.k.**

**(b)** For loss covered under this condition that is not subject to Paragraph **l.(3)(a),** the amount recoverable under this condition is part of, not in addition to, the Limit of Insurance applicable to the loss covered under this insurance and is limited to the lesser of the amount recoverable under:

**(i)** This insurance as of its effective date; or

**(ii)** The prior cancelled insurance had it remained in effect.

**m. Other Insurance**

If other valid and collectible insurance is available to you for loss covered under this insurance, our obligations are limited as follows:

**(1) Primary Insurance**

When this insurance is written as primary insurance, and:

**(a)** You have other insurance subject to the same terms and conditions as this insurance, we will pay our share of the covered loss. Our share is the proportion that the applicable Limit Of Insurance shown in the Declarations bears to the total limit of all insurance covering the same loss.

**(b)** You have other insurance covering the same loss other than that described in Paragraph **m.(1)(a),** we will only pay for the amount of loss that exceeds:

**(i)** The Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not; or

**(ii)** The Deductible Amount shown in the Declarations;

whichever is greater. Our payment for loss is subject to the terms and conditions of this insurance.

**(2) Excess Insurance**

**(a)** When this insurance is written excess over other insurance, we will only pay for the amount of loss that exceeds the Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not. Our payment for loss is subject to the terms and conditions of this insurance.

**(b)** However, if loss covered under this insurance is subject to a deductible, we will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance**.**

**n. Ownership Of Property; Interests Covered**

The property covered under this insurance is limited to property:

**(1)** That you own or lease;

**(2)** That is held by you in any capacity; or

**(3)** For which you are legally liable, provided you were liable for the property prior to the time the loss was sustained.

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this insurance must be presented by you.

**o. Records**

You must keep records of all property covered under this insurance so we can verify the amount of any loss.

**p. Recoveries**

**(1)** Any recoveries, whether effected before or after any payment under this insurance, whether made by us or by you, shall be applied net of the expense of such recovery:

**(a)** First, to you in satisfaction of your covered loss in excess of the amount paid under this insurance;

**(b)** Second, to us in satisfaction of amounts paid in settlement of your claim;

**(c)** Third, to you in satisfaction of any Deductible Amount; and

**(d)** Fourth, to you in satisfaction of any loss not covered under this insurance.

**(2)** Recoveries do not include any recovery:

**(a)** From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

**(b)** Of original "securities" after duplicates of them have been issued.

**q. Territory**

This insurance covers loss that you sustain resulting directly from an "occurrence" taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

**r. Transfer Of Your Rights Of Recovery Against Others To Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

**s. Valuation – Settlement**

The value of any loss for purposes of coverage under this insurance shall be determined as follows:

**(1) Money**

Loss of "money" but only up to and including its face value. We will, at your option, pay for loss of "money" issued by any country other than the United States of America:

**(a)** At face value in the "money" issued by that country; or

**(b)** In the United States of America dollar equivalent, determined by the rate of exchange published in The Wall Street Journal on the day the loss was "discovered".

**(2) Securities**

Loss of "securities" but only up to and including their value at the close of business on the day the loss was "discovered". We may, at our option:

**(a)** Pay the market value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

**(b)** Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

**(i)** Market value of the "securities" at the close of business on the day the loss was "discovered"; or

**(ii)** Limit of Insurance applicable to the "securities".

**(3) Property Other Than Money And Securities**

**(a)** Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

**(i)** The Limit of Insurance applicable to the lost or damaged property;

**(ii)** The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or

**(iii)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 493 of 834

**(b)** We will not pay on a replacement cost basis for any loss or damage to property covered under Paragraph **s.(3)(a):**

  **(i)** Until the lost or damaged property is actually repaired or replaced; and

  **(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

  If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

**(c)** We will, at your option, pay for loss or damage to such property:

  **(i)** In the "money" of the country in which the loss or damage was sustained; or

  **(ii)** In the United States of America dollar equivalent of the "money" of the country in which the loss or damage was sustained, determined by the rate of exchange published in The Wall Street Journal on the day the loss was "discovered".

**(d)** Any property that we pay for or replace becomes our property.

**2. Conditions Applicable To Insuring Agreement A.1.**

  **a. Termination As To Any Employee**

  This Insuring Agreement terminates as to any "employee":

  **(1)** As soon as:

   **(a)** You; or

   **(b)** Any of your partners, "members", "managers", officers, directors or trustees not in collusion with the "employee";

  learn of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you; or

  **(2)** On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

  We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**b. Territory**

  We will pay for loss caused by any "employee" while temporarily outside the territory specified in Territory Condition **E.1.q.** for a period of not more than 90 consecutive days.

**3. Conditions Applicable To Insuring Agreement A.2.**

  **a. Deductible Amount**

  The Deductible Amount does not apply to legal expenses paid under Insuring Agreement **A.2.**

  **b. Electronic And Mechanical Signatures**

  We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

  **c. Proof Of Loss**

  You must include with your proof of loss any instrument involved in that loss or, if that is not possible, an affidavit setting forth the amount and cause of loss.

  **d. Territory**

  We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.q.** does not apply to Insuring Agreement **A.2.**

**4. Conditions Applicable To Insuring Agreements A.4. And A.5.**

  **a. Armored Motor Vehicle Companies**

  Under Insuring Agreement **A.5.,** we will only pay for the amount of loss you cannot recover:

  **(1)** Under your contract with the armored motor vehicle company; and

  **(2)** From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

  **b. Special Limit Of Insurance For Specified Property**

  We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

  **(1)** Precious metals, precious or semiprecious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

© Insurance Services Office, Inc., 2015
CR 00 21 11 15

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 494 of 834

**(2)** Manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**5. Conditions Applicable To Insuring Agreement A.6.**

**a. Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**b. Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.q.** does not apply to Insuring Agreement **A.6.**

**F. Definitions**

**1.** "Computer program" means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enable the computer or devices to receive, process, store or send "electronic data".

**2.** "Computer system" means:

**a.** Computers, including Personal Digital Assistants (PDAs) and other transportable or handheld devices, electronic storage devices and related peripheral components;

**b.** Systems and applications software; and

**c.** Related communications networks;

by which "electronic data" is collected, transmitted, processed, stored or retrieved.

**3.** "Counterfeit money" means an imitation of "money" which is intended to deceive and to be taken as genuine.

**4.** "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

**5.** "Discover" or "discovered" means the time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this insurance has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

"Discover" or "discovered" also means the time when you first receive notice of an actual or potential claim in which it is alleged that you are liable to a third party under circumstances which, if true, would constitute a loss under this insurance.

**6.** "Electronic data" means information, facts, images or sounds stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software) on data storage devices, including hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**7.** "Employee":

**a.** Means:

**(1)** Any natural person:

**(a)** While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any dishonest act committed by the "employee";

**(b)** Whom you compensate directly by salary, wages or commissions; and

**(c)** Whom you have the right to direct and control while performing services for you;

**(2)** Any natural person who is furnished temporarily to you:

**(a)** To substitute for a permanent "employee", as defined in Paragraph **7.a.(1),** who is on leave; or

**(b)** To meet seasonal or short-term work load conditions;

while that person is subject to your direction and control and performing services for you;

**(3)** Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary "employee" as defined in Paragraph **7.a.(2);**

**(4)** Any natural person who is:

**(a)** A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; or

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 495 of 834

**(b)** Your director or trustee while that person is engaged in handling "money", "securities" or "other property" of any "employee benefit plan";

**(5)** Any natural person who is a former "employee", partner, "member", "manager", director or trustee retained by you as a consultant while performing services for you;

**(6)** Any natural person who is a guest student or intern pursuing studies or duties;

**(7)** Any natural person employed by an entity merged or consolidated with you prior to the effective date of this insurance; and

**(8)** Any natural person who is your "manager", director or trustee while:

  **(a)** Performing acts within the scope of the usual duties of an "employee"; or

  **(b)** Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

**b.** Does not mean:

Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in Paragraph **7.a.**

**8.** "Employee benefit plan" means any welfare or pension benefit plan shown in the Declarations that you sponsor and that is subject to the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

**9.** "Financial institution" means:

**a.** With regard to Insuring Agreement **A.3.:**

  **(1)** A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution; or

  **(2)** An insurance company.

**b.** With regard to Insuring Agreement **A.6.:**

  **(1)** A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution;

  **(2)** An insurance company; or

  **(3)** A stock brokerage firm or investment company.

**c.** Other than Insuring Agreements **A.3.** and **A.6.,** any financial institution.

**10.** "Financial institution premises" means the interior of that portion of any building occupied by a "financial institution" as defined in Paragraph **F.9.a.**

**11.** "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

**12.** "Fraudulent instruction" means:

**a.** With regard to Insuring Agreement **A.6.a.(2):**

  **(1)** A computer, telefacsimile, telephone or other electronic instruction directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", which instruction purports to have been issued by you, but which in fact was fraudulently issued by someone else without your knowledge or consent; or

  **(2)** A written instruction (other than those covered under Insuring Agreement **A.2.**) issued to a "financial institution" directing the "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by you, but which in fact was issued, forged or altered by someone else without your knowledge or consent.

**b.** With regard to Insuring Agreement **A.6.b.:**

A computer, telefacsimile, telephone or other electronic, written or voice instruction directing an "employee" to enter or change "electronic data" or "computer programs" within a "computer system" covered under the Insuring Agreement, which instruction in fact was fraudulently issued by your computer software contractor.

**13.** "Manager" means a natural person serving in a directorial capacity for a limited liability company.

**14.** "Member" means an owner of a limited liability company represented by its membership interest who, if a natural person, may also serve as a "manager".

15. "Messenger" means you, or your relative, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

16. "Money" means:

   a. Currency, coins and bank notes in current use and having a face value;

   b. Traveler's checks and money orders held for sale to the public; and

   c. In addition, includes:

      (1) Under Insuring Agreements **A.1.** and **A.2.,** deposits in your account at any "financial institution"; and

      (2) Under Insuring Agreement **A.6.,** deposits in your account at a "financial institution" as defined in Paragraph **F.9.b.**

17. "Occurrence" means:

   a. Under Insuring Agreement **A.1.:**

      (1) An individual act;

      (2) The combined total of all separate acts whether or not related; or

      (3) A series of acts whether or not related;

      committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

   b. Under Insuring Agreement **A.2.:**

      (1) An individual act;

      (2) The combined total of all separate acts whether or not related; or

      (3) A series of acts whether or not related;

      committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

   c. Under all other Insuring Agreements:

      (1) An individual act or event;

      (2) The combined total of all separate acts or events whether or not related; or

      (3) A series of acts or events whether or not related;

      committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

18. "Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include "computer programs", "electronic data" or any property specifically excluded under this insurance.

19. "Premises" means the interior of that portion of any building you occupy in conducting your business.

20. "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

   a. Caused or threatened to cause that person bodily harm; or

   b. Committed an obviously unlawful act witnessed by that person.

21. "Safe burglary" means the unlawful taking of:

   a. Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

   b. A safe or vault from inside the "premises".

22. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

   a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

   but does not include "money".

23. "Theft" means the unlawful taking of property to the deprivation of the Insured.

24. "Transfer account" means an account maintained by you at a "financial institution" from which you can initiate the transfer, payment or delivery of "money" or "securities":

   a. By means of computer, telefacsimile, telephone or other electronic instructions; or

   b. By means of written instructions (other than those covered under Insuring Agreement **A.2.**) establishing the conditions under which such transfers are to be initiated by such "financial institution" through an electronic funds transfer system.

25. "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

 © Insurance Services Office, Inc., 2015

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 497 of 834

This page intentionally left blank

**POLICY NUMBER:  WPP1595109 03**                                            **COMMERCIAL PROPERTY**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

**FORM NAME:**  ORDINANCE OR LAW COVERAGE CHANGES

IT IS UNDERSTOOD AND AGREED THAT FORM CP0405 ORDINANCE OR LAW COVERAGES B & C LIMITS OF INSURANCE ARE AMENDED TO:

$250,000 SUBLIMIT PER LOCATION WITH BUILDINGS RENOVATED PRIOR TO 1990

$500,000 SUBLIMIT PER LOCATION WITH BUILDINGS RENOVATED 1991-2000

$1,000,000 PER LOCATION WITH BUILDINGS RENOVATED AFTER 2000

SUBJECT TO A SHARED UHAB MAXIMUM OF $10,000,000.

**ENDORSEMENT A**

497

This page intentionally left blank

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 500 of 834

**POLICY NUMBER: WPP1595109 03**                                   **COMMERCIAL PROPERTY**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

**FORM NAME:** EARTHQUAKE COVERAGE CHANGES

IT IS UNDERSTOOD AND AGREED THAT THE EARTHQUAKE COVERAGE PROVIDED UNDER EARTHQUAKE ENDORSEMENT CP91003 IS LIMITED TO A SHARED UHAB ANNUAL AGGREGATE LIMIT OF $25,000,000. COVERAGE APPLIES TO LOCATIONS SCALE (=> MMI VII).

**ENDORSEMENT B**

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 501 of 834

This page intentionally left blank

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 502 of 834

**POLICY NUMBER: WPP1595109 03**                                   **COMMERCIAL PROPERTY**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

**FORM NAME:** FLOOD COVERAGE CHANGES

IT IS UNDERSTOOD AND AGREED THAT THE FLOOD COVERAGE PROVIDED UNDER SUPERIOR FLOOD ENDORSEMENT CP91008 IS LIMITED TO A FLOOD LIMIT OF INSURANCE OF $1,000,000 PER OCCURRENCE; $1,000,000 ANNUAL AGGREGATE SUBJECT TO A SHARED UHAB ANNUAL AGGREGATE LIMIT OF $25,000,000. COVERAGE APPLIES ONLY TO LOCATIONS OUTSIDE THE 500 YEAR FLOOD PLAIN (ZONE C). NO FLOOD COVERAGE APPLIES IN ZONES A, V, B AND D (ALL SUFFIXES).

IT IS ALSO UNDERSTOOD AND AGREED THAT A $500,000 DEDUCTIBLE IS APPLICABLE TO LOCATIONS ON THE FOLLOWING POLICIES:

| | |
|---|---|
| WPP1594694 03 | 173 EAST 111TH STREET |
| WPP1594699 03 | 177 EAST 102ND STREET |
| WPP1594751 03 | 230 LEE AVENUE |
| WPP1594761 03 | 235 EAST 121ST STREET |
| WPP1594763 03 | 237 EAST 121st STREET |
| WPP1594779 03 | 269 WEST 153RD STREET |
| WPP1594796 03 | 283-285 E 4TH STREET |
| WPP1594799 03 | 290 EAST 2ND STREET |
| WPP1594807 03 | 310 E. 4TH STREET |
| WPP1594820 03 | 327 EAST 3RD STREET |
| WPP1594863 03 | 42-46 WEST 138TH ST. |
| WPP1594905 03 | 514 EAST 13TH STREET |
| WPP1594922 03 | 528 EAST 11TH STREET |
| WPP1594941 03 | 547-49 EAST 12TH STREET |
| WPP1594944 03 | 551 EAST 12TH STREET |
| WPP1594976 03 | 63 FRANKLIN STREET |
| WPP1594983 03 | 66 AVENUE C |
| WPP1594984 03 | 666 BROADWAY |
| WPP1594984 03 | 668 BROADWAY |
| WPP1594993 03 | 719 EAST 6TH STREET |
| WPP1595055 03 | 292 EAST 3RD STREET |
| WPP1595063 03 | 527-529 EAST 12TH ST. |
| WPP1595073 03 | 519 EAST 11TH STREET |
| WPP1595079 04 | 653 EAST 5TH STREET |
| WPP1852351 01 | 278 EAST 7TH STREET |
| WPP1595082 03 | 320 EAST 4TH STREET |
| WPP1595084 03 | 408 WEST 25TH STREET |
| WPP1595099 03 | 515 EAST 13TH STREET |
| WPP1595105 03 | 64 HAVEMEYER STREET |
| WPP1595109 03 | 2283 SECOND AVENUE |
| WPP1595109 03 | 206 WEST 123RD STREET |
| WPP1595109 03 | 2285 SECOND AVENUE |

**ENDORSEMENT C**

501

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 503 of 834

This page intentionally left blank

# EXHIBIT C

1/10/2020

LEASE dated January 15, 2020 between UHAB Housing Development Fund Corporation, a New York not-for-profit corporation having an address at 120 Wall Street, 20th Floor, New York, New York 10005 ("Landlord"), and Lower East Side People's Federal Credit Union, a federal credit union having an address at 37 Avenue B, New York, New York 10009 ("Tenant").

Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the Demised Premises (as defined in Article 1) for the Term provided for in Article 4 hereof at the rent provided for in Article 5 hereof and on all of the terms and conditions set forth herein. Intending to be legally bound hereunder and for good and valuable consideration, Landlord and Tenant hereby agree with each other as follows:

## ARTICLE 1. SUMMARY OF LEASE PROVISIONS.

The following terms shall be applicable to the various provisions of this Lease which refer to them:

### Section 1.01.  Demised Premises:

Demised Premises means a portion of the ground floor and back yard of the Building and shall not include the basement of the Building. The portion of the Building leased to Tenant consists of approximately one thousand one hundred and fifty-three (1,153) square feet depicted on the site plan annexed hereto as Exhibit B (the "Site Plan"). The Demised Premises includes any alterations, additions or repairs made thereto.

### Section 1.02.  Building:

Means the building located at 2283-85 Second Avenue, New York, New York 10035, in which the Demised Premises is located, as shown on Exhibit A.

### Section 1.03.  Expiration Date:

Means the last day of the month in which the date immediately preceding the fifth (5th) anniversary of the Rent Commencement Date occurs.

### Section 1.04.  Rent:

Means $2,800 per month beginning on the Rent Commencement Date, to be increased by two percent (2%) each year on each anniversary of the Rent Commencement Date. Upon renewal of the Lease the annual increase percentage may be increased by Landlord, but in no event shall such increase exceed 4%.

### Section 1.05.  Use:

(a)    Permitted Uses: Subject to the provisions of Article 9 of this Lease, Tenant shall use the Demised Premises for the operation of a financial institution branch with full service automated teller machines or similar type automated banking technology which dispenses cash and all other activities in which a bank or financial institution may legally engage and for the

5243341.6

504

purpose of holding community outreach programs in the Community Room and for no other purpose.

**Section 1.06.** <u>Notice Addresses</u>:

    (a)    <u>Landlord's Notice Address</u>:

    Del-Mar Management Services Inc.
    743 Driggs Ave., Store #3
    Brooklyn, New York 11211

    (b)    <u>Landlord's Notice Copy Address</u>:

    UHAB Housing Development Fund Corp.
    120 Wall Street, 20th Floor
    New York, New York 10005
    Attn: Andrew Reicher

    (c)    <u>Tenant's Notice Address</u>:

    Lower East Side People's Federal Credit Union
    37 Avenue B
    New York, New York 10009

    (d)    <u>Tenant's Notice Copy Address</u>:

    Dechert LLP
    Three Bryant Park
    1095 Avenue of the Americas
    New York, New York 10036
    Attention:  Timothy Kopcial

### ARTICLE 2. DEFINITIONS.

As used herein, the following words and phrases have the following meanings:

**Section 2.01.** <u>Community Room</u>:

Means the portion of the Demised Premises designated as "Store 002" in <u>Exhibit A</u>.

**Section 2.02.** <u>Expiration Date</u>:

Means the date described in Section 1.03 provided that if the Term has been extended or this Lease has been renewed, the Expiration Date shall be the last day of the Term as so extended or renewed.  If this Lease is cancelled or terminated prior to the Expiration Date, then the Expiration Date shall be the date on which this Lease is so cancelled or terminated.

505

### Section 2.03. <u>Insurance Requirements</u>:

Means the applicable provisions of the insurance policies carried by Landlord covering the Building and the Demised Premises. Where referenced in relationship to Tenant's requirements, the Insurance Requirements shall have the meaning as further described in Exhibit C attached hereto.

### Section 2.04. <u>Mortgage</u>:

Means any mortgage, deed to secure debt, trust indenture, grant, or deed of trust which may hereafter affect, encumber or be a lien upon the Demised Premises, the Building or Landlord's interest therein.

### Section 2.05. <u>Mortgagee</u>:

Means the holder of any Mortgage.

### Section 2.06. <u>Person</u>:

Means an individual, fiduciary, estate, trust, partnership, firm, association, corporation, or other organization, or a government or governmental authority.

### Section 2.07. <u>Rent Commencement Date</u>:

Subject to the terms hereof, the Rent Commencement Date shall be six (6) months from the date of Delivery of Possession, anticipated to be on or about June 1, 2020.

### Section 2.08. <u>Repair</u>:

Includes the words "replacement and restoration", "replacement or restoration", "replace and restore", "replace or restore", as the case may be.

### Section 2.09. <u>Tenant's Agents</u>:

Includes Tenant's employees, servants, licensees, tenants, subtenants, assignees, contractors, heirs, successors, legatees, and devisees.

### Section 2.10. <u>Tenant's Work</u>:

Means any work Tenant deems necessary or desirable to prepare the Premises for Tenant's initial occupancy, subject to the terms of Section 7.03.

### Section 2.11. <u>Term</u>:

The Term is as set forth in Sections 1.03 and 4.01 and includes any renewals and extensions thereof.

5243341.6

3

506

### Section 2.12.  Year:

For the purposes of this Lease, the word "year" or "Lease Year", wherever appearing herein, shall have the following meaning:

The first year shall commence on the Rent Commencement Date and shall terminate on the 364th day thereafter.  Each year thereafter shall commence on the anniversary of the Rent Commencement Date and shall continue for 364 days thereafter, provided, however, that the last year shall terminate on the Expiration Date.

## ARTICLE 3.  DELIVERY OF POSSESSION; TENANT'S WORK.

### Section 3.01.  Delivery of Possession:

Delivery of Possession shall be deemed to have occurred when Landlord shall have tendered possession of the Demised Premises to Tenant.  Landlord covenants to provide Tenant with at least five (5) days' notice prior to Delivery of Possession.  As of the date hereof, Landlord represents that Delivery of Possession is estimated to occur no later than January 10, 2020.  Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated in any event to accept Delivery of Possession prior to the Rent Commencement Date.

### Section 3.02.  Tenant's Work:

(a)     Before the Delivery of Possession, Tenant shall submit to Landlord proposed detailed specifications and working drawings for the performance of Tenant's Work prepared by licensed and/or certified professionals in the relevant trade(s).  The proposed detailed plans and working drawings are referred to in this Lease as "Proposed Specifications".  Landlord shall have a period of thirty (30) days to review the Proposed Specifications, and any changes thereto, prior to the Delivery of Possession.  If Landlord does not respond with questions, comments, acceptance or rejection within such thirty (30) day period, Landlord shall automatically be deemed to have approved the Proposed Specifications.  If Landlord does not approve the Proposed Specifications, Landlord shall return the Proposed Specifications to Tenant and notify Tenant of any changes it desires to the Proposed Specifications, in which event Tenant shall modify the Proposed Specifications in accordance with Landlord's requirements and shall return them as modified to Landlord within the following ten (10) days. Upon submission of the modified Proposed Specifications, Landlord and Tenant shall meet to resolve any remaining differences in good faith. The approved Proposed Specifications shall be a part of this Lease and shall be referred to as the "Plans and Specifications".  Tenant shall bear all expenses in connection with the preparation of approved Plans and Specifications, including any expenses incurred by Landlord which expenses shall be limited to Landlord's review and approval of changes to Tenant's Work, if any.

(b)     Promptly after the Proposed Specifications have been approved by Landlord, Tenant shall apply for all approvals and permits legally required in connection with the performance of Tenant's Work. If requested by Tenant, Landlord shall join in the execution of the applications.  At Tenant's request, Landlord shall cooperate with the prosecution of the application. Tenant shall bear all expenses in connection with such applications, including any expenses incurred by Landlord.  Tenant shall prosecute the applications diligently and use its

5243341.6                                    4

reasonable efforts to obtain such approvals and permits. Tenant shall advise Landlord of its progress from time to time upon request by Landlord.

(c)     Promptly after all requisite approvals have been granted and after Delivery of Possession, Tenant shall commence the performance of Tenant's Work and shall diligently prosecute Tenant's Work to completion. Tenant shall take all legally required and reasonable precautions to ensure public safety from Tenant's Work, including through the use of construction equipment such as sidewalk sheds, scaffolds, and/or temporary fences where the work is facing a public way or sidewalk.

(d)     Tenant shall perform all of Tenant's Work in accordance with the Plans and Specifications, all legal requirements, all of Landlord's and Tenant's insurance requirements and in a good and workmanlike manner free of any unsafe or hazardous conditions. Any review of the Proposed Specifications, Plans and Specifications, or any of Tenant's Work, shall not constitute an approval of architectural or engineering design, compliance with any building codes or other restrictions and limitations, or otherwise constitute any assumption of liability or responsibility by Landlord or its agents or contractors for the quality or adequacy of any design of, or work performed by Tenant's contractors or subcontractors, whether with respect to labor, material or otherwise. Tenant hereby expressly acknowledges that no such inspection, approval or review shall in any way limit the obligations of Tenant or the rights of Landlord under this Lease, and, without limitation on the foregoing, Tenant's obligations under the indemnity provisions of this Lease shall apply to any Claims (as hereinafter defined) arising or alleged to have arisen in connection with Tenant's Work (including reasonable attorneys' and consultants' fees related to such Claims).

(e)     Tenant agrees that it will, to the fullest extent permitted by law, indemnify and save Landlord harmless from and against any and all bills for labor performed and equipment, fixtures and materials furnished to Tenant and applicable sales taxes thereon and from and against any and all liens, bills or claims therefor or against the Demised Premises or the Building and from and against all losses, damages, costs, expenses, suits and claims whatsoever, in each case in connection with the performance of Tenant's Work

(f)     Tenant's Work shall include a reasonable means by which Landlord or its agents (including a management company hired by the Landlord for the management of the Building) can access the basement of the Building in the event of an emergency.

## ARTICLE 4. TERM.

### Section 4.01. Term:

Tenant's obligations under this Lease shall commence on the same date this Lease is fully executed except for the payment of Rent, which shall commence on the Rent Commencement Date. The Term of this Lease shall commence on the date of Delivery of Possession, which is also established as the Commencement Date. The Term shall expire on the Expiration Date.

5243341.6

5

508

**Section 4.02.   Non-Recordation:**

Tenant shall not record this Lease, or any short form or memorandum of lease.  Upon request of either party, the parties shall execute a commencement date agreement in non-recordable form setting forth the Commencement Date, Rent Commencement Date, Expiration Date and renewals (if applicable).

**Section 4.03.   Renewal Terms:**

(a)     Provided no Default has occurred and is continuing, and Tenant is current with all payment obligations to Landlord, Tenant shall have the option to renew this Lease (the "Renewal Option") for an additional five (5) year period (the "Renewal Term").  Time shall be of the essence as to the giving of such notices to renew and said Renewal Option shall expire and be of no force or effect unless exercised by Tenant giving written notice thereof to Landlord sent not earlier than eighteen (18) months prior to the Expiration Date and not later than sixty (60) days prior to the Expiration Date.  All of the terms, conditions and provisions of this Lease shall remain in full force and effect during the Renewal Term.

(b)     Neither the foregoing Renewal Option granted to Tenant, nor the exercise thereof by Tenant, shall prevent Landlord from exercising any right granted or reserved to Landlord in this Lease or which Landlord may have by virtue of any applicable law to terminate this Lease, either during the Initial Term or during the Renewal Terms.  Any termination of this Lease shall serve to terminate the Renewal Option whether or not Tenant shall have exercised same.  Any right on the part of Landlord to terminate this Lease shall continue during the Renewal Term, and the foregoing Renewal Option granted to Tenant to renew this Lease shall not be deemed to give Tenant any further option to renew this Lease.

(c)     Provided that Tenant is not in default under the terms of this Lease, Tenant may, upon 60 days' prior written notice to Landlord, cancel this lease and terminate all of its obligations hereunder effective as of the thirty-first day of the calendar month following delivery of the prior written notice to Landlord. Tenant shall vacate the Demised Premises and deliver possession thereof to Landlord in the condition required by the terms of this Lease and Tenant shall have no further obligations under this Lease with respect to the Demised Premises except as otherwise stated herein for those obligations accruing prior to the date of termination.

## ARTICLE 5.  RENT.

**Section 5.01.   Rent:**

(a)     Rent shall be payable by Tenant to Landlord without notice or demand. Rent shall be due on the first day of each month during the Term as of the Rent Commencement Date.  If the Rent Commencement Date is a day other than the first day of the month, the first installment shall be one thirtieth or one thirty-first, as the case may be, of a normal monthly installment for each day during the period commencing with the Rent Commencement Date up to and including the last day of that month.  If the Expiration Date occurs on a day other than the last day of any month, Rent for the last month during the Term shall be prorated in the same manner.

(b)     All payments under this Lease should be made payable to the Landlord at the address set forth in Section 1.06 of this Lease or such other payee or address as Landlord may designate.

(c)     Landlord shall pay when due all taxes and assessments, general and special, and all other impositions, ordinary and extraordinary, of every kind and nature whatsoever, which may accrue, be levied, assessed, charged or imposed, related to the Building and the Demised Premises. Tenant agrees to pay Landlord, when and if billed, a pro-rata portion of taxes or assessments due limited to Tenant's lease term, as additional rent,

## ARTICLE 6. CONDITION OF DEMISED PREMISES AND SIGNS.

### Section 6.01.  No Representation:

Landlord has made no representation, covenants or warranties with respect to the Demised Premises except as expressly set forth in this Lease.

### Section 6.02.  Mechanics' Liens:

If any mechanic's or materialman's lien is filed against the Demised Premises as a result of any additions, alterations, repairs, installations or improvements made by Tenant, or any other work or act of Tenant, Tenant shall discharge or bond same within twenty (20) days from the filing of the lien.  If Tenant shall fail to discharge or bond the lien, Landlord may bond or pay the lien or claim for the account of Tenant without inquiring into the validity of the lien or claim and Tenant's failure to discharge or bond the lien shall constitute a Default hereunder, notwithstanding Landlord's election to cure.

### Section 6.03.  Signs:

(a)     Tenant shall have the right to install and maintain exterior signage consistent with Tenant's standard signage, subject to (i) applicable legal requirements and (ii) Landlord's approval which shall not be unreasonably withheld, conditioned or delayed.  Tenant shall obtain and pay for all required permits and licenses relating to such signs and shall pay for any actual signage fabrication and the cost of installation.  Copies of all such permits and licenses shall be delivered to Landlord within a reasonable time after they are issued.

(b)     If Landlord shall deem it necessary to remove any sign in order to paint or to make repairs, alterations or improvements in or upon the Demised Premises, Landlord shall have the right to do so upon reasonable notice to Tenant.  Landlord shall diligently complete the work, repair any damage and restore the sign with reasonable diligence.

## ARTICLE 7. REPAIRS, ALTERATIONS, COMPLIANCE, SURRENDER.

### Section 7.01.  Repairs by Landlord:

Upon reasonable notice from Tenant, Landlord shall make or cause to be made all repairs to the Building and the Demised Premises (including, but not limited to, repairs to and paving of

5243341.6                                                   7

510

the sidewalks, parking areas, repairs to the roof and structural repairs to the foundation, exterior walls and any load bearing interior walls, and repairs to the windows).

### Section 7.02.  Repairs and Maintenance by Tenant:

(a)     Tenant shall be solely responsible to make all repairs to its equipment (including any security equipment owned by the Tenant), air-conditioning equipment, and exterior gates, if any, located in the Demised Premises.  Tenant shall maintain all of the equipment (including the air-conditioning unit and connections), furniture and fixtures provided by Landlord in the Demised Premises and keep same in proper working order.

(b)     Landlord shall remove snow and ice in front of the Demised Premises in compliance with applicable City rules and limited to removal during normal business hours.

### Section 7.03.  Approval by Landlord of Repairs and Alterations:

(a)     Tenant may not make alterations to the Demised Premises (other than to its equipment located in the Demised Premises and the Tenant's Work) without the prior written consent of Landlord.  Tenant shall promptly notify Landlord of any alterations to the Proposed Specifications and shall obtain Landlord's consent before proceeding.  Landlord's consent to any such alterations, improvements and/or additions to the Demised Premises (inclusive of submission of plans and any changes required by Landlord thereto) shall not be unreasonably withheld, conditioned or delayed by Landlord.  Landlord reserves the right to obtain the opinion of Landlord's own architect or engineer to review the proposed alteration at Tenant's expense.  If Landlord grants consent, any such alterations, improvements and/or additions shall be performed in a good and workmanlike manner, in accordance with all applicable legal requirements.

(b)     Tenant shall not commence any repair or alteration until Tenant has submitted detailed specifications and working drawings of the proposed repair or alteration and Landlord has approved them.  All work shall be commenced promptly after Tenant has obtained all necessary insurance coverage, permits and approvals.  Tenant shall perform all work in accordance with the approved detailed specifications and working drawings and prosecute the work diligently to completion.  Notwithstanding the foregoing, after completion of the Tenant's Work, Tenant may perform any non-structural interior alterations within the Demised Premises without obtaining Landlord's consent as aforesaid (but upon advance notice to Landlord) provided that (i) such alterations, improvements and/or additions do not affect any part of the Building (including structural components and exteriors) other than the Demised Premises or require any alterations, installations, improvements, additions or other physical changes to be performed in or made to any portion of the Building (including structural components and exteriors) other than the Demised Premises, (ii) such alterations, improvements and/or additions do not affect any service required to be furnished by Landlord to any other tenant or occupant of the Building and (iii) such alterations, improvements and/or additions do not affect the proper functioning of any Building system (including, without limitation, the Building-wide standard systems required to provide heat, ventilation, air-conditioning and electrical and plumbing services in the Building, if any).

5243341.6

511

### Section 7.04.  Compliance:

(a)    Tenant shall observe and comply promptly with all present and future legal requirements and Insurance Requirements relating to or affecting the Demised Premises, the Building or any sign of Tenant, or the use and occupancy thereof, or any appurtenance thereto.

(b)    Prior to Delivery of Possession, Landlord shall remove all hazardous wastes or other hazardous materials, including, without limitation, asbestos (individually and collectively, "Hazardous Substances"), from the Demised Premises.  Landlord shall be responsible for all Hazardous Substances in the Demised Premises that were present prior to the date of Delivery of Possession. In addition, Landlord shall indemnify and hold harmless Tenant, its officers, directors and employees from all fines, suits, procedures, claims, damages, judgments and actions of every kind and all costs associated therewith (including reasonable attorney's and consultant's fees) arising out of the Hazardous Substances that were present prior to the date of Delivery of Possession. Tenant shall be solely responsible to the Landlord for Hazardous Substances that were first present after the date of Delivery of Possession and that are related to Tenant's use and occupancy of the Demised Premises.

### Section 7.05.  Electrical Lines:

Tenant shall be solely responsible for providing backup electrical services for the security of its business, including alarm systems.

If the Tenant installs any electrical equipment that overloads the lines in the Demised Premises or the Building, Landlord may require Tenant to make whatever changes to such lines as may be necessary to render the lines in good order and repair and in compliance with all Insurance Requirements and applicable legal requirements.

### Section 7.06.  Emergency Repairs:

Tenant shall, at all times during the Lease term retain the services of a 24 hour alarm company to secure and monitor the Demised Premises. If, in an emergency, it shall become necessary to make promptly any repairs or replacements required to be made by Tenant, Landlord may re-enter the Demised Premises and proceed to have such repairs or replacements made and Landlord shall pay the cost of such repairs or replacements unless such repairs are required due to the negligence or willful misconduct of Tenant, its agents, employees or invitees, or are insured by policies required to be maintained by Tenant for the benefit of Tenant pursuant to the terms of this Lease.

### Section 7.07.  Surrender of Premises:

On the Expiration Date, Tenant shall quit and surrender the Demised Premises broom clean, and in good condition and repair, reasonable wear and tear excepted, together with all alterations, fixtures, installations, additions and improvements which may have been made in or attached on or to the Demised Premises.  Any personal property of Tenant or any subtenant or occupant which shall remain in or on the Demised Premises after the termination of this Lease and the removal of Tenant or such subtenant from the Demised Premises or the surrender by Tenant of the Demised Premises shall, following Landlord's written notice, be removed by Tenant, at

5243341.6                                         9

512

Tenant's cost and expense. Tenant's obligations under this Section shall survive the Expiration Date.

## ARTICLE 8. UTILITIES.

### Section 8.01.  Utilities:

Landlord shall provide all utilities at the Building and the Demised Premises, including, without limitation, electricity, gas, sewerage, fuel, water and heat. Tenant shall have a separate meter for electricity and water and shall be responsible for the payment of all services and charges related thereto. All other utilities shall be the responsibility of Landlord.

### Section 8.02.  Utility Interruption.

Landlord shall not be liable to Tenant in monetary or non-monetary damages or otherwise if any one or more of said utilities or services are interrupted, impaired or terminated because of failures, repairs, installations or improvements.

## ARTICLE 9. USE AND OPERATION.

### Section 9.01.  Use:

Tenant shall use the Demised Premises for the Permitted Use, and for no other use or purpose. Tenant understands and agrees that the Demised Premises are to be operated as a single unit and without limiting the generality of the foregoing, Tenant agrees that in no event shall the Demised Premises be physically subdivided so as to not be perceived by the public as a single store.

**Section 9.02.** Tenant agrees that it shall conduct its business at the Demised Premises on normal banking business days at its standard hours.

### Section 9.03.  Miscellaneous Obligations:

(a)  Keeping Demised Premises Clean:  Tenant shall keep the Demised Premises, including exterior and interior portions of all windows, doors and all other glass, in neat and clean condition.

(b)  Paying License Fees: Tenant shall pay promptly all license fees, permit fees and charges of a similar nature for the particular conduct by Tenant or any subtenant of any business or undertaking authorized hereunder to be conducted in the Demised Premises.

(c)  Garbage:  At all times during the Lease term the Tenant shall arrange for and pay for a commercial garbage pickup service. Tenant agrees not to permit the accumulation (unless in concealed metal containers) or burning of any rubbish or garbage in, on or about any part of the Demised Premises or the Building's exterior immediately adjacent to the Demised Premises.  Landlord shall handle and dispose of all rubbish and garbage in accordance with the reasonable regulations established by Landlord and shall not permit any rubbish or garbage to be

5243341.6

513

collected or disposed of from the Demised Premises, except by a company reasonably acceptable to Landlord and Landlord shall pay all costs and expenses for such disposal and collection.

## Section 9.04. Illegal Purposes:

Tenant shall not use the Demised Premises for any illegal trade, manufacture, or other business, or any other illegal purpose.

## ARTICLE 10.        TRANSFER OF INTEREST, PRIORITY OF LIEN.

### Section 10.01. Assignment, Subletting, etc.:

(a)      Tenant shall not sublet the Demised Premises or any part thereof, or assign, or transfer in any other manner, mortgage or hypothecate, or otherwise encumber this Lease or any interest therein, whether voluntarily or by operation of law, nor grant concessions or licenses for the occupancy of the Demised Premises or any part thereof, without Landlord's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed. Any attempted transfer, assignment, subletting, mortgage or hypothecation in breach of this Lease shall be void and confer no rights upon any third Person. No assignment or subletting shall relieve Tenant of any obligations herein. No assignee or sublessee or other occupant shall be entitled to occupy the Demised Premises for a use other than the Permitted Use. The consent by Landlord to any transfer, assignment or subletting shall not be deemed to be a waiver on the part of Landlord of any prohibition against any future transfer, assignment or subletting. No transfer, assignment or subletting shall be effective unless and until: (i) Tenant gives notice thereof to Landlord; and (ii) the transferee, assignee or sublessee shall deliver to Landlord: (1) a written agreement in form and substance satisfactory to Landlord pursuant to which the transferee or assignee assumes all of the obligations and liabilities of Tenant under this Lease, or the sublessee acknowledges that its sublease is subordinate to this Lease; and (2) a copy of the transfer, assignment or sublease.

(b)      Notwithstanding the aforementioned restrictions against subletting, licensing and usage, pursuant to Section 17.03 the Tenant may, from time to time, permit Urban Homesteading Assistance (U-HAB), Inc., or its subsidiary to occupy a portion of the Demised Premises for use to conduct meetings, trainings and outreach without fee, with the understanding that said usage will not interfere with Tenant's normal business activities.

### Section 10.02. Subordination:

(a)      This Lease shall be subordinate to the lien of any Mortgage, grant or regulatory agreement that may hereafter be placed on the Building or the Demised Premises. However, from time to time, Landlord may elect that this Lease be paramount to the lien of such Mortgage, and may exercise such election by giving notice thereof to Tenant, which notice must be concurred in by the related Mortgagee. The exercise of any of the elections provided in this Section shall not exhaust Landlord's right to elect differently thereafter, from time to time. This clause shall be self-operative and no further instrument shall be required, however, upon Landlord's request, from time to time, Tenant shall (a) confirm in writing and in recordable form that this Lease is so subordinate or so paramount (as Landlord may elect) to the lien of any Mortgage and/or (b) execute an instrument making this Lease so subordinate or so paramount (as

5243341.6                                    11

514

Landlord may elect) to the lien of any Mortgage, in such form as may be required by the related Mortgagee.

(b)    Notwithstanding anything to the contrary contained herein, in the event that the Building is encumbered by a Mortgage during the Term, Landlord agrees to obtain a subordination, nondisturbance and attornment agreement from the related Mortgagee on such Mortgagee's form within a reasonable period following such encumbrance.  Landlord further agrees to obtain a subordination, nondisturbance and attornment agreement as a condition to Tenant's agreement to subordinate its interest in this Lease pursuant to the provisions of Section 10.03.

**Section 10.03. Attornment:**

(a)    If the Demised Premises or the Building are encumbered by a Mortgage and such Mortgage is foreclosed, or if the Demised Premises or Building are sold pursuant to such foreclosure or by reason of a default under such Mortgage, then notwithstanding such foreclosure, such sale, or such default (i) Tenant shall not disaffirm this Lease or any of its obligations hereunder, and (ii) at the request of the applicable Mortgagee or purchaser at such foreclosure or sale, Tenant shall attorn to such Mortgagee or purchaser and execute a new lease for the Demised Premises setting forth all of the provisions of this Lease except that the term of such new lease shall be for the balance of the Term.

**Section 10.04. Transfer of Landlord's Interest:**

(a)    The term "Landlord" as used in this Lease means only the owner for the time being or the Mortgagee in possession for the time being of the Demised Premises.  In the event of any sale of the Demised Premises, said Landlord shall be and hereby is entirely freed and relieved of all of its covenants, obligations and liability hereunder until the expiration of the applicable Term, which Term shall not be automatically extended.  This subsection shall be applicable to each owner of the Demised Premises, from time to time, and shall not be limited to the first owner of the Demised Premises.  Tenant shall not be released prior to the expiration of the Term based solely upon Landlord's transfer of interest.

**ARTICLE 11.      DESTRUCTION AND FIRE INSURANCE.**

**Section 11.01. Rent Abatement:**

If the whole or any portion of the Demised Premises is damaged by fire or other casualty and is rendered untenantable thereby, then as of the date of such fire or casualty, Rent shall abate in proportion to the untenantable portion of the Demised Premises until the earlier to occur of: (i) sixty (60) days following the date that Landlord's restoration as provided in Section 11.03 is substantially completed; or (ii) the date Tenant reopens for business in such damaged portion of the Demised Premises.

**Section 11.02. Option to Terminate:**

(a)    If all or a substantial portion of the Demised Premises or the Building (even if the Demised Premises is not damaged) shall be damaged by fire or other casualty, this Lease

5243341.6                                                         12

515

shall not be terminated, except that if (i) the Building or areas in which the Demised Premises are located (whether or not the Demised Premises were damaged) shall be damaged to the extent of more than twenty-five (25%) percent of the replacement cost thereof, or (ii) the proceeds of Landlord's insurance recovered or recoverable as a result of such damage by fire or other casualty shall be insufficient to pay fully for the cost of replacement of the Building, or (iii) the Demised Premises or the Building shall be damaged as a result of a risk which is not covered by Landlord's insurance, or (iv) the Demised Premises shall be damaged in whole or in part during the last two (2) years of the Term or of any renewal term hereof, then in any such event, Landlord shall have the option to terminate this Lease upon giving notice of such termination within ninety (90) days following such casualty.

(b)     Notwithstanding the foregoing, if Landlord has not substantially completed the restoration of the Building and/or Demised Premises, as provided in Section 11.03, within eighteen (18) months following a fire or other casualty affecting the Demised Premises and areas outside of the Demised Premises, Tenant may, as its sole remedy, terminate this Lease, by notice to Landlord within thirty (30) days after the expiration of the foregoing applicable period.

(c)     In addition, if the Demised Premises are Substantially Damaged during the last two (2) years of the Term or any renewal term, Landlord or Tenant may terminate this Lease by notice to Landlord within ninety (90) days after following the date the Demised Premises are Substantially Damaged.  "Substantially Damaged" means a fire or other casualty resulting in damage to the Demised Premises which, a licensed architect certifies, cannot be repaired within sixty (60) days after the commencement of the restoration work.

### Section 11.03. Landlord's Obligation to Rebuild:

If all or any portion of the Demised Premises is damaged by fire or other casualty and if neither Landlord nor Tenant elects to terminate this Lease under Section 11.02 as a result thereof, Landlord shall, with reasonable diligence after such occurrence, repair or rebuild the Demised Premises.

### Section 11.04. Waiver of Subrogation:

See Exhibit C (Insurance Requirements)

### ARTICLE 12.    CONDEMNATION.

### Section 12.01. Definitions:

Within the meaning of Article 12, the following words have the following meaning:

(a)     Award:  means the award for or proceeds of any Taking including accrual interest thereon, less all expenses in connection therewith, including reasonable attorney's fees.

(b)     Taking:  means the taking of or damage to the Demised Premises or the Building or any portion thereof, as the case may be, as the result of the exercise of any power of eminent domain, condemnation, or purchase under threat in lieu thereof.

(c)     Taking Date: means, with respect to any Taking, the date on which the condemning authority shall have the right to possession of the Demised Premises or the Building or any portion thereof, as the case may be.

### Section 12.02. Total or Substantial Partial Taking of Demised Premises:

In the event of a Taking of the whole of the Demised Premises, other than a Taking for temporary use, this Lease shall automatically terminate as of the Taking Date. In the event of a Taking of any portion of the Demised Premises, either party may, at its option, terminate this Lease by giving notice to the other party within sixty (60) days of the Taking Date.

### Section 12.03. Restoration:

In the event of a Taking of a portion of the Demised Premises, other than a Taking for temporary use, and if this Lease is not terminated under the provisions of Section 12.02 hereof, Rent shall be reduced in the proportion that the area so Taken bears to the entire area contained within the Demised Premises. If a portion of the Demised Premises are subject to a Taking, Landlord shall with reasonable diligence restore or cause to be restored the remainder to the extent practical. However, Landlord may refuse to restore the remainder. If Landlord refuses to restore the remainder and gives notice of its refusal to Tenant, either party may terminate this Lease by giving notice to the other within ninety (90) days after Landlord shall have given notice of its determination not to repair the damage.

### ARTICLE 13.      INDEMNITY AND LIABILITY.

### Section 13.01. Indemnity:

(a)     Definition: Within the meaning of Article 13, "Claims" means any losses, claims, suits, proceedings, actions, causes of action, responsibility, liability, demands, judgments, and executions, including reasonable attorneys' fees and expenses for such Claims and for enforcing this indemnification.

(b)     To the fullest extent allowed by law, Tenant hereby indemnifies, defends and agrees to hold and save Landlord harmless from and against any and all Claims, which either (i) arise from any act or omission of Tenant in connection with Tenant's possession, use, occupation, management, repair, maintenance or control of the Demised Premises (other than Claims arising from or in connection with acts or omissions by Landlord in connection therewith); (ii) result from any Default by Tenant; or (iii) arise from any Claims for bodily injury (including mental injury or death), personal injury (including violation of civil rights, defamation, wrongful arrest and invasion of privacy), property damage, theft, and damage to the environment, alleged to have been caused by Tenant's or Tenant's Agents' acts or omissions, other than as set forth herein. Tenant shall defend any actions, suits and proceedings which may be brought against Landlord with respect to the foregoing or in which they may be impleaded. Tenant shall pay, satisfy and discharge any judgments, orders and decrees which may be recovered against Landlord in connection with the foregoing. Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord. This indemnification agreement is separate and apart from and in no way limited by, any insurance provided pursuant to this Lease or otherwise. Tenant shall give prompt notice to Landlord of any Claims related hereto.

5243341.6                              14

517

## Section 13.02. Insurance:

As outlined in Exhibit C attached hereto, Tenant shall maintain insurance coverage covering its equipment located in the Demised Premises and shall name Landlord as additional insured under such policies. All other insurance coverage for the Demised Premises and the Building shall be provided and maintained by Landlord. Both parties hereby release the other, and waives their entire right of recovery against the other, for direct or consequential loss, damage or expense arising out of or resulting from fire, explosion or other casualty or occurrence incurred, which loss, damage or expense is then covered in whole or in part by the insurance maintained or required to be maintained by Landlord and Tenant pursuant to this Lease, whether due to the negligence of Landlord or Tenant or their agents, employees, contractors and/or invitees.

### ARTICLE 14.    COVENANT OF QUIET ENJOYMENT.

## Section 14.01. Covenant of Quiet Enjoyment.

Landlord covenants that if Tenant pays the Rent and all other charges provided for herein, performs all of its obligations provided for hereunder, and observes all of the other provisions hereof, Tenant shall at all times during the Term peaceably and quietly have, hold and enjoy the Demised Premises, without any interruption or disturbance from Landlord, subject to the terms hereof.

### ARTICLE 15.    FAILURE TO PERFORM, DEFAULTS, REMEDIES.

## Section 15.01. Defaults, Conditional Limitation:

(a)    Each of the following events shall constitute a "Default":

(i)    If Tenant shall (x) make an assignment for the benefit of creditors, (y) file or acquiesce to a petition in any court (whether or not pursuant to any statute of the United States or of any state) in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceeding, (z) make an application in any such proceeding for or acquiesce to the appointment of a trustee or receiver for it for all or any portion of its property.

(ii)    If any petition shall be filed against Tenant, to which it shall not acquiesce in any court (whether or not pursuant to any statute of the United States or any state) in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceeding, and (x) Tenant shall thereafter be adjudicated a bankrupt, or (y) such petition shall be approved by any such court, or (z) such proceeding shall not be dismissed, discontinued or vacated within sixty (60) days.

(iii)    If, in any proceeding, pursuant to the application of any person other than Tenant to which it shall not acquiesce, a receiver or trustee shall be appointed for Tenant or for all or any portion of the property of either and such receivership or trusteeship shall not be set aside within sixty (60) days after such appointment.

52433341.6

15

518

(iv)     If Tenant shall fail to pay any Rent, or any other charge required to be paid by Tenant hereunder, when the same shall become due and payable, and such failure shall continue for five (5) days after Landlord shall give notice of the failure to Tenant.

(v)     If Tenant shall fail to perform or observe any other requirement of this Lease to be performed or observed by Tenant but not specifically referred to in this Section 15.01(a), and such failure shall continue for thirty (30) days after Landlord shall give notice of the failure to Tenant, or if such failure is of a nature to require more than thirty (30) days for remedy and continues beyond the time reasonably necessary to cure (provided Tenant must have undertaken procedures to cure the default within such thirty day period and diligently pursue such efforts to cure to completion).

(b)     This Lease is subject to the following limitation:  If at any time, a Default shall occur and continue beyond any applicable cure period, Landlord may give to Tenant a notice of intention to end the Term of this Lease at the expiration of forty-five (45) days from the date of service of such notice of termination.  At the expiration of such forty-five (45) days, to the extent Tenant has not cured such Default, this Lease and the Term as well as all of the right, title and interest of the Tenant hereunder shall wholly cease and expire, and Tenant shall then quit and surrender the Demised Premises to the Landlord and this Lease shall be terminated.

## Section 15.02. Landlord's Re-Entry:

If this Lease shall be terminated pursuant to Section 15.01(b), Landlord, or its agents or employees, may re-enter the Demised Premises at any time and remove Tenant, Tenant's Agents, and subtenants, and any licensees, concessionaires or invitees, together with any of its or their property, either by summary dispossess proceedings or by any suitable action or proceeding at law. In the event of such termination, Landlord may repossess and enjoy the Demised Premises. Landlord shall be entitled to the benefits of all provisions of law respecting the speedy recovery of lands and tenements held over by Tenant, or proceedings in forceable entry and detainer.

## Section 15.03. Deficiency:

In case of re-entry, repossession or termination of this Lease, whether the same is the result of the institution of summary or other proceedings or not, Tenant shall remain liable (in addition to accrued liabilities) to the extent legally permissible for the (x) unpaid Rent, if any, and all other charges provided for herein owing as of the date of such re-entry, repossession or termination; and (y) commercially reasonable expenses which Landlord may incur in re-entering the Demised Premises, repossessing the same, or making good any Default of Tenant.  In addition to the foregoing, Tenant shall pay to Landlord such sums as the court which has jurisdiction thereover may adjudge reasonable as attorney's fees with respect to any successful lawsuit or action instituted by Landlord to enforce the provisions hereof.

## Section 15.04. Landlord's Right to Perform for Account of Tenant:

If Tenant shall be in Default hereunder, Landlord may, at any time thereafter, cure said Default for the account and at the expense of Tenant. Tenant shall pay, on demand, to Landlord, the amount so paid, expended, or incurred by the Landlord and any expense of Landlord including attorney's reasonable fees incurred in connection with curing such Default.

519

**Section 15.05. Additional Remedies, Waivers, Etc.:**

With respect to the rights and remedies of and waivers by Landlord, the rights and remedies of Landlord set forth herein shall be in addition to any other right and remedy now and hereafter provided by law. All such rights and remedies shall be cumulative and not exclusive of each other. Landlord may exercise such rights and remedies at such times, in such order, to such extent, and as often as Landlord deems advisable without regard to whether the exercise of one right or remedy precedes, concurs with or succeeds the exercise of another. A single or partial exercise of a right or remedy shall not preclude (i) a further exercise thereof, or (ii) the exercise of another right or remedy, from time to time. No delay or omission by Landlord in exercising a right or remedy shall exhaust or impair the same or constitute a waiver of, or acquiescence to a Default. No waiver of a Default shall extend to or affect any other Default or impair any right or remedy with respect thereto. No action or inaction by Landlord shall constitute a waiver of a Default. No waiver of a Default shall be effective, unless it is in writing.

**Section 15.06. Landlord's Default:**

If Landlord should be in default in the performance of any of its obligations under this Lease, which default continues for a period of more than thirty (30) days after receipt of written notice from Tenant specifying such default, or if such default is of a nature to require more than thirty (30) days for remedy and continues beyond the time reasonably necessary to cure (provided Landlord must have undertaken procedures to cure the default within such thirty day period and diligently pursue such efforts to cure to completion), Tenant may, in addition to availing itself of any other remedies available at law and in equity, at its option, upon written notice, incur any expense necessary to perform the obligation of Landlord specified in such notice and deduct such expense from the Rent or other charges next becoming due, and Tenant shall also have the right to terminate this Lease upon written notice to Landlord.

### ARTICLE 16.    ESTOPPEL CERTIFICATE:

**Section 16.01. Estoppel Certificate:**

At any time within fifteen (15) days after written request by Landlord, Tenant shall, execute, acknowledge and deliver to Landlord a written statement, duly acknowledged: (a) ratifying this Lease; (b) confirming the Rent Commencement Date and Expiration Date (if then ascertainable at the time of the request for such statement); (c) certifying (i) that Tenant is in occupancy of the Demised Premises and the date Tenant commenced operating Tenant's business therein (to the extent applicable at the time of the request for such statement) and (ii) that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended, except by such writings as shall be stated; (d) certifying that Landlord has fulfilled all its obligations under this Lease, except such as shall be stated; (e) certifying that there are no defenses or offsets against Landlord's enforcement of this Lease by Landlord, except such as shall be stated; (f) reciting the amount of Rent Tenant has paid prior to the date thereof; and (g) certifying as to such other matters concerning the Lease as may be reasonably required by Landlord.

5243341.6

17

520

**ARTICLE 17.**    **RIGHT OF ACCESS:**

#### Section 17.01. Entry:

Subject to Tenant's security requirements and upon reasonable notice, during any reasonable time before and after the date of Delivery of Possession, Landlord may enter upon the Demised Premises, any portion thereof and any appurtenances thereto (with men and materials, if required) for the purpose of: (a) inspecting same; (b) making such repairs, replacements or alterations which it may be required to perform as herein provided or which are required in order to comply with laws and court orders or to prevent waste or deterioration; and (c) showing the Demised Premises to prospective purchasers, mortgagees or lessees.

#### Section 17.02. Easement for Pipes:

Subject to Tenant's security requirements and upon reasonable notice, Tenant shall permit Landlord to erect, use, maintain and repair pipes, cables, conduits, plumbing, vents and wires in, to and through the Demised Premises as and to the extent that Landlord may now or hereafter deem to be necessary or appropriate for the proper operation and maintenance of the Building, provided they are concealed within the walls and do not decrease the useable square footage of the Demised Premises.

#### Section 17.03. Community Room:

Tenant shall permit Urban Homesteading Assistance (U-HAB), Inc., and its agents, employees, contractors and invitees to access the Community Room upon reasonable notice at such times approved by Tenant, such approval not to be unreasonably withheld.

**ARTICLE 18.**    **INTERPRETATION, NOTICE, MISCELLANEOUS.**

#### Section 18.01. Interpretation:

(a)    If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

(b)    The captions and headings used throughout this Lease are for convenience of reference only and shall not affect the interpretation of this Lease.

(c)    This Lease may be executed in several counterparts; but the counterparts shall constitute but one and the same instrument.

(d)    Wherever a requirement is imposed on any party hereto, it shall be deemed that such party shall be required to perform such requirement at its own expense unless it is specifically otherwise provided herein.

(e)    The singular includes the plural and the plural includes the singular.

5243341.6

18

521

(f)    This Lease shall be construed and enforced in accordance with the laws of the State of New York.

### Section 18.02. Construing Various Words and Phrases:

Wherever it is provided herein that a party may perform an act or do anything, it shall be construed that that party may, but shall not be obligated to, so perform or so do.

### Section 18.03. No Oral Changes:

This Lease may not be changed or terminated orally.

### Section 18.04. Communications:

No notice, request, consent, approval, waiver or other communication under this Lease shall be effective unless the same is in writing and is mailed by registered or certified mail, return receipt requested, postage prepaid, or sent by a generally recognized overnight carrier with receipted delivery, such as, but not limited to Federal Express, addressed:

(a)    If to Landlord, to the address designated as Landlord's Notice Address in Article 1, or such other address as Landlord designates by giving notice thereof to Tenant, with a copy thereof under separate cover to the address designated as Landlord's Notice Copy Address in Article 1, and with a copy(s) thereof under separate cover to the address(es) and person(s) designated as Landlord's Mortgagee Notice Copy Address in Article 1, if any, or to such other person or party as Landlord shall designate by notice to Tenant, and

(b)    If to Tenant, to the address designated as Tenant's Notice Address in Article 1, or such other address as Tenant shall designate by giving notice thereof to Landlord, with a copy thereof under separate cover to the address designated as Tenant's Notice Copy Address in Article 1 or to such other person or party as Tenant shall designate by giving notice thereof to Landlord.

### Section 18.05. Method of Payment:

Except as herein otherwise expressly provided, all amounts payable under this Lease shall be payable by ACH, wire transfer or check which at the time of payment is legal tender for public and private debts.

### Section 18.06. Successors and Assigns:

Subject to the provisions hereof, this Lease shall bind and inure to the benefit of the parties and their respective successors, representatives, heirs and assigns.

### Section 18.07. Responsibility of Tenant:

Any restriction on or requirement imposed upon Tenant hereunder shall be deemed to extend to Tenant's subtenants, concessionaires and licensees and it shall be Tenant's obligation to cause the foregoing persons to comply with such restriction or requirement.

### Section 18.08. Waiver of Jury Trial:

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, Tenant's use and occupancy of the Demised Premises and/or any claim of injury or damage relating thereto.

### Section 18.09. Regulatory Approvals:

The obligations of Tenant under this Lease are subject to, and conditioned on, Tenant obtaining all necessary regulatory approvals (the "Regulatory Approvals") for the operation of a branch at the Demised Premises. Tenant shall, at Tenant's expense (i) use reasonable diligent efforts to obtain the Regulatory Approvals, (ii) keep Landlord informed of the status of obtaining the Regulatory Approvals and (iii) notify Landlord promptly upon obtaining the Regulatory Approvals. If the Regulatory Approvals are not granted to the Tenant, then this Lease shall automatically be deemed terminated and neither party shall have any further obligation to the other.

### Section 18.10. Execution:

This Lease shall be of no force and effect unless and until it is executed by both Landlord and Tenant.

[SIGNATURE LINES CONTAINED ON FOLLOWING PAGE]

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 525 of 834

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed as of the day and year first above written.

UHAB HOUSING DEVELOPMENT CORP.:

By: _____

Name:    ANDREW REICHER

Title:    PRESIDENT

LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION:

By: _____

Name: Maureen Genna

Title    C EO

5243341.6

524

## EXHIBIT A

Demised Premises

2283-2285 Second Avenue, New York, NY 10035
Block 1667 and Lot 21 and 122 in the Borough of Manhattan, County, City and State of New York

5243341.6                                                    2

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 527 of 834

## EXHIBIT B

Site Plan

# EXHIBIT C

## Insurance Requirements

5243341.6

4

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 529 of 834

## EXHIBIT B

Site Plan

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 530 of 834

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 531 of 834

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 532 of 834
NYSCEF DOC. NO. 92

INDEX NO. 528433/2024

RECEIVED NYSCEF: 06/06/2025

531

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 533 of 834



Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 534 of 834

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 535 of 834



Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 536 of 834

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 537 of 834

# EXHIBIT C

## Insurance Requirements

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 538 of 834

## Exhibit B

### Insurance; Casualty; ~~Condemnation~~

7.01    **Compliance with Insurance Standards.** (a) Tenant shall not violate, or permit the violation of, any condition imposed by any insurance policy then issued in respect of the Project and shall not do, or permit anything to be done, or keep or permit anything to be kept in the Premises, which would subject Landlord, any Superior Lessor or any Superior Mortgagee to any liability or responsibility for personal injury or death or property damage, or which would increase any insurance rate in respect of the Project over the rate which would otherwise then be in effect or which would result in insurance companies of good standing refusing to insure the Project in amounts reasonably satisfactory to Landlord, or which would result in the cancellation of, or the assertion of any defense by the insurer in whole or in part to claims under, any policy of insurance in respect of the Project.

(b)    If, by reason of any failure of Tenant to comply with this Lease, the premiums on Landlord's insurance on the Project shall be higher than they otherwise would be, Tenant shall reimburse Landlord, on demand, for that part of such premiums attributable to such failure on the part of Tenant. A schedule or "make up" of rates for the Project or the Premises, as the case may be, issued by the New York Fire Insurance Rating Organization or other similar body making rates for insurance for the Project or the Premises, as the case may be, shall be conclusive evidence of the facts therein stated and of the several items and charges in the insurance rate then applicable to the Project or the Premises, as the case may be.

7.02    **Tenant's Insurance.** (a) Tenant shall maintain at all times during the Term (i) "all risk" property insurance covering all present and future Tenant's Property, Fixtures and Improvements and Betterments to a limit of not less than the full replacement cost thereof, (ii) commercial general liability insurance, including a contractual liability endorsement, and personal injury liability coverage, in respect of the Premises and the conduct or operation of business therein, with Landlord, :            / and Landlord's Agent, and each Superior Lessor and Superior Mortgagee whose name and address shall have been furnished to Tenant, as additional insureds, with limits of not less than $5,000,000 combined single limit for bodily injury and property damage liability in any one occurrence, (iii) boiler and machinery insurance, if there is a boiler, supplementary air conditioner or pressure object or similar equipment in the Premises, with Landlord and its managing agent, if any, and each Superior Lessor and Superior Mortgagee whose name and address shall have been furnished to Tenant, as additional insureds, with limits of not less than $5,000,000, (iv) ~~when Alterations are in process, the insurance specified in Section 4.02(f)~~ and (v) plate glass insurance covering all plate glass located in or on the Ground Floor Premises. The limits of such insurance shall not limit the liability of Tenant. Tenant shall deliver to Landlord's Agent, at least ten (10) days prior to the Possession Date, such fully paid for policies or certificates of insurance, in form reasonably satisfactory to Landlord issued by the insurance company or its authorized agent. Tenant shall procure and pay for renewals of such insurance from time to time before the expiration thereof, and Tenant shall deliver to Landlord's Agent such renewal policy or a certificate thereof at least thirty (30) days before the expiration of any existing policy. All such policies shall be issued by companies of recognized responsibility licensed to do business in New York State and rated by Best's Insurance Reports or any successor publication of comparable standing as A-/VIII or better or

-43-

us\BADAIDA\7963131.13

the then equivalent of such rating, and all such policies shall contain a provision whereby the same cannot be canceled, allowed to lapse or modified unless Landlord and any additional insureds are given at least thirty (30) days' prior written notice of such cancellation, lapse or modification. The proceeds of policies providing "all risk" property insurance of Tenant's Property, Fixtures and Improvements and Betterments shall be payable to Landlord, Tenant and each Superior Lessor and Superior Mortgagee as their interests may appear. Tenant shall cooperate with Landlord in connection with the collection of any insurance monies that may be due in the event of loss and Tenant shall execute and deliver to Landlord such proofs of loss and other instruments which may be required to recover any such insurance monies. Landlord may from time to time require that the amount of the insurance to be maintained by Tenant under this Section 7.02 be increased, so that the amount thereof adequately protects Landlord's interest.

(b)    Notwithstanding any provision to the contrary contained herein, any of the insurance coverages described in Section 7.02(a), may be effected by a policy or policies of blanket insurance covering the Premises and other premises owned or leased by Tenant, provided that Tenant obtains Landlord's prior written approval of the same by delivering said policy or policies, or certificates thereof, to Landlord. Landlord's approval of said blanket insurance in lieu of any of the insurance coverages described in Section 7.02(a), shall not be unreasonably withheld, conditioned or delayed, provided that said blanket insurance otherwise complies with the provisions of Section 7.02(a), to the extent applicable and adequately protects Landlord, in Landlord's reasonable judgment, exercised in good faith.

7.03    **Subrogation Waiver**. Landlord and Tenant shall each include in each of its insurance policies (insuring the Project in case of Landlord, and insuring Tenant's Property, Fixtures and Improvements and Betterments in the case of Tenant, against loss, damage or destruction by fire or other casualty) a waiver of the insurer's right of subrogation against the other party during the Term or, if such waiver should be unobtainable or unenforceable, (a) an express agreement that such policy shall not be invalidated if the assured waives the right of recovery against any party responsible for a casualty covered by the policy before the casualty or (b) any other form of permission for the release of the other party. Each party hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage or destruction with respect to its property occurring during the Term to the extent to which it is, or is required to be, insured under a policy or policies containing a waiver of subrogation or permission to release liability. Nothing contained in this Section 7.03 shall be deemed to relieve either party of any duty imposed elsewhere in this Lease to repair, restore or rebuild or to nullify any abatement of rents provided for elsewhere in this Lease.

~~7.04    Condemnation.    (a) If there shall be a total taking of the Building in condemnation proceedings or by any right of eminent domain, this Lease and the term and estate hereby granted shall terminate as of the date of taking of possession by the condemning authority and all Rent shall be prorated and paid as of such termination date. If there shall be a taking of any material (in Landlord's reasonable judgment exercised in good faith) portion of the Land or the Building (whether or not the Premises are affected by such taking), then Landlord may terminate this Lease and the term and estate granted hereby by giving written notice to Tenant within sixty (60) days after the date of taking of possession by the condemning authority. If~~

-44-

539

# EXHIBIT D

540

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

_____ Filed:_____

TIMOTHY MILLER,                                           INDEX NO.

               Plaintiff,

                                     Plaintiff designates Kings
-against-                                                 County as the place of trial.

UHAB HOUSING DEVELOPMENT FUND CORPORATION,    **S U M M O N S**
LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION,
and EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION,   The basis of venue is
                                                 Plaintiff's residence:
                    Defendant(s).                437 Union Avenue
_____ Brooklyn, New York

**To the above named Defendant(s):**

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a

copy of your answer on the plaintiff's attorneys within 20 days after the service of this summons,

exclusive of the day of service of this summons, or within 30 days after service of this summons is

complete if this summons is not personally delivered to you within the State of New York.

    In case of your failure to answer this summons, a judgment by default will be taken against

you for the relief demanded in the complaint, together with the costs of this action.

Dated: Brooklyn, New York
       November 10, 2021

                                  Yours, etc.,
                                  *Brian M. King*

                            _____
                            By: Brian M. King, Esq.
                            **BRIAN M. KING LAW OFFICE, PLLC**
                            Attorneys for Plaintiff
                            1400 Avenue Z, Suite 503
                            Brooklyn, New York 11235
                            (718) 942-5100

541

**Defendants' addresses:**

UHAB HOUSING DEVELOPMENT FUND CORPORATION
120 Wall Street, 20th Floor
New York, New York 10005
and
*Via Secretary of State*

LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION
37 Avenue B
New York, NY 10009

EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION
2285 2nd Avenue
New York, NY 10035

**FORWARD TO YOUR INSURANCE COMPANY IMMEDIATEY**

542

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---

TIMOTHY MILLER,

           Plaintiff,

   -against-

UHAB HOUSING DEVELOPMENT FUND CORPORATION,
LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, and
EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION,
           Defendant(s).

INDEX NO.

**VERIFIED COMPLAINT**

---

Plaintiff, by his attorneys, BRIAN M. KING LAW OFFICE, PLLC, as and for his Verified Complaint, respectfully alleges, upon information and belief:

1. The plaintiff, TIMOTHY MILLER, at all times herein mentioned was and still is a resident of the County of Kings and the State of New York.

2. The defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION, at all times herein mentioned, was and still is a corporation organized and existing under the laws of the State of New York, with its principal place of business situated in the County of New York and the State of New York.

3. The defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, at all times herein mentioned, was and still is a corporation organized and existing under the laws of the State of New York, with its principal place of business situated in the County of New York and the State of New York.

4. The defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, at all times herein mentioned, was and still is a corporation organized and existing under the laws of the State of New York, with its principal place of business situated in the County of New York and the State of New York.

5. On or about February 22, 2021, and at all time herein mentioned, the sidewalk adjacent to and in front of 2285 2nd Avenue, New York, New York was and still is a public sidewalk and/or

543

premises in the County of New York, City and State of New York.

6. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION was and still is a corporation duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

7. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION was and still is a limited partnership duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

8. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION was and still is a limited liability partnership duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

9. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION was and still is a limited liability corporation duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

10. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION was and still is a sole proprietorship duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

11. At all times herein mentioned, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION transacted business within the State of New York.

12. At all times herein mentioned, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION derived substantial revenue from goods used or consumed or services rendered in the State of New York.

13. At all times herein mentioned, defendant UHAB HOUSING DEVELOPMENT FUND

544

CORPORATION expected or should reasonably have expected its acts to have consequences in the State of New York.

14. At all times herein mentioned, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION derived substantial revenue from interstate or international commerce.

15. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION was the owner of the land located at and known as 2285 2nd Avenue, New York, New York.

16. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION was the owner of the building located at and known as 2285 2nd Avenue, New York, New York.

17. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION was the owner of the premises located at and known as 2285 2nd Avenue, New York, New York.

18. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION was the lessor of the land, building, and premises located at and known as 2285 2nd Avenue, New York, New York.

19. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION was the lessee of the land, building, and premises located at and known as 2285 2nd Avenue, New York, New York.

20. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION through its agents, servants, and/or employees operated the aforesaid land, building, and premises.

21. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION through its agents, servants, and/or employees managed the aforesaid land, building, and premises.

22. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION through its agents, servants, and/or employees controlled the aforesaid

545

land, building, and premises.

23. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION through its agents, servants, and/or employees maintained the aforesaid land, building, and premises.

24. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION through its agents, servants, and/or employees inspected the aforesaid land, building, and premises.

25. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION through its agents, servants, and/or employees repaired the aforesaid land, building, and premises.

26. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION through its agents, servants, and/or employees supervised the aforesaid land, building, and premises.

27. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION through its agents, servants, and/or employees constructed the aforesaid land, building, and premises.

28. That at all time hereinafter mentioned defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION through its agents, servants, and/or employees designed the aforesaid land, building, and premises.

29. That on or about February 22, 2021, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION, owned the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

30. That on or about February 22, 2021, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION, its agents, servants and/or employees operated the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

31. That on or about February 22, 2021, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION, its agents, servants and/or employees managed the sidewalk and the

546

sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

32. That on or about February 22, 2021, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION, its agents, servants and/or employees maintained the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

33. That on or about February 22, 2021, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION, its agents, servants and/or employees controlled the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

34. That on or about February 22, 2021, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION, its agents, servants and/or employees repaired the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

35. That on or about February 22, 2021, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION, its agents, servants and/or employees supervised the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

36. That on or about February 22, 2021, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION, its agents, servants and/or employees inspected the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

37. That on or about February 22, 2021, defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION, its agents, servants and/or employees constructed the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

38. At all times herein mentioned, it was the duty of the defendant UHAB HOUSING DEVELOPMENT FUND CORPORATION, defendant's servants, agents and/or employees to maintain said sidewalk and the sidewalk cellar doors located at 2285 2nd Avenue, New York, New York, in a reasonably safe and suitable condition and in good repair.

39. At all times herein mentioned, defendant, UHAB HOUSING DEVELOPMENT FUND CORPORATION, did negligently, carelessly, recklessly and dangerously create a dangerous condition on or in front 2285 2nd Avenue, in the County of New York, City and State of New York.

547

40. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION was and still is a corporation duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

41. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION was and still is a limited partnership duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

42. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION was and still is a limited liability partnership duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

43. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDT UNION was and still is a limited liability corporation duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

44. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION was and still is a sole proprietorship duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

45. At all times herein mentioned, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION transacted business within the State of New York.

46. At all times herein mentioned, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION derived substantial revenue from goods used or consumed or services rendered in the State of New York.

47. At all times herein mentioned, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION expected or should reasonably have expected its acts to have consequences in

548

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 550 of 834

the State of New York.

48. At all times herein mentioned, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION derived substantial revenue from interstate or international commerce.

49. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION was the owner of the land located at and known as 2285 2nd Avenue, New York, New York.

50. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION was the owner of the building located at and known as 2285 2nd Avenue, New York, New York.

51. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION was the owner of the premises located at and known as 2285 2nd Avenue, New York, New York.

52. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION was the lessor of the land, building, and premises located at and known as 2285 2nd Avenue, New York, New York.

53. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION was the lessee of the land, building, and premises located at and known as 2285 2nd Avenue, New York, New York.

54. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees operated the aforesaid land, building, and premises.

55. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees managed the aforesaid land, building, and premises.

56. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees controlled the aforesaid land, building, and premises.

549

57. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees maintained the aforesaid land, building, and premises.

58. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees inspected the aforesaid land, building, and premises.

59. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees repaired the aforesaid land, building, and premises.

60. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees supervised the aforesaid land, building, and premises.

61. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees constructed the aforesaid land, building, and premises.

62. That at all time hereinafter mentioned defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees designed the aforesaid land, building, and premises.

63. That on or about February 22, 2021, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, owned the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

64. That on or about February 22, 2021, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees operated the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

65. That on or about February 22, 2021, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees managed the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

550

66. That on or about February 22, 2021, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees maintained the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

67. That on or about February 22, 2021, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees controlled the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

68. That on or about February 22, 2021, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees repaired the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

69. That on or about February 22, 2021, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees supervised the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

70. That on or about February 22, 2021, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees inspected the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

71. That on or about February 22, 2021, defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees constructed the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

72. At all times herein mentioned, it was the duty of the defendant LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, defendant's servants, agents and/or employees to maintain said sidewalk and the sidewalk cellar doors located at 2285 2nd Avenue, New York, New York, in a reasonably safe and suitable condition and in good repair.

73. At all times herein mentioned, defendant, LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, did negligently, carelessly, recklessly and dangerously create a dangerous condition on or in front 2285 2nd Avenue, in the County of New York, City and State of New York.

74. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION was and still is a corporation duly organized and existing by virtue

551

of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

75. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION was and still is a limited partnership duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

76. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION was and still is a limited liability partnership duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

77. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION was and still is a limited liability corporation duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

78. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION was and still is a sole proprietorship duly organized and existing by virtue of the laws of the State of New York and/or doing business in the County of New York and the State of New York.

79. At all times herein mentioned, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION transacted business within the State of New York.

80. At all times herein mentioned, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION derived substantial revenue from goods used or consumed or services rendered in the State of New York.

81. At all times herein mentioned, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION expected or should reasonably have expected its acts to have consequences in the State of New York.

82. At all times herein mentioned, defendant EAST HARLEM PEOPLE'S FEDERAL

552

CREDIT UNION derived substantial revenue from interstate or international commerce.

83. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION was the owner of the land located at and known as 2285 2nd Avenue, New York, New York.

84. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION was the owner of the building located at and known as 2285 2nd Avenue, New York, New York.

85. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION was the owner of the premises located at and known as 2285 2nd Avenue, New York, New York.

86. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION was the lessor of the land, building, and premises located at and known as 2285 2nd Avenue, New York, New York.

87. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION was the lessee of the land, building, and premises located at and known as 2285 2nd Avenue, New York, New York.

88. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees operated the aforesaid land, building, and premises.

89. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees managed the aforesaid land, building, and premises.

90. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees controlled the aforesaid land, building, and premises.

91. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees maintained the

553

aforesaid land, building, and premises.

92. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees inspected the aforesaid land, building, and premises.

93. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees repaired the aforesaid land, building, and premises.

94. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees supervised the aforesaid land, building, and premises.

95. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees constructed the aforesaid land, building, and premises.

96. That at all time hereinafter mentioned defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION through its agents, servants, and/or employees designed the aforesaid land, building, and premises.

97. That on or about February 22, 2021, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, owned the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

98. That on or about February 22, 2021, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees operated the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

99. That on or about February 22, 2021, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees managed the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

100. That on or about February 22, 2021, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees maintained the sidewalk and

554

555

the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

101. That on or about February 22, 2021, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees controlled the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

102. That on or about February 22, 2021, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees repaired the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

103. That on or about February 22, 2021, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees supervised the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

104. That on or about February 22, 2021, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees inspected the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

105. That on or about February 22, 2021, defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, its agents, servants and/or employees constructed the sidewalk and the sidewalk cellar doors adjacent to and in front of 2285 2nd Avenue, New York, New York.

106. At all times herein mentioned, it was the duty of the defendant EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, defendant's servants, agents and/or employees to maintain said sidewalk and the sidewalk cellar doors located at 2285 2nd Avenue, New York, New York, in a reasonably safe and suitable condition and in good repair.

107. At all times herein mentioned, defendant, EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, did negligently, carelessly, recklessly and dangerously create a dangerous condition on or in front 2285 2nd Avenue, in the County of New York, City and State of New York.

108. That on February 22, 2021, plaintiff TIMOTHY MILLER was lawfully upon the sidewalk on or in front of 2285 2nd Avenue, in the County of New York, City and State of New York.

109. That on February 22, 2021, while the plaintiff, TIMOTHY MILLER, was at the

sidewalk in front 2285 2nd Avenue, in the County of New York, City and State of New York, plaintiff was caused to trip and fall, and sustained serious and permanent personal injuries as a result of a defective condition on the sidewalk and/or sidewalk cellar doors.

110. That all of the foregoing occurred solely as a result of the carelessness, recklessness and negligence of the defendant(s), its agents, servants and/or employees in the ownership, operation, management, maintenance, repair, inspection, and control of the aforesaid, sidewalk, sidewalk cellar doors, land, building and premises.

110. By reason of the foregoing, plaintiff, TIMOTHY MILLER, was severely injured and damaged, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are believed to be permanent in nature and duration, and plaintiff will be permanently caused to suffer pain, inconvenience and other effects of such injuries; plaintiff incurred and in the future will necessarily incur further hospital and/or medical expenses in an effort to be cured of said injuries and will be unable to pursue his usual duties with the same degree of efficiency as prior to this accident, all to his great damage.

112. That all of the foregoing occurred without any comparative negligence on the part of plaintiff contributing thereto.

113. Solely as a result of the defendant's negligence, carelessness and recklessness, TIMOTHY MILLER was caused to suffer severe, serious, and permanent personal injuries to mind and body, and further, that TIMOTHY MILLER was subjected to great physical pain and mental anguish.

114. This action falls within one or more of the exceptions set forth in Section 1602 of the Civil Practice Law and Rules.

115. Due to defendant's negligence, plaintiff, TIMOTHY MILLER, is entitled to damages in a sum which exceeds the jurisdictional limit of all lower Courts which would otherwise have jurisdiction.

**WHEREFORE**, the plaintiff demands judgment awarding damages in an amount exceeding the monetary jurisdictional limits of all lower courts which

556

557

would otherwise have jurisdiction, together with interest and the costs and disbursements of this

action, and such other and further relief as to this Court seems just and proper.

Dated: Brooklyn, New York
November 10, 2021

Yours, etc.,

*Brian M. King*

_____

By: Brian M. King, Esq.
**BRIAN M. KING LAW OFFICE, PLLC**
Attorneys for Plaintiff
1400 Avenue Z, Suite 503
Brooklyn, New York 11235
(718) 942-5100

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF __KINGS__

TIMOTHY    MILLER,                              INDEX NO. _____

                              Plaintiff(s)      PLAINTIFF'S
                                                VERIFICATION
              -against-

UHAB HAUSING DEVELOPMENT FUND
CORPORATION, LOWER EAST SIDE PEOPLE'S
FEDERAL CREDIT UNION, and EAST
HARLEM PEOPLE'S FEDERAL CREDIT UNION,
                              Defendant(s)

STATE OF NEW YORK
COUNTY OF __Kings__

__Timothy Miller__, being duly sworn, deposes and says:

I have read the foregoing __Complaint__ and know the contents thereof and the same is true to the best of my knowledge, except as to those matters herein stated to be alleged upon information and belief and that as to those matters, I verily believe them to be true.

                                          _Timothy Miller_
                                          Print: TIMOTHY MILLER.

Sworn to before me this
__10__ day of __November__, 2021

_____
NOTARY PUBLIC

                    LISANDRO DIAZ
                    Commissioner of Deeds
                    City of New York: 2-12034
                    Certificate filed in Kings County
                    Commission Expires December 1, 20

                              1-1-23

558

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS                              Index No.

============================================================

TIMOTHY MILLER,

                                Plaintiff,

                          -against-

UHAB HOUSING DEVELOPMENT FUND CORPORATION, LOWER EAST SIDE
PEOPLE'S FEDERAL CREDIT UNION, and EAST HARLEM PEOPLE'S FEDERAL CREDIT
UNION,

                                Defendants.

============================================================

## SUMMONS and VERIFIED COMPLAINT

============================================================

**BRIAN M. KING LAW OFFICE, PLLC**
Attorneys for Plaintiff
Office and Post Office Address and Telephone
1400 Avenue Z, Suite 503
Brooklyn, New York 11235
(718) 942-5100

============================================================

Yours, etc.,

**BRIAN M. KING LAW OFFICE, PLLC**
*Attorneys for* Plaintiff

559

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 561 of 834

# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

———————————————————————

TIMOTHY MILLER,

                                    Plaintiff,

              -against-

UHAB HOUSING DEVELOPMENT FUND CORPORATION,
LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION,
and EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION,
                                    Defendant(s).

———————————————————————

INDEX NO. 528913/2021

**VERIFIED BILL OF PARTICULARS**

Plaintiff, by his attorney(s), Brian M. King Law Office, PLLC, in response to the Demand

for a Bill of Particulars served by Defendants LOWER EAST SIDE PEOPLE'S FEDERAL

CREDIT UNION, and EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION, as and for a

Bill of Particulars, respectfully alleges, upon information and belief:

1.       Plaintiff's full name is TIMOTHY MILLER. Plaintiff resides at 132-10 South

Conduit Avenue, Queens, NY 11430.

2.       Plaintiff's date of birth is xx/xx/1985.

3.       Plaintiff's social security number is privileged.

4.       The occurrence took place on February 22, 2021.

5.       The occurrence took place at approximately 3:00 p.m.

6.       The occurrence took place at the sidewalk in front of 2285 2nd Avenue, in the

County of New York, City and State of New York.

7.       The defective and dangerous condition was that the embedded cellar doors of the

sidewalk/walkway were deteriorated, dilapidated, cracked, broken, raised, uneven, loose,

unsecure, depressed, dangerous, hazardous and trap-like.

8.       Plaintiff was caused to trip and fall at the cellar doors of the sidewalk in front of

561

2285 2nd Avenue, in the County of New York, City and State of New York.

9. Upon information and belief, defendants, their agents, servants, contractees and/or employees were negligent, careless and reckless in the ownership, operation, maintenance, construction, replacement, supervision, inspection, control and repair of the aforesaid sidewalk cellar doors and/or public walkway in that said doors were caused, permitted and allowed to be, become and remain broken, cracked, uneven, unsecure, broken, depressed, loose, defective, dangerous and hazardous for a long and/or unreasonable length of time; defendants were further negligent, careless and reckless in failing to warn individuals of the above mentioned defective, dangerous and hazardous conditions; in failing to properly light the aforesaid area so that it was not dangerous for persons lawfully traversing the area; in failing to take any steps, precautions and safeguards to keep the situs in a reasonably safe and suitable condition; in failing to place barricades or erect signs with warnings to persons lawfully proceeding upon said situs, more particularly, this plaintiff; in failing to properly maintain and/or repair said defective, dangerous, hazardous and trap-like condition; and in other ways acting in a negligent, careless and reckless manner with regard to said situs, all of which caused plaintiff, TIMOTHY MILLER, to sustain serious injuries.

10-11. It is claimed that the defendant had both actual and constructive notice of the condition: at this time particulars regarding individuals with actual notice are within the exclusive possession of the defendants herein. It is further alleged that the defendants created the aforesaid condition: particulars regarding creation of the condition currently rest in the exclusive possession of the defendant. Constructive notice is claimed in that the defendants had sufficient time to have discovered the condition complained of: any further particulars are currently in the

2

562

exclusive possession of the defendant herein.

12.     As a result of this occurrence, plaintiff TIMOTHY MILLER sustained severe

personal injuries. The following injuries were caused, aggravated, accelerated, precipitated and/or

enhanced as a result of the defendants' negligence:

## CERVICAL SPINE:

- C4-5, and C6-7 disc herniations deforming the thecal sac, C5-7 cord abutment, C4-5 grade I retrolisthesis, right neural foraminal narrowing in conjunction with facet and uncinate hypertrophic changes, moderate central spinal stenosis in conjunction with posterior ligamentous hypertrophy, decreased conspicuity of grade I retrolisthesis at C4-5 on flexion view;
- C2-3,C3-4, C5-6, and C7-T1 disc bulges, with C2-3 right neural foraminal narrowing in conjunction with facet and uncinate hypertrophic changes,C2-3 and C3-4 mild central spinal stenosis in conjunction with posterior ligamentous hypertrophy, with increased conspicuity extension with C3-4;
- Cervical radiculopathy;
- Cervicalgia;
- Spondylolisthesis;
- Straightening of the cervical lordosis;
- Marked loss of range of motion of the Cervical Spine;
- Muscle spasms in the Cervical Spine;
- Severe pain, swelling and tenderness in the Cervical Spine;
- Need for future surgery;
- Need for future physical therapy.

as a result of the foregoing the plaintiff suffers from severe pain, swelling and tenderness of the cervical spine resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

## LUMBAR SPINE:

- **L4-L5 posterior spinal fusion performed on 6/17/2021;**
- **Facetectomy, laminectomy, decompression diskectomy performed on 6/17/2021;**
- **Instrumentation with pedicle screws, allografting performed on 6/17/2021;**
- **Lumbar epidural steroid injection at L4-L5 level performed on 5/14/2021;**
- **Lumbar epidural block performed on 4/21/2021;**
- **Lumbar epidural steroid injection at L4-L5 level performed on 4/21/2021;**
- Severe low back pain;
- L4-5 posterior lumbar disc herniation with neural compression;

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 565 of 834

- Lumbar radiculopathy with neurological deficits;
- L4-5 disc herniation deforming the thecal sac abutting the proximal L5 nerve roots bilaterally with bilateral proximal neural foraminal extension;
- L5-S1   and L3-4 disc bulges with bilateral proximal neural foraminal extension on both levels, L5-S1 abutment with proximal S1 nerve roots bilaterally and decreased conspicuity on flexion view;
- Lumbar spine straightening;
- Lumbar radiculopathy;
- Marked loss of range of motion of the lumbar spine;
- Muscle spasms in the lumbar spine;
- Severe pain, swelling and tenderness in the lumbar spine;
- Need for future surgery;
- Need for future physical therapy.

as a result of the foregoing the plaintiff suffers from severe pain, swelling and tenderness of the lumbar spine resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

**RIGHT ANKLE:**

- Posterior tibialis tendon demonstrates tendinosis/tendinopathy with diffuse intrasubstance signal abnormality approaching the distal insertion;
- The ATFL is deficient and indistinct consistent with a partial tear; some edema within the tibiotalar component of the deltoid ligament consistent with a sprain;
- Synovial fluid within the lateral gutter and posterior recess of the ankle joint;
- Traumatic right ankle injury;
- Marked restriction in range of motion of the right ankle;
- Severe pain, swelling and tenderness in the right ankle;
- Need for future physical therapy .

as a result of the foregoing the plaintiff suffers from severe pain, swelling and tenderness of the right ankle resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

The foregoing injuries directly affected the bones, tendons, tissues, muscles ligaments, nerves, blood vessels and soft tissue in and about the involved areas and sympathetic and radiating pains from all of which the plaintiff suffered, still suffers and may permanently suffer;

As a result of the accident and the injuries herein sustained, the plaintiff suffered a severe shock to his nervous system;

The plaintiff verily believes that all of the injuries hereinabove sustained, with the exception of

4

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 566 of 834

bruises and contusions, are permanent and progressive in nature;

The plaintiff may permanently suffer from the aforesaid injuries and from its effects upon his nervous system and may limit his activities in her employment and his life. Plaintiff may be restricted in his normal life and activities and may permanently require medical and neurological care and attention.

13.     Plaintiff is not making a claim for loss of earnings with regards to this occurrence. Plaintiff was not employed at the time of the occurrence.

14.     Not applicable. At the time of the occurrence, plaintiff was not employed.

15.     Plaintiff TIMOTHY MILLER was confined to Metropolitan Hospital Center, 1901 First Avenue, New York, NY 10029 on the date of the occurrence, to wit: February 22, 2021. Plaintiff was confined to Total Orthopedics and Sports Medicine, 1789 Sheepshead Bay Road, Brooklyn, NY 11235, on the date of his lumbar spine epidural steroid injections, to wit: April 21, 2021 and May 14, 2021. In addition, plaintiff was confined to Nassau University Medical Center, 2201 Hempstead Turnpike, East Meadow, NY 11554, on the date of his lumbar spine surgery, to wit: June 17, 2021.

16.     Plaintiff was confined to bed and home but not necessarily to bed for a period of approximately six (6) months immediately following the date of the occurrence, to wit: February 22, 2021.

17.     Plaintiff TIMOTHY MILLER was treated/examined by the following doctors/medical facilities:

- Metropolitan Hospital Center

- Crosstown Medical

- BCJ Medical PC

- Dynamism Physical Therapy, PC

5

565

- Medalliance Medical Health Services

- Stand-Up MRI of Queens, P.C.

- Stand-Up MRI of Manhattan, P.C.

- Total Orthopedics and Sports Medicine

- Advanced orthopedics and Joint Preservation

- Nassau University Medical Center

18.     As a result of this occurrence, plaintiff TIMOTHY MILLER has incurred the following special damages, to date:

|   |   |   |
|---|---|---|
| a. | hospital expenses: | appx $35,000.00 |
| b. | physicians' services: | appx $25,000.00 and continuing |
| c. | nurses services: | including in "a" if any |
| d. | physical therapy: | included in "b" |
| e. | chiropractic treatment: | included in "b" |
| f. | psychiatric/psychological treatment: | included in "b" if any |
| g. | medicines and medical supplies: | appx $250 for medicine, supplies |

included in "b" if any

h-i.     Other special damages:     Approximately $8,000,000.00 and continuing. Note that this amount does not include the costs for health care which has been increasing at an average annual rate of approximately 5.6% per the U.S. Bureau of Statistics. Plaintiff reserves the right to adjust this amount, at trial, using the U.S Bureau of Statistics average annual rate of increase for the cost of health care.   In addition, plaintiff reserves the right to supplement this response in the form of an expert exchange pursuant to CPLR 3101(d).

**The above amounts are approximate and continuing to date. Plaintiff reserves the right to supplement and/or amend this response after the examinations before trial, and reserves the right to prove additional special damages at the time of the trial of this action.**

6

566

19.     This Court will take judicial notice of the applicable law, ordinances, statutes and common law claimed to have been violated by the defendant. Upon information and belief, defendant violated Article 6 of subchapter 1 of the title 27 of the NY City Building Code for Maintenance: Section 27-127 - Maintenance Requirements - Section 27-128 - Owner Responsibility, ASTM F1637-95 - Standard Practice for Safe Walking Surfaces, Section 4.1 of this standard titled - Walkway Surfaces states the following: Section 4.1.1 – Walkways shall be stable, planar, flush, and even to the extent possible, among other laws, and it will respectfully be left to the trial court to take judicial notice of all additional laws, statutes, ordinances, regulations and/or rules that are claimed the defendants violated, and instruct the jury accordingly.

20.     Not applicable.

21.     Not applicable.

**PLEASE TAKE NOTICE** that Plaintiff TIMOTHY MILLER reserves the right to amend and/or supplement the responses contained herein up to and including the time of trial as and when any new of further information becomes known.

Dated: Brooklyn, New York
       February 23, 2022

                                        Yours, etc.
                                        *Brian M. King*

                                        _____
                                        **By: Brian M. King, Esq.**
                                        **BRIAN M. KING LAW OFFICE, PLLC**
                                        Attorneys for Plaintiff
                                        1400 Avenue Z, Suite 406
                                        Brooklyn, New York   11235
                                        (718) 942-5100

To:
LITCHFIELD CAVO, LLP
Attorneys for Defendant(s)
LOWER EAST SIDE PEOPLES FEDERAL CREDIT UNION

7

567

and EAST HARLEM PEOPLES FEDERAL CREDIT UNION
420 Lexington Avenue, Suite 2104
New York, New York 10170
(212) 792-9772

Cc:

        GANNON, ROSENFARB & DROSSMAN
        Attorney(s) for Defendant(s)
        UHAB HOUSING DEVELOPMENT FUND CORPORATION
        250 Broadway - 25th Floor
        New York, NY   10007
        (212) 655-5000

8

568

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---

INDEX NO. 528913/2021

TIMOTHY MILLER,

               Plaintiff,

     -against-

UHAB HOUSING DEVELOPMENT FUND CORPORATION,
LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION, and
EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION,
               Defendants.

---

**ATTORNEY'S
VERIFICATION**

     Brian M. King, an attorney duly admitted to practice law in the State of New York, makes the following affirmation under the penalty of perjury:

     I am of the firm of BRIAN M. KING LAW OFFICE, PLLC, the attorneys of record for the plaintiff.

     I have read the foregoing Bill of Particulars and know the contents thereof; the same is true to my own knowledge except as to the matters therein stated to be alleged on information and belief and that as to those matters, I believe them to be true.

     This verification is made by affirmant and not by plaintiff because he is not in the County of Kings, which is the County where your affirmant maintains offices.

     The grounds of affirmant's belief as to all matters not stated upon affirmant's knowledge are correspondence had with the said plaintiff, information contained in the said plaintiff's file, which is in affirmant's possession, and other pertinent data relating thereto.

Dated: Brooklyn, New York
       February 23, 2022

                              *Brian M. King*

                              ———————————————

                              BRIAN M. KING

# EXHIBIT F

December 19, 2022

---

Page 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------X
TIMOTHY MILLER,
          Plaintiff,

     -against-          Index No.
                        528913/2021

UHAB HOUSING DEVELOPMENT FUND CORPORATION,
LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION
and EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION,

          Defendants.

-------------------------------------------X

          Date: December 19, 2022
          Time: 9:44 a.m.

          EXAMINATION BEFORE TRIAL of TIMOTHY
MILLER, the Plaintiff, taken by the Defendant,
via video-conference, pursuant to Order, held
on the above mentioned date and time, before
Tracy Newman, a shorthand reporter and Notary
Public of the State of New York.

---

Page 2

APPEARANCES:

LAW OFFICE OF BRIAN M. KING, PLLC
     Attorneys for Plaintiff
     1400 Avenue Z
     Suite 503
     Brooklyn, New York 11235
BY:  ANTHONY DELUCA, ESQ., of Counsel


GANNON, ROSENFARB & DROSSMAN
     Attorneys for Defendant, Uhab Housing
     Development Fund Corporation
     100 William Street
     7th Floor
     New York, New York 10038
BY:  TARA BONOMO, ESQ.
     FILE #3430409-1

LITCHFIELD CAVO, LLP
     Attorneys for Defendant, Lower East Side
     People's Federal Credit Union and East
     Harlem People's Federal Credit Union
     420 Lexington Avenue
     Suite 2104
     New York, New York 10170
BY:  LYNDSEY BECHTEL, ESQ.
     FILE #4048-158

---

Page 3

          S T I P U L A T I O N S

          IT IS HEREBY STIPULATED AND AGREED by
and between Counsel for the respective parties
that:

          All rights provided by the C.P.L.R.,
including the right to object to any question,
except as to form, or to move to strike any
testimony at this examination, are reserved,
and in addition the failure to object to any
question or to move to strike any testimony at
this examination shall not be a bar or waiver
to make such motion at, and is reserved for,
the trial of this action;

          IT IS FURTHER STIPULATED AND AGREED by
and between Counsel for the respective parties
hereto, that this examination may be sworn to
by the witness being examined, before a Notary
Public other than the Notary Public before
whom this examination was begun; but the
failure to do so, or to return the original of
this examination to Counsel, shall not be
deemed a waiver of the rights provided by

---

Page 4

Rules 3116 and 3117 of the C.P.L.R., and shall
be controlled thereby;

          IT IS FURTHER STIPULATED AND AGREED by
and between Counsel for the respective parties
hereto that this examination may be utilized
for all purposes as provided by the C.P.L.R.;

          IT IS FURTHER STIPULATED AND AGREED by
and between Counsel for the respective parties
hereto, that the filing and certification of
the original of this examination shall be and
the same hereby is waived;

          IT IS FURTHER STIPULATED AND AGREED by
and between Counsel for the respective parties
hereto that a copy of the within examination
shall be furnished to Counsel representing the
witness testifying without charge.

          IT IS FURTHER STIPULATED AND AGREED by
and between Counsel for the respective parties
hereto that all rights provided by the
C.P.L.R., and Part 221 of the Uniform Rules
for the Conduct of Depositions, including the

1 (Pages 1 to 4)

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 573 of 834

December 19, 2022

## Page 5

right to object to any questions, except as to form, or to move to strike any testimony at this examination are reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to, the trial of this action.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for all parties present that pursuant to CPLR section 3113(d) this deposition is to be conducted by video conference, that the court reporter, all counsel, and the witness are all in separate remote locations and participating via videoconference (LegalView/Zoom) meeting under the control of Lexitas Court Reporting Service, that the officer administering the oath to the witness need not be in the place of the deposition and the witness shall be sworn in remotely by the court reporter after confirming the witness's identity, that this videoconference will not be recorded in any manner and that any recording without the

## Page 6

express written consent of all parties shall be considered unauthorized, in violation of law, and shall not be used for any purpose in this litigation or otherwise.

IT IS FURTHER STIPULATED that exhibits may be marked by the attorney presenting the exhibit to the witness, and that a copy of any exhibit presented to a witness shall be e-mailed to or otherwise in possession of all counsel prior to any questioning of a witness regarding the exhibit in question.  All parties shall bear their own costs in the conduct of this deposition by video conference, not withstanding the obligation by CPLR to supply a copy of the transcript to the deposed party by the taking party in civil litigation matters.

## Page 7

TIMOTHY MILLER, called as a Witness, having been first duly sworn by a Notary Public in and of the State of New York, was examined and testified as follows:

THE REPORTER:  Please state your name for the record.

THE WITNESS:  Timothy Miller.

THE REPORTER:  Please state your address for the record.

THE WITNESS:  972 Woody Crest Avenue, Apartment 4H, Bronx 10452.

EXAMINATION BY
MS. BECHTEL:

MS. BECHTEL:  Good morning, Mr. Miller.

THE WITNESS:  Good morning. How you doing madam?

MS. BECHTEL:  Good.  How are you?

THE WITNESS:  Blessed.  Can't complain.

MS. BECHTEL:  Good.  My name is Lyndsey Bechtel.  I'm an attorney from a firm called Litchfield Cavo,

## Page 8

T. MILLER

and we represent Lower East Side People's Federal Credit Union in this case.  I'm going to be asking you a few questions today about your background and the accident.

Have you ever been deposed before?

THE WITNESS:  No, not really.

MS. BECHTEL:  Okay.  Let's go over a few rules.

Where are you located today?

THE WITNESS:  In the Bronx.

MS. BECHTEL:  Are you at home?

THE WITNESS:  Yes, ma'am.

MS. BECHTEL:  Is there anyone in the room with you?

THE WITNESS:  No, I'm in the apartment by myself, a studio.

MS. BECHTEL:  We have a court reporter with us from Lexitas, and she is going to be transcribing our conversation today.

THE WITNESS:  Yes, ma'am.

MS. BECHTEL:  So in order for

2 (Pages 5 to 8)

December 19, 2022

Page 9

T. MILLER

her to take an accurate record, let's make sure we don't talk over each other.

THE WITNESS: Yes, ma'am.

MS. BECHTEL: Instead of uh-huh or uh-uh, say yes or no, make all of your answers verbal.

THE WITNESS: Yes, ma'am.

MS. BECHTEL: Nodding or shaking of the head is not going to be recorded.

MS. BONOMO: Is there some background noise?

MR. DELUCA: Yes, I'm hearing feedback or something.

(Whereupon, a discussion was held off the record due to technical difficulties.)

CONTINUED EXAMINATION BY MS. BECHTEL:

MS. BECHTEL: If you don't understand my question, I'll try to rephrase it.

THE WITNESS: Yes, ma'am.

Page 10

T. MILLER

MS. BECHTEL: If your attorney objects with an objection, just wait, and he'll direct you from there.

THE WITNESS: Yes, ma'am.

MS. BECHTEL: And, you understand you've just taken an oath today to tell the truth and your testimony has the same affect as testifying in court; correct?

THE WITNESS: Yes, ma'am.

Q.   I ask this of everyone; have you taken any drugs, alcohol or medication that would affect your testimony today?

A.   No, ma'am.

Q.   Do you have any other conditions that would affect your testimony today?

A.   No, ma'am.

Q.   Do you have a middle name?

A.   Yes, Unique.

Q.   Can you spell it?

A.   U-N-I-Q-U-E.

Q.   How long have you lived at

Page 11

T. MILLER

apartment 4H at 972 Woody Crest Avenue?

A.   I have been living here since August.

Q.   August of 2022?

A.   Yes, ma'am.  I just moved here.

Q.   Where did you live before that?

A.   I was at a shelter.

Q.   Where were you living on February 2, 2021?

A.   I was on 10th Avenue in a shelter.

Q.   Manhattan?

A.   Yes, ma'am.

Q.   Does the shelter have a name or do you know the cross street?

A.   I can give you the cross street but it was in a hotel, the shelter, and it was three shelters in one.  They happened to close down that specific site.  The cross avenue is 10th Avenue between 49th and 50th Street in Hell's Kitchen area, and it was at the

Page 12

T. MILLER

Skylines Hotel.  The specific program of the shelter, the title of the program was, in terms of which branch was -- they called it -- one second because it came from 83rd street.  What is the name of that shelter?  Skyway, ma'am.  The name of the shelter is Skyway, and it was one of it's branches, it's Manhattan branches that happened to be on 10th Avenue.

Q.   So Skyway was operating out of the Skylines Hotel?

A.   Yes, ma'am.

Q.   Are they related?

A.   No, they haven't -- due to the pandemic, they had certain shelters in hotels, and that just how it happened.  They got the luck of the draw.

Q.   So in February of 2021 --

MS. BECHTEL:  Strike that.  I'll get back to it.

Q.   What is your date of birth?

A.   '85.

MR. DELUCA:  Just year of the date of birth on the record.

3 (Pages 9 to 12)

December 19, 2022

## Page 13

T. MILLER

MS. BECHTEL: Off the record.

(Whereupon, a brief recess was taken by all parties.)

CONTINUED EXAMINATION BY MS. BECHTEL:

Q. Mr. Miller, where were you born?

A. I was born in the Bronx. I don't know specifically.

Q. Have you ever lived outside of United States?

A. No, I haven't been lucky enough to. I do want to travel.

Q. Have you ever lived outside of New York?

A. No, I visit outside of New York.

MR. DELUCA: All right. That's not what she asked you. She wants to know if you actually lived somewhere outside of the city.

A. No.

MS. BECHTEL: We can leave the last four on the record, if that's

## Page 14

T. MILLER

okay, counsel.

MR. DELUCA: That's fine.

Q. May I have your Social Security number?

A. XXX-XX-8395.

Q. Have you ever been married?

A. No.

Q. Do you have any children?

A. Yes, ma'am.

Q. How many?

A. Two.

Q. May I have their ages?

A. Sixteen and thirteen.

MS. BECHTEL: We can leave this off the record.

Q. What is the sixteen year old's name?

(Whereupon, the Witness provides requested information off the record.)

Q. And, the thirteen year old's name?

(Whereupon, the Witness provides requested information off the

## Page 15

T. MILLER

record.)

Q. Other than your attorney, have you spoken to anybody to prepare for today's deposition?

A. No, ma'am.

Q. I see you're wearing eyeglasses, are they for reading, or distance or both?

A. I was studying a little bit.

Q. How long have you had the reading glasses?

A. Pretty much the majority of my life, but it's just my vision, to be honest, differ according to environment, but otherwise, I pretty much have pretty good vision, so.

Q. Do you have glasses to help you see distance?

A. No, I don't have no regular glasses that I wear on a regular basis, no.

Q. Do you currently reside with anyone?

A. No, I actually live by myself,

## Page 16

T. MILLER

off record, my daughter comes and visits --

MR. DELUCA: No.

Q. Does your daughter reside with you?

A. It's turning into a regular basis, but she comes and keeps her father company.

Q. She comes part time?

A. Yes, you could say part time is best, yes.

Q. How about the sixteen year old, does he reside with you currently?

A. No, visits.

Q. Does he visit part time?

A. Visits, yes.

Q. Moving along. What is your highest level of education?

A. I have an Associate's degree.

Q. From where?

A. From MCC North Community Country College. North Country Community College. That's how you pronounce it

4 (Pages 13 to 16)

December 19, 2022

## Page 17

T. MILLER

correctly.

Q. Where is North Country Community College located?

A. Senec.

Q. Where?

A. Senec, I believe is how you say it, upstate, New York, Schenectady.

Q. Schenectady?

A. Yes, that's the correct pronunciation.

Q. What was what is your degree in?

A. Entrepreneur management, but I have individual studies at the end of the day.

Q. What year did you earn that Associate's degree?

A. August 2019 was my graduation month.

Q. Do you have any other degrees or professional certifications?

A. I have many certificates throughout my life, to be honest.

Q. Okay. We'll get back to it.

## Page 18

T. MILLER

Other than MCC North Country Community College, have you attended any other colleges or higher education facilities?

A. Not as of yet because I have not found one.

MR. DELUCA: Okay.

Q. Are you looking to go back to school?

A. Yes.

Q. Okay.

A. As soon as I find a suitable one.

MR. DELUCA: Please, just a general instruction, the last question was, have you attended any, so the answer was just no.

THE WITNESS: Okay.

MR. DELUCA: Ms. Bechtel will certainly ask you more questions if she --

THE WITNESS: Okay.

MR. DELUCA: -- needs to know more information, so just answer the

## Page 19

T. MILLER

question that's asked; okay?

THE WITNESS: Yes, sir.

MR. DELUCA: Thank you.

Q. Where did you go to high school?

A. I went to multiple high schools.

Q. How many?

A. Mount St. Michael, Bronx High School -- (inaudible) Davis High, Columbus, I would say a total of about five.

Q. Can you list them for me?

A. Mount St. Michael, Stevenson, Columbus.

Q. Hold on, go slower for me?

A. Mount St. Michael, Stevenson, Columbus, Bronx High School of Science, and I did a program in BCC, which is Bronx Community College, for credits, I did a program there.

Q. Did you graduate from high school?

A. No, ma'am.

## Page 20

T. MILLER

Q. Do you have a GED?

A. Yes, ma'am.

Q. When did you get your GED?

A. In 2010, June. Officially.

Q. Earlier, you said you earned a lot of certificates, what type of certificates are you talking about?

A. In terms of titles and practice, to be able to say that I'm qualified to be an assistant in certain fields.

Q. Okay.

So what are the certificates, can you list them for me?

A. In terms of tailor shop, I'm capable of working with certain machines. In terms of tailoring. In terms of building maintenance, I'm fret -- I'm at the level of being a building maintenance assistant or apprentice, as most people would say. Then there were little things, like computer programs and stuff like that that I'm still trying to learn more, to give you an idea.

5 (Pages 17 to 20)

December 19, 2022

Page 21

T. MILLER

Q.   The first thing you listed, you said tailor shop, like tailoring clothing?

A.   Yes, Sewing machines, you know, surgical sewing machines, I know how to use.  I just might not remember the names of them.

Q.   Earlier, when you said you're looking to go back to school, are you looking to go to school for a particular specialty?

A.   Bachelor's.

Q.   What kind of Bachelor's?

A.   I'm trying to go back into the field I started with, which is entrepreneur management.

Q.   Is there where particular type of industry that the entrepreneur management focuses on?

A.   It basically focused on the pyramid, in the top of the field, or I'm basically trying to create companies, and business and jobs, opening up stores and stuff.

Page 22

T. MILLER

Q.   What kind of car?

A.   Opening up stores.

Q.   What kind of stores?

A.   For instance, to give you an idea, one type of store I would like to open up is a grocery for the neighborhood.  Convenience stores.  Store's that are bringing affordable items.

Q.   Are you currently employed?

A.   No.

Q.   When was the last time that you had a job?

A.   Approximately over two years.

Q.   Over two years ago, so that's like Christmas of 2020, so --

A.   Around, yes.

Q.   Are you saying -- let me finish my question.

A.   Mm-hm.

Q.   Are you saying you had a job shortly after Covid started?

A.   Yes, during Covid, but it ended just before Covid really gone into

Page 23

T. MILLER

affect.  It was in that year.

Q.   That job after Covid started, where was it?

A.   I was doing side jobs.  It was in the Bronx, to be honest.

Q.   For who?

A.   Basically, my employers were people who needed an extra hand.

Q.   Was there a specific person that you reported to to get the jobs?

A.   No.

Q.   How did you get the jobs?

A.   Temp agency.

Q.   Temp agency, okay.  And what was the name --

A.   And word of mouth.  One happened to be HRA with their business link, and JPL program.  Another one happened to be on the street, when I had, when I seen a sign and I see if they need extra help.

MS. BECHTEL:  Let's go off the record for a second.

(Whereupon, a discussion was

Page 24

T. MILLER

held off the record.)

CONTINUED EXAMINATION BY MS. BECHTEL:

Q.   Mr. Miller, what does HRA stand for, if you know?

A.   Human resources.

Q.   What does the JPL program stand for, if you know?

A.   The JDP program I believe -- let me see.

Q.   I'm sorry.  I thought you said JPL.

Did you say something else?

A.   I'm sorry, JPT.  It's a program that they basically send people out to work in parks and stuff like that, HRA business link and the parks opportunity program is also in involved in it.

Q.   That's in the City of New York?

A.   Yes, their job description basically is cleaning up, extra hands working on the -- those are the gentlemen

6 (Pages 21 to 24)

FILED: NEW YORK COUNTY CLERK 03/06/2025 05:09 PM    INDEX NO. 538433/2024
NYSCEF DOC. NO. 12    RECEIVED NYSCEF: 03/06/2025

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 578 of 834

December 19, 2022

Page 25

T. MILLER

and ladies that you see on the side of the highways. They're basically doing the jobs that they used to give back in the days to the community service people. And correction, it's JTP, business link, JTP is the program.

Q. Okay.

The second temp agency you mentioned seeing a sign asking if they need extra help, where was that?

A. That happened to be in the Bronx.

Q. Where in the Bronx?

A. Over here by 149th and Third Avenue.

Q. Going back to the first one, the parks opportunity program, where was that agency located?

A. The parks program one, they have a headquarters that they send us to that I can tell you is 123 Williams Street, 6th floor, New York New York. Manhattan, basically.

Q. Lower Manhattan?

Page 26

T. MILLER

A. Yes, ma'am.

Q. Is that where you reported every day when you worked for that agency or did you go somewhere else?

A. Well, when you get in, they send you to a different site, and that specific site is where you report or meet your handler, I should say.

Q. How do you find out which site that you --

A. When you start, you start at that specific address, and sometimes they give you a handler, they'll give you options and -- whatever program they have offered, sometimes they have two or three programs, different ones, and you go from there. Like whichever program you pick, they'll send you to that site or tell you to go that to that specific -- like, for example, sanitation.

Q. So when you worked for this temp agency, did you report to lower Manhattan every day that you worked?

A. No, I reported to where I had

Page 27

T. MILLER

to go. Like for instance, when I was out in Queens, for instance, with this program, they sent me out in Queens, and I was over there by Van Wyck and I had to report to that sanitation department in that area.

Q. Did you get a text message on your cell phone, or perhaps an e-mail or --

A. No --

Q. -- to tell you where to go to work?

A. No, you would know before you leave that office. This is your main office, this is where you will report. They give you your job assignment and everything.

Q. Would you report to each location for several days at a time before going back to lower Manhattan?

A. Well, most of the time, if you go back to lower Manhattan, it's because you either messed up, or recycled, or you just didn't like the spot they put you at

Page 28

T. MILLER

and you were trying to get put at a different spot. But pretty much most of the jobs is at that site that they give you and you're there until hopefully, they hire you.

Q. Got it.

So when you were going through this agency to the parks opportunity program, how many different field locations did you work at, approximately?

A. Approximately five or better because it's -- when you're working with the parks program, or I should say JTP program.

Q. JTP?

A. Yeah, when you work with them, it's basically -- they'll send you to one -- to a spot, like sanitation, 14th Street and wherever their jurisdiction is, they try to work within that area, and they will drop you off and you just work your way back to the facility or they'll pick you up if you cleaned that specific area that they designed or asked

7 (Pages 25 to 28)

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 579 of 834

December 19, 2022

## Page 29

T. MILLER

for. And most of the time, it's like, basically, you're sl sweeping and cleaning up the sides of the street.

Q. Can you estimate for me or do you know --

MS. BECHTEL: Strike that.

Q. From when to when were you working through JTP?

A. I happen to do the JTP for approximately, like, almost two months. And then the program was getting too much traveling and they wasn't paying enough. Let alone with the JTP program, you can work up to three months to six months, and if they choose to hire you, you go directly through that specific point where you got hired at. For instance, if it's a Queens site, I got hired there, they put me on and I work for them, but if they don't hire me, I sometimes get recycled and they send me to another area.

Q. Let's focus on the time period -- you said you worked there for two

## Page 30

T. MILLER

months?

A. Yes.

Q. Which two months are we talking about?

A. The first two months when I started.

Q. Give me the month and the year, if you know.

A. That would be approximately in the 2020 year. The month, I would say summer was my first official job in 2020, breaking me in -- starting into the pandemic.

Q. Now, you said your first official job starting into the pandemic, what was your next job going --

A. That would be --

Q. -- chronologically, what was your next job?

A. Next job was basically working off the book with, working with word of mouth at the stores. That was what I told you about at --

Q. That was the sign off the

## Page 31

T. MILLER

street at --

A. Yes.

Q. -- and (inaudible?)

A. Yes, ma'am.

Q. Do you know the name of that program?

A. No, it was just -- matter of fact, the company, I believe was Liberty.

Q. Liberty?

A. Gentlemen handing out fliers and sometimes sweeping in front of the area.

MS. BONOMO: Can we just establish a time frame?

(Whereupon, a discussion was held off the record.)

CONTINUED EXAMINATION BY MS. BECHTEL:

Q. From when to when did you work at this job at 149th?

A. It was seasonal and it was only, approximately, like, three months.

Q. Which three months?

A. That was towards the end of

## Page 32

T. MILLER

the summer of 2020 going into the fall. Say, approximately August to October.

Q. Great. What was your next job?

A. I didn't have one after that.

Q. What were you doing instead?

A. Basically, running around for the shelter and trying to find a place.

Q. So --

MS. BONOMO: Sorry, can I get that answer read back, please?

(Whereupon, the requested portion of the record was read back by the Court Reporter.)

MS. BONOMO: For the shelter.

MS. BECHTEL: He said for the shelter. I'll ask.

MS. BONOMO: Okay.

Q. Going back to when you said running around for the shelter, what shelter were you living in in the beginning of the pandemic or where else were you living when the pandemic started?

8 (Pages 29 to 32)

December 19, 2022

Page 33

T. MILLER

A. In 2019 of Christmas, I was in Bellevue. I happened to travel within -- from December to, let's say March, to two different -- to three different shelters. I went from Bellevue Wards Island to South Conduit in Queens.

Q. In March of 2020 when the pandemic started, where were you living?

A. March of 2020, that's when I was at, approximately South Conduit. Skyway Mobile Hotel, and that was in Queens.

Q. How long were you there?

A. Approximately, almost a year, if I remember -- I leave the towards the end of that year.

Q. At the end of which year, 2020 --

A. 20 --

Q. -- or 2021?

A. Yes, ma'am, yes, ma'am, 2020.

Q. When you left at the end of 2020, where did you go next?

A. That's when I went to

Page 34

T. MILLER

Manhattan. But on the way to Manhattan, they moved the block to Garden Inn and then Manhattan. I was in the Garden Inn for a month. That was the month of October of that year.

Q. Garden Inn for October of 2021?

A. Yes.

Q. And, the Garden Inn was still in Queens?

A. Queens, yes, ma'am. It was up the block, North Conduit, to be exact.

Q. And then after Garden Inn --

A. They moved me --

Q. -- where did you go?

A. To the Skyline Hotel where they had three shelters in one and I was there for a minute.

MS. BECHTEL: Let's go off the record for just a second.

(Whereupon, a discussion was held off the record.)

CONTINUED EXAMINATION BY MS. BECHTEL:

Page 35

T. MILLER

Q. Where you just mentioned Skyline in Manhattan, that's the Skyline Hotel at 10th and 49th that we were talking about earlier; right?

A. Yes.

Q. When did you leave there?

A. I left there when they closed down.

Q. Do you remember the month and year?

A. That was -- boom, boom, boom, 2021.

Q. The end --

A. What month?

Q. -- of 2021?

A. Yes. The month? December. December 7, 2021 was the exact date.

Q. Okay. Where did you go after that?

A. Back to Skyway because that shelter happened to close down and I ended up -- I was supposed to go back -- I should say I end up going back to Brooklyn first before I had Skyway, which

Page 36

T. MILLER

was Metropolitan Hotel. And that was classified as reasonable accommodation in the shelter.

Q. How long were you in the --

A. I was --

Q. -- Metropolitan Hotel in Brooklyn?

A. For approximately two months, three months. Yeah, two. Two, three months. And then from there, I went to -- back to Skyway in Queens, and I was there for a month. After that, I came to the Bronx. And from there, I have been in the Bronx -- I got my place August.

MS. BECHTEL: Off the record.

(Whereupon, a discussion was held off the record.)

CONTINUED EXAMINATION BY MS. BECHTEL:

Q. Were you in a shelter in the Bronx before you got your place where you --

A. Yes.

Q. You're talking about your

9 (Pages 33 to 36)

December 19, 2022

Page 37

T. MILLER

place in the Bronx?

A. Yes, I have been explaining, I been shifting around. That's why it's so hard for me to get the dates correct. I may have gotten the dates wrong, but it was a constantly shuffle.

Q. Understood. I think I got it now.

A. I was just giving you a broad --

(Whereupon, a discussion was held off the record.)

CONTINUED EXAMINATION BY MS. BECHTEL:

Q. How long, approximately, were you in the Skyway Hotel in Queens for the second time?

A. December 7th -- approximately two months because --

Q. Would you say you resided at Skyway Hotel in Queens from December 7, 2021 to February of this year?

A. Yes.

Q. And, after that --

Page 38

T. MILLER

A. Almost.

Q. And, after that, you went to a shelter in the Bronx?

A. Yes, ma'am, 173rd Street in Washington.

Q. And, you were there from approximately March to August of this year?

A. February to August of this year, yes. I was supposed to leave in May, but building requirements.

Q. Have you ever served in the military?

A. No, ma'am.

Q. Do you have a driver's license?

A. No, ma'am.

Q. Have you ever had a driver's license?

A. I have not obtained a driver's license, no.

Q. Have you ever had a learner's permit?

A. I have not obtained one but I

Page 39

T. MILLER

have applied.

Q. When did you apply for a learner's permit?

A. The last time I applied was this year and past.

Q. You apply multiple times?

A. Yes, in my life, yes.

Q. Have you ever obtained one?

A. I have not been lucky yet to fully obtain one.

Q. Why is that?

A. Due to either financial.

MR. DELUCA: Objection.

Q. If you know.

A. The first time, not knowing all the questions correctly and failing. The second time, financial.

Q. When you say financial, can you elaborate on that?

A. I went as far as to passing the test and they requested that I pay more money, that I didn't have anything to do with it. And they wanted me to -- they referred me to another branch to

Page 40

T. MILLER

deal with, so getting the shuffle.

Q. It's my understanding that you're not making a lost wages claim as a result of this accident; is that true?

A. I will not be able to identify to that question yet.

MR. DELUCA: By Counsel, the Bill of Particulars does not have a lost earnings claim.

MS. BECHTEL: Can we take a short bathroom break?

MR. DELUCA: Go ahead.

(Whereupon, a brief recess was taken by all parties.)

CONTINUED EXAMINATION BY MS. BECHTEL:

Q. Do A. and L. have the same mother?

A. No.

MR. DELUCA: Note my objection.

Q. What is A.'s mother's name?

A. Samantha.

MR. DELUCA: Note my

10 (Pages 37 to 40)

December 19, 2022

## Page 41

T. MILLER

objection.

Q. What is her last name?

MR. DELUCA: Same objection.

A. Lombardi.

Q. Lombardi?

A. Yes.

Q. What's A.'s mother's name?

MR. DELUCA: Same objection.

THE WITNESS: Can I ask a question?

MS. BECHTEL: Okay.

THE WITNESS: When they say objection, that means I don't have to answer?

MR. DELUCA: If I tell you don't answer, don't answer.

THE WITNESS: Okay.

MR. DELUCA: If I just say objection, that means I'm putting an objection on the record.

MS. BECHTEL: He's preserving it.

THE WITNESS: Okay.

MR. DELUCA: Right.

## Page 42

T. MILLER

THE WITNESS: I'm learning, I'm learning.

A. Her name is Latonia.

Q. Atonia?

A. Latonia.

Q. Last name?

A. Glen.

MR. DELUCA: Same objection.

Q. When did you start going to MCC North Country Community College?

A. Approximately the year of 2018, January is when I started.

Q. What were you doing from 2010 when you got your GED to 2018 when you started community college?

A. A lot of activities, to be exact.

Q. I'm asking about work.

A. GED, where was I working. I wasn't --

Q. Go ahead.

A. I wasn't in the city in terms -- what was I doing at that time? I was in a program.

## Page 43

T. MILLER

Q. I see from your Medicaid records that you have treated at some substance abuse programs and different programs, is that what you're referring to or something else?

A. Yes, that's part.

Q. Do you know what year it was when you went to the first substance abuse program?

A. That would be after my vacation of 2000, the beginning of 2012.

Q. Are you currently enrolled in a substance abuse treatment program?

A. No, it was --

Q. Wait for the question.

A. Mm-hm.

Q. When was the last time that you were enrolled in a substance abuse program?

A. 2020.

Q. 2020?

A. Yes, spring or -- yeah, spring of 2020 into 2021.

Q. You just said into 2021, what

## Page 44

T. MILLER

month of 2021?

A. Pardon me. Winter 2019. Correction. Winter 2019 going into the spring of -- months wise, December and January.

Q. Have you been involved or enrolled in any substance abuse programs since the pandemic started in March of 2020?

A. March of 2020 was when I was in a program. That -- the beginning of 2020, I was in program and it consists of multiple programs.

Q. Multiple programs, okay. Have you ever filed for bankruptcy?

A. No.

Q. Have you ever been convicted of a crime?

A. I plead the 5th.

MR. DELUCA: That's a felony or a misdemeanor, not a violation.

A. In court, they said plead the 5th.

11 (Pages 41 to 44)

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 583 of 834

December 19, 2022

## Page 45

T. MILLER

MR. DELUCA: Just answer the question.

A. Yes.

Q. Okay.

A. He already gave me confirmation.

Q. On how many occasions?

MR. DELUCA: Remember, this is --

A. You said that's misdemeanors and felonies, you said?

MR. DELUCA: Yes, either conviction or pled guilty, not something you were arrested for. If you pled guilty or if you were convicted by a jury.

A. Off record, I do not know, but I say I have three felonies.

MR. DELUCA: Convictions.

THE WITNESS: Yes.

MR. DELUCA: Okay.

MS. BONOMO: Do you have that on the record?

Q. Mr. Miller, have you ever been

## Page 46

T. MILLER

incarcerated?

A. Yes.

Q. On how many occasions?

A. Twice.

MR. DELUCA: Again, any question about incarceration is limited to any incarceration as a result of a conviction or pleading guilty. We're not talking about you were held pending bail or anything like that. That doesn't count.

A. Unfortunately, I went on vacation twice.

Q. I get what you're saying. Okay. Wait for the next question.

The three felony convictions, do you know what the felonies were?

A. Yes.

Q. What were they?

A. Unlawful -- unlicensed and -- unlicensed possession of a firearm, meaning, that I didn't properly report it. I was at the time security -- in security, and the last two, attempted

## Page 47

T. MILLER

assault and possession of controlled substances.

Q. Do you know what year you were convicted of unlicensed possession of a firearm?

A. '09.

Q. Do you know what year you were convicted of a attempted assault?

A. Attempted assault and possession of a controlled substances happened to be April of 2016, officially.

Q. Those stemmed from the same incident?

A. No.

Q. Okay.

A. Two different cases merged.

Q. When was the first time you were incarcerated, from when to when?

A. '09 to 2011, I was on vacation.

Q. Where?

A. I happened to go up as far as Governor.

MS. BONOMO: Can I get that

## Page 48

T. MILLER

again?

(Whereupon, the requested portion of the record was read back by the Court Reporter.)

Q. Is that Governor in New York, is that a town in New York or was that the name of the facility?

A. Both. It's a county upstate, New York, and it also happens to be the name of the facility I spent most of my time at.

Q. Okay.

And, when was the second time you were incarcerated?

A. Second time I went on vacation was 2016 to 2019, Christmas eve.

Q. Where were you?

A. I happened to spend most of my time up in Franklin. I believe it falls under the Glen Falls jurisdiction. Or further. Franklin Correctional Facility, yes, that's where I got my GED, yes, that's where I got my college degree.

MS. BECHTEL: Off the record.

12 (Pages 45 to 48)

December 19, 2022

## Page 49

T. MILLER

(Whereupon, a discussion was held off the record.)

CONTINUED EXAMINATION BY MS. BECHTEL:

Q. I'm going to come back to the questions related to that. Let's move on.

Did there come a time when you were involved in an accident in front of the building located at 2285 Second Avenue, New York, New York on February 22, 2021; yes or no?

A. Can you repeat the first part of that?

Q. Were you involved in an accident --

A. Yes.

Q. -- on February -- okay.

What time of the day did it happen?

A. Afternoon.

Q. Do you know what day of the week it was?

A. Monday, I believe.

## Page 50

T. MILLER

Q. Do you know what time you woke up that day?

A. Early.

Q. What's early to you?

A. Seven, eight o'clock.

Q. When you woke up at seven or eight a.m., was it at your room at the Skylines Hotel?

A. Yes.

Q. Were either your kids staying with you that day?

A. No.

Q. Was anyone else staying with you that day?

A. No.

Q. When did you first leave your room at the Skylines Hotel?

A. That day.

Q. What time?

A. Approximately eight o'clock because I had an appointment.

Q. Where were you headed?

A. Program.

Q. Which program?

## Page 51

T. MILLER

A. Program at Carnegie Hill at the time, and I was on my way from there when the accident happened, if that's what you're asking.

Q. No, that's not what I was asking.

I was actually asking where you went when you first left your room at the Skylines Hotel that morning?

A. To program.

Q. Okay.

How long were you at the program?

A. Approximately two hours.

Q. From which time to which time?

A. I believe at that time, my program was to start at 8:30 or nine o'clock, and I had -- I didn't leave until approximately eleven, 11:30 from there.

Q. A.m.?

A. That's when I decided to go shopping and took the tour, it's a long way home.

## Page 52

T. MILLER

Q. Tell me more about the Carnegie Hill, what type of program was it?

A. It was a program I was referred to when I came home from my vacation, substance abuse individual studies, men's independent counseling. It offers broad aspect and wide range of help in many fields.

Q. Where was the program located?

A. 96th Street by Park Ave.

Q. How did you get from the Skylines Hotel to the program that morning?

A. Train.

Q. Did you walk, take a subway or something else?

A. Train.

Q. Do you know which train route or routes you took to get there?

A. At that particular time when I was going there, it was by train that I took -- I had to go to the east side to jump on the 4 train, I believe. The 4

13 (Pages 49 to 52)

December 19, 2022

Page 53

T. MILLER

and the 5 train. So I think I took the -- yes, I took the buses that goes across 50th Street to get onto the train, to go up to that particular route where I was able to catch the train on 50th Street on the east side.

Q. After you left the Carnegie Hill program on 96th Street, where did you go next?

A. Sightseeing and shopping, window shopping, looking for an outfit.

Q. What do you mean by sightseeing?

A. Window shopping. I was -- my agenda was to look for an outfit.

Q. Did you have, you know, a particular destination in mind?

A. No, just what caught the interest of my eye. Still learning how -- how new the surrounding is. A lot of different things have changed.

Q. Did the accident happen while you were window shopping?

A. In route. Yes.

Page 54

T. MILLER

Q. Do you know the route that you took when you were window shopping?

A. I went straight down Second Avenue.

Q. Okay.

How did you get from --

MS. BECHTEL: Strike that.

Q. Let's start with 96th and Park; okay?

And tell me the exact route you took before the accident took place.

A. After leaving 96th and Park, I went to 125th Street where I started my shopping and was going to walk down to as far as I can go in hopes to find something of my liking in terms of what I was looking for, in terms of my outfit.

Q. So you walked up Park Avenue to 125th Street; is that right?

A. No, after I left Carnegie Hill, I jumped on the train.

Q. Okay.

A. On the 96th Street, the 4 train. And I took it to 125th Street

Page 55

T. MILLER

where I got off at 125th Street and Lexington, I believe. And I happened to walk my way down from there.

Q. When you got off at Lexington and 125th Street, do you know if you went east or west on 125th Street first?

A. Okay. Now you lost me -- I went up 125th Street and that would be going towards the west side. Yes. When I got off and had to come back down the west side on the opposite side, and that's when I got back to where the train station was. And I just said I didn't find what I wanted it terms of price and what I was looking for in terms of taste. I decided to walk down First and Second in hopes to find some, hopefully, stores down there and --

Q. Hold on.

How much time passed from when you got off the train at Lex and 125th to when the accident happened?

A. I got off around Lex about 12:30. Approximately an hour or almost

Page 56

T. MILLER

hour and a half almost.

Q. Do you know how far down 125th Street you went originally, like, for example, did you go all the --

A. Not far.

Q. -- to 11th Avenue or --

A. No.

Q. How far did you go?

MR. DELUCA: Let her finish the question.

THE WITNESS: Okay.

A. I'm sorry.

Q. How far west did you go?

A. Approximately four blocks. I would say three to four blocks.

Q. Okay.

And then you turned around and walked the other way down --

A. I was away, yes.

MS. BECHTEL: Strike that.

Q. Once you went approximately four blocks, you turned around and walked down the opposite side of 125th Street; correct?

14 (Pages 53 to 56)

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 586 of 834

December 19, 2022

## Page 57

T. MILLER

A. Yes.

Q. And then you walked all the way to First Avenue?

A. All the way to Second at first.

Q. When you got to Second Avenue, did you go right or left?

A. I made a right going down towards the early numbers, the lower numbers.

Q. When you were on Second Avenue walking downtown, were you on the left side of the street, or the right side or did you go to both sides?

A. I was on the right side.

Q. When you were walking on the right side of Second Avenue downtown, how many blocks did you go before the accident happened?

(No verbal response was given by the witness.)

Q. Approximately?

A. Approximately, almost ten.

Q. Where were you intending to go

## Page 58

T. MILLER

at the time?

A. I was told of a store that might have a size on 116th.

Q. 116th and what?

A. First Avenue -- Second Avenue. First and Second Avenue area.

Q. Do you know the name of the store?

A. No, they didn't know the name of the store but they told me that there's clothing store down there, most likely might have my size and my taste of what I was looking for at the time.

Q. Who told you that?

A. Word of mouth from my friend. I had asked people.

Q. Were you at another store earlier that day in that hour and a half --

A. That's the reason I was -- when I was on 125th Street, I asked a couple of pedestrians that are long store owners about a variety of stores because as previously stated, I just came off my

## Page 59

T. MILLER

vacation, so I was still learning the area somewhat, and I wanted to know if there was any other stores that I can go that might have my interest or my size.

Q. Okay. And, what exactly were you looking for?

A. A outfit.

Q. What kind of outfit or for what occasion?

A. It was just something casual, to be honest. And also, I was also looking for a business outfit, like dress shirts and stuff. I came across a couple of dollars, you know, and I wanted to try to look presentable and wanted to get some stuff because I didn't have at the time. I was still building my wardrobe.

Q. You had been out of jail for about two months at that time; correct?

A. Approximately.

Q. You testified earlier that you asked pedestrians, how did you know who to approach?

## Page 60

T. MILLER

A. I asked pedestrians in terms of the stores that was in like, people that were clients that were my size that were -- people that were shopping. Excuse me, sir, do you know where I could get certain things at, you know, to give a general statement. Plus, other store workers and stuff.

Q. Okay. So how many pedestrians did you approach and how many store owners did you approach?

A. Approximately, to be honest, offhand, I don't really know. I was just mostly, like, when I saw someone was looking in, for instance, to give an example, I happened to bump into one guy, and he was in the casual area and I happened to explain to him that it's hard to find for our size. And he was like, oh, I go to this store, and I happened to say, do you have the address? And he gave me a location of where it was. He -- that gentleman happened to direct me

15 (Pages 57 to 60)

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 587 of 834

December 19, 2022

## Page 61

T. MILLER

to Men's Warehouse to get my casual stuff. He said they're very good in terms of casual wear and stuff like that. One of the store owners happened to direct me to First Avenue. He was a worker in the store, and he was like, you might like some of the sneakers over there and it's a good price on 116th area. And then I had another person who had directed me to 28th Street. So I had multiple locations and destinations to go and choose. I just said, I'll just walk along, to be honest. It was a nice day, you know.

Q. Earlier, when you testified, I decided to go shopping and took the tour the long way home, is that what you were referring to?

A. Deciding to walk. Yes. When I decided to walk instead of taking transportation, or a bus or something yes. That's why I said the long way home, in other words.

Q. Did you eat lunch that day?

## Page 62

T. MILLER

A. Did I? I believe I had a slice of pizza that day for lunch.

Q. What time?

A. That was right after I got out of program, to be honest.

Q. Okay.

A. Eleven, 11:30.

Q. Where did you get the slice of pizza?

A. On my way to walking to 96th Street to jump on the train. There was a pizza store over there, a restaurant. A pizza restaurant.

Q. How tall are you?

A. 5'11.

Q. How much did you weigh back in February of 2021?

A. Approximately 285. My weight fluctuates from 250 to 285.

Q. How much do you weigh now?

A. Approximately that.

Q. 250?

A. 285.

Q. When was the last time you

## Page 63

T. MILLER

weighed 250?

A. I'd say a couple months ago. Approximately three to four.

Q. Why is that?

A. Sometimes I eat a lot. Sometimes I don't. Idle time. I might just be sitting there reading a book and decide to pick an unhealthy snack, to be honest. Put on too much weight.

Q. Does your weight fluctuation have to do with substance abuse?

A. To my knowledge, no. It's just something that I do. That I noticed been happening for a while. It's like I might feel like eating a good amount, you know, this term and next term, I might not eat that much and I might portion wise. Just according to feeling.

Q. I need to make a correction. Well, let me ask it to you this way, Mr. Miller.

A. Yes, ma'am.

Q. Previously, I asked, had it only been two months since you had been

## Page 64

T. MILLER

out of jail when the accident happened, but I think that was a mistake because you said your incarceration ended Christmas of 2019?

A. Yes.

Q. But the accident didn't happen until February of 2021?

A. Yes.

Q. So you had been out of jail for --

A. A whole year.

Q. -- over a year at that point?

A. Yes, ma'am.

Q. Let me ask you that question then.

When was the last time you were involved or treated in a substance abuse program?

A. That was the -- if I'm not mistaken, you asked me that question. When I came home from my vacation.

Q. I'm just confused because you said the last substance abuse program was --

16 (Pages 61 to 64)

December 19, 2022

Page 65

T. MILLER

A. When I came home from my vacation in --

Q. January 2020. Yet, you were at Carnegie Hill --

A. That was the substance abuse --

(Whereupon, a discussion was held off the record.)

CONTINUED EXAMINATION BY MS. BECHTEL:

A. Carnegie Hill is the substance program. That's why I said it's a broad aspect. It also consists of mental health, adult male and female separate classes, parenting classes. It has broad aspect of many programs in it.

Q. Okay.

A. And that's what I was referring to when I came home from my vacation and the substance abuse is a program that you're speaking of happened to be there that I had to undertake.

Q. Okay.

A. Basically, one of the names of

Page 66

T. MILLER

the programs I had to take -- of the facilities I was housed to have my programs at.

Q. So how long were you enrolled in the Carnegie Hill program before the accident took place?

A. I believe I ended Carnegie Hill that summer. I graduated from Carnegie Hill that summer, I believe. So --

Q. When did you start Carnegie Hill?

A. I was referred to upon becoming -- upon arrival of coming home from my vacation.

Q. So you started Carnegie Hill early 2020?

A. Yes.

Q. And, you were going there --

A. For approximately --

Q. The entire --

MR. DELUCA: Let her ask the question.

A. I'm sorry.

Page 67

T. MILLER

Q. And, you were enrolled in the Carnegie Hill program all of 2020 until the summer of 2021?

A. No, until --

Q. Correct me --

A. Until the summer of 2020 to be correct. After that, --

Q. Did you go out and come back in?

A. Yes.

Q. Okay.

A. I was constantly --

Q. Can you elaborate?

A. Yes, with the program, it was not just the substance abuse that they had put me in. I was given a case manager, and a counselor and a doctor. So any prescriptions or anything -- anybody I need to talk to in terms of therapy wise or just anybody, I was welcome to come there and talk.

Q. So --

A. So my program didn't really end with Carnegie Hill, to be exact,

Page 68

T. MILLER

until then.

MS. BONOMO: Can we clarify what the substance abuse was for this program?

MS. BECHTEL: I didn't hear you.

MS. BONOMO: Can we clarify what type of substance this was for?

MS. BECHTEL: Okay. Let me take one step back, and I will.

Q. When you started at Carnegie Hill, was it mostly for substance abuse, but as time went on, it was more for your case manager, counseling, therapy, et cetera?

A. To clear the record, when I started at Carnegie Hill, I was basically referred to and sent there by my supervisor or (inaudible.) I should say handler, when you come off of vacation, or parole officer, to be exact.

Q. Yes.

A. And it was for broadcast packets. It wasn't just for a substance

17 (Pages 65 to 68)

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 589 of 834

December 19, 2022

Page 69

T. MILLER

abuse or anger management. When involved in any of conviction, you have to take programs for it.

Q. Are you saying that when you were released, your parole officer referred you to Carnegie Hill?

A. Yes, ma'am.

Q. And, for substance abuse initially?

A. For all my charges, I had to take program for it.

Q. For substance abuse, did you say anger management?

A. Mm-hm.

Q. What else?

A. Anger management. Independent counseling.

Q. Yes.

A. I even did a parenting class.

Q. Okay.

A. Course.

Q. And, the substance abuse, was there a particular substance or substances that you had been abusing at

Page 70

T. MILLER

the time?

A. To be honest, the substance abuse for me to be there was their point of view. They wanted me there. My substance was a minor substance, but when you're incarcerated, it's based on the charges that you're incarcerated with that they apply you to the programs. So for instance, if I'm a drug dealer, I might not be on any substances, but due to the fact, for instance, for what I have been told, it's an addiction to getting fast money. So now, I'm put into a substance abuse because substance abuse happens to deal with addictions, but it's addiction to drug, or addiction to getting fast money or anything. So that's one of the reasons why I had to take that program over, unfortunately.

Q. Would you say that you were a drug dealer, and that you were addicted to getting fast money and that's why you were referred to Carnegie Hill?

A. No.

Page 71

T. MILLER

MR. DELUCA: Objection. Don't answer.

A. No, ma'am.

Q. Let me rephrase my question.

A. Yes.

Q. Were you referring to yourself earlier?

A. No.

Q. Okay.

A. I was giving an example.

Q. Okay.

My question to you is, why were you referred to Carnegie, what addiction were you --

A. On --

Q. -- drug --

A. That's what you're trying to ask me?

MR. DELUCA: Well, just objection to --

Q. What was the substance or reason?

A. For me to be in the program?

Q. Yes, sir.

Page 72

T. MILLER

A. One second.

MS. BECHTEL: Sir, are you still there? You have to answer, and then --

MR. DELUCA: He answered that. The conviction was for possession of a controlled substances.

THE WITNESS: Thank you.

MS. BECHTEL: Don't coach him. He needs to answer the question.

MR. DELUCA: I'm not.

MS. BECHTEL: You're coaching him.

MR. DELUCA: I'm not coaching him. Two hours in and we haven't even gotten to the fire truck accident yet.

THE WITNESS: Okay.

A. Okay. Overall speaking, you're asking about other people?

Q. I'm asking about you, what substance led you to being referred to Carnegie Hill?

A. My actions. Overall speaking,

18 (Pages 69 to 72)

December 19, 2022

Page 73

T. MILLER

being incarcerated led me to having to take a program in Carnegie Hill and be referred to a program because of my convictions, you have to take a program. Whether it's the smallest thing, they want you to take a program to show that you are rehabilitated and this is my way -- that was my task at hand.

Q. When you were convicted of possession of a controlled substances, what was the controlled substances?

A. When I was convicted, the controlled substances they charged me with happened to be weed and other narcotics.

Q. Cocaine?

A. No.

Q. What other narcotics?

A. I plead the 5th because it has nothing to do with this case.

Q. No --

A. But if you're asking me --

Q. It's okay.

What other substances, what

Page 74

T. MILLER

other narcotics are you referring to?

A. I happened to have what they call crack, cocaine substance. That's what controlled substances is.

Q. Okay.

A. And --

Q. Weed, crack, cocaine, anything else?

A. No.

Q. Okay.

A. Are you asking me if I was on that?

Q. No.

A. Okay. I just wanted to hear what you were saying specifically.

Q. In the twenty-four hours before the accident happened, were you on any, drugs alcohol or other medication?

A. No, I have not been on anything at the time.

MR. DELUCA: You answered. When you say no, answered. Why do you keep talking.

THE WITNESS: Oh, I'm sorry.

Page 75

T. MILLER

Q. When you were walking downtown on the right side of Second Avenue, were you walking along a sidewalk?

A. Yes.

Q. Was the sidewalk busy at the time, or was it empty or something else?

A. To my recognition, I don't remember how crowded it was, but it was not crowded.

Q. Were you walking on the left side of the sidewalk closest to the street, the right side of the sidewalk closer to the buildings or something else?

A. Closest to the buildings.

Q. Did you fall?

A. Tripped.

Q. What did you trip on?

A. Cellar door. From the ground.

Q. In the ten seconds before you tripped, what direction were you looking, up, to the left, right, at your phone, something else?

A. I do not recall but I wasn't

Page 76

T. MILLER

-- I didn't have anything on me to look at.

Q. Did you have a cell phone with you at the time?

A. Yes, in my pocket.

Q. Did you see the cellar door before you fell?

A. Yes, I saw it, but.

Q. Okay.

Was it a two door cellar door or you one-door cellar door?

A. Two.

Q. Was one or both of them open at the time, or closed or something else?

A. Upon looking or when I saw it, they were closed. Upon walking upon it, they happen to move, which caused me to trip.

Q. What part or parts of the cellar door caused you to trip?

A. The edge on the -- where -- how can I say it? The door itself going down. It was causing me to get caught on the edge of the door.

19 (Pages 73 to 76)

December 19, 2022

## Page 77

T. MILLER

Q. The edge between the door and the sidewalk --

A. Yes.

Q. -- or between the edge between the door and the other door?

A. I'm --

MR. DELUCA: Objection to form.

Q. That's my question, you can answer.

A. Yes, between the two doors, meaning, when I stepped on the cellar, it went down and caused space.

Q. When you stepped on the edge, was it with your left foot or right foot?

A. I do not recall which foot first.

Q. You said when the cellar door went down, did both cellar doors go down or just one cellar door go down?

A. One, and that's how I was able to trip over the other one. Yes.

Q. One door that went down, how far did it go down, like how many inches,

## Page 78

T. MILLER

if you know?

A. Not offhand. It went down far enough to get my boot caught on it and cause me to trip.

Q. What kind of boots were you wearing?

A. At the time, Timberland.

Q. Like the Timberland work boot?

A. Yes.

Q. With the rubber sole?

A. Yes, orange Timberlands or construction Tims.

Q. Do you know which shoe got stuck?

A. When falling, I can remember because it happened so fast, that I believe it was my right foot that got caught mostly in it that caused me to tumble, but I do not recall exactly which one I stepped on first wise. But due to my weight and the -- and the --

Q. What was the weather like at the time?

A. That day, at that specific

## Page 79

T. MILLER

time, the sun was out.

Q. Was the ground wet?

A. I believe we had just came off -- over snow and there was still some snow on the ground. I don't recall specifically where it was, but I do know around that time it had snow.

Q. Do you know --

A. Almost --

Q. No, I cut you off. What were you going to say?

A. I do recall it had snow, I think the day before or prior, but it was a sunny day and the ground was somewhat clear.

Q. Do you know if any snow or ice caused you to trip, or was it the structure of the cellar door or something else?

A. To my knowledge of the incident, there was no cellar -- I mean there was no snow around the cellar that I saw because I'm pretty sure I would have walked around it. And the cellar

## Page 80

T. MILLER

didn't look like it wasn't stable, so the fire department was mostly saying the cellar is not stable, and going down upon crossing it.

Q. Besides your cell phone, what were you carrying with you at the time?

A. My wallet. Other items. A pen.

Q. Were you holding any shopping bags?

A. No, there was nothing in my hands at that time, that I can recall.

Q. So when you fell, what part of your body caused you to hit the ground?

A. When I fell, it happened so fast. I just know that I ended up trying to stop myself from falling and shifted, and next thing you know, I was on the ground.

Q. Did you fall forwards, did you fall backwards, left, or right or something else?

A. It was forwards because I tripped over the cellar but --

20 (Pages 77 to 80)

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 592 of 834

December 19, 2022

## Page 81

T. MILLER

Q. And, you tried to stop yourself --

A. Yes, I stumbled.

Q. When you tried to stop yourself, did you do that with both hands or one hand?

A. Both hands, and I happened to twist at the same time because of the impact of getting caught on the cellar.

Q. When you fell, did you land on top of the cellar door, or next to the cellar door or something else?

A. Where was I? From my recognition, when I happened to call the ambulance, I was next to the cellar door on the side, left hand side of it, like right there by the cellar door. I was still somewhat on it, but not on it fully. It was within reach.

Q. And, when you landed, what part of your body struck the ground first, did you land on your knees, did you land on your behind, did you land on your face, what part of your body hit the

## Page 82

T. MILLER

ground first, if you know?

A. To my recognition, after tripping, I twist and it was mostly my lower back and buttocks, to be specific, due to the twist of me trying to stop myself and stumbling.

Q. Did anyone see your accident?

A. A pedestrian passing by happened to help me and called the ambulance.

Q. Did you get that pedestrian's name?

A. No, ma'am. I do not recall.

Q. Can you describe them?

A. Spanish, I believe he was in his mid thirties, he looked, pretty much.

Q. Did he help you back up to a standing position?

A. He called the ambulance. He told me to wait until they come, I was in a little pain.

Q. After you fell --

A. Yes.

Q. -- did you get back into a

## Page 83

T. MILLER

standing position or did you stay --

A. I stayed --

Q. -- on the ground?

A. Until medical tried to help me up and due to the pain, I wasn't able to apply pressure fully on my leg and my ankle because it hurted.

Q. Did you stay on the ground from the time you fell until when the ambulance arrived?

A. Yes, ma'am.

Q. How much time passed from when you fell to when the ambulance arrived?

A. I do not know, but I do --

Q. Can you approximate?

A. Between minutes, I guess. Thirty minutes. It didn't take long.

Q. Did you try to stand back up during that twenty to thirty minute period?

A. No, I stayed on the ground as instructed. They told me to stay on the ground -- the gentleman told me to stay on the ground. I stayed on the ground as

## Page 84

T. MILLER

instructed by medical.

Q. You want to correct that; right? I'm asking about the twenty to thirty minutes before the ambulance came.

Did you receive any medical treatment in the twenty to thirty minutes before the ambulance came?

A. No.

Q. You were waiting for --

A. I was on the ground. As he was on the phone -- from my understanding, he was on the phone, he told them that I fell and they told him to stay on the ground. He instructed me from what they told me was to stay on the ground, they will come and that they were going to check on me.

Q. Were you cold and wet waiting on the ground for twenty to thirty minutes?

A. I did get wet and I know I was cold too, yes, ma'am.

Q. Did you put anything under yourself to keep you from --

21 (Pages 81 to 84)

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 593 of 834

December 19, 2022

Page 85

T. MILLER

A. No, ma'am.

Q. -- feeling cold?

A. I didn't have anything to put under. I had my jacket, that's all at the time.

Q. Did you take your jacket off and sit on it or did you wear your jacket?

A. No, I left it on. I didn't take anything off. Before I knew it, they were there. Their response time was pretty quick, so I didn't -- from what I could recall.

Q. In that twenty to thirty minute period when you were on the ground waiting for the ambulance to come, was your whole body laying on the ground, were you sat up waiting on the ground, kneeling or something else?

A. I recall I was holding my buttocks and back, and was in a slanted upward position, but not fully sitting up. And I constantly was laying down and getting in that position, to be as

Page 86

T. MILLER

honest, as possible. But not fully laying down, to be honest. I was just --

Q. Did you hit your head as a result of the accident?

A. Not that I could recall.

Q. Did the accident cause you to bleed from anywhere in your body?

A. The only thing I could recall was a scratch, a couple of scratches and the pain overall.

Q. After you fell, did you make any effort to find out what caused you to trip?

A. As far as I could recall, I just know I looked around, saw that and saw what I was walking towards in terms of like, in terms of falling, and that was my specific point of trip. And even the gentleman saw it at the time. I don't have his name.

Q. Had you ever passed by that area before the date of the accident?

A. No.

Q. Are you aware of any

Page 87

T. MILLER

complaints made about the area of your accident before it happened?

A. No.

Q. Have you ever heard of Lower East Side People's Federal Credit Union?

A. No.

Q. Have you ever heard of East Harlem People's Federal Credit Union?

A. No.

Q. Have you ever been a member of either of those institutions?

A. Not that I could recall. I don't remember hearing about them or if I did, I wouldn't remember.

Q. Did you fall in front of a financial institution, did you fall in front of some sort of bank or credit union?

(No verbal response was given by the witness.)

Q. The cellar door, what was the business that was immediately next to the cellar door?

THE WITNESS: Hello, hello.

Page 88

T. MILLER

MS. BECHTEL: Can you hear me.

MR. DELUCA: Did you hear the question.

THE WITNESS: Hello.

MR. DELUCA: Can you hear us, Mr. Miller?

(Whereupon, a discussion was held off the record.)

CONTINUED EXAMINATION BY MS. BECHTEL:

MS. BECHTEL: Tracy, can you read the last question.

(Whereupon, the requested portion of the record was read back by the Court Reporter.)

A. From what I can recall, it was a green ornament business. I don't know exactly the name offhand, but I know it's a green ornament that the cellar door stood in front of.

Q. What do you mean by ornament?

A. The ornament in terms of -- what is the thing that goes -- basically, the thing that goes over windows and

22 (Pages 85 to 88)

December 19, 2022

## Page 89

T. MILLER

doors with the numbers, sometimes it has the address or name of the place on it.

Q. An awning, green awning?

(No verbal response was given by the witness.)

Q. Green sign?

A. Like cloth. Green cloth over it.

Q. Did anyone --

A. I remember, I can remember green. I remember green, to be honest.

Q. Did anyone from the business with the green ornament or awning come outside to --

A. No.

Q. -- to talk to you after the accident?

A. No, ma'am. No one came out, that I know of. Or that I can recall. I don't remember anyone come out.

Q. Was anyone from the business outside before your accident happened?

A. I wouldn't know. I don't know anybody from the business. As far as I

## Page 90

T. MILLER

could recall, if they were, they didn't say anything that I know of to make themselves knowledgeable.

Q. Was there any --

MS. BECHTEL: Strike that.

Q. Were the doors to that business closed at the time?

A. I do not recall, to be honest. If it was established, physically working or what. I do not know because I never --

Q. What color was the cellar door?

A. Cellar door was gray-ish black -- brown-ish. It's old, metal. It was metal. That, I remember. And I believe it was gray-ish and black, or brown or blackish brown. I know it was metal and they had no paint that I know of on it.

Q. Was it a different color than the sidewalk?

A. Yes, you could distinguish the two.

Q. How big was it, what were the

## Page 91

T. MILLER

dimensions of --

A. I would not be able to answer that one. I do not know size offhand. I didn't have a tape measure.

Q. Before your accident, did you notice any defect with the cellar door?

A. No, there's no visible sign of not being stable and there was no visible signs of anything was going to occur. Otherwise, I probably would have avoided it.

Q. After the accident, did you notice any defect with the cellar doors?

A. I do not recall, to be honest. I just know I ended up hurting myself.

Q. Did you take photographs of the accident location immediately after you fell?

A. Yes.

Q. Did you take --

A. I took pictures eventually, but I don't believe I did it immediately after. I just know I took a picture of me falling.

## Page 92

T. MILLER

Q. Did you --

A. Immediately after.

Q. Did you return to the accident site at some point to take photos?

A. Yes, after -- the next day, I believe. The next day or two, I came back because of the report.

Q. Did police arrive at the scene?

A. At the time?

Q. Yes, at the time of your accident.

A. I believe one squad car maybe. If that. But it was mostly the ambulance that I could recall and the ambulance workers that I recall being there.

Q. Do you know if a police report was made as a result of your accident?

A. I do not honestly recall or know. It's possible. I believe there was one made.

Q. Did you take any photographs at the time of your accident other when you were waiting for the ambulance to

23 (Pages 89 to 92)

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 595 of 834

December 19, 2022

## Page 93

T. MILLER

arrive?

A. That I could recall, no.

Q. When you returned to the accident site the next day, were you with your lawyer?

A. No.

Q. Were you with anyone?

A. Upon arriving, I was with -- myself. I happened to drive back to take pictures to have a better understanding of why I fell for the report.

Q. Earlier, a few minutes ago, you testified that you returned the next day or two because of the report, what report are you referring to?

A. In terms of me reporting, calling the ambulance and seeing if there was anything that caused me to trip, or fall or anything. To see what lead me to end up getting hurt and I was with a cane. I had a cane when I left the hospital.

MS. BECHTEL: We'll move to strike the non-responsive portions.

## Page 94

T. MILLER

Q. Did you call the ambulance or did you --

A. A pedestrian.

Q. The Spanish man called the ambulance or did you both call the ambulance?

A. To my recognition, I believe he was the one that got in touch with them and they responded to him. I believe he called.

Q. Did you make any calls on your cell phone in the twenty to thirty minutes that you were waiting for the ambulance to come?

A. I do not recall.

Q. On the day your accident happened, did you contact any friends, family or associates to let them know that you were involved in an accident?

A. My mom, I let her know that I was in the hospital and that I was being overlooked so that she wouldn't be, you know, concerned about me.

Q. Anyone else?

## Page 95

T. MILLER

A. My daughter, but pretty much no one really. I didn't --

Q. What is your mom's name?

A. Janet. Janet Jackson.

Q. What's her date of birth?

MS. BECHTEL: We can leave it off the record.

(Whereupon, the Witness provides requested information off the record.)

Q. Did you speak to any security guards in the twenty to thirty minutes while you were waiting for the ambulance?

A. To my knowledge. I didn't see any security guards.

Q. Did you speak to anyone that you knew to be the owner of the building after your accident took place?

A. Not that I know of.

Q. Did you speak to anyone who you knew to be from the business in front of where you fell after you fell?

A. I cannot recall if I did.

MS. BECHTEL: I think that's

## Page 96

T. MILLER

all I have for liability. I can review my notes if Tara was wants to question.

MS. BONOMO: Yes. Just hold on one second.

EXAMINATION BY
MS. BONOMO:

MS. BONOMO: I just have a couple of follow up questions.

THE WITNESS: Yes, ma'am.

MS. BONOMO: Same ground rules apply as before. Please make sure you understand my question before you give your answer. Also, make sure that you only answer the question being asked of you; okay?

THE WITNESS: Yes.

Q. Okay.

What was the total amount of time that you were living in shelters?

A. 2019 December -- January -- approximately two and some change. Going on three years.

Q. And, that was from what year

24 (Pages 93 to 96)

December 19, 2022

Page 97

T. MILLER

to what year?

A. Specific date, 2019 Christmas eve from when I came home from vacation to August of this year when I signed my lease. Approximately, I think like the 13th or the 15th. Around there.

Q. So during that approximate two year period of time, what was your permanent address, meaning, where you did you receive mail?

A. Never had one. I didn't have a stable address.

Q. Okay.
Prior to 2019, where were you living?

A. 2019, prior to 2019, I was on vacation in Franklin.

Q. Okay.
And that was from 2016 to 2019; is that correct?

A. Yes.

Q. And then where were you living prior to 2016?

A. 95th Street and West End.

Page 98

T. MILLER

Q. Was that an apartment, or a private home or something else?

A. In the shelter with my mother.

Q. What was your mother's name again?

A. Janet Jackson, just like the singer.

Q. Other than your mother, did you live with anyone else at that address?

A. No.

Q. Is that considered in Manhattan or --

A. Yes.

Q. -- somewhere else?
How long did you live there for?

A. To be honest, all I could recall, it was approximately some years.

Q. One year, five years?

A. Approximately over two years. Approximately three.

Q. Prior to that address, where did you live?

Page 99

T. MILLER

A. 91st Street.

Q. Where were we before 91st Street?

A. I believe I was living in my apartment on Barnes in 2012 before being evicted.

Q. Did you have any --

A. With my mother.

Q. -- roommates, alone?

A. I was living in an apartment with my mother. Barnes, B-A-R-N-E-S, in the Bronx.

Q. How long did you live there for?

A. Approximately five years.

Q. And then where did you live before that?

A. Davidson, in the Bronx.

Q. Is that Davidson Avenue, Street --

A. Yes, ma'am. Davidson Avenue.

Q. Okay.
And, who did you live there with?

Page 100

T. MILLER

A. My mother.

Q. How long did you live there for?

A. I do not recall exactly the -- the amount of years because -- to give you an estimate, I'd say about three years.

Q. You mentioned going to five different high schools, were these all located in the Bronx?

A. Yes.

Q. What was the reason why you went to different high schools?

A. My first high school from graduating from junior high school was Mount St. Michael, but I had graduated from the junior high school part of Mount St. Michael, which was a private school. And there was a tuition. At that time, I had just started living -- I was living with my grandparents when I was there and moved in with my mother, and my financial system went down. I didn't have the resources to be able to pay for the

25 (Pages 97 to 100)

December 19, 2022

Page 101

T. MILLER

tuition at the time.

Q. Okay.

A. So therefore, it caused me to leave that school. When I went to from that school, I went to Stevenson and I was there until -- I didn't like what they were offering in terms of their curriculum, and I went to Columbus after that. Columbus, I was there until I didn't like what they were offering overall, and I ended up going into a BRAM, practice which is a vocational training center. At the time, they were called VTC, and that's what led me to the other two schools.

Q. So how many years of high school did you complete?

A. Approximately to the tenth grade, I dropped out going into the eleventh.

Q. Did you complete your tenth grade?

A. Almost.

Q. Okay.

Page 102

T. MILLER

So these five different schools were all during ninth and tenth grade; is that correct?

A. The five different schools were from -- actually, to be honest, the three different schools is from nine to tenth grade going into the eleventh. The other school -- the other two schools were a result of me leaving public school.

Q. Okay.

So did you ever attend Mount St. Michael or did you not attend because of the tuition issue?

A. I did attend. That's where I left.

Q. So how long did you attend Mount St. Michael?

A. Approximately one third of the year, that I know of, that I could recall. Not even one third.

Q. So when you --

A. Yes.

Q. Why did you drop out before

Page 103

T. MILLER

completing the tenth grade?

A. Well, due to the programs and when I dropped off, I went to VTC, which is another school. But the way they were programmed is you either get credits in your GED, or you can do the regents and go for a high school diploma. If you do your regents tests, I was in the process of doing that and wasn't able to complete it.

Q. And, why weren't you able to complete it?

A. Due to the fact I started working in security and that took over more.

Q. So how long did you work in security for?

A. Over a year.

Q. Over one year?

A. Yes, approximately.

Q. Other than security cycles, the program that you mentioned through HRA, what other jobs have you held?

A. McDonald's. What else? New

Page 104

T. MILLER

York Wine Exchange in New York, Wines and Liquors down -- they both two stores that's connected by cousins or brothers, I believe. And one is on 59th Street, one is on downtown Manhattan by Bowling Greene. Those two spots, I worked there. Pretty much --

Q. Did you work at McDonald's longer than one year?

A. McDonald's, six months.

Q. When was that?

A. That was in '06, I believe.

Q. When did you work at the New York Wine Exchange?

A. '05, around there.

Q. How long did you work there for?

A. I worked there for approximately three months, and then it got slow because I was considered extra hand security/delivery man.

Q. So in the last ten years, have you held any other jobs other than what we've gone through?

26 (Pages 101 to 104)

December 19, 2022

Page 105

T. MILLER

A. No, ma'am.

Q. What did you do at McDonald's?

A. Everything, I was a janitor, grill man, inventory stock. The only things I didn't do was management positions.

Q. So when you did security, what company was that for?

A. Command Security.

Q. Why did you leave that job after a year?

A. They was not treating me right in terms of raise and pay.

Q. So when you left the job at Command Security, did you have another job lined up?

A. I did, and that job went sour due to layoff.

Q. What job was that?

A. Delivery.

Q. For where?

A. Local company in the area over on Barnes Avenue.

Q. What company was --

Page 106

T. MILLER

A. The company was Liberty Taxes. I was handing out fliers and delivery.

Q. Okay.

So is it accurate to say you dropped out of --

MS. BONOMO: Withdrawn.

Q. Approximately what year did you drop out of the tenth grade?

A. I cannot recall the exact year. I know that was in tenth grade and approximately what year, I would have to say -- last year I was in school -- 2004, around there, approximately, to give you an idea, around there. 2004, 2005. Around that time.

Q. So since 2004, have you held any other job other than Command Security for longer than one year?

A. No, ma'am. Specifically, no.

Q. Are you currently looking for a job?

A. I'm currently trying to go back to school, madam.

Q. Have you applied for admission

Page 107

T. MILLER

to any schools for the next coming semester?

A. Right now, in the stage, I was talking to an advisor and looking for the right school.

Q. How are you currently supporting yourself?

A. Unfortunately, I'm on public assistance, which is HRA, and family.

Q. Okay.

So what types of government benefits are you currently receiving?

A. Food stamps, cash assistance, and I have a voucher that pays for my place.

Q. Is that Section 8?

A. No, City PHEPS.

Q. Have you applied for any other types of public assistance since this accident?

A. I don't know what other types of public assistance there is.

Q. Okay.

So is that all the money you

Page 108

T. MILLER

have coming in from the different sources every month?

A. Family and public assistance, ma'am.

Q. Okay.

A. I have a mother that's been my biggest support and help.

Q. Are you a U.S. citizen?

A. Yes, ma'am, born and raised.

Q. The crimes that you testified to earlier, did you plead guilty to those crimes or did you go to trial?

A. Unfortunately, I pled guilty.

Q. And, that was to both incidents that you testified to earlier?

A. Unfortunately, yes.

Q. You mentioned that you had an incident where you were at Bellevue for a while; is that correct?

A. I mentioned Bellevue when, upon leaving from my vacation upstate, yes.

Q. Just --

A. That's where they sent me to.

27 (Pages 105 to 108)

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:31 PM
NYSCEF DOC. NO. 52
INDEX NO. 538433/2024
RECEIVED NYSCEF: 03/06/2025

December 19, 2022

## Page 109

T. MILLER

Q.   Just to clarify, when we're using the term vacation, we're talking about when you were in prison; correct?

A.   Yes, ma'am.

Q.   And, you're referring to Bellevue Hospital?

A.   Unfortunately, that's where they send you to start the process of the shelter, from my understanding.

Q.   So were you admitted into, as a patient into Bellevue Hospital?

A.   I was admitted into the shelter.

Q.   Okay.

A.   At Bellevue's location, hospital location.

Q.   So you mentioned that you had gone to the substance abuse program at Carnegie Hill, have you ever been to any other substance abuse programs other than that one?

A.   Due to my vacations, they led me to go to many others, yes.

Q.   So have you gone to any

## Page 110

T. MILLER

substantial abuse programs not connected with prison time?

A.   No, ma'am.

Q.   What were the other programs that you went to, the other substance abuse programs?

A.   Excuse me?

Q.   What were the other substance programs that you --

A.   Oh, names of the programs, Exodus, Vertex.  Yeah.

Q.   Were both of these programs court ordered?

A.   Unfortunately, parole ordered.

Q.   Any of these substance programs, were you treated for any type of drug abuse?

A.   It's required to do drug testing, if that's what you're asking me.

Q.   Okay.

Were you ever treated with any type of methadone treatment?

A.   No, ma'am.  No, ma'am.  No -- how can I put it?  No extra --

## Page 111

T. MILLER

MR. DELUCA:  You already put it --

THE WITNESS:  Huh.

Q.   Back in February 2021, did you take any regular medications --

A.   No, ma'am.

Q.   For any --

MR. DELUCA:  Let her finish the question.

THE WITNESS:  I'm sorry.

MR. DELUCA:  Let her finish the question; okay.

THE WITNESS:  Yes.

Q.   Were you on any type of prescribed medication that you would take on a daily basis back in February of 2021?

A.   None that I know of, ma'am.

Q.   What about now, today, did you take any medication before testifying here today?

A.   No, ma'am.  Not today.

Q.   Are you currently on parole?

A.   No, ma'am.

## Page 112

T. MILLER

Q.   How long were you on parole for when you were released in --

A.   (Inaudible) one year.

Q.   One year?

(Whereupon, a discussion was held off the record.)

CONTINUED EXAMINATION BY MS. BONOMO:

Q.   When you left the shelter on the date of the accident, what were you wearing?

A.   I cannot recall.

Q.   Were you wearing a jacket, were you wearing pants or a sweater?

A.   Yes, pants, jacket, shirt.  I don't go out naked, I can tell you that much, but in terms of specifically what I was wearing, I cannot recall.

Q.   Mr. Miller, if you could just answer the question, it will just go a lot quicker.  Thank you.

THE WITNESS:  Can you hear me.

MS. BONOMO:  Yes.

THE WITNESS:  Okay.

28 (Pages 109 to 112)

December 19, 2022

Page 113

T. MILLER

Q.   When you got off the subway at 125th Street and you proceeded, did you then proceed down Second Avenue?

A.   When I got off the subway, this is the question that the young lady was asking me a minute ago; right?  She asked me which direction I went, and I explained to her, I went up towards the west direction four blocks, and then happened to turn around and walked across the street to the opposite side of the street to look at some stores along the way coming down.

Q.   So at what point did you get onto Second Avenue?

(No verbal response was given by the witness.)

Q.   From what street did you get onto Second Avenue from?

A.   Upon coming back down 125th Street.

Q.   Okay.

So when you proceeded down 125th Street down Second Avenue, did you

Page 114

T. MILLER

stay on the same side of Second Avenue the whole time?

A.   On the right hand side, yes, ma'am.

Q.   Is it correct to say you were walking south down Second Avenue?

A.   Yes, down, south, on the right hand side, to be exact.

Q.   So when you were walking down Second Avenue, was the roadway to the left of you, to the right of you or something else?

A.   The current building that I tripped at, you're asking?

Q.   I'm asking about the roadway.  Where was the roadway --

A.   Oh, to the left.  I was on the right hand side of Second Avenue where the road -- where the street was to the left, and buildings was on the right.

Q.   Okay.

A.   I was between the street and the buildings.

Q.   How many blocks did you walk

Page 115

T. MILLER

down on Second Avenue before your accident occurred?

A.   If I'm not mistaken, that was the same thing she asked me.  Ten blocks.  From 125th Street to 116th.  Approximately ten blocks.

Q.   Did your accident occur at or around Second Avenue and 116th Street?

A.   Approximately 116th, 117th, around there.  If I'm not mistaken.  I'm not certain exactly which street it is offhand.  I just know it was on Second Avenue.  Yeah.

Q.   Again, just answer the question, mister --

A.   Yes.

Q.   Did the accident occur in the middle of the block, or closer to one corner or something else?

A.   The accident occurred right there in front of the facility, right there on Second Avenue.  I don't remember the exact specific street.

MS. BONOMO:  Move to strike as

Page 116

T. MILLER

non-responsive.

Q.   I'm asking you if your accident occurred on a corner, or in the middle of a block or something else?

A.   My accident happened in front of the establishment, in front, walking over the cellar doors that's on the sidewalk, madam, so I don't understand your question.

MR. DELUCA:  She's asking you --

MS. BONOMO:  Strike as non-responsive.

MR. DELUCA:  Listen to the question.  She's asking you where on the block did it happen?  Was it in the middle of the block, closer to one corner, closer to the other?  That's what she's asking.

A.   The establishment is on the edge of the block, that's what I'm trying to say, and it was going towards the end of the block.

Q.   So was it a corner, was it

29 (Pages 113 to 116)

Lexitas Court Reporting
800-678-0166

599

December 19, 2022

## Page 117

T. MILLER

the --

A.    I didn't fully get to the corner, that's what I'm trying to explain.  It was between the corner and the middle of the block.  The last establishment on that block.

MR. DELUCA:  Okay.

Q.    So what was the closest intersection to where your accident occurred?

A.    That street would be -- the closest one was going towards 117th, I believe.

Q.    How far from the corner of Second Avenue and 117th Street did your accident occur?

A.    I'm looking at it now.

Q.    Mr. Miller, I don't want you to look at any --

MR. DELUCA:  This is what you remember.  Don't look at anything.

A.    What I remember is that when I was in front of the facility -- I'm not going to look at anything but what I

## Page 118

T. MILLER

could tell you is this, when I was walking, I know -- what I remember, that there's a bike across from the street from that, and there was that facility right there where I was walking on.  And that street, just before I hit the corner of that street is where the accident occurred where the cellars are.  It's approximately -- I don't know offhand.  I was going to look it up to see how far it is from the corner, but I don't even recall exactly.

MS. BECHTEL:  Move to strike as non-responsive.

Q.    Mr. Miller, if you don't know the answer to a question, just merely state that you do don't know or don't recall.  I also ask that you don't refer to any outside sources.  I don't know what you have in front of you, but I don't want you to referring to the internet or anything else; okay?

A.    Yes, ma'am.

Q.    So my question was, how far

## Page 119

T. MILLER

from the intersection of Second Avenue and 117th Street did your accident occur?

A.    117 -- I cannot recall, ma'am, exactly where.  I just know I was on the corner of that street, madam.

Q.    So when you were walking right before the accident occurred, was 117th Street behind you, or was it in front of you or something else?

A.    I know I was walking down Second Avenue, to be exact.  When I got right there to where the establishment was, I'd say -- I cannot recall -- say offhand without looking at anything.  I can't remember the exact area, to my knowledge now.  But I know that I had just saw the bikes towards my left, and I had saw the green ornaments to my right, and just before I hit the cellar.  That's, you know, what I saw.  Just before I hit the corner of going south of that street is where I tripped.

MS. BONOMO:  Move to strike as non-responsive.

## Page 120

T. MILLER

A.    That's all I can recall.

Q.    Do you know between what two streets your accident occurred between?

A.    The specific streets?

Q.    Yes or no?

A.    No, I don't know offhand right now.  I can't remember.  It's been a while.

Q.    Okay.

Have you been back to that area since the accident?

A.    Since the accident, I been back to that area maybe once or twice, but not on some regular basis, no.

Q.    When is the most recent time you've been to that location?

A.    A year, at least.

Q.    What was the reason why you went a year ago?

A.    To meet my lawyer.  Not even a year ago.  The last time I remember going was to meet my lawyer in that area or a representative of my lawyer's office, I should say.

30 (Pages 117 to 120)

December 19, 2022

## Page 121

T. MILLER

Q. Okay.

Did you meet --

A. Before --

Q. Did you meet --

A. Huh?

Q. Did you meet at the accident location or did you --

A. Yes, ma'am, at the accident location.

Q. When you went approximately one year ago, did you take any photographs?

A. I specifically didn't take anything.

Q. Okay.

Did your attorney --

A. I went --

Q. -- or anyone else take photographs on your behalf?

A. I cannot recall. If they did -- they probably did on their behalf. I don't know what they did. I only know what I did, ma'am.

Q. So did you look at the cellar

## Page 122

T. MILLER

door at that time?

A. And it has not changed since the last time I saw it.

Q. I'll get to that.

I just want to know, did you look at the door, did you look at the cellar door?

A. Yes, I seen it.

Q. Did it look the same way that day as it did when you went one year ago?

A. Yes, at that time, yes, it looked somewhat similar. Same thing. It didn't look like anything changed.

Q. You testified you went after the accident and took some photographs; is that correct?

A. Yes, ma'am.

Q. Approximately when was that?

A. Couple days after the accident.

Q. When you went back, did you notice anything different about the cellar doors or did they look the same way as they did on the date of the

## Page 123

T. MILLER

accident?

A. I cannot recall.

Q. How many photos did you take?

A. I took a number of photos. I -- approximately, like five, I think. Maybe. To be exact, to be honest.

Q. What did you do with those photographs?

A. Submitted them to my lawyer to give them my idea of how I tripped.

Q. Was it cold on the date of the accident?

A. I cannot recall but I know it was sunny. That's all I could recall.

Q. And, you testified it snowed the day before; is that correct?

A. Huh?

Q. You stated it snowed the day before; is that right?

A. I don't know exactly when it had snowed, but I do know it was snowing -- it had snowed before because there was still some snow at the corner.

Q. As were walking down --

## Page 124

T. MILLER

A. I had just finished passing 118 --

MR. DELUCA: Let her ask you the question.

THE WITNESS: Yes.

Q. As you were walking down Second Avenue from 125th Street, was there snow on the sidewalk?

A. As far I know, that I had seen, it wasn't heavy, if there was. Otherwise, I would have probably walked around it, but I didn't see any snow on the ground or ice.

Q. I'm not talking about where your accident occurred, I'm talking about in general, in your travel that day, was there any snow on the ground on the sidewalk?

A. Yes, throughout travel, yeah.

Q. Did you notice any shoveled paths in the snow as you were walking in your travels that day?

A. On that day, if I'm not mistaken, there was no need to shovel

31 (Pages 121 to 124)

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 603 of 834

December 19, 2022

## Page 125

T. MILLER

because it was very less snow. It wasn't, how do you say it? It wasn't affect, the snow wasn't affect. It was just piles, like little footprint piles, like just little patches, to be exact. That's how you say that. But it was no --

Q. What I'm asking you, Mr. Miller, is, in your travels that day, did you notice shoveled paths on the --

A. There was no shoveled paths. It was sidewalk. That's what I'm trying to explain. The sidewalk was more clear that day throughout my path.

Q. Do you know the address of the area in which you fell in front of?

A. I know I had just finished passing 118th and I know it's between 117th and 118. That's on Second Avenue. I don't know exactly the specific address, to be exact. I don't know numbers or anything like that. I just know it's between 117 and 118.

Q. I'm asking if you know the

## Page 126

T. MILLER

specific address?

A. No, ma'am. I would not be able to tell you offhand.

MR. DELUCA: No is no. That's it.

THE WITNESS: Huh.

MR. DELUCA: Never mind.

Q. Do you recall the specific store that you were going to, was it Men's Warehouse or some other --

A. There was no specific store I was going to. I was just going to the specific street first, 116 first -- 116th.

Q. So you were heading to 116th and Second Avenue?

A. The area, yes, ma'am.

Q. And, that's because someone told you that there was a store that carried your size in that --

A. Yes, ma'am.

Q. -- location?

A. They told me I might find something of my taste in that area for a

## Page 127

T. MILLER

decent price.

Q. Were you carrying anything at the time of the accident?

A. Nothing in my hand, ma'am.

Q. In your travel that day, did you notice any salt or sand on the sidewalks?

A. Excuse? Me.

Q. Did you notice any salt or sand on the sidewalks in your traveling that day on the sidewalk?

A. Not that I could recall, no. There was no salt or sand because there was no icy -- it was not icy.

Q. Okay. Was the sidewalk in the accident location wet at all?

A. I cannot recall.

Q. After the accident, you testified earlier that part of your clothing was wet; correct?

A. Yes, upon getting up.

Q. What parts of your clothing were wet?

## Page 128

T. MILLER

A. Pants, like had a little spot. I don't know. I was on the ground a lot.

Q. Which leg was wet?

A. Right and left. I had little spots on it. Some spots on there.

Q. Did you review anything before testifying here today?

A. Excuse me?

Q. Did you review any documents before testifying --

A. No, ma'am.

Q. -- today?

A. That's why I don't -- I didn't know I had to.

Q. Did you review any photographs before testifying here today?

A. No, ma'am.

Q. Can you give me the approximate dimensions of the cellar doors?

A. I'm not an eye measurer. I'm not going to sit here and lie. It looks like average cellar doors, I can tell you that much.

32 (Pages 125 to 128)

FILED: NEW YORK COUNTY CLERK 03/06/2025 05:09 PM
NYSCEF DOC. NO. 52
INDEX NO. 538433/2024
RECEIVED NYSCEF: 03/06/2025

December 19, 2022

Page 129

T. MILLER

Q. Were you able to --

A. It looked square, I can tell you it was square wise, shaft, rectangle, square wise. That's it. But in terms of specific measures, no.

Q. How many steps did you take on the metal doors before you fell?

A. Approximately one to two. Second step, I believe it was. I'm not certain when exactly.

Q. Is there a reason why when you were walking that you chose to walk over the cellar versus on the sidewalk?

A. I think someone was passing by on the -- we both -- on the sidewalk I was walking on. So I don't know about the question, but I know that on that day, somebody was walking, I was walking. I happened to be walking on the inside of the street of that sidewalk towards the buildings, and that's when it happened, ma'am, that I could recall.

Q. So I just want to know --

A. I was just about to hit

Page 130

T. MILLER

117th --

MR. DELUCA: There's no question.

Q. I have --

MS. BONOMO: Can we take a five minute break?

MR. DELUCA: Yes.

(Whereupon, a brief recess was taken by all parties.)

CONTINUED EXAMINATION BY MS. BONOMO:

MS. BONOMO: Okay. Thank you. Can I just get the last question and answer.

(Whereupon, the requested portion of the record was read back by the Court Reporter.)

Q. Approximately how far was your body from the building right before the accident occurred?

A. Approximately, I was on the -- more towards the street from the building, like towards the middle of the sidewalk.

Page 131

T. MILLER

Q. I just want to know -- okay. When the accident occurred were you closer --

A. When the accident occurred --

MR. DELUCA: Let her ask the question.

Q. Were you closer to the roadway or were you closer to the building?

A. Closer to the building.

Q. So I just asked you, how far was your body from the building right before the accident occurred?

A. Far enough that I could reach my arm out, that's all I could tell you.

MR. DELUCA: Okay.

A. And not touch the building.

Q. So whatever way you can estimate in terms of feet, or inches or arm lengths, whatever way you can estimate?

A. At least arm length, I can tell you that much.

Q. So you were over one arm length away from the building; is that

Page 132

T. MILLER

correct?

A. Not even one arm length. Approximately -- approximately close to trying to be an arm way, but not fully. Like I could reach out and touch the building if I wanted to, but I didn't, you know.

Q. When you first --

A. I just know I was walking, madam. I don't recall any of that.

MR. DELUCA: Just answer the question.

Q. When you first stepped onto the cellar door, what foot did you initially step onto the doorway?

A. I do not recall which specific foot actually touched the cellar door first.

Q. Okay.

A. I do know --

Q. Just --

A. -- that my right foot.

Q. Just answer the question. The first step that you did

33 (Pages 129 to 132)

Lexitas Court Reporting
800-678-0166

603

December 19, 2022

## Page 133

T. MILLER

that you placed onto the metal door, did the door move at all?

A. Not that I know of. It happened so fast, but no.

Q. When you first placed your foot onto the metal cellar door, did you notice any snow or ice in the location?

A. Was there any snow or ice, are you asking me if there was any snow or ice next to the cellar door?

Q. Correct.

A. Not that I know of, ma'am.

Q. Was there any salt or sand in the area --

A. No, ma'am.

Q. -- where the door was?

MR. DELUCA: You have to let her finish the question.

Q. Let me finish my question.

MS. BONOMO: Did we get an answer.

A. No, ma'am.

Q. Approximately how far was your body from the building when you landed

## Page 134

T. MILLER

after you fell?

A. I was on the other side of the cellar door. I guess it was in the middle of the street. I don't recall. I have to be looking at the side of the street to tell.

Q. Okay.

Well, you were on the ground for approximately twenty minutes; is that correct?

A. Yes.

Q. So during that twenty minute period of time, were you closer to the roadway, or closer to the building or something else?

A. In that specific time when I was laying on the ground trying to regain -- regain balance or regain myself, I was pretty much in the middle of the sidewalk, to be exact -- to be -- to give detail close wise, almost.

Q. So when you fell, you fell forwards; correct?

A. Huh? When I fell I fell out

## Page 135

T. MILLER

towards the street wise.

Q. I just want to know if you fell forwards?

A. Forward, yes, ma'am, and I twist trying to catch myself.

Q. Okay.

A. Yes, ma'am.

Q. What direction did you twist in?

A. Well --

Q. I just want to know the direction, left, right --

A. That's what I'm trying to look. Ma'am, I'm looking, as you can see, I was looking this way -- (indicating) leaning towards the left. You could say I -- fell to my left, in more tying to catch myself.

Q. So you fell forward and to the left?

A. Leaning my left, ma'am.

Q. I just want to know, is that an accurate statement; you fell forward and towards the left?

## Page 136

T. MILLER

A. I tripped to the -- forward, and I tried to catch myself with the -- with my land out more so than my right that my body shift sideways.

MR. DELUCA: He turned to his right at that time.

Q. So when you landed, were you on your left side or something else?

A. When I landed I was on my buttocks and my lower back.

Q. So when you landed, you landed in a sitting position; is that correct?

A. When I landed, I was on the ground. I ended up in almost like a lay down position.

Q. You first stated you landed on your buttocks; is that correct?

A. Yes, that hit the ground first, that I know of. Lower back, upper buttocks hit the ground first, and then the rest my body followed in, you know.

Q. So when your buttocks landed on the ground, did they land on the metal door?

34 (Pages 133 to 136)

December 19, 2022

Page 137

T. MILLER

A. No, towards the side, like off the metal doors. I touched the metal doors, I can tell you that much. I can tell you this much that I remember. My hand was able to touch the metal doors, my leg on my left was -- was the closest thing to the metal doors. It could actually touch it if I spreaded it out somewhat, but yeah, that's all I can recall.

MS. BONOMO: Move to strike as non-responsive.

Q. So the first part of your body to make contact with the ground were your buttocks; is that correct?

A. First part of the body was my upper buttocks, lower back area mostly.

Q. Okay.

A. Upper buttocks, lower back area.

Q. So when you landed, were your feet in front of you, or to the side of you or something else?

A. Excuse me?

Page 138

T. MILLER

Q. Where was --

A. When I landed?

Q. Where were your feet located when you landed?

A. I guess in front of me because I --

Q. I don't want you to guess.

A. No, I'm saying, I believe in front of me. Like I don't -- I didn't really pay attention about where it was pointing towards, but I know I was landing straight, like straight out.

Q. Well, you testified you couldn't get up; correct?

A. I didn't get up.

Q. Okay.

So --

A. But medical helped me up.

Q. What position was it -- you have to wait for a question, Mr. Miller.

A. Okay.

Q. What position was it that you were in that you couldn't get up from?

A. I was somewhat laying down,

Page 139

T. MILLER

but like slightly sitting up. And the gentleman that I -- what I remember was that the gentleman was standing over me.

MS. BONOMO: Strike as non-responsive. Just answer the question.

MR. DELUCA: The question was just, what position you were in when you were on the ground; all right?

THE WITNESS: Okay.

A. What I remember is the gentleman was standing above me. That's all. And I sat -- I was trying to sit up to gain -- I don't remember exactly anything else too much.

MS. BONOMO: Move to strike as non-responsive.

Q. Okay.

So were you in the position slightly laying down or you don't recall?

A. Slightly laying down, trying to figure out why I was hurt.

Q. Okay.

And, where were you feeling

Page 140

T. MILLER

pain?

A. Lower back, upper buttocks area. The twist from it, like the waist area.

Q. Anything else?

A. Ankle, my right ankle area of my foot. I had some pain there and my right wrist, I had some pain there from trying to stop myself from falling so hard. But -- and some scrapes.

Q. Did you tell anyone at the scene of the accident that you had pain in your left ankle?

A. I told them both, yes.

Q. Okay.

So did you have pain in both ankles?

A. Yes, at the time, I had pain in both ankles but it wasn't -- it was a shocking pain, to be exact, and due to the twist.

Q. When you're saying the twist, what is it you're --

A. When I --

35 (Pages 137 to 140)

December 19, 2022

## Page 141

T. MILLER

Q.   -- referring to?

A.   Trying to stop myself from falling.

Q.   And, that was the twist towards the left?

A.   Well, I would be going towards the right. I was looking towards the direction of the right, so I guess leaning to the left more. I don't know. In the specific, how you put it at, but --

Q.   You testified earlier that you were looking straight immediately before the accident; is that correct?

A.   Yes, I was walking straight.

Q.   Okay.
Was your head facing forward?

A.   I walk normal.

Q.   So was your head turned at all?

A.   Not that I could recall. I don't think I turned my head to watch anything.

Q.   So was your head straight,

## Page 142

T. MILLER

were you looking straight?

A.   Looking at the path straight ahead, yeah, pretty much.

Q.   Okay.

A.   That I could recall because I remember --

Q.   So you're walking on the sidewalk, you're walking straight, your head is straight; correct?

A.   Majority of the time, yes.

Q.   I'm talking about right before the accident?

A.   As I could recall, yes.

Q.   Okay.
So the twist that you're referring to, did your body twist to the left, or did it twist to the right or something else?

A.   The twist I'm referring to is that my left went in forwards trying to catch myself from falling.

Q.   Are you talking about your left foot?

A.   Everything. Like I tried to

## Page 143

T. MILLER

-- I stumbled upon falling, like I bust my butt, like literally caught on the -- when I lift up my right foot, it was caught, which caused me to trip. That's all I can recall. I don't remember exactly like --

Q.   Okay. Thank you, Mr. Miller.

MS. BONOMO: Can I get his last answer read when I asked about the twist, the beginning part of his answer.

A.   I don't know what you're trying to say. I just bust my ass.

MR. DELUCA: Nobody is asking you anything yet, Mr. Miller.

THE WITNESS: I'm sorry.

(Whereupon, the requested portion of the record was read back by the Court Reporter.)

Q.   What do you mean your left went in, can you describe what you mean?

A.   Reflexes wise. I was trying to catch myself, ma'am, as in terms of left going on my shoulder probably. But

## Page 144

T. MILLER

I just know I was trying to catch myself. I was going down to the ground, I was trying to catch myself and I hurt myself.

Q.   I'm trying to clarify your words.

A.   Yes, ma'am, I understand that and all, I do --

Q.   You are referring to --

MR. DELUCA: Let her ask you something.

Q.   Several times now, you mentioned that your body twisted?

A.   Yes, ma'am.

Q.   I'm only trying to understand what direction your body twisted in.

A.   (Indicating.)

Q.   And I don't want you to get up and show me. I want you to use your words.

A.   (Indicating.)

Q.   Okay. I don't know what this is.

A.   Ma'am, best I could tell you is that, I recall is that I was walking

36 (Pages 141 to 144)

December 19, 2022

Page 145

T. MILLER

straight, I tried to catch myself and upon catching myself (inaudible.)

Q. Did your body twist at all?

A. Best I could tell you, ma'am, that I could recall of the incident --

Q. It's a yes or no question. Did your body twist?

A. I just said yes, ma'am.

Q. Okay. I'm going to ask you again.

If you know, what direction did your body twist in?

A. If you want to say towards -- I just told you I leaned in towards the left, I looked towards the right. I just know that I twisted, and I ended up on my buttocks and my back side. That's the best I can tell you, ma'am.

Q. So is it accurate to say you don't know what direction your body twisted in?

A. Huh?

Q. Is it accurate to say you don't know what direction you twisted in?

Page 146

T. MILLER

A. It's accurate to say I don't know my directions upon major events. I'm not thinking of a direction. That's what's accurate. All I know is I hit the ground.

Q. But you know your left from your right; correct, you know what your left side --

A. Upon my -- straight ahead, yes.

Q. You know the difference between left and right?

A. Common sense wise, yes, ma'am.

Q. Okay. So is it accurate to say --

A. Yes.

Q. Is it accurate to say --

MS. BONOMO: Off the record.

(Whereupon, a discussion was held off the record.)

CONTINUED EXAMINATION BY MS. BONOMO:

Q. Is it accurate to say you don't know what direction your body

Page 147

T. MILLER

twisted in?

A. It's accurate to say --

Q. It's a yes or no question.

MR. DELUCA: Just say yes or no.

A. It's accurate to say yes. I don't know what to tell you. I don't recall. I just know that I fell, ma'am. That's all I can tell you.

MR. DELUCA: All right. You don't know. That's it.

Q. What caused you to fall?

A. Getting caught in the cellar door, I guess. It happened so fast, ma'am. I don't know what to tell you. All I can recall is I was walking over that property. I ended up on the floor.

Q. Do you know what specifically caused you to fall?

A. Specifically, what was in my path was that cellar door, madam.

Q. I'm asking you what --

A. I don't know what part of the cellar door offhand. I cannot recall

Page 148

T. MILLER

right now or remember exactly. I just know that I was walking, got stuck, and I tripped over that cellar door. That's all I could recall, madam.

Q. How do you know that you tripped on the cellar door?

A. When -- upon walking, I could recall feeling the cellular -- or I could recall seeing the cellular in front of me, I should say, and my path of walking, I could recall being seated -- ending up on the floor next to the cellar. I could recall that, and being in pain and sore.

Q. Do you know what specifically about the cellar door caused you to fall?

A. Specifically, I do know that when I stepped on it, whether it was intentional or not, I don't -- I know that it went down. I don't know if it was garbage, if it's -- the way it was made or what. I just know that when I stepped, my feet, like, pressed in a little bit more than concrete, but it, like that. Concrete's solid. My foot

37 (Pages 145 to 148)

Lexitas Court Reporting
800-678-0166

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 609 of 834

December 19, 2022

Page 149

T. MILLER

wasn't on solid ground. It went in somewhat and I tripped. That's all I can tell you, madam. Upon recovering -- memory wise of that evening.

Q. Have you ever walked on a cellar door before this accident?

A. No, ma'am.

Q. You never walked on a cellar door before this accident?

A. No, I have not made it my purpose of walking on cellar doors, no.

MR. DELUCA: Mr. Miller, is that --

Q. Is there where reason --

A. And if I did, I wouldn't recognize.

MR. DELUCA: Mr. Miller, you keep talking. You answer the question and then you wait for the next question; okay?

THE WITNESS: Okay.

Q. Is there a reason why you never walked on a cellar door before this accident?

Page 150

T. MILLER

A. I cannot recall if I ever walked, or if it was the reason I walked on it or anything like that, I do not know. All I know is that when I'm going to my destination, I'm going to my destination. I don't look for doors, or cellars, or sidewalks or worry upon trying to get to my destination. I'm most likely trying to get to my destination. I cannot recall any other event that I looked to try to walk over a cellar door. No, ma'am.

Q. I'm just asking in general, if you ever walked over a cellar door, I'm not saying an event.

I'm just asking in general, of your days living --

A. Right.

Q. -- in New York City?

A. I know I cannot recall.

MR. DELUCA: Yes, or no or --

A. I cannot recall is what I told her.

MR. DELUCA: All right.

Page 151

T. MILLER

That's it.

THE WITNESS: And she keeps badgering me like I'm in court about it. I cannot recall if I ever walked over a cellar door specifically.

MR. DELUCA: You only have to say it once.

Q. This will go a lot easier and a lot quicker if you just answer the question.

A. Yes, ma'am.

Q. Was there a lock on the cellar door?

A. I do not recall of seeing a lock.

Q. Were there any cones, construction cones or construction warnings in the area where the accident occurred?

A. I do not recalling seeing any cones or construction, anything of warning for that area. No.

MS. BONOMO: Hold on one second.

Page 152

T. MILLER

Q. Are you doing this deposition from a phone, or a tablet or something else?

A. Unfortunately, I had to switch from my phone to my tablet, ma'am.

Q. Okay.

So I'm going to show you some photographs, which have been exchanged. I just want you to take a look at the photo and then wait for a question?

Can you confirm that you see a photograph on your screen right now?

A. Yes.

MS. BONOMO: It's what's marked as Defendant's Exhibit A, and Tracy, I'll send those to you after.

(Whereupon, Ms. Bonomo shared Defendant's Exhibit A with the Witness.)

Q. Have you ever seen this photograph before?

A. It looks familiar.

Q. Okay.

Do you know who took this

38 (Pages 149 to 152)

December 19, 2022

## Page 153

T. MILLER

photograph?

A.    Looks like one of the pictures I might have taken.  I cannot recall.

Q.    Okay.

A.    Specifically.

Q.    Do you know for certain if this is one of the photographs that you've taken?

A.    Can you move the picture up a little so I can see the top of the picture?

Q.    Is that better?

A.    Yeah.  So it looks -- yes, one of the pictures.  It looks -- I cannot recall if this is the exact one, but -- because of the way the picture is, but I don't -- it looks like the picture, one of them.  I do not have a copy of the picture on hand.

Q.    I'm asking you specifically, do you know if this specific photograph, Defendant's A, was taken by you or someone else?

A.    I do not know specifically if

## Page 154

T. MILLER

that's the picture.  I know I submitted some pictures.  I don't know specifically what it looked like, to be honest.

MR. DELUCA:  Mr. Miller, I don't know is I don't know.  You don't have to keep editorializing.

THE WITNESS:  Okay.

MR. DELUCA:  If you don't know, just say it.

A.    I don't know.

Q.    What does this photograph show?

A.    It shows the cellar door and it shows little triangle flags above.

Q.    Does this photograph accurately depict the way the cellar doors looked like on the date of the accident?

A.    To my recognition, similar.  I would not be able to tell you unless I was at the scene, but yes.

MR. DELUCA:  She's asking you if what you see in the picture --

THE WITNESS:  Yes, I answered

## Page 155

T. MILLER

her.

Q.    So I'm asking you if the cellar doors looked this way, what's shown in Defendant's A, as they did on the day of the accident?

A.    As far as I recall, I guess I don't --

Q.    I don't want you to guess, do you know?

A.    As far as I recall.

Q.    Is that a yes or no?

A.    Yes.

Q.    Or a no?

MR. DELUCA:  Or I don't know.  Remember.

Q.    Or I don't know?

A.    As far as I recall, that's pretty -- yeah, accurate, close to that, I can remember.

Q.    Is there anything different about the cellar doors that's shown in Defendant's A that was different on the date of the accident?

A.    I do not know, to be honest on

## Page 156

T. MILLER

that one, ma'am.  I'm not going to sit here and waste your time.

Q.    Okay.

A.    I don't know.

Q.    Can you describe to me in words the exact location which caused you to fall looking Defendant's A?

A.    Using the picture in front?

Q.    Yes.

A.    As far as I can recall, I was walking there, as you can see, and I stepped between flag number two and three, and that's where I tripped at.  If I was to use this picture to give an example of how I fell, yes.

Q.    When you're talking about flag number two and three, are you referring to the --

A.    Where I was coming from.

MR. DELUCA:  Let her ask you.  You're talking over her.  She's asking you a question, Mr. Miller, let her answer ask the question.

THE WITNESS:  I'm jumping over

39 (Pages 153 to 156)

December 19, 2022

Page 157

T. MILLER

her. I thought she was done.

MR. DELUCA: No.

Q. When you say between flags two and three, are you referring to flag number one as being the shadow on the right side of the photograph?

A. Yes.

Q. Looking at this photograph, were you walking from the right side of the photo to the left side of the photo or --

A. I was walking at --

Q. -- something else?

A. In the direction of your mouse that went from that flag that we just stated to -- yes, ma'am, from that flag.

Q. So you were walking in the direction of the right flag on the right side of the photo towards the second flag; correct?

A. Yes.

Q. You just testified that your accident occurred between the second flag and the third flag; is that correct?

Page 158

T. MILLER

A. Yes. Around where that mouse is. Yes. That I could recall.

Q. Okay.

So --

A. From my memory.

Q. Do you see where the cursor is right now?

A. Yes.

Q. Towards the right portion of the metal cellar door?

A. Yes, I see that.

Q. Is that the location where your accident occurred?

A. I cannot recall or I wouldn't be able to tell you exactly. I just know I stepped on that part, the metal, so --

Q. I want to know the exact location which caused you to fall.

A. Go a little bit up more. That's what I'm trying to explain.

Q. Move it up meaning this way?

A. Yes, ma'am.

Q. Okay.

A. You just passed it, which

Page 159

T. MILLER

caused me to trip.

Q. Okay.

So --

A. That little space there that you see is what I tripped over.

MS. BONOMO: Can I get that read back?

A. I'm answering your last question, madam, so please allow me to give it in detail.

MS. BONOMO: I'm just asking for the answer to be read back.

(Whereupon, the requested portion of the record was read back by the Court Reporter.)

Q. When you say the little space, are you talking about the space between the two doors?

A. Last thing I could remember, my foot was right there going towards the -- I just got -- you see where your arrow is? I didn't even get a chance to pass there with my foot. Where your mouse is, I didn't even get -- that I could

Page 160

T. MILLER

remember, I didn't even get a chance to pass there.

Q. So if I were to make a circle in the accident location, would it be on the first door, somewhere over here?

A. A little bit more up.

Q. When you say up, are you referring up, this way?

A. It looks like a square there, like right there, from there to that space around there.

Q. So if I were to draw a circle around this --

A. Yes, ma'am.

(Draws circle.)

Q. Would that circle accurately reflect where your accident occurred?

A. I got a size eleven, so a little bit more towards the flag, if you're drawing a circle. It would be within that area, that I could recall.

(Draws circle.)

A. Yes.

Q. Does the circle in this

40 (Pages 157 to 160)

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 612 of 834

December 19, 2022

Page 161

T. MILLER

photograph accurately show where the accident occurred?

A. Approximately. Yes, that I could recall, yes.

Q. Well, I don't want you to guess.

Is this --

A. No, I'm not guessing. I remember stepping on metal, and I went down and I tripped at the same time. When I stepped on metal --

Q. I'm trying to pinpoint the exact location.

Does this --

A. And I'm telling you the last thing I recall --

Q. Does this circle represent the exact location?

A. Never mind.

Q. Is that a yes?

A. Ma'am, what you have circled there is the last thing that I can recall.

Q. Okay.

Page 162

T. MILLER

So if we mark this as Exhibit A1 as the exact location where your accident occurred; is that accurate?

A. Yes.

MR. DELUCA: Did you trip within --

A. That I could recall.

MR. DELUCA: Did you trip within that circle.

THE WITNESS: Yes, that's what I told her three times, sir.

MS. BONOMO: All right. Hold on.

MS. BECHTEL: Can we take a one minute break.

(Whereupon, a brief recess was taken by all parties.)

CONTINUED EXAMINATION BY MS. BONOMO:

(Whereupon, Ms. Bonomo shared Defendant's Exhibit B with the Witness.)

Q. Looking at Defendant's Exhibit B, have you ever seen this photograph

Page 163

T. MILLER

before?

A. Yes, that picture.

Q. Is this one of the photographs that you took?

A. Yes, definitely, I could say that.

Q. Can you describe what's shown in Defendant's B?

A. I see a cellar door, I see some shadows of some flags, triangle flags and concrete.

Q. Looking at this photograph, are you able to tell me if you were walking from the bottom of the photograph to the top of the photograph or something else, if you're able to tell?

A. From this angle, it's correct.

Q. So which way is that?

A. As if I was walking in that direction.

Q. Walking from the bottom to --

A. From the triangle going up, yes. To the cellar door. From the sidewalk to the cellar door. I'm sorry.

Page 164

T. MILLER

Q. Doing what we did on the last photograph, can you tell me the exact location where the accident occurred using words, looking at this photograph?

A. After the third flag, to give an estimate. I could tell you, from what I recall from looking at this angle was the last step that I recall.

Q. When you say flag, can we establish which flag is flag number one?

A. Following from where your mouse is as being flag number one.

Q. So bottom right side of the photo would be flag number one?

A. Flag number one.

Q. So flag number three would be on the edge of the cellar door over here (indicating?)

A. Yes.

Q. Okay.

A. What I recall.

Q. Is that the area where your accident occurred or was it somewhere else?

41 (Pages 161 to 164)

December 19, 2022

Page 165

T. MILLER

A.    Moving past that a little bit. Where the shadow just finished, I stepped in.  If I recall, my left foot hit about that area.

Q.    So when your left foot hit the metal doors, did the door go down?

A.    No, otherwise, I would have recognized it or knew that it was unsafe.

Q.    Do you see this line between the two doors?

A.    Now, yes.

Q.    Okay.

Did your accident occur in that area or somewhere else?

A.    That's where my boot tripped.

Q.    Okay.

Now --

A.    My right foot.

Q.    What was the difference in height between these two steps at the time of the accident?

A.    Difference in height, I don't know.

Q.    Okay.

Page 166

T. MILLER

Can you approximate?

A.    How many steps it took me to get to there?

Q.    I'm talking about the difference in height between the two doors?

A.    I would not be able to tell you.  I just know I tripped at that time.

Q.    Do you know if it was less than an inch difference?

A.    Not off -- I would not be able to tell you.

Q.    Moving to Defendant's C.

(Whereupon, Ms. Bonomo shared Defendant's Exhibit C with the Witness.)

Q.    Have you ever seen this photograph before?

A.    Yes.

Q.    Okay.

And, what does this photograph show?

A.    It looks like the front.

Q.    The front of what?

Page 167

T. MILLER

A.    Of a spot called People's.

Q.    Okay.

Is this what the front of the People's business looked like on the date of the accident?

A.    I do not recall.

Q.    Do you see the one door located towards the right of the photo?

A.    Yes.

Q.    Okay.

Is that a second door closer towards the left side of the photo?

A.    Upon my observation, yes.

Q.    Can you describe to me looking at Defendant's C where it is that you landed?

A.    Excuse me?

Q.    Looking at the photo, can you tell me where you landed?

A.    Upon looking at this photo, after passing door number one and that concrete in front of it being concrete number one, concrete number two, approximately on the side of the cellar

Page 168

T. MILLER

going into concrete number four -- number three and four is where I ended up back on the floor.

Q.    Okay.

So when you're saying numbers, are you talking about sidewalk flags, are you counting sidewalk flags?

A.    Counting from where you have your mouse is, the concrete slab.

Q.    So looking at this photograph, were you walking from the right lower corner to the -- towards the left side of the photo in your travels?

A.    Looking at this photo, knowing the way I walk and recalling some images of the evening, I say I was approximately within the third and fourth flag when I was walking down that street.

Q.    I just want to know the direction you were traveling in when you were walking, were you walking from the lower right side of the photo?

A.    Yes, where your mouse is going across there.

42 (Pages 165 to 168)

December 19, 2022

Page 169

T. MILLER

Q.    So when you landed, where did you land in relationship to this second door on the left side of the photo?

A.    Before landing to the door, I was more towards your left, if you push your mouse over.

Q.    So --

A.    I was in front of your cellar -- I didn't fully pass your cellar over left to the concrete, right about over there where the concrete meets that cellar is where I fell.

Q.    Do you see this square towards the left side of this the photo that looks like it's --

A.    Yes, I didn't even get to there yet.

Q.    Did you land between the metal doors and this other metal square?

MR. DELUCA:  For the record, the other metal square looks like a different color than the sidewalk.

THE WITNESS:  Yes, I know what she is saying, and if she moves her

Page 170

T. MILLER

mouse over to a little bit to the left, she will be directly over the spot where I was at which --

A.    Yes, over that area is where I ended up at.

Q.    So did you land at the edge of the --

A.    Yes.

Q.    Left side of the photograph towards the lower left side of the door?

A.    Exactly where your mouse is, ma'am.

Q.    Okay.

Does --

A.    In that area.

Q.    Directly in front of the door to the People's Credit Union?

A.    With my height, I probably could be in front of it.  But I don't know if it's directly in front, but from this angle, it looks like if I were to lay flat, my body would be in front of it.  But I know I was just above passing that cellar door, from my recognition, to

Page 171

T. MILLER

give you an accurate idea.

Q.    When you were down on the ground for the twenty minutes --

A.    If that, yes, approximately.

Q.    Did anyone come in and out of the People's Credit Union?

A.    As far as I can recall, no.

Q.    When the ambulance arrived, were you in the same location as where you landed?

A.    Yes, I never moved.  They told me to stay still.

Q.    Did you lose consciousness after the accident?

A.    No, ma'am, not from my recognition.

MS. BONOMO:  Lyndsey, I don't know if you have anything further.  I think I'm done.  I just have to do a quick --

MS. BECHTEL:  I don't.

MS. BONOMO:  Okay.  Let me just review my notes.

(Whereupon, a discussion was

Page 172

T. MILLER

held off the record.)

MS. BONOMO:  I have nothing further.

(Whereupon, a discussion was held off the record.)

MS. BONOMO:  As the parties have previously agreed, due to time restraints, we were not able to complete the entirety of Plaintiff's deposition and the parties will agree to a date for the completion of Plaintiff's deposition on another date.

MR. DELUCA:  Agreed.

MS. BECHTEL:  Agreed.  I'll tell Mr. King's office to contact both Defendant's offices to try to arrange for a mutually convenient date.

THE REPORTER:  Ms. Bechtel, are you ordering a copy of the transcript.

MS. BECHTEL:  Yes.

(Whereupon, photographs were

43  (Pages 169 to 172)

Lexitas Court Reporting
800-678-0166

December 19, 2022

---

Page 173

T. MILLER
marked as Defendant's Exhibits A, B and C, for identification as of today's date by the Court Reporter.)

(Whereupon, a photograph was marked as Defendant's Exhibit A-1, Defendant's Exhibit A with Circle, for identification as of today's date by the Court Reporter.)

(Whereupon, at 1:35 p.m., the Examination of this Witness was concluded.)

TIMOTHY MILLER

Signed and subscribed to before me,

this_____day of _____ 20___

_____
NOTARY PUBLIC

---

Page 175

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| A - C | Photographs | 172 |
| A-1 | Defendant's Exhibit A with circle | 173 |

---

Page 174

I N D E X

| EXAMINATION BY: | PAGE |
|---|---|
| Ms. Bechtel | 7 |
| Ms. Bonomo | 96 |

---

Page 176

R E Q U E S T S

| DOCUMENT REQUESTS: | PAGE |
|---|---|
| NONE | |

| INSERTS: | PAGE | LINE |
|---|---|---|
| NONE | | |

| RULINGS: | PAGE | LINE |
|---|---|---|
| NONE | | |

---

44 (Pages 173 to 176)

December 19, 2022

Page 177

CERTIFICATION

STATE OF NEW YORK )
          SS:
COUNTY OF NASSAU )

I, Tracy Newman, a stenotype reporter and Notary Public within and for the State of New York, do hereby certify: That the witness, TIMOTHY MILLER, whose Examination Before Trial is hereinbefore set forth, was first duly sworn by me, and that such Examination Before Trial is a true and accurate record of the testimony given by said witness; and I further certify that I am not related to any of the parties of this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of December, 2022.

_____
TRACY NEWMAN

Page 178

ERRATA SHEET FOR: TIMOTHY MILLER
TIMOTHY MILLER, being duly sworn, deposes and says: I have reviewed the transcript of my proceeding taken on 12/19/2022. The following changes are necessary to correct my testimony.

_____

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Witness Signature:_____
Subscribed and sworn to, before me
this ___ day of _____, 20 ___.
_____    _____
(NOTARY PUBLIC)       MY COMMISSION EXPIRES

December 19, 2022

[Page 179]

| A | | | | |
|---|---|---|---|---|
| **A-1 (2)** | 91:13,18 92:4 | 161:2 | 23:14,15 25:9 | 140:14 |
| 173:6 175:5 | 92:13,19,24 | **action (3)** | 25:19 26:4,23 | **ankles (2)** |
| **A.'s (2)** | 93:5 94:17,20 | 3:15 5:8 | 28:9 | 140:18,20 |
| 40:23 41:8 | 95:19 107:21 | 177:15 | **agenda (1)** | **answer (28)** |
| **a.m (3)** | 112:11 115:3 | **actions (1)** | 53:16 | 18:18,25 32:12 |
| 1:12 50:8 | 115:8,18,21 | 72:25 | **ages (1)** | 41:15,17,17 |
| 51:22 | 116:4,6 | **activities (1)** | 14:13 | 45:2 71:3 |
| **A1 (1)** | 117:10,17 | 42:17 | **ago (8)** | 72:4,11 77:11 |
| 162:3 | 118:8 119:3,8 | **addicted (1)** | 22:16 63:3 | 91:3 96:15,16 |
| **able (19)** | 120:4,12,13 | 70:22 | 93:13 113:7 | 112:21 |
| 20:10 40:6 | 121:7,9 | **addiction (4)** | 120:20,22 | 115:15 |
| 53:6 77:22 | 122:16,21 | 70:13,17,17 | 121:12 | 118:17 |
| 83:6 91:3 | 123:2,13 | 71:15 | 122:11 | 130:15 |
| 100:25 | 124:16 127:4 | **addictions (1)** | **agree (1)** | 132:12,24 |
| 103:10,12 | 127:18,20 | 70:16 | 172:11 | 133:22 139:6 |
| 126:4 129:2 | 130:21 131:3 | **addition (2)** | **agreed (10)** | 143:10,12 |
| 137:6 154:21 | 131:5,13 | 3:11 5:4 | 3:3,17 4:4,9,15 | 149:19 |
| 158:16 | 140:13 | **address (11)** | 4:21 5:10 | 151:10 |
| 163:14,17 | 141:15 | 7:10 26:13 | 172:8,15,16 | 156:24 |
| 166:8,12 | 142:13 149:7 | 60:23 89:3 | **ahead (4)** | 159:13 |
| 172:9 | 149:10,25 | 97:10,13 | 40:13 42:22 | **answered (4)** |
| **abuse (26)** | 151:19 | 98:11,24 | 142:4 146:10 | 72:6 74:22,23 |
| 43:4,10,14,19 | 154:19 155:6 | 125:16,22 | **alcohol (2)** | 154:25 |
| 44:8 52:7 | 155:24 | 126:2 | 10:13 74:19 | **answering (1)** |
| 63:12 64:19 | 157:24 | **administerin...** | **allow (1)** | 159:9 |
| 64:24 65:7,21 | 158:14 160:5 | 5:19 | 159:10 | **answers (1)** |
| 67:16 68:4,13 | 160:18 161:3 | **admission (1)** | **ambulance (...** | 9:8 |
| 69:2,9,13,23 | 162:4 164:4 | 106:25 | 81:16 82:11,20 | **ANTHONY ...** |
| 70:4,15,15 | 164:24 | **admitted (2)** | 83:11,14 84:5 | 2:5 |
| 109:19,21 | 165:14,22 | 109:11,13 | 84:8 85:17 | **anybody (4)** |
| 110:2,7,18 | 167:6 171:15 | **adult (1)** | 92:15,16,25 | 15:4 67:20,21 |
| **abusing (1)** | **accommodat...** | 65:15 | 93:18 94:2,6 | 89:25 |
| 69:25 | 36:3 | **advisor (1)** | 94:7,15 95:14 | **apartment (6)** |
| **accident (84)** | **accurate (16)** | 107:5 | 171:9 | 7:12 8:19 11:2 |
| 8:6 40:5 49:10 | 9:2 106:5 | **affect (6)** | **amount (3)** | 98:2 99:6,11 |
| 49:17 51:4 | 135:24 | 10:9,14,18 | 63:16 96:20 | **applied (4)** |
| 53:23 54:12 | 145:20,24 | 23:2 125:4,4 | 100:6 | 39:2,5 106:25 |
| 55:23 57:20 | 146:2,5,16,18 | **affordable (1)** | **anger (3)** | 107:19 |
| 64:2,7 66:7 | 146:24 147:3 | 22:9 | 69:2,14,17 | **apply (5)** |
| 72:18 74:18 | 147:7 155:19 | **Afternoon (1)** | **angle (3)** | 39:3,7 70:9 |
| 82:8 86:5,7 | 162:4 171:2 | 49:22 | 163:18 164:8 | 83:7 96:13 |
| 86:23 87:3 | 177:12 | **against- (1)** | 170:22 | **appointment...** |
| 89:18,23 91:6 | **accurately (3)** | 1:5 | **ankle (4)** | 50:22 |
| | 154:17 160:17 | **agency (7)** | 83:8 140:7,7 | **apprentice (1)** |

Lexitas Court Reporting
800-678-0166

December 19, 2022

[Page 180]

20:21
**approach (3)**
59:25 60:12,13
**approximate...**
83:16 97:8
128:20 166:2
**approximate...**
22:15 28:11,12
29:11 30:10
31:23 32:3
33:11,15 36:9
37:16,19 38:8
42:12 50:21
51:15,20
55:25 56:15
56:22 57:23
57:24 59:22
60:14 62:19
62:22 63:4
66:21 96:23
97:6 98:20,22
98:23 99:16
101:19
102:20
103:21
104:20 106:8
106:12,14
115:7,10
118:10
121:11
122:19 123:6
129:9 130:19
130:22 132:4
132:4 133:24
134:10 161:4
167:25
168:17 171:5
**April (1)**
47:12
**area (34)**
11:25 27:7
28:21,25
29:23 31:13
58:7 59:3

60:19 61:10
86:23 87:2
105:23
119:16
120:12,14,23
125:17
126:18,25
133:15
137:18,21
140:4,5,7
151:19,23
160:22
164:23 165:5
165:15 170:5
170:16
**arm (6)**
131:15,20,22
131:24 132:3
132:5
**arrange (1)**
172:19
**arrested (1)**
45:15
**arrival (1)**
66:15
**arrive (2)**
92:9 93:2
**arrived (3)**
83:11,14 171:9
**arriving (1)**
93:9
**arrow (1)**
159:22
**asked (14)**
13:20 19:2
28:25 58:17
58:22 59:24
60:2 63:24
64:21 96:17
113:8 115:5
131:11
143:10
**asking (31)**
8:4 25:10

42:19 51:5,7
51:8 72:21,22
73:23 74:12
84:4 110:20
113:7 114:15
114:16 116:3
116:11,16,20
125:9,25
133:10
143:15
147:23
150:14,17
153:21
154:23 155:3
156:23
159:12
**aspect (3)**
52:9 65:14,17
**ass (1)**
143:14
**assault (3)**
47:2,9,10
**assignment (1)**
27:17
**assistance (5)**
107:10,14,20
107:23 108:4
**assistant (2)**
20:11,21
**Associate's (2)**
16:21 17:18
**associates (1)**
94:19
**Atonia (1)**
42:5
**attempted (3)**
46:25 47:9,10
**attend (4)**
102:13,14,16
102:18
**attended (2)**
18:3,17
**attention (1)**
138:11

**attorney (5)**
6:7 7:24 10:2
15:3 121:17
**Attorneys (3)**
2:3,8,13
**August (8)**
11:4,5 17:19
32:3 36:15
38:8,10 97:5
**Ave (1)**
52:12
**avenue (43)**
2:4,15 7:12
11:2,13,23,24
12:10 25:16
49:12 54:5,19
56:7 57:4,7
57:12,18 58:6
58:6,7 61:6
75:3 99:20,22
105:24 113:4
113:16,20,25
114:2,7,11,19
115:2,9,14,23
117:16 119:2
119:12 124:8
125:20
126:17
**average (1)**
128:24
**avoided (1)**
91:11
**aware (1)**
86:25
**awning (3)**
89:4,4,14

———————
B
———————
**B (5)**
162:22,25
163:9 173:2
175:1
**B-A-R-N-E-...**
99:12

**Bachelor's (2)**
21:13,14
**back (51)**
12:21 17:25
18:9 21:10,15
25:4,17 27:21
27:23 28:23
32:12,14,20
35:21,23,24
36:12 48:4
49:6 55:11,13
62:17 67:9
68:11 82:5,18
82:25 83:19
85:22 88:15
92:8 93:10
106:24 111:5
111:17
113:21
120:11,14
122:22
130:17
136:11,20
137:18,20
140:3 143:19
145:18 159:8
159:13,15
168:3
**background ...**
8:6 9:14
**backwards (1)**
80:22
**badgering (1)**
151:4
**bags (1)**
80:11
**bail (1)**
46:11
**balance (1)**
134:19
**bank (1)**
87:18
**bankruptcy (...**
44:17

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 619 of 834

December 19, 2022

[Page 181]

44:17
**bar (2)**
3:13 5:6
**Barnes (3)**
99:6,12 105:24
**based (1)**
70:7
**basically (14)**
21:21,23 23:8
24:16,24 25:3
25:24 28:18
29:3 30:21
32:8 65:25
68:18 88:24
**basis (4)**
15:21 16:8
111:17
120:15
**bathroom (1)**
40:12
**BCC (1)**
19:20
**bear (1)**
6:13
**Bechtel (61)**
2:16 7:14,15
7:19,23,24
8:10,14,16,20
8:25 9:6,10
9:21,22 10:2
10:6 12:20
13:2,6,24
14:15 18:20
23:23 24:4
29:7 31:19
32:17 34:20
34:25 36:16
36:20 37:15
40:11,17
41:12,22
48:25 49:5
54:8 56:21
65:11 68:6,10
72:3,10,13

88:2,11,12
90:6 93:24
95:7,25
118:14
162:15
171:22
172:16,21,24
174:4
**becoming (1)**
66:15
**beginning (4)**
32:23 43:12
44:12 143:11
**begun (1)**
3:22
**behalf (2)**
121:20,22
**believe (27)**
17:7 24:10
31:9 48:20
49:25 51:17
52:25 55:3
62:2 66:8,10
78:18 79:4
82:16 90:17
91:23 92:7,14
92:21 94:8,11
99:5 104:5,13
117:14
129:10 138:9
**Bellevue (6)**
33:3,6 108:19
108:21 109:7
109:12
**Bellevue's (1)**
109:16
**benefits (1)**
107:13
**best (4)**
16:12 144:24
145:5,19
**better (3)**
28:12 93:11
153:13

**big (1)**
90:25
**biggest (1)**
108:8
**bike (1)**
118:4
**bikes (1)**
119:18
**Bill (1)**
40:9
**birth (3)**
12:22,25 95:6
**bit (7)**
15:10 148:24
158:20 160:7
160:20 165:2
170:2
**black (2)**
90:15,18
**blackish (1)**
90:19
**bleed (1)**
86:8
**Blessed (1)**
7:21
**block (10)**
34:3,13 115:19
116:5,17,18
116:22,24
117:6,7
**blocks (8)**
56:15,16,23
57:19 113:10
114:25 115:5
115:7
**blood (1)**
177:15
**body (21)**
80:15 81:22,25
85:18 86:8
130:20
131:12
133:25 136:5
136:22

137:14,17
142:17
144:13,16
145:4,8,13,21
146:25
170:23
**Bonomo (44)**
2:10 9:13
31:14 32:11
32:16,19
45:23 47:25
68:3,8 96:5,8
96:9,12 106:7
112:9,24
115:25
116:13
119:24 130:6
130:12,13
133:21
137:12 139:5
139:17 143:9
146:19,23
151:24
152:15,18
159:7,12
162:13,20,21
166:15
171:18,23
172:3,7 174:5
**book (2)**
30:22 63:8
**boom (3)**
35:12,12,12
**boot (3)**
78:4,9 165:16
**boots (1)**
78:6
**born (3)**
13:8,9 108:10
**bottom (3)**
163:15,22
164:14
**Bowling (1)**
104:6

**BRAM (1)**
101:13
**branch (2)**
12:4 39:25
**branches (2)**
12:9,9
**break (3)**
40:12 130:7
162:16
**breaking (1)**
30:13
**BRIAN (1)**
2:3
**brief (4)**
13:3 40:14
130:9 162:17
**bringing (1)**
22:9
**broad (4)**
37:11 52:9
65:13,16
**broadcast (1)**
68:24
**Bronx (17)**
7:12 8:13 13:9
19:10,19,21
23:6 25:13,14
36:14,15,22
37:2 38:4
99:13,19
100:11
**Brooklyn (3)**
2:5 35:25 36:8
**brothers (1)**
104:4
**brown (2)**
90:18,19
**brown-ish (1)**
90:16
**building (17)**
20:19,20 38:12
49:11 59:19
95:18 114:14
130:20,24

December 19, 2022

[Page 182]

131:9,10,12
131:17,25
132:7 133:25
134:15
**buildings (5)**
75:14,16
114:21,24
129:22
**bump (1)**
60:18
**bus (1)**
61:22
**buses (1)**
53:3
**business (13)**
21:24 23:18
24:18 25:6
59:14 87:23
88:18 89:13
89:22,25 90:8
95:22 167:5
**bust (2)**
143:2,14
**busy (1)**
75:6
**butt (1)**
143:3
**buttocks (11)**
82:5 85:22
136:11,18,21
136:23
137:16,18,20
140:3 145:18

———————
C
———————

**C (6)**
2:1 166:14,16
167:16 173:3
175:4
**C.P.L.R (4)**
3:7 4:1,7,24
**call (4)**
74:4 81:15
94:2,6

**called (9)**
7:1,25 12:5
82:10,20 94:5
94:11 101:15
167:2
**calling (1)**
93:18
**calls (1)**
94:12
**cane (2)**
93:22,22
**capable (1)**
20:17
**car (2)**
22:2 92:14
**Carnegie (21)**
51:2 52:3 53:8
54:21 65:5,12
66:6,8,10,12
66:17 67:3,25
68:12,18 69:7
70:24 71:14
72:24 73:3
109:20
**carried (1)**
126:21
**carrying (2)**
80:7 127:3
**case (4)**
8:4 67:17
68:15 73:21
**cases (1)**
47:17
**cash (1)**
107:14
**casual (4)**
59:12 60:19
61:2,4
**catch (9)**
53:6 135:6,19
136:3 142:22
143:24 144:2
144:4 145:2
**catching (1)**

145:3
**caught (8)**
53:19 76:24
78:4,19 81:10
143:3,5
147:14
**cause (2)**
78:5 86:7
**caused (16)**
76:18,21 77:14
78:19 79:18
80:15 86:13
93:19 101:4
143:5 147:13
147:20
148:16 156:7
158:19 159:2
**causing (1)**
76:24
**Cavo (2)**
2:13 7:25
**cell (4)**
27:9 76:4 80:6
94:13
**cellar (69)**
75:20 76:7,11
76:12,21
77:13,19,20
77:21 79:19
79:22,23,25
80:4,25 81:10
81:12,13,16
81:18 87:22
87:24 88:20
90:13,15 91:7
91:14 116:8
119:20
121:25 122:8
122:24
128:20,24
129:14
132:15,18
133:7,11
134:4 147:14

147:22,25
148:4,7,13,16
149:7,9,12,24
150:13,15
151:6,13
154:14,17
155:4,22
158:11
163:10,24,25
164:18
167:25 169:9
169:10,13
170:25
**cellars (2)**
118:9 150:8
**cellular (2)**
148:9,10
**center (1)**
101:14
**certain (7)**
12:16 20:11,17
60:7 115:12
129:11 153:7
**certainly (1)**
18:21
**certificates (4)**
17:23 20:7,8
20:14
**certification ...**
4:11 177:1
**certifications...**
17:22
**certify (2)**
177:7,13
**cetera (1)**
68:16
**chance (2)**
159:23 160:2
**change (2)**
96:23 178:6
**changed (3)**
53:22 122:3,14
**changes (1)**
178:4

**charge (1)**
4:19
**charged (1)**
73:14
**charges (2)**
69:11 70:8
**check (1)**
84:18
**children (1)**
14:9
**choose (2)**
29:16 61:13
**chose (1)**
129:13
**Christmas (5)**
22:17 33:2
48:17 64:5
97:3
**chronologica...**
30:19
**circle (11)**
160:4,13,16,17
160:21,23,25
161:18
162:10 173:7
175:6
**circled (1)**
161:22
**citizen (1)**
108:9
**city (5)**
13:22 24:21
42:23 107:18
150:20
**civil (1)**
6:17
**claim (2)**
40:4,10
**clarify (4)**
68:3,8 109:2
144:5
**class (1)**
69:20
**classes (2)**

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 621 of 834

December 19, 2022

[Page 183]

| | | | | |
|---|---|---|---|---|
| 65:16,16 | 18:3 19:21 | complaints (1) | 104:4 110:2 | conviction (4) |
| **classified (1)** | 42:11,16 | 87:2 | **consciousnes...** | 45:14 46:9 |
| 36:3 | 48:24 | **complete (5)** | 171:14 | 69:3 72:7 |
| **cleaned (1)** | **colleges (1)** | 101:18,22 | **consent (1)** | **convictions (3)** |
| 28:24 | 18:4 | 103:10,13 | 6:1 | 45:20 46:17 |
| **cleaning (2)** | **color (3)** | 172:10 | **considered (3)** | 73:5 |
| 24:24 29:4 | 90:13,21 | **completing (1)** | 6:2 98:13 | **copy (5)** |
| **clear (3)** | 169:23 | 103:2 | 104:21 | 4:17 6:8,16 |
| 68:17 79:16 | **Columbus (5)** | **completion (1)** | **consists (2)** | 153:19 |
| 125:14 | 19:12,16,19 | 172:12 | 44:13 65:14 | 172:22 |
| **clients (1)** | 101:9,10 | **computer (1)** | **constantly (3)** | **corner (13)** |
| 60:4 | **come (13)** | 20:23 | 37:7 67:13 | 115:20 116:4 |
| **close (5)** | 49:6,9 55:11 | **concerned (1)** | 85:24 | 116:19,25 |
| 11:22 35:22 | 67:9,22 68:21 | 94:24 | **construction ...** | 117:4,5,15 |
| 132:4 134:22 | 82:21 84:17 | **concluded (1)** | 78:13 151:18 | 118:7,12 |
| 155:19 | 85:17 89:14 | 173:12 | 151:18,22 | 119:6,22 |
| **closed (4)** | 89:21 94:15 | **concrete (9)** | **contact (3)** | 123:24 |
| 35:8 76:15,17 | 171:6 | 148:24 163:12 | 94:18 137:15 | 168:13 |
| 90:8 | **comes (3)** | 167:23,23,24 | 172:17 | **Corporation ...** |
| **closer (11)** | 16:2,8,10 | 168:2,10 | **CONTINUE...** | 1:7 2:8 |
| 75:14 115:19 | **coming (6)** | 169:11,12 | 9:20 13:5 24:3 | **correct (31)** |
| 116:18,19 | 66:15 107:2 | **Concrete's (1)** | 31:18 34:24 | 10:10 17:10 |
| 131:4,8,9,10 | 108:2 113:14 | 148:25 | 36:19 37:14 | 37:5 56:25 |
| 134:14,15 | 113:21 | **conditions (1)** | 40:16 49:4 | 59:21 67:6,8 |
| 167:12 | 156:20 | 10:18 | 65:10 88:10 | 84:3 97:21 |
| **closest (5)** | **Command (3)** | **conduct (2)** | 112:8 130:11 | 102:4 108:20 |
| 75:12,16 117:9 | 105:10,16 | 4:25 6:14 | 146:22 | 109:4 114:6 |
| 117:13 137:7 | 106:18 | **conducted (1)** | 162:19 | 122:17 |
| **cloth (2)** | **COMMISSI...** | 5:13 | **control (1)** | 123:17 |
| 89:8,8 | 178:25 | **Conduit (3)** | 5:18 | 127:22 132:2 |
| **clothing (4)** | **Common (1)** | 33:7,11 34:13 | **controlled (8)** | 133:12 |
| 21:4 58:12 | 146:14 | **cones (3)** | 4:2 47:2,11 | 134:11,24 |
| 127:22,24 | **community (8)** | 151:17,18,22 | 72:8 73:11,12 | 136:13,18 |
| **coach (1)** | 16:23,24 17:4 | **conference (2)** | 73:14 74:5 | 137:16 |
| 72:10 | 18:3 19:21 | 5:14 6:15 | **Convenience...** | 138:15 |
| **coaching (2)** | 25:5 42:11,16 | **confirm (1)** | 22:8 | 141:15 |
| 72:13,15 | **companies (1)** | 152:12 | **convenient (1)** | 142:10 146:8 |
| **cocaine (3)** | 21:23 | **confirmation...** | 172:19 | 157:21,25 |
| 73:17 74:4,8 | **company (6)** | 45:7 | **conversation...** | 163:18 178:4 |
| **cold (4)** | 16:9 31:9 | **confirming (1)** | 8:23 | **correction (3)** |
| 84:19,23 85:3 | 105:9,23,25 | 5:23 | **convicted (6)** | 25:6 44:4 |
| 123:12 | 106:2 | **confused (1)** | 44:19 45:17 | 63:20 |
| **college (8)** | **complain (1)** | 64:23 | 47:5,9 73:10 | **Correctional...** |
| 16:24,25 17:4 | 7:22 | **connected (2)** | 73:13 | 48:22 |

December 19, 2022

[Page 184]

| | | | | |
|---|---|---|---|---|
| **correctly (2)** | 23:3 | 174:1 | **deal (2)** | 105:21 106:3 |
| 17:2 39:17 | **CPLR (2)** | **daily (1)** | 40:2 70:16 | **DELUCA (77)** |
| **costs (1)** | 5:12 6:16 | 111:17 | **dealer (2)** | 2:5 9:15 12:24 |
| 6:13 | **crack (2)** | **date (19)** | 70:10,22 | 13:19 14:3 |
| **counsel (14)** | 74:4,8 | 1:11,18 12:22 | **December (9)** | 16:4 18:8,15 |
| 2:5 3:4,18,24 | **create (1)** | 12:25 35:18 | 1:11 33:4 | 18:20,24 19:4 |
| 4:5,10,16,18 | 21:23 | 86:23 95:6 | 35:17,18 | 39:14 40:8,13 |
| 4:22 5:11,15 | **credit (10)** | 97:3 112:11 | 37:19,22 44:5 | 40:21,25 41:4 |
| 6:11 14:2 | 1:8,8 2:14,14 | 122:25 | 96:22 177:19 | 41:9,16,19,25 |
| 40:8 | 8:3 87:6,9,18 | 123:12 | **decent (1)** | 42:9 44:22 |
| **counseling (3)** | 170:18 171:7 | 154:18 | 127:2 | 45:2,9,13,20 |
| 52:8 68:15 | **credits (2)** | 155:24 167:5 | **decide (1)** | 45:22 46:6 |
| 69:18 | 19:21 103:6 | 172:12,14,20 | 63:9 | 56:10 66:23 |
| **counselor (1)** | **Crest (2)** | 173:4,8 | **decided (4)** | 71:2,20 72:6 |
| 67:18 | 7:11 11:2 | **dates (2)** | 51:23 55:17 | 72:12,15 |
| **count (1)** | **crime (1)** | 37:5,6 | 61:17,21 | 74:22 77:8 |
| 46:12 | 44:20 | **daughter (3)** | **Deciding (1)** | 88:3,6 111:2 |
| **counting (2)** | **crimes (2)** | 16:2,5 95:2 | 61:20 | 111:9,12 |
| 168:8,9 | 108:11,13 | **Davidson (3)** | **deemed (1)** | 116:11,15 |
| **Country (5)** | **cross (3)** | 99:19,20,22 | 3:25 | 117:8,21 |
| 16:24,24 17:3 | 11:18,19,23 | **Davis (1)** | **defect (2)** | 124:4 126:5,8 |
| 18:2 42:11 | **crossing (1)** | 19:11 | 91:7,14 | 130:3,8 131:6 |
| **county (3)** | 80:5 | **day (36)** | **Defendant (3)** | 131:16 |
| 1:1 48:9 177:3 | **crowded (2)** | 17:16 26:4,24 | 1:16 2:8,13 | 132:12 |
| **couple (6)** | 75:9,10 | 49:20,23 50:3 | **Defendant's ...** | 133:18 136:6 |
| 58:23 59:15 | **current (1)** | 50:12,15,19 | 152:16,19 | 139:8 143:15 |
| 63:3 86:10 | 114:14 | 58:19 61:14 | 153:23 155:5 | 144:10 147:5 |
| 96:10 122:20 | **currently (9)** | 61:25 62:3 | 155:23 156:8 | 147:11 |
| **Course (1)** | 15:23 16:14 | 78:25 79:14 | 162:22,24 | 149:13,18 |
| 69:22 | 22:11 43:13 | 79:15 92:6,7 | 163:9 166:14 | 150:22,25 |
| **court (17)** | 106:21,23 | 93:5,15 94:17 | 166:16 | 151:7 154:5,9 |
| 1:1 5:14,18,22 | 107:7,13 | 122:11 | 167:16 | 154:23 |
| 8:20 10:10 | 111:24 | 123:17,19 | 172:18 173:2 | 155:15 |
| 32:15 44:24 | **curriculum (1)** | 124:17,23,24 | 173:6,7 175:5 | 156:21 157:3 |
| 48:5 88:16 | 101:9 | 125:10,15 | **Defendants (1)** | 162:6,9 |
| 110:14 | **cursor (1)** | 127:6,12 | 1:9 | 169:21 |
| 130:18 | 158:7 | 129:19 155:6 | **definitely (1)** | 172:15 |
| 143:20 151:4 | **cut (1)** | 173:17 | 163:6 | **department (...** |
| 159:16 173:4 | 79:11 | 177:19 | **degree (4)** | 27:6 80:3 |
| 173:9 | **cycles (1)** | 178:23 | 16:21 17:12,18 | **depict (1)** |
| **cousins (1)** | 103:22 | **days (4)** | 48:24 | 154:17 |
| 104:4 | | 25:5 27:20 | **degrees (1)** | **deposed (2)** |
| **Covid (4)** | _____ D _____ | 122:20 | 17:21 | 6:17 8:7 |
| 22:23,24,25 | **D (1)** | 150:18 | **delivery (2)** | **deposes (1)** |

December 19, 2022

178:2
**deposition (7)**
5:13,21 6:14
15:5 152:2
172:11,13
**Depositions (1)**
4:25
**describe (5)**
82:15 143:22
156:6 163:8
167:15
**description (2)**
24:23 175:3
**designed (1)**
28:25
**destination (5)**
53:18 150:6,7
150:9,11
**destinations ...**
61:12
**detail (2)**
134:22 159:11
**Development...**
1:7 2:8
**differ (1)**
15:15
**difference (5)**
146:12 165:20
165:23 166:6
166:11
**different (20)**
26:7,17 28:3
28:10 33:5,5
43:4 47:17
53:22 90:21
100:10,14
102:2,5,7
108:2 122:23
155:21,23
169:23
**difficulties (1)**
9:19
**dimensions (2)**
91:2 128:20

**diploma (1)**
103:8
**direct (3)**
10:4 60:25
61:6
**directed (1)**
61:11
**direction (16)**
75:22 113:8,10
135:9,13
141:9 144:16
145:12,21,25
146:4,25
157:15,19
163:21
168:21
**directions (1)**
146:3
**directly (4)**
29:17 170:3,17
170:21
**discussion (13)**
9:17 23:25
31:16 34:22
36:17 37:12
49:2 65:8
88:8 112:6
146:20
171:25 172:5
**distance (2)**
15:9,19
**distinguish (1)**
90:23
**doctor (1)**
67:18
**DOCUMEN...**
176:3
**documents (1)**
128:10
**doing (9)**
7:18 23:5 25:3
32:7 42:14,24
103:10 152:2
164:2

**dollars (1)**
59:16
**door (66)**
75:20 76:7,11
76:11,12,21
76:23,25 77:2
77:6,6,19,21
77:24 79:19
81:12,13,16
81:18 87:22
87:24 88:20
90:14,15 91:7
122:2,7,8
132:15,18
133:2,3,7,11
133:17 134:4
136:25
147:15,22,25
148:4,7,16
149:7,10,24
150:13,15
151:6,14
154:14
158:11 160:6
163:10,24,25
164:18 165:7
167:8,12,22
169:4,5
170:11,17,25
**doors (24)**
77:12,20 89:2
90:7 91:14
116:8 122:24
128:21,24
129:8 137:3,4
137:6,8
149:12 150:7
154:18 155:4
155:22
159:19 165:7
165:11 166:7
169:20
**doorway (1)**
132:16

**downtown (4)**
57:13,18 75:2
104:6
**draw (2)**
12:18 160:13
**drawing (1)**
160:21
**Draws (2)**
160:16,23
**dress (1)**
59:14
**drive (1)**
93:10
**driver's (3)**
38:16,19,21
**drop (3)**
28:22 102:25
106:9
**dropped (3)**
101:20 103:4
106:6
**DROSSMA...**
2:7
**drug (6)**
70:10,17,22
71:17 110:18
110:19
**drugs (2)**
10:13 74:19
**due (13)**
9:18 12:15
39:13 70:11
78:21 82:6
83:6 103:3,14
105:19
109:23
140:21 172:8
**duly (3)**
7:2 177:10
178:2

─────── **E** ───────

**E (7)**
2:1,1 7:1 174:1

175:1 176:1,1
**e-mail (1)**
27:9
**e-mailed (1)**
6:10
**earlier (12)**
20:6 21:9 35:5
58:19 59:23
61:16 71:8
93:13 108:12
108:16
127:21
141:13
**early (4)**
50:4,5 57:10
66:18
**earn (1)**
17:17
**earned (1)**
20:6
**earnings (1)**
40:10
**easier (1)**
151:9
**east (10)**
1:8,8 2:13,14
8:2 52:24
53:7 55:7
87:6,8
**eat (3)**
61:25 63:6,18
**eating (1)**
63:16
**edge (8)**
76:22,25 77:2
77:5,15
116:22
164:18 170:7
**editorializin...**
154:7
**education (2)**
16:20 18:4
**effort (1)**
86:13

December 19, 2022

[Page 186]

| | | | | |
|---|---|---|---|---|
| **eight (3)** | 31:15 164:11 | 123:21 | 6:6 173:2 | 80:21,22 |
| 50:6,8,21 | **established (1)** | 125:21 | **Exodus (1)** | 87:16,17 |
| **either (6)** | 90:10 | 129:11 | 110:12 | 93:20 147:13 |
| 27:24 39:13 | **establishmen...** | 139:15 143:7 | **EXPIRES (1)** | 147:20 |
| 45:13 50:11 | 116:7,21 117:7 | 148:2 158:16 | 178:25 | 148:16 156:8 |
| 87:12 103:6 | 119:13 | 170:12 | **explain (4)** | 158:19 |
| **elaborate (2)** | **estimate (5)** | **examination ...** | 60:20 117:5 | **falling (8)** |
| 39:20 67:14 | 29:5 100:7 | 1:15 3:10,13 | 125:14 | 78:16 80:18 |
| **eleven (3)** | 131:19,21 | 3:19,22,24 | 158:21 | 86:18 91:25 |
| 51:20 62:8 | 164:7 | 4:6,12,17 5:3 | **explained (1)** | 140:10 141:4 |
| 160:19 | **et (1)** | 5:6 7:13 9:20 | 113:9 | 142:22 143:2 |
| **eleventh (2)** | 68:15 | 13:5 24:3 | **explaining (1)** | **falls (2)** |
| 101:21 102:8 | **eve (2)** | 31:18 34:24 | 37:3 | 48:20,21 |
| **employed (1)** | 48:17 97:4 | 36:19 37:14 | **express (1)** | **familiar (1)** |
| 22:11 | **evening (2)** | 40:16 49:4 | 6:1 | 152:23 |
| **employers (1)** | 149:5 168:17 | 65:10 88:10 | **extra (6)** | **family (3)** |
| 23:8 | **event (2)** | 96:7 112:8 | 23:9,22 24:24 | 94:19 107:10 |
| **empty (1)** | 150:12,16 | 130:11 | 25:11 104:21 | 108:4 |
| 75:7 | **events (1)** | 146:22 | 110:25 | **far (24)** |
| **ended (12)** | 146:3 | 162:19 | **eye (2)** | 39:21 47:23 |
| 22:25 35:23 | **eventually (1)** | 173:11 174:3 | 53:20 128:22 | 54:16 56:3,6 |
| 64:4 66:8 | 91:22 | 177:9,11 | **eyeglasses (1)** | 56:9,14 77:25 |
| 80:17 91:16 | **evicted (1)** | **examined (2)** | 15:8 | 78:3 86:15 |
| 101:12 | 99:7 | 3:20 7:4 | | 89:25 117:15 |
| 136:15 | **exact (23)** | **example (5)** | ——— **F** ——— | 118:11,25 |
| 145:17 | 34:13 35:18 | 26:21 56:5 | **face (1)** | 124:10 |
| 147:18 168:3 | 42:18 54:11 | 60:18 71:11 | 81:25 | 130:19 |
| 170:6 | 67:25 68:22 | 156:16 | **facilities (2)** | 131:11,14 |
| **enrolled (5)** | 106:10 114:9 | **Exchange (2)** | 18:5 66:3 | 133:24 155:7 |
| 43:13,19 44:8 | 115:24 | 104:2,15 | **facility (7)** | 155:11,18 |
| 66:5 67:2 | 119:12,16 | **exchanged (1)** | 28:23 48:8,11 | 156:11 171:8 |
| **entire (1)** | 123:7 125:6 | 152:9 | 48:22 115:22 | **fast (7)** |
| 66:22 | 125:22 | **Excuse (6)** | 117:24 118:5 | 70:14,18,23 |
| **entirety (1)** | 134:21 | 60:6 110:8 | **facing (1)** | 78:17 80:17 |
| 172:10 | 140:21 | 127:9 128:9 | 141:18 | 133:5 147:15 |
| **entrepreneu...** | 153:16 156:7 | 137:25 | **fact (3)** | **father (1)** |
| 17:14 21:17,19 | 158:18 | 167:18 | 31:9 70:12 | 16:8 |
| **environment...** | 161:14,19 | **exhibit (13)** | 103:14 | **February (10)** |
| 15:15 | 162:3 164:3 | 6:8,9,12 | **failing (1)** | 11:12 12:19 |
| **ERRATA (1)** | **exactly (15)** | 152:16,19 | 39:17 | 37:23 38:10 |
| 178:1 | 59:7 78:20 | 162:2,22,24 | **failure (3)** | 49:12,19 |
| **ESQ (3)** | 88:19 100:5 | 166:16 173:6 | 3:11,23 5:4 | 62:18 64:8 |
| 2:5,10,16 | 115:12 | 173:7 175:3,5 | **fall (12)** | 111:5,17 |
| **establish (2)** | 118:13 119:5 | **exhibits (2)** | 32:2 75:17 | **Federal (7)** |

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 625 of 834

December 19, 2022

[Page 187]

1:8,8 2:14,14
8:3 87:6,9
**feedback (1)**
9:16
**feel (1)**
63:16
**feeling (4)**
63:19 85:3
139:25 148:9
**feet (4)**
131:19 137:23
138:4 148:23
**fell (27)**
76:8 80:14,16
81:11 82:23
83:10,14
84:14 86:12
91:19 93:12
95:23,23
125:17 129:8
134:2,23,23
134:25,25
135:4,18,20
135:24 147:9
156:16
169:13
**felonies (3)**
45:12,19 46:18
**felony (2)**
44:22 46:17
**female (1)**
65:15
**field (3)**
21:16,22 28:10
**fields (2)**
20:12 52:10
**figure (1)**
139:23
**FILE (2)**
2:11,17
**filed (1)**
44:16
**filing (1)**
4:11

**financial (5)**
39:13,18,19
87:17 100:23
**find (9)**
18:13 26:10
32:9 54:16
55:15,18
60:21 86:13
126:24
**fine (1)**
14:3
**finish (6)**
22:20 56:10
111:9,12
133:19,20
**finished (3)**
124:2 125:18
165:3
**fire (2)**
72:17 80:3
**firearm (2)**
46:22 47:6
**firm (1)**
7:25
**first (39)**
7:2 21:2 25:17
30:6,12,15
35:25 39:16
43:9 47:18
49:14 50:17
51:9 55:7,17
57:4,6 58:6,7
61:6 77:18
78:21 81:23
82:2 100:15
126:14,14
132:9,14,19
132:25 133:6
136:17,20,21
137:14,17
160:6 177:10
**five (9)**
19:13 28:12
98:21 99:16

100:9 102:2,5
123:6 130:7
**flag (19)**
156:13,17
157:5,16,17
157:19,21,24
157:25
160:20 164:6
164:10,11,11
164:13,15,16
164:17
168:18
**flags (6)**
154:15 157:4
163:11,12
168:7,8
**flat (1)**
170:23
**fliers (2)**
31:11 106:3
**floor (5)**
2:9 25:23
147:18
148:13 168:4
**fluctuates (1)**
62:20
**fluctuation (1)**
63:11
**focus (1)**
29:24
**focused (1)**
21:21
**focuses (1)**
21:20
**follow (1)**
96:10
**followed (1)**
136:22
**following (2)**
164:12 178:3
**follows (1)**
7:5
**Food (1)**
107:14

**foot (17)**
77:16,16,17
78:18 132:15
132:18,23
133:7 140:8
142:24 143:4
148:25
159:21,24
165:4,6,19
**footprint (1)**
125:5
**form (3)**
3:9 5:2 77:9
**forth (1)**
177:10
**forward (5)**
135:5,20,24
136:2 141:18
**forwards (5)**
80:21,24
134:24 135:4
142:21
**found (1)**
18:7
**four (8)**
13:25 56:15,16
56:23 63:4
113:10 168:2
168:3
**fourth (1)**
168:18
**frame (1)**
31:15
**Franklin (3)**
48:20,22 97:18
**fret (1)**
20:19
**friend (1)**
58:16
**friends (1)**
94:18
**front (27)**
31:12 49:10
87:16,18

88:21 95:22
115:22 116:6
116:7 117:24
118:21 119:9
125:17
137:23 138:6
138:10
148:10 156:9
166:24,25
167:4,23
169:9 170:17
170:20,21,23
**fully (8)**
39:11 81:20
83:7 85:23
86:2 117:3
132:5 169:10
**Fund (2)**
1:7 2:8
**furnished (1)**
4:18
**further (11)**
3:17 4:4,9,15
4:21 5:10 6:6
48:22 171:19
172:4 177:13

———————
**G**
———————
**gain (1)**
139:15
**GANNON (1)**
2:7
**garbage (1)**
148:21
**Garden (5)**
34:3,4,7,10,14
**GED (6)**
20:2,4 42:15
42:20 48:23
103:7
**general (5)**
18:16 60:8
124:17
150:14,17

December 19, 2022

[Page 188]

| | | | | |
|---|---|---|---|---|
| **gentleman (6)** | 33:24 34:16 | 163:23 168:2 | 82:2 83:4,9 | 26:9,14 68:21 |
| 60:25 83:24 | 34:20 35:20 | 168:24 | 83:22,24,25 | **hands (4)** |
| 86:20 139:3,4 | 35:23 40:13 | **good (8)** | 83:25 84:11 | 24:24 80:13 |
| 139:13 | 42:22 47:23 | 7:15,17,19,23 | 84:15,17,20 | 81:6,8 |
| **gentlemen (2)** | 51:23 52:24 | 15:17 61:3,9 | 85:16,18,19 | **happen (6)** |
| 24:25 31:11 | 53:4,10 54:16 | 63:16 | 96:12 124:14 | 29:10 49:21 |
| **getting (10)** | 56:5,9,14 | **gotten (2)** | 124:18 128:3 | 53:23 64:7 |
| 29:12 40:2 | 57:8,15,19,25 | 37:6 72:17 | 134:9,18 | 76:18 116:17 |
| 70:14,18,23 | 59:4 60:22 | **government ...** | 136:15,19,21 | **happened (40)** |
| 81:10 85:25 | 61:12,17 67:9 | 107:12 | 136:24 | 11:22 12:10,17 |
| 93:21 127:23 | 77:20,21,25 | **Governor (2)** | 137:15 | 23:18,20 |
| 147:14 | 103:8 106:23 | 47:24 48:6 | 139:10 144:3 | 25:12 33:3 |
| **give (21)** | 108:13 | **grade (7)** | 146:6 149:2 | 35:22 47:12 |
| 11:19 20:25 | 109:24 | 101:20,23 | 171:4 | 47:23 48:19 |
| 22:5 25:4 | 112:17,21 | 102:4,8 103:2 | **guards (2)** | 51:4 55:3,23 |
| 26:14,14 | 151:9 158:20 | 106:9,11 | 95:13,16 | 57:20 60:18 |
| 27:17 28:4 | 165:7 | **graduate (1)** | **guess (9)** | 60:20,22,25 |
| 30:8 60:7,17 | **goes (3)** | 19:23 | 83:17 134:4 | 61:5 64:2 |
| 96:15 100:6 | 53:3 88:24,25 | **graduated (2)** | 138:6,8 141:9 | 65:22 73:15 |
| 106:14 | **going (50)** | 66:9 100:17 | 147:15 155:7 | 74:3,18 78:17 |
| 123:11 | 8:4,22 9:11 | **graduating (1)** | 155:9 161:7 | 80:16 81:8,15 |
| 128:19 | 25:17 27:21 | 100:16 | **guessing (1)** | 82:10 87:3 |
| 134:21 | 28:8 30:17 | **graduation (1)** | 161:9 | 89:23 93:10 |
| 156:15 | 32:2,20 35:24 | 17:19 | **guilty (5)** | 94:18 113:11 |
| 159:11 164:6 | 42:10 44:4 | **grandparent...** | 45:14,16 46:10 | 116:6 129:20 |
| 171:2 | 49:6 52:23 | 100:22 | 108:12,14 | 129:22 133:5 |
| **given (6)** | 54:15 55:10 | **gray-ish (2)** | **guy (1)** | 147:15 |
| 57:21 67:17 | 57:9 66:20 | 90:15,18 | 60:18 | **happening (1)** |
| 87:20 89:5 | 76:23 79:12 | **Great (1)** | | 63:15 |
| 113:17 | 80:4 84:18 | 32:4 | ───────── | **happens (2)** |
| 177:12 | 91:10 96:23 | **green (9)** | **H** | 48:10 70:16 |
| **giving (2)** | 100:9 101:12 | 88:18,20 89:4 | ───────── | **hard (3)** |
| 37:10 71:11 | 101:20 102:8 | 89:7,8,12,12 | **H (2)** | 37:5 60:20 |
| **glasses (3)** | 116:23 | 89:14 119:19 | 7:1 175:1 | 140:11 |
| 15:12,18,21 | 117:13,25 | **Greene (1)** | **half (2)** | **Harlem (3)** |
| **Glen (2)** | 118:11 | 104:7 | 56:2 58:20 | 1:8 2:14 87:9 |
| 42:8 48:21 | 119:22 | **grill (1)** | **hand (12)** | **he'll (1)** |
| **go (52)** | 120:22 | 105:5 | 23:9 73:9 81:7 | 10:4 |
| 8:10 18:9 19:5 | 126:10,13,13 | **grocery (1)** | 81:17 104:22 | **head (7)** |
| 19:17 21:10 | 128:23 141:7 | 22:7 | 114:4,9,19 | 9:11 86:4 |
| 21:11,15 | 143:25 144:3 | **ground (37)** | 127:5 137:6 | 141:18,20,23 |
| 23:23 26:5,17 | 145:10 150:5 | 75:20 79:3,6 | 153:20 | 141:25 |
| 26:20 27:2,12 | 150:6 152:8 | 79:15 80:15 | 177:19 | 142:10 |
| 27:23 29:16 | 156:2 159:21 | 80:20 81:22 | **handing (2)** | **headed (1)** |
| | | | 31:11 106:3 | |
| | | | **handler (3)** | |

December 19, 2022

[Page 189]

50:23

**heading (1)**
126:16

**headquarter...**
25:21

**health (1)**
65:15

**hear (6)**
68:6 74:15
88:2,3,6
112:23

**heard (2)**
87:5,8

**hearing (2)**
9:15 87:14

**heavy (1)**
124:11

**height (4)**
165:21,23
166:6 170:19

**held (18)**
1:17 9:18 24:2
31:17 34:23
36:18 37:13
46:11 49:3
65:9 88:9
103:24
104:24
106:17 112:7
146:21 172:2
172:6

**Hell's (1)**
11:25

**hello (3)**
87:25,25 88:5

**help (8)**
15:18 23:22
25:11 52:10
82:10,18 83:5
108:8

**helped (1)**
138:19

**hereinbefore...**
177:9

**hereto (5)**
3:19 4:6,11,17
4:23

**hereunto (1)**
177:18

**high (13)**
19:5,7,10,11
19:19,23
100:10,14,15
100:16,18
101:17 103:8

**higher (1)**
18:4

**highest (1)**
16:19

**highways (1)**
25:3

**Hill (20)**
51:2 52:3 53:9
54:22 65:5,12
66:6,9,10,13
66:17 67:3,25
68:13,18 69:7
70:24 72:24
73:3 109:20

**hire (3)**
28:6 29:16,21

**hired (2)**
29:18,19

**hit (12)**
80:15 81:25
86:4 118:7
119:20,22
129:25
136:19,21
146:5 165:4,6

**hold (5)**
19:17 55:20
96:5 151:24
162:13

**holding (2)**
80:10 85:21

**home (11)**
8:14 51:25

**hereto (5)**
52:6 61:18,24
64:22 65:2,20
66:15 97:4
98:3

**honest (19)**
15:15 17:24
23:6 59:13
60:14 61:14
62:6 63:10
70:3 86:2,3
89:12 90:9
91:15 98:19
102:6 123:7
154:4 155:25

**honestly (1)**
92:20

**hopefully (2)**
28:5 55:18

**hopes (2)**
54:16 55:18

**hospital (5)**
93:23 94:22
109:7,12,17

**hotel (14)**
11:20 12:2,12
33:12 34:17
35:4 36:2,7
37:17,22 50:9
50:18 51:10
52:14

**hotels (1)**
12:17

**hour (3)**
55:25 56:2
58:19

**hours (3)**
51:15 72:16
74:17

**housed (1)**
66:3

**Housing (2)**
1:7 2:8

**HRA (5)**
23:18 24:5,18

103:24
107:10

**Huh (6)**
111:4 121:6
123:18 126:7
134:25
145:23

**Human (1)**
24:7

**hurt (3)**
93:21 139:23
144:4

**hurted (1)**
83:8

**hurting (1)**
91:16

——— **I** ———

**ice (5)**
79:17 124:14
133:8,9,11

**icy (2)**
127:15,15

**idea (5)**
20:25 22:6
106:15
123:11 171:2

**identificatio...**
173:3,8

**identify (1)**
40:6

**identity (1)**
5:23

**Idle (1)**
63:7

**images (1)**
168:16

**immediately ...**
87:23 91:18,23
92:3 141:14

**impact (1)**
81:10

**inaudible (5)**
19:11 31:4

68:20 112:4
145:3

**incarcerated...**
46:2 47:19
48:15 70:7,8
73:2

**incarceratio...**
46:7,8 64:4

**inch (1)**
166:11

**inches (2)**
77:25 131:19

**incident (4)**
47:14 79:22
108:19 145:6

**incidents (1)**
108:16

**including (2)**
3:8 4:25

**independent ...**
52:8 69:17

**Index (1)**
1:5

**indicating (4)**
135:17 144:17
144:21
164:19

**individual (2)**
17:15 52:7

**industry (1)**
21:19

**information ...**
14:20,25 18:25
95:10

**initially (2)**
69:10 132:16

**Inn (5)**
34:3,4,7,10,14

**INSERTS (1)**
176:7

**inside (1)**
129:20

**instance (7)**
22:5 27:2,3

December 19, 2022

[Page 190]

| | | | | |
|---|---|---|---|---|
| 29:18 60:17 70:10,12 | **Janet (3)** 95:5,5 98:7 | 45:17 | 79:9,17 80:17 80:19 82:2 | 148:19,20,22 150:5,5,21 |
| **institution (1)** 87:17 | **janitor (1)** 105:4 | **K** | 83:15 84:22 86:16 88:18 | 152:25 153:7 153:22,25 |
| **institutions (1)** 87:12 | **January (4)** 42:13 44:6 | **keep (4)** 74:24 84:25 | 88:19 89:20 89:24,24 90:3 | 154:2,3,6,6 154:10,11 |
| **instructed (3)** 83:23 84:2,15 | 65:4 96:22 | 149:19 154:7 | 90:11,19,20 | 155:10,15,17 |
| **instruction (1)** 18:16 | **JDP (1)** 24:10 | **keeps (2)** 16:8 151:3 | 91:4,16,24 92:18,21 | 155:25 156:5 158:16,18 |
| **intending (1)** 57:25 | **job (19)** 22:14,22 23:3 | **kids (1)** 50:11 | 94:19,21,24 95:20 102:21 | 165:24 166:9 166:10 |
| **intentional (1)** 148:19 | 24:23 27:17 30:12,16,17 | **kind (5)** 21:14 22:2,4 | 106:11 107:22 | 168:20 169:24 |
| **interest (2)** 53:20 59:5 | 30:20,21 31:21 32:5 | 59:10 78:6 | 111:19 115:13 118:3 | 170:21,24 171:19 |
| **interested (1)** 177:16 | 105:11,15,17 105:18,20 | **KING (1)** 2:3 | 118:10,16,18 118:20 119:5 | **knowing (2)** 39:16 168:15 |
| **internet (1)** 118:23 | 106:18,22 | **King's (1)** 172:17 | 119:11,17,21 120:3,7 | **knowledge (4)** 63:13 79:21 |
| **intersection (...** 117:10 119:2 | **jobs (8)** 21:24 23:5,11 | **KINGS (1)** 1:1 | 121:23,23 122:6 123:14 | 95:15 119:17 |
| **inventory (1)** 105:5 | 23:13 25:4 28:4 103:24 | **Kitchen (1)** 11:25 | 123:21,22 124:10 | **knowledgeab...** 90:4 |
| **involved (7)** 24:19 44:7 | 104:24 | **kneeling (1)** 85:20 | 125:16,18,19 125:21,22,24 | **L** |
| 49:10,16 64:18 69:2 | **JPL (3)** 23:19 24:8,13 | **knees (1)** 81:23 | 125:25 128:3 128:15 | **L (4)** 3:1 7:1,1 40:18 |
| 94:20 | **JPT (1)** 24:15 | **knew (4)** 85:11 95:18,22 | 129:17,18,24 131:2 132:8 | **ladies (1)** 25:2 |
| **Island (1)** 33:6 | **JTP (7)** 25:6,7 28:14 | 165:9 | 132:10,21 133:4,13 | **lady (1)** 113:6 |
| **issue (1)** 102:15 | 28:16 29:9,10 29:14 | **know (166)** 11:18 13:10,21 | 135:3,12,23 136:20,22 | **land (9)** 81:11,23,24,24 |
| **items (2)** 22:10 80:8 | **jump (2)** 52:25 62:12 | 18:24 21:6,6 24:6,9 27:14 | 138:12 141:10 | 136:4,24 169:3,19 |
| **J** | **jumped (1)** 54:22 | 29:6 30:9 31:6 39:15 | 143:13 144:2 144:22 | 170:7 |
| **jacket (5)** 85:5,7,9 | **jumping (1)** 156:25 | 43:8 45:18 46:18 47:4,8 | 145:12,17,21 145:25 146:3 | **landed (16)** 81:21 133:25 |
| 112:14,16 | **June (1)** 20:5 | 49:23 50:2 52:20 53:17 | 146:5,7,8,12 146:25 147:8 | 136:8,10,12 136:12,14,17 |
| **Jackson (2)** 95:5 98:7 | **junior (2)** 100:16,18 | 54:2 55:6 56:3 58:8,10 | 147:9,12,16 147:19,24 | 136:23 137:22 138:3 |
| **jail (3)** 59:20 64:2,10 | **jurisdiction (...** 28:20 48:21 | 59:3,16,24 60:6,7,15 | 148:3,6,15,17 | 138:5 167:17 167:20 169:2 |
| | **jury (1)** | 61:15 63:17 78:2,14 79:7 | | 171:11 |

December 19, 2022

**landing (2)**
138:13 169:5
**Latonia (2)**
42:4,6
**law (2)**
2:3 6:3
**lawyer (4)**
93:6 120:21,23
123:10
**lawyer's (1)**
120:24
**lay (2)**
136:15 170:23
**laying (7)**
85:18,24 86:3
134:18
138:25
139:21,22
**layoff (1)**
105:19
**lead (1)**
93:20
**leaned (1)**
145:15
**leaning (3)**
135:17,22
141:10
**learn (1)**
20:24
**learner's (2)**
38:23 39:4
**learning (4)**
42:2,3 53:20
59:2
**lease (1)**
97:6
**leave (11)**
13:24 14:15
27:15 33:16
35:7 38:11
50:17 51:19
95:7 101:5
105:11
**leaving (3)**

54:13 102:10
108:22
**led (4)**
72:23 73:2
101:15
109:23
**left (54)**
33:23 35:8
51:9 53:8
54:21 57:8,13
75:11,23
77:16 80:22
81:17 85:10
93:22 102:17
105:15
112:10
114:12,18,21
119:18 128:5
135:13,17,18
135:21,22,25
136:9 137:7
140:14 141:6
141:10
142:18,21,24
143:21,25
145:16 146:7
146:9,13
157:11 165:4
165:6 167:13
168:13 169:4
169:6,11,15
170:3,10,11
**leg (3)**
83:7 128:4
137:7
**LegalView/Z...**
5:17
**length (3)**
131:22,25
132:3
**lengths (1)**
131:20
**let's (8)**
8:10 9:2 23:23

29:24 33:4
34:20 49:7
54:9
**level (2)**
16:19 20:20
**Lex (2)**
55:22,24
**Lexington (3)**
2:15 55:3,5
**Lexitas (2)**
5:18 8:21
**liability (1)**
96:2
**Liberty (3)**
31:9,10 106:2
**license (3)**
38:17,20,22
**lie (1)**
128:23
**life (3)**
15:14 17:24
39:8
**lift (1)**
143:4
**liking (1)**
54:17
**limited (1)**
46:8
**line (4)**
165:10 176:7
176:12 178:6
**lined (1)**
105:17
**link (3)**
23:19 24:18
25:6
**Liquors (1)**
104:3
**list (2)**
19:14 20:15
**listed (1)**
21:2
**Listen (1)**
116:15

**Litchfield (2)**
2:13 7:25
**literally (1)**
143:3
**litigation (2)**
6:4,18
**little (17)**
15:10 20:22
82:22 125:5,6
128:2,5
148:24
153:11
154:15
158:20 159:5
159:17 160:7
160:20 165:2
170:2
**live (9)**
11:8 15:25
98:10,17,25
99:14,17,24
100:3
**lived (4)**
10:25 13:11,15
13:21
**living (13)**
11:3,11 32:22
32:24 33:9
96:21 97:16
97:23 99:5,11
100:21,21
150:18
**LLP (1)**
2:13
**Local (1)**
105:23
**located (8)**
8:12 17:4
25:19 49:11
52:11 100:11
138:4 167:9
**location (20)**
27:20 60:24
91:18 109:16

109:17
120:17 121:8
121:10
126:23
127:18 133:8
156:7 158:13
158:19 160:5
161:14,19
162:3 164:4
171:10
**locations (3)**
5:16 28:11
61:12
**lock (2)**
151:13,16
**Lombardi (2)**
41:5,6
**long (19)**
10:25 15:11
33:14 36:5
37:16 51:13
51:24 58:23
61:18,23 66:5
83:18 98:17
99:14 100:3
102:18
103:17
104:17 112:2
**longer (2)**
104:10 106:19
**look (18)**
53:16 59:17
76:2 80:2
113:13
117:20,22,25
118:11
121:25 122:7
122:7,10,14
122:24
135:15 150:7
152:10
**looked (10)**
82:17 86:16
122:13 129:3

December 19, 2022

[Page 192]

145:16
150:12 154:4
154:18 155:4
167:5
**looking (34)**
18:9 21:10,11
53:12 54:18
55:16 58:14
59:8,14 60:17
75:22 76:16
106:21 107:5
117:18
119:15 134:6
135:15,16
141:8,14
142:2,3 156:8
157:9 162:24
163:13 164:5
164:8 167:15
167:19,21
168:11,15
**looks (11)**
128:23 152:23
153:3,14,15
153:18
160:10
166:24
169:16,22
170:22
**lose (1)**
171:14
**lost (3)**
40:4,10 55:8
**lot (8)**
20:7 42:17
53:21 63:6
112:22 128:3
151:9,10
**lower (18)**
1:8 2:13 8:2
25:25 26:23
27:21,23
57:10 82:5
87:5 136:11

136:20
137:18,20
140:3 168:12
168:23
170:11
**luck (1)**
12:18
**lucky (2)**
13:13 39:10
**lunch (2)**
61:25 62:3
**Lyndsey (3)**
2:16 7:24
171:18

———————
**M**
———————
**M (3)**
2:3 7:1,1
**ma'am (89)**
8:15,24 9:5,9
9:25 10:5,11
10:16,20 11:6
11:16 12:7,13
14:10 15:6
19:25 20:3
26:2 31:5
33:22,22
34:12 38:5,15
38:18 63:23
64:14 69:8
71:4 82:14
83:12 84:23
85:2 89:19
96:11 99:22
105:2 106:20
108:5,10
109:5 110:4
110:24,24
111:7,19,23
111:25 114:5
118:24 119:4
121:9,24
122:18 126:3
126:18,22

127:5 128:12
128:18
129:23
133:13,16,23
135:5,8,15,22
143:24 144:7
144:14,24
145:5,9,19
146:14 147:9
147:16 149:8
150:13
151:12 152:6
156:2 157:17
158:23
160:15
161:22
170:13
171:16
**machines (3)**
20:17 21:5,6
**madam (9)**
7:18 106:24
116:9 119:6
132:11
147:22 148:5
149:4 159:10
**mail (1)**
97:11
**main (1)**
27:15
**maintenance...**
20:19,20
**major (1)**
146:3
**majority (2)**
15:13 142:11
**making (1)**
40:4
**male (1)**
65:15
**man (3)**
94:5 104:22
105:5
**management...**

17:14 21:17,20
69:2,14,17
105:6
**manager (2)**
67:18 68:15
**Manhattan (...**
11:15 12:9
25:24,25
26:24 27:21
27:23 34:2,2
34:4 35:3
98:14 104:6
**manner (1)**
5:25
**March (6)**
33:4,8,10 38:8
44:9,11
**mark (1)**
162:2
**marked (4)**
6:7 152:16
173:2,6
**marriage (1)**
177:15
**married (1)**
14:7
**matter (2)**
31:8 177:17
**matters (1)**
6:18
**MCC (3)**
16:23 18:2
42:11
**McDonald's ...**
103:25 104:9
104:11 105:3
**mean (5)**
53:13 79:22
88:22 143:21
143:22
**meaning (4)**
46:23 77:13
97:10 158:22
**means (2)**

41:14,20
**measure (1)**
91:5
**measurer (1)**
128:22
**measures (1)**
129:6
**Medicaid (1)**
43:2
**medical (4)**
83:5 84:2,6
138:19
**medication (4)**
10:14 74:19
111:16,21
**medications ...**
111:6
**meet (6)**
26:8 120:21,23
121:3,5,7
**meeting (1)**
5:17
**meets (1)**
169:12
**member (1)**
87:11
**memory (2)**
149:5 158:6
**men's (3)**
52:8 61:2
126:11
**mental (1)**
65:14
**mentioned (9)**
1:18 25:10
35:2 100:9
103:23
108:18,21
109:18
144:13
**merely (1)**
118:17
**merged (1)**
47:17

December 19, 2022

[Page 193]

| | | | | |
|---|---|---|---|---|
| **message (1)** | 33:1 34:1 | 118:16 119:1 | 84:7,21 93:13 | 52:15 |
| 27:8 | 35:1 36:1 | 120:1 121:1 | 94:14 95:13 | **mother (8)** |
| **messed (1)** | 37:1 38:1 | 122:1 123:1 | 134:10 171:4 | 40:19 98:4,9 |
| 27:24 | 39:1 40:1 | 124:1 125:1 | **misdemeano...** | 99:9,12 100:2 |
| **metal (19)** | 41:1 42:1 | 125:10 126:1 | 44:23 | 100:23 108:7 |
| 90:16,17,19 | 43:1 44:1 | 127:1 128:1 | **misdemeano...** | **mother's (3)** |
| 129:8 133:2,7 | 45:1,25 46:1 | 129:1 130:1 | 45:11 | 40:23 41:8 |
| 136:24 137:3 | 47:1 48:1 | 131:1 132:1 | **mistake (1)** | 98:5 |
| 137:3,6,8 | 49:1 50:1 | 133:1 134:1 | 64:3 | **motion (2)** |
| 158:11,17 | 51:1 52:1 | 135:1 136:1 | **mistaken (4)** | 3:14 5:7 |
| 161:10,12 | 53:1 54:1 | 137:1 138:1 | 64:21 115:4,11 | **Mount (7)** |
| 165:7 169:19 | 55:1 56:1 | 138:21 139:1 | 124:25 | 19:10,15,18 |
| 169:20,22 | 57:1 58:1 | 140:1 141:1 | **mister (1)** | 100:17,18 |
| **methadone (1)** | 59:1 60:1 | 142:1 143:1,8 | 115:16 | 102:13,19 |
| 110:23 | 61:1 62:1 | 143:16 144:1 | **Mm-hm (3)** | **mouse (9)** |
| **Metropolita...** | 63:1,22 64:1 | 145:1 146:1 | 22:21 43:17 | 157:15 158:2 |
| 36:2,7 | 65:1 66:1 | 147:1 148:1 | 69:15 | 159:24 |
| **Michael (7)** | 67:1 68:1 | 149:1,13,18 | **Mobile (1)** | 164:13 |
| 19:10,15,18 | 69:1 70:1 | 150:1 151:1 | 33:12 | 168:10,24 |
| 100:17,19 | 71:1 72:1 | 152:1 153:1 | **mom (1)** | 169:7 170:2 |
| 102:14,19 | 73:1 74:1 | 154:1,5 155:1 | 94:21 | 170:12 |
| **mid (1)** | 75:1 76:1 | 156:1,23 | **mom's (1)** | **mouth (3)** |
| 82:17 | 77:1 78:1 | 157:1 158:1 | 95:4 | 23:17 30:23 |
| **middle (8)** | 79:1 80:1 | 159:1 160:1 | **Monday (1)** | 58:16 |
| 10:21 115:19 | 81:1 82:1 | 161:1 162:1 | 49:25 | **move (15)** |
| 116:5,18 | 83:1 84:1 | 163:1 164:1 | **money (5)** | 3:9,12 5:2,5 |
| 117:6 130:24 | 85:1 86:1 | 165:1 166:1 | 39:23 70:14,18 | 49:7 76:18 |
| 134:5,20 | 87:1 88:1,7 | 167:1 168:1 | 70:23 107:25 | 93:24 115:25 |
| **military (1)** | 89:1 90:1 | 169:1 170:1 | **month (11)** | 118:14 |
| 38:14 | 91:1 92:1 | 171:1 172:1 | 17:20 30:8,11 | 119:24 133:3 |
| **Miller (190)** | 93:1 94:1 | 173:1,14 | 34:5,5 35:10 | 137:12 |
| 1:3,16 7:8,16 | 95:1 96:1 | 177:8 178:1,2 | 35:15,17 | 139:17 |
| 8:1 9:1 10:1 | 97:1 98:1 | **mind (3)** | 36:13 44:2 | 153:10 |
| 11:1 12:1 | 99:1 100:1 | 53:18 126:8 | 108:3 | 158:22 |
| 13:1,7 14:1 | 101:1 102:1 | 161:20 | **months (18)** | **moved (5)** |
| 15:1 16:1 | 103:1 104:1 | **minor (1)** | 29:11,15,15 | 11:6 34:3,15 |
| 17:1 18:1 | 105:1 106:1 | 70:6 | 30:2,4,6 | 100:23 |
| 19:1 20:1 | 107:1 108:1 | **minute (7)** | 31:23,24 36:9 | 171:12 |
| 21:1 22:1 | 109:1 110:1 | 34:19 83:20 | 36:10,11 | **moves (1)** |
| 23:1 24:1,5 | 111:1 112:1 | 85:16 113:7 | 37:20 44:5 | 169:25 |
| 25:1 26:1 | 112:20 113:1 | 130:7 134:13 | 59:21 63:3,25 | **Moving (3)** |
| 27:1 28:1 | 114:1 115:1 | 162:16 | 104:11,20 | 16:18 165:2 |
| 29:1 30:1 | 116:1 117:1 | **minutes (10)** | **morning (4)** | 166:14 |
| 31:1 32:1 | 117:19 118:1 | 83:17,18 84:5 | 7:15,17 51:10 | **multiple (5)** |

December 19, 2022

[Page 194]

| | | | | |
|---|---|---|---|---|
| 19:7 39:7 | 149:24 | 40:21,25 | 39:11 | 5:19 68:22 |
| 44:14,15 | 161:20 | **notes (2)** | **obtained (3)** | 69:6 |
| 61:12 | 171:12 | 96:3 171:24 | 38:21,25 39:9 | **offices (1)** |
| **mutually (1)** | **new (26)** | **notice (8)** | **occasion (1)** | 172:18 |
| 172:19 | 1:1,20 2:5,10 | 91:7,14 122:23 | 59:11 | **official (2)** |
| ———— | 2:10,16,16 | 124:21 | **occasions (2)** | 30:12,16 |
| **N** | 7:4 13:16,17 | 125:11 127:7 | 45:8 46:4 | **officially (2)** |
| ———— | 17:8 24:21 | 127:10 133:8 | **occur (6)** | 20:5 47:12 |
| **N (3)** | 25:23,23 48:6 | **noticed (1)** | 91:10 115:8,18 | **oh (4)** |
| 2:1 3:1 174:1 | 48:7,10 49:12 | 63:14 | 117:17 119:3 | 60:22 74:25 |
| **naked (1)** | 49:12 53:21 | **number (15)** | 165:14 | 110:11 |
| 112:17 | 103:25 104:2 | 14:5 123:5 | **occurred (20)** | 114:18 |
| **name (25)** | 104:14 | 156:13,18 | 115:3,21 116:4 | **okay (112)** |
| 7:7,23 10:21 | 150:20 177:2 | 157:6 164:11 | 117:11 118:9 | 8:10 14:2 |
| 11:17 12:6,7 | 177:7 | 164:13,15,16 | 119:8 120:4 | 17:25 18:8,12 |
| 14:18,23 | **Newman (3)** | 164:17 | 124:16 | 18:19,23 19:2 |
| 23:16 31:6 | 1:19 177:5,22 | 167:22,24,24 | 130:21 131:3 | 20:13 23:15 |
| 40:23 41:3,8 | **nice (1)** | 168:2,2 | 131:5,13 | 25:8 32:19 |
| 42:4,7 48:8 | 61:14 | **numbers (5)** | 151:20 | 35:19 41:12 |
| 48:11 58:8,10 | **nine (2)** | 57:10,11 89:2 | 157:24 | 41:18,24 |
| 82:13 86:21 | 51:18 102:7 | 125:23 168:6 | 158:14 | 44:15 45:5,22 |
| 88:19 89:3 | **ninth (1)** | | 160:18 161:3 | 46:16 47:16 |
| 95:4 98:5 | 102:3 | ———— | 162:4 164:4 | 48:13 49:19 |
| **names (3)** | **Nodding (1)** | **O** | 164:24 | 51:12 54:6,10 |
| 21:8 65:25 | 9:10 | ———— | **October (3)** | 54:23 55:8 |
| 110:11 | **noise (1)** | **O (2)** | 32:3 34:6,7 | 56:12,17 59:6 |
| **narcotics (3)** | 9:14 | 3:1 7:1 | **offered (1)** | 60:10 62:7 |
| 73:16,19 74:2 | **non-responsi...** | **o'clock (3)** | 26:16 | 65:18,24 |
| **NASSAU (1)** | 93:25 116:2,14 | 50:6,21 51:19 | **offering (2)** | 67:12 68:10 |
| 177:3 | 118:15 | **oath (2)** | 101:8,11 | 69:21 71:10 |
| **necessary (1)** | 119:25 | 5:20 10:7 | **offers (1)** | 71:12 72:19 |
| 178:4 | 137:13 139:6 | **object (4)** | 52:9 | 72:20 73:24 |
| **need (6)** | 139:18 | 3:8,11 5:1,4 | **offhand (10)** | 74:6,11,15 |
| 5:20 23:21 | **normal (1)** | **objection (13)** | 60:15 78:3 | 76:10 96:17 |
| 25:11 63:20 | 141:19 | 10:3 39:14 | 88:19 91:4 | 96:19 97:14 |
| 67:20 124:25 | **North (6)** | 40:22 41:2,4 | 115:13 | 97:19 99:23 |
| **needed (1)** | 16:23,24 17:3 | 41:9,14,20,21 | 118:10 | 101:3,25 |
| 23:9 | 18:2 34:13 | 42:9 71:2,21 | 119:15 120:7 | 102:12 106:4 |
| **needs (2)** | 42:11 | 77:8 | 126:4 147:25 | 107:11,24 |
| 18:24 72:11 | **Notary (7)** | **objects (1)** | **office (5)** | 108:6 109:15 |
| **neighborhoo...** | 1:19 3:20,21 | 10:3 | 2:3 27:15,16 | 110:21 |
| 22:8 | 7:3 173:19 | **obligation (1)** | 120:24 | 111:13 |
| **never (7)** | 177:6 178:25 | 6:15 | 172:17 | 112:25 |
| 90:12 97:12 | **Note (2)** | **observation (...** | **officer (3)** | 113:23 |
| 126:8 149:9 | | 167:14 | | |
| | | **obtain (1)** | | |

December 19, 2022

[Page 195]

114:22 117:8 118:23 120:10 121:2 121:16 127:16 130:13 131:2 131:16 132:20 134:8 135:7 137:19 138:17,22 139:11,19,24 140:16 141:17 142:5 142:15 143:8 144:22 145:10 146:15 149:21,22 152:7,24 153:5 154:8 156:4 158:4 158:24 159:3 161:25 164:21 165:13,17,25 166:21 167:3 167:11 168:5 170:14 171:23

**old (2)**
16:14 90:16
**old's (2)**
14:17,22
**once (3)**
56:22 120:14 151:8
**one-door (1)**
76:12
**ones (1)**
26:17
**open (2)**
22:7 76:14
**opening (2)**
21:24 22:3

**operating (1)**
12:11
**opportunity ...**
24:19 25:18 28:9
**opposite (3)**
55:12 56:24 113:12
**options (1)**
26:15
**orange (1)**
78:12
**order (2)**
1:17 8:25
**ordered (2)**
110:14,15
**ordering (1)**
172:22
**original (2)**
3:23 4:12
**originally (1)**
56:4
**ornament (5)**
88:18,20,22,23 89:14
**ornaments (1)**
119:19
**outcome (1)**
177:16
**outfit (6)**
53:12,16 54:18 59:9,10,14
**outside (7)**
13:11,15,17,22 89:15,23 118:20
**overall (4)**
72:20,25 86:11 101:12
**overlooked (1)**
94:23
**owner (1)**
95:18
**owners (3)**

58:24 60:12 61:5

——————
**P**

**P (3)**
2:1,1 3:1
**p.m (1)**
173:10
**packets (1)**
68:25
**PAGE (6)**
174:3 175:3 176:3,7,12 178:6
**pain (11)**
82:22 83:6 86:11 140:2,8 140:9,13,17 140:19,21 148:14
**paint (1)**
90:20
**pandemic (7)**
12:16 30:14,16 32:23,24 33:9 44:9
**pants (3)**
112:15,16 128:2
**Pardon (1)**
44:3
**parenting (2)**
65:16 69:20
**Park (4)**
52:12 54:10,13 54:19
**parks (6)**
24:17,18 25:18 25:20 28:9,14
**parole (5)**
68:22 69:6 110:15 111:24 112:2
**part (17)**

4:24 16:10,11 16:16 43:7 49:14 76:20 80:14 81:22 81:25 100:18 127:21 137:14,17 143:11 147:24 158:17
**participating...**
5:16
**particular (6)**
21:11,18 52:22 53:5,18 69:24
**Particulars (1)**
40:9
**parties (16)**
3:4,18 4:5,10 4:16,22 5:11 6:1,13 13:4 40:15 130:10 162:18 172:7 172:11 177:14
**parts (2)**
76:20 127:24
**party (2)**
6:17,17
**pass (3)**
159:23 160:3 169:10
**passed (4)**
55:21 83:13 86:22 158:25
**passing (7)**
39:21 82:9 124:2 125:19 129:15 167:22 170:24
**patches (1)**
125:6
**path (4)**

125:15 142:3 147:22 148:11
**paths (3)**
124:22 125:11 125:12
**patient (1)**
109:12
**pay (4)**
39:22 100:25 105:14 138:11
**paying (1)**
29:13
**pays (1)**
107:15
**pedestrian (2)**
82:9 94:4
**pedestrian's ...**
82:12
**pedestrians (4)**
58:23 59:24 60:2,11
**pen (1)**
80:9
**pending (1)**
46:11
**people (8)**
20:21 23:9 24:16 25:5 58:17 60:3,5 72:21
**People's (11)**
1:8,8 2:14,14 8:3 87:6,9 167:2,5 170:18 171:7
**period (5)**
29:24 83:21 85:16 97:9 134:14
**permanent (1)**
97:10
**permit (2)**

December 19, 2022

[Page 196]

| | | | | |
|---|---|---|---|---|
| 38:24 39:4 | 153:12,17,18 | **point (6)** | 6:9 | 17:22 |
| **person (2)** | 153:20 154:2 | 29:17 64:13 | **presenting (1)** | **program (57)** |
| 23:10 61:10 | 154:24 156:9 | 70:4 86:19 | 6:7 | 12:2,3 19:20 |
| **PHEPS (1)** | 156:15 163:3 | 92:5 113:15 | **preserving (1)** | 19:22 23:19 |
| 107:18 | **pictures (5)** | **pointing (1)** | 41:22 | 24:8,10,16,19 |
| **phone (9)** | 91:22 93:11 | 138:12 | **pressed (1)** | 25:7,18,20 |
| 27:9 75:23 | 153:3,15 | **police (2)** | 148:23 | 26:15,18 27:4 |
| 76:4 80:6 | 154:3 | 92:9,18 | **pressure (1)** | 28:10,14,15 |
| 84:12,13 | **piles (2)** | **portion (8)** | 83:7 | 29:12,14 31:7 |
| 94:13 152:3,6 | 125:5,5 | 32:14 48:4 | **pretty (12)** | 42:25 43:10 |
| **photo (14)** | **pinpoint (1)** | 63:18 88:15 | 15:13,16,16 | 43:14,20 |
| 152:11 157:11 | 161:13 | 130:17 | 28:3 79:24 | 44:12,13 |
| 157:11,20 | **pizza (4)** | 143:19 | 82:17 85:13 | 50:24,25 51:2 |
| 164:15 167:9 | 62:3,10,13,14 | 158:10 | 95:2 104:8 | 51:11,14,18 |
| 167:13,19,21 | **place (10)** | 159:15 | 134:20 142:4 | 52:3,5,11,14 |
| 168:14,15,23 | 5:20 32:9 | **portions (1)** | 155:19 | 53:9 62:6 |
| 169:4,15 | 36:15,22 37:2 | 93:25 | **previously (3)** | 64:19,24 |
| **photograph (...** | 54:12 66:7 | **position (10)** | 58:25 63:24 | 65:13,22 66:6 |
| 152:13,22 | 89:3 95:19 | 82:19 83:2 | 172:8 | 67:3,15,24 |
| 153:2,22 | 107:16 | 85:23,25 | **price (3)** | 68:5 69:12 |
| 154:12,16 | **placed (2)** | 136:13,16 | 55:15 61:9 | 70:20 71:24 |
| 157:7,9 161:2 | 133:2,6 | 138:20,23 | 127:2 | 73:3,4,5,7 |
| 162:25 | **Plaintiff (3)** | 139:9,20 | **prior (6)** | 103:23 |
| 163:13,15,16 | 1:4,16 2:3 | **positions (1)** | 6:11 79:14 | 109:19 |
| 164:3,5 | **Plaintiff's (2)** | 105:7 | 97:15,17,24 | **programmed...** |
| 166:19,22 | 172:10,13 | **possession (7)** | 98:24 | 103:6 |
| 168:11 | **plead (4)** | 6:10 46:22 | **prison (2)** | **programs (21)** |
| 170:10 173:5 | 44:21,24 73:20 | 47:2,5,11 | 109:4 110:3 | 20:23 26:17 |
| **photographs...** | 108:12 | 72:7 73:11 | **private (2)** | 43:4,5 44:8 |
| 91:17 92:23 | **pleading (1)** | **possible (2)** | 98:3 100:19 | 44:14,15 |
| 121:13,20 | 46:9 | 86:2 92:21 | **probably (5)** | 65:17 66:2,4 |
| 122:16 123:9 | **please (6)** | **practice (2)** | 91:11 121:22 | 69:4 70:9 |
| 128:16 152:9 | 7:6,9 18:15 | 20:10 101:13 | 124:12 | 103:3 109:21 |
| 153:8 163:4 | 32:12 96:13 | **prepare (1)** | 143:25 | 110:2,5,7,10 |
| 172:25 175:4 | 159:10 | 15:4 | 170:19 | 110:11,13,17 |
| **photos (3)** | **pled (3)** | **prescribed (1)** | **proceed (1)** | **pronounce (1)** |
| 92:5 123:4,5 | 45:14,16 | 111:16 | 113:4 | 16:25 |
| **physically (1)** | 108:14 | **prescriptions...** | **proceeded (2)** | **pronunciatio...** |
| 90:10 | **PLLC (1)** | 67:19 | 113:3,24 | 17:11 |
| **pick (3)** | 2:3 | **present (1)** | **proceeding (1)** | **properly (1)** |
| 26:18 28:24 | **Plus (1)** | 5:11 | 178:3 | 46:23 |
| 63:9 | 60:8 | **presentable (1)** | **process (2)** | **property (1)** |
| **picture (11)** | **pocket (1)** | 59:17 | 103:9 109:9 | 147:18 |
| 91:24 153:10 | 76:6 | **presented (1)** | **professional ...** | **provided (4)** |

December 19, 2022

[Page 197]

3:7,25 4:7,23
**provides (3)**
14:20,25 95:10
**public (12)**
1:20 3:21,21
7:3 102:10
107:9,20,23
108:4 173:19
177:6 178:25
**purpose (2)**
6:3 149:12
**purposes (1)**
4:7
**pursuant (2)**
1:17 5:12
**push (1)**
169:6
**put (11)**
27:25 28:2
29:20 63:10
67:17 70:14
84:24 85:4
110:25 111:2
141:11
**putting (1)**
41:20
**pyramid (1)**
21:22

───── Q ─────
**qualified (1)**
20:11
**Queens (10)**
27:3,4 29:19
33:7,13 34:11
34:12 36:12
37:17,22
**question (57)**
3:8,12 5:5 6:12
9:23 18:17
19:2 22:20
40:7 41:11
43:16 45:3
46:7,16 56:11

64:15,21
66:24 71:5,13
72:11 77:10
88:4,13 96:4
96:14,16
111:10,13
112:21 113:6
115:16
116:10,16
118:17,25
124:5 129:18
130:4,14
131:7 132:13
132:24
133:19,20
138:21 139:7
139:8 145:7
147:4 149:20
149:21
151:11
152:11
156:23,24
159:10
**questioning (1)**
6:11
**questions (6)**
5:1 8:5 18:21
39:17 49:7
96:10
**quick (2)**
85:13 171:21
**quicker (2)**
112:22 151:10

───── R ─────
**R (3)**
2:1 7:1 176:1
**raise (1)**
105:14
**raised (1)**
108:10
**range (1)**
52:9
**reach (3)**

81:20 131:14
132:6
**read (11)**
32:12,14 48:4
88:13,15
130:17
143:10,19
159:8,13,15
**reading (3)**
15:8,12 63:8
**really (6)**
8:9 22:25
60:15 67:24
95:3 138:11
**reason (9)**
58:21 71:23
100:13
120:19
129:12
149:15,23
150:3 178:6
**reasonable (1)**
36:3
**reasons (1)**
70:19
**recall (87)**
75:25 77:17
78:20 79:6,13
80:13 82:14
85:14,21 86:6
86:9,15 87:13
88:17 89:20
90:2,9 91:15
92:16,17,20
93:3 94:16
95:24 98:20
100:5 102:22
106:10
112:13,19
118:13,19
119:4,14
120:2 121:21
123:3,14,15
126:9 127:13

127:19
129:23
132:11,17
134:5 137:11
139:21
141:22 142:6
142:14 143:6
144:25 145:6
147:9,17,25
148:5,9,10,12
148:14 150:2
150:11,21,23
151:5,15
153:4,16
155:7,11,18
156:11 158:3
158:15
160:22 161:5
161:17,24
162:8 164:8,9
164:22 165:4
167:7 171:8
**recalling (2)**
151:21 168:16
**receive (2)**
84:6 97:11
**receiving (1)**
107:13
**recess (4)**
13:3 40:14
130:9 162:17
**recognition (7)**
75:8 81:15
82:3 94:8
154:20
170:25
171:17
**recognize (1)**
149:17
**recognized (1)**
165:9
**record (42)**
7:7,10 9:2,18
12:25 13:2,25

14:16,21 15:2
16:2 23:24
24:2 31:17
32:14 34:21
34:23 36:16
36:18 37:13
41:21 45:18
45:24 48:4,25
49:3 65:9
68:17 88:9,15
95:8,11 112:7
130:17
143:19
146:19,21
159:15
169:21 172:2
172:6 177:12
**recorded (2)**
5:24 9:12
**recording (1)**
5:25
**records (1)**
43:3
**recovering (1)**
149:4
**rectangle (1)**
129:4
**recycled (2)**
27:24 29:22
**refer (1)**
118:19
**referred (9)**
39:25 52:6
66:14 68:19
69:7 70:24
71:14 72:23
73:4
**referring (15)**
43:5 61:19
65:20 71:7
74:2 93:16
109:6 118:22
141:2 142:17
142:20 144:9

| | | | | |
|---|---|---|---|---|
| 142:20 144:9 156:18 157:5 160:9 | 5:16 | reserved (4) 3:10,14 5:3,7 | 81:18 84:4 105:13 107:4 | 2:7 |
| **reflect (1)** 160:18 | **remotely (1)** 5:22 | **reside (3)** 15:23 16:5,14 | 107:6 113:7 114:4,8,12,19 | **route (5)** 52:20 53:5,25 54:2,11 |
| **Reflexes (1)** 143:23 | **repeat (1)** 49:14 | **resided (1)** 37:21 | 114:21 115:21,22 | **routes (1)** 52:21 |
| **regain (3)** 134:18,19,19 | **rephrase (2)** 9:24 71:5 | **resources (2)** 24:7 100:25 | 118:6 119:7 119:13,19 | **rubber (1)** 78:11 |
| **regarding (1)** 6:12 | **report (11)** 26:8,23 27:6 | **respective (6)** 3:4,18 4:5,10 | 120:7 123:20 128:5 130:20 | **rules (4)** 4:1,24 8:11 |
| **regents (2)** 103:7,9 | 27:16,19 46:23 92:8,18 | 4:16,22 | 131:12 132:23 | 96:12 |
| **regular (5)** 15:20,21 16:7 | 93:12,15,16 **reported (3)** | **responded (1)** 94:10 | 135:13 136:4 136:7 139:10 | **RULINGS (1)** 176:12 |
| 111:6 120:15 | 23:11 26:3,25 | **response (5)** 57:21 85:12 | 140:7,9 141:8 141:9 142:12 | **running (2)** 32:8,21 |
| **rehabilitated...** 73:8 | **reporter (16)** 1:19 5:14,22 | 87:20 89:5 113:17 | 142:18 143:4 145:16 146:8 | ——————— S |
| **related (3)** 12:14 49:7 | 7:6,9 8:21 32:15 48:5 | **rest (1)** 136:22 | 146:13 147:11 148:2 | **S (6)** 2:1 3:1,1 175:1 |
| 177:14 | 88:16 130:18 143:20 | **restaurant (2)** 62:13,14 | 150:19,25 152:13 157:7 | 176:1,1 |
| **relationship ...** 169:3 | 159:16 172:21 173:4 | **restraints (1)** 172:9 | 157:10,19,19 158:8,10 | **salt (4)** 127:7,10,14 133:14 |
| **released (2)** 69:6 112:3 | 173:9 177:5 | **result (5)** 40:5 46:9 86:5 | 159:21 160:11 | **Samantha (1)** 40:24 |
| **remember (32)** 21:7 33:16 | **reporting (2)** 5:18 93:17 | 92:19 102:10 | 162:13 164:14 | **sand (4)** 127:7,11,14 |
| 35:10 45:9 | **represent (2)** 8:2 161:18 | **return (2)** 3:23 92:4 | 165:19 167:9 168:12,23 | 133:14 |
| 75:9 78:16 87:14,15 | **representati...** 120:24 | **returned (2)** 93:4,14 | 169:11 | **sanitation (3)** 26:21 27:6 |
| 89:11,11,12 89:21 90:17 | **representing...** 4:18 | **review (5)** 96:3 128:7,10 | **rights (3)** 3:7,25 4:23 | 28:19 |
| 115:23 117:22,23 | **requested (10)** 14:20,25 32:13 | 128:16 171:24 | **road (1)** 114:20 | **sat (2)** 85:19 139:14 |
| 118:3 119:16 120:8,22 | 39:22 48:3 88:14 95:10 | **reviewed (1)** 178:3 | **roadway (5)** 114:11,16,17 | **saw (11)** 60:16 76:9,16 |
| 137:5 139:3 139:12,15 | 130:16 143:18 | **right (75)** 3:8 5:1 13:19 | 131:8 134:15 | 79:24 86:16 86:17,20 |
| 142:7 143:6 148:2 155:16 | 159:14 | 35:5 41:25 54:20 57:8,9 | **room (4)** 8:17 50:8,18 | 119:18,19,21 122:4 |
| 155:20 159:20 160:2 | **REQUESTS ...** 176:3 | 57:14,16,18 62:5 75:3,13 | 51:9 | **saying (11)** 22:19,22 46:15 |
| 161:10 | **required (1)** 110:19 | 75:23 77:16 78:18 80:22 | **roommates (1)** 99:10 | 69:5 74:16 80:3 138:9 |
| **remote (1)** | **requirement...** 38:12 | | **ROSENFAR...** | 140:23 |

December 19, 2022

[Page 199]

150:16 168:6 169:25

**says (1)** 178:3

**scene (3)** 92:10 140:13 154:22

**Schenectady ...** 17:8,9

**school (21)** 18:10 19:6,11 19:19,24 21:10,11 100:15,16,18 100:19 101:5 101:6,18 102:9,11 103:5,8 106:13,24 107:6

**schools (9)** 19:8 100:10,14 101:16 102:3 102:5,7,9 107:2

**Science (1)** 19:19

**scrapes (1)** 140:11

**scratch (1)** 86:10

**scratches (1)** 86:10

**screen (1)** 152:13

**seasonal (1)** 31:22

**seated (1)** 148:12

**second (44)** 12:5 23:24 25:9 34:21 37:18 39:18 48:14,16

49:11 54:4 55:17 57:5,7 57:12,18 58:6 58:7 72:2 75:3 96:6 113:4,16,20 113:25 114:2 114:7,11,19 115:2,9,13,23 117:16 119:2 119:12 124:8 125:20 126:17 129:10 151:25 157:20,24 167:12 169:3

**seconds (1)** 75:21

**section (2)** 5:12 107:17

**security (12)** 14:5 46:24,25 95:12,16 103:15,18,22 105:8,10,16 106:18

**security/deli...** 104:22

**see (26)** 15:7,19 23:21 24:11 25:2 43:2 76:7 82:8 93:20 95:15 118:11 124:13 135:16 152:12 153:11 154:24 156:12 158:7 158:12 159:6 159:22 163:10,10

165:10 167:8 169:14

**seeing (5)** 25:10 93:18 148:10 151:15,21

**seen (6)** 23:21 122:9 124:11 152:21 162:25 166:18

**semester (1)** 107:3

**send (8)** 24:16 25:21 26:7,19 28:18 29:22 109:9 152:17

**Senec (2)** 17:5,7

**sense (1)** 146:14

**sent (3)** 27:4 68:19 108:25

**separate (2)** 5:15 65:15

**served (1)** 38:13

**service (2)** 5:19 25:5

**set (2)** 177:10,19

**seven (2)** 50:6,7

**sewing (2)** 21:5,6

**shadow (2)** 157:6 165:3

**shadows (1)** 163:11

**shaft (1)** 129:4

shaking (1) 9:11

**shared (3)** 152:18 162:21 166:15

**SHEET (1)** 178:1

**shelter (20)** 11:10,14,17,21 12:3,7,8 32:9 32:16,18,21 32:22 35:22 36:4,21 38:4 98:4 109:10 109:14 112:10

**shelters (5)** 11:21 12:16 33:5 34:18 96:21

**shift (1)** 136:5

**shifted (1)** 80:18

**shifting (1)** 37:4

**shirt (1)** 112:16

**shirts (1)** 59:15

**shocking (1)** 140:21

**shoe (1)** 78:14

**shop (2)** 20:16 21:3

**shopping (10)** 51:24 53:11,12 53:15,24 54:3 54:15 60:5 61:17 80:10

**short (1)** 40:12

**shorthand (1)**

1:19

**shortly (1)** 22:23

**shoulder (1)** 143:25

**shovel (1)** 124:25

**shoveled (3)** 124:21 125:11 125:12

**show (6)** 73:7 144:19 152:8 154:13 161:2 166:23

**shown (3)** 155:5,22 163:8

**shows (2)** 154:14,15

**shuffle (2)** 37:7 40:2

**side (46)** 1:8 2:13 8:2 23:5 25:2 52:24 53:7 55:10,12,12 56:24 57:14 57:14,16,18 75:3,12,13 81:17,17 87:6 113:12 114:2 114:4,9,19 134:3,6 136:9 137:2,23 145:18 146:9 157:7,10,11 157:20 164:14 167:13,25 168:13,23 169:4,15 170:10,11

**sides (2)** 29:4 57:15

**sidewalk (23)**

December 19, 2022

[Page 200]

| | | | | |
|---|---|---|---|---|
| 75:4,6,12,13 | 63:8 85:23 | 79:23 123:24 | 159:18 | 170:4 |
| 77:3 90:22 | 136:13 139:2 | 124:9,13,18 | 160:12 | **spots (3)** |
| 116:9 124:9 | **six (2)** | 124:22 125:2 | **Spanish (2)** | 104:7 128:6,6 |
| 124:19 | 29:15 104:11 | 125:4 133:8,9 | 82:16 94:5 | **spreaded (1)** |
| 125:13,14 | **sixteen (3)** | 133:10 | **speak (3)** | 137:9 |
| 127:12,17 | 14:14,17 16:13 | **snowed (4)** | 95:12,17,21 | **spring (3)** |
| 129:14,16,21 | **size (8)** | 123:16,19,22 | **speaking (3)** | 43:23,23 44:5 |
| 130:25 | 58:4,13 59:5 | 123:23 | 65:22 72:20,25 | **squad (1)** |
| 134:21 142:9 | 60:4,21 91:4 | **snowing (1)** | **specialty (1)** | 92:14 |
| 163:25 168:7 | 126:21 | 123:22 | 21:12 | **square (7)** |
| 168:8 169:23 | 160:19 | **Social (1)** | **specific (24)** | 129:3,4,5 |
| **sidewalks (3)** | **Skyline (3)** | 14:4 | 11:23 12:2 | 160:10 |
| 127:8,11 150:8 | 34:17 35:3,3 | **sole (1)** | 23:10 26:8,13 | 169:14,20,22 |
| **sideways (1)** | **Skylines (6)** | 78:11 | 26:20 28:25 | **SS (1)** |
| 136:5 | 12:2,12 50:9 | **solid (2)** | 29:17 78:25 | 177:3 |
| **sightseeing (2)** | 50:18 51:10 | 148:25 149:2 | 82:5 86:19 | **St (7)** |
| 53:11,14 | 52:14 | **somebody (1)** | 97:3 115:24 | 19:10,15,18 |
| **sign (5)** | **Skyway (9)** | 129:19 | 120:5 125:21 | 100:17,19 |
| 23:21 25:10 | 12:7,8,11 | **somewhat (7)** | 126:2,9,12,14 | 102:14,19 |
| 30:25 89:7 | 33:12 35:21 | 59:3 79:15 | 129:6 132:17 | **stable (4)** |
| 91:8 | 35:25 36:12 | 81:19 122:13 | 134:17 | 80:2,4 91:9 |
| **Signature (1)** | 37:17,22 | 137:10 | 141:11 | 97:13 |
| 178:22 | **sl (1)** | 138:25 149:3 | 153:22 | **stage (1)** |
| **signed (2)** | 29:3 | **soon (1)** | **specifically (...** | 107:4 |
| 97:5 173:16 | **slab (1)** | 18:13 | 13:10 74:16 | **stamps (1)** |
| **signs (1)** | 168:10 | **sore (1)** | 79:7 106:20 | 107:14 |
| 91:10 | **slanted (1)** | 148:14 | 112:18 | **stand (3)** |
| **similar (2)** | 85:22 | **sorry (9)** | 121:14 | 24:6,9 83:19 |
| 122:13 154:20 | **slice (2)** | 24:12,15 32:11 | 147:19,21 | **standing (4)** |
| **singer (1)** | 62:3,9 | 56:13 66:25 | 148:15,17 | 82:19 83:2 |
| 98:8 | **slightly (3)** | 74:25 111:11 | 151:6 153:6 | 139:4,13 |
| **sir (5)** | 139:2,21,22 | 143:17 | 153:21,25 | **start (7)** |
| 19:3 60:6 | **slow (1)** | 163:25 | 154:3 | 26:12,12 42:10 |
| 71:25 72:3 | 104:21 | **sort (1)** | **spell (1)** | 51:18 54:9 |
| 162:12 | **slower (1)** | 87:18 | 10:23 | 66:12 109:9 |
| **sit (4)** | 19:17 | **sour (1)** | **spend (1)** | **started (15)** |
| 85:8 128:23 | **smallest (1)** | 105:18 | 48:19 | 21:16 22:23 |
| 139:14 156:2 | 73:6 | **sources (2)** | **spent (1)** | 23:3 30:7 |
| **site (9)** | **snack (1)** | 108:2 118:20 | 48:11 | 32:25 33:9 |
| 11:23 26:7,8 | 63:9 | **south (5)** | **spoken (1)** | 42:13,16 44:9 |
| 26:10,19 28:4 | **sneakers (1)** | 33:7,11 114:7 | 15:4 | 54:14 66:17 |
| 29:19 92:5 | 61:8 | 114:8 119:22 | **spot (6)** | 68:12,18 |
| 93:5 | **snow (16)** | **space (5)** | 27:25 28:3,19 | 100:21 |
| **sitting (4)** | 79:5,6,8,13,17 | 77:14 159:5,17 | 128:2 167:2 | 103:14 |

December 19, 2022

[Page 201]

103:14
**starting (2)**
30:13,16
**state (8)**
1:1,20 7:3,6,9
118:18 177:2
177:6
**stated (4)**
58:25 123:19
136:17
157:17
**statement (2)**
60:8 135:24
**States (1)**
13:12
**station (1)**
55:14
**stay (8)**
83:2,9,23,24
84:15,16
114:2 171:13
**stayed (3)**
83:3,22,25
**staying (2)**
50:11,14
**stemmed (1)**
47:13
**stenotype (1)**
177:5
**step (5)**
68:11 129:10
132:16,25
164:9
**stepped (10)**
77:13,15 78:21
132:14
148:18,23
156:13
158:17
161:12 165:3
**stepping (1)**
161:10
**steps (3)**
129:7 165:21

166:3
**Stevenson (3)**
19:15,18 101:6
**STIPULAT...**
3:3,17 4:4,9,15
4:21 5:10 6:6
**stock (1)**
105:5
**stood (1)**
88:21
**stop (6)**
80:18 81:2,5
82:6 140:10
141:3
**store (16)**
22:6 58:3,9,11
58:12,18,23
60:8,12,22
61:5,7 62:13
126:10,12,20
**Store's (1)**
22:9
**stores (11)**
21:24 22:3,4,8
30:23 55:18
58:24 59:4
60:3 104:3
113:13
**straight (12)**
54:4 138:13,13
141:14,16,25
142:2,3,9,10
145:2 146:10
**street (64)**
2:9 11:18,20
11:24 12:6
23:20 25:23
28:20 29:4
31:2 38:5
52:12 53:4,6
53:9 54:14,20
54:24,25 55:2
55:6,7,9 56:4
56:24 57:14

58:22 61:11
62:12 75:13
97:25 99:2,4
99:21 104:5
113:3,12,13
113:19,22,25
114:20,23
115:6,9,12,24
117:12,16
118:4,7,8
119:3,6,9,23
124:8 126:14
129:21
130:23 134:5
134:7 135:2
168:19
**streets (2)**
120:4,5
**strike (17)**
3:9,12 5:2,5
12:20 29:7
54:8 56:21
90:6 93:25
115:25
116:13
118:14
119:24
137:12 139:5
139:17
**struck (1)**
81:22
**structure (1)**
79:19
**stuck (2)**
78:15 148:3
**studies (2)**
17:15 52:8
**studio (1)**
8:19
**studying (1)**
15:10
**stuff (8)**
20:23 21:25
24:17 59:15

59:18 60:9
61:3,4
**stumbled (2)**
81:4 143:2
**stumbling (1)**
82:7
**submitted (2)**
123:10 154:2
**subscribed (2)**
173:16 178:22
**substance (34)**
43:4,9,14,19
44:8 52:7
63:12 64:18
64:24 65:6,12
65:21 67:16
68:4,9,13,25
69:9,13,23,24
70:3,6,6,15
70:15 71:22
72:23 74:4
109:19,21
110:6,9,16
**substances (...**
47:3,11 69:25
70:11 72:8
73:11,12,14
73:25 74:5
**substantial (1)**
110:2
**subway (3)**
52:17 113:2,5
**suitable (1)**
18:13
**Suite (2)**
2:4,15
**summer (6)**
30:12 32:2
66:9,10 67:4
67:7
**sun (1)**
79:2
**sunny (2)**
79:15 123:15

**supervisor (1)**
68:20
**supply (1)**
6:16
**support (1)**
108:8
**supporting (1)**
107:8
**supposed (2)**
35:23 38:11
**SUPREME (1)**
1:1
**sure (4)**
9:3 79:24
96:13,15
**surgical (1)**
21:6
**surrounding ...**
53:21
**sweater (1)**
112:15
**sweeping (2)**
29:3 31:12
**switch (1)**
152:5
**sworn (6)**
3:19 5:22 7:2
177:10 178:2
178:22
**system (1)**
100:24

---
**T**
---
**T (172)**
3:1,1 7:1,1 8:1
9:1 10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1

December 19, 2022

[Page 202]

| | | | | |
|---|---|---|---|---|
| 28:1 29:1 | 116:1 117:1 | 93:10 111:6 | 41:16 52:2 | 143:24 |
| 30:1 31:1 | 118:1 119:1 | 111:16,21 | 54:11 112:17 | **test (1)** |
| 32:1 33:1 | 120:1 121:1 | 121:12,14,19 | 118:2 126:4 | 39:22 |
| 34:1 35:1 | 122:1 123:1 | 123:4 129:7 | 128:24 129:3 | **testified (12)** |
| 36:1 37:1 | 124:1 125:1 | 130:6 152:10 | 131:15,23 | 7:5 59:23 |
| 38:1 39:1 | 126:1 127:1 | 162:15 | 134:7 137:4,5 | 61:16 93:14 |
| 40:1 41:1 | 128:1 129:1 | **taken (11)** | 140:12 | 108:11,16 |
| 42:1 43:1 | 130:1 131:1 | 1:16 10:7,13 | 144:24 145:5 | 122:15 |
| 44:1 45:1 | 132:1 133:1 | 13:4 40:15 | 145:19 147:8 | 123:16 |
| 46:1 47:1 | 134:1 135:1 | 130:10 153:4 | 147:10,16 | 127:21 |
| 48:1 49:1 | 136:1 137:1 | 153:9,23 | 149:4 154:21 | 138:14 |
| 50:1 51:1 | 138:1 139:1 | 162:18 178:3 | 158:16 | 141:13 |
| 52:1 53:1 | 140:1 141:1 | **talk (4)** | 163:14,17 | 157:23 |
| 54:1 55:1 | 142:1 143:1 | 9:3 67:20,22 | 164:3,7 166:8 | **testifying (6)** |
| 56:1 57:1 | 144:1 145:1 | 89:17 | 166:13 | 4:19 10:10 |
| 58:1 59:1 | 146:1 147:1 | **talking (18)** | 167:20 | 111:21 128:8 |
| 60:1 61:1 | 148:1 149:1 | 20:8 30:5 35:5 | 172:17 | 128:11,17 |
| 62:1 63:1 | 150:1 151:1 | 36:25 46:10 | **telling (1)** | **testimony (9)** |
| 64:1 65:1 | 152:1 153:1 | 74:24 107:5 | 161:16 | 3:10,12 5:2,5 |
| 66:1 67:1 | 154:1 155:1 | 109:3 124:15 | **temp (4)** | 10:9,15,19 |
| 68:1 69:1 | 156:1 157:1 | 124:16 | 23:14,15 25:9 | 177:12 178:4 |
| 70:1 71:1 | 158:1 159:1 | 142:12,23 | 26:23 | **testing (1)** |
| 72:1 73:1 | 160:1 161:1 | 149:19 | **ten (5)** | 110:20 |
| 74:1 75:1 | 162:1 163:1 | 156:17,22 | 57:24 75:21 | **tests (1)** |
| 76:1 77:1 | 164:1 165:1 | 159:18 166:5 | 104:23 115:5 | 103:9 |
| 78:1 79:1 | 166:1 167:1 | 168:7 | 115:7 | **text (1)** |
| 80:1 81:1 | 168:1 169:1 | **tall (1)** | **tenth (7)** | 27:8 |
| 82:1 83:1 | 170:1 171:1 | 62:15 | 101:19,22 | **Thank (5)** |
| 84:1 85:1 | 172:1 173:1 | **tape (1)** | 102:3,8 103:2 | 19:4 72:9 |
| 86:1 87:1 | 175:1 176:1 | 91:5 | 106:9,11 | 112:22 |
| 88:1 89:1 | **tablet (2)** | **Tara (2)** | **term (3)** | 130:13 143:8 |
| 90:1 91:1 | 152:3,6 | 2:10 96:3 | 63:17,17 109:3 | **therapy (2)** |
| 92:1 93:1 | **tailor (2)** | **task (1)** | **terms (23)** | 67:21 68:15 |
| 94:1 95:1 | 20:16 21:3 | 73:9 | 12:4 20:9,16 | **thing (12)** |
| 96:1 97:1 | **tailoring (2)** | **taste (3)** | 20:18,18 | 21:2 73:6 |
| 98:1 99:1 | 20:18 21:3 | 55:16 58:13 | 42:23 54:17 | 80:19 86:9 |
| 100:1 101:1 | **take (30)** | 126:25 | 54:18 55:15 | 88:24,25 |
| 102:1 103:1 | 9:2 40:11 | **Taxes (1)** | 55:16 60:2 | 115:5 122:13 |
| 104:1 105:1 | 52:17 66:2 | 106:2 | 61:4 67:20 | 137:8 159:20 |
| 106:1 107:1 | 68:11 69:3,12 | **technical (1)** | 86:17,18 | 161:17,23 |
| 108:1 109:1 | 70:20 73:3,5 | 9:18 | 88:23 93:17 | **things (4)** |
| 110:1 111:1 | 73:7 83:18 | **tell (35)** | 101:8 105:14 | 20:23 53:22 |
| 112:1 113:1 | 85:7,11 91:17 | 10:8 25:22 | 112:18 129:5 | 60:7 105:6 |
| 114:1 115:1 | 91:21 92:5,23 | 26:19 27:12 | 131:19 | **think (10)** |

Lexitas Court Reporting
800-678-0166

639

December 19, 2022

[Page 203]

| | | | | |
|---|---|---|---|---|
| 37:8 53:2 | 27:22 29:2,24 | **title (1)** | 52:25 53:2,4 | 77:23 78:5 |
| 64:3 79:14 | 31:15 37:18 | 12:3 | 53:6 54:22,25 | 79:18 86:14 |
| 95:25 97:6 | 39:5,16,18 | **titles (1)** | 55:13,22 | 86:19 93:19 |
| 123:6 129:15 | 42:24 43:18 | 20:9 | 62:12 | 143:5 159:2 |
| 141:23 | 46:24 47:18 | **today (12)** | **training (1)** | 162:6,9 |
| 171:20 | 48:12,14,16 | 8:5,12,23 10:8 | 101:14 | **tripped (15)** |
| **thinking (1)** | 48:20 49:9,20 | 10:15,19 | **transcribing ...** | 75:18,22 80:25 |
| 146:4 | 50:2,20 51:3 | 111:20,22,23 | 8:22 | 114:15 |
| **third (6)** | 51:16,16,17 | 128:8,13,17 | **transcript (3)** | 119:23 |
| 25:15 102:20 | 52:22 55:21 | **today's (3)** | 6:16 172:23 | 123:11 136:2 |
| 102:22 | 58:2,14 59:19 | 15:5 173:4,8 | 178:3 | 148:4,7 149:3 |
| 157:25 164:6 | 59:21 62:4,25 | **told (18)** | **transportati...** | 156:14 159:6 |
| 168:18 | 63:7 64:17 | 30:24 58:3,11 | 61:22 | 161:11 |
| **thirteen (2)** | 68:14 70:2 | 58:15 70:13 | **travel (5)** | 165:16 166:9 |
| 14:14,22 | 74:21 75:7 | 82:21 83:23 | 13:14 33:3 | **tripping (1)** |
| **thirties (1)** | 76:5,15 78:8 | 83:24 84:14 | 124:17,20 | 82:4 |
| 82:17 | 78:24 79:2,8 | 84:14,16 | 127:6 | **truck (1)** |
| **thirty (8)** | 80:7,13 81:9 | 126:20,24 | **traveling (3)** | 72:17 |
| 83:18,20 84:5 | 83:10,13 85:6 | 140:15 | 29:13 127:11 | **true (2)** |
| 84:7,20 85:15 | 85:12 86:20 | 145:15 | 168:21 | 40:5 177:11 |
| 94:13 95:13 | 90:8 92:11,12 | 150:23 | **travels (3)** | **truth (1)** |
| **thought (2)** | 92:24 96:21 | 162:12 | 124:23 125:10 | 10:8 |
| 24:12 157:2 | 97:9 100:20 | 171:12 | 168:14 | **try (6)** |
| **three (24)** | 101:2,14 | **top (4)** | **treated (4)** | 9:23 28:21 |
| 11:21 26:16 | 106:16 110:3 | 21:22 81:12 | 43:3 64:18 | 59:16 83:19 |
| 29:15 31:23 | 114:3 120:16 | 153:11 | 110:17,22 | 150:12 |
| 31:24 33:5 | 120:22 122:2 | 163:16 | **treating (1)** | 172:18 |
| 34:18 36:10 | 122:4,12 | **total (2)** | 105:13 | **trying (31)** |
| 36:10 45:19 | 127:4 134:14 | 19:12 96:20 | **treatment (3)** | 20:24 21:15,23 |
| 46:17 56:16 | 134:17 136:7 | **touch (5)** | 43:14 84:7 | 28:2 32:9 |
| 63:4 96:24 | 140:19 | 94:9 131:17 | 110:23 | 71:18 80:17 |
| 98:23 100:7 | 142:11 156:3 | 132:6 137:6,9 | **trial (6)** | 82:6 106:23 |
| 102:7 104:20 | 161:11 | **touched (2)** | 1:15 3:15 5:8 | 116:22 117:4 |
| 156:14,18 | 165:22 166:9 | 132:18 137:3 | 108:13 177:9 | 125:13 132:5 |
| 157:5 162:12 | 172:8 | **tour (2)** | 177:11 | 134:18 135:6 |
| 164:17 168:3 | **times (3)** | 51:24 61:17 | **triangle (3)** | 135:14 |
| **Timberland ...** | 39:7 144:12 | **town (1)** | 154:15 163:11 | 139:14,22 |
| 78:8,9 | 162:12 | 48:7 | 163:23 | 140:10 141:3 |
| **Timberlands...** | **Timothy (7)** | **Tracy (5)** | **tried (6)** | 142:21 |
| 78:12 | 1:3,15 7:8 | 1:19 88:12 | 81:2,5 83:5 | 143:14,23 |
| **time (87)** | 173:14 177:8 | 152:17 177:5 | 136:3 142:25 | 144:2,4,5,15 |
| 1:12,18 16:10 | 178:1,2 | 177:22 | 145:2 | 150:9,10 |
| 16:11,16 | **Tims (1)** | **train (13)** | **trip (13)** | 158:21 |
| 22:13 27:20 | 78:13 | 52:16,19,20,23 | 75:19 76:19,21 | 161:13 |

December 19, 2022

[Page 204]

| | | | | |
|---|---|---|---|---|
| **tuition (3)** | 77:12 90:24 | 37:8 | 52:7 59:2 | **W** |
| 100:20 101:2 | 92:7 93:15 | **undertake (1)** | 64:22 65:3,21 | **wages (1)** |
| 102:15 | 96:23 97:8 | 65:23 | 66:16 68:21 | 40:4 |
| **tumble (1)** | 98:22 101:16 | **unfortunatel...** | 97:4,18 | **waist (1)** |
| 78:20 | 102:9 104:3,7 | 46:13 70:20 | 108:22 109:3 | 140:4 |
| **turn (1)** | 120:3 129:9 | 107:9 108:14 | **vacations (1)** | **wait (7)** |
| 113:11 | 156:13,18 | 108:17 109:8 | 109:23 | 10:3 43:16 |
| **turned (5)** | 157:4 159:19 | 110:15 152:5 | **Van (1)** | 46:16 82:21 |
| 56:18,23 136:6 | 165:11,21 | **unhealthy (1)** | 27:5 | 138:21 |
| 141:20,23 | 166:6 167:24 | 63:9 | **variety (1)** | 149:20 |
| **turning (1)** | **tying (1)** | **Uniform (1)** | 58:24 | 152:11 |
| 16:7 | 135:19 | 4:24 | **verbal (5)** | **waiting (7)** |
| **twenty (10)** | **type (8)** | **union (10)** | 9:8 57:21 | 84:10,19 85:17 |
| 83:20 84:4,7 | 20:7 21:18 | 1:8,8 2:14,14 | 87:20 89:5 | 85:19 92:25 |
| 84:20 85:15 | 22:6 52:3 | 8:3 87:6,9,19 | 113:17 | 94:14 95:14 |
| 94:13 95:13 | 68:9 110:17 | 170:18 171:7 | **versus (1)** | **waived (1)** |
| 134:10,13 | 110:23 | **Unique (1)** | 129:14 | 4:13 |
| 171:4 | 111:15 | 10:22 | **Vertex (1)** | **waiver (3)** |
| **twenty-four ...** | **types (3)** | **United (1)** | 110:12 | 3:13,25 5:6 |
| 74:17 | 107:12,20,22 | 13:12 | **video (2)** | **walk (12)** |
| **twice (3)** | | **Unlawful (1)** | 5:13 6:14 | 52:17 54:15 |
| 46:5,14 120:14 | **U** | 46:21 | **video-confer...** | 55:4,17 61:13 |
| **twist (17)** | **U (2)** | **unlicensed (3)** | 1:17 | 61:20,21 |
| 81:9 82:4,6 | 3:1 176:1 | 46:21,22 47:5 | **videoconfere...** | 114:25 |
| 135:6,9 140:4 | **U-N-I-Q-U-...** | **unsafe (1)** | 5:17,24 | 129:13 |
| 140:22,23 | 10:24 | 165:9 | **view (1)** | 141:19 |
| 141:5 142:16 | **U.S (1)** | **upper (4)** | 70:5 | 150:12 |
| 142:17,18,20 | 108:9 | 136:20 137:18 | **violation (2)** | 168:16 |
| 143:11 145:4 | **uh-huh (1)** | 137:20 140:3 | 6:2 44:23 | **walked (14)** |
| 145:8,13 | 9:7 | **upstate (3)** | **visible (2)** | 54:19 56:19,23 |
| **twisted (6)** | **uh-uh (1)** | 17:8 48:9 | 91:8,9 | 57:3 79:25 |
| 144:13,16 | 9:7 | 108:22 | **vision (2)** | 113:11 |
| 145:17,22,25 | **Uhab (2)** | **upward (1)** | 15:14,17 | 124:12 149:6 |
| 147:2 | 1:7 2:8 | 85:23 | **visit (2)** | 149:9,24 |
| **two (42)** | **unauthorize...** | **use (3)** | 13:17 16:16 | 150:3,3,15 |
| 14:12 22:15,16 | 6:2 | 21:7 144:19 | **visits (3)** | 151:5 |
| 26:16 29:11 | **understand (6)** | 156:15 | 16:3,15,17 | **walking (44)** |
| 29:25 30:4,6 | 9:23 10:7 | **utilized (1)** | **vocational (1)** | 57:13,17 62:11 |
| 33:4 36:9,10 | 96:14 116:9 | 4:6 | 101:13 | 75:2,4,11 |
| 36:10 37:20 | 144:7,15 | | **voucher (1)** | 76:17 86:17 |
| 46:25 47:17 | **understandi...** | **V** | 107:15 | 114:7,10 |
| 51:15 59:21 | 40:3 84:13 | **vacation (15)** | **VTC (2)** | 116:7 118:3,6 |
| 63:25 72:16 | 93:11 109:10 | 43:12 46:14 | 101:15 103:4 | 119:7,11 |
| 76:11,13 | **Understood (...** | 47:21 48:16 | | 123:25 124:7 |

December 19, 2022

[Page 205]

124:22
129:13,17,19
129:19,20
132:10
141:16 142:8
142:9 144:25
147:17 148:3
148:8,11
149:12
156:12
157:10,13,18
163:15,20,22
168:12,19,22
168:22

**wallet (1)**
80:8

**want (20)**
13:14 73:7
84:3 117:19
118:22 122:6
129:24 131:2
135:3,12,23
138:8 144:18
144:19
145:14
152:10 155:9
158:18 161:6
168:20

**wanted (8)**
39:24 55:15
59:3,16,17
70:5 74:15
132:7

**wants (2)**
13:21 96:3

**wardrobe (1)**
59:19

**Wards (1)**
33:6

**Warehouse (2)**
61:2 126:11

**warning (1)**
151:23

**warnings (1)**

151:19
**Washington ...**
38:6
**wasn't (14)**
29:13 42:21,23
68:25 75:25
80:2 83:6
103:10
124:11 125:3
125:3,4
140:20 149:2
**waste (1)**
156:3
**watch (1)**
141:23
**way (30)**
28:23 34:2
51:3,25 55:4
56:19 57:4,5
61:18,23
62:11 63:22
73:8 103:5
113:14
122:10,25
131:18,20
132:5 135:16
148:21
153:17
154:17 155:4
158:22 160:9
163:19
168:16
177:16
**We'll (2)**
17:25 93:24
**we're (3)**
46:10 109:2,3
**we've (1)**
104:25
**wear (3)**
15:21 61:4
85:8
**wearing (6)**
15:7 78:7

112:12,14,15
112:19
**weather (1)**
78:23
**weed (2)**
73:15 74:8
**week (1)**
49:24
**weigh (2)**
62:17,21
**weighed (1)**
63:2
**weight (4)**
62:19 63:10,11
78:22
**welcome (1)**
67:22
**went (43)**
19:7 33:6,25
36:11 38:3
39:21 43:9
46:13 48:16
51:9 54:4,14
55:6,9 56:4
56:22 68:14
77:14,20,24
78:3 100:14
100:24 101:5
101:6,9 103:4
105:18 110:6
113:8,9
120:20
121:11,18
122:11,15,22
142:21
143:22
148:20 149:2
157:16
161:10
**weren't (1)**
103:12
**west (6)**
55:7,10,12
56:14 97:25

113:10
**wet (7)**
79:3 84:19,22
127:18,22,25
128:4
**WHEREOF ...**
177:18
**whichever (1)**
26:18
**wide (1)**
52:9
**William (1)**
2:9
**Williams (1)**
25:22
**window (4)**
53:12,15,24
54:3
**windows (1)**
88:25
**Wine (2)**
104:2,15
**Wines (1)**
104:2
**Winter (2)**
44:3,4
**wise (11)**
44:5 63:19
67:21 78:21
129:4,5
134:22 135:2
143:23
146:14 149:5
**Withdrawn (1)**
106:7
**withstanding...**
6:15
**witness (71)**
3:20 4:19 5:15
5:20,21 6:8,9
6:11 7:2,8,11
7:17,21 8:9
8:13,15,18,24
9:5,9,25 10:5

10:11 14:19
14:24 18:19
18:23 19:3
41:10,13,18
41:24 42:2
45:21 56:12
57:22 72:9,19
74:25 87:21
87:25 88:5
89:6 95:9
96:11,18
111:4,11,14
112:23,25
113:18 124:6
126:7 139:11
143:17
149:22 151:3
152:20 154:8
154:25
156:25
162:11,23
166:17
169:24
173:11 177:8
177:13,18
178:22
**witness's (1)**
5:23
**woke (2)**
50:2,7
**Woody (2)**
7:11 11:2
**word (3)**
23:17 30:22
58:16
**words (5)**
61:24 144:6,20
156:7 164:5
**work (15)**
24:17 27:13
28:11,17,21
28:23 29:15
29:20 31:20
42:19 78:9

December 19, 2022

[Page 206]

103:17 104:9
104:14,17
**worked (6)**
26:4,22,24
29:25 104:7
104:19
**worker (1)**
61:7
**workers (2)**
60:9 92:17
**working (9)**
20:17 24:25
28:13 29:9
30:21,22
42:20 90:10
103:15
**worry (1)**
150:8
**wouldn't (5)**
87:15 89:24
94:23 149:16
158:15
**wrist (1)**
140:9
**written (1)**
6:1
**wrong (1)**
37:6
**Wyck (1)**
27:5

**X**

**X (4)**
1:2,10 174:1
175:1
**XXX-XX-83...**
14:6

**Y**

**Y (1)**
7:1
**yeah (10)**
28:17 36:10
43:23 110:12
115:14

124:20
137:10 142:4
153:14
155:19
**year (45)**
12:24 14:17,22
16:13 17:17
23:2 30:9,11
33:15,17,18
34:6 35:11
37:23 38:9,11
39:6 42:12
43:8 47:4,8
64:12,13
96:25 97:2,5
97:9 98:21
102:21
103:19,20
104:10
105:12 106:8
106:11,12,13
106:19 112:4
112:5 120:18
120:20,22
121:12
122:11
**years (11)**
22:15,16 96:24
98:20,21,22
99:16 100:6,8
101:17
104:23
**York (25)**
1:1,20 2:5,10
2:10,16,16
7:4 13:16,18
17:8 24:22
25:23,23 48:6
48:7,10 49:12
49:12 104:2,2
104:15
150:20 177:2
177:7
**young (1)**

113:6

**Z**

**Z (1)**
2:4

**0**

**05 (1)**
104:16
**06 (1)**
104:13
**09 (2)**
47:7,20

**1**

**1:35 (1)**
173:10
**100 (1)**
2:9
**10038 (1)**
2:10
**10170 (1)**
2:16
**10452 (1)**
7:12
**10th (4)**
11:13,23 12:10
35:4
**11:30 (2)**
51:20 62:8
**11235 (1)**
2:5
**116 (1)**
126:14
**116th (8)**
58:4,5 61:9
115:6,9,10
126:15,16
**117 (2)**
119:4 125:24
**117th (7)**
115:10 117:13
117:16 119:3
119:8 125:20
130:2

**118 (3)**
124:3 125:20
125:24
**118th (1)**
125:19
**11th (1)**
56:7
**12/19/2022 (1)**
178:3
**12:30 (1)**
55:25
**123 (1)**
25:22
**125th (16)**
54:14,20,25
55:2,6,7,9,22
56:3,24 58:22
113:3,21,25
115:6 124:8
**13th (1)**
97:7
**1400 (1)**
2:4
**149th (2)**
25:15 31:21
**14th (1)**
28:19
**15th (1)**
97:7
**172 (1)**
175:4
**173 (1)**
175:5
**173rd (1)**
38:5
**19 (1)**
1:11
**19th (1)**
177:19

**2**

**2 (1)**
11:12
**20 (3)**

33:20 173:17
178:23
**2000 (1)**
43:12
**2004 (3)**
106:13,15,17
**2005 (1)**
106:15
**2010 (2)**
20:5 42:14
**2011 (1)**
47:20
**2012 (2)**
43:12 99:6
**2016 (4)**
47:12 48:17
97:20,24
**2018 (2)**
42:13,15
**2019 (12)**
17:19 33:2
44:3,4 48:17
64:5 96:22
97:3,15,17,17
97:21
**2020 (19)**
22:17 30:11,12
32:2 33:8,10
33:19,22,24
43:21,22,24
44:10,11,13
65:4 66:18
67:3,7
**2021 (17)**
11:12 12:19
33:21 34:8
35:13,16,18
37:23 43:24
43:25 44:2
49:13 62:18
64:8 67:4
111:5,18
**2022 (3)**
1:11 11:5

December 19, 2022

[Page 207]

177:19
**2104 (1)**
2:15
**22 (1)**
49:13
**221 (1)**
4:24
**2285 (1)**
49:11
**250 (3)**
62:20,23 63:2
**285 (3)**
62:19,20,24
**28th (1)**
61:11

---
**3**

**3113(d) (1)**
5:12
**3116 (1)**
4:1
**3117 (1)**
4:1
**3430409-1 (1)**
2:11

---
**4**

**4 (3)**
52:25,25 54:24
**4048-158 (1)**
2:17
**420 (1)**
2:15
**49th (2)**
11:24 35:4
**4H (2)**
7:12 11:2

---
**5**

**5 (1)**
53:2
**5'11 (1)**
62:16
**503 (1)**
2:4

**50th (3)**
11:24 53:4,6
**528913/2021 ...**
1:6
**59th (1)**
104:5
**5th (3)**
44:21,25 73:20

---
**6**

**6th (1)**
25:23

---
**7**

**7 (3)**
35:18 37:22
174:4
**7th (2)**
2:9 37:19

---
**8**

**8 (1)**
107:17
**8:30 (1)**
51:18
**83rd (1)**
12:6
**85 (1)**
12:23

---
**9**

**9:44 (1)**
1:12
**91st (2)**
99:2,3
**95th (1)**
97:25
**96 (1)**
174:5
**96th (6)**
52:12 53:9
54:9,13,24
62:11
**972 (2)**
7:11 11:2

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 646 of 834

# EXHIBIT G

645



**EXHIBIT**

DEFT EX A-1 12/19/22 TN

exhibitsticker.com

**EXHIBIT**

DEFT A 12/19/22 TN



NYSCEF DOC. NO. 13



**EXHIBIT**

DEFT EX B 12/19/22 TN

**EXHIBIT**

DEFT EX C 12/19/22 TN



EXHIBIT

DEFT EX D 12/19/22 TN

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 652 of 834

# EXHIBIT H

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 653 of 834

Nora Donkor
December 08, 2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------X
TIMOTHY MILLER,

                            PLAINTIFF,

        -against-      Index No.:

                       528913/2021

UHAB HOUSING DEVELOPMENT FUND CORPORATION,
LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT
UNION and EAST HARLEM PEOPLE'S FEDERAL
CREDIT UNION,

                            DEFENDANTS.
------------------------------------------X




                   Videoconference


                   DATE:   December 8, 2023

                   TIME:   9:52 a.m.




        EXAMINATION BEFORE TRIAL of the

Defendant, by NORA DONKOR, taken by the

resective parties, held remotely via video

conference, before Christos Liopyros, a

Notary Public of the State of New York.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 654 of 834

Nora Donkor
December 08, 2023

A P P E A R A N C E S:


BRIAN KING LAW FIRM
   Attorneys for the Plaintiff
   1400 Avenue Z, Suite 406
   Brooklyn, New York 11235
   BY:  ANTHONY DeLUCCA, ESQ., OF COUNSEL



GANNON, ROSENFARB & DROSSMAN
   Attorneys for the Defendant
   UHAB HOUSING DEVELOPMENT FUND CORPORATION
   250 Broadway, 25th Floor
   New York, New York 10007
   BY:  TARA BONOMO, ESQ.



LITCHFIELD CAVO
   Attorneys for the Defendants
   LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT
   UNION and EAST HARLEM PEOPLE'S FEDERAL
   CREDIT UNION
   420 Lexington Avenue, Suite 2104
   New York, New York 10170
   BY:  LYNDSEY BECHTEL, ESQ.



                    *        *        *

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 655 of 834

Nora Donkor
December 08, 2023

S T I P U L A T I O N S:

IT IS STIPULATED AND AGREED by and between the attorneys for the respective parties herein, and in compliance with Rule 221 of the Uniform Rules for the Trial Courts: THAT the parties recognize the provision of Rule 3115 subdivisions (b), (c) and/or (d). All objections made at a deposition shall be noted by the officer before whom the deposition is taken, and the answer shall be given and the deposition shall proceed subject to the objections and to the right of a person to apply for appropriate relief pursuant to Article 31 of the C.P.L.R.;

THAT every objection raised during a deposition shall be stated succinctly and framed so as not to suggest an answer to the deponent and, at the request of the questioning attorney, shall include a clear statement as to any defect in form or other basis of error or irregularity.  Except to the extent permitted by CPLR Rule 3115 or by this rule, during the course of the examination persons in attendance shall not make statements or comments that interfere with the questioning.

THAT a deponent shall answer all questions at a deposition, except (i) to preserve a privilege or right of confidentiality, (ii) to enforce a limitation set forth in an order of a court, or (iii) when the question is plainly improper and would, if answered, cause significant prejudice to any person.  An attorney shall not direct a deponent not to answer except as provided in CPLR Rule 3115 or this subdivision.  Any refusal to answer or direction not to answer shall be accompanied by a succinct and clear statement on the basis therefore. If the deponent does not answer a question, the examining party shall have the right to complete the remainder of the deposition.

THAT an attorney shall not interrupt the deposition for the purpose of communicating

Nora Donkor
December 08, 2023

with the deponent unless all parties consent or the determining whether the question should not be answered on the grounds set forth in Section 221.2 of these rules, and, in such event, the reason for the communication shall be stated for the record succinctly and clearly.

THAT the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such objection or motion at the time of the trial of this action, and is hereby reserved; and THAT this examination may be signed and sworn to by the witness examined herein before any Notary Public, but the failure to do so or to return the original of the examination to the attorney on whose behalf the examination is taken, shall not be deemed a waiver of the rights provided by Rule 3116 and 3117 of the C.P.L.R, and shall be controlled thereby; and

THAT the certification and filing of the original of this examination are hereby waived; and THAT the questioning attorney shall provide counsel for the witness examined herein with a copy of this examination at no charge.

VIDEO STIPS FOR EBT

IT IS HEREBY STIPULATED AND AGREED by and between counsel for all parties present that Pursuant to CPLR section 3113 (d) this deposition is being conducted by Videoconference, that the Court Reporter, all counsel, and the witness are all in separate remote locations and participating via Videoconference (LegalView/Zoom/WebEx) meeting under the control of Lexitas Court Reporting Service, that the officer administering the oath to the witness need witness shall be sworn in remotely by the Court Reporter after confirming the witness's identity, that this Videoconference will not be recorded in any manner, and that any recording without the

Nora Donkor
December 08, 2023

express written consent of all parties shall be considered unauthorized, in violation of law, and shall not be used for any purpose in this litigation or otherwise.

IT IS FURTHER STIPULATED that exhibits may be marked by the attorney presenting the exhibit to the witness, and that a copy of any exhibit presented to a witness shall be emailed to or otherwise in possession of all counsel prior to any questioning of a witness regarding the exhibit in question. All parties shall bear their own costs in the conduct of this deposition by Videoconference.

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:30 PM

NYSCEF DOC. NO. 14

INDEX NO. 538413/2024

RECEIVED NYSCEF: 06/06/2025

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 658 of 834

Nora Donkor
December 08, 2023

N. DONKOR

N O R A   D O N K O R, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

THE COURT REPORTER:  What is your name, please?

THE WITNESS:  Nora Donkor.

THE COURT REPORTER:  What is your business address, please?

THE WITNESS:  266 Broadway, Suite 301, Brooklyn, New York 11211.

THE COURT REPORTER:  Lindsey, before I forget, are you ordering a copy?

MS. BECHTEL:  Yes.

THE COURT REPORTER:  Thank you.

EXAMINATION BY

MR. DeLUCCA:

Q.    Hi, Ms. Donkor.  Good morning.

A.    Good morning, sir.

Q.    Okay.  You answered me, so, you hear me okay?

A.    I can hear you.

Q.    All right.  Great.

Nora Donkor
December 08, 2023

N. DONKOR

My name's Anthony DeLucca.  I am here today on behalf of the plaintiff in this lawsuit.  Of Mr. Miller.  I'm gonna you ask a series of questions.

Now, I think you've seen, as convenient as these Zoom meetings are, there are some times where you get a little bit of an issue with them, so you'll have to bear with me.

Now, if you don't hear my question or you don't understand my question, don't answer it.  Let, let me know that you didn't hear it or you didn't understand it.

Okay?

A.    Will do.

Q.    Okay.  And, of course, all of your answers have to be verbal.  You can't answer just by, saying yes by nodding your head or saying no by shaking your head.  Just say everything out loud, and hopefully for the rest of this we'll all be able to hear each other fine.

A.    Will do.

Nora Donkor
December 08, 2023

N. DONKOR

Q.    Okay.  And I'll try to talk loud to make sure you hear me.  Just don't think I'm yelling at you cause I'm not.

A.    Okay.  Okay.

Q.    I only yell at the television when the Mets are on.

Now, I promise, I'm not gonna take up any more of your time than I have to, but just the same, if you need to take a break for any reason, that's okay.  You let me know that you need to take a break, and we can take a break for as long as you need, for whatever reason as you need.

The only thing I'm gonna ask is that if I ask you a question, answer it first.  Then, then, then just tell us all that you need a break.

Is that okay?

A.    Will do.

Q.    Okay.  Where are you right now?

A.    I'm sitting at my desk in the office.

Q.    Okay.  Is there anyone else in your office right now?

Nora Donkor
December 08, 2023

N. DONKOR

A.    Right now, my assistant.

Q.    Okay.  Does she need to be there?  Can you be --

You really should be alone in the office.  For the -- for this deposition.

A.    This is, this is as alone as we can be because she has to be working at her desk.

But she --

Q.    Okay.

A.    -- she's far enough away from me that, that she's not in our conversation.

Q.    Okay.  Fair enough.  Fair enough.

And just because she's in your office, if she needs to speak to someone, just lowly, because as the court reporter indicated, it's gonna be hard for any of us, especially him, to hear, to hear what you're saying if someone else is talking in the room too.

A.    I understand.

Nora Donkor
December 08, 2023

                    N. DONKOR

Q.    Alright.

A.    I've asked that the sound be
kept to an absolute minimum here.

Q.    That's all I can ask.

          But thanks a lot.

A.    Thank you.

Q.    Okay.  Now, you told me you're
in your, in your office.

          This is your workplace,
correct?

A.    Yes, sir.

Q.    Okay.  Who do you work for?

A.    I work for Delmar Management
Services Inc.

Q.    Okay.  And what type of
business is Delmar?

A.    We are a real estate management
firm.

Q.    When did you begin working for
Delmar?

A.    May 2019.

Q.    And when you started working
for them in May of 2019, what was your job
title?

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 663 of 834

Nora Donkor
December 08, 2023

N. DONKOR

A.    Assistant property manager.

Q.    What's your job title now?

A.    Property manager.

Q.    When did your title change from assistant property manager to property manager?

A.    Officially, February of 2020.

Q.    Okay.  So back in, fair to say, back in February of 2021, your job title was property manager?

A.    Yes.

Q.    Okay.  And back in 2021, how many properties did you manage?

A.    We work as a team, so approximately 50 properties.

Q.    So just so I understand correctly, back in 20 -- February of 2021, you had your hand in all 50 properties in some way?

A.    At one point or another, yes.

Q.    Okay.  Is one of the properties 2285 2nd Avenue?

A.    Yes.

Q.    And back in February of 2021,

Nora Donkor
December 08, 2023

N. DONKOR

what was your, what was your connection to 2285 2nd Avenue?  Was it -- were you the direct property manager, something else?

A.    I was the property manager.

However, as I said, we work as a team.

Q.    Okay.

A.    There were two property managers here, and we shared.  If one was out, the other would do, and if not I would.

Q.    Okay.  Two others beside you?

A.    No.

Q.    You and someone else?

A.    Me as property manager and another property manager.

Same level.

Q.    Okay.  And what's the name of the other, the other person or persons that were property managers?

A.    Back in --

Q.    Back in 2021.

A.    It would have been -- no.

Back in 2021 I was the only

Nora Donkor
December 08, 2023

N. DONKOR

one.

Q.    Okay.  What were your duties as the property manager?

MS. BONOMO:  With respect to that building?

MR. DeLUCCA:  Yeah.

A.    Okay.  With respect to that building, my official duties were, number one, to oversee arrears, to make sure that when I got called from the residents that the complaints were taken care of, to speak to UHAB, who is the owner of record, um --

General management duty.

Q.    Okay.  Was there a particular person at UHAB that you speak to?

A.    At that property?

Q.    At that property, and at that time.  February 20 -- in 2021.

Unless I say otherwise, I'm asking you about 2021.

Okay?

A.    Okay.  It would be Brent Sherman.  From UHAB.  And inside the property it would be their porter.  If I

Nora Donkor
December 08, 2023

N. DONKOR

needed access to something.

Q.    And who was the porter then?

A.    His name is Freddy Cevallos.

Q.    Can you spell that last name, please?

A.    C E V A L L O S.

Q.    Got it.  Cevallos.  Okay.
Is Mr. Cevallos still the porter --

A.    Yes.

Q.    -- at that building?

A.    Yes.

Q.    Okay.  Did you have an office, did you have office space inside 2285 2nd Avenue?

A.    No, sir.

Q.    Okay.  What type of building is that?

A.    It is a mixed-use building. Three residential units and one commercial.

Q.    How many floors?

A.    Three.

Q.    Is there also a basement?

A.    There's a basement.

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:30 PM
NYSCEF DOC. NO. 14                                                    INDEX NO. 538413/2024
RECEIVED NYSCEF: 06/06/2025

Nora Donkor
December 08, 2023

N. DONKOR

Q.    And, and if I understood you correctly just now, there was one commercial tenant and three residential tenants?

A.    Yes, sir.

Q.    Okay.  What was the -- back in 2021, who was the commercial tenant?

A.    That would be the Federal Credit Union.  The Lower East Side Federal Credit Union.

I believe it's actually Lower East Side People's Federal Credit Union.  That's the whole name.

Q.    Okay.  What, what part of the building did they rent?

A.    Street level.

Q.    The entire first floor?

A.    Of the corner of the building, yes.

Q.    Okay.  What are the cross streets of the building?

A.    It's 2nd Avenue and 117th Street.

Q.    Okay.  As part of their rental,

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 668 of 834

Nora Donkor
December 08, 2023

N. DONKOR

did --

I'm just gonna call it -- if I call it the Lower East -- if I just call it Credit Union, you're gonna know who I'm talking about?

A.    Yes, sir.

Q.    Okay.  As part of the rental agreement, did, did Federal Credit Union have any access to the basement?

A.    Access, yes, because the entrance to the basement is through their space.

Q.    That's --

A.    One of the entrances.

Q.    Okay.  That's an inside entrance?

A.    Yes, sir.

Q.    Well, I guess it was a bad question.

What I meant was, did they actually -- did the rental agreement allow them use of the basement?

A.    I can't speak to exactly what it says, but I don't believe that they have

Nora Donkor
December 08, 2023

N. DONKOR

storage space down there.

MS. BECHTEL:  Just note my

objection to the last question.

I tried to object but I was on

mute.

MR. DeLUCCA:  Okay.

Q.    Back in 2021, was there a

contact at the Credit Union that, that,

that you would speak to?

A.    The manager.  Ms. Morel.

Alfosina Morel.

Q.    How long has Delmar Management

been the, been the manage -- the manager

for that building?

A.    I don't know the exact date,

but they were managing the building when I

got here --

Q.    Okay.

A.    -- in '19.

Q.    Who was the building manager

before you?

A.    Eugene Fernandez.

Q.    Does Mr. Fernandez still work

for Delmar?

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 670 of 834

Nora Donkor
December 08, 2023

N. DONKOR

A.    No, he does not.

Q.    Okay.  When did you take over?
From Mr. Fernandez as the building manager?

MS. BECHTEL:  Of that building.

A.    March 2020.

In that building.

Q.    Right.

When did Mr. Cevallos become the porter?

A.    He was the porter when I started.

Q.    Do you know how long he had been the porter when you started?

A.    No, I don't.

Q.    Okay.  Do you know who hired Mr. Cevallos?

A.    No.

Any, any answer I give on that one would be an assumption, so I, I don't know.

Q.    Okay.  And thank you for that, because nobody wants you to guess at anything.

A.    Correct.

Nora Donkor
December 08, 2023

N. DONKOR

Q. Okay. Well, back in 2021, aside from Mr. Cevallos, was, was there any other staff at the building?

A. No.

Q. So Mr. Cevallos was basically the, the only porter or the only maintenance person?

A. Yes, sir.

Q. Okay. And what were his duties? As far as you know? Back in 2021?

A. Very limited. He was in charge of making sure that the garbage was taken out, and if anything needed specific attention he would call me and let me know about it.

Q. Back in 2021, were there any outside vendors that were hired for any type of work in the building? Whether, you know, house -- housekeeping and anything like that?

MS. BONOMO: Just note my objection to form.

Can you just clarify you're talking about an ongoing contractor,

Nora Donkor
December 08, 2023

N. DONKOR

or a one-time contractor, something else?

MR. DeLUCCA: Okay, sure.

Q. Were there any other contractors, full-time contractors that had duties inside the building?

A. No, sir.

Q. Okay. Did Mr. Cevallos have a supervisor?

A. He would report to me and to UHAB.

Q. Now, you told me about an entrance to the basement that, that's inside the building.

Were there any entrances to the basement that were on the exterior of the building?

A. Yes, sir.

Q. And what entrance or entrances are that? Is that?

A. It is a, what we commonly refer to as a vault entrance. Instead of metal doors that go down to the basement from the street level.

Nora Donkor
December 08, 2023

N. DONKOR

Q. Okay. Would those be metal doors that are on the sidewalk?

A. Yes, sir.

Q. And are they flat on the sidewalk?

A. Yes, sir.

Q. Is that a double door?

A. Yes, sir.

Q. What are the doors made of?

A. What are they made of?

Q. Yeah.

A. Metal.

Q. Okay. Do you know what kind of metal? Do you know if it's steel, or cast iron, or something else?

A. No, I don't know the exact composition.

Q. That's okay. Thanks.

When were those doors installed?

A. There were doors there in 2019 when I started working, and they were replaced again in 2022.

Q. How old is the building?

Nora Donkor
December 08, 2023

N. DONKOR

A.    I don't know.

Q.    Okay.  Well, before the doors were replaced in 2022, did you know if --

Strike that.

Do you know if the doors, if the entrance that was there in 2021 is the original?  Or had it been replaced after --

A.    I don't know.

Q.    Back in 2021, did those doors have a lock on them?

A.    Yes, they did.

Q.    What kind of lock?

A.    A padlock.

Q.    Is that a combination lock or a lock you use a key on?

A.    A key (indicating.)

Q.    Okay.  Who had the key?

A.    Usually it would be Mr. Cevallos.

Q.    Okay.  Do you know if there was one key or more than one key back in 2021?

A.    I believe it was only one key. I don't know of anyone else having had it.

Q.    What was the basement used for

Nora Donkor
December 08, 2023

N. DONKOR

in 2021?

A.    Mainly to keep the boiler and other utility meters, but the residents in the three apartments also kept some of their belongings down there.

Q.    Okay.  And the utility meters, you're talking gas, electric --

A.    Correct.

Q.    -- like that?

Would the meter readers go in through the, the vault entrance or would they go into the basement from the inside entrance?

A.    Usually when they have to go down there they make an appointment, I call Mr. Cevallos, and he arranges to give them access.

Q.    Okay.  Back in 2021, were there ever any types of deliveries made through the basement?

A.    Not that I recall.

Q.    Okay.  Is the building gas or oil?

A.    Gas.

Nora Donkor
December 08, 2023

N. DONKOR

Q.    In 2021 you were the property manager.

Was there also an, was there an assistant property manager that worked with you?  With respect to 2285 2nd Avenue?

A.    No.

THE COURT REPORTER:  (Speaks off record.)

Q.    As part of your duties as the property manager for 2285 2nd Avenue, were you required to, let's say, make visits to the premises?  On occasion?

A.    Intermittently.  As needed.

MS. BECHTEL:  Off the record.

(Whereupon, a conversation was held off the record.)

MS. BECHTEL:  Can you read back the question and the answer.

(Whereupon, the referred to portion was read back by the Reporter.)

Q.    So fair to say that it wasn't -- there wasn't any sort of schedule?  Like every other month or

Nora Donkor
December 08, 2023

                    N. DONKOR

something like that?

        A.    No, sir.

        Q.    Okay.  When you say as needed,
what would be a reason that would be needed
for you to go to the premises?

        A.    I recall once there had been
several noise complaints, and there was a
proposal to install a ceiling barrier
between two apartments, so I went there to
check on the so-called noise level and see
what kind of area we were talking about.

        Q.    Did you ever --

        A.    Another time --

        Q.    I'm sorry.  I didn't mean to
cut you off.

              Go ahead.

        A.    Another time was a complaint
about too many articles in the basement.

        Q.    Earlier, if I understood you
correctly, you mentioned that part of
Mr. Cevallos's duties was taking care of
the garbage.

              Did I --

        A.    Yes, sir.

Nora Donkor
December 08, 2023

N. DONKOR

Q.    -- hear that correctly?  Okay.

Were there garbage pails that residents and the commercial tenants would have to deposit their, their garbage?

A.    Garbage bags.

Q.    Bags?  Okay.

There's no dumpster, or anything like that?

A.    No.

Q.    Okay.  Where were the bags -- where would the bags be?

A.    In the side or, or back of the building.  There's, there's a little walkway.  In the back.  Or many times they'd just bring them downstairs on, on collection day.

Q.    Okay.  And then when they did that, would they leave them in the front of the building or somewhere else?

A.    Yes.  In the front of the building.

Q.    Front?  Okay.

Was there any company that was contracted or on retainer for inspecting

Nora Donkor
December 08, 2023

N. DONKOR

the vault entrance?

A.   No, sir.

Q.   Was anyone responsible for making periodic inspections of the vault entrance?  Meaning the metal doors?

A.   In writing or scheduled?

No.

Q.   Who was responsible for snow removal?

A.   Freddy.

MS. BONOMO:  Objection to the form.

Q.   Who was responsible for snow removal back in 2021?

A.   Mr. Cevallos.

Q.   Okay.

MS. BONOMO:  Note my objection to form.

Q.   Was there some -- who was responsible for sweeping and cleaning the sidewalk?  Back in 2021?

MS. BONOMO:  Note my objection to form.

THE WITNESS:  May I answer?

Nora Donkor
December 08, 2023

N. DONKOR

MS. BONOMO:  Yes.

THE WITNESS:  Okay.

A.    Mr. Cevallos.

Q.    Okay.  If the tenants, be it
the Credit Union or one of the residential
tenants, had a complaint, who would the
complaint be made to?

A.    Ultimately?

Me.

Q.    Okay.  Well, would it -- would
the complaints go directly to you, would it
go through Mr. Cevallos, it could be both?

A.    Both.

Q.    Okay.  Was any type of record
kept of complaints?

MS. BONOMO:  Note my objection
to form.

You can answer.

A.    Not really.

A phone call would come in,
and, um, if it was something that we needed
to call a vendor for either a, a boiler or
a water complaint, I would call the
contractor or a vendor and send someone to

Nora Donkor
December 08, 2023

N. DONKOR

repair the problem.

Q.   So just to clarify, if you got a phone call about a complaint, would you, would you make a written note of the complaint?

A.   Usually.  Yeah.  On, on piece of paper.  Yeah.

Q.   Okay.  Anything that you would enter on a, you know, a hard drive or a laptop?

A.   No, sir.

Q.   Okay.  Would you keep any, would you keep any type of file for the complaints?

A.   No.

Q.   Would you keep any type of --

        Excuse me.

        Would you keep any type of file or written records if you -- a vendor was hired to, to make a repair or, or some other issue?

A.   I would get an invoice from that vendor.

Q.   Okay.  Would you need -- would

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 682 of 834

Nora Donkor
December 08, 2023

N. DONKOR

you hire the vendor or would someone else hire the vendor?

A.    Ultimately I would get a pricing and get an okay from UHAB.

In this case Mr. Brent Sherman.

Q.    Well, who would pay the vendor?

A.    Delmar would pay out of the corporation's account.

Q.    And from when you took over as the property manager until February 2021, did you ever hire a vendor to make any type of repair on the, the vault entrance doors?

MS. BONOMO:  Can you just clarify the timeframe you're referring to?  So it's clear?

A.    Please.

Q.    From when you took over.

If I understood you correctly, you took over as property manager in -- sometime in 2021?

A.    Correct.

Q.    Okay.  So from when you took over up until February 22nd, 2021.  Just in between those two dates.  Those two times.

N. DONKOR

A.    Other than boiler repairs, I don't recall anything else.

Q.    Okay.  When Mr. Fernandez was the property manager, was the, was the procedure the same, as far as hiring vendors and fielding --

A.    Yes.

Q.    -- complaints?  Okay.

When you took over for him, did your predecessor leave, leave his records with you?

A.    No.

Q.    Well, would you -- when you took over, would invoices from when Mr. -- from, from any vendors Mr. Fernandez hired still be available to you for review?

A.    The vendors that were paid?

Q.    Yes.

A.    Yes.

Q.    Okay.

A.    Yes.

Q.    Okay.  And you mentioned one time to me where there was a noise complaint.  That you went to 2285 2nd

N. DONKOR

December 08, 2023

Nora Donkor

Avenue.

From February --

Do you remember when that was?

A.    Not really, because the person that caused the problem has since left.

Q.    Okay.  Well, was it before February 22nd, 2021?

A.    Yes.

Q.    Aside from that one visit, from before February 22nd, 2021, aside from that visit, did you make any other visits, visits to 2285 2nd Avenue?

A.    When that person left.  The one that I'm talking about.  Yes.

Q.    Okay.  Well, aside from that noise complaint, did you ever go to 2285 2nd Avenue for any other reason before February 22nd, 2021?

A.    No, sir.

Q.    With respect to the vault entrance, was there any maintenance schedule for that vault entrance?

A.    No, sir.

Q.    Okay.  From the time that you

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 685 of 834

Nora Donkor
December 08, 2023

N. DONKOR

were the property -- you took over as

property manager to, 'till February 22nd,

2021, was there any type of rust proofing

done on the vault entrance?

    A.    None that I'm aware of.

    Q.    Was part of Mr. Cevallos's

duties then, back, back then, was he

required to make periodic inspections of

the hardware attached to the vault

entrance?

    A.    No, sir.

    Q.    Prior to February 22nd, 2021,

did you ever receive, did you ever receive

any complains, whether from a tenant, from

Mr. Cevallos, or from anyone in the public

regarding the condition of the vault

entrance doors?

    A.    No, sir.

    Q.    During that same time period,

did you ever receive any notices of

violation from the City of New York?

    A.    Any?  Violations?

    Q.    Any.

    A.    I don't recall any specific

Nora Donkor
December 08, 2023

N. DONKOR

violations, no.

Q.    By the way, was there a lease between the Credit Union and UHAB?

A.    There is.  Yes.

Q.    Well, I'm just asking about back in 2021.

A.    Yes.  The same lease.

Q.    Okay.  Did the lease have any -- anything specific in it regarding maintenance of the vault entrance?  Or the doors?  Metal doors on the floor?

MS. BECHTEL:  Objection.

MS. BONOMO:  Just note my objection to form.

You can answer if you know.

A.    I don't know.

Q.    Okay.  At some time did you become aware -- were you made aware that Mr. -- that tenant Miller was alleging having had an incident on February 22nd, 2021?

A.    I became aware of it in late '21.

Q.    Okay.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 687 of 834

Nora Donkor
December 08, 2023

N. DONKOR

A.    Late '21, early, early '22. But I, I believe it was 2021.

Q.    Okay.  How did you become aware?

A.    From Mr. Brent Sherman.

Q.    And what exactly did -- what exactly were you told at that time?

A.    That there was a legal action on -- because -- on the property because of that.

I believe it was towards the bank that it was addressed.

Q.    After Mr. Sherman gave you that information, did you speak at all to Mr. Cevallos?  About the incident?

A.    Yes.

Q.    And what did you speak to Mr. Cevallos about?

A.    I asked him about --

I'm trying to recall the conversation.

MS. BONOMO:  If you recall. Don't guess.

Q.    Yeah, I don't need word for

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 688 of 834

Nora Donkor
December 08, 2023

N. DONKOR

word, just sum and substance what you --

A.    Okay.

Q.    -- remember.  That's all.

A.    I asked how it was, and he told me it looked old and rusty.

Q.    When you say it, you're talking about the vault entrance?

A.    Yes.

I'm sorry.

Q.    That's alright.

Did you speak to anyone else?

MS. BONOMO:  Other than any conversations you and I may have had.

A.    With Mr. Sherman.

Q.    Okay.

A.    Yeah.

Q.    And just to clarify, I'll apologize to Ms. Bonomo, I should have said I don't wanna know anything you talked to any lawyer about.

A.    (No verbal response.)

Q.    Okay?

A.    Fine.

MS. BONOMO:  Before we ask

N. DONKOR

another question, I think we're gonna need that background noise to simmer down.

MR. DeLUCCA:  Yeah.

(Whereupon, a short recess was taken.)

MR. DeLUCCA:  What was the last question and answer?

(Whereupon, the referred to portion was read back by the Reporter.)

Q.    So just to clarify, aside Mr. Sherman and Mr. Cevallos, and again, not counting any lawyers, did you speak to anyone else about the incident?

MS. BONOMO:  Other than your attorney.

MR. DeLUCCA:  Yeah, I said don't -- I don't wanna know --

A.    No.  The attorney.

That's, that's -- I --

Q.    Okay.  And --

A.    No.

Q.    -- after you learned about the

N. DONKOR

incident, after you spoke to Mr. Cevallos, did you go down to 2285 2nd Avenue to, to look at the vault entrance?

A.   No.

Q.   Okay.  I know, again, if I understood you correctly, aside from going down a couple of times regarding that noise complaint, you did not go to 2285 2nd Avenue.

From the time you took over as property manager in 2020 until February 2021, did anyone else from Delmar go down to visit or inspect the, the premises at 2285 2nd Avenue?

A.   Not that I'm aware of.

Q.   Any time anyone went -- any time a visit would be made, would there be a record kept?

A.   No.  No.

Q.   And, again, just to clarify, like when you went, for instance, when you went down, when you went down to the premises because of the noise complaint, did you take notes, did you make an

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:09 PM INDEX NO. 538413/2024
NYSCEF DOC. NO. 14 RECEIVED NYSCEF: 03/06/2025

Nora Donkor
December 08, 2023

N. DONKOR

entrance in a, in any type of journal that you visited the premises?

A.    The entrance, no.  There -- I don't have any records of that.

MR. DeLUCCA:  Off the record for a second.

(Whereupon, a conversation was held off the record.)

(Sharing screen.)

Q.    Can you see the photo?  Ms. Donkor?

A.    Yes, I can.

Q.    Okay.  Do you know what's shown in that photo?

MS. BONOMO:  Well, just for identification, we're referring to Defendant's Exhibit A that was marked on 12 --

MR. DeLUCCA:  I'm sorry.  I'm sorry.

MS. BONOMO:  -- 12-19, 2022. Can you possibly just make the screen a little bit bigger?

MS. BECHTEL:  Yes.

Nora Donkor
December 08, 2023

N. DONKOR

(Complying.)

MS. BONOMO:  Thank you.

Q.    Okay.  So this is what was marked as an exhibit on December 19, 2022.

Do you know what's shown in that photo?

A.    It appears to be the vault doors.  By 2285.

Q.    Okay.  And if you look toward the, the top of the doors, near where the building line is, is, is -- do you see what appears to be a lock?

A.    Yes.

Q.    Okay.  Is there a, is there any kind of lock at the bottom?  Let's say the, the bottom part of the frame?

A.    No.

Q.    Okay.

MS. BONOMO:  And that's, again, referring to 2021?

MR. DeLUCCA:  Yeah.

A.    I have no way of knowing when this was taken except what you've just stipulated to.

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 693 of 834

Nora Donkor
December 08, 2023

N. DONKOR

Q.    Okay.  You just answered the question I was about to ask ya.

A.    Okay.

Q.    Okay.  Well, first I was gonna ask you, do you know who took the photo?

A.    No, I don't.

Q.    Okay.  Do you know when it was taken?

A.    No, I don't.

Q.    When you went to the building, when you went to 2285 2nd Avenue for that noise complaint, regarding that noise complaint, did -- how did you enter the building?

A.    Through the entrance to the residential part of the building.

Q.    Okay.  So there's an entrance to the residential.

       And is there also an entrance to the Credit Union?

A.    Yes.

       MS. BONOMO:  Do we still need the photo up or should we take that down?

Nora Donkor
December 08, 2023

N. DONKOR

MR. DeLUCCA:  I think we can take it down --

MS. BONOMO:  Okay.

MR. DeLUCCA:  -- unless Lindsay has any questions.  Maybe it's better to do it while it's up.

I'll yield the floor.

EXAMINATION BY

MS. BECHTEL:

Q.    Do you know --

MS. BONOMO:  Well --

Q.    Okay.  Have you ever seen this photo before?  Marked as Defendant's Exhibit A-1?

A.    Not until today.

Q.    Okay.

A.    No.

Q.    Do you know who took it?

A.    No, I don't.

Q.    Do you know when it was taken?

A.    No, I don't.

MS. BECHTEL:  Okay.  That's, that's all I have.

MR. DeLUCCA:  Okay.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 695 of 834

Nora Donkor
December 08, 2023

N. DONKOR

MS. BECHTEL:  Counsel, do you wanna see B, C?

(Sharing screen.)

MR. DeLUCCA:  Yeah, let's leave C up.

MS. BECHTEL:  C?  Okay.

MR. DeLUCCA:  Yeah, let's leave C up for a minute.

MS. BECHTEL:  Okay.

EXAMINATION BY

MR. DeLUCCA:

Q.    Do you see the photo that was previously marked as Defendant's Exhibit C? On the --

A.    Yes.

Q.    -- screen right now?

A.    Yes, sir.

Q.    Okay.  What's in that?  What's shown in that photo?

A.    That is the Federal Credit Union we've been discussing as the tenant.

Q.    Okay.  Is the residential entrance that you entered, with regard to that noise complaint, is the residential

Nora Donkor
December 08, 2023

N. DONKOR

entrance shown in this photo?

A. No.

Q. Okay.

A. It's on the side, I believe.

Q. Well, looking at the photo, would it be toward the right or to the left?

A. It would be towards the left.

Q. Okay. Was the, was that residential entrance on 2nd Avenue or was it on the cross street?

I think you said 117th?

A. 117th.

Q. Okay. When you went to visit that time, regarding the noise complaint, did you walk around or inspect the 2nd Avenue side of the building?

A. No, I did not.

MR. DeLUCCA: Okay. Unless Lindsay has any questions about the -- or Ms. Bonomo has any questions about the photo I don't need it anymore.

MS. BECHTEL: No.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 697 of 834

Nora Donkor
December 08, 2023

N. DONKOR

EXAMINATION BY

MS. BECHTEL:

Q.    So looking at the photo marked as Exhibit C, do you -- have you ever seen this photo before?

A.    Not before this morning, no.

Q.    Do you know when it was taken?

A.    No, I don't.

Q.    Okay.  Do you know if it depicts the condition of the cellar door in February of 2021?

MS. BONOMO:  Note my objection to form.

You can answer.

A.    I don't know it for a fact.

Q.    Okay.

MS. BECHTEL:  Alright.

MR. DeLUCCA:  I just wanna go over my notes for a minute, so if you've got any questions go ahead.

MS. BECHTEL:  Alright.

Q.    Good morning, Ms. Donkor.

My name is Lindsay Bechtel.  I'm from Litchfield Cavo.  I'm gonna ask

FILED: NEW YORK COUNTY CLERK 03/26/2025 09:09 PM          INDEX NO. 538413/2024
NYSCEF DOC. NO. 14                                        RECEIVED NYSCEF: 06/06/2025

Nora Donkor
December 08, 2023

N. DONKOR

you a few follow-up questions.

Have you ever seen a copy of the lease that was in effect for the Credit Union and UHAB in February of 2021?

A.    I had seen the front page. And the pages that describe the charges that had to be made as far as rent.

Q.    How were these pages kept in your office?  Or files?

A.    They are in our computer system.

Q.    Does your computer system keep a copy of the entire lease?  Typically?

A.    Usually?  Usually yes.

Is it there?  I haven't pulled it so I can't be sure.

Q.    And why did you say previously that you had only seen the front pages and the pages related to the charges?

A.    Because those are mainly the ones that I deal with to make sure that the charges on the rent are being applied properly.

Q.    Does your office do anything to

Nora Donkor
December 08, 2023

N. DONKOR

keep track of the respective tenant's and landlord's duties with respect to the leases?

MS. BONOMO:  Note my objection to form.

A.    (No verbal response.)

MS. BONOMO:  You can answer.

A.    The computer system has dates and it flags when something is to change.

For example --

Q.    Does --

A.    -- for increasing rent.

Q.    Okay.  Does Delmar's computer system or --

Strike that.

Does Delmar have any way of keeping track of the respective tenant's and landlord's duties that are listed in the leases that are kept on file?

For example, if a tenant is responsible for snow removal in one property, and then a tenant on another property is not responsible for snow removal, according to the various leases,

Nora Donkor
December 08, 2023

N. DONKOR

is, is that kept track of?

A.    Only with respect to a copy of the lease being on file.

Q.    Okay.  Do you know who negotiated the lease between the Credit Union and UHAB that was in effect in February of 2021 on behalf of UHAB?

A.    Exactly who did it?

Q.    (No verbal response.)

A.    No.  I know it was UHAB and the bank.

Q.    Okay.

A.    Credit Union.

Q.    Is Brent Sherman an officer of UHAB?

A.    I don't know.

Q.    Do you know of his position at UHAB?

A.    I know he is an attorney.

I'm not sure what his title is, because he signs Brent Sherman and nothing else.

Q.    Do you recognize the name Andrew Reicher?

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 701 of 834

Nora Donkor
December 08, 2023

N. DONKOR

A.    No, I don't.

MS. BECHTEL:  Give me one second.

(Whereupon, a short recess was taken.)

Q.    Do you know if the building at issue, 2285, if it had any security cameras recording the outside of the premises in February of 2021?

A.    Not that I'm aware of.

Q.    Did you previously testify that the only repairs you knew of from your tenure in -- from your tenure from 2019 to 2021 related to the boiler?  Or am I mistaken?

MS. BONOMO:  Just note my objection to form.

Just I think you're mischaracterizing the testimony.  If you wanna just --

MS. BECHTEL:  Okay.  Yeah, let me ask another question.

MS. BONOMO:  Okay.

Q.    From 2019 to February of 2021,

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 702 of 834

Nora Donkor
December 08, 2023

N. DONKOR

are you aware of any repairs made to the premises?

MS. BONOMO:  Note my objection to form.

Are you talking about anywhere in the premises?

MS. BECHTEL:  Yes.

MS. BONOMO:  You can answer.

A.    I know that there were repairs to, as I said, the ceiling at -- between two of the apartments.

I know that the water bill had seemed a little high, so the DEP was called in to look at the meters.

And I know that we sent a contractor for the boilers.

That's, that's all I recall at the moment.

Q.    So did the building have two entrances to the basement?  Or more?

A.    Two.  The one inside the bank, the, the Federal Credit Union, and the vault.

Q.    Do you know if the Credit Union

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 703 of 834

Nora Donkor
December 08, 2023

N. DONKOR

used the basement?

A.    I don't know.

Q.    Did Mr. Cevallos live in the building?

A.    Yes.

Q.    He's an employee of Delmar, correct?

A.    Correct.

Q.    Did anyone live in the basement?  In --

A.    No.

Q.    -- 2021?

A.    No.

Q.    When the cellar door was replaced in 2022, was that paid for from Delmar's corporate account?

A.    Not from Delmar's.  From 2285.
Each building has their own separate bank account.

Q.    It's, it's Delmar's bank account that it has designated for that particular property?  And then it charges it to the client?  Or something else?

A.    It's something else.

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:30 PM INDEX NO. 538413/2024
NYSCEF DOC. NO. 14

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 704 of 834

RECEIVED NYSCEF: 06/06/2025

Nora Donkor
December 08, 2023

N. DONKOR

The bank account is actually in the name of 2285.  Actually, it's 2283, 2285.  UHAB account.

Q.    And Delmar has access to it?

A.    Correct.

Q.    Okay.  Did the Credit Union have any role with respect to replacing the cellar door in 2022?

A.    No.

Q.    Do you have any, do you have any knowledge of the Credit Union using the, the cellar door at issue from when you started in 2019 up until February of 2021?

MS. BONOMO:  Note my objection to form.

You can answer.

A.    If they needed to go down there, for example, to give Con Edison access for some reason, they would have used their, the entrance inside the bank.

Q.    To your knowledge, was the Credit Union required to notify Delmar or the landlord of any known defective conditions on the outside of the premises?

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 705 of 834

Nora Donkor
December 08, 2023

N. DONKOR

MS. BONOMO:  I'm sorry.

Can I just get that question read back?

(Whereupon, the referred to portion was read back by the Reporter.)

MS. BONOMO:  I assume that you're referring to pursuant to the lease agreement?

MS. BECHTEL:  (No verbal response.)

MS. BONOMO:  Counsel?

MS. BECHTEL:  Yes.

MS. BONOMO:  Note my --

MS. BECHTEL:  Or any other -- any requirement.

MS. BONOMO:  Well --

MS. BECHTEL:  Either written or oral.

MS. BONOMO:  Are you talking about an oral requirement or?

MS. BECHTEL:  (No verbal response.)

MS. BONOMO:  Well, can you

Nora Donkor
December 08, 2023

N. DONKOR

rephrase the question?

MS. BECHTEL: I think it's a

good question.

Q. Was, was the Credit Union --

MS. BONOMO: Well, if you're

not referring to the lease agreement,

then, then what requirement is it

that you're referring to?

MS. BECHTEL: Okay. So I guess

I'll ask about the lease agreement

and then I'll ask about any other

requirement.

Q. So was the Credit Union

required to notify Delmar, Delmar or the

landlord of any known defective conditions

on the outside of the premises according to

the lease agreement?

MS. BONOMO: Note my objection

to the form. To the extent the lease

agreement speaks for itself.

Ms. Donkor's testimony

indicates that she did not review the

lease, and she's not very familiar

with the lease.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 707 of 834

Nora Donkor
December 08, 2023

N. DONKOR

Over objection you can answer to the best of your knowledge.  But I ask, Nora, that you not guess.

A.     (No verbal response.)

MS. BONOMO:  You can answer. Nora.

THE WITNESS:  Okay.

A.     I have not read the lease in depth other than for the charge pages, so I'm not aware of any legal responsibility that they had to call us.

However, if something did go wrong with the utilities or the building that affect them, they would call us.

For example.  If it was cold, or if they had a leak, or if they had a gas leak.  They would call me.

Q.     Are you aware of any other requirement outside of the lease for the Credit Union to notify Delmar or the landlord of any known defective conditions on the outside of the premises?

MS. BONOMO:  Just note my objection to form.

Nora Donkor
December 08, 2023

N. DONKOR

Q.    In 2021.

MS. BONOMO:  Ms. Donkor is not familiar with any legal requirements that may be bound through the law. Other, other than that I think that the question is vague.

I would just ask that you rephrase it.

MS. BECHTEL:  (No verbal response.)

MS. BONOMO:  Can you just, can you just rephrase it?

MS. BECHTEL:  No, I think it's a -- I think it's --

MS. BONOMO:  Well, I'm not gonna allow her to answer to any question that requires a legal conclusion, so --

MS. BECHTEL:  Okay.

Q.    Did anyone ever tell you that the union was required to notify Delmar or the landlord of defective conditions outside of the premises?  In 2021?

A.    No, no one told me that.

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:09 PM    INDEX NO. 538433/2024
NYSCEF DOC. NO. 14                                  RECEIVED NYSCEF: 06/06/2025

Nora Donkor
December 08, 2023

N. DONKOR

Q.    You started working for Delmar in 2019, correct?

A.    Correct.

Q.    What did you do before that? Immediately before that?

A.    I worked as a medical coordinator in an urgent care facility.

Q.    Did you undergo any training upon being hired by Delmar?

A.    Okay.  You asked before, just before being hired at Delmar.

I had retired.  I went back to work as a medical coordinator.

But before that I was a real estate manager for over 15 years.

Q.    Here, in New York?

A.    Yes.  On Sutton Place.

Q.    What's your highest level of education?

A.    I have a bachelors.

Q.    From what school?

A.    Pace University.

Q.    In what?

A.    Management.

Nora Donkor
December 08, 2023

N. DONKOR

Q.   Did you review anything to prepare for your deposition today?

A.   The answer's yes.

I reviewed the Federal Credit Union's rent history, and I looked for, and haven't found, but I know it exists, the invoice for the repair.  The replacement of the vault doors.

Q.   For what reason did you look at the Credit Union's rent history?

A.   I wasn't sure of when they moved in.  What year.

Q.   When did they move in, if you know?

A.   In 2020.

Our records start as of September as far as charging.

MS. BECHTEL:  That's all I have, I think.

Do you, do you have anything else?  Counsel?

MR. DeLUCCA:  Yeah, just one.

EXAMINATION BY

MR. DeLUCCA:

Nora Donkor
December 08, 2023

N. DONKOR

Q.    Who was the tenant, who was the tenant before the Credit Union?

A.    There was no tenant there when I started.

Q.    Okay.  Thanks.

Appreciate your time.

A.    You're welcome.

Q.    Thank you.

MS. BECHTEL:  Thank you.

(Whereupon, at 11:02 a.m., the Examination of this witness was concluded.)

o     o     o     o

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 712 of 834

Nora Donkor
December 08, 2023

N. DONKOR

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

_____
        NORA DONKOR

Subscribed and sworn to before me this _____ day of _____ 20___.

_____
        NOTARY PUBLIC

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 713 of 834

Nora Donkor
December 08, 2023

N. DONKOR

E X H I B I T S


(None)



I N D E X


EXAMINATION BY                        PAGE

Mr. DeLucca                        6, 43, 59

Ms. Bechtel                        42, 45


INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION AND/OR DOCUMENTS        PAGE

(None)


    QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:30 PM

NYSCEF DOC. NO. 14

INDEX NO. 538433/2024

RECEIVED NYSCEF: 03/06/2025

Nora Donkor
December 08, 2023

N. DONKOR

C E R T I F I C A T E

STATE OF NEW YORK  )
          :  SS.:
COUNTY OF SUFFOLK  )

I, CHRISTOS LIOPYROS, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of December 2023.

_____
CHRISTOS LIOPYROS

Nora Donkor
December 08, 2023

**1**

**11211**
  6:12
**117th**
  15:23 44:13,
  14
**12**
  39:19
**12-19**
  39:22
**19**
  17:20 40:5

**2**

**20**
  11:18 13:19
**2019**
  10:22,24
  21:22 49:14,
  25 52:14
**2020**
  11:8 18:6
  38:12
**2021**
  11:10,13,18,
  25 12:23,25
  13:19,21
  15:8 17:8
  19:2,11,17
  22:7,10,22
  23:2,19 24:2
  27:15,22
  30:11,21,24
  32:8,11,19
  33:4,13
  34:7,22 35:3
  38:13 40:21
  45:12 46:5
  48:8 49:10,
  15,25 51:13
  52:14 56:2,
  24
**2022**
  21:24 22:4

**39:22 40:5**
**51:16 52:9**
**21**
  34:24 35:2
**22**
  35:2
**2283**
  52:3
**2285**
  11:23 12:3
  14:16 24:6,
  11 31:25
  32:13,17
  38:3,9,15
  40:9 41:12
  49:8 51:18
  52:3,4
**22nd**
  30:24 32:8,
  11,19 33:3,
  13 34:21
**266**
  6:11
**2nd**
  11:23 12:3
  14:16 15:23
  24:6,11
  31:25 32:13,
  18 38:3,9,15
  41:12 44:11,
  17

**3**

**301**
  6:12

**5**

**50**
  11:16,19

**A**

**A-1**
  42:15

**able**
  7:23
**absolute**
  10:4
**access**
  14:2 16:10,
  11 23:18
  52:5,20
**account**
  30:9 51:17,
  20,22 52:2,4
**action**
  35:9
**address**
  6:10
**addressed**
  35:13
**affect**
  55:15
**agreement**
  16:9,22
  53:10 54:7,
  11,18,21
**ahead**
  25:17 45:21
**Alfosina**
  17:12
**alleging**
  34:20
**allow**
  16:22 56:17
**alright**
  10:2 36:11
  45:18,22
**Andrew**
  48:25
**answer**
  7:13,20 8:16
  18:19 24:19
  27:25 28:19
  34:16 37:9
  45:15 47:8
  50:9 52:17
  55:2,6 56:17
**answered**
  6:22 41:2

**answers**
  7:19
**Anthony**
  7:2
**anymore**
  44:24
**anyone**
  8:24 22:24
  27:4 33:16
  36:12 37:16
  38:13,17
  51:10 56:21
**apartments**
  23:5 25:10
  50:12
**apologize**
  36:19
**appears**
  40:8,13
**applied**
  46:23
**appointment**
  23:16
**approximately**
  11:16
**area**
  25:12
**around**
  44:17
**arranges**
  23:17
**arrears**
  13:10
**articles**
  25:19
**asked**
  10:3 35:20
  36:5
**asking**
  13:21 34:6
**assistant**
  9:2 11:2,6
  24:5
**assume**
  53:8
**assumption**
  18:20

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 716 of 834

Nora Donkor
December 08, 2023

**attached**
  33:10
**attention**
  19:15
**attorney**
  37:18,21
  48:20
**available**
  31:17
**Avenue**
  11:23 12:3
  14:16 15:23
  24:6,11
  32:2,13,18
  38:3,10,15
  41:12 44:11,
  18
**aware**
  33:6 34:19,
  23 35:5
  38:16 49:11
  50:2 55:11,
  19

---

**B**

---

**back**
  11:9,10,13,
  18,25 12:22,
  23,25 15:7
  17:8 19:2,
  11,17 22:10,
  22 23:19
  24:18,21
  26:13,15
  27:15,22
  33:8 34:7
  37:11 53:4,6
**background**
  37:3
**bad**
  16:19
**bags**
  26:6,7,11,12
**bank**
  35:13 48:12
  50:22 51:20,

21 52:2,21
**barrier**
  25:9
**basement**
  14:24,25
  16:10,12,23
  20:14,17,24
  22:25 23:13,
  21 25:19
  50:21 51:2,
  11
**basically**
  19:6
**bear**
  7:10
**Bechtel**
  6:16 17:3
  18:5 24:15,
  18 34:13
  39:25 42:10,
  23 43:2,7,10
  44:25 45:3,
  18,22,24
  49:3,22 50:8
  53:11,14,16,
  19,23 54:3,
  10 56:10,14,
  20
**begin**
  10:20
**behalf**
  7:3 48:8
**believe**
  15:12 16:25
  22:23 35:3,
  12 44:5
**belongings**
  23:6
**beside**
  12:13
**best**
  55:3
**better**
  42:6
**bigger**
  39:24

**bill**
  50:13
**bit**
  7:9 39:24
**boiler**
  23:3 28:23
  31:2 49:15
**boilers**
  50:17
**Bonomo**
  13:5 19:22
  27:12,18,23
  28:2,17
  30:14 34:14
  35:23 36:13,
  19,25 37:17
  39:16,22
  40:3,20
  41:23 42:4,
  12 44:22
  45:13 47:5,8
  49:17,24
  50:4,9 52:15
  53:2,8,13,
  15,18,21,25
  54:6,19
  55:6,24
  56:3,12,16
**bottom**
  40:16,17
**bound**
  56:5
**break**
  8:11,12,13,
  18
**Brent**
  13:23 30:6
  35:6 48:15,
  22
**bring**
  26:16
**Broadway**
  6:11
**Brooklyn**
  6:12
**building**
  13:6,9

14:12,18,20
  15:16,19,22
  17:15,17,21
  18:4,5,7
  19:4,19
  20:7,15,18
  21:25 23:23
  26:14,20,22
  40:12 41:11,
  15,17 44:18
  49:7 50:20
  51:5,19
  55:14
**business**
  6:10 10:17

---

**C**

---

**call**
  16:3,4 19:15
  23:16 28:21,
  23,24 29:4
  55:12,15,18
**called**
  6:2 13:11
  50:14
**cameras**
  49:8
**care**
  13:12 25:22
**case**
  30:6
**cast**
  21:15
**caused**
  32:6
**Cavo**
  45:25
**ceiling**
  25:9 50:11
**cellar**
  45:11 51:15
  52:9,13
**Cevallos**
  14:4,8,9
  18:9,17
  19:3,6 20:9

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 717 of 834

Nora Donkor
December 08, 2023

| | | | |
|---|---|---|---|
| 22:20 23:17 27:16 28:4, 13 33:16 35:16,19 37:14 38:2 51:4 | **complaint** 25:18 28:7, 8,24 29:4,6 31:25 32:17 38:9,24 41:13,14 43:25 44:16 | 48:3 **corner** 15:19 **corporate** 51:17 **corporation's** 30:9 | **day** 26:17 **deal** 46:22 **December** 40:5 **defective** 52:24 54:16 55:22 56:23 |
| **Cevallos's** 25:22 33:7 | **complaints** 13:12 25:8 28:12,16 29:15 31:9 | **correct** 10:11 18:25 23:9 30:22 51:8,9 52:6 | **Defendant's** 39:18 42:14 43:14 |
| **change** 11:5 47:10 | **Complying** 40:2 | **correctly** 11:18 15:3 25:21 26:2 30:19 38:7 | **deliveries** 23:20 **Delmar** 10:14,17,21 17:13,25 30:8 38:13 47:17 51:7 52:5,23 54:15 55:21 56:22 |
| **charge** 19:12 55:10 | **composition** 21:18 | **Counsel** 43:2 53:13 | |
| **charges** 46:7,20,23 51:23 | **computer** 46:11,13 47:9,14 | **counting** 37:15 | |
| **check** 25:11 | **Con** 52:19 | **couple** 38:8 | |
| **City** 33:22 | **conclusion** 56:19 | **course** 7:18 | **Delmar's** 47:14 51:17, 18,21 |
| **clarify** 19:24 29:3 30:15 36:18 37:13 38:21 | **condition** 33:17 45:11 | **court** 6:6,9,13,17 9:20 24:8 | **Delucca** 6:19 7:2 13:7 17:7 20:4 37:5,8, 19 39:6,20 40:22 42:2, 5,25 43:5,8, 12 44:20 45:19 |
| **cleaning** 27:21 | **conditions** 52:25 54:16 55:22 56:23 | **Credit** 15:10,11,13 16:5,9 17:9 28:6 34:4 41:21 43:21 46:4 48:6,14 50:23,25 52:7,12,23 54:5,14 55:21 | |
| **clear** 30:16 | **connection** 12:2 | | |
| **client** 51:24 | **contact** 17:9 | | |
| **cold** 55:16 | **contracted** 26:25 | | **DEP** 50:14 |
| **collection** 26:17 | **contractor** 19:25 20:2 28:25 50:17 | **cross** 15:21 44:12 | **depicts** 45:11 |
| **combination** 22:15 | **contractors** 20:6 | **cut** 25:16 | **deposit** 26:5 |
| **come** 28:21 | **convenient** 7:7 | | **deposition** 9:7 |
| **commercial** 14:21 15:4,8 26:4 | **conversation** 9:15 24:16 35:22 39:8 | **D** | **depth** 55:10 |
| **commonly** 20:22 | **conversations** 36:14 | **date** 17:16 | **describe** 46:7 |
| **company** 26:24 | **copy** 6:15 46:3,14 | **dates** 30:25 47:9 | |
| **complains** 33:15 | | | |

Nora Donkor
December 08, 2023

**designated**
  51:22
**desk**
  8:22 9:10
**direct**
  12:4
**directly**
  28:12
**discussing**
  43:22
**Donkor**
  6:1,8,20 7:1
  8:1 9:1 10:1
  11:1 12:1
  13:1 14:1
  15:1 16:1
  17:1 18:1
  19:1 20:1
  21:1 22:1
  23:1 24:1
  25:1 26:1
  27:1 28:1
  29:1 30:1
  31:1 32:1
  33:1 34:1
  35:1 36:1
  37:1 38:1
  39:1,12 40:1
  41:1 42:1
  43:1 44:1
  45:1,23 46:1
  47:1 48:1
  49:1 50:1
  51:1 52:1
  53:1 54:1
  55:1 56:1,3
**Donkor's**
  54:22
**door**
  21:8 45:11
  51:15 52:9,
  13
**doors**
  20:24 21:3,
  10,20,22
  22:3,6,10
  27:6 30:13
  33:18 34:12

**double**
  40:9,11
**double**
  21:8
**downstairs**
  26:16
**drive**
  29:10
**duly**
  6:3
**dumpster**
  26:8
**duties**
  13:3,9 19:11
  20:7 24:10
  25:22 33:8
  47:3,19
**duty**
  13:14

———————————

E
———————————

**Earlier**
  25:20
**early**
  35:2
**East**
  15:10,13
  16:4
**Edison**
  52:19
**effect**
  46:4 48:7
**either**
  28:23 53:19
**electric**
  23:8
**employee**
  51:7
**enter**
  29:10 41:14
**entered**
  43:24
**entire**
  15:18 46:14
**entrance**
  16:12,17

  20:14,20,23
  22:7 23:12,
  14 27:2,6
  30:13 32:22,
  23 33:5,11,
  18 34:11
  36:8 38:4
  39:2,4
  41:16,18,20
  43:24 44:2,
  11 52:21
**entrances**
  16:15 20:16,
  20 50:21
**estate**
  10:18
**Eugene**
  17:23
**exact**
  17:16 21:17
**exactly**
  16:24 35:7,8
  48:9
**EXAMINATION**
  6:18 42:9
  43:11 45:2
**examined**
  6:5
**Excuse**
  29:18
**exhibit**
  39:18 40:5
  42:15 43:14
  45:5
**extent**
  54:20
**exterior**
  20:17

———————————

F
———————————

**fact**
  45:16
**fair**
  9:16 11:9
  24:23

**familiar**
  54:24 56:4
**far**
  9:13 19:11
  31:6 46:8
**February**
  11:8,10,18,
  25 13:19
  30:11,24
  32:3,8,11,19
  33:3,13
  34:21 38:13
  45:12 46:5
  48:8 49:10,
  25 52:14
**Federal**
  15:9,10,13
  16:9 43:21
  50:23
**Fernandez**
  17:23,24
  18:4 31:4,16
**fielding**
  31:7
**file**
  29:14,19
  47:20 48:4
**files**
  46:10
**fine**
  7:24 36:24
**firm**
  10:19
**first**
  6:3 8:17
  15:18 41:5
**flags**
  47:10
**flat**
  21:5
**floor**
  15:18 34:12
  42:8
**floors**
  14:22
**follow-up**
  46:2

Nora Donkor
December 08, 2023

**follows**
6:5
**forget**
6:14
**form**
19:23 27:13,
19,24 28:18
34:15 45:14
47:6 49:18
50:5 52:16
54:20 55:25
**frame**
40:17
**Freddy**
14:4 27:11
**front**
26:19,21,23
46:6,19
**full-time**
20:6

---

**G**

---

**garbage**
19:13 25:23
26:3,5,6
**gas**
23:8,23,25
55:17
**gave**
35:14
**General**
13:14
**give**
18:19 23:17
49:3 52:19
**going**
38:7
**good**
6:20,21
45:23 54:4
**Great**
6:25
**guess**
16:19 18:23
35:24 54:10
55:4

---

**H**

---

**hand**
11:19
**hard**
9:21 29:10
**hardware**
33:10
**head**
7:21
**hear**
6:23,24
7:11,14,24
8:3 9:22
26:2
**held**
24:17 39:9
**high**
50:14
**hire**
30:2,3,12
**hired**
18:16 19:18
29:21 31:16
**hiring**
31:6
**house**
19:20
**housekeeping**
19:20

---

**I**

---

**identification**
39:17
**incident**
34:21 35:16
37:16 38:2
**increasing**
47:13
**indicated**
9:21
**indicates**
54:23

**indicating**
22:17
**information**
35:15
**inside**
13:24 14:15
16:16 20:7,
15 23:13
50:22 52:21
**inspect**
38:14 44:17
**inspecting**
26:25
**inspections**
27:5 33:9
**install**
25:9
**installed**
21:21
**instance**
38:22
**Intermittently**
24:14
**invoice**
29:23
**invoices**
31:15
**iron**
21:16
**issue**
7:9 29:22
49:8 52:13

---

**J**

---

**job**
10:24 11:3,
10
**journal**
39:2

---

**K**

---

**keep**
23:3 29:13,

14,17,19
46:13 47:2
**keeping**
47:18
**kept**
10:4 23:5
28:16 38:19
46:9 47:20
48:2
**key**
22:16,17,18,
22,23
**kind**
21:14 22:13
25:12 40:16
**knew**
49:13
**know**
7:14 8:12
16:5 17:16
18:13,16,21
19:11,15,20
21:14,15,17
22:2,4,6,9,
21,24 29:10
34:16,17
36:20 37:20
38:6 39:14
40:6 41:6,8
42:11,19,21
45:8,10,16
48:5,11,17,
18,20 49:7
50:10,13,16,
25 51:3
**knowing**
40:23
**knowledge**
52:12,22
55:3
**known**
52:24 54:16
55:22

---

**L**

---

**landlord**

52:24 54:16
55:22 56:23
**landlord's**
47:3,19
**laptop**
29:11
**late**
34:23 35:2
**law**
56:5
**lawsuit**
7:4
**lawyer**
36:21
**lawyers**
37:15
**leak**
55:17,18
**learned**
37:25
**lease**
34:3,8,9
46:4,14
48:4,6 53:10
54:7,11,18,
20,24,25
55:9,20
**leases**
47:4,20,25
**leave**
26:19 31:11
43:5,8
**left**
32:6,14
44:8,9
**legal**
35:9 55:11
56:4,18
**level**
12:18 15:17
20:25 25:11
**limited**
19:12
**Lindsay**
42:5 44:21
45:24

**Lindsey**
6:13
**line**
40:12
**listed**
47:19
**Litchfield**
45:25
**little**
7:8 26:14
39:24 50:14
**live**
51:4,10
**lock**
22:11,13,15,
16 40:13,16
**long**
8:13 17:13
18:13
**look**
38:4 40:10
50:15
**looked**
36:6
**looking**
44:6 45:4
**lot**
10:6
**loud**
7:22 8:3
**Lower**
15:10,12
16:4
**lowly**
9:20

**M**

**made**
21:10,11
23:20 28:8
34:19 38:18
46:8 50:2
**maintenance**
19:8 32:22
34:11

**make**
8:3 13:10
23:16 24:12
29:5,21
30:12 32:12
33:9 38:25
39:23 46:22
**making**
19:13 27:5
**manage**
11:14 17:14
**management**
10:14,18
13:14 17:13
**manager**
11:2,4,6,7,
11 12:4,5,
16,17 13:4
17:11,14,21
18:4 24:3,5,
11 30:11,20
31:5 33:3
38:12
**managers**
12:10,21
**managing**
17:17
**March**
18:6
**marked**
39:18 40:5
42:14 43:14
45:4
**mean**
25:15
**Meaning**
27:6
**meant**
16:21
**meetings**
7:7
**mentioned**
25:21 31:23
**metal**
20:23 21:2,
13,15 27:6
34:12

**meter**
23:11
**meters**
23:4,7 50:15
**Mets**
8:7
**Miller**
7:4 34:20
**minimum**
10:4
**minute**
43:9 45:20
**mischaracteri
zing**
49:20
**mistaken**
49:16
**mixed-use**
14:20
**moment**
50:19
**month**
24:25
**Morel**
17:11,12
**morning**
6:20,21
45:7,23
**mute**
17:6

**N**

**name**
6:7 12:19
14:4,5 15:14
45:24 48:24
52:3
**name's**
7:2
**need**
8:10,12,14,
18 9:3 29:25
35:25 37:3
41:23 44:24
**needed**
14:2 19:14

Nora Donkor
December 08, 2023

24:14 25:4,5
28:22 52:18
**needs**
9:19
**negotiated**
48:6
**nodding**
7:20
**noise**
25:8,11
31:24 32:17
37:3 38:8,24
41:13 43:25
44:16
**Nora**
6:8 55:4,7
**Notary**
6:3
**note**
17:3 19:22
27:18,23
28:17 29:5
34:14 45:13
47:5 49:17
50:4 52:15
53:15 54:19
55:24
**notes**
38:25 45:20
**notices**
33:21
**notify**
52:23 54:15
55:21 56:22
**number**
13:9

**O**

**object**
17:5
**objection**
17:4 19:23
27:12,18,23
28:17 34:13,
15 45:13
47:5 49:18

50:4 52:15
54:19 55:2,
25
**occasion**
24:13
**office**
8:23,25 9:6,
19 10:9
14:15 46:10,
25
**officer**
48:15
**official**
13:9
**Officially**
11:8
**oil**
23:24
**okay**
6:22,23
7:16,18 8:2,
5,11,19,21,
24 9:3,12,16
10:8,13,16
11:9,13,22
12:8,13,19
13:3,8,15,
22,23 14:8,
14,18 15:7,
15,21,25
16:8,16
17:7,19
18:3,16,22
19:2,10
20:4,9 21:2,
14,19 22:3,
18,21 23:7,
19,23 25:4
26:2,7,11,
18,23 27:17
28:3,5,11,15
29:9,13,25
30:5,23
31:4,9,21,23
32:7,16,25
34:9,18,25
35:4 36:3,
16,23 37:23

38:6 39:14
40:4,10,15,
19 41:2,4,5,
8,18 42:4,
13,17,23,25
43:7,10,19,
23 44:4,10,
15,20 45:10,
17 47:14
48:5,13
49:22,24
52:7 54:10
55:8 56:20
**once**
25:7
**one**
11:21,22
12:10 13:2,
10 14:21
15:3 16:15
18:20 22:22,
23 28:6
31:23 32:10,
14 47:22
49:3 50:22
56:25
**one-time**
20:2
**ones**
46:22
**ongoing**
19:25
**oral**
53:20,22
**ordering**
6:14
**original**
22:8
**outside**
19:18 49:9
52:25 54:17
55:20,23
56:24
**oversee**
13:10
**owner**
13:13

**P**

**padlock**
22:14
**page**
46:6
**pages**
46:7,9,19,20
55:10
**paid**
31:18 51:16
**pails**
26:3
**paper**
29:8
**part**
15:15,25
16:8 24:10
25:21 33:7
40:17 41:17
**particular**
13:15 51:23
**pay**
30:7,8
**People's**
15:13
**period**
33:20
**periodic**
27:5 33:9
**person**
12:20 13:16
19:8 32:5,14
**persons**
12:20
**phone**
28:21 29:4
**photo**
39:11,15
40:7 41:6,24
42:14 43:13,
20 44:2,6,23
45:4,6
**piece**
29:7

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 722 of 834

Nora Donkor
December 08, 2023

**plaintiff**
  7:3
**please**
  6:7,10 14:6
  30:17
**point**
  11:21
**porter**
  13:25 14:3,
  10 18:10,11,
  14 19:7
**portion**
  24:21 37:11
  53:6
**position**
  48:18
**possibly**
  39:23
**predecessor**
  31:11
**premises**
  24:13 25:6
  38:15,24
  39:3 49:9
  50:3,7 52:25
  54:17 55:23
  56:24
**previously**
  43:14 46:18
  49:12
**pricing**
  30:5
**Prior**
  33:13
**problem**
  29:2 32:6
**procedure**
  31:6
**promise**
  8:8
**proofing**
  33:4
**properly**
  46:24
**properties**
  11:14,16,19,
  22

**property**
  11:2,4,6,11
  12:4,5,9,16,
  17,21 13:4,
  17,18,25
  24:2,5,11
  30:11,20
  31:5 33:2,3
  35:10 38:12
  47:23,24
  51:23
**proposal**
  25:9
**public**
  6:4 33:16
**pulled**
  46:16
**pursuant**
  53:9

───────────

Q

───────────

**question**
  7:12,13 8:16
  16:20 17:4
  24:19 37:2,9
  41:3 49:23
  53:3 54:2,4
  56:7,18
**questions**
  7:5 42:6
  44:21,23
  45:21 46:2

───────────

R

───────────

**read**
  24:18,21
  37:11 53:4,6
  55:9
**readers**
  23:11
**real**
  10:18
**reason**
  8:11,14 25:5
  32:18 52:20

**recall**
  23:22 25:7
  31:3 33:25
  35:21,23
  50:18
**receive**
  33:14,21
**recess**
  37:6 49:5
**recognize**
  48:24
**record**
  13:13 24:9,
  15,17 28:15
  38:19 39:6,9
**recording**
  49:9
**records**
  29:20 31:11
  39:5
**refer**
  20:22
**referred**
  24:20 37:10
  53:5
**referring**
  30:16 39:17
  40:21 53:9
  54:7,9
**regard**
  43:24
**regarding**
  33:17 34:10
  38:8 41:13
  44:16
**Reicher**
  48:25
**related**
  46:20 49:15
**remember**
  32:4 36:4
**removal**
  27:10,15
  47:22,25
**rent**
  15:16 46:8,
  23 47:13

**rental**
  15:25 16:8,
  22
**repair**
  29:2,21
  30:13
**repairs**
  31:2 49:13
  50:2,10
**rephrase**
  54:2 56:9,13
**replaced**
  21:24 22:4,8
  51:16
**replacing**
  52:8
**report**
  20:11
**reporter**
  6:6,9,13,17
  9:20 24:8,22
  37:12 53:7
**required**
  24:12 33:9
  52:23 54:15
  56:22
**requirement**
  53:17,22
  54:8,13
  55:20
**requirements**
  56:4
**requires**
  56:18
**residential**
  14:21 15:4
  28:6 41:17,
  19 43:23,25
  44:11
**residents**
  13:11 23:4
  26:4
**respect**
  13:5,8 24:6
  32:21 47:3
  48:3 52:8

Nora Donkor
December 08, 2023

respective
  47:2,18
response
  36:22 47:7
  48:10 53:12,
  24 55:5
  56:11
responsibilit
y
  55:11
responsible
  27:4,9,14,21
  47:22,24
rest
  7:23
retainer
  26:25
review
  31:17 54:23
right
  6:25 8:21,25
  9:2 18:8
  43:17 44:7
role
  52:8
room
  9:24
rust
  33:4
rusty
  36:6

          S

saying
  7:20,21 9:23
says
  16:25
schedule
  24:25 32:23
scheduled
  27:7
screen
  39:10,24
  43:4,17
second
  39:7 49:4

security
  49:8
see
  25:11 39:11
  40:12 43:3,
  13
send
  28:25
separate
  51:20
series
  7:5
Services
  10:15
several
  25:8
shaking
  7:21
shared
  12:10
sharing
  39:10 43:4
Sherman
  13:24 30:6
  35:6,14
  36:15 37:14
  48:15,22
short
  37:6 49:5
shown
  39:14 40:6
  43:20 44:2
side
  15:10,13
  26:13 44:5,
  18
sidewalk
  21:3,6 27:22
signs
  48:22
simmer
  37:3
sir
  6:21 10:12
  14:17 15:6
  16:7,18 19:9
  20:8,19

21:4,7,9
  25:3,25 27:3
  29:12 32:20,
  24 33:12,19
  43:18
sitting
  8:22
snow
  27:9,14
  47:22,24
so-called
  25:11
sort
  24:24
sound
  10:3
space
  14:15 16:13
  17:2
speak
  9:19 13:12,
  16 16:24
  17:10 35:15,
  18 36:12
  37:15
speaks
  24:8 54:21
specific
  19:14 33:25
  34:10
spell
  14:5
spoke
  38:2
staff
  19:4
started
  10:23 18:12,
  14 21:23
  52:14
State
  6:4
steel
  21:15
stipulated
  40:25

storage
  17:2
street
  15:17,24
  20:25 44:12
streets
  15:22
Strike
  22:5 47:16
substance
  36:2
Suite
  6:12
sum
  36:2
supervisor
  20:10
sure
  8:3 13:10
  19:13 20:4
  46:17,22
  48:21
sweeping
  27:21
sworn
  6:3
system
  46:12,13
  47:9,15

          T

take
  8:9,10,12,13
  18:3 38:25
  41:24 42:3
taken
  13:12 19:13
  37:7 40:24
  41:9 42:21
  45:8 49:6
taking
  25:22
talk
  8:2
talked
  36:20

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:09 PM
NYSCEF DOC. NO. 14

INDEX NO. 538413/2024
RECEIVED NYSCEF: 03/06/2025

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 724 of 834
Nora Donkor
December 08, 2023

**talking**
 9:23 16:6
 19:25 23:8
 25:12 32:15
 36:7 50:6
 53:21
**team**
 11:15 12:7
**television**
 8:6
**tell**
 8:17 56:21
**tenant**
 15:4,8 33:15
 34:20 43:22
 47:21,23
**tenant's**
 47:2,18
**tenants**
 15:5 26:4
 28:5,7
**tenure**
 49:14
**testified**
 6:5
**testify**
 49:12
**testimony**
 49:20 54:22
**thank**
 6:17 10:7
 18:22 40:3
**thanks**
 10:6 21:19
**thing**
 8:15
**think**
 7:6 8:4 37:2
 42:2 44:13
 49:19 54:3
 56:6,14,15
**three**
 14:21,23
 15:4 23:5
**till**
 33:3

**time**
 8:9 13:19
 25:14,18
 31:24 32:25
 33:20 34:18
 35:8 38:11,
 17,18 44:16
**timeframe**
 30:15
**times**
 7:8 26:15
 30:25 38:8
**title**
 10:25 11:3,
 5,10 48:21
**today**
 7:3 42:16
**told**
 10:8 20:13
 35:8 36:5
 56:25
**top**
 40:11
**track**
 47:2,18 48:2
**try**
 8:2
**trying**
 35:21
**two**
 12:9,13
 25:10 30:25
 50:12,20,22
**type**
 10:16 14:18
 19:19 28:15
 29:14,17,19
 30:12 33:4
 39:2
**types**
 23:20
**Typically**
 46:14

**U**

**UHAB**
 13:13,16,24
 20:12 30:5
 34:4 46:5
 48:7,8,11,
 16,19 52:4
**Ultimately**
 28:9 30:4
**understand**
 7:12,15 9:25
 11:17
**understood**
 15:2 25:20
 30:19 38:7
**union**
 15:10,11,13
 16:5,9 17:9
 28:6 34:4
 41:21 43:22
 46:5 48:7,14
 50:23,25
 52:7,12,23
 54:5,14
 55:21 56:22
**units**
 14:21
**utilities**
 55:14
**utility**
 23:4,7

**V**

**vague**
 56:7
**various**
 47:25
**vault**
 20:23 23:12
 27:2,5 30:13
 32:21,23
 33:5,10,17
 34:11 36:8
 38:4 40:8

 50:24
**vendor**
 28:23,25
 29:20,24
 30:2,3,7,12
**vendors**
 19:18 31:7,
 16,18
**verbal**
 7:19 36:22
 47:7 48:10
 53:11,23
 55:5 56:10
**violation**
 33:22
**violations**
 33:23 34:2
**visit**
 32:10,12
 38:14,18
 44:15
**visited**
 39:3
**visits**
 24:12 32:12,
 13

**W**

**walk**
 44:17
**walkway**
 26:15
**wanna**
 36:20 37:20
 43:3 45:19
 49:21
**water**
 28:24 50:13
**way**
 11:20 34:3
 40:23 47:17
**went**
 25:10 31:25
 38:17,22,23
 41:11,12
 44:15

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 725 of 834

Nora Donkor
December 08, 2023

**witness**
  6:2,8,11
  27:25 28:3
  55:8
**word**
  35:25 36:2
**work**
  10:13,14
  11:15 12:6
  17:24 19:19
**worked**
  24:5
**working**
  9:9 10:20,23
  21:23
**workplace**
  10:10
**writing**
  27:7
**written**
  29:5,20
  53:19
**wrong**
  55:14

---

Y

---

**ya**
  41:3
**Yeah**
  13:7 21:12
  29:7,8 35:25
  36:17 37:5,
  19 40:22
  43:5,8 49:22
**yell**
  8:6
**yelling**
  8:4
**yield**
  42:8
**York**
  6:4,12 33:22

---

Z

---

**Zoom**
  7:7

# EXHIBIT I

725

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 727 of 834

Aissatou Barry-Fall
December 12, 2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------x
TIMOTHY MILLER,

                    Plaintiff,


      -against-              Index No:
                            XXXXXXX



UHAB HOUSING DEVELOPMENT FUND CORPORATION,
LOWER EAST SIDE PEOPLE'S FEDERAL CREDIT UNION,
and EAST HARLEM PEOPLE'S FEDERAL CREDIT UNION,

                    Defendants.
-------------------------------------x

          EXAMINATION BEFORE TRIAL of the

Defendant, LOWER EAST SIDE PEOPLE'S FEDERAL

CREDIT UNION BY AISSATOU BARRY-FALL, taken by

the Plaintiff, pursuant to Court Order, held at

U.S. Legal Support - Remote Videoconference, on

December 12th, 2023, at 10:10 a.m., before

JUSTIN ORTIZ, a Notary Public of the State of

New York.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 728 of 834

Aissatou Barry-Fall
December 12, 2023

A P P E A R A N C E S:

 BRIAN KING LAW OFFICE, PLLC
        Attorneys for Plaintiff
        1400 Avenue Z, Suite 503
        Brooklyn, New York 11235
 BY:      ANTHONY DELUCA, ESQ.


 GANNON, ROSENFARB & DROSSMAN
        Attorneys for Defendant UHAB Housing
        Development Fund Corporation
        250 Broadway, 25th Floor
        New York, New York 10007
 BY:      TARA BONOMO, ESQ.


 LITCHFIELD CAVO, LLP
        Attorneys for Defendants LOWER EAST
        SIDE PEOPLE'S FEDERAL CREDIT UNION, and
        EAST HARLEM PEOPLE'S FEDERAL CREDIT
        UNION
        420 Lexington Avenue, Suite 2104
        New York, New York 10170
 BY:      LYNDSEY BECHTEL, ESQ.

Aissatou Barry-Fall
December 12, 2023

S T I P U L A T I O N S:

IT IS STIPULATED AND AGREED by and between the attorneys for the respective parties herein, and in compliance with Rule 221 of the Uniform Rules for the Trial Courts:

THAT the parties recognize the provision of Rule 3115 subdivisions (b), (c) and/or (d). All objections made at a deposition shall be noted by the officer before whom the deposition is taken, and the answer shall be given and the deposition shall proceed subject to the objections and to the right of a person to apply for appropriate relief pursuant to Article 31 of the CPLR;

THAT every objection raised during a deposition shall be stated succinctly and framed so as not to suggest an answer to the deponent and, at the request of the questioning attorney, shall include a clear statement as to any defect in form or other basis of error or irregularity. Except to the extent permitted by CPLR Rule 3115 or by this rule, during the course of the examination persons in attendance shall not make statements or comments that interfere with the questioning.

THAT a deponent shall answer all questions at a deposition, except (i) to preserve a privilege or right of confidentiality, (ii) to enforce a limitation set forth in an order of a court, or (iii) when the question is plainly improper and would, if answered, cause significant prejudice to any person. An attorney shall not direct a deponent not to answer except as provided in CPLR Rule 3115 or this subdivision. Any refusal to answer or direction not to answer shall be accompanied by a succinct and clear statement on the basis therefore. If the deponent does not answer a question, the examining party shall have the right to complete the remainder of the deposition.

THAT an attorney shall not interrupt the deposition for the purpose of communicating with the deponent unless all parties consent or

Aissatou Barry-Fall
December 12, 2023

the communication is made for the purpose of determining whether the question should not be answered on the grounds set forth in Section 221.2 of these rules, and, in such event, the reason for the communication shall be stated for the record succinctly and clearly.

THAT the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such objection or motion at the time of the trial of this action, and is hereby reserved; and

THAT this examination may be signed and sworn to by the witness examined herein before any Notary Public, but the failure to do so or to return the original of the examination to the attorney on whose behalf the examination is taken, shall not be deemed a waiver of the rights provided by Rule 3116 and 3117 of the CPLR, and shall be controlled thereby; and

THAT the certification and filing of the original of this examination are hereby waived; and

THAT the questioning attorney shall provide counsel for the witness examined herein with a copy of this examination at no charge.

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:39 PM   INDEX NO. 538413/2024
NYSCEF DOC. NO. 65   RECEIVED NYSCEF: 03/06/2025

Aissatou Barry-Fall
December 12, 2023

A I S S A T O U  B A R R Y-F A L L, the witness herein, having been first duly sworn, remotely via Zoom, by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. DELUCA:

MS. BONOMO:  I would like to order a copy of the transcript.

Q.    State your name for the record, please.

A.    Aissatou Barry-Fall.

Q.    State your address for the record, please.

A.    37 Avenue B, New York, New York 10009.

Q.    Good morning.

A.    Good morning.

Q.    Can you hear me okay?

A.    Yes.

Q.    My name is Anthony Deluca.  I'm here today on behalf of the plaintiff in the lawsuit, Mr. Miller.  I'm just going to ask you a series of questions.  If you don't hear my question or if you don't understand my question, don't answer it.  Let me know, and

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

I'll repeat the question or I'll rephrase it or I'll let the court reporter read it back to you.

A couple of things I'm going to ask you to do.  First of, all of your responses have to be verbal.  You can't answer with a gesture, like, nodding or shaking your head.  Just say everything out loud.  The other thing is often before I'm finished asking the question, you might know what I'm asking.  I'm just going to ask you to wait until I ask you the whole question before you give your answer. Especially with these Zoom meetings, sometimes if one person's talking and another person starts talking, somebody gets cut off and we'll get half a question and half an answer, so wait for me to ask the whole question.  Is that all okay with you?

A.     Yes.

Q.     If you need to take a break for any reason, that's no problem.  Just let me know, and we can take a break.  All I'll ask you to do is if I ask you a question, answer it first, then tell me you need to take the break and we

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

can take the break for as long as you need for whatever reason you need, all right?

A.    Okay.

Q.    Now, the address you gave on Avenue B, is that a business address?

A.    A business.

Q.    What business is that?

A.    The credit union.

Q.    What's the name of the credit union?

A.    Lower East Side People's Federal Credit Union.

Q.    What type of business is that?

A.    It's a financial institution.

Q.    Like a bank?

A.    Yes.

Q.    How many branches does the bank have?

A.    Three.

Q.    Can you tell me the addresses of the three branches?

A.    You have the 37 Avenue B which is the main branch, New York, New York 10009.  You have East Harlem branch.  Can you read off the address because I don't know memorize them all.

Q.    If I said it was 2285 Second Avenue, is

Aissatou Barry-Fall
December 12, 2023

                         A. BARRY-FALL

that it?

A.      That is correct.  We have the North Shore branch in Staten Island.  It's 4 -- it's 2 Saint Paul Avenue.

                 MS. BONOMO:  Can the witness
        speak a little bit more into the
        microphone?

Q.      When did you begin working for the credit union?

A.      1991.

Q.      When you began working there in 1991, what was your job title?

A.      I was a part-time teller.

Q.      What location -- did you work at one specific location or did you work at different locations back then?

A.      One.  We had only one location back then.

Q.      Which one was that?

A.      37 Avenue B, the main branch.

Q.      At some point after you began working as a part-time teller, did your job title change?

A.      Yes, it did.

Q.      What did it change to?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.      I became a full-time teller, then I became the head teller, then the fiscal officer, then I became the operation's manager, then a CFO operation's manager, and then CEO.

Q.      CEO, that's your current position?

A.      Yes.

Q.      I just want to take it one at a time here.  When you became a full-time teller, was that still at the Avenue B branch?

A.      That is correct.

Q.      Same thing with head teller, was that Avenue B or did you change locations?

A.      Yes.

Q.      When you became a fiscal officer, was that at a branch or something else?

A.      Yes.

Q.      Avenue B?

A.      Avenue B, yes.

Q.      Had you ever -- for the time that you've been working for the credit union, have you worked anywhere other than at the Avenue B branch?

A.      Now I work -- like right now I'm calling from the North Shore branch.  I rotate

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

different branches.

Q.    Is that since you've been the CEO?

A.    Yes.

Q.    So you rotate between the three branches?

A.    Yes.  Well, I stay more in Staten Island because I live there.

Q.    That makes sense.  Other than -- any time before you became CEO, did you rotate branches or work at another branch other than Avenue B?

A.    Also that's the time when we opened this branch, the North Shore branch.  I was rotating between the two.

Q.    Before you became CEO, did you ever work at the Second Avenue branch?

A.    It wasn't open.  I became CEO when the branch was open.  You said East Harlem, right?

Q.    Yeah.  Is it easier if instead of saying Second Avenue if I said Harlem Branch?

A.    Yeah.

Q.    I can do that for you.  When did you become CEO?

A.    It was in October, 2020.

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

Q.      If I understood you correctly, since you've been CEO, you rotate the branches.  Do you have a set schedule?  Do you have a schedule, like, two months there, two months there, anything like that?

A.      No.

Q.      How often do you work out of the East Harlem branch?

A.      At the beginning of when we opened the branch, I used to be there, like, every Tuesday in the beginning.

Q.      How long were you on that schedule going there every Tuesday?

A.      I don't recall exactly when.

Q.      I don't need exactly; approximately, as long as you're not guessing.

A.      I would say when Covid became serious. I would say maybe a couple of months.

Q.      Do you recall the last time you were at the East Harlem branch before February 22nd, 2021?

A.      No.

Q.      Do you recall if you were there in January of 2021?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.      No.

Q.      Back in February of 2021, was there a branch manager at that -- at the East Harlem branch?

A.      Yes.  There was an assistant member service manager that was running the branch.

Q.      Who was that?

A.      Shelly Jones.

Q.      Do you know somebody named Alfonsina Morrel?

A.      Yes.  Alfonsina, yes, I do.

Q.      She's an employee of the credit union?

A.      Yes.

Q.      What's her --

A.      She was.  She's no longer.

Q.      Was she an employee in February of 2021?

A.      Yes.

Q.      What was her job title back then?

A.      She's the commercial lending manager.

Q.      For the entire credit union or just one particular branch?

A.      The entire credit union.

Q.      Where was her office?

A.      She used to rotate between the East

A. BARRY-FALL

Harlem branch and the main branch.

Q.     Is Shelly Jones still at the East Harlem branch?

A.     No.

Q.     Is Shelly Jones still employed by the credit union?

A.     She retired.

Q.     When did Ms. Jones retire?

A.     I have to get you the date.  I don't recall exactly.

Q.     I don't need the exact date.  Was it 2021, 2022?

A.     I'll guess '21.

Q.     I don't want you to guess.

A.     I can get you the date.

Q.     That's fine.  We'll leave a blank and you can write in the date.

(INSERT)_____.

Q.     The East Harlem branch, does the credit union rent a part of that building or does it own the building?

A.     Only where we are on the first floor we occupy.

Q.     You rent the first floor.  Who owns the

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:30 PM
NYSCEF DOC. NO. 65
INDEX NO. 538433/2024
RECEIVED NYSCEF: 06/06/2025

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

building?  Do you know who owns the building?

A.      We do not.  If we own the building?

Q.      No.  Do you know who does own the building?

A.      I will say UHAB.

Q.      Is there a lease for the space that you rent?

A.      Yes.

Q.      Had you ever seen the lease?

A.      Yes.

Q.      Have you read it?

A.      Yes.

Q.      Did you sign it?

A.      No.

Q.      Now that building, is that a corner building?

A.      Can you repeat that?

Q.      Sure.  Is the building on a corner?

A.      Yes.

Q.      The address is 2285 Second Avenue.  Do you know what the corner is, what the cross street at the corner is?

A.      117th.

Q.      East 117th?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.    Yes.

Q.    How many entrances are there to the bank?

A.    We have two active entrances.

Q.    Where are they located?

A.    One in front of 2285 I believe.  The other one, I'm not sure if it's 83, but they're, like, two storefronts.

Q.    Are both storefronts on Second Avenue?

A.    Yes.

Q.    Does the bank have ATM machines?

A.    Yes.

Q.    Does the bank have, like, a separate area with the ATMs where people can go during times when the bank -- business hours are closed?

A.    Yes.  It's 24 hours.  It's not a separate place.  It's the same entrance, but we have a gate that divides where the ATM is and where the lobby is.

Q.    Are there any surveillance cameras in that area?

A.    Yes.

Q.    Do any of the surveillance cameras cover

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

the outside of the bank?

A.      Yes.

Q.      Would that be on the Second Avenue side?

A.      Second and 117th.

Q.      Inside the bank, are there any monitors
that people can view what the cameras are
showing?

A.      Yes.

Q.      Does the bank have a security staff?

A.      Yes.

Q.      Is that security staff that's employed
by the credit union or is it an outside
security agency?

A.      Let me go back.  When -- you said
security staff?

Q.      In other words, security guards,
security personnel.

A.      Only during certain days of the business
we hire one.

Q.      When you hire someone, is it an outside
agency, you get a guard or guards from an
outside agency?

A.      We have one guard we've been using
forever.  I'm not -- I don't recall how we got

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

him, but he come during check days, Social

Security payday.

Q.      What's his name?

A.      I don't recall his name, but I can get

it for you.

Q.      That's fine.  We'll leave a blank space

in the transcript.  If you can get his name,

write it in.

(INSERT)_____.

Q.      Were you using this security guard in

February, 2021?

A.      Yes.  Back then, yes.

Q.      Was it a guard that the credit union

paid for coming in on those days or was it an

agency that would send the guard in?

A.      We pay him.

Q.      Would anybody monitor the -- would

anybody be looking at the monitors for the

surveillance cameras on a daily basis?

A.      I will say every manager has a screen in

front of them where they see the activity.

Q.      That would be Ms. Jones back in 2021?

A.      Yes, Ms. Jones had one.

Q.      Would anybody else have one besides

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

Ms. Jones back in February, 2021?

A.      At what branch?

Q.      Everything that I'm asking you is about the East Harlem branch, okay?

A.      Yeah.  This is an office in the back also that I use when I'm there or Morrel use when she's there.  That one also has a camera.

Q.      Is there any kind of hookup where say on Avenue B you can watch the security cameras that are at the East Harlem branch?

A.      Yes.

Q.      Are those videos saved or on what they called a loop where 24 hours or 48 hours they re-tape over themselves?

A.      There is a limit.  I don't recall how long they're kept.  We have -- legally we have to keep them for a certain time.  They're kept for that.

Q.      Did you have any person specifically that you had contact with that you have?

A.      Not one person.  A couple of them.

Q.      Did -- back in 2021, do you remember the names of the persons you had contact with?

A.      I have to go back to my e-mail to see

FILED: NEW YORK COUNTY CLERK 04/06/2025 09:09 PM
INDEX NO. 538413/2024
NYSCEF DOC. NO. 15
RECEIVED NYSCEF: 06/06/2025

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 745 of 834

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

the list.  There's a few of them.  I always send a group e-mail.

Q.    Are any of those contacts from February, 2021?  Are any of them people that you still have contact with?

A.    Lately, yes.  I would say yes.

Q.    Who is it that you would have contact with from February, 2021 up until today?

A.    The last person I recall is McDonald.

Q.    You're saying McDonald?

A.    Yeah, Oscor.

        MS. BONOMO:  Can I get a spelling of that?

        THE WITNESS:  O-S-C-O-R.

        MS. BONOMO:  That's Oscor McDonald?

        THE WITNESS:  Yeah.

Q.    Do you know what his position is at UHAB?

A.    Oh, I have to double check.

Q.    Was there any -- did the credit union have any kind of cleaning staff for the bank at the East Harlem branch?

A.    Yes.

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

Q.    Were those credit union employees or was it some outside vendor that you would use for the cleaning?

A.    The consultant.

Q.    What's the name of the consultant?

A.    Freddy.  We refer to him as Freddy.  I don't have his full name.

Q.    If I said Cevallos, would that be his last name?

A.    I can get it for you.

Q.    Okay.

A.    I don't deal with them directly.

Q.    Was Freddy a full-time employee at the building?

A.    Of UHAB, I believe, yes.

Q.    Well, aside from Freddy, did the credit union have anyone that would come in after hours to clean the inside of the bank or anything like that?

A.    Not that I'm aware of.

Q.    Do you know if there's a basement at that building?

A.    There is a basement, yes.

Q.    Did the credit union have access to the

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

basement?

A.      Yes.

Q.      Did you use the basement for any reason?

                MS. BECHTEL:  What time period?

                MR. DELUCA:  Sorry, February,

        2021.

A.      No.

Q.      Are you familiar with an entity known as

Del-Mar Management?

A.      Yes.

Q.      What's your familiarity with that?  How

do you know them?

A.      I believe I seen them on the lease, the

management company.

Q.      Back in February, 2021, did you have any

contact with anyone from Del-Mar?

A.      February, '21, I don't recall.

Q.      How about now?  Do you have contact with

anyone at Del-Mar presently?

A.      You say the credit union.  The whole

credit union or me?

Q.      Let's start with you personally.

A.      I don't recall.

Q.      Do you know anyone named Nora Donkor?

NYSCEF DOC. NO. 65

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.      That don't sound familiar.

Q.      Have you ever spoken to her?

A.      Through e-mail.  All the staff, I talk to them through e-mail.

Q.      What about Eugene Fernandez, do you know anyone by that name?

A.      It don't ring a bell unless it's part of the e-mail change and I don't recall.

                (Whereupon, a recess was taken
        at this time.)

                (Whereupon, photograph was
        marked as Plaintiff's Exhibit 1, for
        identification, as of this date.)

Q.      Can you see the photo that's marked on the screen?

A.      Yes.

Q.      It's been -- we have a sticker on it. It's been marked Plaintiff's Exhibit 1 of this date, December 12th, 2023.  First off, do you know who took that photo?

A.      No.

Q.      Do you know when it was taken?

A.      No.

Q.      Do you know what's shown in the photo?

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 749 of 834

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.      Yes.

Q.      What's shown in the photo?

A.      I see the two doors of the credit union.

Q.      Is that the East Harlem credit union branch?

A.      That is correct.

Q.      The storefront that we're looking at there, is that the Second Avenue side?

A.      Yes.

Q.      Kind of in the middle toward the left of the photo, do you see a metal door on the sidewalk?

A.      Yes.

Q.      Do you know -- was that -- when the credit union began renting, was that metal door there?

A.      Yes.

Q.      If you look a little bit above the metal door, there's, like, a column and to the left of the column it looks like a doorway.  Is that a doorway -- is that an entrance to the credit union?

A.      No.

Q.      What is that door?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.     We have only two doors here that I know of.  It's the door that's going to the conference room and the one going to the branch.

Q.     Do you see two glass doors in the photo?

A.     Yes.

Q.     Are they both -- are both of those doors for the credit union?

A.     Yes.

Q.     The one all the way on the right, the bigger door, what's that door for?

A.     The one on the right, that's the one that goes to the conference room, conference area.

Q.     The other one, the one on the left, is that an entrance to the actual bank itself?

A.     Yes.  To the branch, yeah.

Q.     The one on the right, is that where the ATMs are located?

A.     The ATMs are on the left.

Q.     Are there surveillance cameras inside the area where the left door is?

A.     Not sure exactly where, but it has a view of the front.

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

Q.    How about the door on the right for the conference rooms?  Are any surveillance cameras there?

A.    We have to -- camera everywhere, but I don't know exactly the location.

Q.    At the times when you were rotating and you go to the lower east side -- the East Harlem branch, do you enter through one of those two doors?

A.    The one on the left -- on the right actually, the conference room.

Q.    At any time you were at the branch prior to February 22nd, 2021, did you see that metal -- those metal doors that are affixed to the sidewalk?

A.    I don't know.  I never saw it open.

          MS. BECHTEL:  I think he's
     asking if you see the doors in the
     photo, right?

A.    Yes.

Q.    Have you seen them before February of 2021?

A.    Yeah.

Q.    Looking at the doors -- the metal doors

A. BARRY-FALL

in the photo, are they a fair and accurate representation of how those -- how that -- how those metal doors looked when you would see them before February, 2021?

MS. BECHTEL:  Objection.  You can answer.

MS. BONOMO:  I didn't hear the answer.

MS. BECHTEL:  I don't know.  Is that what you said?

THE WITNESS:  Yes.

Q.    Was there any type of process or procedure if anyone -- if any customer of the bank had a complaint?

A.    Yes, we do.

Q.    Generally -- back in 2021, what was the procedure?

A.    Our procedure when a member complains, we refer them -- we have a supervisory committee.  We send them to the supervisory committee.  They're the ones that deal with member issue.

MS. BONOMO:  Can I get the answer read back?  I heard an echo.

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

(Whereupon, the record was read by the reporter.)

Q.    Let's say the branch -- Ms. Jones got a complaint, would she refer the complaint to you or would it be somebody else at the credit union that would get the complaint?

A.    It would go to her -- she will send it to her direct supervisor, which is the operation's -- the COO.  They will, of course, let me know and it --

(Whereupon, the record was read by the reporter.)

A.    -- will be escalated, sent to the supervisory committee that we have.

Q.    Who is the operation's CEO back in 2021?

A.    Victoria Rodriguez.

Q.    Is she still the operation's CEO?

A.    Yes; COO.

Q.    How many members were on the supervisory committee in February, 2021?

A.    I got to check that one.

Q.    I'm sorry?

A.    I will guess four.

Q.    Don't guess.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 754 of 834

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.      I'll get you the number.

Q.      Fair to say it was about four?

A.      Mm-hmm.

Q.      That was a yes?

A.      Yes.

Q.      Are you aware of any complaints prior to February 22nd, 2021 specifically about the metal doors on the sidewalk in front of the East Harlem branch?

A.      No.

Q.      At some point, did you become aware that Timothy Miller was claiming that he had an incident in front of the East Harlem branch?

A.      When the lawsuit happened, yes.

Q.      How did you become aware?

A.      I actually don't remember.

Q.      Did somebody tell you, did you get something in the mail, something else?

A.      I don't remember how I found out.

Q.      Do you remember when you found out, about when you found out?

A.      I have to go back to my e-mail and stuff, yeah.

Q.      Is that maybe how you found out, through

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:PM PM
NYSCEF DOC. NO. 85
INDEX NO. 538413/2024
RECEIVED NYSCEF: 03/06/2025
Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 755 of 834

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

an e-mail?

A.      I don't recall.  That's why I'm saying I have to go back and check.

Q.      Well, regardless of how you found out or when you found out, after you found out, did you speak to anyone other than a lawyer?

A.      When I found out, I call Cuna.  Any time we receive any litigation, they have to know right away.

Q.      Did you speak to anyone at the East Harlem branch after you found out about the incident?

A.      I did speak to people, but I don't remember the details of what happened then.

Q.      Do you remember who you spoke to?

A.      I don't remember.

Q.      Did you speak to anyone at UHAB after you found out about the incident?

A.      I'm sure I did, but I don't remember.  I have to go back and check.

Q.      Did you speak to anyone from Del-Mar after you found out about the incident.

A.      I have to go back and check.  I don't remember.

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:29 PM

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

Q.    After you found out about the incident, did you go to the branch personally?

A.    I don't remember.  It was during Covid. I don't remember.  I honestly don't remember. I have to go back and check, yeah.  I don't remember.

Q.    Do you recall if you spoke at all to Freddy?

A.    No, I don't speak to Freddy.

Q.    I just want to go over my notes a little.  I think Ms. Bonomo has some questions for you, so I'll yield the floor to her for the time being.

EXAMINATION BY

MS. BONOMO:

Q.    Good morning, I represent UHAB.  I just have some follow-up questions.  Who was the CEO of Lower East Side before you were?

A.    Maureen Jenna.

Q.    When did she leave as CEO of East Harlem?

A.    When I took on.  She left in July I will say, July or August.

Q.    Of what year?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.      2020.

Q.      Were you involved in any of the lease negotiations with UHAB?

A.      No.

Q.      Who, if anyone, was involved in the lease negotiations on behalf of Lower East Side?

A.      Maureen.

Q.      Was the lease between UHAB and Lower East Side signed by the time you came on as CEO in October of 2020?

A.      Yes, it was signed before.

Q.      Do you know when it was signed?

A.      January, 2020.

Q.      Do you know if East Harlem did any construction work prior to opening up the bank at that location on Second Avenue?

A.      Yes.

Q.      Who was in charge of overseeing that construction work?

A.       It was between Maureen, myself, and Victoria.

Q.      What are Victoria Rodriguez's job duties?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.      She's the COO.

Q.      What does she do as the COO?

A.      She oversees the operation.  Also oversees the IT.

Q.      Can you be a little more specific about what overseeing operations would entail?

A.      She's responsible of the operations, the day-to-day operations.  She makes sure that branches operating correctly on a daily basis and everything is functional in the branches.

Q.      What location is she based out of?

A.      All the branches.  Oh, she's based out of the main branch.

Q.      Who does Maureen answer to?

A.      The board.

Q.      Strike that.  Who does Victoria Rodriguez answer to?

A.      Maureen at that time.  When Maureen was COO she reported to the CEO.

Q.      So back in 2021, did Victoria answer to you?

A.      Yes.

Q.      So during what time period did the construction work go on at the Second Avenue

FILED: NEW YORK COUNTY CLERK 03/06/2025 09:00 PM INDEX NO. 158413/2024
NYSCEF DOC. NO. 65 RECEIVED NYSCEF: 03/06/2025

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

location?

A.      Can you repeat that, please?

Q.      What was the timeframe that the construction work went on?

A.      I have to go back and check the exact -- I know it ended when we opened in October, 2020.

Q.      Do you keep any type of electronic file for the Second Avenue branch?

A.      When you say "electronic file," what document?

Q.      So you've referred to a lot of e-mails. Are all the e-mails for the Second Avenue branch in one particular folder in your computer?

A.      They're not in a particular folder, but you can search them and go back.

Q.      Does East Harlem have any type of internal program where you save e-mails?

A.      No.

Q.      So if you wanted to pull up all of your e-mails relating to the Second Avenue location, how would you do that?

A.      I have to search by name or subject.

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

Get them like that.

MS. BECHTEL:  Are you referring to a particular time period, Tara?

MS. BONOMO:  That was a general question.

Q.    Currently, is that how you would do a particular search if you were looking for an e-mail for the Second Avenue location?

A.    Yes.

Q.    Was it the same back in 2021?

A.    Yes.

Q.    While the construction work was going on, would yourself or anyone else from East Harlem go to the Second Avenue location to see what was going on or to answer any questions from contractors or for any other reason?

A.    Could you start the question again?  I didn't catch the beginning.

(Whereupon, the record was read by the reporter.)

A.    Yeah.

Q.    Who would typically be there?

A.    It depends.  It could be me or Victoria.

Q.    So from January of 2020 until the

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

opening in October of 2020, approximately how many times did you go to the Second Avenue location?

A.      I don't remember.

Q.      Would it be one time?

A.      More than once, but I don't remember.

Q.      Would it be more than five times?

A.      Could be more than five.

Q.      Would it be more than 10 times?

A.      I have to go back and look at the period, like, how long the construction was just to give me a sense of it, yeah.

Q.      So --

A.      More than 10, yeah, it could be.

Q.      What types of records would you look at to figure out how often you were there during that time?

A.      When we go in, we just want to make sure, like, they're sticking to plan.  It was an interior, right?  We know they have the plan and they were remodelling the inside.  We just want to show, like, things are moving as planned.

MS. BONOMO:  Move to strike as

FILED: NEW YORK COUNTY CLERK 03/26/2025 09:31 PM
NYSCEF DOC. NO. 65
INDEX NO. 538413/2024
RECEIVED NYSCEF: 06/06/2025

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

not responsive.

Q.    My question was as you're referring you would have to go back and check the records to see how often you went to the location at that time period, what records is it that you're referring to that you need to go back to?

A.    I wanted to see, like, how long we were there for, how long the construction was going on, and how often they were there. Stuff like that.

Q.    What records would you check to obtain that information?

A.    I will say I will go through e-mail maybe or talk to Victoria to see if she remembers.

Q.    What information --

A.    She's no longer here.

Q.    What information would Victoria have access to that you wouldn't have access to?

A.    It's just recollection. Just communicating with her to see if she remembers.

Q.    So other than e-mails, are there any other records or documents that you would refer to that would refresh your recollection of how

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

often you went to the property during that time period?

A.    Besides talking to Victoria or maybe the contractor, I will say no.

Q.    Who was the contractor?

A.    AAA Builder.

Q.    Did East Harlem have a contract with AAA Builder?

A.    We had a contract, yes.

Q.    Who signed that contract?

A.    I believe it was Maureen.  You can go back and check it.

Q.    Have you ever seen that contract?

A.    I saw it in the past, yes.

Q.    Do you have access to that contract?

A.    I do.

Q.    Where would that contract -- where would you find that contract?

A.    It will be in our drive, the computer system.

Q.    Is there a specific drive that's saved for this location, the Second Avenue location?

A.    Yeah.  We have a drive.  Not only the Second Avenue.  We have a drive where we have

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

all of our leases and contracts.

Q.      How is that saved?  Is it saved by location or project or something else?

A.      It's just called lease and it's saved there.  The lease is saved with the lease and the contract is saved with the contracts.

Q.      Did you ever see the construction plans for the bank location on Second Avenue?

A.      Yes.

Q.      From your understanding, what was the scope of the construction work?

A.      It was for the interior of the credit union.

Q.      Did any of the construction work relate to the cellar?

A.      No.

Q.      Did any --

A.      Only --

Q.      Was there an interior stairwell from the bank that leads down to the cellar?

A.      Not that I'm aware of, no.

Q.      Have you ever gone to the back of the bank to look to see if there's an interior door leading to the cellar?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.      To the back of the -- I don't recall going to the back of the credit union.

Q.      Do you recall if the construction work involved redoing those interior steps to the cellar?

A.      I don't recall.  I have to go back and check.  I don't recall.

Q.      When you would go to the property while it was under construction, did you have any type of a regular schedule that you would go on?  Would it be a certain day of the week, certain time of the month?

A.      No.

Q.      From your recollection, who went to the property more during the construction work, you or Victoria or was it variable?

A.      I would say me.

Q.      Why did Maureen Jenna leave Lower East Side?

A.      I will say personal.  I don't know.

Q.      Do you know if she still resides in the state of New York?

A.      She should be.

                    (Whereupon, lease was marked as

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

          Defendant's Exhibit A, for

          identification, as of this date.)

Q.      I have here what's a 36 page document.
I'm going to scroll through some of the pages
and bring you to the signature page and then
I'm going to ask you some questions.  The
document that I just scrolled, do you know what
that document is?

A.      Yes.

Q.      What is it?

A.      The lease.

Q.      Is that the lease between UHAB and Lower
East Side?

A.      Yes.

Q.      Do you see a signature for Lower East
Side on page 21?

A.      Yes.

Q.      Whose signature is that?

A.      Maureen.

Q.      Going back to the first page, the first
line where it says lease dated January 15th,
2020 between UHAB and Lower East Side, does
that refresh your recollection as to the date
the lease was signed?

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 767 of 834

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.      Yes.

Q.      Referring to page 27, have you ever seen this diagram before?

A.      I was more into the inside, the decoration, like, the way the branch will look.

Q.      So is that a no, you've never seen this before?

A.      No, I saw it, but maybe don't know what is in it in detail.

Q.      Referring to the upper left portion of the diagram, do you see where it says "Existing open cellar" on left side of the diagram?

A.      I see that.

Q.      What portion, if any, of the bank is that?

A.      Is that inside or outside?  I don't --

Q.      Do you know?

A.      I don't know.

Q.      Do you see where it says on the left side "Contractor to remove existing damaged stairs.  Provide new steel steps to replace existing?"  Do you see where it says that on the left side of page 27?

A.      I can't see it, but when you read, yes.

FILED: NEW YORK COUNTY CLERK 04/06/2025 09:09 PM
NYSCEF DOC. NO. 45
Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 768 of 834
INDEX NO. 538433/2024
RECEIVED NYSCEF: 06/06/2025
Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

Q.    Where are those stairs located?

A.    I don't know.  It looks like the basement because I see the stairs going down to the basement.

Q.    How many times have you been to the branch on Second Avenue?

A.    I used to go every Tuesday at the beginning.

Q.    So from January until Covid, which was March of 2020, you went every Tuesday?

A.    We opened in October.  We opened the branch in October.  I used to go every Tuesday.

Q.    The lease was signed in January of 2020, correct?

A.    Mm-hmm.

Q.    Is it your testimony from January until sometime around October of 2020 there was construction work going on?

A.    Probably, yeah.  I have to look at, you know, if they stopped -- that was during renovation time, construction time.

Q.    So during roughly January, 2020 to October 2020, how often did you go to the branch on second Avenue?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.    As I responded earlier, I cannot tell you exactly how often.  I have to go back and check.

Q.    During the Covid shutdown in 2020, did you visit the premises?

A.    During shutdown, I don't believe so.  I don't believe so.

Q.    What about summer of 2020?  Did you go to the premises?

A.    2020?

Q.    In the summer of 2020.

A.    That was during the construction.  I used to go -- we used to go check the construction, yes.

Q.    So during the summer of 2020 until October of 2020, how often did you go to the premises?

A.    I don't remember.

Q.    Once the construction work was done and the bank was opened, is that when you started going every Tuesday?

A.    That is correct.

Q.    How often did you go every Tuesday for?

A.    I think until the shutdown.  I have to

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

double check.

Q.    Now we're after -- the store opens in October, 2020, correct?

A.    Yes.

Q.    So from October, 2020, moving forward, how often did you go every Tuesday, for how long?

A.    I have to double check to confirm with you.

Q.    What would you have to double check, what records?

A.    Again, I need to speak with Victoria, I need to look at my e-mails because usually I may have something saying that I'm at the branch.  I have to double check to find out how long I was doing it for.

Q.    Can you approximate for me?  Was it one month, six months, a year?

A.    I need to double check.

Q.    In 2022, were you going every Tuesday?

A.    No.  After Covid since the lockdown started, I stopped that rotation.

Q.    So when you're saying after Covid, I know we all have different ideas.  When you say

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

Covid ended, what timeframe are you referring to?

A.    I will say from the lockdown.  I don't think I was doing that because I couldn't do it.  Since then, I did not resume going every Tuesday.

Q.    Have you been to the second Avenue property in 2023?

A.    Yes, I did.

Q.    How many times?

A.    I have to go back and check, but not often.

Q.    Approximately.

A.    I need to check.

Q.    Other than checking your e-mails, is there any other way to show how often you've been at the property in 2023?

A.    I would say e-mail.  I don't see how else because I usually send notification.

Q.    So prior to attending -- to visiting the Second Avenue branch, would you send an e-mail to them the day before when you would go?

A.    When I'm there I'll send an e-mail.

Q.    Who would you send the e-mail to?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.     The management team.

Q.     Who is the -- who do you consider the management team?

A.     Victoria, Alicia, Alfonsina, Francisca, Christian.

Q.     Are any of these people based out of the Second Avenue location?

A.     Alfonsina worked there move before leaving.

Q.     Of the five people on the management team, are they currently employed by Lower East Side?

A.     Only Alfonsina is not.

Q.     What is Alicia's position?

A.     She's the director of marketing.

Q.     Where is she based out of?

A.     She rotates between the main branch and East Harlem.

Q.     What's Francisca's last name?

A.     Francisca's mainly North Shore and main branch.

Q.     What's Francisca's last name?

A.     Fabian.

Q.     What's her title?

Aissatou Barry-Fall
December 12, 2023

                    A. BARRY-FALL

A.     She's the chief lending officer.

Q.     What's Christian's last name?

A.     Christian is Chirila, C-H-I-R-I-L-A.

Q.     What's Christian's title?

A.     He's the CFO.

Q.     Were all of these employees employed
back in 2021 by Lower East Side?

A.     Yes.  I got to check Christian's start
day.  He's the newest one.

Q.     When the bank opened in October of 2020,
what were the hours of the bank?

A.     My recollection, we had the same hours,
9:00 to 4:00 Monday to Friday.

Q.     Did you review any documents or
photographs before testifying today?

A.     If I what?  Can you repeat that?

Q.     Reviewed anything; any documents,
e-mails, photos before testifying today.

A.     Yeah.  I briefly went through the
discovery response, the e-mail.

       MS. BECHTEL:  By counsel, she
       reviewed the response to plaintiff's
       combined demands.

Q.     What e-mails did you review before

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 774 of 834

Aissatou Barry-Fall
December 12, 2023

                        A. BARRY-FALL

testifying today?

A.      I was going back to e-mail

correspondence with UHAB.

          MS. BECHTEL:  It's in the

     discovery response from yesterday.

          MS. BONOMO:  I did not see that.

          MS. BECHTEL:  Oh, I sent it at

     --

          MS. BONOMO:  I saw the -- I did

     not see the --

          MS. BECHTEL:  Here, let me find

     the e-mail.  Hold on.

          (Whereupon, a discussion was

     held off the record.)

Q.      What's your highest level of education?

A.      Bachelor's.

Q.      From where?

A.      From CSI, college of Staten Island.

Q.      When did you obtain that degree?

A.      1999.

Q.      What was the degree in?

A.      Business administration.

          (Whereupon, a recess was taken

     at this time.)

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

Q.      Ms. Barry-Fall, can you see this photograph that was previously marked as Plaintiff's Exhibit 1?

A.      Yes.

Q.      Can you tell me by looking at Plaintiff's Exhibit 1 where the surveillance cameras are located outside of the store?

A.      I don't know where they are located, but I know we have a view.

Q.      The view that you're referring to, have you ever seen a view of the outside from a computer screen?

A.      Yeah.  You can see the front.

Q.      Do you see where the metal cellar doors are to the left of the photo?

A.      Yes.

Q.      Does the video pick up that particular location as well?

A.      It should.

Q.      Did Lower East Side install the surveillance camera system?

A.      Yes.

Q.      Was an outside company hired to install that system?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.     Yes.

Q.     How is the video footage stored?  Does it go to a centralized location or something else?

A.     I believe it stay at the credit union. We have a computer room.

Q.     At which location?

A.     Every location have the camera, the computer room, every branch.

Q.     So if you wanted to pull up the surveillance footage for the Second Avenue location from your office at the main branch, would you be able to do that?

A.     Should be able to.

Q.     At any time after this accident, did you ever pull up the surveillance footage looking to see if Mr. Miller's accident occurred when he said he claimed it did?

A.     My recollection, we went, but when we look at the timeframe from the time we found out, we did not have the footage for that day. We no longer had them.

Q.     Did you contact anyone -- withdrawn.
       Who's the company that installed the

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

system?

A.      Nypek.

Q.      Did you ever contact anyone at Nypek to see if you could recover that footage?

A.      They didn't have it.  We contacted them prior to the incident, but they don't keep anything on their side.

Q.      Who contacted Nypek?

A.      Either me or Victoria.

Q.      Do you have an independent recollection of contacting Nypek?

A.      Yes, I do.

Q.      Was that by phone?

A.      Yeah, either phone or e-mail.  I don't recollect which one.

Q.      If it was done by e-mail, would you still have a copy of that e-mail?

A.      If it was e-mail, I will, yes.

Q.      Approximately when did you reach out to Nypek to see if there was video surveillance?

A.      I don't really recall when we got the -- you know, we found out about this.

Q.      What year did you find out about this accident?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.    I have to go back and check when we told Cuna because we called them right away.  I have to go back and check.

Q.    That would be checking your e-mails?

A.    Yeah, or calling Susan.  E-mail definitely, yes.

Q.    Who is Susan?

A.    Susan is our contact at the -- she was the one in charge of the litigation.

Q.    Is Susan still employed by UHAB?

MS. BECHTEL:  Objection.  Cuna.

(Whereupon, a discussion was held off the record.)

Q.    Is Susan an employee of Lower East Side?

A.    No.

Q.    Were there any accident reports filled out by Lower East Side in connection with the plaintiff's accident?

A.    Can you repeat that, please?

Q.    Did anyone at UHAB fill out any accident reports in connection with the plaintiff's accident?

A.    If there was another report?

MS. BECHTEL:  Anyone at UHAB

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

fill out any reports you're asking?

MS. BONOMO:  Sorry, Lower East Side.

Q.     Was there an accident report filled out?

A.     No.  We weren't aware of the accident until we received the litigation.

Q.     Did anyone at Lower East Side ever witness the plaintiff's accident?

A.     No.

Q.     Does anyone ever check the cameras in front of the storefront on the weekends when the bank is closed?

A.     I got to check on the procedures on what they do on that.

Q.     Is it your understanding that someone was monitoring the cameras while the bank is closed?

A.     We don't have anyone on staff that monitors the camera.

Q.     So if the camera would pick up some type of activity that seemed suspicious or otherwise on a weekend, how would it or would Lower East Side be notified by anyone?

A.     If we get notified of any incident,

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

we'll just go and check the camera.

Q.      Who would be the person that would notify Lower East Side if it's a weekend not during business hours?

A.      Whomever is involved or witnessed it.

Q.      So is it accurate to say that no one's watching these computer screens when the bank is closed?

A.      That is correct.

Q.      Before testifying here today, did you do a couple of searches on your e-mails?

A.      Yes, I did.

Q.      What were the things that you were searching for before today's testimony?

A.      Just communication to UHAB related to the repair and --

Q.      Relating to what repair?

A.      Anything that had to do with the sidewalk, the door.

Q.      So when you did that search on your e-mail, were you searching by a specific name or title or something else?

A.      The subject.

Q.      What subject did you put in your search?

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

A.    Sidewalk repair, the address.  I tried different things.

Q.    So approximately how many e-mails popped up during your searches?

A.    A few.  I didn't count them.

Q.    When you say "a few," approximately how many are we talking about?

A.    I would say I got a list of seven to ten I would guess.

Q.    What did you do with that list?

A.    I have it printed.

Q.    Did you give all those seven to ten e-mails to your attorney?

A.    I don't think I gave her all of them.  I just gave her -- because when you print one, you will have everything on the communication below.

Q.    Approximately how many e-mails did you give to your attorney?

A.    Can I count it?  I don't remember. Whatever I found.  It's part of the exhibit, I think.

Q.    At some point, did you speak with someone at UHAB regarding a repair to the

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 782 of 834

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

sidewalk?

A.      Communication e-mail, yes.

Q.      So right now I'm not referring to an e-mail, but I'm referring to your recollection, and I ask that you not refer to any specific documents in front of you.

A.      I didn't talk to anyone besides e-mail.

Q.      How did you come to learn that there was going to be a repair to the sidewalk at some point?

A.      I got an e-mail from UHAB.

Q.      When was that?  Again, I'm asking you not to reference any documents right now.

A.      2020.  September, 2020.

Q.      From your recollection, what did that e-mail -- who was that e-mail from?

A.      Sharmen.

Q.      Would that be Brent Sharmen?

A.      I believe so.

Q.      Was that the first time you had ever received an e-mail from Brent Sharmen regarding the sidewalk?

A.      I will say so.  I can go double check the one I saw.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 783 of 834

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

Q.    Were there any complaints made by anyone from UHAB regarding the sidewalk in front of the bank on Second Avenue?

A.    Complaint made?  No.

Q.    The e-mail that you're referring to that was in September of 2021, did that relate to the cellar doors in front of the bank on Second Avenue?

A.    Yes, it was part of it.  It was part of the repair.  It was in 2020, not 2021.

Q.    When was the repair done?

A.    I don't know when they did it.

Q.    Were you present when it was done?

A.    Hmm?

Q.    Were you present when it was done?

A.    No, I was not.  I have to go back through the e-mails.

        MS. BONOMO:  Counsel, do you have any follow-up?  I'm going to review my notes.

        MR. DELUCA:  Yeah, I just have one, actually.

        MS. BONOMO:  Otherwise I'm going to need to take a five minute break.

Aissatou Barry-Fall
December 12, 2023

A. BARRY-FALL

CONTINUED EXAMINATION BY

MR. DELUCA:

Q.      The supervisory committee, does it meet regularly?  Did it have regularly scheduled meetings?

A.      They meet monthly.

Q.      Do they keep minutes of their meetings?

A.      Yes, they do.

Q.      Back in February, 2021, what were the hours of the bank for weekdays?

A.      It's supposed to be 9:00 to 4:00 Monday to Friday.

Q.      Was it open on Saturdays?

A.      No.

Q.      Sundays?

A.      No.  It's not a bank.  It's a credit union.

              (Whereupon, a discussion was
        held off the record.)

Q.      When I refer to the bank, did you understand that to mean the East Harlem credit union?

A.      Yes.

CONTINUED EXAMINATION BY

Aissatou Barry-Fall
December 12, 2023

MS. BONOMO:

Q.      Do you know someone by the name of Mr. Hamzat?

A.      That's the contractor.

Q.      What company is he with?

A.      AAA Builder.

Q.      Is there someone by the name of Reicher? Is that a last name?

A.      I don't recall.

                MS. BONOMO:  I have nothing further.

                MR. DELUCA:  I don't have anything else.

                (Time Noted:  11:53 a.m.)


                        AISSATOU BARRY-FALL


Subscribed and sworn to before me this      day of      , 2023.




          Notary Public

Aissatou Barry-Fall
December 12, 2023

                           I N D E X


WITNESS                    EXAMINATION BY    PAGE

Aissatou Barry-Fall    Mr. Deluca           5; 58

                       Ms. Bonomo           30; 58


                       EXHIBITS

PLAINTIFF'S            DESCRIPTION           PAGE

1                     Photograph            22

DEFENDANT'S            DESCRIPTION           PAGE

A                     Lease                 39


                       INSERTS

DESCRIPTION                                 PAGE

Ms. Jones retirement date                  13

Guard name                                 1

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 787 of 834

Aissatou Barry-Fall
December 12, 2023

C E R T I F I C A T E

I, JUSTIN ORTIZ, hereby certify that the Examination Before Trial of Aissatou Barry-Fall was held before me on the 12th day of December, 2023; that said witness was duly sworn before the commencement of her testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;                    That the within transcript is a true record of the Examination Before Trial of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of December, 2023.

_____

JUSTIN ORTIZ

Aissatou Barry-Fall
December 12, 2023

Errata Sheet


NAME OF CASE: Timothy Miller vs UHAB Housing Development Fund Corporation

DATE OF DEPOSITION: 12/12/2023

NAME OF WITNESS: Aissatou Barry-Fall

Reason Codes:

    1. To clarify the record.

    2. To conform to the facts.

    3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____



                        _____
                        Aissatou Barry-Fall

Aissatou Barry-Fall
December 12, 2023

**Exhibits**

**EX 0001 Aissa
tou Barry-
Fall PLFT 121
223**
  22:13,19
  49:4,7
**EX A Aissatou
 Barry-
Fall DEFT 121
223**
  40:2 60:12

---

**1**

**1**
  22:13,19
  49:4,7
**10**
  35:10,15
**10009**
  5:15 7:22
**117th**
  14:24,25
  16:5
**12th**
  22:20
**15th**
  40:22
**1991**
  8:11,12
**1999**
  48:21

---

**2**

**2**
  8:5
**2020**
  10:25 31:2,
  12,15 33:8
  34:25 35:2
  40:23 42:11,
  14,18,23,24
  43:5,9,11,

  12,16,17
  44:4,6 47:11
  56:15 57:11
**2021**
  11:22,25
  12:3,17
  13:13 17:12,
  23 18:2,23
  19:5,9 21:7,
  16 25:14,23
  26:5,17
  27:16,21
  28:8 32:21
  34:11 47:8
  57:7,11
  58:10
**2022**
  13:13 44:21
**2023**
  22:20 45:9,
  18
**21**
  13:14 21:18
  40:17
**2285**
  7:25 14:21
  15:7
**22nd**
  11:21 25:14
  28:8
**24**
  15:18 18:14
**27**
  41:3,24

---

**3**

**36**
  40:4
**37**
  5:15 7:21
  8:21

---

**4**

**4**
  8:4

**48**
  18:14
**4:00**
  47:14 58:12

---

**8**

**83**
  15:8

---

**9**

**9:00**
  47:14 58:12

---

**A**

**AAA**
  37:7,8
**able**
  50:14,15
**above**
  23:19
**access**
  20:25 36:20
  37:16
**accident**
  50:16,18
  51:25 52:17,
  19,21,23
  53:5,6,9
**accurate**
  26:2 54:7
**active**
  15:5
**activity**
  17:22 53:22
**actual**
  24:17
**address**
  5:13 7:5,6,
  24 14:21
  55:2
**addresses**
  7:19

**administratio
n**
  48:23
**affixed**
  25:15
**agency**
  16:14,22,23
  17:16
**Aissatou**
  5:12
**Alfonsina**
  12:10,12
  46:5,9,14
**Alicia**
  46:5
**Alicia's**
  46:15
**answer**
  5:25 6:7,13,
  17,24 26:7,
  9,25 32:15,
  18,21 34:16
**Anthony**
  5:20
**anybody**
  17:18,19,25
**anyone**
  20:18 21:17,
  20,25 22:7
  26:14 29:7,
  11,18,22
  31:6 34:14
  50:24 51:4
  52:21,25
  53:8,11,19,
  24 56:8 57:2
**approximate**
  44:18
**approximately**
  11:16 35:2
  45:14 51:20
  55:4,7,19
**area**
  15:15,23
  24:15,23
**around**
  42:18

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 790 of 834

Aissatou Barry-Fall
December 12, 2023

**asking**
  6:10,11 18:4
  25:19 53:2
  56:13
**assistant**
  12:6
**ATM**
  15:12,20
**ATMS**
  15:15 24:20,
  21
**attending**
  45:21
**attorney**
  55:14,20
**August**
  30:24
**Avenue**
  5:15 7:5,21,
  25 8:5,21
  9:10,13,18,
  19,22 10:12,
  17,21 14:21
  15:10 16:4
  18:10 23:9
  31:18 32:25
  33:10,14,23
  34:9,15 35:3
  37:23,25
  38:9 42:7,25
  45:8,22 46:8
  50:12 57:4,9
**aware**
  20:21 28:7,
  12,16 38:22
  53:6

---

**B**

---

**Bachelor's**
  48:17
**back**
  6:3 8:17,18
  12:3,19
  16:15 17:13,
  23 18:2,6,
  23,25 21:16

26:17,25
27:16 28:23
29:4,21,24
30:6 32:21
33:6,18
34:11 35:11
36:4,7 37:13
38:23 39:2,
3,7 40:21
43:3 45:12
47:8 48:3
52:2,4 57:17
58:10
**bank**
  7:15,17
  15:4,12,14,
  16 16:2,6,10
  19:23 20:19
  24:17 26:15
  31:17 38:9,
  21,24 41:15
  43:21 47:11,
  12 53:13,17
  54:8 57:4,8
  58:11,17,21
**Barry-fall**
  5:12 6:1 7:1
  8:1 9:1 10:1
  11:1 12:1
  13:1 14:1
  15:1 16:1
  17:1 18:1
  19:1 20:1
  21:1 22:1
  23:1 24:1
  25:1 26:1
  27:1 28:1
  29:1 30:1
  31:1 32:1
  33:1 34:1
  35:1 36:1
  37:1 38:1
  39:1 40:1
  41:1 42:1
  43:1 44:1
  45:1 46:1
  47:1 48:1
  49:1,2 50:1

51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
**based**
  32:12,13
  46:7,17
**basement**
  20:22,24
  21:2,4 42:4,
  5
**basis**
  17:20 32:10
**BECHTEL**
  21:5 25:18
  26:6,10 34:3
  47:22 48:5,
  8,12 52:12,
  25
**began**
  8:12,22
  23:16
**begin**
  8:9
**beginning**
  11:10,12
  34:19 42:9
**behalf**
  5:21 31:7
**believe**
  15:7 20:16
  21:14 37:12
  43:7,8 50:6
  56:20
**bell**
  22:8
**below**
  55:18
**besides**
  17:25 37:4
  56:8
**bigger**
  24:12
**bit**
  8:7 23:19
**blank**
  13:17 17:7

**board**
  32:16
**Bonomo**
  5:9 8:6
  19:13,16
  26:8,24
  30:12,16
  34:5 35:25
  48:7,10 53:3
  57:19,24
**branch**
  7:22,23 8:4,
  21 9:10,16,
  23,25 10:11,
  14,17,19,21
  11:9,11,21
  12:4,5,7,22
  13:2,4,20
  18:3,5,11
  19:24 23:6
  24:5,18
  25:9,13 27:4
  28:10,14
  29:12 30:3
  32:14 33:10,
  15 41:6
  42:7,13,25
  44:16 45:22
  46:18,22
  50:10,13
**branches**
  7:17,20
  10:2,6,11
  11:3 32:10,
  11,13
**break**
  6:21,23,25
  7:2 57:25
**Brent**
  56:19,22
**briefly**
  47:20
**bring**
  40:6
**Builder**
  37:7,9
**building**
  13:21,22

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 791 of 834

Aissatou Barry-Fall
December 12, 2023

14:2,3,5,16,
17,19 20:15,
23
**business**
7:6,7,8,13
15:16 16:19
48:23 54:5

---

**C**

---

**C-H-I-R-I-L-A**
47:4
**call**
29:8
**called**
18:14 38:5
52:3
**calling**
9:24 52:6
**camera**
18:8 25:5
49:22 50:9
53:20,21
54:2
**cameras**
15:22,25
16:7 17:20
18:10 24:22
25:3 49:8
53:11,17
**catch**
34:19
**cellar**
38:16,21,25
39:6 41:13
49:15 57:8
**centralized**
50:4
**CEO**
9:5,6 10:3,
10,16,18,24
11:3 27:16,
18 30:18,21
31:11 32:20
**certain**
16:19 18:18
39:12,13

**Cevallos**
20:9
**CFO**
9:5 47:6
**change**
8:23,25 9:13
22:9
**charge**
31:20 52:10
**check**
17:2 19:21
27:22 29:4,
21,24 30:6
33:6 36:4,12
37:13 39:8
43:4,14
44:2,9,11,
16,20 45:12,
15 47:9
52:2,4
53:11,14
54:2 56:24
**checking**
45:16 52:5
**chief**
47:2
**Chirila**
47:4
**Christian**
46:6 47:4
**Christian's**
47:3,5,9
**claimed**
50:19
**claiming**
28:13
**clean**
20:19
**cleaning**
19:23 20:4
**closed**
15:17 53:13,
18 54:9
**college**
48:19
**column**
23:20,21

**combined**
47:24
**come**
17:2 20:18
56:9
**commercial**
12:20
**committee**
26:21,22
27:15,21
58:4
**communicating**
36:22
**communication**
54:16 55:17
56:3
**company**
21:15 49:24
50:25
**complains**
26:19
**complaint**
26:15 27:5,7
57:5
**complaints**
28:7 57:2
**computer**
33:16 37:20
49:13 50:7,
10 54:8
**conference**
24:4,14
25:3,12
**confirm**
44:9
**connection**
52:18,22
**consider**
46:3
**construction**
31:17,21
32:25 33:5
34:13 35:12
36:9 38:8,
12,15 39:4,
10,16 42:19,
22 43:13,15,

20
**consultant**
20:5,6
**contact**
18:21,24
19:6,8
21:17,19
50:24 51:4
52:9
**contacted**
51:6,9
**contacting**
51:12
**contacts**
19:4
**CONTINUED**
58:2,25
**contract**
37:8,10,11,
14,16,18,19
38:7
**contractor**
37:5,6 41:21
**contractors**
34:17
**contracts**
38:2,7
**COO**
27:10,19
32:2,3,20
**copy**
5:10 51:18
**corner**
14:16,19,22,
23
**correct**
8:3 9:11
23:7 42:15
43:23 44:4
54:10
**correctly**
11:2 32:10
**correspondenc
e**
48:4
**counsel**
47:22 57:19

Aissatou Barry-Fall
December 12, 2023

count
  55:6,21
couple
  6:5 11:19
  18:22 54:12
course
  27:10
court
  6:3
cover
  15:25
Covid
  11:18 30:4
  42:10 43:5
  44:22,24
  45:2
credit
  7:9,10,11
  8:10 9:21
  12:13,21,23
  13:7,20
  16:13 17:14
  19:22 20:2,
  17,25 21:21,
  22 23:4,5,
  16,22 24:9
  27:6 38:13
  39:3 50:6
  58:17,22
cross
  14:22
CSI
  48:19
Cuna
  29:8 52:3,12
current
  9:6
customer
  26:14
cut
  6:16

**D**

daily
  17:20 32:10

damaged
  41:21
date
  13:10,12,16,
  18 22:14,20
  40:3,24
dated
  40:22
day
  39:12 45:23
  47:10 50:22
day-to-day
  32:9
days
  16:19 17:2,
  15
deal
  20:13 26:22
December
  22:20
decoration
  41:6
Defendant's
  40:2
definitely
  52:7
degree
  48:20,22
Del-mar
  21:10,17,20
  29:22
Deluca
  5:8,20 21:6
  57:22 58:3
demands
  47:24
depends
  34:24
detail
  41:10
details
  29:15
diagram
  41:4,12,13
different
  8:16 10:2
  44:25 55:3

direct
  27:9
directly
  20:13
director
  46:16
discovery
  47:21 48:6
discussion
  48:14 52:13
  58:19
divides
  15:20
document
  33:12 40:4,
  8,9
documents
  36:24 47:15,
  18 56:7,14
doing
  44:17 45:5
Donkor
  21:25
door
  23:12,16,20,
  25 24:3,12,
  23 25:2
  38:24 54:20
doors
  23:4 24:2,6,
  8 25:10,15,
  19,25 26:4
  28:9 49:15
  57:8
doorway
  23:21,22
double
  19:21 44:2,
  9,11,16,20
  56:24
drive
  37:20,22,24,
  25
duly
  5:3
duties
  31:25

**E**

e-mail
  18:25 19:3
  22:4,5,9
  28:23 29:2
  34:9 36:14
  45:19,22,24,
  25 47:21
  48:3,13
  51:15,17,18,
  19 52:6
  54:22 56:3,
  5,8,12,17,22
  57:6
e-mails
  33:13,14,20,
  23 36:23
  44:14 45:16
  47:19,25
  52:5 54:12
  55:4,14,19
  57:18
earlier
  43:2
easier
  10:20
east
  7:11,23
  10:19 11:8,
  21 12:4,25
  13:3,20
  14:25 18:5,
  11 19:24
  23:5 25:8
  28:10,14
  29:11 30:19,
  21 31:7,11,
  16 33:19
  34:14 37:8
  39:19 40:14,
  16,23 46:12,
  19 47:8
  49:21 52:15,
  18 53:3,8,23
  54:4 58:22

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 793 of 834

Aissatou Barry-Fall
December 12, 2023

| | | | |
|---|---|---|---|
| **echo** 26:25 | **exhibit** 22:13,19 40:2 49:4,7 55:22 | **first** 5:3 6:6,24 13:23,25 22:20 40:21 56:21 | 53:12 56:7 57:3,8 |
| **education** 48:16 | **existing** 41:12,21,23 | **fiscal** 9:3,15 | **full** 20:8 |
| **either** 51:10,15 | | **five** 35:8,9 46:11 57:25 | **full-time** 9:2,9 20:14 |
| **electronic** 33:9,11 | **F** | **floor** 13:23,25 30:13 | **functional** 32:11 |
| **employed** 13:6 16:12 46:12 47:7 52:11 | **Fabian** 46:24 | **folder** 33:15,17 | **G** |
| **employee** 12:13,17 20:14 52:15 | **fair** 26:2 28:3 | **follow-up** 30:18 57:20 | **gate** 15:20 |
| **employees** 20:2 47:7 | **familiar** 21:9 22:2 | **follows** 5:6 | **gave** 7:5 55:15,16 |
| **ended** 33:7 45:2 | **familiarity** 21:12 | **footage** 50:3,12,17 22 51:5 | **general** 34:5 |
| **entail** 32:7 | **February** 11:21 12:3, 17 17:12 18:2 19:4,9 21:6,16,18 25:14,22 26:5 27:21 28:8 58:10 | **forever** 16:25 | **Generally** 26:17 |
| **enter** 25:9 | | **forward** 44:6 | **gesture** 6:7 |
| **entire** 12:21,23 | | **found** 28:20,21,22, 25 29:5,6,8, 12,19,23 30:2 50:21 51:23 55:22 | **give** 6:13 35:13 55:13,20 |
| **entity** 21:9 | **Federal** 7:11 | | **glass** 24:6 |
| **entrance** 15:19 23:22 24:17 | **Fernandez** 22:6 | | **goes** 24:14 |
| **entrances** 15:3,5 | **figure** 35:17 | **four** 27:24 28:3 | **going** 5:22 6:5,11 11:13 24:3,4 34:13,16 36:9 39:3 40:5,7,21 42:4,19 43:22 44:21 45:6 48:3 56:10 57:20, 24 |
| **escalated** 27:14 | **file** 33:9,11 | **Francisca** 46:5 | |
| **Eugene** 22:6 | **fill** 52:21 53:2 | **Francisca's** 46:20,21,23 | |
| **exact** 13:12 33:6 | **filled** 52:17 53:5 | **Freddy** 20:7,14,17 30:9,10 | |
| **exactly** 11:15,16 13:11 24:24 25:6 43:3 | **financial** 7:14 | **Friday** 47:14 58:13 | **Good** 5:16,17 30:17 |
| **EXAMINATION** 5:7 30:15 58:2,25 | **find** 37:19 44:16 48:12 51:24 | **front** 15:7 17:22 24:25 28:9, 14 49:14 | **group** 19:3 |
| **examined** 5:5 | **fine** 13:17 17:7 | | **guard** 16:22,24 17:11,14,16 |
| | **finished** 6:10 | | |

Aissatou Barry-Fall
December 12, 2023

**guards**
  16:17,22
**guess**
  13:14,15
  27:24,25
  55:10
**guessing**
  11:17

---

### H

**half**
  6:17
**happened**
  28:15  29:15
**Harlem**
  7:23  10:19,
  21  11:9,21
  12:4  13:2,3,
  20  18:5,11
  19:24  23:5
  25:9  28:10,
  14  29:12
  30:22  31:16
  33:19  34:15
  37:8  46:19
  58:22
**head**
  6:8  9:3,12
**hear**
  5:18,23  26:8
**heard**
  26:25
**held**
  48:15  52:14
  58:20
**highest**
  48:16
**hire**
  16:20,21
**hired**
  49:24
**Hmm**
  57:15
**Hold**
  48:13

**honestly**
  30:5
**hookup**
  18:9
**hours**
  15:16,18
  18:14  20:19
  47:12,13
  54:5  58:11

---

### I

**ideas**
  44:25
**identificatio
n**
  22:14  40:3
**incident**
  28:14  29:13,
  19,23  30:2
  51:7  53:25
**independent**
  51:11
**information**
  36:13,17,19
**INSERT**
  13:19  17:10
**inside**
  16:6  20:19
  24:22  35:22
  41:5,17
**install**
  49:21,24
**installed**
  50:25
**institution**
  7:14
**interior**
  35:21  38:13,
  20,24  39:5
**internal**
  33:20
**involved**
  31:3,6  39:5
  54:6
**Island**
  8:4  10:7

  48:19
**issue**
  26:23

---

### J

**January**
  11:25  31:15
  34:25  40:22
  42:10,14,17,
  23
**Jenna**
  30:20  39:19
**job**
  8:13,23
  12:19  31:24
**Jones**
  12:9  13:3,6,
  9  17:23,24
  18:2  27:4
**July**
  30:23,24

---

### K

**keep**
  18:18  33:9
  51:7  58:8
**kept**
  18:17,18
**kind**
  18:9  19:23
  23:11
**know**
  5:25  6:11,22
  7:24  12:10
  14:2,4,22
  19:19  20:22
  21:13,25
  22:6,21,23,
  25  23:15
  24:2  25:6,17
  26:10  27:11
  29:9  31:14,
  16  33:7
  35:21  39:21,
  22  40:8

  41:9,18,19
  42:3,21
  44:25  49:9,
  10  51:23
  57:13
**known**
  21:9

---

### L

**lawsuit**
  5:22  28:15
**lawyer**
  29:7
**leading**
  38:25
**leads**
  38:21
**learn**
  56:9
**lease**
  14:7,10
  21:14  31:3,
  7,10  38:5,6
  39:25  40:12,
  13,22,25
  42:14
**leases**
  38:2
**leave**
  13:17  17:7
  30:21  39:19
**leaving**
  46:10
**left**
  23:11,20
  24:16,21,23
  25:11  30:23
  41:11,13,20,
  24  49:16
**legally**
  18:17
**lending**
  12:20  47:2
**level**
  48:16

Aissatou Barry-Fall
December 12, 2023

**limit**
 18:16
**line**
 40:22
**list**
 19:2 55:9,11
**litigation**
 29:9 52:10
 53:7
**little**
 8:7 23:19
 30:12 32:6
**live**
 10:8
**lobby**
 15:21
**located**
 15:6 24:20
 42:2 49:8,9
**location**
 8:15,16,18
 25:6 31:18
 32:12 33:2,
 23 34:9,15
 35:4 36:5
 37:23 38:4,9
 46:8 49:19
 50:4,8,9,13
**locations**
 8:17 9:13
**lockdown**
 44:22 45:4
**long**
 7:2 11:13,17
 18:17 35:12
 36:8,9 44:8,
 17
**longer**
 12:16 36:18
 50:23
**look**
 23:19 35:11,
 16 38:24
 41:6 42:20
 44:14 50:21
**looked**
 26:4

**looking**
 17:19 23:8
 25:25 34:8
 49:6 50:17
**looks**
 23:21 42:3
**loop**
 18:14
**lot**
 33:13
**loud**
 6:9
**lower**
 7:11 25:8
 30:19 31:7,
 10 39:19
 40:13,16,23
 46:12 47:8
 49:21 52:15,
 18 53:3,8,23
 54:4

— M —

**machines**
 15:12
**made**
 57:2,5
**mail**
 28:19
**main**
 7:22 8:21
 13:2 32:14
 46:18,21
 50:13
**make**
 35:19
**makes**
 10:9 32:9
**management**
 21:10,15
 46:2,4,11
**manager**
 9:4,5 12:4,
 7,20 17:21
**March**
 42:11

**marked**
 22:13,15,19
 39:25 49:3
**marketing**
 46:16
**Maureen**
 30:20 31:9,
 22 32:15,19
 37:12 39:19
 40:20
**Mcdonald**
 19:10,11,17
**mean**
 58:22
**meet**
 58:4,7
**meetings**
 6:14 58:6,8
**member**
 12:6 26:19,
 23
**members**
 27:20
**memorize**
 7:24
**metal**
 23:12,16,19
 25:14,15,25
 26:4 28:9
 49:15
**microphone**
 8:8
**middle**
 23:11
**Miller**
 5:22 28:13
**Miller's**
 50:18
**minute**
 57:25
**minutes**
 58:8
**Mm-hmm**
 28:4 42:16
**Monday**
 47:14 58:12

**monitor**
 17:18
**monitoring**
 53:17
**monitors**
 16:6 17:19
 53:20
**month**
 39:13 44:19
**monthly**
 58:7
**months**
 11:5,19
 44:19
**morning**
 5:16,17
 30:17
**Morrel**
 12:11 18:7
**move**
 35:25 46:9
**moving**
 35:23 44:6

— N —

**name**
 5:11,20 7:10
 17:4,5,8
 20:6,8,10
 22:7 33:25
 46:20,23
 47:3 54:22
**named**
 12:10 21:25
**names**
 18:24
**need**
 6:21,25 7:2,
 3 11:16
 13:12 36:7
 44:13,14,20
 45:15 57:25
**negotiations**
 31:4,7
**never**
 25:17 41:7

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 796 of 834

Aissatou Barry-Fall
December 12, 2023

**newest**
47:10
**nodding**
6:8
**Nora**
21:25
**North**
8:3 9:25
10:14 46:21
**Notary**
5:4
**notes**
30:11 57:21
**notification**
45:20
**notified**
53:24,25
**notify**
54:4
**number**
28:2
**Nypek**
51:3,4,9,12,
21

**O**

**O-S-C-O-R**
19:15
**Objection**
26:6 52:12
**obtain**
36:12 48:20
**occupy**
13:24
**occurred**
50:18
**October**
10:25 31:12
33:7 35:2
42:12,13,18,
24 43:17
44:4,6 47:11
**office**
12:24 18:6
50:13

**officer**
9:4,15 47:2
**okay**
5:18 6:19
7:4 18:5
20:12
**once**
35:7 43:20
**one**
6:15 8:15,
18,20 9:8
12:21 15:7,8
16:20,24
17:24,25
18:8,22
24:4,11,13,
16,19 25:9,
11 27:22
33:15 35:6
44:18 47:10
51:16 52:10
55:16 56:25
57:23
**one's**
54:7
**ones**
26:22
**open**
10:18,19
25:17 41:13
58:14
**opened**
10:13 11:10
33:7 42:12
43:21 47:11
**opening**
31:17 35:2
**opens**
44:3
**operating**
32:10
**operation**
32:4
**operation's**
9:4,5 27:10,
16,18

**operations**
32:7,8,9
**order**
5:10
**Oscor**
19:12,16
**outside**
16:2,13,21,
23 20:3
41:17 49:8,
12,24
**overseeing**
31:20 32:7
**oversees**
32:4,5
**owns**
13:25 14:2

**P**

**page**
40:4,6,17,21
41:3,24
**pages**
40:5
**paid**
17:15
**part**
13:21 22:8
55:22 57:10
**part-time**
8:14,23
**particular**
12:22 33:15,
17 34:4,8
49:18
**past**
37:15
**Paul**
8:5
**pay**
17:17
**payday**
17:3
**people**
15:15 16:7
19:5 29:14

46:7,11
**People's**
7:11
**period**
21:5 32:24
34:4 35:12
36:6 37:3
**person**
6:15 18:20,
22 19:10
54:3
**person's**
6:15
**personal**
39:21
**personally**
21:23 30:3
**personnel**
16:18
**persons**
18:24
**phone**
51:14,15
**photo**
22:15,21,25
23:3,12 24:6
25:20 26:2
49:16
**photograph**
22:12 49:3
**photographs**
47:16
**photos**
47:19
**pick**
49:18 53:21
**place**
15:19
**plaintiff**
5:21
**plaintiff's**
22:13,19
47:23 49:4,7
52:19,22
53:9
**plan**
35:20,21

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:09 PM

NYSCEF DOC. NO. 65

INDEX NO. 538413/2024

RECEIVED NYSCEF: 06/06/2025

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 797 of 834

Aissatou Barry-Fall

December 12, 2023

**planned**
35:24
**plans**
38:8
**please**
5:11,14 33:3
52:20
**point**
8:22 28:12
55:24 56:11
**popped**
55:4
**portion**
41:11,15
**position**
9:6 19:19
46:15
**premises**
43:6,10,18
**present**
57:14,16
**presently**
21:20
**previously**
49:3
**print**
55:16
**printed**
55:12
**prior**
25:13 28:7
31:17 45:21
51:7
**Probably**
42:20
**problem**
6:22
**procedure**
26:14,18,19
**procedures**
53:14
**process**
26:13
**program**
33:20
**project**
38:4

**property**
37:2 39:9,16
45:9,18
**Provide**
41:22
**Public**
5:4
**pull**
33:22 50:11,
17
**put**
54:25

---

### Q

**question**
5:24,25 6:2,
10,13,17,18,
24 34:6,18
36:3
**questions**
5:23 30:12,
18 34:16
40:7

---

### R

**re-tape**
18:15
**reach**
51:20
**read**
6:3 7:23
14:12 26:25
27:2,12
34:20 41:25
**reason**
6:22 7:3
21:4 34:17
**recall**
11:15,20,24
13:11 16:25
17:5 18:16
19:10 21:18,
24 22:9 29:3
30:8 39:2,4,
7,8 51:22

**receive**
29:9
**received**
53:7 56:22
**recess**
22:10 48:24
**recollect**
51:16
**recollection**
36:21,25
39:15 40:24
47:13 50:20
51:11 56:5,
16
**record**
5:11,13
27:2,12
34:20 48:15
52:14 58:20
**records**
35:16 36:4,
6,12,24
44:12
**recover**
51:5
**redoing**
39:5
**refer**
20:7 26:20
27:5 36:24
56:6 58:21
**reference**
56:14
**referred**
33:13
**referring**
34:3 36:3,7
41:3,11 45:2
49:11 56:4,5
57:6
**refresh**
36:25 40:24
**regarding**
55:25 56:22
57:3
**regular**
39:11

**regularly**
58:5
**relate**
38:15 57:7
**related**
54:16
**relating**
33:23 54:18
**remember**
18:23 28:17,
20,21 29:15,
16,17,20,25
30:4,5,7
35:5,7 43:19
55:21
**remembers**
36:16,22
**remodelling**
35:22
**remotely**
5:4
**remove**
41:21
**renovation**
42:22
**rent**
13:21,25
14:8
**renting**
23:16
**repair**
54:17,18
55:2,25
56:10 57:11,
12
**repeat**
6:2 14:18
33:3 47:17
52:20
**rephrase**
6:2
**replace**
41:22
**report**
52:24 53:5
**reported**
32:20

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 798 of 834

Aissatou Barry-Fall
December 12, 2023

**reporter**
  6:3 27:3,13
  34:21
**reports**
  52:17,22
  53:2
**represent**
  30:17
**representatio**
**n**
  26:3
**resides**
  39:22
**responded**
  43:2
**response**
  47:21,23
  48:6
**responses**
  6:6
**responsible**
  32:8
**responsive**
  36:2
**resume**
  45:6
**retire**
  13:9
**retired**
  13:8
**review**
  47:15,25
  57:20
**reviewed**
  47:18,23
**right**
  7:3 9:24
  10:19 24:11,
  13,19 25:2,
  11,20 29:10
  35:21 52:3
  56:4,14
**ring**
  22:8
**Rodriguez**
  27:17 32:18

**Rodriguez's**
  31:24
**room**
  24:4,14
  25:12 50:7,
  10
**rooms**
  25:3
**rotate**
  9:25 10:5,10
  11:3 12:25
**rotates**
  46:18
**rotating**
  10:14 25:7
**rotation**
  44:23
**roughly**
  42:23
**running**
  12:7

———————————————

                S

———————————————

**Saint**
  8:5
**Saturdays**
  58:14
**save**
  33:20
**saved**
  18:13 37:22
  38:3,5,6,7
**saying**
  10:20 19:11
  29:3 44:15,
  24
**says**
  40:22 41:12,
  20,23
**schedule**
  11:4,5,13
  39:11
**scheduled**
  58:5
**scope**
  38:12

**screen**
  17:21 22:16
  49:13
**screens**
  54:8
**scroll**
  40:5
**scrolled**
  40:8
**search**
  33:18,25
  34:8 54:21,
  25
**searches**
  54:12 55:5
**searching**
  54:15,22
**second**
  7:25 10:17,
  21 14:21
  15:10 16:4,5
  23:9 31:18
  32:25 33:10,
  14,23 34:9,
  15 35:3
  37:23,25
  38:9 42:7,25
  45:8,22 46:8
  50:12 57:4,8
**security**
  16:10,12,14,
  16,17,18
  17:3,11
  18:10
**see**
  17:22 18:25
  22:15 23:4,
  12 24:6
  25:14,19
  26:4 34:15
  36:5,8,15,22
  38:8,24
  40:16 41:12,
  14,20,23,25
  42:4 45:19
  48:7,11
  49:2,14,15
  50:18 51:5,

  21
**send**
  17:16 19:3
  26:21 27:8
  45:20,22,24,
  25
**sense**
  10:9 35:13
**separate**
  15:14,19
**September**
  56:15 57:7
**series**
  5:23
**serious**
  11:18
**service**
  12:7
**set**
  11:4
**seven**
  55:9,13
**shaking**
  6:8
**Sharmen**
  56:18,19,22
**Shelly**
  12:9 13:3,6
**Shore**
  8:4 9:25
  10:14 46:21
**show**
  35:23 45:17
**showing**
  16:8
**shown**
  22:25 23:3
**shutdown**
  43:5,7,25
**side**
  7:11 16:4
  23:9 25:8
  30:19 31:8,
  11 39:20
  40:14,17,23
  41:13,21,24
  46:13 47:8

FILED: NEW YORK COUNTY CLERK 03/06/2025 03:09 PM
NYSCEF DOC. NO. 65
INDEX NO. 538413/2024
RECEIVED NYSCEF: 03/06/2025
Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 799 of 834
Aissatou Barry-Fall
December 12, 2023

| | | | |
|---|---|---|---|
| 49:21 51:8 | **stairwell** | **Sundays** | **Tara** |
| 52:15,18 | 38:20 | 58:16 | 34:4 |
| 53:4,8,24 | **start** | **supervisor** | **team** |
| 54:4 | 21:23 34:18 | 27:9 | 46:2,4,12 |
| **sidewalk** | 47:9 | **supervisory** | **tell** |
| 23:13 25:16 | **started** | 26:20,21 | 6:25 7:19 |
| 28:9 54:20 | 43:21 44:23 | 27:15,20 | 28:18 43:2 |
| 55:2 56:2, | **starts** | 58:4 | 49:6 |
| 10,23 57:3 | 6:16 | **supposed** | **teller** |
| **sign** | **state** | 58:12 | 8:14,23 9:2, |
| 14:14 | 5:5,11,13 | **sure** | 3,9,12 |
| **signature** | 39:23 | 14:19 15:8 | **ten** |
| 40:6,16,19 | **Staten** | 24:24 29:20 | 55:9,13 |
| **signed** | 8:4 10:7 | 32:9 35:20 | **testified** |
| 31:11,13,14 | 48:19 | **surveillance** | 5:5 |
| 37:11 40:25 | **stay** | 15:22,25 | **testifying** |
| 42:14 | 10:7 50:6 | 17:20 24:22 | 47:16,19 |
| **Social** | **steel** | 25:3 49:7,22 | 48:2 54:11 |
| 17:2 | 41:22 | 50:12,17 | **testimony** |
| **sound** | **steps** | 51:21 | 42:17 54:15 |
| 22:2 | 39:5 41:22 | **Susan** | **thing** |
| **space** | **sticker** | 52:6,8,9,11, | 6:9 9:12 |
| 14:7 17:7 | 22:18 | 15 | **things** |
| **speak** | **sticking** | **suspicious** | 6:5 35:23 |
| 8:7 29:7,11, | 35:20 | 53:22 | 54:14 55:3 |
| 14,18,22 | **stopped** | **sworn** | **think** |
| 30:10 44:13 | 42:21 44:23 | 5:3 | 25:18 30:12 |
| 55:24 | **store** | **system** | 43:25 45:5 |
| **specific** | 44:3 49:8 | 37:21 49:22, | 55:15,23 |
| 8:16 32:6 | **stored** | 25 51:2 | **three** |
| 37:22 54:22 | 50:3 | | 7:18,20 10:5 |
| 56:6 | **storefront** | ——————— | **time** |
| **specifically** | 23:8 53:12 | T | 9:8,20 |
| 18:20 28:8 | **storefronts** | ——————— | 10:10,13 |
| **spelling** | 15:9,10 | **take** | 11:20 18:18 |
| 19:14 | **street** | 6:21,23,25 | 21:5 22:11 |
| **spoke** | 14:23 | 7:2 9:8 | 25:13 29:8 |
| 29:16 30:8 | **strike** | 57:25 | 30:14 31:11 |
| **spoken** | 32:17 35:25 | **taken** | 32:19,24 |
| 22:3 | **stuff** | 22:10,23 | 34:4 35:6,18 |
| **staff** | 28:24 36:10 | 48:24 | 36:6 37:2 |
| 16:10,12,16 | **subject** | **talk** | 39:13 42:22 |
| 19:23 22:4 | 33:25 54:24, | 22:4 36:15 | 48:25 50:16, |
| 53:19 | 25 | 56:8 | 21 56:21 |
| **stairs** | **summer** | **talking** | **timeframe** |
| 41:22 42:2,4 | 43:9,12,16 | 6:15,16 37:4 | 33:4 45:2 |
| | | 55:8 | 50:21 |

Aissatou Barry-Fall
December 12, 2023

**times**
15:16 25:7
35:3,8,10
42:6 45:11

**Timothy**
28:13

**title**
8:13,23
12:19 46:25
47:5 54:23

**today**
5:21 19:9
47:16,19
48:2 54:11

**today's**
54:15

**told**
52:2

**transcript**
5:10 17:8

**Tuesday**
11:11,14
42:8,11,13
43:22,24
44:7,21 45:7

**two**
10:15 11:5
15:5,9 23:4
24:2,6 25:10

**type**
7:13 26:13
33:9,19
39:11 53:21

**types**
35:16

**typically**
34:23

---

**U**

**UHAB**
14:6 19:20
20:16 29:18
30:17 31:4,
10 40:13,23
48:4 52:11,
21,25 54:16

55:25 56:12
57:3

**understand**
5:24 58:22

**understanding**
38:11 53:16

**understood**
11:2

**union**
7:9,10,12
8:10 9:21
12:13,21,23
13:7,21
16:13 17:14
19:22 20:2,
18,25 21:21,
22 23:4,5,
16,23 24:9
27:7 38:14
39:3 50:6
58:18,23

**upper**
41:11

---

**V**

**variable**
39:17

**vendor**
20:3

**verbal**
6:7

**Victoria**
27:17 31:23,
24 32:17,21
34:24 36:15,
19 37:4
39:17 44:13
46:5 51:10

**video**
49:18 50:3
51:21

**videos**
18:13

**view**
16:7 24:25
49:10,11,12

**visit**
43:6

**visiting**
45:21

---

**W**

**wait**
6:12,17

**want**
9:8 13:15
30:11 35:19,
23

**wanted**
33:22 36:8
50:11

**watch**
18:10

**watching**
54:8

**way**
24:11 41:6
45:17

**week**
39:12

**weekdays**
58:11

**weekend**
53:23 54:4

**weekends**
53:12

**went**
33:5 36:5
37:2 39:15
42:11 47:20
50:20

**Whomever**
54:6

**withdrawn**
50:24

**witness**
5:3 8:6
19:15,18
26:12 53:9

**witnessed**
54:6

**words**
16:17

**work**
8:15,16 9:24
10:11,16
11:8 31:17,
21 32:25
33:5 34:13
38:12,15
39:4,16
42:19 43:20

**worked**
9:22 46:9

**working**
8:9,12,22
9:21

**write**
13:18 17:9

---

**Y**

**Y-F**
5:2

**yeah**
10:20,22
18:6 19:12,
18 24:18
25:24 28:24
30:6 34:22
35:13,15
37:24 42:20
47:20 49:14
51:15 52:6
57:22

**year**
30:25 44:19
51:24

**yesterday**
48:6

**yield**
30:13

**York**
5:5,15 7:22
39:23

Aissatou Barry-Fall
December 12, 2023

|  |  |
|---|---|
| **Z** | |
| **Zoom** | |
| 5:4 6:14 | |

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 802 of 834

# EXHIBIT J

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 803 of 834

# gunner*cooke*

New York
475 Park Avenue South
Suite 2300
New York, NY 10016
USA

<u>Via Email</u> (cheryl.guthrie-swarzprauber@trustage.com)
Ms. Cheryl Guthrie
TruStage

August 8, 2024
Our ref: 94-00666
Contact: max.gershweir@gunner*cooke*.com
646-440-8375

Re:  Timothy Miller v. UHAB Housing Development Fund Corporation, et al.
     Date of Loss      : February 22, 2021
     Your Insured      : Lower East Side People's Federal Credit Union
     Your Claim No. : C1218825
     Client Claim No.: 3430409-1

Dear Ms. Guthrie:

We are coverage counsel for AmTrust North America, claims administrator for Wesco Insurance Company, which insures UHAB Housing Development Fund Corporation. On behalf of Wesco, we hereby tender to Cumis Insurance Society UHAB's defense and indemnification in the above-cited litigation ("the Miller Action") as an additional insured under the commercial general liability insurance policy that Cumis issued to Lower East Side People's Federal Credit Union ("LESPFCU"), UHAB's tenant.

To briefly recap, the plaintiff in the Miller Action, Timothy Miller, seeks damages for personal injuries he allegedly sustained when he tripped and fell due to a defective condition on the sidewalk cellar doors abutting the premises UHAB leased to LESPFCU.

The Cumis policy includes a provision covering UHAB as an additional insured "with respect to liability arising out of the ownership, maintenance or use of that part of the premises . . . leased to" LESPFCU.

Under well-settled New York law, that industry-standard provision covers the lessor for injuries sustained on the sidewalk abutting the premises leased to the named insured, even though it is not part of the leased premises and whether or not the lessor was responsible for the alleged defect. *See, e.g., Tech. Ins. Co. v. Philadelphia Indem. Ins. Co.*, 642 F.Supp.3d 445 (S.D.N.Y. 2022); *Isidore Margel Trust Mitzi Trustee v. Mt. Hawley Ins. Co.*, 195 A.D.3d 799 (2d Dep't 2021); *Wesco Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 188 A.D.3d 476 (1st Dep't 2020); *Tower Ins. Co. of N.Y. v. Leading Ins. Group Ins. Co. Ltd.*, 134 A.D.3d 510 (1st Dep't 2015); *Frank v. Cont'l Cas. Co.*, 123 A.D.3d 878 (2d Dep't 2014); *ZKZ Assocs. v. CNA Ins. Co.*, 224 A.D.2d 174 (1st Dep't 1996), *aff'd*, 89 N.Y.2d 990 (1997).

gunnercooke US LLP is a limited liability partnership with offices in New York.  gunnercooke US LLP is affiliated with gunnercooke LLP, a limited liability partnership registered in England and Wales.  'gunnercooke' is a trading name of gunnercooke US LLP.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 804 of 834

August 8, 2024
Page 2 of 3

The court in *Tech. Ins. Co.*, a case the undersigned handled for the prevailing insurer that also involved an alleged sidewalk cellar-door trip and fall, summarized this well-settled New York law as follows:

> [This provision] has been the subject of numerous decisions in the New York courts. *See*, *e.g.*, *Isidore Margel Tr. Mitzi Zank Tr. v. Mt. Hawley Ins. Co.*, 195 A.D.3d 799 (2d Dep't 2021). Those courts have held that the language triggers additional insured coverage for accidents occurring as a result of defects outside the perimeter of the leased premises in at least two separate circumstances. First, relying on the policy language regarding liability that Arises out of the "ownership" of the premises that are leased, the New York courts have held that the owner or landlord is entitled to be treated as an additional insured when the claim arises from an accident on a sidewalk appurtenant to the leased premises. In that instance, liability arises out of the ownership of the property abutting the sidewalk. New York City Administrative Code Section 7-210 makes it "the duty of the owner of real property abutting any sidewalk, including, but not limited to, the intersection quadrant for corner property, to maintain such sidewalk in a reasonably safe condition" and makes the owner of real property abutting any sidewalk "liable for any injury to property or personal injury proximately caused by the failure of such owner to maintain such sidewalk in a reasonably safe condition." N.Y.C. Admin. Code § 7-210(a), (b). Section 7-210 "imposes a nondelegable duty on the owner of the abutting premises to maintain and repair the sidewalk." *Collado v. Cruz*, 81 A.D.3d 542 (1st Dep't 2011). The New York courts reason that even if the landlord does not own the sidewalk and therefore cannot lease it, the duty to maintain it in reasonably safe condition arises by virtue of its ownership of the leasable abutting premises. When the premises have been leased and an accident occurs by virtue of the failure of the sidewalk to be maintained, the landlord's liability arises as a result of its ownership of the leased premises and additional insured coverage is triggered. *See*, *e.g.*, *Isidore Margel Tr. Mitzi Zank Tr.*, 145 N.Y.S.3d at 818 (holding that plaintiff was an additional insured for liability "arising out of the ownership, maintenance or use" of that part of the premises leased to the tenant on the basis that Section 7-210 imposes liability on owners of commercial property for defective conditions on sidewalks and that, as a result, the plaintiff's potential liability arises from its ownership of the premises leased to the tenant); *Frank v. Cont'l Cas. Co.*, 123 A.D.3d 878 (2d Dep't 2014) ("Inasmuch as Administrative Code of the City of New York § 7-210 imposes liability on owners of commercial property for defective conditions on sidewalks, the plaintiffs' potential liability arises from their ownership of the leased premises."); *L & B Ests., LLC v. Allstate Ins.*, 71 A.D.3d 834 (2d Dep't 2010) (same).
>
> Second, relying on the portion of the policy language referring to liability arising from the "maintenance or use of the leased premises," the New York courts have held that additional insured coverage is

August 8, 2024
Page 3 of 3

triggered for accidents that occur in areas that serve as points of ingress or egress from the leased premises. That was the express holding of the New York Court of Appeals in *ZKZ Associates LP v. CNA Insurance Company*, 89 N.Y.2d 990 (1997). There, a pedestrian allegedly tripped and fell on the sidewalk outside a building leased by the plaintiff to the named insured, a garage. *Id.* The New York Court of Appeals held that "[t]he part of the sidewalk where the alleged accident occurred was necessarily used for access in and out of the garage Guardian operated and was thus, by implication, 'part of the ... premises' that Guardian was licensed to use under the parties' agreement." *Id.* Consequently, "the claim arose out of 'the ownership, maintenance [or] use of' the garage." *Id.*; *see also Town Plaza of Poughquag, LLC v. Hartford Ins. Co.*, 175 F. Supp. 3d 93, 101 (S.D.N.Y. 2016) ("*ZKZ Associates* has been applied by courts to hold that the insurers of lessees have a duty to defend and indemnify lessors for injuries occurring on sidewalks and areas outside of demised leases.") . . . .

642 F.Supp.3d at 459-61 (citations shortened).

As such, UHAB's liability, if any, will necessarily fall within the scope of the additional insured provision.

For the reasons stated above, should Cumis fail within 20 days to agree unconditionally to defend and indemnify UHAB in the Miller Action on a primary, noncontributory basis under the Cumis Policy, Wesco intends to file suit against Cumis seeking a declaratory judgment to that effect and to recover the fees and expenses it has incurred defending UHAB in the Miller Action.

Very truly yours,

**Max Gershweir**

Partner

gunner*cooke* US LLP

cc:     Ms. Therese Sprung (via email)
        AmTrust North America

        Tara Bonomo, Esq. (via email)
        Gannon Rosenfarb & Drossman

        Lyndsey C. Caldwell, Esq. (via email: caldwell@litchfieldcavo.com)
        Litchfield Cavo, LLP

        Mr. Stephen Murray (via email: Stephen.Murray@LibertyMutual.com)
        Liberty Mutual (claim #NEWCAS000362268)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x
:    Index No.: 655437/2024
WESCO INSURANCE COMPANY,    :
:    **AFFIRMATION OF**
:    **NICOLE FISHER**
:
Plaintiffs,    :
:
-against-    :
:
CUMIS INSURANCE SOCIETY, INC.,    :
:
Defendant.    :
:
------------------------------------------------------------------x

I, Nicole Fisher, affirm under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding at law:

1.    I am employed as a Senior Director, Claims, by AmTrust North America, Inc., the claims administrator for plaintiff Wesco Insurance Company. The source of my knowledge of the within is based on my review of records maintained in the ordinary course of AmTrust's business.

2.    I submit this affirmation in support of Wesco's motion for summary judgment.

3.    Wesco issued a Commercial Policy to UHAB Housing Development Fund bearing policy number WPP1595109 03, effective December 31, 2020, to December 31, 2021.[1]

---

[1] A complete and accurate copy of the policy, less redacted financial information, is attached to the Gershweir Affirmation in support of the motion as Exhibit B.

4. Wesco, through AmTrust, was first notified of an action filed by Timothy Miller against UHAB ("the Underlying Action") on November 29, 2021, when it received from an insurance agent the summons and complaint.

5. By letter dated and emailed on August 8, 2024, to CUMIS, AmTrust, by its counsel, tendered UHAB's defense and indemnification in the Underlying Action as an additional insured under the CUMIS Policy.[2]

6. CUMIS did not respond to the tender.

7. Wesco has been defending UHAB to date in the Underlying Action due to CUMIS's failure to do so.

Dated:    Chittenango, New York
          __March 6_____, 2025

                                        _____
                                        Nicole Fisher

---

[2] Aug. 8, 2024 ltr., Gershweir Mov. Afm. Ex. J.

2

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 808 of 834

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x
                                :

WESCO INSURANCE COMPANY,              :        Index No.: 655437/2024
                                :

                Plaintiff,            :
                                :

                -against-             :
                                :

CUMIS INSURANCE SOCIETY, INC.,         :
                                :

                Defendant.        :
                                :
-----------------------------------------------------------------x

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

                                    GUNNERCOOKE US LLP
                                      Attorneys for Plaintiff
                                      475 Park Avenue South – 23rd Floor
                                      New York, New York 10016
                                      646.440.8375

Of Counsel:
Max W. Gershweir

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 809 of 834

## Preliminary Statement

Plaintiff Wesco Insurance Company submits this memorandum of law in support of its motion for summary judgment pursuant to CPLR 3212 against defendant CUMIS Insurance Society, Inc.:

a. declaring that CUMIS has a duty to defend UHAB Housing Development Fund in an action captioned *Timothy Miller v. UHAB Housing Development Fund Corporation, et al.*, in the Supreme Court of the State of New York, Kings County, Index No. 528913/2021 ("the Underlying Action"), as an additional insured under an insurance policy issued by CUMIS bearing policy number 004577 ("the CUMIS Policy");

b. declaring that CUMIS has a duty to indemnify UHAB in the Underlying Action as an additional insured under the CUMIS Policy;

c. declaring that UHAB's coverage under the CUMIS Policy is primary to its coverage under the policy Wesco issued to it with respect to the Underlying Action;

d. declaring that CUMIS must reimburse Wesco for all reasonable costs Wesco has incurred defending and, if necessary, indemnifying UHAB in the Underlying Action, plus interest;

e. setting this matter down for a hearing on the amount Wesco is entitled to recover on its claim against CUMIS for defense and indemnification costs; and for such other and further relief as may be just and proper.

This action involves a dispute over whether UHAB, a building owner insured under a commercial general liability insurance policy issued by Wesco ("the Wesco Policy"), is entitled to defense and indemnification in the Underlying Action as an additional insured

808

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 810 of 834

under the CUMIS Policy, a commercial general liability insurance policy CUMIS issued to Lower East Side People's Federal Credit Union, UHAB's tenant.

In the Underlying Action, the plaintiff, Timothy Miller, seeks damages against UHAB and Credit Union for injuries he allegedly sustained when he tripped and fell due to a defective condition on a public sidewalk abutting the premises UHAB leased to Credit Union.

The CUMIS Policy includes an endorsement covering UHAB as an additional insured "with respect to 'bodily injury' . . . arising out of the ownership, maintenance or use of" the leased premises.

Since, under well-settled New York law construing this industry-standard endorsement, a property owner's liability for injury sustained on a public sidewalk abutting the premises leased to the named insured is deemed to arise out of the ownership, maintenance or use of those premises, no matter which party is liable for the alleged condition, CUMIS is required to defend and indemnify UHAB in the Underlying Action.

Moreover, since UHAB's coverage under the CUMIS Policy is primary to its coverage under the Wesco Policy based on the policies' respective "other insurance" provisions, CUMIS must reimburse Wesco in full for the reasonable amounts it spends defending and, if necessary, indemnifying UHAB in the Underlying Action.

2

809

## Statement of Facts and of the Case

### CUMIS Policy

CUMIS issued to Credit Union, as operator of multiple credit unions, including one located at 2283-85 Second Avenue, New York, New York, an insurance policy numbered 004577, effective October 4, 2020, to October 4, 2021, providing commercial general liability coverage subject to the policy's terms and conditions ("the CUMIS Policy").[1]

Subject to its other terms and conditions, the CUMIS Policy's commercial general liability insurance coverage part covers, as relevant here, "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury'" sustained during the policy period and "caused by an 'occurrence'," which the policy defines in relevant part as an "accident."[2]

The policy includes an endorsement stating in relevant part:

Designation of Premises (Part You Lease):
2283-85 2nd Ave
New York NY 10035 4820

Name of Person or Organization (Additional Insured):
UHAB Housing Development Fund Corp.
120 Wall St Fl 20
New York NY 10005 4029
. . .

The following is added to the Who Is An Insured provision in the Business Liability Coverage:

The person or organization shown on this endorsement is also an insured, but only with respect to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the ownership, maintenance or use of that part of the premises designated on this endorsement, leased to you (Credit Union], and subject to the following Additional Exclusions:

---

[1] CUMIS Policy, Gershweir Mov. Afm. Ex. A.
[2] *Id.* at Business Liability Coverage — Property and Business Liability form, Insuring Agreement, ¶ 1., p. 3; Definitions, Occurrence, p. 27.

3

810

The insurance does not apply:

1. To any "occurrence" which takes place after you cease to be a tenant in said premises; or
2. To structural alterations, new construction or demolition operations performed by or on behalf of the person or organization designated above.

However;

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and
2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.[3]

The policy's "other insurance" provision applicable to additional insureds states:

7. This insurance is primary and will not seek contribution from any other insurance available to an additional insured under your Policy provided that:
   a. The additional insured is a Named Insured under such other insurance; and
   b. You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

This supersedes any provision to the contrary.[4]

**Wesco Policy**

Wesco issued to UHAB, as owner of multiple premises, including 2283 and 2285 Second Avenue, New York, New York, a Commercial Policy bearing policy number WPP1595109 03, effective December 31, 2020, to December 31, 2021, which affords commercial general liability coverage essentially identical to that provided under the CUMIS Policy ("the Wesco Policy").[5]

---

[3] *Id.* at Additional Insured Endorsement — Premises You Lease form, p. 1.

[4] *Id.* at Business Liability Coverage — Property and Business Liability form, Additional Conditions, Other Insurance, ¶ 7, p. 25.

[5] Wesco Policy, Gershweir Mov. Afm. Ex. B, at Commercial General Liability Coverage Form, p. 1.

The Wesco Policy's "Other Insurance" provision renders it excess to other primary policies that include UHAB as an additional insured:

4. **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

. . .

**b. Excess Insurance**

(1) This insurance is excess over:

. . .

(b) Any other primary insurance available to you [UHAB] covering liability for damages arising out of the premises . . . for which you have been added as an additional insured.

(2) When this insurance is excess, we will have no duty . . . to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.[6]

**The Leased Premises**

By Lease dated January 15, 2020, UHAB leased to Credit Union "a portion of the ground floor and back yard of the Building," defined as "the building located at 2283-85 Second Avenue, New York, New York." [7] The lease includes diagrams showing that the entire first floor, except for an entrance to the upstairs floors, is leased to Credit Union.[8]

The lease requires Credit Union to maintain "commercial general liability insurance, including a contractual liability endorsement, and personal injury liability coverage, in respect of the Premises and the conduct or operation of business therein, with Landlord . . . as additional insured[]." [9]

---

[6] *Id.* at Commercial General Liability Coverage Form, § IV, ¶ 4.b.(1)(b), p. 12.

[7] Lease, Gershweir Mov. Afm. Ex. C, at §§ 1.01, 1.02.

[8] *Id.* at Ex. B.

[9] *Id.* at Exhibit B, ¶ 7.02.

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 814 of 834

**Underlying Action**

Miller commenced the Underlying Action by filing a summons and complaint on November 11, 2022.[10] The complaint seeks damages against UHAB and Credit Union for injuries Miller allegedly sustained on February 22, 2021, when he tripped and fell due to a defective "sidewalk and/or sidewalk cellar doors" abutting the premises located at 2285 2nd Avenue, New York, New York.

Miller's bill of particulars specifies that the alleged hazard was "embedded cellar doors of the sidewalk/walkway," which "were deteriorated, cracked, broken, raised, uneven, loose, unsecure, depressed, dangerous, hazardous and trap-like."[11]

Miller confirmed at his deposition that he fell while walking on the sidewalk cellar doors abutting the premises leased to Credit Union, when one door deflected and he tripped over the edge of the other, identifying them in the below photograph, which shows that they are situated between two street-level Credit Union entrance doors:[12]



---

[10] Underlying Action Sum. & Compl., Gershweir Mov. Afm. Ex. D.

[11] Bill of parts., Gershweir Mov. Afm. Ex. E.

[12] Miller dep. tr., Gershweir Mov. Afm. Ex. F, at pp. 75-78; 155-171; photos, Gershweir Mov. Afm. Ex. G.

6

813

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 815 of 834

UHAB's deposition witness, property manager Nora Donkor, testified as follows: (1) the premises consists of a four-story, mixed-use building, with one street-level commercial unit leased to Credit Union and each of the upper floors rented to a residential tenant; (2) the building includes a basement accessible through both the sidewalk cellar doors and from the inside of the premises leased to Credit Union; and (3) the basement is used by UHAB to maintain the boiler and utility meters and by the residential tenants for storage.[13]

Credit Union's deposition witness, CEO Aissatou Barry-Fell, testified as follows: (1) Credit Union has three entrances, two at street level—one leading to the branch and one to a conference room—and one from the basement; and (2) Credit Union has access to but does not use the basement.[14]

**Tender Correspondence**

Wesco, through AmTrust North America, its claims administrator, was first notified of this matter on November 29, 2021, when it received the summons and complaint.[15]

By letter dated and emailed on August 8, 2024, to CUMIS, AmTrust, by its counsel, tendered UHAB's defense and indemnification in the Underlying Action as an additional insured under the CUMIS Policy.[16]

CUMIS never responded to the tender.[17]

---

[13] Donkor dep. tr., Gershweir Mov. Afm. Ex. H, at pp. 14-16, 20-23.
[14] Barry-Fell dep. tr., Gershweir Mov. Afm. Ex. I, at pp. 15, 20-21.
[15] Fisher Mov. Afm. at ¶ 4.
[16] *Id.* at ¶ 5; Aug. 8, 2024 ltr., Gershweir Mov. Afm. Ex. J.
[17] Fisher Mov. Afm. ¶ 6.

7

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 816 of 834

Wesco has been defending UHAB to date in the Underlying Action due to CUMIS's failure to do so.[18]

**This Action**

Wesco commenced this action by filing a Summons and Complaint on October 15, 2024.[19] The complaint seeks a judgment: (1) declaring that CUMIS has a duty to defend and indemnify UHAB as an additional insured under the CUMIS Policy as respects the Underlying Action; (2) declaring that the CUMIS Policy is primary to the Wesco Policy as respects UHAB's coverage; and (3) awarding Wesco the amount it incurs defending and, if necessary, indemnifying UHAB in the Underlying Action.

CUMIS appeared by filing an Answer on December 18, 2024, denying coverage.[20]

---

[18] *Id.* at ¶ 7.

[19] Sum. and Compl., NYCEF Doc. No. 1.

[20] Answer, NYCEF Doc. No. 4.

8

815

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 817 of 834

## Argument

**I.    The CUMIS Policy's "lessor of premises" provision covers UHAB for accidents occurring on public sidewalks abutting the premises leased to Credit Union.**

To recap, the CUMIS Policy's relevant additional-insured provision covers UHAB "with respect to 'bodily injury' . . . arising out of the ownership, maintenance or use of that part of the premises" leased to Credit Union. As discussed below, New York case law addressing this industry-standard provision establishes that it broadly extends to accidents occurring on the public sidewalk abutting the premises leased to the named insured and thus applies here.

First, there is no language limiting coverage to injury sustained within the leased premises or to vicarious liability resulting from the tenant's negligence. Indeed, to the contrary, by using the phrase "arising out of," the provision may not be interpreted that way. *See Burlington Ins. Co. v. NYCTA*, 29 N.Y.3d 313, 326 (2017) ("additional insured endorsements [using the phrase] respond to injury or damage arising from the additional insured's sole negligence"); *Regal Constr. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 15 N.Y.3d 34, 38 (2010) ("the phrase 'arising out of' in an additional insured clause . . . mean(s) originating from, incident to, or having connection with" (internal quotation marks and citation omitted)); *Mt. Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 353 (1996) (finding the phrase requires a "but-for" test to determine coverage).

Moreover, because the provision states "that additional coverage arises from 'ownership,' 'maintenance,' or 'use' in the disjunctive . . ., each term is entitled to be given independent meaning. Each term can independently provide a trigger for 'additional insured' coverage." *Tech. Ins. Co. v. Philadelphia Indem. Ins. Co.*, 642 F.Supp.3d 445, 462 (S.D.N.Y. 2022). "Further, . . . it does not matter whether the 'ownership,

9

816

Case 1:25-cv-02172-PAE    Document 1-2    Filed 03/17/25    Page 818 of 834

maintenance, or use' is tied to the landlord or tenant. Additional insured coverage could arise from ownership by the landlord, or by use by the tenant." *Id.*

Consistent with the provision's use of this broad language, the New York courts have routinely interpreted it to cover the lessor for accidents occurring on public sidewalks abutting the premises leased to the named insured, even if the lessor, whether under the lease or by statute, was required to maintain or repair the area. *See, e.g., Tech. Ins. Co., supra*; *Isidore Margel Trust Mitzi Trustee v. Mt. Hawley Ins. Co.*, 195 A.D.3d 799 (2d Dep't 2021); *Wesco Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 188 A.D.3d 476 (1st Dep't 2020); *Tower Ins. Co. of N.Y. v. Leading Ins. Group Ins. Co. Ltd.*, 134 A.D.3d 510 (1st Dep't 2015); *Frank v. Cont'l Cas. Co.*, 123 A.D.3d 878 (2d Dep't 2014); *L&B Estates, LLC v. Allstate Ins.*, 71 A.D.3d 834 (2d Dep't 2010); *ZKZ Assocs. v. CNA Ins. Co.*, 224 A.D.2d 174 (1st Dep't 1996), *aff'd*, 89 N.Y.2d 990 (1997); *Donato Realty, LLC v. Utica First Ins. Co.*, No. 152419/12, 2016 WL 3902273 (Sup. Ct. N.Y. County Jul. 15, 2016), *aff'd*, 146 A.D.3d 481 (1st Dep't 2017); *76-01 37th Ave. Realty Corp. v. Dongbu Ins. Co., Ltd.*, No. 161256/13, 2015 WL 5643614, *3-4 (Sup. Ct. N.Y. County Sep. 25, 2015), *rev'd*, 146 A.D.3d 448 (1st Dep't 2017) (reversing only to the extent the lower court found it premature to declare that the defendant insurer had to indemnify the lessor).

Thus, for example, in *ZKZ*, in finding the lessor, ZKZ, was entitled to a defense as an additional insured for an abutting-sidewalk accident under its tenant Guardian's policy, the Appellate Division stated:

> We note that *it is not relevant that the management contract between ZKZ and Guardian may have assigned maintenance of the sidewalks to ZKZ.* At issue is the extent of the insurance coverage provided by the subject policy, and it is clear that the language of that policy extended to ZKZ protection for liability arising out of the use of the premises, which were defined not on the basis of who was obligated to maintain them but rather by the consequences stemming from their use as a garage.

10

817

224 A.D.2d at 176 (emphasis added); *accord, Tech. Ins. Co.*, 642 F.Supp.3d at 464 ("The provision focuses on whether the liability 'aris[es] out of' the ownership, maintenance, and use of the leased premises, with no mention of the landlord or tenant as to those specific prongs. Whether it was [the tenant or landlord] which was responsible for maintenance is thus irrelevant to the determination of coverage."); *Wesco*, 188 A.D.3d at 477 ("Coverage is determined by the terms of the policy, and is not affected by the finding in the underlying action that [the lessor] may have failed to satisfy any legal obligations to maintain the sidewalk").

Rather than evaluating which party was responsible for maintaining the sidewalk or whether the sidewalk is part of the leased premises—which it cannot be, at least in New York City, where the City owns the sidewalks—the courts have generally found two independent bases for finding coverage for such claims: (1) directly abutting sidewalks are "necessarily used for access in and out of" the leased space, thus implicating the endorsement's "maintenance" or "use" coverage triggers, *ZKZ*, 89 N.Y.2d at 991; *Isidore Margel*, 195 A.D.3d at 818; *Frank*, 123 A.D.3d at 881; and (2) with regard to New York City public-sidewalk accidents like this one, "[i]nasmuch as Administrative Code of the City of New York § 7-210 imposes liability on owners of commercial property for defective conditions on sidewalks, the [lessor's] potential liability arises from its ownership of the leased premises," thus implicating the endorsement's "ownership" coverage trigger, *Isidore Margel*, 195 A.D.3d at 818; *Frank*, 123 A.D.3d at 880-81; *L&B*, 71 A.D.3d at 836-37; *see Tower*, 134 A.D.3d at 510 (approvingly citing *Frank* and *L&B*); *Tech. Ins. Co.*, 642 F.Supp.3d at 460 ("When the premises have been leased and an accident occurs by virtue of the failure of the sidewalk to be maintained, the landlord's liability arises as a

result of its ownership of the leased premises and additional insured coverage is triggered").

Consistent with the above, the courts have also routinely found coverage without regard to whether the injured plaintiff was using the sidewalk to enter or exit the leased premises. *See, e.g., Tech. Ins. Co.*, 642 F.Supp.3d at 464-65; *Tower* (appellant's brief confirms injured plaintiff was not entering or exiting, 2015 WL 11070613, at *7); *Donato Realty, LLC v. Utica First Ins. Co.*, No. 152419/2012, 2016 WL 3902273, at *2 (N.Y. Sup. Ct. July 15, 2016) (stating that, where "liability exists as a result of an accident 'arising out of' use of leased area," if it is an area that people "would have to traverse in order to reach the leased space," there can be liability, and thus coverage under the provision, "even when the injured person was not entering or exiting the establishment at the time he or she was injured"), *aff'd*, 146 A.D.3d 481 (1st Dep't 2017); *76-01 37th Ave. Realty Corp.*, 2015 WL 5643614, *1 (confirming injured plaintiff was not entering or exiting).

Moreover, in *Technology*, the federal district court found coverage where a passerby was injured due to the same condition as that at issue here—a deflecting sidewalk cellar door—because such conditions also fall within § 7-210's scope:

> [T]he Sidewalk Law defines the failure to maintain a sidewalk in a reasonably safe condition to "include, but not be limited to, the negligent failure to install, construct, repave, repair or replace defective sidewalk flags and the negligent failure to remove snow, ice, direct or other material from the sidewalk." N.Y.C. Admin. Code § 7-210(b). (Sidewalk flags refer to the specific squares of the sidewalk.) Under New York City Administrative Code § 19-152, the commission has authority to direct the owner of real property abutting a sidewalk to repair sidewalk flags that contain a "substantial defect" and the regulations define "substantial defect" to include "hardware defects" such as "(i) hardware or other appurtenances not flush within 1/2" of the sidewalk surface or (ii) cellar doors that deflect greater than one inch when walked on, are not skid resistant or are otherwise in a dangerous or unsafe condition." N.Y.C. Admin. Code § 19-152(a)(6). . . .

> . . . "Court[s] look[] to . . . section 19-152 . . . as the background underlying Section 7-210's enactment and a 'guidepost for determining [its] scope.'" *Marino v. 101 MacDougal St. LLC*, 2014 U.S. Dist. LEXIS 189917, 2014 WL 12539359, at *3 (S.D.N.Y. Aug. 18, 2014); *see also Hernandez v. NY Prepaid Wireless LLC*, 206 A.D.3d 409, 170 N.Y.S.3d 29, 30 (1st Dep't 2022) ("As the owner of the property abutting the sidewalk, Madison had a nondelegable duty to maintain the sidewalk—*which included the cellar doors* (Administrative Code of City of New York §§ 19-101[d]; 19-152[a][6], [a-1][6])—in a reasonably safe condition (Administrative Code § 7-210[a])." (emphasis added)).

*Tech. Ins. Co.*, 642 F.Supp.3d at 462-63.

Moreover, the *Technology* court rejected the defendant insurer's argument that coverage was barred because the basement to which the sidewalk cellar doors led was not leased to its named insured tenant:

> PIIC argues that PRFI [its named insured tenant] had no responsibility for the vault area or doors outside the property line, and that that area was not part of the leased premises. But the allocation for upkeep or repairs under the Lease is not dispositive of coverage under the insurance policy. "Coverage is determined by the terms of the policy, and is not affected by the finding in the underlying action that Waldman may have failed to satisfy any legal obligations to maintain the sidewalk." *Wesco Ins. Co*, 188 A.D.3d at 477. Coverage arises under the terms of the PIIC Policy by virtue of Hinde's ownership of the leased premises and PRFI's use of the leased premises, and not from any claim that PRFI had responsibility for the cellar doors. The provision focuses on whether the liability "aris[es] out of" the ownership, maintenance, and use of the leased premises, with no mention of the landlord or tenant as to those specific prongs. Whether it was PRFI or Hinde which was responsible for maintenance is thus irrelevant to the determination of coverage.
> . . .
> Finally, PIIC argues that the cases cited by Technology did not involve . . . "a claim in a location which the landlord and tenant mutually agreed in writing were not part of the leased premises." . . . With respect to "ownership," the cellar doors are expressly encompassed within the "scope" of the Sidewalk Law that attaches liability to owners of property abutting the sidewalk. *See Hernandez*, 170 N.Y.S.3d at 30. That PRFI and Hinde expressly disclaimed any lease of the *vault area* outside the property line in Paragraph 17 of the Lease does not mean that the loss did not arise from the ownership of leased area itself—separate from that vault area—which includes liability for the abutting cellar doors under the Sidewalk Law. With respect to the "use" and "maintenance" prongs of the policy, PIIC's argument reads the term "arising out of" out of the Additional Insured

provision. As noted, that term covers liability that arises from areas necessary for ingress and egress and not just from the leased premises itself. It is sufficient that the liability arose from the ownership or use of the demised premises even if the specific location of the accident was elsewhere. Coverage, in short, does not depend on whether the cellar doors were leased to PRFI.

642 F. Supp. 3d at 464-465.

Notwithstanding this case law broadly interpreting the provision to cover the landlord for all accidents occurring on sidewalks abutting the premises leased to the named-insured tenant, including in connection with sidewalk cellar doors, the court in *Wesco Ins. Co. v. Jewelers Mut. Ins. Co.*, 2025 N.Y. App. Div. LEXIS 729 (1st Dep't Feb. 6, 2025), recently found to the contrary in a case also involving a defect relating to cellar doors leading to a basement not leased to the named insured. In explaining the reasons for its decision, however, the court relied on facts contrary to those present here:

> Nonparty Rio De Oro Jewelry Corp. leased and operated a store on the ground floor of the premises owned by nonparty AKJR. As relevant to this appeal, the store was situated on the corner of Liberty Avenue and Eldert Lane in Brooklyn. The record shows that the store's sole entrance and storefront was located on the Liberty Avenue side of the building, while the Eldert Lane side of the store was a windowless, doorless wall. On the sidewalk abutting the Eldert Lane side of the store were cellar doors opening to a staircase leading to the building's basement. It is undisputed that at all relevant times the leased premises did not include, and that Rio otherwise had no access to nor an obligation to maintain, the basement or the cellar doors. While the basement was situated below the store, there was no internal access to the basement through the Rio jewelry store. Further, the record clearly establishes that another AKJR tenant had exclusive use and control over the basement and cellar doors. Additionally, while the lease obligated Rio to keep the sidewalk "in front of" the store (which we read to mean the Liberty Avenue storefront) free from obstructions, it is silent as to any similar duty regarding the Eldert Lane sidewalk with the cellar doors, and fails to impose upon Rio any broader duty regarding the sidewalks abutting the store.
> . . .
>
> Defendant is not obligated to cover AKJR as an additional insured because the injury did not arise out of AKJR's *ownership* of "that part of the premises leased to Rio" (*see General Acc. Fire & Life Assur. Corp. v*

14

*Travelers ins. Co.*, 162 AD2d 130, 132 [1st Dept 1990][denying coverage where relevant documents did not expressly expand coverage to incidents involving lessee's use of areas beyond those leased to the lessee]; *see cf. Tower Ins. Co. of NY v Leading Ins. Group ins. Co., Ltd.*, 134 AD3d 510, 510 [1st Dep't 2015][affirming declaration of coverage where lease obligated lessee to indemnify landlord for any damages arising out of use of demised premises or the streets and sidewalks adjacent thereto, as well as to maintain the sidewalk and curb]). The raised concrete panel which allegedly caused the underlying injury was part and parcel of the cellar doors, which was not part of Rio's demised premises, property which Rio had no obligation to maintain. As such, any liability resulting from the trip and fall did not arise out of AKJR's *ownership* of that part of the building leased to Rio. For these reasons, the court properly granted defendant's motion.

*Id.* at *1-3 (emphasis added).

First, consistent with Wesco's argument in that case[21], the *Jewelers* court focused exclusively on the "ownership" prong of the provision, ignoring the "maintenance" and "use" prongs. This is significant because, per the discussion supra, the courts have cited the latter when finding coverage under the rationale that sidewalks directly abutting ground-floor leased space are "necessarily used for access in and out of" that space. *See ZKZ*, 89 N.Y.2d at 991; *Isidore Margel*, 195 A.D.3d at 818; *Frank*, 123 A.D.3d at 881. That argument was not available to Wesco in the *Jewelers* case because, per the above-quoted discussion, the sidewalk area where that accident occurred was around the corner from the entrance to the leased store. Here, by contrast, the subject sidewalk area is directly between and close to two entrances to the leased space and is thus indeed "necessarily used for access in and out of" that space.

Moreover, unlike in *Jewelers*, the basement to which the cellar doors lead is accessible within the leased space here and is thus an inextricable part of that space, thereby supporting coverage under the "ownership" prong as well.

---

[21] See appellant's initial and reply briefs, NYSCEF (Index No. 2024-04153) Doc. Nos. 5 and 10.

Moreover, although the *Jewelers* court also relied on lease provisions governing the parties' sidewalk maintenance and repair obligations, that reliance stands in sharp contrast with the same court's finding in other cases cited above that such provisions do not impact coverage under the provision. As a stark example, in *Tower*—which the *Jewelers* court cited as implicit support because the court found coverage in that case after citing such lease provisions—the court stated: "Even if the lease did not address the sidewalk explicitly, the additional insured endorsement would give the landlords coverage for accidents occurring outside the demised premises, including on abutting public sidewalks." *Tower*, 134 A.D.3d at 510.

Moreover, in *Wesco Insurance Co. v. Rutgers Casualty Insurance Co.*, 202 A.D.3d 460, 460 (1st Dep't 2022), the court cited such lease provisions favoring the additional insured lessor as support for finding coverage under only the insuring clause's "maintenance" prong.

Thus, such lease provisions are only marginally relevant, if at all, in determining coverage under the insuring clause's "ownership" or "use" prongs, particularly where, as here, the alleged sidewalk defect is within a few steps of an entrance to the leased premises and is thus in an area necessarily used for access in and out of those premises.

16

823

**II.    Since the Underlying Action complaint alleges Miller was injured due to a hazardous condition on the sidewalk abutting the leased premises, CUMIS has a duty to defend UHAB.**

A liability insurer's "duty to defend arises whenever the allegations in a complaint against the insured fall within the scope of risks undertaken by the policy, regardless of how false or groundless those allegations might be." *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 310 (1984). This same broad duty-to-defend standard applies to additional insureds. *BP Air Conditioning Corp. v. One Beacon Ins. Group*, 8 N.Y.3d 708, 711 (2007).

Since the Underlying Action complaint alleges the accident occurred on the sidewalk abutting the leased premises, and that both UHAB and Credit Union are liable, it at least raises the possibility that UHAB is entitled to coverage under the CUMIS Policy, thus triggering CUMIS's duty to defend it. Wesco is thus entitled to a declaratory judgment to that effect.

**III.    Since Miller's claim is based exclusively on her allegation that she was injured due to a hazardous condition on the public sidewalk abutting the leased premises, CUMIS also has a duty to indemnify UHAB.**

Unlike the duty to defend, which, as discussed supra, "is measured against the allegations of pleadings," an insurer's duty to indemnify "is determined by the actual basis for the insured's liability." *Servidone Const. Corp. v. Security Ins. Co. of Hartford*, 64 N.Y.2d 419, 424 (1985). This difference derives from the fact that a duty to defend may be triggered even where uncovered claims are also asserted against the insured, whereas an insurer need only indemnify the insured against covered claims. *See BP Air Conditioning Corp. v. One Beacon Ins. Group*, 8 N.Y.3d 708, 714 (2007).

But if no uncovered claims are pleaded, there is no practical basis for distinguishing between the duty to defend and the duty to indemnify. Thus, as the courts have confirmed, a determination regarding an insurer's duty to indemnify before the insured's underlying liability has been determined is premature only "where the complaint in the underlying action alleges several grounds of liability, *some of which* invoke the coverage of the policy, and where the issues of indemnification and coverage hinge on facts which will necessarily be decided in that underlying action." *Hout v. Coffman*, 126 A.D.2d 973, 973 (4th Dep't 1987) (emphasis added); *see Prashker v. U.S. Guar. Co.*, 1 N.Y.2d 584, 590 (1956) (after concluding that some of the claims against insured in underlying complaint were covered and some not, Court found it could not rule on duty to indemnify until those claims were resolved in underlying action).

Thus, in cases where coverage does not pivot on which theory of liability against the insured prevails, including in connection with sidewalk trip-and-fall cases such as this one, the courts have found a duty to indemnify without a liability determination in the underlying action. *See, e.g., Regal Constr. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh,*

18

825

*PA.*, 15 N.Y.3d 34 (2010); *Wesco Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 188 A.D.3d 476 (1st Dep't 2020); *76-01 37th Ave. Realty Corp. v. Dongbu Ins. Co., Ltd.*, 146 A.D.3d 448 (1st Dep't 2017); *Maldonado v. Kissm 518 Ninth Corp.*, 18 A.D.3d 627 (2d Dep't 2005); *N.Y. Conv. Ctr. Oper. Corp. v. Morris Cerrullo World Evangelism, Inc.*, 269 A.D.2d 275 (1st Dep't 2000); *see generally Wausau Underwriters Ins. Co. v. Old Republic Gen. Ins. Co.*, 122 F.Supp.3d 44, 52-53 (S.D.N.Y. 2015) (discussing cases where the court found a duty to indemnify an additional insured before its liability in the underlying action was determined).

Here, Miller's claim against UHAB, as confirmed by his sworn testimony, is based exclusively on his allegation that his injuries were caused by a hazardous condition on the sidewalk abutting, and close to entrances to, the leased premises.[22] As shown *supra*, that claim, if proven true, would be covered under the CUMIS Policy, regardless of any other circumstances. Since Miller did not plead or testify to an alternate theory of liability against UHAB, let alone one not covered under the CUMIS Policy, CUMIS's duty to indemnify UHAB is established.

Accordingly, Wesco is entitled to a judgment declaring that CUMIS has a duty to indemnify UHAB in the Underlying Action.

---

[22] Underlying Action complaint, Gershweir Mov Afm. Ex. E.; Miller dep. tr., Gershweir Mov Afm. Ex. F, at pp. 28-46; photographs, Gershweir Mov Afm. G.

19

**IV.    The CUMIS Policy is primary to the Wesco Policy with respect to UHAB's coverage in the Underlying Action given the policies' respective "other insurance" clauses, thus requiring CUMIS to reimburse Wesco in full for the costs it has incurred and will incur defending and, if necessary, indemnifying UHAB.**

Although, like the CUMIS Policy, the Wesco Policy also covers UHAB for the claims against it in the Underlying Action, as explained below, the CUMIS Policy is primary to the Wesco Policy as respects UHAB's coverage. Thus, CUMIS's duty to defend and indemnify UHAB is primary and CUMIS must reimburse Wesco in full for the costs Wesco has incurred and will incur defending and, if necessary, indemnifying UHAB.

"Where the same risk is covered by two or more policies, each of which was sold to provide the same level of coverage (as is the case here), priority of coverage (or, alternatively, allocation of coverage) among the policies is determined by comparison of their respective 'other insurance' clauses." *Sport Rock Int'l, Inc. v. Am. Cas. Co. of Reading, PA*, 65 A.D.3d 12, 18 (1st Dep't 2009) (citations omitted). This analysis applies here because both policies were sold to provide primary commercial general liability coverage.

The Wesco Policy states it is primary unless "other primary insurance [is] available to you [UHAB] covering liability for damages arising out of the premises . . . for which you have been added as an additional insured," in which case it is excess.[23] Since UHAB is entitled to coverage as an additional insured under the CUMIS Policy covering such liability, the Wesco Policy purports to be excess.

The CUMIS Policy's applicable "other insurance" clause states that the policy "is primary and will not seek contribution from any other insurance available to an additional

---

[23] Wesco Policy, Gershweir Mov. Afm. Ex. B, at at Commercial General Liability Coverage Form, § IV, ¶ 4.b.(1)(b), p. 12.

insured [if]: a. The additional insured is a Named Insured under such other insurance; and b. You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured."

First, unlike other "other insurance" clauses in the same provision identifying those circumstances under which the policy is "excess" to other insurance[24], this clause does not purport to render the CUMIS Policy excess to any other insurance available to an additional insured under any circumstances and instead only purports to identify the circumstances under which the policy will be both primary *and non-contributory* vis-à-vis such other insurance. That is, this provision merely purports to render the policy co-primary with other primary insurance available to the additional insured if those conditions are not satisfied. For that reason alone, when read together with the Wesco Policy provision expressly rendering that policy excess to such other insurance, the CUMIS Policy is primary to the Wesco Policy as respects UHAB's coverage, whether or not the other conditions are satisfied.

In any event, the New York courts have found that, even where a contract does not explicitly require that additional-insured coverage be primary, it is necessarily implied as the clear purpose of such insurance-procurement provisions is to require the promisor's coverage to cover both parties on the same, primary basis. Thus, the courts have found that such non-explicit insurance-procurement provisions fall within the scope of any exception to an excess "other insurance" clause that applies where the underlying contract requires that the additional-insured coverage be primary. *See Pecker Iron Works of N.Y.,*

---

[24] *Id*. at Business Liability Coverage — Property and Business Liability form, Additional Conditions, Other Insurance, ¶ 1.b., p. 24.

Case 1:25-cv-02172-PAE Document 1-2 Filed 03/17/25 Page 830 of 834

*Inc. v. Traveler's Ins. Co.*, 99 N.Y.2d 391, 393-94 (2003); *Wm. Floyd Sch. Dist. v. Maxner*, 68 A.D.3d 982, 986-87 (2d Dep't 2009), *rev'g* No. 05-18003, 2008 N.Y. Misc. LEXIS 10516 (Sup. Ct. Suffolk County Oct. 6, 2008). Accordingly, even though the lease here does not explicitly require that the coverage protecting UHAB be primary and non-contributory, it must be read as such, thereby satisfying the CUMIS Policy's "other insurance" clause's requirement that the underlying contract require such coverage.[25]

Since the CUMIS Policy is thus primary to the Wesco Policy as respects UHAB's coverage, CUMIS must reimburse Wesco in full for the amounts it has spent and will spend to defend and, if necessary, indemnify UHAB in the Underlying Action. *See Village of Brewster v. Virginia Sur. Co., Inc.*, 70 A.D.3d 1239, 1242-43 (3d Dep't 2010); *Harleysville Ins. Co. v. Utica Ins. Co.*, 38 A.D.3d 1364, 1367 (4th Dep't 2007).

Finally, Wesco is entitled to recover 9% statutory interest on the defense and indemnity amounts from the date of payment under CPLR § 5001. *See, e.g., U.S. Fire Ins. Co. v. Fed. Ins. Co.*, 858 F.2d 882, 887-89 (2d Cir. 1988); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Greenwich Ins. Co.*, 103 A.D.3d 473, 474 (1st Dep't 2013).

---

[25] CUMIS Policy, Gershweir Mov. Afm. Ex. A, at Businessowners Coverage Form, § III, ¶ H., p. 48.

## Conclusion

Based on the foregoing, Wesco respectfully requests that this Court issue an order granting its motion; and that it grant such further relief as the Court deems just and proper.

Dated:     New York, New York
           March 6, 2025

                              Respectfully submitted,

                              GUNNERCOOKE US LLP

                              By: _____

                                   Max W. Gershweir
                              Attorneys for Plaintiff
                              475 Park Avenue South – 23rd Floor
                              New York, New York 10016
                              646.440.8375

23

830

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 832 of 834

## WORD COUNT CERTIFICATION

Your affirmant certifies the word count of this Memorandum of Law contains 6,315 words and complies with the word count limit of Rule 202.8-b of the Uniform Civil Rules for the Supreme Court and the County Court. This word count was calculated by the word-processing system used to prepare this document.

Dated:       New York, New York
             March 6, 2025

_____
Max W. Gershweir

831

Case 1:25-cv-02172-PAE   Document 1-2   Filed 03/17/25   Page 833 of 834



# REQUEST FOR JUDICIAL INTERVENTION

UCS-840
(rev. 12/16/2024)

## Supreme COURT, COUNTY OF New York

Index No: _____655437/2024_____    Date Index Issued: ____10/16/2024____

| **CAPTION** | Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet. | **For Court Use Only:** |
|---|---|---|

Wesco Insurance Company

**IAS Entry Date**

*Plaintiff(s)/Petitioner(s)*

-against-

**Judge Assigned**

CUMIS Insurance Society, Inc.

**RJI Filed Date**

*Defendant(s)/Respondent(s)*

## NATURE OF ACTION OR PROCEEDING:    Check only one box and specify where indicated.

### COMMERCIAL

- ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ☐ Contract
- ☒ Insurance (where insurance company is a party, except arbitration)
- ☐ UCC (includes sales and negotiable instruments)
- ☐ Other Commercial (*specify*): _____

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)**.*

### TORTS

- ☐ Asbestos
- ☐ Environmental (*specify*): _____
- ☐ Medical, Dental or Podiatric Malpractice
- ☐ Motor Vehicle
- ☐ Products Liability (*specify*): _____
- ☐ Other Negligence (*specify*): _____
- ☐ Other Professional Malpractice (*specify*): _____
- ☐ Other Tort (*specify*): _____

### SPECIAL PROCEEDINGS

- ☐ Child-Parent Security Act (*specify*): ☐ Assisted Reproduction ☐ Surrogacy Agreement
- ☐ CPLR Article 75 - Arbitration    [see ***NOTE*** in **COMMERCIAL** section]
- ☐ CPLR Article 78 - Proceeding against a Body or Officer
- ☐ Election Law
- ☐ Extreme Risk Protection Order
- ☐ MHL Article 9.60 - Kendra's Law
- ☐ MHL Article 10 - Sex Offender Confinement (*specify*): ☐ Initial ☐ Review
- ☐ MHL Article 81 (Guardianship)
- ☐ Other Mental Hygiene (*specify*): _____
- ☐ Other Special Proceeding (*specify*): _____

### MATRIMONIAL

- ☐ Contested

   *NOTE: If there are children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum (UCS-840M)**.*

   *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI **(UD-13)**.*

### REAL PROPERTY   Specify how many properties the application includes: _____

- ☐ Condemnation
- ☐ Mortgage Foreclosure (*specify*): ☐ Residential    ☐ Commercial

   Property Address: _____

   *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the **FORECLOSURE RJI ADDENDUM (UCS-840F)**.*

- ☐ Partition

   *NOTE: Complete and attach the **PARTITION RJI ADDENDUM (UCS-840P)**.*

- ☐ Tax Certiorari (*specify*): Section: _____ Block: _____ Lot: _____
- ☐ Tax Foreclosure
- ☐ Other Real Property (*specify*): _____

### OTHER MATTERS

- ☐ Certificate of Incorporation/Dissolution    [see ***NOTE*** in **COMMERCIAL** section]
- ☐ Emergency Medical Treatment
- ☐ Habeas Corpus
- ☐ Local Court Appeal
- ☐ Mechanic's Lien
- ☐ Name Change/Sex Designation Change
- ☐ Pistol Permit Revocation Hearing
- ☐ Sale or Finance of Religious/Not-for-Profit Property
- ☐ Other (*specify*): _____

## STATUS OF ACTION OR PROCEEDING    Answer YES or NO for every question and enter additional information where indicated.

|  | YES | NO |  |  |
|---|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ☒ | ☐ | If yes, date filed: | 10/15/2024 |
| Has a summons and complaint or summons with notice been served? | ☒ | ☐ | If yes, date served: | 10/28/2024 |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: | |

## NATURE OF JUDICIAL INTERVENTION    Check one box only and enter additional information where indicated.

- ☐ Infant's Compromise
- ☐ Extreme Risk Protection Order Application
- ☐ Note of Issue/Certificate of Readiness
- ☐ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
- ☒ Notice of Motion    Relief Requested: Judgment - Summary _____    Return Date: 03/28/2025
- ☐ Notice of Petition    Relief Requested: _____    Return Date: _____
- ☐ Order to Show Cause    Relief Requested: _____    Return Date: _____
- ☐ Other Ex Parte Application    Relief Requested: _____
- ☐ Partition Settlement Conference
- ☐ Request for Preliminary Conference
- ☐ Residential Mortgage Foreclosure Settlement Conference
- ☐ Waiver of Court Costs, Fees and Expenses
- ☐ Writ of Habeas Corpus
- ☐ Other (*specify*): _____

832

Case 1:25-cv-02172-PAE     Document 1-2     Filed 03/17/25     Page 834 of 834

| RELATED CASES | List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | | |
|---|---|---|---|---|
| **Case Title** | **Index/Case Number** | **Court** | **Judge (if assigned)** | **Relationship to instant case** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| PARTIES | For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | | |
|---|---|---|---|---|

| Un-Rep | Parties<br><br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br><br>For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined<br><br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br><br>For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: Wesco Insurance Company<br><br>Role(s): Plaintiff/Petitioner | MAX GERSHWEIR, Gunnercooke US LLP, 475 Park Avenue South, 23rd Fl , New York, NY 10016, 646-440-8375, max.gershweir@gunnercooke.com | ☒ YES ☐ NO | |
| ☐ | Name: CUMIS Insurance Society, Inc.<br><br>Role(s): Defendant/Respondent | DEBORAH RENNER, Dentons US LLP, 1221 Avenue of the Americas , New York, NY 10020, 212-398-5793, deborah.renner@dentons.com | ☒ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated:   03/06/2025

MAX WILLIAM GERSHWEIR
_____
Signature

2605137
_____
Attorney Registration Number

MAX WILLIAM GERSHWEIR
_____
Print Name